**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 17-23429-Civ-COOKE/GOODMAN**

JEFF RODGERS, PATRICIA RODGERS,
MICHAEL LAVIGNE, JENNIFER LAVIGNE,
CODY PYLE, JENNIFER RIBALTA, IZAAR
VALDEZ, FELIX VALDEZ, individually and on
behalf of all others similarly situated,
                  Plaintiffs,

v.

HERBALIFE, LTD., et al.,
                  Defendants.

_____/

**RESPONSE IN OPPOSITION TO**
**DEFENDANTS' JOINT MOTION TO COMPEL ARBITRATION**

      Plaintiffs Jeff Rodgers, Patricia Rodgers, Michael LaVigne, Jen LaVigne, Izaar Valdez, Felix Valdez, Cody Pyle and Jen Ribalta ("Plaintiffs") respond to Defendants' Joint Motion to Compel Arbitration ("Motion") [ECF No. 62] as follows:

## I.    INTRODUCTION

      What a tangled web we weave. Years of litigation, unfavorable press, and an FTC enforcement action have produced a Frankenstein of sorts: a mélange of internally inconsistent contractual provisions, many of which purport to incorporate the other, several contradictory dispute resolution processes, dozens of revisions and hundreds of pages of rules and "codes of conduct." While courts favor arbitration, the burden rests squarely on the Defendants to prove its applicability by a preponderance of the evidence. *Newton v. Am. Debt Servs., Inc.*, 854 F. Supp. 2d 712, 721 (N.D. Cal. 2012), *aff'd*, 549 F. App'x 692 (9th Cir. 2013).[1] And, "[w]hen evaluating a motion to compel arbitration, courts treat the facts as they would when ruling on a motion for summary judgment, construing all facts and reasonable

---

[1] Defendants have argued that the Plaintiffs' claims are governed by California law based upon choice of law provisions found in a number of the amendments to the documents that they claim are relevant to the formation of the contract between Plaintiffs and Defendant Herbalife. Florida law follows California law with regard to the dispositive issues of this motion, but to quash any claim that Plaintiffs did not use the proper case precedent for their analysis, the case law cited is primarily California and Ninth Circuit case law.

inferences that can be drawn from those facts in a light most favorable to the non-moving party." *Totten v. Kellogg Brown & Root, LLC*, 152 F. Supp. 3d 1243, 1249 (C.D. Cal. 2016).

Moreover, although "doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522, 526 (2d Cir. 2011). Defendants have failed to satisfy their burden.

This failure is particularly glaring in light of the contract of adhesion at issue.[2] Ambiguities permeate the mass of rules arbitrarily imposed on Plaintiffs, and these ambiguities are construed against the drafter, a rule that "applies with peculiar force in the case of a contract of adhesion." *Sandquist v. Lebo Auto., Inc.*, 1 Cal. 5th 233, 248 (Cal. 2016). *Varela v. Lamps Plus, Inc.*, 701 F. App'x. 670, 672 (9th Cir. 2017).

Plaintiffs filed a class action Complaint against the Defendants [ECF No. 1] asserting claims for violations of RICO, deceptive and unfair trade practices, unjust enrichment, and negligent misrepresentation in connection with Defendants' deceptive event system designed to lure Plaintiffs, and others similarly situated, under false pretenses for Defendants' sole financial benefit. This Complaint is not about the commissions paid, the well-trod alleged Herbalife "pyramid," or the products Herbalife peddles. It is about a cabal of Individual Defendants and their organizations who, together with Herbalife, have bamboozled hundreds of thousands of individuals – often lower-income, first generation Americans – into attending an unceasing calendar of events with the promise that attendance will result in significant financial success for them personally. Herbalife's "contract" is not mentioned in the Complaint, nor is reference to it required; it is relevant only as a stark illustration of Herbalife's relentless abuse and manipulation of its own distributors.

---

[2] A contract of adhesion is a "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Everest Biosynthesis Group, LLC v. Biosynthesis Pharma Group Ltd.*, 2018 WL 325123, at *4 (S.D. Cal. Jan. 8, 2018). Unquestionably, the "take it or leave it" Application (defined *infra* at 3) signed by six of the Plaintiffs is a contract of adhesion.

## II.    ARGUMENT AND STATEMENT OF UNDISPUTED FACTS

The following facts are undisputed:[3]

Herbalife claims an unfettered right to amend its contract with the Plaintiffs, with or without notice, rendering it illusory and unconscionable. Ex. 1 at 85:24 – 86:2. It has exercised this "right" dozens of times, including in 2013 when it modified the Application to add an arbitration provision, a jury waiver, and a class action waiver – each of which it now seeks to enforce against the Plaintiffs.

Notification of amendments are provided sporadically, and often months after the amendments have become "effective." These amendments are commonly characterized as "new and improved," and are designed to reconfigure a distributor's rights while leaving them no opportunity to object, opt out, accept or acknowledge a new and dramatically altered business relationship. For example, Defendants argue that amendments to the Rules of Conduct, including the addition of the arbitration provision, became effective on October 28, 2013 without any notice to distributors. *See* Ex. 1 at 88:5-7. Four months later, on February 13, 2014, Herbalife emailed a summary announcement covering the previous *four* versions of the Rules of Conduct, including the addition of the arbitration provision. *See* Motion at Ex. C.

The truncated agreements, executed by six of the Plaintiffs[4] (referred to by Defendants as "Distributor Agreements" and referred to herein as the "Applications") purport to incorporate hundreds of pages of documents unseen at the time of execution.[5] These include Rules of Conduct, Distributor Policies, Sales and Marketing Plans, Ordering Procedures and Sample Forms (none of which are defined), "together with such modifications and amendments as Herbalife shall make from time to time in its sole and absolute discretion." These hundreds of pages of Rules are not provided to the applicant before she completes her online Application – they are either mailed to her, or they are otherwise available on myherbalife.com. Ex. 1 at 55:23 – 57:2.

