## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF FLORIDA
 3                    MIAMI DIVISION
 4
 5   JEFF RODGERS, et al.,
     individually and on behalf
 6   of all others similarly
     situated,
 7
                 Plaintiffs,      No. 1:17-cv-23429-MGC
 8
     vs.
 9
     HERBALIFE LTD, et al.,
10
                 Defendants.
11   _____
12
13
14
15          DEPOSITION OF ROXANE ROMANS
16              January 24, 2018
17                 12:00 p.m.
18
19
20        1875 Century Park East, Suite 2300
                Los Angeles, California
21
22
23
24          Diana Janniere, CSR-10034
25
```

## Page 2

```
 1              APPEARANCES OF COUNSEL
 2
 3   For the Plaintiffs:
 4      MARK MIGDAL & HAYDEN
        ETAN MARK, ESQ.
 5      80 S.W. 8TH STREET, SUITE 1999
        MIAMI, FLORIDA  33130
 6      305.374.0440
        etan@markmigdal.com
 7
        MARK MIGDAL & HAYDEN
 8      LARA O'DONNELL GRILLO, ESQ.
        (Appearing Telephonically)
 9      80 S.W. 8TH STREET, SUITE 1999
        MIAMI, FLORIDA  33130
10      305.374.0440
11
12   For the Defendant Herbalife Ltd:
13      BIRD MARELLA BOXER WOLPERT
        NEISSIM DROOKS LINCENBERG
14      MARK T. DROOKS, ESQ.
        GOPI K. PANCHAPAKESAN, ESQ.
15      1875 CENTURY PARK EAST, SUITE 2300
        LOS ANGELES, CALIFORNIA  90067
16      310.201.2100
        mdrooks@birdmarella.com
17      gkp@birdmarella.com
18
19   Co-Counsel for Defendant Herbalife Ltd:
20      KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.
        TODD A. LEVINE, ESQ.
21      (Appearing Telephonically)
        201 S. BISCAYNE BOULEVARD, SUITE 2700
22      MIAMI, FLORIDA  33131
        305.379.9000
23      tlevine@klugerkaplan.com
24
25
```

## Page 3