---

[3] Roxane Romans, Herbalife's Senior Director of Member Policy Administration, submitted a declaration in support of Herbalife's Motion to Compel, and was deposed on January 24, 2018.  Her deposition testimony is attached hereto as **Exhibit 1**.
[4] Neither Mr. Rodgers nor Mr. LaVigne signed an Application.
[5] A prospective distributor cannot access the Rules of Conduct on myherbalife.com until she receives login credentials; which are not available until she signs up as a distributor.

Herbalife requires distributors to stay apprised of frequent rule changes by utilizing myherbalife.com, but the Terms of Use governing that site – and any claims arising out of or relating to Herbalife's "products or services" – expressly supersede any other contract with Herbalife. The Terms do not permit arbitration and instead require that any action be filed in a judicial proceeding in California.[6]

Herbalife has already taken the position that "the arbitration agreement . . . [does] not affect preexisting members who simply remained members after September 2013."[7] It is estopped from taking the opposite position here.

Finally, the Defendants have not shown the Court that the Plaintiffs ever saw (much less agreed to) the 2016 arbitration provision it now seeks to enforce. There is no record before this Court that any Plaintiffs were sent, or actually received, notice of the addition of this provision.[8]

Layered on top of these significant hurdles are a host of contractual ambiguities[9] and conflicts between provisions, leaving the Court, Herbalife, and hundreds of thousands of distributors to parse through a formless, ever-shifting blob, that even Herbalife's own Senior

---

[6] The Terms of Use are available on http://myherbalife.com.

[7] *See Bostick et al. v. Herbalife International, Inc. et al.*, Case No. 13-CV-02488-BRO-RZ filed in the United States District Court, Central District of California, ECF No. 137 at 6, attached hereto as **Exhibit 2**. The Court may take judicial notice of Exhibits 2, 9, 10 and 11 hereto, all of which were filed in the *Bostick* action, pursuant to Fed. R. Civ. P. 201(c)(2). *See also Universal Express, Inc. v. U.S. SEC*, 177 Fed.Appx. 52, 53 (11th Cir. 2006) (holding that judicial notice of public records, such as court filings, is proper); *Navarro v. City of Riviera Beach*, 192 F. Supp. 3d 1353, 1364 (S.D. Fla. 2016) (same).

[8] Ms. Romans recalled conducting an investigation to determine whether any of the Plaintiffs actually received the notice but could not "recall" the results of that investigation. Ex. 1 at 114:2-115:5. Defendants have produced nothing to show that Plaintiffs were sent notice of amendments.

[9] By way of example, version 28 of the Rules of Conduct from July 2013 includes an arbitration provision, and incongruously incorporates a "Form" (which is purported to be equally binding on the distributor) providing for any dispute to be litigated in court in California. *Compare* ECF No. 62-2 at 192 of 771 *with* ECF No. 62-2 at 244 of 771. The November 2016 version of the Rules (version 33) incorporates the Direct Selling Association Code of Ethics with a detailed complaint process, appeals procedure and "any appropriate remedies" while simultaneously providing that any dispute must be initiated in arbitration. *Compare* Motion at ECF No. 62-2 at 607 of 771 *with* ECF No. 62-2 at 703-4 of 771. That same version of the Rules provides for an exception to the arbitration provision in one part of the Rules (intellectual property claims) and an entirely different exception in a separate part of the same Rules (federal, state or local law enforcement). *Compare* Motion at ECF No. 62-2 at 607 of 771 *with* ECF No. 62-2 at 679-80 of 771. One provision of the Applications incorporates policies and rules "in its then most recently published form," and a later provision states that "[t]his Agreement (including documents incorporated herein, in their then published form) constitutes the entire Agreement between Herbalife and me." *Compare* Motion, Ex. I at ¶ 4 with ¶11(b) (emphasis added).

Director of Member Policy Administration could not understand.[10] Construing all facts and reasonable inferences in favor of Plaintiffs, as the Court must do here, mandates the denial of Defendants' Motion.

Within the Plaintiffs are two groups – those who signed documents containing arbitration provisions (Ms. LaVigne, Mr. Pyle and Mr. Valdez) and those who did not (Ms. Rodgers, Ms. Ribalta and Ms. Valdez executed Applications without arbitration provisions and neither Mr. LaVigne nor Mr. Rodgers signed any Application), contrary to Defendants' sweeping contention that "Plaintiffs expressly agreed to arbitrate precisely the types of claims that they now bring against Herbalife and the individual Defendants in this lawsuit." Motion at 1.[11] In fact, each of Ms. Rodgers, Ms. Ribalta (f/k/a Loken), and Ms. Valdez signed Applications providing that any claim arising out of or relating to the Application be "resolved exclusively in a judicial proceeding in either the Superior Court or the United States District Court…" *See* **Exhibit 3** (Rodgers Application), **Exhibit 4** (Ribalta Application) and **Exhibit 5** (I. Valdez Application).

**A. The Arbitration Provisions Do Not Apply to Any of the Plaintiffs.**

The arbitration provision does not apply to any of the Plaintiffs for two reasons. First, Herbalife's ability to amend these agreements at any time, without notice, renders them illusory. Second, Defendants expressly superseded those provisions by incorporating conflicting provisions mandating the filing of any claim in a judicial proceeding in California.

1. The unilateral right to amend has rendered the contract illusory and unconscionable.

It is well-established that under California law, a contract permitting one party to unilaterally amend the contract at any time, in its sole discretion, is illusory. *Harris v. Tap Worldwide, LLC*, 248 Cal. App. 4th 373, 385 (Cal. App. 2d Dist. 2016). This "is not fatal to its enforcement, if the exercise of the power is subject to limitations, such as fairness and

---

[10] *See* Ex. 1 at 148:10-16 (witness unable to answer what provision controls in the event of a conflict); or to which provisions distributors are bound because "I am not a lawyer." *Id.* at 134:13-22; 136:3-18; 147:23 – 148:10. Ms. Romans did not have an issue opining in her declaration about the provisions of the various contracts to which distributors were subject or the legal effect of various modifications. *See* Motion at Ex. A (Romans Decl.) at ¶¶ 6, 8, 10.