```
 1              APPEARANCES OF COUNSEL
 2
 3   For the Individual Defendants:
 4      QUARLES & BRADY, LLP
        MICHAEL S. CATLETT, ESQ.
 5      ONE RENAISSANCE SQUARE
        TWO NORTH CENTRAL AVENUE
 6      PHOENIX, ARIZONA   85004
        602.229.5279
 7      michael.catlett@quarles.com
 8
 9   Also Present:
10      PATTI SABEL, V.P., Counsel
        HERBALIFE - LEGAL DEPARTMENT
11
        JASON JONES
12      (Appearing Telephonically)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              INDEX OF EXAMINATION
 2   WITNESS:  Roxane Romans
 3   EXAMINATION                              PAGE
 4   By Mr. Mark                                 6
 5
 6              INDEX OF EXHIBITS
 7   EXHIBIT    DESCRIPTION                    PAGE
 8      3    DECLARATION OF ROXANE ROMANS
             IN SUPPORT OF DEFENDANTS' JOINT
 9           MOTION TO COMPEL ARBITRATION        19
10      4    SUPPLEMENTAL DECLARATION OF
             ROXANE ROMANS IN SUPPORT OF
11           DEFENDANTS' JOINT MOTION TO
             COMPEL ARBITRATION                  20
12
        5    FELIX VALDEZ' MEMBERSHIP APPLICATION 23
13
        6    IZAAR VALDEZ' DISTRIBUTOR APPLICATION 24
14
        7    PATRICIA RODGER'S DISTRIBUTOR
15           APPLICATION                         25
16      8    JENNIFER LOKEN'S DISTRIBUTOR
             APPLICATION                         26
17
        9    IZAAR VALDEZ' DISTRIBUTOR APPLICATION 27
18
       10    CODY PYLE'S DISTRIBUTOR APPLICATION 27
19
       11    JENNIFER LAVIGNE'S DISTRIBUTOR
20           APPLICATION                         28
       12    2/13/14 HERBALIFE ANNOUNCEMENT      81
21
       13    SUMMARY OF UPDATES                  83
22
       14    BOOK 4, WHICH INCLUDES THE RULES
23           OF CONDUCT, SALES AND MARKETING PLAN,
             SAMPLE FORMS, ORDERING PROCEDURES,
24           ENFORCEMENT PROCEDURES              99
25
```



Page 5

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 15 | BOOK 4, VERSION 40, REVISED DATE 09/13 | 105 |
| 16 | ONLINE ANNOUNCEMENT | 110 |
| 17 | 7/21/14 ANNOUNCEMENT | 110 |
| 18 | BOOK 4, VERSION 31 | 116 |
| 19 | PRINTOUT OF MYHERBALIFE.COM HOME PAGE | 123 |
| 20 | TERMS OF USE LOCATED IN MYHERBALIFE.COM WEBSITE | 126 |
| 21 | 11/2016 VERSION 33, BOOK 4 | 139 |

(Original Exhibits 3 - 21 are attached hereto.)

INSTRUCTED NOT TO ANSWER
                    PAGE   LINE
                     61     10
                    122     24

Page 6

1    DEPOSITION OF ROXANE ROMANS
2         JANUARY 24, 2018
3
4         ROXANE ROMANS,
5    having been first duly sworn, testifies as follows:
6
7         EXAMINATION
8    BY MR. MARK:
9    Q    Good afternoon, Ms. Romans.
10   A    Good afternoon.
11   Q    My name is Etan Mark.  I represent the
12   plaintiffs in this case.  I am going to be asking you
13   some questions today; okay?
14   A    Okay.
15   Q    Have you been deposed before?
16   A    Yes.
17   Q    Okay.  How many times, approximately?
18   A    Three.
19   Q    When was the last time you were deposed?
20   A    To the best of my recollection, maybe about
21   three, four years ago.
22   Q    Okay.  Do you want me to run through the
23   ground rules for today?
24        MR. MARK:  Mr. Drooks, you want me to run
25   through the grounds rules?

Page 7

1         MR. DROOKS:  Up to you.
2         MR. MARK:  Okay.
3    Q    There is somebody transcribing everything
4    that we say today.  So I would ask that you please
5    provide verbal responses.  A shake of the head, a nod
6    is not going to be recorded.
7    A    Yes.
8    Q    To the extent I ask a question that you
9    don't understand, please ask me to rephrase it, and I
10   will be happy to do that.
11   A    Thank you.
12   Q    If you answer a question, I am going to
13   assume that you understand it; okay?
14   A    Okay.
15   Q    If at any point you want to take a break,
16   feel free to ask and I will be happy to accommodate
17   you.
18        I would ask that if there is a question
19   pending, you answer the question.  Then you could take
20   a break.  Okay?
21   A    Thank you.
22   Q    Sure.
23        What is your home address, please?
24   A    4500 Via, V-I-A, Marina, No. 203, in
25   Marina Del Rey, California 90292.

Page 8

1    Q    And your work address?
2    A    My work address -- sorry, I don't recall.
3    We moved recently.
4    Q    Okay.
5    A    Our building, it is in Torrance.
6    Q    It's in Torrance?
7    A    Yes, on 190th.
8    Q    Do you work in the same building as
9    Ms. Ramirez?
10   A    Yes -- no.  Sorry, no.
11   Q    No.
12        Okay.  Are you under any medication that
13   would impact your ability to testify truthfully or
14   completely today?
15   A    No.
16   Q    What did you do to prepare for today's
17   deposition?
18        And I don't want to hear about any
19   conversations you have had with your attorneys, other
20   than that.
21   A    Reviewed my declarations.
22   Q    Okay.  Did you review the exhibits that were
23   attached to the declaration, as well?
24   A    Yes.
25   Q    What is your title at Herbalife?



Page 9

1    A   The senior director of Member Policy
2  Administration.
3    Q   And that's for which company?
4    A   Herbalife International of America, Inc.
5    Q   What are your responsibilities as a senior
6  director of Member Policy Administration?
7    A   My current responsibilities are developing
8  strategies that relate to our member policies and
9  member materials and departmental operations.
10   Q   Did you say departmental --
11   A   Operations.
12   Q   -- operations?
13       So what does that mean, developing strategy
14  relating to member policies and member materials?
15       What -- on a day-to-day basis, what does
16  that mean?
17   A   So, basically, coming up with ideas on how
18  to improve either our materials that include
19  distributor policies or the policies themselves or the
20  way we do the work in our department.
21   Q   And what is your department?
22   A   Member Policy Administration.
23   Q   How many employees are in that department?
24   A   It's a worldwide department, but in the
25  U.S., we have seven employees, including myself.

Page 10

1    Q   Are you the head of the department in the
2  U.S.?
3    A   Yes.
4    Q   Who do you report to?
5    A   Pamela Jones Harbor.
6    Q   Harbor?
7    A   H-A-R-B-O-R.
8    Q   And what is her title?
9    A   She is the senior vice president, legal
10  officer of privacy and worldwide compliance.
11   Q   Are you an attorney?
12   A   No.
13   Q   Do you hold any graduate degrees?
14   A   No.
15   Q   Are you generally familiar with the member
16  policies and member materials?
17   A   Yes.
18   Q   Okay.  And what falls into that description,
19  member policies and member materials?  What documents
20  are we talking about?
21   A   So numerous documents:  Our rule book, our
22  member application and other agreements and materials
23  that we post online, advisories.
24   Q   Post online on myherbalife.com?
25   A   Correct.

Page 11

1    Q   When you said "the rule book," is that the
2  same as the Rules of Conduct?
3    A   Yes.
4    Q   And the "member application," is that the
5  same thing as the Application for International
6  Distributorship?
7    A   Correct.
8    Q   If I use those phrases interchangeably
9  today, you understand what I mean?
10   A   Yes.
11   Q   I might say, "rule book."  I say might say,
12  "Rules of Conduct."  I mean the same thing when I --
13   A   Yes.
14   Q   Okay.  I will try to use your vernacular,
15  though.
16       Are you responsible for updating these
17  documents?
18   A   Yes.
19   Q   And what is the process, usually, for
20  updating these documents?
21   A   My department becomes aware that there is a
22  need to either update a current rule or add an
23  additional rule, and we facilitate that happening.
24   Q   How does your department become aware of the
25  need to update the rules?

Page 12

1    A   Generally, from our other business partners
2  within the company.
3    Q   "Other business partners," meaning other
4  employees of Herbalife or --
5    A   Yes, perhaps, from the legal department or
6  other departments within Herbalife.
7    Q   Okay.  Okay.  How many times has Herbalife
8  amended the member application?
9    A   Numerous times.
10   Q   Well, are you aware of what version of the
11  member application is currently in effect?
12   A   To the best of my recollection, it is
13  Version 48.
14   Q   And does that mean Herbalife's amended it 48
15  times?
16       MR. DROOKS:  Um-hmm.
17  BY MR. MARK:
18   Q   You can answer.
19   A   No.
20   Q   So -- so just -- I did not mention this in
21  the ground rules.  I apologize.  There is going to be
22  sometimes where your counsel is going to be objecting
23  to my questions because they are, for whatever reason,
24  not good questions.
25       Unless he instructs you not to answer, I



ROXANE ROMANS
JEFF RODGERS vs HERBALIFE LTD

January 24, 2018
13–16

Page 13

1  would ask that you answer the question.  Okay?
2      A   Okay.
3      Q   So -- so you said that, no, Version 48 does
4  not mean that it was amended 48 times.
5          Can you explain that?
6      A   Sure.
7          The -- the versioning of our materials
8  occurs between the printer and our Creative Services
9  Department.  So there are times where maybe they have
10  skipped a numbering versioning.  Sometimes that
11  happens to a line -- our Spanish version of an
12  application and our English version of an application
13  or sometimes -- I don't know exactly the reason; but
14  something happens between the printing company and our
15  Creative Services Department.
16          So just because it is Version 48, doesn't
17  necessarily reflect that it has been changed 48 times.
18      Q   Okay.
19      A   I wouldn't know without studying how many
20  times.
21      Q   And the same thing, same question for the
22  Rules of Conduct, do you know what version,
23  approximately, you were on on the Rules of Conduct?
24      A   Today, I believe it is Version 34D.
25      Q   Okay.  Do you know how many times the Rules

Page 14

1  of Conduct have been amended?
2      A   No.  Numerous times.
3      Q   More than 30?
4      A   I wouldn't know without studying that.
5      Q   So -- so -- well, let's take a step back.
6          We are currently on Version 48 of the
7  application; right?
8      A   Yes.
9      Q   Are we on Version 48 of the Spanish
10  application, as well?
11      A   They should align.  I believe that they do
12  at this time.
13      Q   Okay.  And Version 34D of the Rules of
14  Conduct, is it also up to Version 34D of the Spanish
15  versions of the Rules of Conduct?
16      A   I believe so at this time.
17      Q   And are those rules identical, say, for the
18  language?  In other words, the translation?
19      A   Yes.
20      Q   So you don't know how many times the
21  application has been amended?
22      A   Correct.
23      Q   Do you know approximately how many times it
24  has been amended?
25      A   No.

Page 15

1      Q   And Rules of Conduct, you don't know how
2  many times that has been amended?
3      A   No.
4      Q   Do you know approximately how many times it
5  has been amended?
6      A   No.
7      Q   There is varying terminology that I have
8  seen in the Rules of Conduct and the application,
9  distributor, member and customer?
10      A   Yes.
11      Q   Do you know what each of those terms means
12  in the context of those documents?
13      A   Yes.
14      Q   Can you tell me?
15      A   Sure.
16          So our distributor relates to an individual
17  who entered into an application in order to do the
18  business, which means purchase the products either for
19  their personal use or for resale, and to recruit
20  others to do the same.
21      Q   Okay.
22      A   A member is an individual who entered into a
23  contract simply to obtain a discount on our products
24  for personal use.  They do not do the business.
25      Q   Okay.

Page 16

1      A   And a customer relates to an individual that
2  is purchasing a product from a distributor.
3      Q   Okay.  And that's currently the way those
4  words are used; right?
5      A   Correct.
6      Q   Is that a fairly recent change?
7          MR. DROOKS:  Lacks foundation.
8  BY MR. MARK:
9      Q   Do you know?  In other words --
10          MR. DROOKS:  It still lacks foundation.
11  BY MR. MARK:
12      Q   Okay.  You can answer.
13      A   Can I ask you to rephrase the question?
14      Q   Sure.  Yeah, that's fine.
15          This difference between distributor and
16  member that you just outlined, has it always been that
17  way at Herbalife?
18      A   Yes.
19      Q   Did it used to mean the same thing,
20  distributor/member?
21      A   No, it has never meant the same thing.
22      Q   Okay.
23      A   But it wasn't -- it wasn't defined that way
24  in our materials.
25      Q   It used to be defined a different way in



ROXANE ROMANS
JEFF RODGERS vs HERBALIFE LTD

January 24, 2018
17—20

Page 17

1  your materials?

2     A   We used to simply use the term

3  "distributor."

4     Q   I see.  So the term "member" is a new term

5  for Herbalife?

6     A   Yes.

7     Q   Okay.  And distributor, what a distributor

8  means in the old way that Herbalife used it?

9     A   Distributor was a person that entered into

10  an agreement --

11     Q   Regardless of --

12     A   -- with Herbalife.

13     Q   Regardless of whether the product was solely

14  for personal consumption or to pursue a business

15  opportunity?

16     A   Correct.

17     Q   And at a certain point, there was a decision

18  to create these two different categories?

19     A   Correct.

20     Q   Do you know when that was done?

21     A   To the best of my recollection, it was in

22  2013 or '14.

23     Q   Okay.  So not all -- not all members are

24  distributors today?

25     A   Correct.

Page 18

1     Q   But all distributors are members?

2     A   All distributors are members -- can you say

3  that again?

4     Q   Sure.

5         Distributors can both pursue the business

6  opportunity and also purchase the product for personal

7  consumption; right?

8     A   Correct.

9     Q   It can be both?

10        Whereas members only are obtaining it to --

11  are only purchasing the product to obtain the discount

12  for personal consumption?

13     A   Correct.

14     Q   Okay.  And what is the approximate split

15  today of Herbalife distributors versus members?

16     A   I am not aware of that figure.

17     Q   Are there more distributors or more members?

18     A   I would be speculating.  I don't know.

19     Q   Okay.  I don't want you to speculate.

20        The Rules of Conduct, do those apply to both

21  distributors and members?

22     A   The Rules of Conduct apply to distributors.

23  Members don't do the business.

24     Q   So the Rules of Conduct do not apply to

25  members?

Page 19

1     A   Not the Rules of Conduct, no.

2         MR. MARK:  Okay.  I am going to hand you a

3  document that we will mark as Exhibit 3.

4         (Exhibit 3 marked.)

5         THE WITNESS:  Can I grab my glasses?

6         MR. MARK:  Of course.

7     Q   Okay.  Have you seen this document before?

8     A   Yes, I have.

9     Q   Can you identify it for me, please?

10     A   This is my declaration.

11     Q   You signed it?

12     A   Yes, I did.

13     Q   And you agree with the statements contained

14  therein?

15     A   Yes, I do.

16     Q   You didn't write this declaration; did you?

17     A   No, I didn't.

18     Q   Did you make any changes to the declaration

19  once you received it?

20     A   Yes, I did.

21     Q   What were the changes that you made?

22     A   I don't specifically recall what the changes

23  were, but if there was anything that I verified

24  that -- if there was a discrepancy, then I made that

25  change.

Page 20

1     Q   Okay.  Now, there came a certain point in

2  which you signed a supplemental declaration; correct?

3     A   Yes.

4     Q   Okay.  And why did you do that?

5     A   I believe it was for clarification purposes

6  about the printing of one of our rule books.

7         MR. MARK:  I will hand you a document that

8  we will mark as Exhibit 4.

9         THE WITNESS:  Thank you.

10  BY MR. MARK:

11     Q   Can you identify that document for me,

12  please?

13        (Exhibit 4 marked.)

14        THE WITNESS:  Yes, this is the supplemental

15  declaration that I signed.

16  BY MR. MARK:

17     Q   So the reason you signed the supplemental

18  declaration is because the wrong version of the rules

19  was attached to the first declaration with respect to

20  Exhibit C?

21     A   I believe that was the case.

22     Q   Okay.  But other than that, everything in

23  your first declaration marked as Exhibit 3 is correct?

24     A   Yes, correct.

25     Q   These applications or distributor agreements



Page 21

1  that we are talking about, how are those maintained by
2  Herbalife?
3      A   Those are maintained online.
4      Q   Are there hard copies kept of any of the
5  distributor applications?
6      A   I believe with regard to paper applications,
7  there are paper records, and to the best of my
8  knowledge, the online applications are maintained, you
9  know, online.
10     Q   Is there a system at Herbalife that
11 maintains those applications?
12     A   Yes.
13     Q   What is it called?
14     A   I -- I can't respond to that because
15 technology may have advanced since -- since I knew
16 what we used to use.
17     Q   Well, I am asking today.
18     A   I wouldn't know the name of the system
19 today.
20     Q   So do you know today how online applications
21 are maintained at Herbalife?
22     A   They are maintained online.
23     Q   But you don't know how -- you don't know how
24 they get there or who is responsible for maintaining
25 them?

Page 22

1      A   I know that the records department scans
2  paper applications and uploads them into a system, an
3  online system.  I don't know the name of that system.
4      Q   And what about the -- what about the
5  applications that are completed online, how are those
6  maintained at Herbalife?
7      A   Those are, to my knowledge, maintained
8  online.
9      Q   How do you know that?
10     A   Because we have access to those applications
11 online.
12     Q   But you don't know the name of the system
13 you have to access to get the applications?
14     A   Correct.
15     Q   Do you, in the regular course of your
16 business, access the applications online?
17     A   No.
18     Q   When was the last time you went online to
19 access an application?
20     A   Years.
21         MR. MARK:  Okay.  Well, I am going to hand
22 you a series of documents that we will mark as
23 Exhibits, I guess, 5 through 11, maybe.
24         So the first one I am going to hand you is
25 attached as Exhibit M to your declaration.

Page 23

1         (Exhibit 5 marked.)
2  BY MR. MARK:
3      Q   Have you seen this document before?
4      A   Yes, I have.
5      Q   Okay.  So this document has been marked as
6  Exhibit 5.  Can you identify, please, what that
7  document is?
8      A   Yes, this is a membership application for
9  Felix Valdez.
10     Q   What is the date of that application?
11     A   The date the member signed the application?
12     Q   Yes.
13     A   Is June 14th of 2008.
14         MR. MARK:  Hand you a document that we will
15 mark as Exhibit 6 -- well, before I move on to that,
16 I'm sorry.
17     Q   Exhibit 5, you will agree with me, that is
18 the same document that was attached as Exhibit M to
19 your declaration?
20     A   Exhibit M being the English translation
21 of --
22     Q   So look at your declaration, which is --
23     A   Oh, I see it.  It is here, sorry.
24         MR. DROOKS:  You don't have the exhibits
25 attached to the declaration; do you?

Page 24

1         MR. MARK:  Well, I want her to confirm that
2  that is the document.
3         MR. DROOKS:  Well, then you need to give her
4  the declaration with the exhibits, so she could match
5  them up to make sure that they have not been changed.
6         MR. MARK:  Okay.
7         MR. DROOKS:  If you are representing that
8  you --
9         MR. MARK:  I am.
10        MR. DROOKS:  -- are offering it to her, I
11 have no reason to dispute it.
12        MR. MARK:  That's fine.
13     Q   So look at not the supplemental declaration,
14 the original, the other declaration, okay, and if you
15 look at paragraph 16.
16        So I am representing to you that Exhibit 5
17 is Exhibit M to your declaration.
18     A   That's correct.
19     Q   Okay.
20        MR. MARK:  I am going to hand you Exhibit 6.
21        THE WITNESS:  Thank you.
22        (Exhibit 6 marked.)
23 BY MR. MARK:
24     Q   Can you identify, please, what Exhibit 6 is?
25     A   This is a distributor application from Izaar



ROXANE ROMANS
JEFF RODGERS vs HERBALIFE LTD

January 24, 2018
25–28

Page 25

1 Valdez.
2    Q    What is the date of that, please?
3    A    The date signed was June 14th, 2008.
4    Q    Okay.  And if you look at paragraph 17 of
5 your declaration, and I am going to represent to you
6 that the document marked as Exhibit 6 was Exhibit N to
7 your declaration.  Okay?
8    A    Yes, that's correct.
9         MR. MARK:  Hand you a document that we will
10 mark --
11        MR. DROOKS:  If you represent to us that you
12 have taken an exhibit with a letter on it from
13 Ms. Romans' declaration and you're now marking it with
14 a number, we are not going to dispute that.
15        MR. MARK:  Okay.
16        MR. DROOKS:  You don't need to have her
17 physically compare them.
18        MR. MARK:  Okay.  But I am going to be
19 marking each of the applications, so --
20        MR. DROOKS:  That's fine.
21        MR. MARK:  -- as separate exhibits.
22        THE REPORTER:  That's 7.
23        (Exhibit 7 marked.)
24 BY MR. MARK:
25    Q    Okay.  Have you seen that document before?

Page 26

1    A    Yes.
2    Q    What is it?
3    A    It's a distributor application submitted by
4 Patricia Rodgers.
5    Q    What is the date of that application,
6 please?
7    A    June 23rd, 2010.
8    Q    I am going to represent to you that that is
9 attached as Exhibit I to your declaration.  Okay?
10   A    Okay.
11        MR. MARK:  Handing you what has been marked
12 as Exhibit 8.
13        (Exhibit 8 marked.)
14        THE WITNESS:  Thank you.
15 BY MR. MARK:
16   Q    Have you seen that document before?
17   A    Yes, I have.
18   Q    Can you identify it, please?
19   A    A distributor application submitted by
20 Jennifer Loken.
21   Q    And what is the date of that document?
22   A    February 14th, 2011.
23   Q    I am going to represent to you that that was
24 attached as Exhibit K to your declaration.  Okay?
25   A    Okay.

Page 27

1        THE REPORTER:  That is 9.
2        MR. MARK:  Exhibit 9.  Handing you what has
3 been marked as Exhibit 9.
4    Q    Can you identify that for me, please?
5        (Exhibit 9 marked.)
6        THE WITNESS:  A distributor application
7 submitted by Izaar Valdez.
8 BY MR. MARK:
9    Q    What is the date of that, please?
10   A    March 22nd, 2013.
11   Q    Do you recognize that document?
12   A    Yes.
13   Q    And I will represent to you that was
14 attached as Exhibit O to your declaration.  Okay?
15   A    Thank you.
16        MR. MARK:  Handing you what we will mark as
17 Exhibit 10.
18        (Exhibit 10 marked.)
19 BY MR. MARK:
20   Q    Can you identify that document, please?
21   A    A distributorship application submitted by
22 Cody Pyle.
23   Q    What is the date of that, please?
24   A    7/7/2014.
25   Q    And have you seen that document before?

Page 28

1    A    Yes, I have.
2    Q    And I will represent to you that was
3 attached as Exhibit L to your declaration.
4    A    Thank you.
5        MR. MARK:  Last, but not least, Exhibit 11.
6        (Exhibit 11 marked.)
7 BY MR. MARK:
8    Q    Have you seen that document before?
9    A    Yes, I have.
10   Q    What is it?
11   A    A distributorship application submitted by
12 Jennifer Lavigne.
13   Q    Have you seen that document before?
14   A    Yes, I have.
15   Q    What is the date of it, please?
16   A    December 2nd, 2014.
17   Q    Okay.  I will represent to you that was