[11] Felix Valdez signed an application in 2008 containing a uniquely unconscionable arbitration provision. According to Herbalife, that contract was replaced by one without an arbitration provision in 2009, and then replaced again in 2013 by one with yet another arbitration provision.

reasonable notice." *Id.* at 388. Without those limitations, however, the contract will be determined to be illusory and unenforceable.[12]

There are no such limitations here. And, "if a contractual provision allows one side, particularly the side with stronger bargaining power, to completely turn an agreement on its head, then there is no reason for a court to go further – this is unconscionable."[13] *Ridgeway v. Nabors Completion & Production Serv. Co.*, 139 F. Supp. 3d 1084, 1092-93 (C.D. Cal. 2015).

When asked whether "there are any parameters as to Herbalife's ability to amend the Rules of Conduct," Ms. Romans testified that there were not. Ex. 1 at 85:24 – 86:2. Herbalife has no obligation to notify its distributors of any amendment, much less that distributors must consent to the amendment. Instead, an Herbalife distributor "is bound by whatever, at any given date and time, whatever the rules are at that time." *Id.* at 78:3-6. Unlike in *Harris*, where any amendment to the arbitration provision had to be in writing, signed by both parties, and without oral modification, here no recognition or acceptance of a modification is required or expected. Instead, Herbalife shifts the burden to the individual distributors to stay apprised of notices by regularly visiting myherbalife.com. *See* Ex. 1 at 92:12-25. Although certain generic notices are (allegedly) emailed to distributors, Herbalife argues that material changes are deemed effective as to all existing distributors without any acceptance, acknowledgement or even the receipt of a notice for it to be effective. Ex. 1 at 98:8-11 ("Q: And regardless of whether or not any distributor receives this e-mail, they are still bound by the Rules of

---

[12] The Court should find the Application and its subsequent unilateral amendments illusory and strike them. Alternatively, the Court may conduct the same analysis and determine that the Application and its subsequent unilateral amendments are procedurally and substantive unconscionable. Both are plainly present here. An agreement or any portion thereof is procedurally unconscionable if "the weaker party is presented the clause and told to 'take it or leave it' without the opportunity for meaningful negotiation." *Szetela v. Discover Bank*, 97 Cal. App. 4th 1094, 1100 (Cal. App. 4th Dist. 2002). Thus, a contract is procedurally unconscionable under California law if it is "a standardized contract, drafted by the party of superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 996 (9th Cir. 2010). Further, the unilateral right to amend is regularly considered to meet the standard for substantive unconscionability under California law. *See e.g. Ridgeway v. Nabors Completion & Production Services Co.,* 139 F. Supp. 3d 1084, 1092-93 (C.D. Cal. 2015).

[13] To be sure, although the addition of the arbitration provision in 2013 is the most egregious example, Herbalife has completely rewritten its rules and policies via this unilateral amendment process. For example, through these amendments Herbalife has completely changed how distributors can market, sell and make money in the "business opportunity."

Conduct, correct? A: Correct"). Herbalife has proffered no record evidence that any notice was ever actually provided to the Plaintiffs.[14]

In *Roling v. E\*Trade Securities, LLC*, the Court invalidated a nearly identical contract which allowed the defendant to amend at any time, but which shifted the burden to the consumer to continually check the website for updates. *Roling v. E\*Trade Securities, LLC*, 756 F. Supp. 2d 1179, 1190 (N.D. Cal. 2010). This case is even more egregious as the provision in the Rules of Conduct that "requires" distributors to "Keep Informed of Herbalife's Policies" (Rule 8(C)) was removed in 2014 and was not replaced by an equivalent rule.[15] *See also Diverse Elements, Inc. v. Ecommerce, Inc.*, 5 F. Supp. 3d 1378, 1382 (S.D. Fla. 2014) (applying Florida law in finding an agreement illusory where amendment is permissible without notice); *In re Winn-Dixie Stores, Inc.*, 639 F.3d 1053, 1057 (11th Cir. 2011) ("Appellants argue that their original claims contained language reserving the right to amend and supplement those claims. But such language cannot, as a matter of law, be construed to protect in *perpetuity* appellants' right to amend their claims. Such a construction of this language would truly render illusory all finality achieved by a reorganization plan").

Herbalife argues that "while the Rules generally grant Herbalife the sole and absolute discretion to amend the Rules, the right to amend the Arbitration Provisions is limited such that amendments do not apply to claims that 'have accrued or are otherwise known to Herbalife at the time.'" Motion to Compel at 7. Herbalife will rely on *Peleg v. Neiman Marcus Group, Inc.*, for the proposition that the covenant of good faith and fair dealing "impliedly restricts" a "unilateral modification provision that is silent as to whether contract changes apply to claims, accrued or known," so that subsequent amendments do not apply to those claims. 204 Cal. App. 4th 1425, 1465 (Cal. App. 2d Dist. 2012). Accordingly, this exemption "saves" the contract from being deemed illusory because it cannot apply to "known" or "accrued" claims. This qualification fails for a few reasons.

---

[14] Plaintiffs sought production of all documents relating to these "notices" sent to Plaintiffs. Although a generic example notice was provided, Herbalife did not produce records of actual notifications sent to the Plaintiffs here.
[15] Incredibly, Ms. Romans states in her Declaration that even after Rule 8(C) was removed from the Rules of Conduct, distributors were still subject to its requirements, because a later version of the Rules provided that "Members must comply with the laws and the Rules and that members are to review these Rules with downline members." Ex. 1 at 121:2-14. Ms. Romans was unable to point to any current rule that required distributors to continually "stay informed" of the modifications to the Rules, as Rule 8(C) purportedly had.

First, in its Motion to Dismiss, Herbalife argues that Plaintiffs' claims were known to it in 2013 – indeed, Herbalife contends in this action that the Plaintiffs in *Bostick* were complaining about the same misrepresentations that Plaintiffs complain of here. *See* ECF No. 70 at 3 ("Like the Plaintiffs here, the *Bostick* Plaintiffs alleged primarily that Herbalife had misrepresented to them that if they 'put in the time, effort and commitment,' they could successfully pursue the Herbalife business opportunity…Additionally, the *Bostick* Complaint, like the Complaint here, alleged that such misrepresentations were made at Herbalife-sponsored events"). Herbalife argues that the claims made here are duplicative of those in *Bostick* and therefore were released. By their own admission then, these claims were "known to Herbalife at the time" and cannot be subject to arbitration provisions added subsequently.