18 attached as Exhibit J to your declaration.  Okay?
19   A    Thank you.
20   Q    So when we were talking about how were these
21 documents maintained by Herbalife, you stated that
22 some are maintained in hard copy and some are
23 maintained electronically; is that correct?
24        MR. DROOKS:  Mischaracterizes the testimony.
25



Page 29

1  BY MR. MARK:
2      Q   You can answer.
3      A   I think what I stated was paper applications
4  are scanned into our online system, and online
5  applications are, obviously, directly input into the
6  system.
7      Q   Are original paper applications maintained
8  at Herbalife, as well?
9      A   Yes.
10     Q   Okay.  So the paper applications are
11 maintained in both the hard copy form and electronic
12 form?
13     A   Yes.
14     Q   And then the online applications are only
15 maintained in their electronic form?
16     A   To my knowledge.
17     Q   Okay.  So let's start by looking at the
18 declarations of -- I'm sorry, the application of Izaar
19 Valdez.
20         MR. DROOKS:  Which one?
21         MR. MARK:  Exhibit 6.
22     Q   This is not an electronic application;
23 correct?
24     A   Correct.
25     Q   Is this a -- this is a one-page,

Page 30

1  double-sided form as maintain -- the original form, is
2  it a one-page double-sided piece of paper?
3      A   I believe it was.
4      Q   Okay.  And the only place for signature on
5  this document that has been marked as Exhibit 6 is on
6  the first page; right?
7      A   That's correct.
8      Q   And this document, if you look at
9  paragraph 4 -- do you speak Spanish?
10     A   A little bit.
11     Q   Okay.  Me, too, just a little, though.
12         If you look at paragraph 4 of this document
13 marked as Exhibit 6, there is a provision requiring
14 the parties to mediate if there is any dispute and
15 then arbitrate.
16         Do you see that?
17     A   Yes, I do.
18     Q   Okay.  Now, at a certain point in time,
19 Herbalife removed the arbitration provision; is that
20 correct?
21     A   Yes, that's correct.
22     Q   Do you know when that occurred?
23     A   No, I don't recall.
24     Q   All right.  And what version is this
25 document?

Page 31

1          MR. DROOKS:  "This document" being
2  Exhibit 6?
3          MR. MARK:  Yes.  I am talking about
4  Exhibit 6 right now.
5          THE WITNESS:  The version date on this
6  document is No. 31.
7  BY MR. MARK:
8      Q   So this is Version 31?
9      A   Spanish.
10     Q   In Spanish.
11         And what is the -- and if you turn two
12 pages, you will see that there is the English version
13 of this document; is that right?
14     A   Yes, that's correct.
15     Q   And this is the Version 29 of the English
16 version; is that right?
17     A   Yes, that's correct.
18     Q   And the Spanish version, the revision says
19 it is effective January, 2008; is that correct?
20     A   Can you repeat the question?
21     Q   Sure.
22         The revision date is January, 2008; is that
23 correct?
24     A   Are you asking about the -- which document
25 are you asking?

Page 32

1      Q   So I am looking in Exhibit 6.
2      A   Uh-huh.
3      Q   And you will see there is a footer on
4  Exhibit 6 that says, "Form 4011-USSP-31 Rev 01/08."
5          Did I read that correctly?  It's small.
6      A   Yeah, it is small.
7          MR. DROOKS:  I see the witness is having
8  trouble reading it.
9          Do you mind if she hands it to me and I will
10 read it and stipulate if you have read it accurately?
11         MR. MARK:  That's fine.
12         MR. DROOKS:  I am reading it and we will
13 stipulate that the first page of Exhibit 6 reads,
14 Form 4011-USSP-31, space, Rev, space, 01/0 -- and I
15 believe that is an 8.  It could be a 6, but I think it
16 is an 8.
17         MR. MARK:  Okay.  So we are saying the same
18 thing, then.  Okay?
19         MR. DROOKS:  Yeah.  And looking, by the way,
20 at Exhibit N to the witness' declaration, which is a
21 clearer copy, it is clearly an 8.
22         MR. MARK:  Well, you are looking at the
23 English version.  That is why.
24         MR. DROOKS:  That's true.
25



Page 33

1  BY MR. MARK:
2      Q   Okay.  So does this mean that the last
3  revision -- that this document was revised in January
4  of 2008; is that what that footer means?
5      A   Correct.
6      Q   Okay.  So at a certain point after January,
7  2008, Herbalife removed this arbitration provision;
8  correct?
9      A   I don't recall when it was removed.
10     Q   Well, it was certainly after January, 2008,
11  though; right?  Because this document was signed in
12  June of 2008, and it was last revised in January of
13  2008.
14     A   Yes, correct.
15     Q   Okay.
16     A   Um-hmm.
17     Q   Do you know why Herbalife removed the
18  arbitration provision in this document?
19     A   No.
20     Q   But you would agree with me that there was a
21  certain point in time -- and we will look at those
22  applications soon -- in which Herbalife removed the
23  arbitration provision; correct?
24     A   Yes.
25     Q   Do you see there is a stamp on this page?

Page 34

1      It is hard to see, but it is across -- it is
2  sort of a vertical line under where it says, Acuerdo
3  de distribucion.
4      Do you see that?
5      A   Yes.
6      Q   What is that?
7      MR. CATLETT:  Foundation.
8  BY MR. MARK:
9      Q   You can answer.
10     A   To the best of my knowledge, it would be the
11  stamp imposed by the records department when they
12  physically received this application.
13     Q   Okay.  So -- and that is why I am interested
14  in the process a little bit.
15     So this hard copy is filled out by
16  Ms. Valdez and it is sent into Herbalife.  Herbalife
17  receives it, stamps it, and puts it in a hard file; is
18  that right?
19     A   I am not an expert in that area.
20     Q   Do you know how that is done or no?
21     A   To the best of my knowledge, it is as you
22  described.  The application is submitted and stamped
23  by the records department and scanned into the online
24  system; and the paper copy is filed.
25     Q   And it is your understanding that was the

Page 35

1  process in 2008, as well?
2      A   Yes.
3      Q   Now, if you look at Exhibit 5, which is
4  Felix Valdez's application.
5      A   Yes.
6      Q   The form is identical; correct?
7      Actually, it's not.  This is a different
8  application; correct?
9      A   Yes, correct.  It is a different version of
10  the application.
11     Q   And what version is this?
12     A   This one is the Spanish version with the
13  number 28, revision date March of '06.
14     Q   Okay.  Now, are you aware of what the
15  difference is between these two versions?
16     A   No, I am not.
17     Q   Okay.  And which application is
18  Mr. Valdez -- Felix Valdez, Exhibit 5, which
19  application is Mr. Valdez bound to?
20     MR. DROOKS:  Calls for a legal conclusion.
21  BY MR. MARK:
22     Q   You can answer.
23     MR. DROOKS:  And by "which," do you mean
24  Exhibit M or N?
25     MR. MARK:  Yeah.

Page 36

1      Q   I am asking, in other words, he signed this
2  in June of -- the same day as Izaar Valdez; right?
3      They appear to be signed the same day;
4  correct?
5      A   Correct.
6      Q   Okay.  And there are two different versions
7  of the application; correct?
8      A   Correct.
9      Q   And Version 31 was in place after
10  Version 28; correct?
11     A   Correct.
12     Q   Do you know which version of the
13  application, Exhibit 5 or Exhibit 6, Mr. Valdez is
14  bound to?
15     MR. DROOKS:  Calls for a legal conclusion.
16  BY MR. MARK:
17     Q   You can answer.
18     MR. CATLETT:  Join.
19     THE WITNESS:  Both Mr. Valdezs are --
20  BY MR. MARK:
21     Q   Okay.  Well, Izaar is a female, but --
22     A   Oh, I didn't know.
23     Q   That's okay.  Yeah.
24     A   By virtue of signing these applications,
25  they are bound by all of our rules.  There is a clause



ROXANE ROMANS
JEFF RODGERS vs HERBALIFE LTD

January 24, 2018
37–40

Page 37

1  in the application --
2      Q    Um-hmm.
3      A    -- that dictates that.
4      Q    Okay.  So does that mean that they are
5  always bound by the latest version of the application?
6      A    They are bound by the most current version
7  of our rules.
8      Q    And what about the application, are they
9  bound by the most current version of the application,
10  as well?
11         MR. DROOKS:  Calls for a legal conclusion.
12         THE WITNESS:  I think I would have to be a
13  lawyer to answer that.
14  BY MR. MARK:
15      Q    Well, you have testified that they are bound
16  by the most current version of the rules; correct?
17      A    Because we have a clause in the application
18  that states that.
19      Q    Where does it say that?
20      A    So clause No. 1:
21         "I apply to become an independent
22         distributor of Herbalife products
23         on the terms and conditions set
24         forth below and on the back of this
25         form, as well as the documents

Page 38

1         which are expressly incorporated
2         into this agreement of
3         distributorship."
4      Q    Okay.  And which documents are "expressly
5  incorporated into this agreement of distributorship"?
6         MR. DROOKS:  Calls for a legal conclusion.
7  BY MR. MARK:
8      Q    You can answer.
9      A    Can you -- can you repeat the question?
10      Q    Sure.
11         Which documents are "expressly incorporated
12  into this agreement of distributorship"?
13      A    So those documents are identified in clause
14  No. 5.
15      Q    Okay.
16      A    Which explicitly states:
17         "The Herbalife International
18         business pack contains, among other
19         things, the Rules of Conduct and
20         distributor policies, the sales and
21         marketing plan, ordering procedures
22         and sample forms.  Those documents
23         and such other rules and policies
24         as Herbalife has published or in
25         the future may publish, together

Page 39

1         with such modifications and
2         amendments as Herbalife shall make
3         from time to time in its sole and
4         absolute discretion collectively
5         the rules are each hereby
6         incorporated into this agreement of
7         distributorship, each in its then
8         most recently published form."
9      Q    Okay.  So that's the basis for your
10  testimony that the individuals who -- that sign these
11  applications are subject to the Rules of Conduct that
12  are in effect at the time?
13         MR. DROOKS:  Lacks foundation.  Calls for a
14  legal conclusion.
15         MR. CATLETT:  Object to the form.
16         THE WITNESS:  That's correct.
17  BY MR. MARK:
18      Q    And if you see here, look at -- looking at
19  Exhibit 6, it refers to an Herbalife International
20  business pack, IBP or mini IBP.
21         Do you see that?
22         MR. DROOKS:  Are you talking about the
23  English translation, paragraph 5?
24         MR. MARK:  No, I am talking about
25  paragraph 3(a).

Page 40

1         MR. DROOKS:  In the English version?
2         MR. MARK:  Yes.  It is in both versions.  I
3  am just using English.
4         MR. DROOKS:  Okay.
5         THE WITNESS:  Yes, I see that.
6  BY MR. MARK:
7      Q    Okay.  What is the Herbalife International
8  business pack?
9      A    The Herbalife International business pack is
10  what an individual purchases when they want to become
11  a distributor.
12      Q    Okay.  And what is in an International
13  business pack?
14         MR. DROOKS:  Vague as to time.
15  BY MR. MARK:
16      Q    At the time that this document was signed in
17  June of 2008, what was in the International business
18  pack?
19      A    I am not an expert, but I can tell you, to
20  the best of my knowledge, what was included in the
21  pack.
22      Q    Um-hmm.
23      A    Distributorship application, a button, some
24  product, and some marketing literature, as well as the
25  rule book; and sales and marketing plan.



ROXANE ROMANS
JEFF RODGERS vs HERBALIFE LTD

January 24, 2018
41–44

Page 41

1    Q    The "rule book" being the Rules of Conduct?
2    A    Correct.
3    Q    Okay.  So after somebody would sign this,
4  mail it into Herbalife, Herbalife would then send back
5  that International business pack?
6    A    No.
7    Q    Okay.  So then how was it that they would
8  receive the International business pack?
9    A    They would receive it in a variety of ways.
10  They could receive it from a distributor who meets
11  them and discusses the business opportunity with them.
12    Q    Okay.
13    A    And that distributor would provide the kit
14  at that moment.
15         If an individual became aware of our
16  business opportunity online, then in that case, yes,
17  the kit would be mailed to them from Herbalife.
18    Q    Okay.  But right now, I just want to focus
19  in on these applications that were actually
20  handwritten out and mailed back to Herbalife.
21    A    Um-hmm.
22    Q    Okay.  So the way that they would receive
23  the kit would be either from another distributor;
24  right?
25    A    Correct.

Page 42

1    Q    Or would Herbalife send the kit or Herbalife
2  would not send the kit?
3    A    If these applications were signed previous
4  to our online ability for people to sign up online,
5  they would have received it directly from the
6  distributor.
7    Q    Okay.  Do you know when Herbalife first
8  permitted people to sign up online?
9    A    I don't recall.
10    Q    But obviously, Izaar and Felix Valdez did
11  not sign up online; right?  You can see that by the
12  application?
13         MR. DROOKS:  It's vague as to time.
14         THE WITNESS:  That's true.
15  BY MR. MARK:
16    Q    In other words, it is true that they didn't
17  sign up online; right?
18         It is not true that it is vague as to time.
19  I am trying to understand.
20    A    I'm sorry.  I am mistaken.
21         Felix Valdez and Izaar Valdez, in 2008,
22  submitted paper applications.
23    Q    Right.
24    A    That's correct.
25    Q    So they did not receive -- so they did not

Page 43

1  sign up online; correct?
2    A    Correct.
3    Q    Okay.  So how did they receive the
4  International business pack?
5         How would that have come to them, just
6  solely through another distributor?
7    A    To the best of my knowledge, it would have
8  been from their sponsor.
9    Q    And does their sponsor -- what is the
10  process by which a sponsor gives them the
11  International business pack?
12         Is it after they fill out the application,
13  they then give it to the sponsor?
14         Obviously, not because they sent it to
15  Herbalife, the application.
16    A    Well --
17         MR. DROOKS:  It is now compound and
18  argumentative.
19  BY MR. MARK:
20    Q    Okay.  So how do they receive the
21  International business pack?
22    A    They would receive it physically from their
23  sponsor.
24    Q    After they signed the application?
25         MR. CATLETT:  Foundation.

Page 44

1         THE WITNESS:  It is kind of like the chicken
2  or the egg; right?  The application is within the kit.
3  So whether they -- well, they would receive the kit,
4  open it, take out the application; and complete it --
5  BY MR. MARK:
6    Q    Oh, okay.
7    A    -- together.
8    Q    I understand.  Okay.
9         So the only way to get the paper application
10  was, it is part of the kit?
11    A    Correct.
12    Q    Okay.  Was the kit -- did the kit contain
13  documents in Spanish or English or both?
14    A    We have a Spanish kit and an English kit.
15    Q    If the application is in Spanish, does that
16  mean that the other documents in the kit are in
17  Spanish, as well?
18    A    Correct.
19    Q    There are two different packs referenced
20  here in paragraph 3(a) of Mr. and Mrs. Valdez's
21  application, the International business pack and the
22  mini IBP.
23         What is the difference between the mini IBP
24  and the IBP?
25    A    The difference is the product that is



Page 45

1   included within the kit.  So in the full kit, the
2   person receives a full canister of product, and in the
3   mini kit, I believe they are only receiving sample
4   size products.
5       Q   Okay.  Are all the documents the same in
6   both kits?
7       A   Yes.
8       Q   Okay.  Okay.  Let's look at Exhibit 7,
9   please, which is Ms. Rodgers' application.
10      A   Okay.
11      Q   There were Rules of Conduct in effect at the
12  time of this application?
13      A   Yes.
14      Q   Okay.  Now, this application does not
15  contain an arbitration provision; correct?
16          MR. DROOKS:  The documents speaks for
17  itself.
18  BY MR. MARK:
19      Q   Okay.  You can answer the question.
20          MR. MARK:  Please keep your objections to
21  form.  Okay.
22          Go ahead.
23          THE WITNESS:  Yeah, I would say that is
24  correct.
25

Page 46

1   BY MR. MARK:
2       Q   So you would agree with me that at the time
3   that she signed this application in June of 2010,
4   there was no arbitration agreement in effect; correct?
5           MR. DROOKS:  Calls for a legal conclusion.
6           MR. MARK:  Her whole affidavit is a legal
7   conclusion.  Okay.
8           Go ahead.
9           THE WITNESS:  I believe that's correct.
10  BY MR. MARK:
11      Q   And the same goes for Ms. Loken; correct, if
12  you look at the next exhibit?
13          MR. DROOKS:  Calls for a legal conclusion.
14          MR. MARK:  Please keep your objections to
15  form.
16          MR. DROOKS:  Calls for a legal conclusion.
17          MR. MARK:  I don't know what the practice is
18  in Central District California.  In the Southern
19  District of Florida, objection depositions are either
20  form or you can instruct the witness not to answer.
21          MR. DROOKS:  Well, my understanding is that
22  calling for a legal conclusion is an objection to form
23  because it could be corrected in a way that would
24  allow you to avoid the objection.
25          MR. MARK:  So just say, "Object to form."

Page 47

1           MR. DROOKS:  That is not a viable objection.
2   I have to state what the objection is so that when the
3   Court reviews the transcript, the Court will know what
4   it is; and you are on notice as to how to correct it.
5           MR. MARK:  Okay.  We disagree.
6           MR. DROOKS:  We may have a difference in
7   practice.
8           MR. MARK:  It is not a difference in
9   practice.  It is a difference in the local rules under
10  the Southern District of Florida.
11      Q   Okay.  Ms. Rodgers' application, that has
12  been marked as Exhibit 8; is that correct?
13      A   7.
14      Q   I'm sorry.  7.
15          Okay.  And Ms. Loken's application, what is
16  that exhibit?
17      A   8.
18      Q   8.  Okay.
19          So you would agree that Ms. Loken's
20  application does not contain an arbitration provision;
21  correct?
22      A   Yes, I agree.
23      Q   Okay.  And Ms. Rodgers' application does not
24  contain an arbitration provision; correct?
25          MR. DROOKS:  What exhibit is that?

Page 48

1           MR. MARK:  7.
2           MR. DROOKS:  What exhibit?
3           MR. MARK:  7.  7.
4           MR. DROOKS:  Thank you.
5           THE WITNESS:  I don't believe that I have
6   the entire application.  I only -- it stops at 8 and
7   it does not include the entire clause.
8   BY MR. MARK:
9       Q   I'm sorry, this is Ms. Loken's?
10      A   Patricia Rodgers.
11          MR. MARK:  Can I see?
12          MR. CATLETT:  It should be a three-page
13  document.
14          MR. MARK:  Yeah, three pages.  Let me run a
15  copy of my version, which has the three pages.
16          THE WITNESS:  Okay.
17          MR. MARK:  Sorry about that.
18          THE WITNESS:  No problem.
19          MR. MARK:  Is there someone that can run a
20  copy for me?
21          MR. DROOKS:  Sure.  We have been going about
22  an hour.  Let's take a five-minute break.  I will get
23  you the copy, and if you have any other copies, I can
24  do it at the same time.
25          MR. MARK:  I don't think I do, but you never



Page 49

1   know.
2        MR. CATLETT:  Are we off the record?
3        MR. MARK:  Yeah.
4        (Recess.)
5        MR. MARK:  So, Counsel, I am going to add,
6   this page was inadvertently omitted from Exhibit 7.
7   It is the third page of Ms. Rodgers' application.
8        MR. DROOKS:  Sure.
9        MR. MARK:  Okay.  I am going to add that to
10  what has been previously marked as Exhibit 7.
11       Q    So now, can you confirm for me that that is
12  a complete application for Ms. Rodgers?
13       A    Yes, it is a complete application.
14       Q    Okay.  Thank you.
15            This application was filled out online?
16       A    Yes, it was.
17            MR. LEVINE:  What did she say, Etan?
18            MR. MARK:  Said this application was filled
19  out online.
20       Q    So, remember, earlier we were talking about
21  the process by which those folks who had paper
22  applications received the International business pack?
23       A    Yes.
24       Q    What is the process by which people who fill
25  out applications online receive the International

Page 50

1   business pack?
2        A    To the best of my knowledge, the applicant
3   could have received the pack in two various ways:
4            One, when they go online, they have the
5   option of purchasing the business pack at that time;
6   but also, we have people that meet a distributor, and
7   just the same as I described for the paper process,
8   that distributor provides them with a kit; but
9   perhaps, they don't want to fill out the paper
10  application.  They want to do it online
11  electronically.
12            So in this case, they could either get it
13  from a distributor and fill the application out
14  online, or they could just go online and purchase a
15  kit at the same time that they are filling out the
16  application.
17       Q    Oh, when they purchase a kit, that then
18  triggers Herbalife to send the kit to that
19  distributor?
20       A    That is correct.
21       Q    And in that kit, is the same items that we
22  talked about earlier, it does not change; correct?
23       A    That's correct.
24       Q    Including the Rules of Conduct; correct?
25       A    Correct.

Page 51

1        Q    And if you fill out the application online
2   and the kit is mailed to you subsequently?  You are
3   not seeing the Rules of Conducts until the kit is
4   mailed to you; is that correct?
5        MR. DROOKS:  That calls -- form.  Objection
6   as to form.
7        MR. MARK:  Very good.  Thank you.
8        Q    You can answer.
9        A    The distributor has the opportunity to read
10  the rules when they are signing up online.
11       Q    How does that work?
12       A    Through a link.
13       Q    So walk me through that.
14            So you had this application online; right?
15       A    Yes.
16       Q    And you are filling it out.  How do you then
17  see the Rules of Conduct?
18       A    So the distributor acknowledges by signing
19  this application that they have reviewed or will
20  review the Rules of Conduct, which are provided online
21  through a link.
22       Q    Where does it say that?
23       A    Okay.  I believe that is cited in
24  Clause 3(d) and also in Clause 4.
25            Cause 3(d) states:

Page 52

1            "I am aware that the only required
2            purchase to become, succeed or
3            advance as an Herbalife independent
4            distributor is the mini
5            International business pack.  The
6            mini IBP is a basic package
7            containing only explanatory
8            materials, forms and product sample
9            packages."
10       Q    I'm sorry, what provision are you in?
11       A    I am in 3 and D.  3(d).
12       Q    Can I see the document that you are looking
13  at, please?
14       A    Of course.
15       Q    Oh, okay.  So I am actually looking at
16  Ms. Rodgers' application.
17       A    Oh, I'm sorry.
18       Q    So let's look at that one; okay?
19       A    Okay.
20       Q    And Exhibit 7; right?
21       A    Yes.
22       Q    Is it your understanding that provision is
23  in there, as well, Exhibit 7?