Second, this "saving" provision does not appear in any of Plaintiffs' Applications. It was only added in 2014 in an apparent attempt to comply with prevailing California law. For the Court to consider the application of this provision, it must first accept Herbalife's position that it can amend at any time without notice, and then impose such amendments to an Application that was illusory and unenforceable in the first instance.

Third, the implied covenant of good faith and fair dealing will not apply if there is language directly contradicting this "saving" language. *See Peleg*, 204 Cal. App. 4th at 146 ("[i]f, on the other hand, an arbitration agreement expressly applies a contract change to such claims, the covenant cannot vary the plain language, and the agreement is illusory"). Here, the two post-2013 Applications that contain arbitration provisions executed by Plaintiffs belie Herbalife's narrow "saving" exception, expressly ordaining that the provision applies retroactively to "**claims that arose** before this or any prior agreement between Herbalife and Member." *See* **Exhibit 6** at 8 (LaVigne Application) and **Exhibit 7** at 8 (Pyle Application). The application of amendments to "claims that arose" prior to those amendments, is in direct contradiction with Herbalife's futile attempt to inject "fairness" into these contracts. Herbalife's self-serving limitation will not save it here.

Most importantly, this exception does nothing to address the issue of notice; it solely addresses "fairness." Herbalife fails to address its absence of an obligation to provide notice of rule changes to its distributors.

2. <u>The Applications were superseded by subsequent terms and conditions that do not require arbitration.</u>

The Defendants here have elected to play a game of "gotcha."  On a grossly uneven playing field, the Defendants have taken the position that because the Application expressly incorporates Herbalife policies that exist now or may exist in the future, the Plaintiffs are bound by provisions buried in the morass that did not even exist at the time of contract. As discussed above, the Defendants further press their advantage by requiring individual distributors to stay informed of amendments by visiting the myherbalife.com website, thus abdicating any responsibility to communicate directly with the distributors and allowing mere website postings to suffice. Defendants conspicuously ignore one of these policies, the Terms of Use ("Terms") on the myherbalife.com website, which Herbalife's Senior Director of Member Policy Administration testified was also incorporated into the Applications in its current and future form.  *See* Ex. 1 at 73:12 – 74:16; 125:5-24 (agreeing that the Terms would be "one of the written policies that provide the terms and conditions under which a distributor must operate his or her distributorship"). This omission is glaring, considering that, of all the contracts to which Defendants argue Plaintiffs are bound, only the Terms contain express language superseding all other contracts.

These Terms appear prominently on myherbalife.com – the same website that Defendants argue Plaintiffs are required to regularly visit to "stay informed of Herbalife's policies." *See* Motion at Ex. A. (Romans Decl.), ¶ 8. These Terms require any lawsuit to be brought in a judicial proceeding in California, and express a clear intent not to arbitrate disputes:

> Any dispute between you and us must be brought before state or federal courts located in Los Angeles County, California within ninety (90) days after the occurrence of the facts giving rise to the cause of action, otherwise the cause shall be forever barred.[16] **You hereby consent and submit to the exclusive personal jurisdiction and venue of the courts located in Los Angeles, California for any cause of action relating to or arising under this Agreement or the Site.**

---

[16] This "private statute of limitations" is unenforceable under California law. *Ellis v. U.S. Sec. Associates*, 169 Cal. Rptr. 3d 752, 761 (Cal. App. 1st Dist. 2014).

Terms (last revised Feb. 2, 2017) (emphasis added), **Exhibit 8** hereto.

The Terms[17] expressly supersede all prior agreements between the parties and purport to encompass

> your use of this website and each Independent Distributor's Platform and each Web Property (collectively referred to herein as the "Site") <u>and for your purchase and/or use of any Herbalife goods, services</u> . . . This Agreement and the Herbalife Privacy Policy and any other terms and policies incorporated herein by reference (collectively, the "Other Policies"), <u>constitute the entire agreement between you and us pertaining to the subject matter hereof and supersede all prior or other arrangements, understandings, negotiations and discussions, whether oral or written</u>.

*Id.*; *see also* Ex. 1 at 131:22-132:12.

These Terms do not require arbitration of this, or any, dispute. Herbalife has a "heavy burden" in seeking to avoid this forum selection clause. *See Doe 1 v. AOL LLC,* 552 F.3d 1077, 1083 (9th Cir. 2009) ("[T]he party seeking to avoid a forum selection clause bears a 'heavy burden' to establish a ground upon which ... the clause is unenforceable").

Thus, even taking Defendants' arguments at face value, an analysis of the agreements on which Defendants rely shows that no applicable agreement to arbitrate this case exists because any arbitration clause is superseded by the Terms. *See Applied Energetics*, 645 F.3d at 526; *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1122 (11th Cir. 2014) ("And when 'all prior agreements' are superseded, as they were here, a prior arbitration agreement is superseded because it obviously fits within the category of 'all prior agreements'"). In *Dasher*, 745 F.3d 1111, the original account agreement between the parties provided for arbitration of disputes. A subsequent agreement was issued to customers containing new terms and conditions that did not require arbitration. The court held that the subsequent agreement governed and arbitration was not required. *Id.* at 1119. It further found that because the question before the court was essentially "a dispute about whether a 'validly formed… agreement' has been

---

[17] Plaintiffs do not believe any of the cited agreements apply to this dispute and believe that various provisions within them are unenforceable, however, Defendants claim that the Terms apply. Those Terms directly contradict Defendants' assertion that there is an applicable agreement to arbitrate. Therefore, in view of all the terms and provisions which Defendants claim apply, Herbalife has expressed a clear intent not to arbitrate by incorporating terms that supersede and are inconsistent with arbitration. Over a flurry of objections, Ms. Romans admitted that the Terms stated that they superseded all other terms, but as she is not an attorney, she would not opine on what that meant. Ex. 1 at 133:14 – 135:20.

made," the "district court properly refused to apply the FAA's presumption in favor of arbitrability." *Id.* at 1116. Similarly, here, Herbalife chose to impose new terms on the parties that are inconsistent with arbitration. Not only do the Terms not include an arbitration provision, they express a contrary requirement to litigate all disputes. *See* Ex. 8 at §20. Such language stands in direct conflict with the requirement to arbitrate:

> Here, the Placement Agreement's language that "[a]ny dispute" between the parties "shall be adjudicated" by specified courts stands in direct conflict with the Engagement Agreement's parallel language that "any dispute … shall be resolved through binding arbitration." Both provisions are all-inclusive, both are mandatory, and neither admits the possibility of the other.