24       A    Yes.
25       Q    Okay.  Where is that?



Page 53

1    A   That is in also Clause 3(d).
2    Q   Okay.
3    A   "So I am aware" -- do you want me to --
4    Q   I'm sorry, I just don't -- oh, Clause 3.
5        Okay.  I am on 3.  I got it.
6    A   And letter D.
7    Q   Mine just says 3.
8    A   Well, we have 3 and then we have got an A,
9   B, C, D.
10   Q   Can I just make sure we are looking at the
11  same document?
12   A   Um-hmm.  Of course.
13   Q   Okay.  Okay.  So 3, yup, "I am aware."  Got
14  it.
15   A   Okay.
16       And the Clause D says:  "I will
17       review the statement of average
18       gross compensation of U.S.
19       supervisors and policy statements
20       on business methods, both of which
21       are contained in the mini IBP and
22       the IBP, and which are available on
23       myherbalife.com or upon request
24       from my sponsor or Herbalife's
25       Distributor Relations Department."

Page 54

1    Q   Okay.  But -- I'm sorry.
2    A   Clause 4, just to continue.
3    Q   Yes, please.
4    A   "The Herbalife International
5        Business pack contains, among other
6        things:  The Rules of conduct and
7        distributor policies, the sales and
8        marketing plan; ordering procedures
9        and sample forms.  Those documents
10       and such other rules and policies
11       as Herbalife has published or in
12       the future may publish together
13       with such modifications and
14       amendments as Herbalife shall make,
15       from time to time, in its sole and
16       absolute discretion, collectively
17       the rules are each hereby
18       incorporated into this agreement,
19       each in their then most recently
20       published form."
21   Q   Okay.
22   A   And, I'm sorry, I know that doesn't answer
23  your question.  Let me find that.
24   Q   Right.  Because I thought you said that
25  there was a provision --

Page 55

1        MR. DROOKS:  Let -- the witness is still
2   answering the question.
3   BY MR. MARK:
4    Q   Okay.
5    A   Oh, I found it.
6    Q   Okay.  Good.
7    A   It is Clause 3(a).
8        "So I hereby represent, warrant,
9        agree that upon my receipt of
10       Herbalife's mini or full
11       International business pack, I will
12       thoroughly review the contents of
13       the previously unopened pack."
14   Q   I see.  Okay.  And within that pack includes
15  the Rules of Conduct?
16   A   Exactly.
17   Q   And earlier when you testified that you
18  understood there was a provision in this agreement
19  that provides that the distributor will review the
20  Rules of Conduct, that was the provision that you were
21  referring to?
22   A   That's correct.
23   Q   Okay.  And am I correct that in some cases,
24  the distributor doesn't have physically in his or her
25  possession the Rules of Conduct at the time that they

Page 56

1   sign this application?
2    A   It depends on how you define "physically."
3    Q   Okay.  How do you define it?
4    A   If they are online submitting an
5   application, they had access to the Rules of Conduct
6   online; and also they are able to print them, if they
7   wish.
8    Q   Okay.  Does it say here how to access the
9   Rules of Conduct online?
10   A   I believe so.
11   Q   Where is that?
12   A   I believe your question is answered with
13  No. 4 for technical requirements.
14   Q   Okay.
15   A   I will have to read it to see if it answers
16  your question.
17   Q   Sure.  Please read.
18   A   "The technical requirements to access" --
19   Q   If you want to read that out loud, you're
20  welcome to; but you don't have to.
21   A   Okay.  Let me read it to myself.
22   Q   Sure.
23   A   I don't see that in this version of the
24  application.
25   Q   Okay.  So how does a distributor access the



1  Rules of Conduct online as of June of 2010?
2      A   On myherbalife.com.
3      Q   Okay.  So after the distributor completes
4  this application, what does it look like to -- how do
5  you access the Rules of Conduct?
6          I know it is obviously on myherbalife.com.
7          This application is completed on
8  myherbalife.com; right?
9      A   Correct.
10     Q   Okay.  So then how do you then get to the
11 Rules of Conduct from this application?
12     A   It is my understanding that we provide a
13 link within the application.
14     Q   Okay.  But there is no link within this
15 application; is there, to the Rules of Conduct?
16     A   Not that I can see on this printed version.
17     Q   Okay.
18     A   But that doesn't mean that there is not a
19 link available.
20     Q   Well, what is a link?  I mean, is it a
21 hyperlink or is it a button?
22         What does it look like, the link, if you
23 know?
24     A   I don't know.
25     Q   Okay.  So you don't know whether -- you know

1  that the Rules of Conduct were available online as of
2  June, 2010; correct?
3      A   Correct.
4      Q   But you don't know exactly how it is that a
5  distributor can access those Rules of Conduct from
6  this application?
7      A   My understanding is that they are provided
8  with a link and that they click that link, which
9  carries them to the Rules of Conduct.
10     Q   Okay.  But that link is nowhere to be seen
11 on Exhibit 7; correct?
12     A   I don't see that link in Exhibit 7.
13     Q   And nor is it on Exhibit 8; correct?
14     A   Correct, nor is it on Exhibit 7.
15     Q   Okay.  And on --
16     A   I'm sorry, Exhibit 8.
17     Q   Thank you.
18         And on both Exhibits 7 and 8, there is a
19 place for a signature on the first page; correct?
20     A   Correct.
21     Q   And then how is it, then, the applicant gets
22 to the agreement of distributorship itself when you
23 are looking at it online?
24         Is it literally just a screen that you
25 scroll down and you see the agreement of

1  distributorship, and then you see the next page of the
2  agreement of distributorship; is that how it looks?
3      A   I believe so.
4      Q   Okay.  And once the applicant signs
5  electronically the first page of this document that
6  has been marked as Exhibit 7, is there anything else
7  that the applicant has to do to submit her application
8  for distributorship?
9      A   No.
10     Q   Now, on the third page of Exhibit 7, there
11 is a provision that says:
12         "Herbalife electronic disclosure
13         agreement and online distributor
14         application and agreement."
15         Do you see that?
16     A   Yes.
17     Q   Okay.
18         And it says, "By clicking, I agree
19         below," et cetera, et cetera.
20         Do you see that?
21     A   Yes.
22     Q   Is there a -- is there a button on the
23 bottom of this that normally appears that says, "I
24 agree"?
25     A   I am not sure where the button is located,

1  but where the distributor signs on page 1.
2      Q   Yes.
3      A   "By executing the application,
4         The distributor acknowledges that
5         he/she has reviewed the terms and
6         conditions on the reverse side of
7         the application and agrees to be
8         bound by them."
9      Q   Right.  So -- and I appreciate that, but
10 what I am wondering is are you aware of any kind of --
11 it says, "By clicking, I agree below."
12         I am wondering if there is a button that the
13 distributor clicks or the applicant clicks, which then
14 submits the application to Herbalife electronically,
15 if you know?
16     A   I don't know if it is a button or a link.  I
17 don't know what it looks like online.
18     Q   But is there some kind of a submit button or
19 an okay button?
20     A   There is something, yes.
21     Q   Okay.  And that is not on the first page of
22 the application; that is at the end of the application
23 after the electronic disclosure agreement?
24     A   I wouldn't know.
25     Q   Okay.



ROXANE ROMANS                                          January 24, 2018
JEFF RODGERS vs HERBALIFE LTD                          61–64

Page 61

1       And this statement: "By executing
2   the application, distributor
3   acknowledges that he/she has
4   reviewed the terms and conditions
5   on the reverse side of the
6   application."
7       There is no reverse side of this
8   application; is there?
9   A   You're correct.
10      Q   And is it your position that they are bound
11  by the terms -- by the Rules of Conduct that are in
12  effect at the time that they signed the application?
13      MR. DROOKS:  Yeah, that is a contention
14  interrogatory.  That is a contention question.  The
15  witness is not a PMQ.
16      I will instruct her not to answer.
17      MR. MARK:  Okay.
18      MR. DROOKS:  You can ask her her
19  understanding.
20  BY MR. MARK:
21      Q   Is it your understanding that at the time
22  that they signed this application, they are bound by
23  the Rules of Conduct in effect as of the date that
24  they signed the application?
25      A   As of the date we accept their application,

Page 62

1   they are bound by the rules that -- yes, the current
2   rules that are -- that are published.
3       And one of our rules stipulates that the
4   distributor should stay informed of our current
5   policies and will abide and comply with our rules and
6   the law.
7       Q   And that is Rule 8(c); is that correct?
8       A   A portion of 8(c), yes.
9       Q   But is that the rule you were referring to,
10  the portion of 8(c)?
11      A   One of the rules, yes.
12      Q   Is there another rule besides 8(c) that
13  provides that?
14      A   There is one rule, 8(c), which stipulates:
15      "The distributor should stay
16      informed of our current rules and
17      abide by them."
18      And then there is another rule that states:
19      "Distributors must comply with our
20      rules and the law."
21      Q   What rule is that?
22      A   I'm sorry, I don't recall the number.
23      Q   Okay.  Is Rule 8(c) in the current version
24  of the Rules of Conduct?
25      A   I believe that language or similar language

Page 63

1   is in the current Rules of Conduct, but it is not
2   entitled 8(c).
3       Q   Okay.  We will get to that later.  Okay?
4       A   Um-hmm.
5       Q   Looking at what has been marked as
6   Exhibits 10 and 11, that's Mr. Pyle and Ms. Lavigne;
7   right?
8       A   Yes, that's correct.
9       Q   Is there any kind of click to agree in this
10  application?
11      A   It's not visible to me on this printout, but
12  it's visible -- something is visible to the applicant
13  on the screen.
14      Q   Okay.  So let's go through it.
15      So 10 and 11, those are the same -- those
16  are the same versions of the distributorship
17  application; right?  They are both Version 43, it
18  looks like, in English?
19      A   Yes, that's correct.
20      Q   Okay.  So let's just look at Mr. Pyle's
21  Exhibit 10.  Then I will assume that your answers
22  apply to Exhibit 11; okay?
23      A   Okay.
24      Q   If they don't, just let me know.
25      So on the first page, there is a place for

Page 64

1   the applicant's signature; correct?
2       A   That's correct.
3       Q   Okay.  And that is an electronic signature,
4   they type in their name; right?
5       A   Correct.
6       Q   Now, on the second page of the application
7   where it states, "Gold Standard Guarantees," there are
8   a number of provisions that say, "I have read and
9   understood this message."
10      Do you see that?
11      A   Correct.
12      Q   Are there little boxes to check next to each
13  of those statements?
14      A   That's correct.
15      Q   Okay.  Are they actually check boxes or do
16  you click, "I have read and understood"; I have read
17  and understood"?
18      A   I -- I don't recall.
19      Q   Okay.  And then the next page is a Statement
20  of Average Gross Compensation paid by Herbalife to
21  U.S. members in 2013; right?
22      A   Yes.
23      Q   Is there any kind of click to agree or I
24  understand with respect to that statement?
25      A   Yes.



Page 65

1    Q   Where is that?
2    A   That's No. 6 on the previous page, the Gold
3  Standard Guarantees.
4    Q   Okay.  Where does it say that -- oh, it
5  says, I understand -- I see.  I understand.  Okay.
6    A   Correct.  Um-hmm.
7    Q   I see.  So that check next to No. 6 applies
8  to the Statement of Average Gross Compensation on the
9  next page?
10    A   Correct.
11    Q   And then it states, after No. 6:
12        "To see all of your rights and
13        obligations as an Herbalife member,
14        please review Herbalife's Rules of
15        Conduct in your member pack or
16        visit myherbalife.com."
17        Did I read that correctly?
18    A   Yes.
19    Q   And there is an actual hyperlink to
20  myherbalife.com; correct?
21    A   Correct.
22    Q   Is there a link to the Herbalife Rules of
23  Conduct?
24    A   Directly to the Rules of Conduct?
25    Q   Yes.

Page 66

1    A   I don't know.
2    Q   Okay.  Well, how --
3    A   I believe this routes directly to the Rules
4  of Conduct.
5    Q   You believe that the hyperlink that says
6  "myherbalife.com" actually links directly to the Rules
7  of Conduct?
8    A   I believe so.
9    Q   Okay.  Are you certain about that or are you
10  speculating?
11        MR. DROOKS:  Form.
12  BY MR. MARK:
13    Q   You can answer.
14    A   I am not certain technically how it works,
15  but I do know that we provide a PDF specifically of
16  the Rules of Conduct, which is linked directly to this
17  application.
18        And so it is my understanding that this link
19  will take the user directly to the rules document.
20    Q   Okay.  And if you look at the page, the next
21  page that begins with, "A membership," do you see
22  that?  It is in two pages.
23    A   Yes.
24    Q   Is there any place as you go through the
25  next eight or nine pages of this document where you --

Page 67

1  where it says, click to agree or accept or anything
2  like that, as we have seen on the previous three
3  pages?
4    A   I believe that there is near D, Electronic
5  Disclosures.
6    Q   Okay.  So you are on page 749 of 771; right?
7  Where it says, "Electronic disclosures"?
8    A   Yes, correct.
9    Q   Okay.  So you think that somewhere on D --
10  on that section D, there is a button to click?
11    A   To the best of my recollection, yes.
12    Q   And where is that button?
13    A   Well, it's not showing on this printout.
14    Q   Right.
15    A   But the person sees it on the screen.
16    Q   And it would be after paragraph 1, "Consent
17  to Electronic Disclosures"?
18    A   I would be guessing if I told you where it
19  was located.
20    Q   Okay.  So you think that there is a button
21  somewhere on this page, you're not sure where?
22    A   Correct.
23    Q   And prior to Herbalife accepting the
24  application, are they required to consent to
25  Electronic Disclosures?

Page 68

1        MR. DROOKS:  By "they," you mean --
2  BY MR. MARK:
3    Q   Prior to Herbalife accepting this
4  application, is the applicant required to consent to
5  the Electronic Disclosures?
6    A   I don't know the answer to that question.
7    Q   Prior to Herbalife accepting this
8  application, is it required that the applicant click
9  each of the options on the second page of this
10  document that states, "I have read and understood this
11  message"?
12    A   That's correct.
13    Q   But you're not aware of any other point on
14  this application that is required for the applicant to
15  click in order to submit the application to Herbalife
16  other than on the first two pages; is that correct?
17    A   Correct.
18    Q   Let's look at your declaration.
19  Paragraph 6, it states:
20        "Herbalife distributor Rules of
21        Conduct, defined as rules, together
22        with the distributor agreement,
23        among other documents, provide the
24        terms and conditions under which a
25        distributor must operate his or her



Page 69

1       Herbalife distributorship."
2       Did I read that correctly?
3    A   Yes.
4    Q   So is it your understanding that
5    distributors are bound by the provisions of the Rules
6    of Conduct?
7    A   Yes.
8    Q   And it is by the provisions of the Rules of
9    Conduct in effect at that -- at the moment; correct?
10   A   Yes.
11   Q   And going back to Ms. Rodgers' application,
12   let's look at paragraph 4, which you read before
13   talking about the documents that are incorporated; --
14   A   Yes.
15   Q   -- right?
16       Okay. So -- so tell me, please, which
17   documents are incorporated into an application for
18   distributorship?
19       MR. CATLETT:  Form and foundation.
20       THE WITNESS:  Any policy document that
21   Herbalife publishes is incorporated.
22   BY MR. MARK:
23   Q   And how does Herbalife publish these policy
24   documents?
25   A   We have a number of different materials

Page 70

1    which could be our -- before our rule book, Rules of
2    Conduct.  It could be on the membership application.
3    It could be in any other agreement that we require our
4    distributors to sign.  It could be in an announcement
5    that we have made to our members about a policy.
6    Q   An announcement, an oral announcement or a
7    written announcement?
8    A   The announcements would -- do take place
9    orally and -- and written.
10   Q   Okay.  And are all of these announcements
11   available on myherbalife.com?
12   A   Yes.
13   Q   Okay.  Are all of the policies that bind --
14   let me try that again.
15       All policies to which distributors are bound
16   are found on myherbalife.com?
17       MR. DROOKS:  Objection as to form.  Legal
18   conclusion.
19   BY MR. MARK:
20   Q   You can answer.
21   A   I would say, yes.
22   Q   So we talked about the Rules of Conduct,
23   that is Book 4; is that how you --
24   A   Yes.
25   Q   Okay.  What are distributor policies?  What

Page 71

1    is that?
2    A   Distributor policies are the rules and the
3    clauses on our membership application, clauses on
4    other forms, information included in announcements.
5    Q   Anything else that you think fall into
6    distributor policies?
7    A   Not that I can think of.
8    Q   Okay.  And the sales and marketing plan,
9    what is that?
10   A   The sales and marketing plan describes the
11   business plan.
12   Q   And is that also incorporated into each of
13   the applications?
14   A   Yes.
15   Q   Ordering procedures?
16   A   Yes.
17   Q   What is that?
18   A   Ordering procedures provides members with
19   information as to how to place an order, what time
20   frames to place an order.  General information, fax
21   numbers, phone numbers, warehouse information.
22   Q   And those are also incorporated into the
23   applications?
24   A   Yes.
25   Q   And those are part of the documents that

Page 72

1    form the agreement between Herbalife and an applicant?
2    A   Correct.
3        MR. DROOKS:  Form.
4    BY MR. MARK:
5    Q   And sample forms, what is that?  What are
6    sample forms?
7    A   There is a section in the book that includes
8    a sample of the various forms.
9    Q   The various --
10   A   For reference and sometimes some of the
11   forms that a distributor can photocopy it in order to
12   use it.
13   Q   And are those sample forms part of the
14   documents that are incorporated into this agreement of
15   distributorship?
16       MR. DROOKS:  Form.
17       THE WITNESS:  Correct.
18   BY MR. MARK:
19   Q   And are those documents the terms and
20   conditions under which a distributor must operate his
21   or her Herbalife distributorship?
22       MR. DROOKS:  Form.
23       THE WITNESS:  Correct.
24   BY MR. MARK:
25   Q   Well, that is what you stated in your



Page 73

1   declaration; correct?
2        In paragraph 6 in your declaration you state
3   that:
4        "Herbalife's Rules of Conduct,
5        together with a distributor
6        agreement, among other documents,
7        provide the terms and conditions
8        under which a distributor must
9        operate his or her Herbalife
10       distributorship"; correct?
11   A   That's correct.
12   Q   Okay.  So I want to just make sure I
13   understand the universe of documents that comprise
14   those terms and conditions under which a distributor
15   must operate his or her Herbalife distributorship;
16   okay?
17   A   Yes.
18   Q   Okay.  So those documents include the Rules
19   of Conduct; correct?
20   A   Correct.
21   Q   The distributor policies?
22   A   Correct.
23   Q   The sales and marketing plan?
24   A   Correct.
25   Q   The ordering procedures?

Page 74

1   A   Correct.
2   Q   The sample forms?
3   A   Correct.
4   Q   And then other rules and policies --
5   A   Correct.
6   Q   -- that are available on myherbalife.com?
7   A   Correct.
8   Q   Okay.  As you sit here today, are there any
9   other -- are there any other terms and conditions
10   under which a distributor must operate his or her
11   Herbalife distributorship, other than those that I
12   just listed?
13       MR. DROOKS:  Form.
14   BY MR. MARK:
15   Q   That you are aware of?
16   A   No.
17   Q   And each of those documents are incorporated
18   into these applications in their most recently
19   published form; is that correct?
20       MR. DROOKS:  Form.
21       THE WITNESS:  Can you repeat that?
22   BY MR. MARK:
23   Q   Yeah.
24       Each of those agreements are incorporated
25   into these applications in their most recently

Page 75

1   published form?
2        MR. DROOKS:  Form.
3        THE WITNESS:  Yes.
4   BY MR. MARK:
5   Q   Now, later in these applications, it
6   states -- and if you look at Ms. Rodgers' application,
7   for example --
8        MR. DROOKS:  Yeah, that is compound.  It's a
9   different --
10   BY MR. MARK:
11   Q   If you look at Ms. Rodgers' application --
12   A   Um-hmm.
13   Q   -- Exhibit 7?
14   A   Yes, third page.
15   Q   Okay.  If you look at the third page, you
16   will see paragraph 12(b).
17       Do you see that paragraph?
18   A   Yes.
19   Q   And it states:
20       "This agreement, including
21       documents incorporated herein in
22       their then published form."
23       Do you see that?
24       MR. DROOKS:  Can I have an exhibit number on
25   that, so we can follow along?

Page 76

1        MR. MARK:  7.
2        MR. DROOKS:  7.
3   BY MR. MARK:
4   Q   Do you see the "then published form"?  Do
5   you see that?
6   A   I'm sorry, where were we?
7   Q   12(b).
8   A   Oh, yeah.  12(b), yes.
9   Q   What does "in their then published form"
10   mean?
11       MR. CATLETT:  Form and foundation.
12       MR. DROOKS:  Form.  Foundation.
13       THE WITNESS:  To my understanding?
14   BY MR. MARK:
15   Q   If you know what that means, yeah.
16   A   My understanding is the current form at that
17   time.
18   Q   At the time that this application is signed?
19       MR. CATLETT:  Same objections.
20       MR. DROOKS:  Same objections.  Form.
21       THE WITNESS:  No.
22   BY MR. MARK:
23   Q   So what does it mean?
24   A   The most current, whatever is the most
25   current at any date in time.



ROXANE ROMANS
JEFF RODGERS vs HERBALIFE LTD

January 24, 2018
77—80

Page 77

1    Q   Okay.  So when it states, "including
2   documents incorporated herein in their then published
3   form," that, to you, means the same thing as "the most
4   recently published form"; is that correct?
5    A   No.
6    Q   They mean different things?
7    A   My understanding is that this refers to the
8   document's most recently published form.  So at any
9   given date in time, whatever the current form of that
10  particular document is, is what this is applying to.
11  That's my understanding.
12    Q   So "then published form," to you, means the
13  same thing as "most recently published form"?
14        I am not trying to trick you.  I am just
15  trying to understand because there is two different --
16  the language is different in two different parts of
17  the application.
18        I am trying to understand if it is intended
19  to mean the same thing or if they mean two different
20  things.
21        MR. DROOKS:  It's argumentative.
22        THE WITNESS:  I think "most recently
23  published form" can also mean the same as "in their
24  then published form."
25

Page 78

1   BY MR. MARK:
2    Q   Okay.