*Applied Energetics*, 645 F.3d at 525. Thus, unlike contracts in which a venue provision does not conflict with an arbitration clause on the theory that matters not within the scope of the arbitration clause could still be litigated, the mandate in the Terms that all disputes must be submitted to the exclusive jurisdiction of California courts does not admit the possibility of arbitration. Because the Terms, which mandate litigation of disputes, supersede the Applications, no applicable arbitration agreement exists between the parties.

Based on the foregoing, the arbitration provision is either illusory, unconscionable or superseded by the Terms and is therefore inapplicable to each Plaintiff.

### B. The Delegation Clause Fails.

It is within this Court's purview to consider and resolve whether the Defendants have satisfied their burden to demonstrate the existence of a valid agreement to arbitrate. The delegation provision at issue here does not change that fact. Defendants correctly note that "the question 'who has the power to decide arbitrability' turns upon **what the parties agreed about that matter.**" Mot. at 9 (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (emphasis added by Defendants)). This principle applies with greater force to the question of delegation because it is subject to a "heightened standard" requiring the delegation to be "clear and unmistakable" to be effective. *Pinela v. Neiman Marcus Group, Inc.*, 238 Cal.App.4th 227, 239-40 (2015). This is so because the reasonable expectation of the parties would ordinarily be for the Court to decide the gateway issues concerning arbitrability. *Id.* This is particularly important in the context of an adhesion contract, such as the one at issue here. *Id.* at 246-48.

First, before reaching any further questions concerning the arbitration provision, including any delegation clause within it, the Defendants must satisfy their threshold burden of showing that a presumptively applicable agreement exists. They have not done so. *Bruni v. Didion*, 160 Cal.App.4th 1272, 1284 (A court "still must consider one type of challenge to the overall contract: a claim that the party resisting arbitration never actually agreed to be bound. Where "a party's apparent assent to a written contract is negated…, there is simply no arbitration agreement to be enforced.") (citations omitted). Instead, as demonstrated herein (*see infra* §§ C, D, and *supra* § A), Defendants seek to enforce, in the context of an adhesion contract, one of several iterations of an arbitration clause and associated delegation provision that have not been mutually agreed upon, that were unilaterally imposed on the Plaintiffs without notice, and that are subject to change at any time without notice. Specifically, Defendants seek to apply the most recent dispute resolution provision contained within the Rules of Conduct while ignoring the most recent dispute resolution provision contained within the Terms (which does not call for arbitration). Defendants do so despite their position that both the Rules of Conduct and the Terms are incorporated into the Applications. In some instances, the arbitration provision sought to be enforced unilaterally revokes a litigation mandate and forum selection clause originally agreed upon by the parties. In all instances, it operates to deprive Plaintiffs of their right to a jury trial. And in all instances, it conflicts with the litigation mandate contained in the Terms. As a result of Defendants failing to show the existence of a valid agreement (or delegation clause within such an agreement), their delegation argument must fail. *See Inetianbor v. Cashcall, Inc.*, No. 13-60066-CIV, 2016 WL 4702370, at *4 (S.D. Fla. Aug. 18, 2016) (parties need not relitigate delegation issue if arbitration agreement is unenforceable and fails for the same reasons).

Second, the delegation clause itself is independently unconscionable because it is adhesive, illusory, and not mutually agreed upon for the same reasons that apply to the arbitration clause as a whole (*see* §§ A, C, and D herein), but even more so. These failures are more compelling in the context of delegation because of the elevated standard that applies to purported delegations of gateway issues ordinarily decided by courts. "Even if a delegation of arbitrability is clear and unmistakable it may be found unenforceable if the delegation *itself* is unconscionable." *Saravia v. Dynamex, Inc.*, 310 F.R.D. 412, 419 (N.D. Cal. 2015) (citing *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63, 71–4 (2010)). Courts also take into account

a party's sophistication when assessing unconscionability. *See, e.g., Pinela*, 238 Cal.App.4th at 190 (finding procedural unconscionability where it was "less likely" an "unsophisticated layperson" like the plaintiff "would understand how arbitrability questions are to be resolved under the agreement."). Thus, even if the delegation clause were found to delegate certain questions to the arbitrator, the delegation fails because it is unconscionable and illusory. *See id.*[18]

Further, like the arbitration provision and the Application in general, the delegation clause has been superseded by the Terms of Use which Defendants also claim apply and which provide for all issues to be litigated in a court of law. *See supra* §A.2.

Finally, the delegation clause does not contain a clear and unmistakable delegation of the questions at issue in Defendants' Motion to Compel. In particular, no iteration of the arbitration clause contains a provision delegating the question of unconscionability to the arbitrator. *See Bruni*, 160 Cal.App.4th at 1283 ("arbitrability" is an ambiguous term that can encompass multiple distinct concepts. Moreover, the conflicting provision in the Terms of Use renders the purported delegation in the arbitration clause ambiguous and thus unenforceable. *See O'Connor v. Uber Technologies, Inc.*, 150 F. Supp. 3d 1095, 1101-02 (2015) (conflict with other applicable terms rendered delegation clause ambiguous such that "the clear and unmistakable delegation requirement necessary to overcome the presumption that arbitrability is for the Court to decide" was "not satisfied").