3    A   My understanding of both terminologies is
4   that the distributor is bound by whatever, at any
5   given date and time, whatever the rules are at that
6   time.
7    Q   And it is your understanding that "then
8   published form" means the same thing as "most recently
9   published form"?
10    A   I don't know how to better describe my
11  answer than to say this includes future versions of
12  the language.
13    Q   So "then published form" includes future
14  versions of the documents?
15    A   Yes.
16    Q   Those categories of documents that we talked
17  about that were incorporated by reference into these
18  agreements, are they the same for each application?
19        Are there categories of documents that are
20  incorporated into certain applications, but not other
21  applications?
22    A   No.
23    Q   It's the same?
24    A   (Witness nods head.)
25    Q   "Yes"?

Page 79

1    A   Yes.
2    Q   Okay.  You talked about the myherbalife.com
3   website in your affidavit in paragraph 7.
4        Do you see that?
5    A   I see paragraph 7.
6    Q   In your declaration?
7        "Yes"?
8    A   (Witness nods head.)
9    Q   And you see there is a footnote; right,
10  which talks about myherbalife.com?
11    A   Yes.
12    Q   Can you tell me a little bit about
13  myherbalife.com.  I know, obviously, it is a website,
14  but what is it for?  And what is the purpose of
15  myherbalife.com?
16        MR. DROOKS:  Form.  Compound.
17  BY MR. MARK:
18    Q   What is the purpose of myherbalife.com?
19    A   Myherbalife.com is a tool for distributors
20  to use.
21    Q   Anything else?
22    A   It includes the Rules of Conduct.  It
23  includes areas on the site where the distributor can
24  track their progress, see how many volume points they
25  have, look at their royalties; and their earnings; and

Page 80

1   other information for distributors to use in order to
2   build their business.
3    Q   Is it an important tool for a distributor?
4        MR. CATLETT:  Form.
5        MR. DROOKS:  Speculative.  Form.
6   BY MR. MARK:
7    Q   You can answer.
8    A   I would say yes.
9    Q   Can you participate in the Herbalife
10  business opportunity without using the website?
11    A   If you sign up online, no.
12    Q   And it is your con -- well, is it your
13  understanding that you are actually required to stay
14  apprised of the myherbalife.com website, that is one
15  of the requirements to be a distributor?
16    A   I would rephrase that a little bit to say,
17  it's my understanding that the distributor has to stay
18  apprised of the Rules of Conduct.
19    Q   And the Rules of Conduct are only available
20  in their current form through myherbalife.com; is that
21  correct?
22        MR. CATLETT:  Form.
23        THE WITNESS:  Can you rephrase that?
24  BY MR. MARK:
25    Q   You -- you said that Herbalife -- that



Page 81

1   distributors are required to stay apprised of the
2   updated versions of the Rules of Conduct through
3   myherbalife.com; right?
4       A   Yes.
5       Q   Is there any other obligation, in your mind,
6   for distributors to go to myherbalife.com?
7       A   Obligation, no.
8       Q   Okay.  After Ms. Rodgers signed her
9   application, and after Ms. Loken signed her
10  application, the Rules of Conduct were amended;
11  correct?
12      A   Yes.
13      Q   And they were amended to include an
14  arbitration provision; correct, among other things?
15      A   I believe the amendment occurred prior to
16  the date they signed their application.
17      Q   The --
18      A   Oh, I beg your pardon.  You're correct.
19  After they signed their application, they were
20  amended.
21          MR. MARK:  I will hand you a document that I
22  will mark as Exhibit 12.
23          (Exhibit 12 marked.)
24          MR. DROOKS:  Is that somewhere that --
25          MR. MARK:  Yes.  I am going to tell you

Page 82

1   where it is.
2       Q   Well, can you identify this document?
3           MR. DROOKS:  I would really like to have a
4   copy of it before we start questioning the witness
5   about it.
6           MR. MARK:  Sure.  Here.
7       Q   Can you identify it?
8       A   This is an announcement provided by the
9   company.
10      Q   What is the date of the announcement?
11      A   I don't see a date here.
12      Q   If you look at your declaration,
13  paragraph 7, the second part of that, let me give you
14  this -- the second part of that states:
15          "On February 13, 2014, Herbalife
16          also sent a notification to all
17          distributors of the recent changes
18          to the rules, including the
19          addition of the arbitration
20          provision.  A complete and
21          authentic copy of that notice is
22          attached hereto as Exhibit B."
23          Do you see that?
24      A   Yes, I do.
25      Q   Okay.

Page 83

1           MR. MARK:  So I am going to hand you a
2   document that we will mark as the next exhibit.
3           THE REPORTER:  13.
4           MR. MARK:  13.
5           (Exhibit 13 marked.)
6           THE WITNESS:  Thank you.
7   BY MR. MARK:
8       Q   So I will represent to you that Exhibits 12
9   and 13 that I have handed you together comprise
10  Exhibit B to your declaration; okay?
11      A   Yes.
12      Q   And if you look at Exhibit 13, is it your
13  understanding that the advisory dated February 13,
14  2014, was part of Exhibit 12?
15      A   Yes, that's correct.
16      Q   Okay.  And it is your -- is it your
17  understanding that this amendment applied to those
18  existing distributors?
19      A   Yes, to all distributors.
20      Q   Including those that predated the date of
21  this amendment; correct?
22      A   Yes, that's correct.
23      Q   Okay.  And that is because Herbalife retains
24  the right to change the terms of its agreement with
25  its distributors by amending the Rules of Conduct?

Page 84

1       A   That's correct.
2           MR. DROOKS:  Objection as to form.
3   BY MR. MARK:
4       Q   Can Herbalife make these changes at any
5   time?
6       A   Yes.
7           MR. DROOKS:  Objection to form.
8           MR. MARK:  "Yes"?
9           THE WITNESS:  Yes.
10          MR. DROOKS:  Legal conclusion.
11  BY MR. MARK:
12      Q   Are there any restrictions, to your
13  knowledge, on Herbalife's ability to make these
14  changes to the documents?
15          MR. DROOKS:  Objection as to form.
16  BY MR. MARK:
17      Q   You can answer.
18      A   Can you rephrase the question?
19      Q   Are there any restrictions, to your
20  knowledge, on Herbalife's ability to make these
21  amendments?
22      A   These amendments?
23      Q   Yeah, any amendments.
24          MR. DROOKS:  Objection as to form.
25          MR. CATLETT:  And foundation.



Page 85

1  BY MR. MARK:
2      Q    You testified that Herbalife can amend the
3  documents at any time; correct?
4      A    Um-hmm.  Yes.
5      Q    Okay.  And it can do so -- are there any
6  restrictions on its ability to do so, to your
7  knowledge?
8      A    Yes.
9      Q    And what are those restrictions?
10     A    We are bound by an agreement that we made
11  with our distributors that we will not make changes to
12  our sales and marketing plan in any way that will
13  be -- impact the way that -- that their -- that they
14  have been able to earn with our marketing -- sales and
15  marketing plan.
16     Q    Okay.  So there is a restriction on
17  Herbalife's ability to amend its sales and marketing
18  plan; is that correct?
19         MR. DROOKS:  Calls for -- form.
20         THE WITNESS:  Let me say there is parameters
21  as to how we make certain changes to our sales and
22  marketing plan.
23  BY MR. MARK:
24     Q    Okay.  Are there any parameters as to
25  Herbalife's ability to amend the Rules of Conduct, to

Page 86

1  your knowledge?
2      A    No.
3      Q    And when are the changes -- well, let's
4  start with this one, Exhibit 12.
5         When do these changes become effective?  In
6  other words, when do they first apply to the
7  distributors?
8         MR. CATLETT:  Form and foundation.
9         THE WITNESS:  Upon publication.
10  BY MR. MARK:
11     Q    Okay.  And when were these amendments
12  published?
13     A    Well, it states in this advisory that these
14  rules became available in our warehouses and could be
15  accessed online --
16     Q    You are looking at Exhibit --
17     A    -- around --
18     Q    -- 13 --
19     A    -- February 13th of 2014.
20     Q    Okay.  So you are looking at Exhibit 13; is
21  that correct?
22     A    Correct.
23     Q    So -- so the changes that are reflected in
24  Exhibit 13 first became effective on February 13,
25  2014?

Page 87

1      A    No.
2      Q    Okay.  When did they first become effective?
3      A    When we published them --
4      Q    And when did you --
5      A    -- online, which was, I believe, in advance
6  of this advisory being published.
7      Q    And when was -- when was that?
8      A    So let me see, I believe it was in October
9  of 2013.
10     Q    And what forms the basis of that
11  understanding?
12     A    I just recall that in reviewing materials in
13  preparation for my declaration.
14     Q    Okay.  So -- and if you look in your
15  declaration, you see in paragraph 7 it states:
16         "This version of the rules and the
17         arbitration provision were readily
18         available to distributors online
19         through myherbalife.com on
20         October 28, 2013."
21     A    Correct.
22     Q    Okay.  So it is your understanding that --
23  that these amendments that are reflected in
24  Exhibit 13, first became effective on October 28,
25  2013, when they were published on the Herbalife

Page 88

1  website?
2      A    That's correct.
3      Q    And that is myherbalife.com; right?
4      A    Yes.
5      Q    Was there any notification to distributors
6  at that time that the rules were changing?
7      A    Not -- that I can recall.
8      Q    Exhibit 12 is the first notification of --
9  to distributors of this change; correct?
10     A    It is possible that we may have made a
11  verbal announcement to our distributor leadership in
12  advance of the advisory being published.  So a verbal
13  announcement is very possible in advance of the
14  October date.
15     Q    And you said "distributor leadership"; is
16  that what you said?
17     A    Yes.
18     Q    Who is that?
19     A    So our President Team members.
20     Q    Okay.  Other than -- other than the
21  potential announcement to President Team members, are
22  you aware of any other announcement of these
23  amendments to the distributorship relationship prior
24  to February 13, 2014?
25     A    No.



Page 89

1    Q   And is it your -- do you believe that when
2  these new rules were first posted on the website in
3  October of 2013, that those replaced the earlier
4  versions of the Rules of Conduct?
5    A   Yes.
6    Q   Do you know why it took four months between
7  the posting of the rules in October of 2013 and the
8  February 13, 2014 announcement?
9    A   As I recall, we were making quite a few
10 changes at that time, and rather than sending several
11 different announcements within that period of months,
12 I believe we waited to complete our full nomenclature
13 changes before publishing this advisory.
14   Q   Okay.  And this amendment, which you state
15 became effective in October of 2013, this is the
16 first -- this amendment added an arbitration
17 provision; correct?
18   A   Yes.
19   Q   And this also added the jury trial waiver
20 provision; correct?
21   A   Yes.
22   Q   And this also added the class action waiver
23 provision; correct?
24   A   Yes.
25   Q   And until this change occurred in October of

Page 90

1  2013, there were no such restrictions in the
2  distributor agreement at the time; correct?
3    A   Can you ask one more time?
4        MR. MARK:  Can you read it back?
5        (Record read.)
6        MR. CATLETT:  Object to form.
7        THE WITNESS:  We may have had arbitration
8  provision years before and I am not certain.  I don't
9  want to --
10 BY MR. MARK:
11   Q   Well, we saw the arbitration provision, in
12 fact, in earlier --
13       MR. DROOKS:  Let the witness finish her
14 answer.
15 BY MR. MARK:
16   Q   Okay.  Go ahead.
17   A   Before 2013, we may have had an arbitration
18 provision in our membership application.
19   Q   Well -- are you done with your answer?
20   A   Yes.
21   Q   Okay.  Now, in 2008, we saw Mr. Valdez -- we
22 saw in Mr. Valdez's agreement, which was signed in
23 2008, there was an arbitration provision; correct?
24   A   Yes.
25   Q   Is that what you are thinking about?

Page 91

1    A   Yes.  Thank you for reminding me.
2    Q   Sure.
3        And then subsequent to that, though, the
4  arbitration provision was removed; correct?
5    A   Yes.
6    Q   And then it was added again in 2013;
7  correct?
8    A   Correct.
9    Q   But at the time that it was added in October
10 of 2013, there was no arbitration agreement in effect;
11 correct?
12   A   Correct.
13   Q   Okay.  And I -- and there was no jury trial
14 waiver in effect; correct?
15   A   Correct.
16   Q   And there was no class action waiver in
17 effect; correct?
18   A   Correct.
19   Q   And you stated that that change became
20 effective to all distributors in October of 2013;
21 correct?
22   A   Correct.
23   Q   So what was the purpose of this
24 notification?
25       MR. DROOKS:  Objection as to form.

Page 92

1  BY MR. MARK:
2    Q   Exhibit 13?
3    A   The purpose of the notification is to make
4  distributors aware that we made changes in our Book 4.
5    Q   How would distributors -- is there any way
6  for distributors to know that there was a change to
7  the Rules of Conduct prior to this February 13, 2014
8  announcement?
9    A   Verbal announcement to our leadership.
10   Q   Other than that?
11   A   No.
12   Q   Does Herbalife expect the distributors to go
13 onto myherbalife.com and look at the Rules of Conduct
14 on a regular basis to see if they have been updated?
15   A   Yes.
16       MR. DROOKS:  Speculation.
17 BY MR. MARK:
18   Q   "Yes"?
19   A   Yes.
20   Q   And that is without -- regardless of whether
21 or not there is a notice to do so?
22   A   Well, the membership application has a
23 clause that -- that indicates members should go online
24 to stay apprised of -- of the rules, the most current
25 rules.



Page 93

1    Q   And how often are distributors to do that?
2         MR. DROOKS:  Objection as to form.  Lacks
3    foundation.
4         THE WITNESS:  I suppose a time frame would
5    depend on each distributor and how they conduct their
6    business.
7    BY MR. MARK:
8    Q   How -- how -- I don't understand.
9         Why would it depend on how the distributor
10   conducts its business?
11   A   Some distributors maybe are online more
12   often than others.
13   Q   So the obligation to go online to review the
14   Rules of Conduct depends on the distributor?
15        MR. DROOKS:  Objection as to form.
16        THE WITNESS:  I didn't --
17        MR. DROOKS:  Lacks foundation.  Legal
18   conclusion.
19        THE WITNESS:  Yeah, the distributor is
20   obligated to stay apprised of the most current rules.
21   BY MR. MARK:
22   Q   But how does a distributor do that?
23        MR. DROOKS:  Calls for speculation.
24        THE WITNESS:  They go on myherbalife.com or
25   their sponsor or through trainings that occur in the

Page 94

1    field or through our events that also include
2    training.
3    BY MR. MARK:
4    Q   And that's -- is there a certain amount of
5    times that a distributor is required to do that?
6    A   No.
7         MR. MARK:  I will hand you a document that
8    we will mark as the next exhibit.
9         THE REPORTER:  14.
10        MR. MARK:  Thank you.
11   Q   Actually, I'm sorry, before we do that,
12   let's look at Exhibit 12 for a moment.
13        This is the E-mail announcement; right?
14   A   Yes.
15   Q   And in order to obtain the actual summary of
16   updates that is Exhibit 13, you have to click through
17   to learn more; is that right?
18   A   Yes, or a distributor could just be online.
19   Obviously, they can get through it through this
20   announcement by clicking the link, but a distributor
21   could just be online and also get to this
22   announcement.
23   Q   Okay.  But right now, I am just talking
24   about the announcement that is Exhibit 12.  Okay?
25   A   Yes.

Page 95

1    Q   This announcement, you receive this E-mail,
2    all you are seeing is Exhibit 12 in the E-mail;
3    correct?
4    A   Correct.
5    Q   Okay.  And in order to see the summary of
6    updates, that is Exhibit 13, you have to click where
7    it says, "Learn more"?
8    A   Correct.
9    Q   Okay.  Now, who is -- who is
10   salvadorrod@herbalife.com?  It's at the bottom of
11   Exhibit 12.
12   A   He was an employee in charge of pushing
13   these announcements out online.
14   Q   Is he no longer with Herbalife?
15   A   To my knowledge, he is no longer with the
16   company.
17   Q   Okay.  Is this E-mail announcement sent to
18   all distributors?
19   A   Yes.
20   Q   And how -- is there any method of confirming
21   that this was, in fact, sent to all distributors?
22        MR. CATLETT:  Foundation.
23   BY MR. MARK:
24   Q   If you know?
25   A   Yes, I believe so.

Page 96

1    Q   How is that done?
2    A   The system that we use to push these
3    announcements out has reporting capabilities.
4    Q   Is it like Constant Contact or something?
5    Do you know what the system is called?
6    A   I believe it is called ExactTarget.
7    Q   ExactTarget.  Okay.
8         So that system, then, pushes out these
9    announcements and then it knows whether or not those
10   announcements bounce back or not, for example?
11   A   Yes.
12   Q   And I assume that a certain percentage of
13   them do, in fact, bounce back?
14   A   I assume.
15   Q   Yeah.  Is there any method by which
16   Herbalife confirms that these announcements are, in
17   fact, sent and received by all distributors?
18   A   We have the capability to do so.
19   Q   Does Herbalife do so?
20   A   I don't know.
21   Q   Okay.  And what about clicking through;
22   right, where it says, "Learn more," for example?
23   A   Uh-huh.
24   Q   Is there a way to tell what percentage of
25   people, for example, click through to learn more?



Page 97

1     A   I don't know.
2     Q   Is receipt of these announcements a
3  condition to staying a distributor?
4         MR. DROOKS:  Objection as to form.  Legal
5  conclusion.
6         THE WITNESS:  No.
7  BY MR. MARK:
8     Q   And, in fact, a distributor can unsubscribe
9  from these announcements; right?
10    A   Yes.
11    Q   And do distributors unsubscribe from these
12  announcements?
13    A   I don't know.
14    Q   In order to stay a distributor, do you have
15  to stay subscribed to these announcements?
16    A   No.
17    Q   Is there anything on this notification that
18  requires the recipient of these E-mails to acknowledge
19  that they have received it?
20    A   No.
21    Q   And is there anything on this E-mail that
22  allows a distributor to determine whether or not --
23  that allows Herbalife, excuse me, to determine whether
24  or not the E-mail went into spam or not?
25    A   Well, I don't know.

Page 98

1     Q   And there is nothing in this announcement
2  that requires the recipient to acknowledge that they
3  agree with the new Rules of Conduct; correct?
4     A   Correct.
5     Q   Are you aware of whether any distributors
6  actually unsubscribed from these announcements?
7     A   I don't know.
8     Q   And regardless of whether or not any
9  distributor receives this E-mail, they are still bound
10  by the Rules of Conduct; correct?
11    A   Correct.
12        MR. DROOKS:  Legal conclusion.  Form.
13  BY MR. MARK:
14    Q   Is it your understanding that the Rules of
15  Conduct still apply to distributors that do not
16  receive these announcements?
17    A   Correct.
18        MR. MARK:  Okay.  I am going to hand you a
19  document --
20        MR. DROOKS:  Etan, at some point when you
21  are at a stopping point, I would like to take a break.
22        MR. MARK:  Sure.
23        MR. DROOKS:  Can you do it now?  I don't
24  want to interrupt, but I see you are moving on.
25        MR. MARK:  That's fine.

Page 99

1         (Recess.)
2         MR. MARK:  I am going to hand the witness
3  what has been marked as Exhibit 15.
4         THE REPORTER:  14.
5         MR. MARK:  14, I'm sorry.
6         (Exhibit 14 marked.)
7  BY MR. MARK:
8     Q   Can you identify this document for me?
9     A   Yes.  This is Book 4, which includes the
10  Rules of Conduct, the sales and marketing plan, sample
11  forms, ordering procedures, enforcement procedures.
12    Q   And what is the effective date of these
13  Rules of Conduct?
14    A   I can't tell you that by looking at this
15  document.
16    Q   Okay.  If you look at -- this document has
17  been Bates stamped HLF, underscore, 00051 through
18  000184.
19        If you go to the last page, 184, you will
20  see a -- what I think is a version number; is that
21  right?
22    A   Correct.
23    Q   Okay.  What version is this?
24    A   Version 29.
25    Q   And there is a date next to it; right?

Page 100

1     A   Correct.
2     Q   That date is August, 2013?
3     A   Correct.
4     Q   Okay.  So is that the date that this was
5  published?
6     A   No.
7     Q   What is that?
8     A   That's the date that we approved all of the
9  content in this book and sent it to our Creative
10  Services Department for preparation of publication.
11    Q   Okay.
12        MR. CATLETT:  And just so the record is
13  clear, then, Exhibit 14 is attached as Exhibit A to
14  Ms. Romans' deposition?
15        MR. MARK:  Well, that is what I was going
16  to -- that is where I am going.
17        MR. CATLETT:  Okay.  I'm sorry.
18  BY MR. MARK:
19    Q   So can you confirm for me, then, that
20  Exhibit 14 is the same as Exhibit A to your
21  declaration?  In other words, this copy of the rules
22  as amended in August of 2013?
23    A   Yes.
24        MR. DROOKS:  That lacks foundation.  Form.
25



ROXANE ROMANS
JEFF RODGERS vs HERBALIFE LTD

Page 101

1  BY MR. MARK:
2    Q   "Yes"?
3        MR. DROOKS:  As amended.
4        THE WITNESS:  Yes.
5  BY MR. MARK:
6    Q   Okay.  And this is the version of the rules
7  that we were talking about earlier that was first
8  published on October 28, 2013 on the myherbalife.com
9  website?
10   A   Correct.
11   Q   And -- and as of that date, this document
12  marked as Exhibit 14 was the -- this provided the
13  terms and conditions under which a distributor must
14  operate his or her Herbalife distributorship?
15       MR. DROOKS:  Form.
16       THE WITNESS:  Correct.
17  BY MR. MARK:
18   Q   Now, if you look on page -- starting on
19  page, it looks like 93, there is some forms.  I think
20  they are forms.
21   A   Yes.
22   Q   Okay.  And earlier you recall testifying
23  that there are certain forms that get incorporated
24  into the agreements, as well?
25   A   Correct.

Page 102

1    Q   And are these the forms you are talking
2  about with respect to each version of the Rules of
3  Conduct?
4    A   Yes.  And there could be other forms.
5    Q   Okay.  And I understand there could be other
6  policies, as well; correct?
7    A   Yes.
8    Q   That are in effect at the time?
9    A   Correct.
10   Q   Now, if you look at page 94, you will see
11  there is an application for International
12  distributorship.  And when I say "page 94," I am
13  referring to HLF, underscore, 000094.  Okay?
14   A   Yes.
15   Q   Is that the application of International
16  distributorship that was in effect at the time that
17  these Rules of Conduct were in effect?
18   A   I am not certain.
19   Q   But this form is incorporated into these
20  Rules of Conduct; correct?
21   A   Correct.
22   Q   And you will see that this distributorship
23  agreement on page 97 does not contain an arbitration
24  provision; correct?
25   A   That's correct, but I would like to point

Page 103

1  out that this is just a sample form and not
2  necessarily the current version of the form that was
3  in place at that time.
4    Q   Okay.  But I thought you said that this form