## C. The Arbitration Agreement Does Not Apply to the Plaintiffs that Did Not Sign an Arbitration Agreement.

For the reasons stated above, the arbitration provision is illusory, unconscionable, or is otherwise superseded. In the event the Court disagrees, however, there remains no legal support for enforcing the arbitration provision against those Plaintiffs who did not sign an Application containing one.

---

[18] Defendants' Motion relies on *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332-33 (11th Cir. 2005) to support its delegation argument. *Terminix* is inapplicable because there was no question of unconscionability involved, nor were there conflicting terms and documents incorporated by reference that rendered the delegation provision ambiguous. At a minimum, the Court will determine whether Defendants have satisfied their initial burden of showing the existence of an applicable agreement (they have not), as well as the unconscionability of the delegation clause itself. Here, the same essential facts that render the arbitration clause unconscionable render the delegation clause unconscionable as well.

First, Defendants are estopped from now arguing that anyone who joined Herbalife before September 2013 is subject to arbitration when they were advantaged by taking the opposite position in the *Bostick* action. Second, imposing class action waivers, jury waivers and arbitration provisions in the haphazard way Herbalife now advocates is legally unsupportable.

      1. The *Bostick* Action.

In *Bostick et al. v. Herbalife International, Inc. et al.*, Case No. 13-CV-02488-BRO-RZ filed in the United States District Court, Central District of California, ECF No. 137 at 6, Herbalife took the opposite position it takes here. It stated:

> Herbalife does not take, and has never taken, the position that the arbitration agreement applies to members who joined before Herbalife introduced the arbitration agreement in September 2013. The arbitration agreement, and the related provision in the Second Amendment to the Stipulation of Settlement, do not affect preexisting members who simply remained members after September 2013.

*See* Ex. 2 at 6. In response to an objection raised to the settlement achieved in that case, Herbalife excluded anyone who had agreed to be "subject to the arbitration provisions of the Arbitration Agreement" revised during or after September 2013. During one hearing Herbalife practically scoffed at the notion of retroactive application of the provision: "If we were to do what [counsel for the objectors] is speculating we were to bind all of the other people who are not signatories [to the arbitration provision], there would be such an avalanche of adverse consequences, including from this Court, that I think there's no basis whatsoever to accept his concerns on that front." *See Bostick*, 13-CV-02488 (C.D. Cal.), ECF No. 151 at 16:3-7, attached hereto as **Exhibit 9**.

The Court in *Bostick* agreed with Herbalife. It noted in response to the concern that Herbalife would try to bootstrap early signatories to a non-existent arbitration clause, that "[t]he objectors have cited no authority for the proposition that these members and distributors could be subject to an arbitration provision contained within an agreement they neither agreed to nor signed at the time they joined Herbalife simply because the company retains the right to amend its rules and policies. Nor is it clear to the Court that a binding contract such as an arbitration agreement could be included within the definition of a corporate 'rule or policy.'" *See Bostick*, 13-CV-02488 (C.D. Cal.), ECF No. 145 at 52, attached

hereto as **Exhibit 10**.  In light of the absence of support for the position Herbalife takes now and no doubt considering its position that it "does not, and has never taken the position" that the arbitration agreement can be retroactively applied, the Court approved the settlement agreement. Yet, two and half years later, here we are.

This "opportunistic flip-flopping" presents a textbook case for the application of judicial estoppel.  "Judicial estoppel is an equitable doctrine that is intended to protect the integrity of the judicial process by preventing a litigant from playing fast and loose with the courts." *Whaley v. Belleque*, 520 F.3d 997, 1002 (9th Cir. 2008) (internal quotation and citation omitted). "Judicial estoppel "prohibit[s] parties from deliberately changing positions according to the exigencies of the moment" and is intended to protect the judicial system rather than the litigants." *Toyo Tire & Rubber Co., Ltd. v. Hong Kong Tri-Ace Tire Co., Ltd.*, 2017 WL 6547649, at *6 (C.D. Cal. Nov. 20, 2017).

There are three elements to judicial estoppel: "First, a party's later position must be 'clearly inconsistent' with its earlier position. . . . Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled. . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Toyo Tire & Rubber*, 2017 WL 6547649, at *5 (internal citations omitted).  Each of these elements is met here.

In *Bostick,* the same Herbalife Defendants took the position that the arbitration provision did not apply to pre-September 2013 signatories. It took this position to get a favorable settlement approved, expressly excluding from the settlement "all Herbalife members who have agreed to be subject to the arbitration provisions of the Arbitration Agreement for Disputes Between Members and Herbalife contained in the Membership Application Agreement revised during or after September 2013." *See Bostick*, 13-CV-02488 (C.D. Cal.) ECF No. 127 at ¶1.13.2, attached hereto as **Exhibit 11.** Yet here, it takes the position that all Herbalife distributors have "agreed to be subject to the arbitration provisions" by virtue of subsequent revisions to "rules" they may have never seen. Herbalife persuaded the district court judge in *Bostick* to approve the settlement it sought, and in approving the

settlement, the Court accepted Herbalife's position. Herbalife is judicially estopped from arguing the opposite now.

>    2.    <u>There is no legal basis for Herbalife to impose an arbitration provision that Plaintiffs never assented to nor signed.</u>

The touchstone for all contracts, whether digital or etched in stone, is the "'mutual manifestation of assent, whether by written or spoken word or by conduct.'" *Nguyen v. Barnes & Noble, Inc.* 763 F. 3d 1171, 1175 (9th Cir. 2014). To determine whether a binding contract has been formed, the dispositive questions are (1) did the offeror "provide reasonable notice" of the proposed terms, and (2) did the offeree "unambiguously manifest assent" to them? *In re Facebook,* 185 F. Supp 1155, 1164 (N.D. Cal. 2016) *citing Nguyen*, 763 F.3d at 1173.