5  is incorporated into these rules of conduct?
6    A   The distributor application itself is
7  incorporated into the rules.  This, though, is simply
8  a sample form.
9    Q   I see.  So this distributor application that
10  is on pages 94 through 97 is just a sample form?
11   A   Correct.
12   Q   It is not -- but it is incorporated into
13  these Rules of Conduct?
14   A   The distributor application itself is
15  incorporated into the Rules of Conduct.  The form that
16  is included in this book as a sample, may not
17  necessarily be the form that was in existence at the
18  time that this printed, simply because of printing
19  logistics.
20   Q   Okay.  Well, this says, "Revised 7/13";
21  right, this form?
22   A   I can't read the date.  Sorry.  I see 13,
23  but I can't see the month.
24   Q   Okay.  I will represent to you it says,
25  "Rev. 07/13."

Page 104

1    A   Okay.
2    Q   Okay.  Does that mean that this form was
3  effective as of July, 2013?
4    A   No.
5    Q   Okay.  What does it mean?
6    A   It means that we prepared and agreed on the
7  content of this form at that time; but it still had to
8  go through our Creative Services team for artwork and
9  preparation of publication.
10   Q   Okay.  And do you know what form was in
11  effect as of 7/13 -- I'm sorry, as of the date of
12  these Rules of Conduct?
13   A   No, I don't know.
14   Q   Okay.  Is whatever form that was in effect
15  as of the date of these Rules of Conduct, the form
16  that is incorporated into the terms and conditions
17  under which a distributor must operate his or her
18  Herbalife distributorship?
19   A   Yes.
20   Q   But you don't know whether it was this form?
21   A   Correct.
22   Q   This is Version 39; right?
23   A   Yes.
24   Q   Is Version 40 the next version of this form?
25   A   To my recollection, yes.



ROXANE ROMANS
JEFF RODGERS vs HERBALIFE LTD

January 24, 2018
105–108

Page 105

1    Q    You're not aware of a 39(a) or (b); are you?
2    A    No, I'm not.
3        MR. MARK:  I will hand you a document that
4  we will mark as Exhibit --
5        THE REPORTER:  15.
6        MR. MARK:  -- 15.
7        (Exhibit 15 marked.)
8        THE WITNESS:  Thank you.
9  BY MR. MARK:
10    Q    I am handing you a document that has been
11  Bates stamped HLF, underscore, 000802.
12    A    Yes.
13    Q    Okay.  And if you look in the lower
14  right-hand corner, you will see there is a form
15  number.
16        Do you see that?
17    A    Yes.
18    Q    Is this Version 40?
19    A    It looks like Version 40.
20    Q    Okay.  And this was revised -- it states the
21  revised date is 09/13; is that right?
22    A    Yes.
23    Q    So this form that has been marked as
24  Exhibit 15 was in effect after the date -- the
25  effective date of these Rules of Conduct; correct?

Page 106

1        MR. DROOKS:  Lacks foundation.
2        THE WITNESS:  I believe so.
3  BY MR. MARK:
4    Q    So at the time, looking at Exhibit 15 and
5  the form on HLF 000097, it appears that the
6  application in effect at the time of these Rules of
7  Conduct was Version 39; is that correct?
8    A    It appears so.
9    Q    Okay.  And you will agree with me that this
10  form states, paragraph 17:
11        "Any claim shall be resolved
12        exclusively in a judicial
13        proceeding in either the Superior
14        Court of the Commonwealth of" -- I
15        am looking at the Puerto Rico one.
16        Let's look at page 00095, paragraph 17, it
17  states:
18        "Any claims shall be resolved
19        exclusively in a judicial
20        proceeding in either the Superior
21        Court or the United States District
22        Court, both located in Los Angeles,
23        California."  Correct?
24    A    That's what this document states.
25    Q    Okay.  And that's inconsistent with the

Page 107

1  provision of these Rules of Conduct that contain an
2  arbitration agreement; correct?
3        MR. CATLETT:  Form.  Foundation.
4        MR. DROOKS:  Form.
5        THE WITNESS:  Correct.
6  BY MR. MARK:
7    Q    Okay.  So as of August of 2013, which --
8  which one was it?
9        Was it the arbitration provision or was it
10  the, "any claim shall be resolved exclusively in a
11  judicial proceeding in Los Angeles"?
12        MR. DROOKS:  Calls for a legal conclusion.
13        THE WITNESS:  I wouldn't know the answer to
14  that question.
15  BY MR. MARK:
16    Q    How would a distributor know the answer to
17  that question?
18        MR. CATLETT:  Foundation.
19        MR. DROOKS:  Speculation.
20  BY MR. MARK:
21    Q    I assume you don't know.
22    A    I don't know how to answer that.
23    Q    Your testimony earlier about this amendment
24  to the Rules of Conduct being available online for the
25  first time on October 28, 2013, did that also apply to

Page 108

1  the Spanish version of the documents or only the
2  English version?
3    A    Can you repeat the beginning of your
4  question?
5    Q    I'm sorry, that was not a good question.
6        Do you recall your earlier testimony that
7  Version 29 of the Rules of Conduct first became
8  effective on -- when it was available to distributors
9  online on October 28, 2013?
10    A    Yes.
11    Q    Okay.  Was the Spanish version of the Rules
12  of Conduct also available on that date?
13    A    Yes.
14    Q    Okay.  Going back to Exhibit 14 for a
15  moment.
16        If you look on page HLF, underscore, 000121,
17  do you remember your earlier testimony about
18  Rule 8(c)?
19    A    Yes.
20    Q    Is this the rule you were referring to, the
21  one that is headed, "Keep Informed of Herbalife's
22  Policies"?
23    A    Yes.
24    Q    And now I thought you said that there were
25  two sort of similar provisions in the Rules of



ROXANE ROMANS
JEFF RODGERS vs HERBALIFE LTD

January 24, 2018
109–112

Page 109

1  Conduct, that both required distributors to stay
2  informed of Herbalife's policy; is that --
3       MR. DROOKS: Mischaracterizes --
4  BY MR. MARK:
5       Q   I am not trying to mischaracterize. Is that
6  correct?
7       A   It is not exactly what I stated.
8       Q   So tell me again, please, if you don't mind.
9       A   8(c), yes, does include language that
10 states, the distributor should regularly visit
11 Herbalife's website and stay apprised of our -- of our
12 rules, keep informed of our policies.
13      But there is another rule that states the
14 distributor must also abide by our rules and abide by
15 the law.
16      Q   Okay. Where is that?
17      A   Oh, 8(d), "Comply with the Laws."
18      Q   Okay. It doesn't say anything about
19 Herbalife's rules, though, there, does it?
20      A   This one doesn't. Perhaps, it is in another
21 version of the rules.
22      Q   Okay.
23      MR. MARK: I will hand you a document we
24 will mark as Exhibit 15 and Exhibit 16.
25      MR. DROOKS: You already marked an Exhibit

Page 110

1  15.
2       MR. MARK: I did?
3       THE WITNESS: You said 16 after.
4       MR. MARK: I'm sorry, Exhibit 16 and 17.
5       (Exhibits 16 and 17 marked.)
6  BY MR. MARK:
7       Q   So I am handing you what has been marked as
8  Exhibits 15 and 16.
9       Can you identify these documents?
10      A   Exhibit 16 is the --
11      Q   Did I say 15 and 16 again? 16 and 17. I'm
12 sorry.
13      So Exhibit 16 is the online announcement
14 where the reader can click, "Learn more," and get to
15 the actual announcement about the Rules of Conduct.
16      Q   And Exhibit 17 is the actual announcement?
17      A   Correct.
18      Q   And this announcement was sent on July 21st,
19 2014?
20      A   Correct.
21      Q   The only way to see the document marked as
22 Exhibit 17 would be to click on "Learn more";
23 correct?
24      A   No.
25      Q   Okay. How else would you see Exhibit 17?

Page 111

1       A   A distributor that is online could find this
2  announcement.
3       Q   How would they find it?
4       A   Under our Rules and Policies tab.
5       Q   So under Rules and Policies, it would
6  look -- what would it look like? There would be
7  another tab --
8       A   There would be another tab for Advisories
9  and Announcements.
10      Q   Advisories and Announcements. Okay. So
11 then this advisory or announcement would be up there
12 at the time?
13      A   Yes.
14      Q   How long does that advisory or announcement
15 stay on the myherbalife.com website?
16      A   Indefinitely.
17      Q   Is it still -- it is still there right now?
18      A   Which one is this, Version 31. To my
19 knowledge, this one is no longer there.
20      Q   Okay. So how long do these announcements
21 stay on online?
22      A   In the past, they used to stay on an
23 extended period of time.
24      Q   Do you know how long this Exhibit 17 stayed?
25      A   No.

Page 112

1       Q   Okay. And part -- it is your understanding
2  that part of a distributor's obligation is to stay
3  apprised of the rules is to routinely check the
4  Announcements tab on myherbalife.com?
5       A   The Announcements tab, yes, and also the
6  book. The actual book.
7       Q   Regardless of whether or not there is
8  actually -- they receive notice of a published
9  announcement?
10      A   Correct.
11      Q   And is this announcement sent via the same
12 system that you talked about earlier?
13      A   Yes.
14      Q   What was it called again?
15      A   ExactTarget.
16      Q   Exact, E-X-A-C-T --
17      A   Target.
18      Q   -- Target.
19      And there is no -- and you don't know
20 whether or not this announcement reached each
21 distributor; correct?
22      A   No, I don't know.
23      Q   Do you know whether it reached the --
24 specifically the plaintiffs in this case?
25      A   I wouldn't know.



ROXANE ROMANS
JEFF RODGERS vs HERBALIFE LTD

January 24, 2018
113–116

Page 113

1    Q    Did you check to see if any of the
2   plaintiffs in this case received the announcement that
3   was marked as Exhibit 16?
4    A    No.
5    Q    Did you check to see if any of the
6   plaintiffs in this case received the announcement that
7   was marked as Exhibit 12?
8    A    I may have.
9    Q    And what did you see?
10    A    I don't recall.
11    Q    All right.  How did you check to see if the
12   plaintiffs in this case received the announcement
13   marked as Exhibit 12?
14        MR. DROOKS:  Lacks foundation.
15        THE WITNESS:  Through the department that
16   pushes the ExactTarget communications.
17   BY MR. MARK:
18    Q    Can you describe for me, please, that
19   conversation?
20    A    That was done through E-mail.
21    Q    Okay.  So you E-mailed -- do you actually
22   recall E-mailing the department that deals with
23   pushing these announcements through as to whether or
24   not the plaintiffs in this case actually received the
25   document that has been previously marked as

Page 114

1   Exhibit 12?
2    A    I may have E-mailed one of my team members
3   to obtain the information.
4    Q    Okay.  Did your team member respond to your
5   E-mail?
6        MR. DROOKS:  Objection as to form.  Lacks
7   foundation.
8        THE WITNESS:  I believe so.
9   BY MR. MARK:
10    Q    Okay.  And what did your team member tell
11   you?
12    A    I don't recall.
13    Q    You don't recall whether your team member
14   said that any of the plaintiffs did or did not receive
15   the notification marked as Exhibit 12?
16    A    Correct, I don't recall.
17    Q    But the purpose of reaching out to this team
18   member was to determine whether any of plaintiffs did,
19   in fact, receive the document marked as Exhibit 12?
20    A    Correct.
21    Q    Okay.  Did you make any efforts to see if
22   the plaintiffs received the document marked as
23   Exhibit 16?
24    A    I believe I did.
25    Q    Okay.  And same sets -- same questions --

Page 115

1    A    I don't recall.
2    Q    Okay.  So you recall asking a team member,
3   the team member responded to you, but you don't recall
4   what the response was?
5    A    Exactly.
6    Q    Why did you ask your team member whether or
7   not any of the plaintiffs in this case received the
8   notification?
9    A    I believe our lawyer asked me the question.
10    Q    But it is your -- but it is your
11   understanding that those -- that all the plaintiffs
12   are bound by these rules regardless of whether or not
13   they received notification; right?
14    A    Yes.
15    Q    And there is certainly no obligation for
16   them to affirm that they have accepted any of these
17   obligations; correct?
18        MR. DROOKS:  Objection as to form.  Legal
19   conclusion.
20        THE WITNESS:  They affirm when they sign
21   their distributor application that they will.
22   BY MR. MARK:
23    Q    Right.  But I am talking about the
24   amendments.  I am talking about receiving the
25   amendments.

Page 116

1        There is no obligation that any distributor
2   affirmed that they agreed to the amendments; correct?
3    A    Correct.
4        MR. DROOKS:  Objection as to form.
5   BY MR. MARK:
6    Q    Do you know why Rule 8(c) was removed from
7   the rules?
8        MR. DROOKS:  Calls for speculation.
9        THE WITNESS:  No, I don't know.
10   BY MR. MARK:
11    Q    I think I asked this, but I want to confirm.
12        There were Rules of Conduct in effect prior
13   to the Rules of Conduct dated August, 2013; right?
14    A    Correct.
15    Q    And you saw the applications that you have
16   attached to your declaration, including some in 2008,
17   there were Rules of Conduct in effect at the time;
18   correct?
19    A    Correct.
20        MR. MARK:  I will hand you a document that
21   we will mark as Exhibit 18.
22        (Exhibit 18 marked.)
23        THE WITNESS:  Thank you.
24   BY MR. MARK:
25    Q    Can you identify this document for me,



ROXANE ROMANS
JEFF RODGERS vs HERBALIFE LTD

January 24, 2018
117–120

Page 117

1  please?
2      A   Yes, this is Book 4, Version 31, which
3  includes the Rules of Conduct, sample forms, ordering
4  procedures.
5      Q   What was the date that these Rules of
6  Conduct governed the distributors?
7      A   They became available July 21st, 2014.
8      Q   Is that the date at which distributors
9  became bound by these Rules of Conduct?
10         MR. CATLETT:  Foundation.
11         MR. DROOKS:  Form.
12         THE WITNESS:  It is my understanding.
13  BY MR. MARK:
14     Q   And how is that your understanding?
15     A   That is when we published these rules.
16     Q   So if you look at paragraph 9 of your
17  declaration, you write:
18         "On July 21st, Herbalife sent a
19         notification to all distributors of
20         the recent changes of the rules,
21         including the changes to the
22         arbitration provision."  Correct?
23     A   My paragraph 9 doesn't -- oh, yes, it does.
24  Yes.
25     Q   Okay.  And that is the notification we just

Page 118

1  looked at; right?
2      A   Yes.
3      Q   Now, are you aware of whether these rules
4  were published on herbalife.com before July 21st,
5  2014?
6      A   It's my recollection that they were
7  published online on July 21st, 2014.
8      Q   Simultaneous with this notification?
9      A   I believe so.
10     Q   Now, Rule 8(c) is not contained in this
11  version of the rules; correct?
12     A   We changed our numbering.  So I am
13  verifying.
14     Q   Sure.
15     A   So we have, in this version, Rule 3.1.1
16  entitled Must Comply with the Rules and the Law, which
17  is on page 84, our page 84.
18     Q   Page 84, okay.  3.1.1.
19     A   "Must Comply with the Rules
20         and the Law.  Members must comply
21         with the laws and the rules in each
22         country where they are conducting
23         their Herbalife business.  Members
24         are to review these rules with
25         downline members."

Page 119

1      Q   Okay.  Is that the replacement of Rule 8(c)?
2      A   I believe so.
3      Q   And you will agree with me that as of
4  July 21st, 2014, Rule 8(c), in its form, Rule 8(c) is
5  no longer in effect; correct?
6      A   I can't agree to that on the spot because we
7  may have similar language in other documents.
8      Q   Okay.  But Rule 8(c) -- and that is why I am
9  talking specifically about Rule 8(c).
10         Rule 8(c), as Rule 8(c), is no longer
11  applicable; correct?
12     A   Correct.
13     Q   Okay.  So as of July 21st, 2014, Rule 8(c)
14  is no longer in effect?
15     A   That specific rule is no longer published.
16     Q   So it is no longer in effect; correct?
17         MR. CATLETT:  Foundation.
18         MR. DROOKS:  Form.
19         THE WITNESS:  I would not say that it is no
20  longer in effect.
21  BY MR. MARK:
22     Q   So Rule 8(c) is still in effect as of
23  July 21st, 2014?
24         MR. CATLETT:  Same objections.
25         MR. DROOKS:  Form.

Page 120

1          THE WITNESS:  The parameter that is set for
2  distributors in Rule 8(c) is still in effect.
3  BY MR. MARK:
4      Q   Okay.  And is that because a similar
5  parameter exists in this version of 31?
6      A   It may be in this version or it may be on
7  the application.  So I can't remember sitting here in
8  front of you.
9      Q   Okay.
10     A   So I don't want to say no.
11     Q   Okay.  And that is why -- what I understand
12  your testimony that there may be some other language
13  in some other application or somewhere else as of
14  July 21st, 2014, that contains some of the same
15  obligations as what Rule 8(c) contained?
16     A   That's correct.
17     Q   Okay.  But you will agree with me that
18  Rule 8(c) is no longer in existence for purposes of
19  obligations of distributors as of July 21st, 2014?
20         MR. CATLETT:  Form.
21         THE WITNESS:  No, I don't agree with that
22  statement.
23  BY MR. MARK:
24     Q   So Rule 8(c) still is in existence as of
25  July 21st, 2014 and distributors are still bound by



Page 121

1  it?
2      A   The requirements in Rule 8(c) are still in
3  existence and distributors are still bound by it.
4      Q   Okay.  Show me, please, where the
5  requirements of Rule 8(c), and specifically, the
6  obligation to stay informed of the rules is contained
7  in the Rules of Conduct marked as Exhibit 19.
8      A   18.
9      Q   18.
10     A   My interpretation of Rule 3.1.1 states that:
11         "Members must comply with the laws
12         and the Rules and that members are
13         to review these Rules with downline
14         members."
15         And these are the most current rules.
16     Q   So the word "rules" is capitalized; right,
17  in 3.1.1?
18     A   Yes.
19     Q   Does "rules" mean the Rules of Conduct?
20     A   My understanding is all policies, whether it
21  be on the membership application, Book 4, the forms,
22  the advisories.
23     Q   Is the word "rules" defined in this
24  document?
25     A   I don't know.

Page 122

1         "The Herbalife Rules of Conduct and
2         all other rules and policies and
3         advisories that Herbalife issues or
4         in the future may issue from time
5         to time."
6      Q   What page are you on?
7      A   On page 111.
8      Q   Under Definitions?
9      A   Yes.
10     Q   Is there any part of this exhibit that
11  requires distributors to stay informed of the rules?
12     A   Again, my interpretation of 3.1.1 indicates
13  they have to stay informed because they must comply
14  with the laws and the rules.
15     Q   Okay.  So it says that they have to comply
16  with the rules, and you interpret that as meaning that
17  they also have to stay informed of the rules?
18     A   Correct.
19     Q   Is there anything else in this document, to
20  your knowledge, that obligates the distributors to
21  stay informed of changes in the rules?
22     A   I believe that there are references in some
23  of the rules.
24     Q   But you don't -- it is not your position
25  that Rule 8(c) specifically carries forward to the

Page 123

1  later revisions of the rule; is it?
2      MR. DROOKS:  You can't ask her what our
3  position is.  You can ask her understanding.
4  BY MR. MARK:
5      Q   Understanding.  It is not your understanding
6  that Rule 8(c) carries forward in its form to future
7  versions of the rules; is it?
8      MR. CATLETT:  Form.
9      THE WITNESS:  I think I have already
10  answered that question.  Rule 8(c), the specific
11  language in Rule 8(c), does not appear in this
12  Version 31, but my understanding of Rule 3.1.1 covers
13  what was in Rule 8(c).
14  BY MR. MARK:
15     Q   Okay.  But that Version 31 replaces earlier
16  versions of the Rules of Conduct; correct?
17     A   That's correct.
18     Q   Okay.  You're familiar with the Herbalife --
19  the home page of myherbalife.com; right?
20     A   Yes.
21     MR. MARK:  I will hand you a document that
22  we will mark as --
23     THE REPORTER:  19.
24     MR. MARK:  -- 19.
25     (Exhibit 19 marked.)

Page 124

1      THE WITNESS:  Thank you.
2  BY MR. MARK:
3      Q   Is this the myherbalife.com home page?
4  Admittedly, it is a printout of it.
5      A   It looks like it.
6      Q   Okay.  And do you remember your earlier
7  testimony about the policies that are incorporated
8  into the distributor agreement?
9      A   Yes.
10     Q   Those are available on myherbalife.com;
11  correct?
12     A   Correct.
13     Q   And do those include the Privacy Policy?
14     A   Yes.
15     Q   Does it include the terms of use?
16     A   The terms of use, sorry, I am not clear what
17  you're asking me.
18     Q   Sure.
19         You talked earlier about the incorporation
20  of the various documents into the application; --
21     A   Yes.
22     Q   -- right?
23         And you said that those were available on
24  myherbalife.com; right?
25     A   Yes.



ROXANE ROMANS
JEFF RODGERS vs HERBALIFE LTD

January 24, 2018
125–128

Page 125

1    Q   Okay.  And the Privacy Policy is one of
2  those written policies that are incorporated in here;
3  right?
4    A   Yes.
5    Q   Okay.  And the Terms of Use, do you see the
6  Terms of Use?
7        MR. DROOKS:  Of the website?
8        MR. MARK:  Of the website.
9        THE WITNESS:  Oh, I see here, Terms of Use.
10  BY MR. MARK:
11    Q   Yes.  Is that also something that was
12  incorporated into the application?  The Privacy Policy
13  is; correct?
14    A   Um-hmm.
15    Q   "Yes"?  Is the Terms of Use also?
16        MR. CATLETT:  Form.  Foundation.
17        MR. DROOKS:  Form.  Legal conclusion.
18        THE WITNESS:  It would --
19  BY MR. MARK:
20    Q   Is that one of the written Herbalife
21  policies that provide the terms and conditions under
22  which a distributor must operate his or her
23  distributorship?
24    A   It would be my understanding that it is.
25    Q   Yeah.  And is the Privacy Policy one of the

Page 126

1  terms and conditions under which a distributor must
2  operate his or her Herbalife distributorship?
3        MR. CATLETT:  Form and foundation.
4        THE WITNESS:  I am pausing a moment because
5  I don't know if this Privacy Policy is in reference to
6  the website or if this Privacy Policy is the Privacy
7  Policy that we have in place as part of our rules for
8  our members.
9  BY MR. MARK:
10    Q   Okay.
11    A   I don't know what is behind this.
12    Q   So does that matter, then, which one of
13  those two are in --
14    A   My understanding would be that it is
15  incorporated.
16    Q   Okay.  Right.  That both the Privacy Policy
17  and the Terms of Use are incorporated?
18        MR. CATLETT:  Form and foundation.
19        THE WITNESS:  Yes.
20        MR. MARK:  I will hand you a document that
21  we will mark as Exhibit 20.
22        (Exhibit 20 marked.)
23        THE WITNESS:  Thank you.
24  BY MR. MARK:
25    Q   Have you seen this document before?

Page 127

1    A   No.
2    Q   You have never seen it?
3    A   No, I haven't.
4    Q   Okay.  Are you aware that these are the
5  Terms of Use that are on the myherbalife.com website?
6    A   No, I am not aware of this.
7    Q   Okay.  Do you see the last revised date,
8  February 2nd, 2017?
9    A   No, I see January -- oh, I see after that.
10    Q   The last revised date on the first page?
11    A   Oh, yes, February 2nd, 2017.
12    Q   Who is responsible at Herbalife for revising
13  the Terms of Use --
14        MR. DROOKS:  Maybe you want to let her
15  finish her answer.
16        MR. MARK:  I thought she did.