Where, as in this case, a party has the unilateral right to change the terms of a contract, it does not act in an objectively reasonable manner "when it attempts to 'recapture' a forgone opportunity by adding an entirely new term which has no bearing on any subject, issue, right, or obligation addressed in the original contract and which was not within the reasonable contemplation of the parties when the contract was entered into. That is particularly true where the new term deprives the other party of the right to a jury trial and the right to select a judicial forum for dispute resolution." *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 796-97 (Cal. App. 1st Dist. 1998) (ADR provision that was not in original agreement was not in the "universe of terms" that could be unilaterally added in good faith with minimal notice; waiver of jury trial must be unequivocal).

On at least some occasions when Herbalife decided to unilaterally change the terms of their deal with the Plaintiff class, the company claims to have sent an email notification containing a hyperlink to a Summary of those (frequently complex) changes. Attached hereto as **Exhibit 12** is an example of one of those notifications. Clicking on that "Summary" led to a new page with what Herbalife considered "the most prominent updates." Attached hereto as **Exhibit 13** is an example of one of those notifications. Nowhere on these notices does a distributor have to affirm, accept, check a box, acknowledge receipt, or indicate any understanding of these changes. According to Herbalife, distributors are bound by the rules regardless of acceptance or receipt. By force of these inadequate notifications alone does Herbalife seek to strip the Plaintiffs of their rights to a jury trial, a class action, and a judge.

Commerce on the Internet has not fundamentally changed the principles of contract. *Nguyen*, 763 F.3d at 1175. Cases involving online notices have settled on an analytical framework that places agreements which are executed by a party clicking a button expressly affirming their agreement to new terms and conditions, i.e., "clickwrap" agreements, on one end of the enforceability spectrum, and agreements claimed to be formed by posting new terms and conditions on a website, i.e., "browsewrap" agreements, on the other. Herbalife's posting of the amended Rules equates to a browsewrap agreement. As Ms. Romans confirmed, "there is no obligation for [a distributor] to affirm that they have accepted any of these obligations." Ex. 1 at 115:15 – 116:3.

As discussed in detail in *In Re Facebook,* 185 F. Supp at 1165, the two "wraps" differ in the way the offeree manifests assent. For clickwrap agreements, users are "required to click on an 'I agree' box"; they must expressly manifest assent to the terms and conditions. *Nguyen,* 763 F. 3d at 1175-76. For browsewrap agreements, the user "gives his assent simply by using the website." *Id.* at 1176. In a "pure-form browsewrap agreement, the website will contain a notice that by merely using the services of, obtaining information from or initiating applications within the website, the user is agreeing to and is bound by the site's terms of service. *In Re Facebook* at 1165.

The closer digital agreements are to the clickwrap end of the spectrum, the more often they have been upheld as valid and enforceable. Browsewrap agreements are viewed with skepticism. In *Nguyen,* the Ninth Circuit affirmed the denial of a retailer's motion to compel arbitration where the arbitration provision was contained in terms of use that were accessible on its website by clicking a link. The court observed that given that there was no evidence that the user had actual knowledge of the arbitration clause, the validity of the browsewrap agreement turned on whether the website put a reasonably prudent user on inquiry notice of the provision such that use of the site could be considered assent to an arbitration provision. The court found that it did not, even though there was a link to the arbitration provision on every page of the site, including the purchase page. *Id.* at 1178-79. *See also Norcia v. Samsung Telecommunications America, LLC,* 845 F.3d 1279, 1290 (9th Cir. 2017) ("An offeree, regardless of apparent manifestation of his consent is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious"); *Perez v. DirectTV Group Holdings, LLC.*, 251 F. Supp. 3d 1328, 1339-40 (C.D. Cal.

2017) (Court refused to enforce an arbitration provision contained in a separate document entitled "Customer Agreement" provided after service began as not conspicuously incorporated into the Equipment Leasing Agreement signed by the customer at the time they began the service).

In light of the Terms conspicuously posted on myherbalife.com containing a provision requiring any litigation to be filed in state or federal court in California, it is hard to imagine a scenario where a reasonably prudent user who (i) signed an agreement requiring lawsuits to be filed in courts; and (ii) used a website that required a user to submit to jurisdiction of the courts, could "assent" to an arbitration provision that could have been emailed to them no sooner than four months after it took effect, buried in hundreds of pages of other rules that are available for download via a tab buried on the myherbalife.com website.

Based on the foregoing, it is readily apparent that the Plaintiffs who did not sign the arbitration provision, or assent to it, cannot be bound to its terms.

### D. Equitable Estoppel Does Not Apply.

To the extent the arbitration provision does not apply to any Plaintiffs, nor can the doctrine of equitable estoppel compel arbitration with respect to the Individual Defendants. Even if this Court were to rule that the arbitration provision is applicable, Plaintiffs have not agreed to arbitrate their claims against the Individual Defendants. Generally speaking, one cannot be compelled to arbitrate claims that one has not agreed to arbitrate. *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648 (1986). But the Individual Defendants here seek to skirt this general rule by invoking a limited exception, the doctrine of equitable estoppel, in circumstances where it is clearly inapposite.[19]

"In California, equitable estoppel is inapplicable where a plaintiff's 'allegations reveal no claim of any violation of any duty, obligation, term or condition imposed" by the agreement containing the arbitration provision. *Galitski v. Samsung Telecomm. Am., LLC*, 2013 WL 6330645, at *3–4 (N.D. Tex. Dec. 5, 2013); *Murphy v. DirecTV, Inc.,* 724 F.3d 1218, 1230

---

[19] Defendants advance no discernable argument as to why or how the non-signatory Plaintiffs (Mr. LaVigne and Mr. Rodgers) could be equitably estopped here. A significant percentage of Circle of Success attendees, like Plaintiffs Jeff Rodgers and Michael LaVigne, have not even signed Herbalife's Wholesaler Contract and could not bring claims on that contract. The Application does not provide a signature block for spouses and contains this disclaimer under the block for spousal information: "Spouse's name is for recognition purposes only and is not an indication of ownership or entitlement." *See e.g.* ECF No. 62-2 at 724. Yet spouses are actively encouraged by the Individual Defendants to "attend every event" and to make bulk purchases of nonrefundable event tickets.