17    Q   Who is responsible at Herbalife for revising
18  the Terms of Use, if you know?
19    A   I don't know.
20    Q   Okay.  And these Terms of Use, if you look
21  at the first paragraph, it states:
22        "Please read these Terms of Use and
23        the Privacy Policy" -- and then it
24        links to the Privacy Policy --
25        "before using this website or

Page 128

1        purchasing any product or services
2        from Herbalife."
3        Do you see that?
4    A   Yes.
5    Q   Did I read that correctly?
6    A   Yes.
7    Q   Okay.  Are you aware that Herbalife requires
8  its distributors to read these Terms of Use before
9  using this website or purchasing any product or
10  services from Herbalife?
11    A   No.
12        MR. DROOKS:  Mischaracterizes the document.
13        THE WITNESS:  I wasn't aware.
14  BY MR. MARK:
15    Q   Okay.  Let's look at the third paragraph.
16        Do you see the bold language there, "If you
17  do not agree"?
18        Do you see that?
19    A   Yes.
20    Q   Can you read that, please?
21    A   "If you do not agree to be
22        bound by this agreement, do not
23        access or otherwise use this site
24        or participate in any of the
25        offerings."



ROXANE ROMANS
JEFF RODGERS vs HERBALIFE LTD

January 24, 2018
129–132

Page 129

1    Q    So these Terms of Use govern the use of the
2 website; correct?
3        MR. DROOKS:  Form.  Legal conclusion.
4        MR. CATLETT:  Foundation.
5        MR. DROOKS:  Foundation.
6        THE WITNESS:  What was your question?
7 BY MR. MARK:
8    Q    These Terms of Use govern the use of
9 myherbalife.com website; right?
10       MR. DROOKS:  Same objections.
11       THE WITNESS:  It appears to.
12 BY MR. MARK:
13   Q    Okay.  And you are the senior director of
14 Member Policy Administration; right?
15   A    Correct.
16   Q    And you were not aware of this policy?
17   A    I have never seen this document with the
18 question you had asked me.
19   Q    But it is all on the Herbalife --
20 myherbalife.com website?
21   A    Yes.
22   Q    Okay.  Do you see the fourth paragraph that
23 begins with, "This agreement"?
24   A    Yes.
25   Q    It states that:

Page 130

1        "It constitutes the entire
2        agreement between you and us
3        pertaining to the subject matter
4        hereof and supersede all prior or
5        other arrangements, understandings,
6        negotiations and discussions,
7        whether oral or written."
8        Do you see that?
9   A    Yes.
10   Q    Are you aware of any language in any of the
11 Rules of Conduct that states that it supersedes all
12 prior versions of the Rules of Conduct or any other
13 agreement between the distributor and Herbalife?
14       MR. CATLETT:  Form and foundation.
15       THE WITNESS:  I don't recall.
16 BY MR. MARK:
17   Q    As you sit here today, as the senior
18 director of Member Policy Administration, are you
19 aware of any language in any of the Rules of Conduct
20 that state that a particular Rule of Conduct
21 supersedes any other agreements between the
22 distributor and Herbalife?
23       MR. CATLETT:  Form.
24       THE WITNESS:  I am familiar with that
25 language, but I am having difficulty in recalling

Page 131

1 where -- where that would be positioned.
2 BY MR. MARK:
3    Q    So you think you have seen it, but you're
4 not sure where?
5    A    Correct.
6    Q    Is it possible that it was the Terms of Use
7 that you saw it?
8    A    I don't believe that is where I saw it.
9        MR. DROOKS:  Speculation.
10 BY MR. MARK:
11   Q    If you look at the second paragraph of the
12 Terms of Use, you will see where it says -- this
13 sentence begins with, "This agreement"?
14   A    Second paragraph?
15   Q    Yes.  I'm sorry.
16       The second sentence of the second paragraph
17 that begins with, "This agreement."
18       Do you see that?
19   A    Yes.
20   Q    Can you read that sentence for me, please,
21 out loud?
22   A    Second paragraph, second sentence, okay, I
23 see it.
24       "This agreement sets forth the
25       legal terms and conditions

Page 132

1        governing your use of this website
2        and each independent distributor's
3        platform and each web property
4        collectively referred to herein as
5        the Site, and for your purchase
6        and/or use of any Herbalife goods,
7        services, collectively referred to
8        hereinafter as Offerings.  This
9        agreement also provides information
10       on how to become an Herbalife
11       independent distributor or
12       Herbalife preferred member."
13   Q    Okay.  So you would agree with me that these
14 Terms of Use govern the use of the website; correct?
15       MR. DROOKS:  Objection as to form.
16       THE WITNESS:  It appears so.
17 BY MR. MARK:
18   Q    And you would also agree with me that these
19 Terms of Use govern each independent distributor's
20 platform and each web property?
21       MR. DROOKS:  Objection as to form.
22 Mischaracterizes the document.
23 BY MR. MARK:
24   Q    Correct?
25       MR. CATLETT:  And foundation.



ROXANE ROMANS
JEFF RODGERS vs HERBALIFE LTD

January 24, 2018
133–136

Page 133

1      THE WITNESS:  I believe so.
2   BY MR. MARK:
3      Q   And you would agree with me that this
4   agreement also governs a distributor's purchase and/or
5   use of any Herbalife goods or services?
6      MR. DROOKS:  Mischaracterizes the document.
7      MR. CATLETT:  Foundation.
8   BY MR. MARK:
9      Q   Correct?
10     MR. DROOKS:  Objection as to form.
11     THE WITNESS:  It is one document that
12  includes policies, but not the only.
13  BY MR. MARK:
14     Q   Well, this supersedes other documents,
15  though; right?
16     MR. DROOKS:  Objection as to form.
17  BY MR. MARK:
18     Q   You can answer.
19     MR. DROOKS:  Calls for a legal conclusion.
20     MR. CATLETT:  Form.
21     THE WITNESS:  I wouldn't know how to define
22  that.
23  BY MR. MARK:
24     Q   Well, it states that.  But all right.  It
25  states that it supersedes other agreements; correct?

Page 134

1      MR. DROOKS:  Mischaracterizes the document.
2   BY MR. MARK:
3      Q   You can answer.
4      MR. DROOKS:  Object as to form.
5      THE WITNESS:  I believe we read the word
6   "supersedes."
7   BY MR. MARK:
8      Q   Do you want me to show --
9      A   Yeah, show me.
10     Q   Okay.  Sure.  It is it one, two, three,
11  fourth paragraph.
12     A   Yes, it indicates supersedes.
13     Q   Okay.  So would you agree with me that this
14  document supersedes all prior other arrangements,
15  understandings, negotiations and discussions between
16  distributor and Herbalife?
17     MR. CATLETT:  Foundation.
18     MR. DROOKS:  Objection as to form.
19  Mischaracterizes the document.
20     THE WITNESS:  I don't feel like I am in a
21  position to answer that question because I am not a
22  lawyer.
23  BY MR. MARK:
24     Q   Okay.  But are you the head of --
25     MR. DROOKS:  That has been asked and

Page 135

1   answered --
2   BY MR. MARK:
3      Q   You are the --
4      MR. DROOKS:  -- now for the fifth time.
5   BY MR. MARK:
6      Q   You are the senior director of Member Policy
7   Administration; right?
8      A   Yes, that's correct.
9      MR. DROOKS:  Asked and answered.
10  BY MR. MARK:
11     Q   And as part of your responsibilities, you
12  are required to stay apprised of Herbalife's policies;
13  correct?
14     A   Yes, I am.
15     Q   And this is an Herbalife policy; correct?
16     MR. CATLETT:  Foundation.
17     THE WITNESS:  Yes.
18  BY MR. MARK:
19     Q   Okay.  So that is why I am asking you this
20  question because I don't know who else to ask.
21     MR. DROOKS:  That's argumentative.
22  BY MR. MARK:
23     Q   Okay.  So would you agree that --
24     MR. DROOKS:  That's not a question,
25  actually.  Let's stick with the questions.  Don't

Page 136

1   argue with the witness.
2   BY MR. MARK:
3      Q   So you would agree with me, then, that this
4   agreement appears to supersede all other agreements
5   between Herbalife and the distributor; correct?
6      MR. DROOKS:  Object as to form.
7   Mischaracterizes the document.
8      THE WITNESS:  I did not say that.
9   BY MR. MARK:
10     Q   You don't agree with that statement?
11     MR. CATLETT:  Foundation.
12     MR. DROOKS:  Lacks foundation.  Form.  Legal
13  conclusion.
14     THE WITNESS:  I am not in a capacity to make
15  that determination.
16  BY MR. MARK:
17     Q   Okay.  Who would be at Herbalife?
18     A   I assume a lawyer.
19     Q   Okay.  You see the reference to Herbalife
20  goods or services -- goods, services in the second
21  paragraph?
22     A   Yes, I do.
23     Q   What are Herbalife's goods?
24     MR. CATLETT:  Foundation.
25



ROXANE ROMANS
JEFF RODGERS vs HERBALIFE LTD

January 24, 2018
137–140

Page 137

1  BY MR. MARK:
2      Q   If you know?
3          MR. DROOKS:  Foundation.
4          THE WITNESS:  Nutritional products.
5  BY MR. MARK:
6      Q   What about Herbalife services?
7          MR. CATLETT:  Same objection.
8          THE WITNESS:  My understanding of services
9  would be some of the services that we offer our
10 distributors, like use of our website.
11 BY MR. MARK:
12     Q   What about events?
13         MR. CATLETT:  Same objection.
14         THE WITNESS:  I don't know that an event is
15 considered a service.
16 BY MR. MARK:
17     Q   Can you purchase tickets for events on the
18 Herbalife website?
19     A   I don't know.
20     Q   You don't know whether you can buy tickets
21 to Extravaganza on myherbalife.com?
22     A   I don't know that.
23     Q   Going to paragraph 20, the last page of the
24 document, do you see where it says, "Choice of law and
25 venue"?

Page 138

1      A   Yes.
2      Q   That is not an arbitration provision; is it,
3  to your knowledge?
4          MR. DROOKS:  Objection as to form.  Legal
5  conclusion.
6          MR. CATLETT:  Foundation.
7  BY MR. MARK:
8      Q   Well, you know what an "arbitration
9  provision" is; right?
10     A   To my knowledge, this is not an arbitration
11 provision.
12     Q   Do you know what an "arbitration provision"
13 is?
14     A   I have a general understanding.
15     Q   Well, you stated in your declaration that
16 all Herbalife members are subject to an arbitration
17 provision; correct?
18     A   Correct.
19     Q   Okay.  So I am asking you whether
20 paragraph 20 is an arbitration provision, to your
21 knowledge?
22     A   To my knowledge, it's not.
23     Q   Okay.  Is paragraph 20, to your knowledge,
24 inconsistent with an arbitration provision?
25         MR. DROOKS:  Objection as to form.  Legal

Page 139

1  conclusion.
2  BY MR. MARK:
3      Q   You can answer.
4      A   It is different than an arbitration
5  provision.
6      Q   In other words, you can't have both; right?
7  It is one or the other?
8          MR. DROOKS:  Objection as to form.  Legal
9  conclusion.
10 BY MR. MARK:
11     Q   If you know?
12     A   I don't know.
13         MR. MARK:  Okay.  I am going to hand you a
14 document that we will mark as Exhibit 21.
15         (Exhibit 21 marked.)
16         THE WITNESS:  Thank you.
17 BY MR. MARK:
18     Q   Have you seen this document before?
19     A   Yes, I have.
20     Q   Okay.  Can you identify it for me, please?
21     A   It says, "Version 33 of Book 4."  The date
22 on the spine is November, '16.
23     Q   November, 2016, is that 2016?
24     A   It is 2016.
25     Q   Okay.  Is it your understanding that this is

Page 140

1  the version of the Rules of Conduct that is currently
2  in effect?
3      A   I don't believe so.
4      Q   There is a later version?
5      A   Yes.
6      Q   If you go to page HLF, underscore, 000666
7  for a moment.
8      A   Yes.
9      Q   Do you see that Footnote 1?
10     A   Yes.
11     Q   Do you understand what that footnote means?
12         MR. DROOKS:  Calls for speculation.
13         THE WITNESS:  So it states:
14     "Herbalife has the sole and
15     absolute discretion to change the
16     Rules of Conduct and issue other
17     rules, policies and advisories from
18     time to time altogether the rules.
19     However, the changes in new rules
20     will be prospective, which means
21     they will not be applied to past
22     behavior.  Herbalife may impose any
23     corrective action or sanction to
24     address any breach of the rules and
25     we reserve the right to waive fully



ROXANE ROMANS
JEFF RODGERS vs HERBALIFE LTD

January 24, 2018
141–144

Page 141

1        or partially any breach of any
2        rule."
3   BY MR. MARK:
4        Q   Okay.  And this is the document that was
5   marked -- and just to make sure we are all on the same
6   page.
7        This document, which was Bates stamped HLF,
8   underscore, 582 through 749 is the document that is
9   referred to as Exhibit G of your declaration,
10  paragraph 11; is that correct?
11       A   Yes.
12       Q   Okay.
13       So the sentence that says,
14       "However, the changes in new rules
15       will be prospective, which means
16       they will not be applied to past
17       behavior," what does that mean?
18       MR. DROOKS:  Calls for speculation.  Lacks
19  foundation.  Legal conclusion.
20  BY MR. MARK:
21       Q   Do you know what that means?
22       MR. DROOKS:  Speculative.  Form.
23       THE WITNESS:  My understanding is that if
24  someone's behavior did X prior to a rule coming out,
25  we are not going to go back in time and say, you know,

Page 142

1   in whatever month, you did X; and now we have this
2   rule in place; and we are going to -- so you are in
3   trouble for what you did in the past before the rule
4   was published.
5   BY MR. MARK:
6        Q   Okay.  So -- okay.  So if a rule -- so if --
7   I am trying to think if there is a way I can rephrase
8   it because I still don't completely understand.
9        If a new rule is added in 20 -- in, let's
10  say, this Version 33, and that rule makes conduct that
11  predated this amendment a violation of the rules,
12  Herbalife is not going to go back and say, hey, you
13  violated these rules before this amendment, now this
14  amendment is in effect; and I am imposing these rules
15  to your earlier behavior?
16       A   Exactly.
17       MR. DROOKS:  Objection as to form.
18  BY MR. MARK:
19       Q   Is it your understanding that that would
20  apply also to the arbitration provision?  And do you
21  understand what I mean by that?
22       A   I understand your question, but I can't
23  answer that.  Again, I am not a lawyer.  I don't know
24  how to interpret that specific.
25       Q   So whether or not conduct that predated the

Page 143

1   arbitration provision, you're not sure whether or not
2   that would fall into -- whether or not the arbitration
3   provision would apply to that conduct?
4        MR. DROOKS:  Vague and ambiguous.  Objection
5   as to form.
6   BY MR. MARK:
7        Q   Do you understand?
8        A   I understand, but I don't know how to answer
9   your question correctly -- or to answer your question.
10       Q   I don't know what the correct answer --
11       A   I don't mean correctly.  I just mean I do
12  not know how to answer the question.
13       Q   Okay.  I just want to make sure it is not
14  because you don't understand the question; it is just
15  that you are not sure of what the answer is?
16       A   I understand your question, but because I am
17  not a person with legal background, I don't have the
18  capacity to interpret when arbitration that you're
19  asking me about went into effect or what it covered
20  people before or after.
21       Q   Okay.  Well, you do state that the
22  arbitration provision was added in August, 2013 in
23  your declaration; right?
24       A   Correct.
25       Q   Okay.  So let's talk about conduct in July

Page 144

1   of 2013.  There is no arbitration provision in effect
2   then; right?
3        MR. DROOKS:  Vague and ambiguous as to
4   "conduct."
5   BY MR. MARK:
6        Q   Okay.  Right?
7        A   Again, I don't know how to answer that.
8        Q   Well --
9        A   We read on the application the clause that
10  spoke about policies being in their then current form.
11       Q   Okay.
12       A   So I would leave that up to an attorney to
13  define exactly the answer to your question.
14       Q   As to whether or not conduct before the
15  arbitration provision would or would not be subject to
16  arbitration?
17       MR. DROOKS:  Objection as to form.
18  BY MR. MARK:
19       Q   Is that the question that you are --
20       MR. DROOKS:  Objection as to form.
21       MR. MARK:  Can I finish the question before
22  you object?
23       MR. DROOKS:  Your question was complete.  If
24  you go on, it is just compound.
25       MR. MARK:  It was not complete.



ROXANE ROMANS
JEFF RODGERS vs HERBALIFE LTD

January 24, 2018
145–148

Page 145

1    MR. DROOKS:  Okay.
2    MR. MARK:  You objected to form and then I
3  started another question, and then you objected to
4  form when I was four words into that question.
5    MR. DROOKS:  I see.  So you are withdrawing
6  the prior question?
7    MR. MARK:  Yes, I am withdrawing the prior
8  question.
9    MR. DROOKS:  Okay.
10  BY MR. MARK:
11   Q   So is it your -- so what you are stating --
12  I just want to make sure I understand -- is that an
13  arbitration provision that was first added in August,
14  2013, you're not sure whether or not that would apply
15  to conduct before August of 2013?
16    MR. DROOKS:  Objection.  Vague and ambiguous
17  as to "conduct."  Objection as to form.
18    THE WITNESS:  My personal understanding is
19  that it would apply based on the sentence that we
20  spoke about on the member application, which says that
21  the distributor is bound by the policy -- the most
22  current policies in their then form.
23  BY MR. MARK:
24   Q   Which is the same, you testified to, as the
25  most recently published form?

Page 146

1    A   Yes.
2    Q   Okay.  So it is your understanding, then,
3  that conduct that occurred before the arbitration
4  provision went into effect in August, 2013 would be
5  subject to the arbitration provision because of that
6  provision which applies on a prospective basis?
7    A   That is my personal understanding.
8    Q   If you turn to page 644 of Exhibit 21.
9    A   Yes.
10   Q   There is the sample form Herbalife
11  Membership Application and Agreement, Version 46,
12  revised April, 2016; is that correct?
13   A   I can't see the date.
14   Q   Okay.
15   A   Yes.
16   Q   Other than the date part, is what I said
17  correct?
18   A   Yes.
19   Q   I will represent to you it says,
20  "Version 46, revised April 2016"; okay?
21   A   Yes.
22   Q   All right.  So -- but you don't know whether
23  this form application was in effect at the time that
24  these rules were put into effect; correct?
25   A   That's true.

Page 147

1    Q   And that is because of the Creative
2  Department?
3    A   The logistics of printing.
4    Q   Print; right.
5    Now, is the -- are the provisions of this
6  Membership Application and Agreement sample form
7  also -- do those also govern the Herbalife distributor
8  relationship as of the time that these rules are put
9  into effect?
10    MR. DROOKS:  Objection as to form.  Legal
11  conclusion.
12    THE WITNESS:  That is a very technical
13  question.
14  BY MR. MARK:
15   Q   Well, a distributor gets this packet, these
16  Rules of Conduct; right, when they sign the
17  application; correct?
18   A   Yes.
19   Q   And these Rules of Conduct contain this
20  sample form, Herbalife Membership Application
21  Agreement; correct?
22   A   Correct.
23   Q   Are they bound by the provisions in terms of
24  that Herbalife Membership Application and Agreement in
25  the Rules of Conduct or are they bound by the

Page 148

1  Herbalife Membership Application Agreement that they
2  signed?
3    MR. CATLETT:  Form.  Foundation.
4    MR. DROOKS:  Form.  Foundation.  Legal
5  conclusion.
6  BY MR. MARK:
7    Q   If you know.
8    A   I am back to -- I don't know how to answer
9  that question since I am not a lawyer.
10   Q   Okay.  And if there is a conflict between
11  the application that they signed and the application
12  that is incorporated in these Rules of Conduct, which
13  one controls, if you know?
14    MR. DROOKS:  Objection.  Form.
15    MR. CATLETT:  Foundation.
16    THE WITNESS:  I don't know.
17  BY MR. MARK:
18   Q   Are sponsors required to train downline
19  distributors about the Rules of Conduct?
20   A   Yes, they are.
21   Q   That is an obligation under the Rules of
22  Conduct?
23   A   Yes.
24   Q   And how does that occur?
25   A   Training can occur different ways from the



ROXANE ROMANS
JEFF RODGERS vs HERBALIFE LTD

January 24, 2018
149–152

Page 149

1   sponsor to the member, whether it is face-to-face
2   training, you know, virtual training between them.
3      Q   Does Herbalife monitor whether or not that
4   training occurs?
5      And I mean specifically the training with
6   respect to updates to the Rules of Conduct.
7      MR. CATLETT:  Form.
8   BY MR. MARK:
9      Q   If you know.
10     A   We would look into any issues reported.
11     Q   Okay.
12     A   If a downline made us aware that their
13   sponsor is not providing them with training, then -- I
14   think you used the word "monitor," and actually, we
15   would inquire about that sponsor's business activities
16   and how they are training their downline.
17     Q   Okay.  But absent notification from a
18   downline member that their sponsor is not providing
19   him or her training as to updates in the Rules of
20   Conduct, is there any other way in which Herbalife
21   monitors training?
22     A   Yes.
23     Q   Can you tell me about that?
24     A   Training between the company and the
25   distributor, but training between a distributor and

Page 151

1   the court reporter be relieved of
2   her obligation to maintain the
3   original.  The original will be
4   sent to me.
5      "Ms. Ramirez will review it.
6   We will provide you with any
7   errata.  She will sign it under
8   penalty of perjury without benefit
9   of a notary.
10     "I will provide the original
11   to you.  You will maintain it for
12   all purposes.  File it with the
13   court, as needed or appropriate.
14     "If the original is lost or
15   misplaced, a certified copy can be
16   used for all purposes.  And if the
17   original is not timely signed, you
18   can use an unsigned, certified copy
19   for all purposes.
20     "And I understand you have a
21   motion pending.  So if you want to
22   expedite the transcript, you can do
23   that.  We will make every effort to
24   have Ms. Ramirez review it and sign
25   it within 10 days of receipt.

Page 150

1   their downline?
2      Q   Yes.
3      A   Not that I am aware.
4      MR. MARK:  Let's take three minutes.  I
5   might be done.
6      THE WITNESS:  Okay.
7      MR. MARK:  Thank you.
8      THE WITNESS:  Yeah.
9      (Recess.)
10     MR. MARK:  I don't have any further
11   questions.
12     MR. DROOKS:  Do you want to just put the
13   same stipulation on the record that we did this
14   morning?
15     THE REPORTER:  Yes, I can.
16     MR. MARK:  Okay.  Thank you so much for your
17   time.  I really appreciate it.
18     THE WITNESS:  You're welcome.
19     MR. DROOKS:  Thank you.
20     MR. MARK:  I'd like to get rough drafts.
21     (Whereupon, the following
22     stipulation was agreed to by the
23     parties and copied from the
24     deposition of Silvia Ramirez:
25     "MR. DROOKS:  I propose that

Page 152

1      "If that becomes a problem,
2   for some reason, we will let you
3   know.
4      "MR. MARK:  Well, yeah, so --
5   so I would like to expedite the
6   transcript.
7      "Yeah.  Obviously, you have
8   the right to read the transcript
9   and make any changes, et cetera,
10   via an errata sheet.  So I don't
11   have a problem with that.
12     "Obviously, I would like to
13   expedite it in light of the fact
14   that we have a response due in
15   20 days, I think.  That should be
16   fine.
17     "MR. DROOKS:  So stipulated?
18     "MR. MARK:  Yeah.  Yeah.")
19   (The deposition concluded at 3:45 p.m.)
20        * * *
21
22
23
24
25



ROXANE ROMANS
JEFF RODGERS vs HERBALIFE LTD

January 24, 2018
153—156

---

**Page 153**