(9th Cir. 2013) (quoting *Goldman,* 173 Cal.App.4th at 209). For the doctrine to apply "the claims plaintiff asserts . . . must be dependent upon, or founded in and inextricably intertwined with, the underlying contractual obligations of the agreement containing the arbitration clause." *Goldman*, 173 Cal.App.4th at 218. It is not enough that claims simply reference a contract with an arbitration provision, for equitable estoppel to apply, claims must **<u>rely</u>** on the terms of the written agreement. *Id.* at 218. As the California Court of Appeals observed in an opinion cited by Defendants, "[a] common theme in these cases is that the party seeking relief was suing on the contract itself, not a statute or some other basis outside the contract." *Crowley Maritime Corp. v. Boston Old Colony Ins. Co.*, 158 Cal.App.4th 1061, 1071 (2008). And "[p]arties who have not agreed to arbitrate may not be compelled to do so simply because two defendants, one with an arbitration agreement and one without, have colluded to defraud the plaintiff." *Goldman* , 173 Cal.App.4th at 233.

The Individual Defendants argue that "both the RICO Claim and the RICO Conspiracy Claim against the Individual Defendants necessarily rely on and are intertwined with the Contract," but there are no citations to either the contracts at issue or the Complaint that support this conclusion. The Individual Defendants cite to a sentence of the Complaint stating that the Individual Defendants had "a duty to disclose that there was no correlation between event attendance and success," and then surmise that this alleged duty "likely could only arise from Defendants' roles as upline Distributors to the Plaintiffs," without citation to a provision of any of the contracts that would impose this duty on the Individual Defendants. To the contrary, the Rules of Conduct establish an explicitly independent relationship between distributors: "A Distributor is not an employee, agent, franchisee, securities holder, joint venture, fiduciary or beneficiary of . . . any other Distributor." *See e.g.* Motion Ex. G at 644. A Distributor is not an employee, agent, franchisee, securities holder, joint venture, fiduciary or beneficiary of Herbalife or any other Distributor.

The Complaint's allegations do not rely in any way on the contracts between the parties. Plaintiffs allege a pattern of racketeering activity in which approximately 80% of the fraudulent transactions occur between Plaintiffs and what the Complaint terms a "web of Defendant connected entities." *See* ECF No. 1 at ¶ 71. Entities identified in the complaint; Gioiosa Marketing, OrlandoSTS, Telos, and MiamiSTS, along with dozens of others, are controlled by the Individual Defendants, their agents, and proxies. Plaintiffs' statutory claims

against these individuals and entities are stated without any reference to Herbalife's Application or Rules of Conduct. The Complaint alleges that the Individual Defendants defraud Plaintiffs and prospective class members by pressuring them into attending expensive Circle of Success events. At these events the Individual Defendants misrepresent how much money they have made, how they made that money, their expenses, their reliance on the proceeds of unrelated criminal conduct, and the probability that attendees will achieve the same fictionalized outcomes through dedicated event attendance.

Defendants argue Plaintiffs' claims are "inextricably intertwined" with the Application because one must perform an "in-depth analysis" of that contract to determine whether the Individual Defendants have "misrepresented the importance of event attendance." Motion at 15. But there is no contract between the Individual Defendants and Plaintiffs. There is no provision of any contract to which the Individual Defendants cite that must be "analyzed," and even if there were, it is irrelevant. Plaintiffs allege that Circle of Success events are essentially valueless, and that the Individual Defendants have intentionally misrepresented the role that event attendance has played in their attainment of the exaggerated financial success being claimed. No analysis of the Application is necessary to make determinations regarding these allegations. Plaintiffs' claims against the Circle of Success are not founded in, do not arise from, and are not related to the Application. Plaintiffs' causes of action are not contractual and can be fully adjudicated without reference to the Application or the Rules.

## III.   **CONCLUSION**

Based on the foregoing, Plaintiffs respectfully request that Defendants' Motion be denied.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Southern District of Florida Local Rule 7.1(b), in light of the complexity of the issues raised herein and in Defendants' Motion to Compel [ECF No. 62], Plaintiffs respectfully request oral argument. Plaintiffs estimate that one hour will be required.

Dated: February 12, 2018

MARK MIGDAL & HAYDEN
80 SW 8th Street
Suite 1999
Miami, FL 33130
Telephone: 305-374-0440

By: *s/ Etan Mark*
    Etan Mark, Esq.
    Florida Bar No. 720852
    etan@markmigdal.com
    Donald J. Hayden, Esq.
    Florida Bar No. 097136
    don@markmigdal.com
    Lara O'Donnell Grillo, Esq.
    Florida Bar No. 37735
    lara@markmigdal.com
    eservice@markmigdal.com

    and

    s/ Jason Jones
    Jason Jones, Esquire
    Jason Jones, Attorney at Law
    Ohio Bar No. 95384
    jason@jonesatlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 12th day of February 2018, the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, via Electronic mail.

By: *s/ Etan Mark*
    Etan Mark, Esq.

21

**<u>SERVICE LIST</u>**

Steve I. Silverman, Esq.
Todd A. Levine, Esq.
Erin E. Bohannon, Esq.
KLUGER, KAPLAN, SILVERMAN,
KATZEN & LEVINE, P.L.
201 South Biscayne Boulevard
Suite 2700
Miami, Florida 33131
*Co-Counsel for Herbalife Defendants*

Edward Salanga, Esq.
S. Douglas Knox, Esq.
Zachary S. Foster, Esq.
Brian A. Howie, Esq.
Michael S. Catlett, Esq.
QUARLES & BRADY, LLP
101 E. Kennedy Boulevard, Suite 3400
Tampa, Florida 33602
*Attorneys for Individual Defendants*

Mark T. Drooks, Esq.
Paul S. Chan, Esq.
Gopi K. Panchapakesan, Esq.
BIRD MARELLA
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067
*Attorneys for Herbalife Defendants*

Jason Jones, Esq.
JASON JONES ATTORNEY AT LAW
1147 Hunter Ave
Columbus, OH 43201
*Co-Counsel for Plaintiffs*