```
 1                REPORTER'S CERTIFICATION

 2

 3      I, Diana Janniere, a Certified Shorthand Reporter,

 4   in and for the State of California, do hereby certify:

 5

 6      That the foregoing witness was by me duly sworn;

 7   That the deposition was then taken before me at the

 8   time and place herein set forth; that the testimony

 9   and proceedings were reported stenographically by me

10   and later transcribed into typewriting under my

11   direction; and that the foregoing is a true record of

12   the testimony and proceedings taken at that time.

13

14      IN WITNESS WHEREOF, I subscribed my name

15   this 25th day of January, 2018.

16

17

18

19

20   _____

21   Diana Janniere, CSR No. 10034

22

23

24

25
```

---

**Page 154**

```
 1                DECLARATION ERRATA SHEET

 2

 3

 4   Our Assignment No. J1131135

 5   Case Caption:  Rodgers

 6   vs. Herbalife

 7

 8         DECLARATION UNDER PENALTY OF PERJURY

 9           I declare under penalty of perjury that I

10   have read the foregoing transcript of my deposition

11   taken in the above-captioned matter or the same has

12   been read to me, and the same is true and accurate,

13   save and except for the changes and/or corrections, if

14   any, as indicated by me on the DEPOSITION ERRATA SHEET

15   hereof, with the understanding that I offer these

16   changes as if still under oath.

17         Signed on the _____ day of

18   _____, 2018.

19

20

21

22         _____

23

24                ROXANE ROMANS

25
```

---

**Page 155**

```
 1                DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Page No._____Line No._____Change to:_____

 5   _____

 6   Page No._____Line No._____Change to:_____

 7   _____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Page No._____Line No._____Change to:_____

11   _____

12   Page No._____Line No._____Change to:_____

13   _____

14   Page No._____Line No._____Change to:_____

15   _____

16   Page No._____Line No._____Change to:_____

17   _____

18   Page No._____Line No._____Change to:_____

19   _____

20   Page No._____Line No._____Change to:_____

21   _____

22   Page No._____Line No._____Change to:_____

23   _____

24   SIGNATURE:_____DATE_____

25                ROXANE ROMANS
```

---

**Page 156**

```
 1                DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Page No._____Line No._____Change to:_____

 5   _____

 6   Page No._____Line No._____Change to:_____

 7   _____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Page No._____Line No._____Change to:_____

11   _____

12   Page No._____Line No._____Change to:_____

13   _____

14   Page No._____Line No._____Change to:_____

15   _____

16   Page No._____Line No._____Change to:_____

17   _____

18   Page No._____Line No._____Change to:_____

19   _____

20   Page No._____Line No._____Change to:_____

21   _____

22   Page No._____Line No._____Change to:_____

23   _____

24   SIGNATURE:_____DATE_____

25                ROXANE ROMANS
```

---

