# Exhibit 1

00/00/2013   12:19:27 FAX 2132499

COPY

1    Philip D. Dracht, SBN 219044
     **FABIAN & CLENDENIN**
2    215 South State Street, Suite 1200
     Salt Lake City, UT 84151-0210
3    Telephone: (801) 531-8900
     Facsimile: (801) 596-2814
4

5    Thomas G. Foley, Jr., SBN 65812
     Robert A. Curtis, SBN 203870
6    **FOLEY BEZEK BEHLE & CURTIS, LLP**
     15 West Carrillo Street
7    Santa Barbara, California 93101
     Telephone: (805) 962-9495

8    *Attorneys for Plaintiff Dana Bostick*

FILED
CLERK, U.S. DISTRICT COURT

APR - 8 2013

CENTRAL DISTRICT OF CALIFORNIA
BY          DEPUTY

9

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

10

11 | DANA BOSTICK, a California citizen, on behalf of himself and all others similarly situated, and on behalf of the general public,
12 |
13 |       PLAINTIFF,
14 |
15 | vs.
16 | HERBALIFE INTERNATIONAL OF AMERICA, INC., a Nevada Corporation, HERBALIFE INTERNATIONAL, INC., a Nevada Corporation, HERBALIFE, LTD a Cayman Island Corporation,
17 |
18 |
19 |       DEFENDANTS.

Case No. CV 13-02488  PA (RZx)

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

20

## INTRODUCTION TO THE CASE

21

22      1.     Herbalife told Dana Bostick that if he "put in the time, effort, and

23 commitment," he could make money from retail sales and, by recruiting others to

24 become Herbalife distributors, he could make money off them. Bostick paid

25 Herbalife $95.95 and became a distributor. He ordered Herbalife products – enough

26 products that he jumped up the chain and qualified for additional discounts and

27 commissions from potential recruits' purchases.

28

1     2.      Bostick did not make money as promised. Like the hundreds of

2 thousands of Herbalife distributors before and after him, Bostick failed. He failed

3 even though he was committed and put in the time and effort. He failed because he

4 was doomed from the start. He was doomed from the start by an Herbalife

5 marketing plan that systematically rewards recruiting over retail sales. A marketing

6 plan that for every dollar that Bostick and other distributors pay for Herbalife

7 product Herbalife pays $0.46 to $0.64 cents in recruiting rewards, regardless of

8 distributors' retail sales. A marketing plan that pays millions to those few at the top

9 in recruiting rewards at the expense of the many at the bottom.

10     3.      Accordingly, Dana Bostick, for himself, all others similarly situated,

11 and the general public alleges:

12 **TYPE OF ACTION**

13     4.      Bostick sues for himself and for all persons who were Herbalife

14 distributors from April 2009 until the present under California's Endless Chain

15 Scheme Law (California's Penal Code § 327 and California Civil Code § 1689.2),

16 the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*;

17 California's Unfair Competition Law (Business and Professions Code Section

18 17200 *et seq.*), False Advertising (Business and Professions Code § 17500) against

19 Herbalife International, Inc., Herbalife International of America, Inc., and

20 Herbalife, Ltd for the operation and promotion of an inherently fraudulent pyramid

21 scheme.

22 **PARTIES**

23     5.      Plaintiff Dana Bostick is and at all relevant times was an individual

24 who resides in Los Angeles County, California. Bostick entered into an Agreement

25 of Distribution with Herbalife and became an Herbalife distributor in April of 2012.

26     6.      Defendant Herbalife International of America, Inc. is and at all

27 material times was a Nevada corporation headquartered in Los Angeles. Defendant

28 Herbalife International of America, Inc. is a wholly-owned subsidiary of Herbalife

1  International, Inc. and an indirectly wholly-owned subsidiary of Herbalife, Ltd, and
2  is employed by those entities to conduct their U.S. operations.

3      7.     Defendant Herbalife International, Inc. is and at all material times was
4  a Nevada corporation headquartered in Los Angeles. Herbalife International, Inc. is
5  an indirect wholly-owned subsidiary of Herbalife Ltd. Herbalife International, Inc.
6  was the former parent company of "Herbalife" but it and its subsidiaries were
7  acquired on July 31, 2002 by an entity that became Herbalife Ltd. Herbalife Ltd.
8  employs Herbalife International, Inc. to manage its global marketing company.

9      8.     Herbalife Ltd. is "one of the largest network marketing companies in
10  the world." Herbalife Ltd. is and at all material times was a corporation organized
11  under the laws of the Cayman Islands with its corporate headquarters in Los
12  Angeles. Herbalife Ltd. is a publicly held corporation traded on the NYSE as
13  "HLF." Herbalife Ltd. is the architect, implementer, and operator of a global
14  enterprise that is and has been an illegal and fraudulent pyramid scheme, the
15  "Herbalife Pyramid."

16     9.     Although the three entities are legally distinct and have distinct roles
17  within the Herbalife Pyramid, in Herbalife's dealings with Bostick and the Class,
18  Herbalife generally does not distinguish between the three corporate entities but
19  instead refers to itself singularly as "Herbalife." This Complaint, therefore, also
20  refers to Herbalife Ltd., Herbalife International, Inc., and Herbalife International of
21  America, Inc. collectively as "Herbalife."

22     10.    John Tartol, an Herbalife Chairman's Club member, is a California
23  resident. Leslie Stanford, an Herbalife Founder's Circle member, is a Colorado
24  resident. Geraldine Cvitanovich, an Herbalife Founder's Circle member, is a Hawaii
25  resident. Susan Peterson, an Herbalife Founder's Circle member, is a Colorado
26  resident. Doran Andre is an Herbalife Chairman's Club member. Maurice Smith, an
27  Herbalife President's Circle member, is an Arizona resident.

28

1        11.     Tartol, Stanford, Cvitanovich, Peterson, Andre, Smith, and other

2 President's Circle, Founder's Circle and Chairman's Club members were at all

3 relevant times, primary beneficiaries and promoters of the Herbalife scheme, the

4 **"Beneficiaries and Promoters."**

5                     **JURISDICTION AND VENUE**

6        12.     Defendants Herbalife International, Inc., Herbalife International of

7 America, Inc., and Herbalife Ltd. are subject to the jurisdiction of this Court. They

8 have been engaged in continuous and systematic business in California. Defendants

9 have designated agents for service of process in this State or have their principal

10 place of business here and have committed tortious acts in this State. Plaintiff

11 Bostick is a resident of California.

12        13.     Because Bostick asserts claims under the Racketeer Influenced

13 Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 – 1968, this Court has

14 jurisdiction over this action under 28 U.S.C. § 1331. This Court may exercise

15 supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

16        14.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) and

17 18 U.S.C. § 1965(a) and (b) because a substantial number of the acts and

18 transactions that established the claims of the Plaintiff and the class occurred within

19 this District. Defendants conducted business, solicited business, and transmitted

20 communications by mail or wire relating to the illegal scheme in this district.

21 Defendants transacted their affairs, resided within California and this judicial

22 district, and Defendants' wrongful acts occurred in this District and have directly

23 impacted the general public of this district.

24        15.     Bostick and the class have also executed an "Agreement of

25 Distributorship" with Herbalife, which requires all claims to be "resolved

26 exclusively in a judicial proceeding in either the Superior Court or the United States

27 Court, both located in Los Angeles, California."

28                          **THE LAW**

Case 2:18-cv-07480-JAK-MRW   Document 142-3   Filed 09/28/18   Page 6 of 156   Page ID
#:2767
Case 2:13-cv-02488-PA-RZ   Document 1   Filed 04/08/13   Page 5 of 68   Page ID #:8

16.    In *Webster v. Omnitrition Int'l. Inc.*, the Ninth Circuit adopted the

"*Koscot* test" for determining what constitutes a pyramid scheme:

> Pyramid schemes are "[s]uch contrivances . . . characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users."

*Webster v. Omnitrition Int'l. Inc.*, 79 F.3d 776, 781 (9th Cir. 1996) ("*Omnitrition*")

quoting *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1181 (1975), aff'd mem.

sub nom. ("*Koscot*").

17.    The second element of the *Koscot* test is the determining

element for a pyramid scheme:

> The satisfaction of the second element of the *Koscot* test is the *sine qua non* of a pyramid scheme: "As is apparent, the presence of this second element, recruitment with rewards unrelated to product sales, is nothing more than an elaborate chain letter device in which individuals who pay a valuable consideration with the expectation of recouping it to some degree via recruitment are bound to be disappointed."

*Omnitrition*, 79 F.3d at 782. The Ninth Circuit held that "the operation of a pyramid

scheme constitutes fraud for purposes of several federal antifraud statutes." *Id.*.

18.    A multi-level sales organization where members obtain monetary

benefits primarily from the recruitment of new members rather than from selling

goods to *bona fide* consumers is an endless chain scheme. Endless chain schemes

are inherently deceptive because most participants are doomed to failure, even if

some retail sales occur:

> "The promise of lucrative rewards for recruiting others tends to induce participants to focus on the recruitment side of the business at the expense of their retail marketing efforts, making it unlikely that meaningful opportunities for retail sales will occur." Thus, the fact that some retail sales occur does not mitigate the unlawful nature of the overall arrangement.

*Omnitrition*, 79 F.3d at 782, citing *In re Ger-Ro-Mar Inc.*, 84 F.T.C. 95, 148-49

(1974), rev'd on other grounds, 518 F.2d 33 (2d Cir. 1975).

19.    "Like chain letters, pyramid schemes may make money for those at

the top of the chain or pyramid, but 'must end up disappointing those at the bottom who can find no recruits.'" *Omnitrition*, 79 F.3d at 781 (quoting *Koscot*, 86 F.T.C. 1106, 1181 (1975), aff'd mem. sub nom., *Turner v. F.T.C.*, 580 F.2d 701 (D.C. Cir. 1978)).

20.     Endless chain schemes are inherently fraudulent by nature because the futility of the plan is not apparent to the participant:

> Misrepresentations, knowledge and intent follow from the inherently fraudulent nature of a pyramid scheme as a matter of law. As to justifiable reliance, the very reasons for the *per se* illegality of Endless Chain schemes is their inherent deceptiveness and the fact that the "futility" of the plan is not "apparent to the consumer participant."

*Omnitrition*, 79 .3d at 788 (citations omitted).

21.     Section 327 of the California Penal Code prohibits endless chains:

> Every person who contrives, prepares, sets up, proposes, or operates any endless chain is guilty of a public offense, and is punishable by imprisonment in the county jail not exceeding one year or in state prison for 16 months, two, or three years.

> As used in this section, an "endless chain" means any scheme for the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant.

> Compensation, as used in this section, does not mean or include payment based upon sales made to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme.

22.     In *Herbalife International of America, Inc. v. Ford et al*, Central District Court, Case No. 2:07-cv-02529-GAF-FMO, Herbalife sued distributors leaving Herbalife. Those distributors counterclaimed against Herbalife, claiming that the Herbalife Sales and Marketing Plan was an "endless chain" under California Penal Code §327. The Court denied Herbalife's motion for summary judgment on the distributors' endless chain-scheme counterclaim, finding that there was:

> a genuine issue as to whether Herbalife distributors must pay Herbalife to become supervisors—a threshold requirement under the

6

COMPLAINT

Case 2:18-cv-07480-JAK-MRW  Document 142-3  Filed 09/28/18  Page 8 of 156  Page ID
#:2769
Case 2:13-cv-02488-PA-RZ  Document 1  Filed 04/08/13  Page 7 of 68  Page ID #:10

1  *Koscot* analysis—precludes the Court from granting summary
judgment for either side on the endless-chain-scheme claim. As noted
2  above, Herbalife's Sales and Marketing Plan provides that a
distributor may qualify to become a Supervisor by achieving 4,000
3  Volume Points in a given month or 2,500 Volume Points in each of
two consecutive months. A minimum of 1,000 of these Volume Points
4  must consist of Unencumbered Volume, while the rest may consist of
Encumbered Volume. Because both Unencumbered Volume and
5  Encumbered Volume may consist of volume purchased not by the
distributor herself but those in her downline, a distributor could
6  qualify to become a Supervisor without purchasing anything.
...
7  Moreover, in the Court's view, Herbalife's entire business model
appears to incentivize primarily the payment of compensation that is
8  "facially unrelated to the sale of the product to ultimate users because
it is paid based on the suggested retail price of the amount ordered
9  from [Herbalife], rather than based on actual sales to consumers."
*Omnitrition*, 79 F3d at 782 (emphasis and internal quotation marks
10  omitted). Nevertheless, the conflicting evidence before the Court is
sufficient to create a triable issue regarding the "payment of money"
11  element of the Koscot analysis that only the trier of fact may resolve.
Accordingly, the parties' cross-motions for summary judgment are
12  **DENIED** as to the endless-chain-scheme claim

13  *Herbalife International of America, Inc. v. Ford et al*, Central District Court, Case

14  No. 2:07-cv-02529-GAF-FMO, "Memorandum and Order Regarding Cross-

15  Motions for Summary Judgment," [Docket No. 374], 8/25/2009.

16  **FACTS**

17  **SUMMARY OF FACTS**

18      23.    From 2009-2012, Herbalife made disclosures of "Statements of

19  Average Gross Compensation of U.S. Supervisors" that were deceptive and

20  misleading as to the likelihood that a distributor could reach the level of Supervisor

21  and earn money from the scheme. Herbalife included these disclosures in the Sales

22  and Marketing Plan received by Bostick and the class. Herbalife also posted these

23  disclosures online. None of these disclosures provided any information that would

24  allow a potential or actual distributor to meaningfully evaluate their likelihood of

25  success in the scheme. Copies of the 2009-2012 disclosures are attached as **Exhibit**

26  **A** and are referred to as the **"2009-2012 Statements"**

27      24.    As recently disclosed by Herbalife in their February 2013 Statement

28  of Average Gross Compensation Paid by Herbalife to United States Distributors in

2012 (attached as **Exhibit B**, and referred to as the **"2013 Statement"**) the majority of Herbalife's U.S. distributors earn nothing from Herbalife. In 2012, Herbalife's real business opportunity was:

    a.  Herbalife paid nothing to over 87.9% of all distributors;

    b.  Herbalife paid $1 to $1,000 to 8.43% of all distributors;

    c.  Herbalife paid $1,001 to $5,000 to 2.2% of all distributors;

    d.  Herbalife paid $5,001 to $10,000 to 0.5% of all distributors;

    e.  Herbalife paid $10,000 to $25,000 to 0.393% of all distributors;

    f.  Herbalife paid $25,001-$50,000 to 0.230% of all distributors;

    g.  Herbalife paid $50,000-$100,000 to 0.109% of all distributors;

    h.  Herbalife paid $100,001-$250,000 to 0.092% of all distributors; and

    i.  Herbalife paid more than $250,000 to 0.039% of all distributors.

25.    These real numbers are in direct contrast to the deceptive earning claims referenced in Herbalife's promotional materials, including videos on Herbalife's website, YouTube, and Herbalife distributor's websites, often featuring the Beneficiaries and Promoters, and Herbalife's prior Statements of Average Gross Compensations distributed to Bostick and the class.

26.    An undisclosed fact is that there is little to no opportunity for an Herbalife distributor to earn a "retail profit" on the sales of Herbalife products because Herbalife sets the "Suggested Retail Price" (**"SRP"**) at a price so high that few if any Herbalife distributors can earn retail profits.

27.    Herbalife sets the SRP so high because for every dollar a distributor pays Herbalife for Herbalife product (not including packaging, handling, shipping, and tax) Herbalife pays out $0.46 to $0.64 to its top distributors as recruiting bonuses. Herbalife makes these payments upline whether the distributor sells the product at retail and whether the distributor sells the product at SRP.

28.    Besides setting the SRP at an inflated price, Herbalife charges its distributors a7% fee for "Packaging and Handling" and a 2.5% to 4% fee for

Case 2:18-cv-07480-JAK-MRW   Document 142-3   Filed 09/28/18   Page 10 of 156   Page ID
#:2771
Case 2:13-cv-02488-PA-RZ   Document 1   Filed 04/08/13   Page 9 of 68   Page ID #:12

1  shipping, based solely on the inflated SRP and not on Herbalife's actual or

2  estimated costs for packaging, handling, and shipping. This makes it even harder for

3  a distributor to make retail profits as it drives their retail price even higher.

4        29.    An undisclosed fact (from at least April 2009 to February 2013) is that

5  a large majority of all distributors (approximately 71%) make few if any retail sales

6  and are forced to self-consume the Herbalife products.

7        30.    An undisclosed material fact is that the vast majority of participants in

8  Herbalife's Pyramid scheme drop out within one year of becoming Herbalife

9  distributors and have usually lost most, if not all, of their investment and thousands

10  of dollars expended to build their supposed "business opportunity."

11        31.    To avoid being a pyramid scheme, a multi-level marketing plan must

12  have effective provisions to ensure that its distributors sell most products to

13  consumers not a part of the marketing system. Herbalife does or did not employ or

14  enforce such provisions.

15              **THE HERBALIFE SALES AND MARKETING PLAN**

16        32.    As a direct-sales company, Herbalife operates a multi-level

17  distribution system – the Herbalife Sales and Marketing Plan – relying on

18  individual distributors to market, promote, and sell its products.

19        33.    A copy of the Herbalife "Sales and Marketing Plan and Business

20  Rules" (**"Sales and Marketing Plan"**) purchased by Bostick as part of his

21  International Business Pack is attached as **Exhibit C.** The Sales and Marketing Plan

22  is an incredibly complex set of rules and regulations.

23        34.    Anyone can become an Herbalife distributor if they purchase an

24  Herbalife International Business Pack (**"IBP"**) or a mini-IBP at a cost of $95.95 or

25  $57.75 respectively, apply to become a distributor, and are sponsored by an existing

26  Herbalife distributor.

27

28

35.     Herbalife recruits prospective participants by offering them the opportunity to participate in a "tested proven business plan" "designed to maximize rewards for effort and provide substantial and ongoing income."

36.     Herbalife recruits prospective participants by promising them "Immediate Retail Profit," "Daily Wholesale Profit," "Monthly Override Income," "Monthly Production Bonuses," "Annual Bonuses" for Top Achievers, and "Special Vacations and Training Events" that will "teach you how to meet your goals, increase your earning power and build an international business without leaving the comfort of your own home!"

37.     Herbalife's distributors promise recruits and other distributors that they can "be your own boss – take charge of your life," achieve "financial freedom," earn "extra income," "retirement/pension," and "leave a legacy."

38.     Herbalife recruits prospective participants by boasting that the Herbalife Sales and Marketing Plan is "[t]he best Marketing Plan in the industry" and that it pays out up to 73% of product revenues to distributors in "Retail and Wholesale Profits, Royalty and bonus income and incentives." Herbalife stresses:

> Each Distributor's success is dependent on two primary factors: The time, effort and commitment a Distributor puts into their Herbalife business and the product sales made by a Distributor and their downline organization. These two factors raise the importance of a Distributor's responsibility to train, support and motivate their downline organization.

39.     Herbalife divides the "73% of product revenue" by apportioning 23% of the SRP to "Royalty, bonus income, and incentives" and 50% to "Retail and Wholesale Profits" Herbalife's 73% payout claim depends on a distributor reselling the product at 100% of the SRP.

40.     By basing these "Retail and Wholesale Profits, Royalty and bonus income and incentives" off the SRP, Herbalife masks that for every dollar the purchasing distributor spends on Herbalife product, Herbalife pays from $0.46 to $0.64 upline in the form of recruiting rewards.

41.     Because so much money is paid upline in recruiting bonuses so that Herbalife can retain its "most active and productive distributors," Herbalife's SRP is an inflated price that bears no relation to the actual market price distributors can get for Herbalife's products in sales to retail customers.

## BOSTICK IS RECRUITED TO HERBALIFE

### "Position Determines the Pay," "You Determine Your Position"

42.     Dana Bostick responded to an internet advertisement for a "trial offer." It offered an "Internet Business Starter Pack" where Bostick paid $9.95 in Shipping and Handling and would be charged an additional $39.95 if he did not return the package within fourteen days. Interested in earning monthly and residual income, Bostick signed up for the pack. The Internet Business Starter Pack was mailed to Bostick sometime between late-March and early-April 2012.

43.     Bostick reviewed the pack, which is attached **Exhibit D**, and the DVD video enclosed in that pack, which revealed the "business" as Herbalife.

44.     Bostick watched the DVD. A spokeswoman explained that within Herbalife, "the position determines the pay - meaning, the higher you start the more money you can make."

45.     On the video, Beneficiary and Promoter Maurice Smith reiterates that "position determines the pay" and that "you determine your position." Smith tells viewers that an average Herbalife distributor earns "between $100 and $300 per month - part time." And Success Builders "have the opportunity to earn between $400-$600 - part time." Smith encourages recruits to become a "Supervisor," a level in the Herbalife Pyramid that requires a significant purchase of product but where distributors, if they have a downline, can start to earn recruiting rewards:

> Supervisor is the highest level that you can choose to position yourself at today. And, this is very important to know, Supervisor is the gateway to the rest of the levels of the marketing plan. You cannot get to the higher income levels without first becoming a Supervisor.

Case 2:18-cv-07480-JAK-MRW   Document 142-3   Filed 09/28/18   Page 13 of 156   Page ID
#:2774
Case 2:13-cv-02488-PA-RZ   Document 1   Filed 04/08/13   Page 12 of 68   Page ID #:15

1       46.    The graphics on the video display that Supervisors can earn between

2  $500-$1500 a month. Smith explains that a World Team member can earn $1,500-

3  $3000 a month, GET Team member can earn $3,500-$7,000 a month, Millionaire

4  Team can earn between $7,500-$15,000 a month, and President's Team members

5  typically earn between $25,000-$100,000+ a month. Images of Smith's presentation

6  and representations of potential distributor's earnings are attached as **Exhibit E**.

7       47.    Smith explains why it is so important to become a Supervisor: "It's

8  the highest paying position that you can start at today. You've set yourself up for

9  retail profits of 50% so you've doubled your money for the same work you've been

10  doing." A Supervisor is at the "gateway to the rest of the marketing plan," because

11  Supervisors can begin to get royalties, production bonuses, spontaneous bonuses,

12  1% annual bonus pool, and paid vacations.

13       48.    Bostick viewed this video, Herbalife's website, and various other

14  Herbalife related websites. Upon viewing these materials, Bostick believed that

15  retailing Herbalife products and recruiting distributors would be a way for him to

16  build a business where he could earn both monthly income and residual income.

17       49.    Bostick ordered an IBP for $95.95. It was sent to him by FedEx. The

18  IBP contained the magazine, *Live the Good Life! Herbalife* (relevant portions of

19  which are attached as **Exhibit F)** and four distributor workbooks: "Your Business

20  Basics" (relevant portions of which are attached as **Exhibit G** to the Complaint);

21  "Using and Retailing Your Products"; "Building Your Business" (relevant portions

22  of which are attached as **Exhibit H** to the Complaint); and the "Sales & Marketing

23  Plan and Business Rules" (Exhibit C). Bostick reviewed the IBP and the materials

24  in the IBP.

25       50.    On April 6, 2012, Bostick went online and signed an Agreement of

26  Distribution. That agreement is attached as **Exhibit I**.

27       51.    Bostick worked hard to build his business. He bought and used

28  products himself so he would know what he was selling. He set up three websites.

1  Two were set up to sell Herbalife products to the public and one was to recruit

2  downline distributors. He paid for "coaching" sessions where the coaches "taught"

3  him how to recruit downline distributors to build a downline. In spite of his hard

4  work, the only recruit he made was a long-time friend.

5      52.     On April 6, and 26, 2012, May 21, 2012, June 18, 19, 22, and 27,

6  2012, and July 20, 2012, Plaintiff Bostick ordered products from Herbalife. Besides

7  the purchase price for product, Herbalife added a 7% "Packaging and Handling" fee

8  and a shipping fee of anywhere from 2.5% to 4%, solely based on the SRP of the

9  product and not on the actual or estimated costs.

10     53.     On June 22, 2012, he attempted to "pay for his position" by

11 coordinating with his friend. They were supposed to both purchase enough product

12 to become a Supervisor, the "gateway to the rest of the marketing plan." On June

13 22, 2012, he made a single order. That order cost him over $1,800 for the product

14 alone. Bostick's downline did not make the purchase and Bostick did not advance

15 to Supervisor.

16     54.     When he tried to resell the product he purchased to qualify as a

17 Supervisor, Bostick learned that there was little opportunity for him to earn monthly

18 income or residual income with Herbalife. The SRP alone was an uncompetitive

19 price in the market, and, when Bostick would add the shipping, handling, and

20 packaging fees to recoup his costs, the retail price was so high that there were

21 virtually no retail purchasers willing to pay the full retail price. And other

22 distributors were selling Herbalife products online on Craigslist and EBay at or

23 below their cost, making retail profits in the amounts promised by Herbalife even

24 more almost impossible to achieve.

25     55.     As to the over $3,000 (SRP) worth of Herbalife products that Bostick

26 purchased that he has not self-consumed or given away to family members, Plaintiff

27 Bostick has tried to sell it on Craigslist at or around his purchase cost.

28

1     56.    Bostick's experience is the same as most Herbalife distributors. As

2 Herbalife's 2013 Statement shows, most Herbalife distributors earn nothing from

3 Herbalife. Even if he would have qualified as a Supervisor, only 33% of Newly

4 Qualified Supervisors requalify.

5     57.    Bostick's failure and the other distributors' failure are not for lack of

6 time, effort, and commitment to Herbalife. These failures are due to a marketing

7 plan that, by its design, systematically rewards recruiting over retailing and

8 systematically rewards those Beneficiaries and Promoters at the top at the expense

9 of the many distributors at the bottom.

10           **MECHANICS OF THE SALES AND MARKETING PROGRAM**

11     58.    Within the Herbalife Pyramid, there are 11 levels of Herbalife

12 distributors. The bottom four categories are Distributors,[1] Senior Consultants,

13 Success Builders, and Qualified Producers. Herbalife calls the bottom four

14 categories "Non-Sales Leaders" (**"NSL"**). The top seven categories are Supervisors,

15 World Team, Global Expansion Team, Millionaire's Team, President's Team,

16 Chairman's Club, and Founders Circle. Herbalife calls these distributors "Sales

17 Leaders" (**"SL"**). Bostick was always an NSL.

18     59.    Herbalife assigns a new distributor to an existing "line of

19 sponsorship" to which the recruiting distributor already belongs. A line of

20 sponsorship includes a hierarchy of distributors starting with the newly-recruited

21 distributor and proceeding by seniority up to a distributor heading the line of

22 sponsorship. These distributors at the heads of the lines of sponsorship are members

23 of the Founder's Circle and the Chairman's Club – Beneficiaries and Promoters.

24     60.    Junior (or "downline") distributors purchase products from more

25 senior (or "upline") distributors within their line of sponsorship or from Herbalife

26 directly. Herbalife pays bonuses upline to distributors based on purchases from

27

28

---

[1] The use of a lower-case "distributor" refers to all Herbalife distributors, regardless of level. The use of a capitalized "Distributor" refers to the first-level Herbalife distributor.

Case 2:18-cv-07480-JAK-MRW   Document 142-3   Filed 09/28/18   Page 16 of 156   Page ID
#:2777
Case 2:13-cv-02488-PA-RZ   Document 1   Filed 04/08/13   Page 15 of 68   Page ID #:18

1  Herbalife by downline distributors. Any distributor at any level may sponsor new

2  distributors.

3      61.    Herbalife protects its distributors' downlines. A distributor who wants

4  to change their sponsor must obtain a written, notarized release from their Sponsor

5  and upline distributors. Herbalife can still deny the request. The distributor

6  changing sponsors can only keep her downline if her upline agrees.

7      62.    To move up the Herbalife Pyramid and qualify for higher levels of

8  compensation, Herbalife requires a distributor to "achieve" (either through their

9  own purchases of Herbalife products or through their downline's purchases)

10  specific "Volume" during specified time-periods.

11      63.    Herbalife calculates a distributor's Volume by using **"Volume**

12  **Points."** Volume Points are point values that Herbalife assigns to each of their

13  products. In the U.S., Herbalife uses a Volume Point to dollar ratio to assign Value

14  Points to specific products. It displays a product's Value Points on the price sheet.

15      64.    For 2012, in the United States, the dollar to Volume Point ratio ranges

16  from $1:0.57VP to approximately $1:0.905VP. Most Herbalife Products in 2012

17  have a ratio of approximately $1:0.905. In 2011, the average ratio was

18  approximately $1:0.9167.

19      65.    If a distributors order products the distributor collects "Personally

20  Purchased Volume" points.[2] The Volume Points that a distributor accumulates

21  either through Personally Purchased Volume and through the Volume Points

22  purchased by the distributor's downline become the distributor's sales production.

23  Herbalife uses Volume Points to qualify distributors for higher levels, sales

24  commissions, royalties, bonuses, and other incentives and benefits. Herbalife

25  calculates Volume Points monthly.

26

27  _____
[2] **"Personally Purchased Volume"** is defined as "The volume purchased directly

28  from Herbalife using your [the distributor's] Herbalife Identification Number." All
defined terms from the Sales and Marketing Plan are found on Exhibit C, pp. 21-22.

**NON-SALES LEADERS: DISTRIBUTORS, SENIOR**

**CONSULTANTS, SUCCESS BUILDERS, & QUALIFIED PRODUCERS**

**Distributors (NSL)**

66.    Herbalife calls its first-level distributors "Distributors."

67.    A Distributor buys Herbalife products at a 25% discount off the SRP, whether for personal use or resale. In its promotional materials, Herbalife characterizes the 25% discount as an opportunity for the Distributors to earn 25% in retail profits from reselling the Herbalife products.

68.    If a Distributor purchases a product with an SRP of $100, the cost is $75. Herbalife pays the Distributor's upline $48 of the $75 cost – $25 upline in "Wholesale Profits" and $23 in Royalty Overrides, bonuses, and other incentives – even if the Distributor cannot resell the product for $100.

69.    For a Distributor's purchase, $0.64 out of every dollar paid for Herbalife product goes upline ($0.33 in Wholesale Profits and $0.31 in royalties, bonuses, and incentives).

**Senior Consultants (NSL)**

70.    Herbalife promotes a Distributor to "Senior Consultant" if they buy 500 or more Personally Purchased Volume Points, or, if their recruited distributors provide 500 Volume Points in "Downline Volume."[3]

71.    Senior Consultants buy Herbalife product at a 35% discount off SRP and are eligible for a 10% commission off their downline Distributor's purchases, so long as that distributor remains a Distributor. Herbalife calls this commission "Wholesale Profit."

72.    A Distributor can also qualify for Senior Consultant if the distributor gets 2,000 Volume Points in a month, either through Personally Purchased Volume or through Downline Volume. That Senior Consultant gets a 42% discount off of

---

[3] **"Downline Volume"** is defined as "As a non-Supervisor, Downline volume is based on volume which is placed by your downline Distributors directly from Herbalife or order between 25% to 42% discount.

1   SRP, both on the qualifying purchase and on purchases in the qualifying month.

2   The next month their discount is 35% off of SRP.

3       73.    A Distributor can become a Senior Consultant without purchasing or

4   reselling Herbalife product if the Distributor recruits downline distributors and

5   those distributors purchase the required 500 or 2,000 Volume Points in a month.

6       74.    If a Senior Consultant with a 35% discount purchases a product with

7   an SRP of $100, the cost is $65. Herbalife pays the upline $38 of the $65 cost – $15

8   in "Wholesale Profits" and $23 in Royalty Overrides, bonuses, and other incentives

9   – even if the Senior Consultant does not resell the product for a $100.

10      75.    For a Senior Consultant's purchase with a 35% discount, $0.58 out of

11  every dollar paid for Herbalife product goes upline ($0.23 in Wholesale Profits and

12  $0.35 in royalties, bonuses, and incentives).

13                          **Success Builder (NSL)**

14      76.    A Distributor or Senior Consultant becomes a "Success Builder" if the

15  distributor places a single order of 1,000 Personally Purchased Volume Points.

16  Success Builders get a 42% discount on that order and on other purchases in the

17  same month they qualify. A Success Builder becomes a Senior Consultant with a

18  35% discount the next month.

19      77.    Herbalife and the Beneficiaries and Promoters encourage Distributors

20  to become Success Builders to get "higher retail profits" because of the discount. In

21  the video called "Senior Consultant & Success Builder," which is hosted at

22  http://www.youtube.com/watch?v=8b2pyw3A6FA and on the official Herbalife

23  website www.video.herbalife.com, Beneficiaries and Promoters John Tartol and

24  Leslie Stanford encourage distributors to become Success Builders. Tartol explains

25  in minutes 5:20-6:18 how a distributor can "qualify right away" for a 35% discount

26  "with just one order" and "enjoy a substantial 42% discount immediately." He tells

27  distributors that "this will get you the highest discount for the least expenditure."

28                          **Qualified Producer (NSL)**

Case 2:18-cv-07480-JAK-MRW   Document 142-3   Filed 09/28/18   Page 19 of 156   Page ID
#:2780
Case 2:13-cv-02488-PA-RZ   Document 1   Filed 04/08/13   Page 18 of 68   Page ID #:21

78.     A Distributor, Senior Consultant, or Success Builder becomes a "Qualified Producer" if the distributor purchases 2,500 Personally Purchased Volume Points within one to three months, or the distributor can combine up to 1,000 Downline Volume (Volume placed by downline distributors) Points and 1,500 Personally Purchased Volume Points in a single month.

79.     A Qualified Producer gets a 42% discount off SRP for a full year and qualifies for up to 7% to 17% of commissions on the Qualified Producer's downline distributors' (below the level of Qualified Producer, Success Builder, or Senior Consultant with a 42% discount) purchases.

80.     If a Qualified Producer (or Senior Consultant or Success Builder) with a 42% discount purchases a product with an SRP of $100, the cost is $58. Herbalife pays the upline $31 of the $58 cost – $8 upline in "Wholesale Profits" and $23 in Royalty Overrides, bonuses, and other incentives – even if the Qualified Producer does not resell the product for $100.

81.     For distributors with a 42% discount, $0.53 out of every dollar paid for Herbalife product goes upline (~$0.13 in Wholesale Profits and ~$0.40 in royalties, bonuses, and incentives).

82.     According to Herbalife's recently revised 2013 Statement, Distributors, Senior Consultants, Success Builders, and Qualified Producers (all NSLs) and Supervisors without a downline made up 83% of their total distributors in 2012.

83.     Unless an NSL is participating in the Herbalife Advantage Promotion (an automatic monthly product shipment program) and has orders for 12 consecutive months, the NSL must pay an Annual Processing Fee of $15.00 on their "anniversary date" to remain an Herbalife distributor. Supervisors also must pay an Annual Processing Fee of $79.99. Herbalife has described this fee as necessary because "The fee keeps you on our system by letting us know that you are still

1   enjoying working your Herbalife business. If it is not paid then your Distributorship

2   is subject to deletion."

3        84.    In Herbalife's 2004 and 2005 10-Ks to investors, Herbalife disclosed

4   that for the reporting year, "more than 90% of our distributors that are not

5   supervisors turned over." Herbalife stopped disclosing the turnover rate of Non-

6   Sales Leaders in their 10-Ks and never disclosed turnover rates of its NSL's to

7   Bostick and members of the class. Based on the 2004 and 2005 disclosures and

8   Plaintiff's own experience with distributors in his own upline and downline,

9   Plaintiff is informed and believes that the non-Supervisor turnover rate for 2009-

10   2013 is approximately 90%.

11   **SALES LEADERS: SUPERVISORS, WORLD TEAM, TAB TEAM,**

12   **PRESIDENT'S TEAM, FOUNDER'S CIRCLE, CHAIRMAN'S CLUB**

13   **<u>Supervisor (SL)</u>**

14        85.    Becoming a "Supervisor" means a distributor moves from being what

15   Herbalife classifies as an "Non-Sales Leader" to a "Sales Leader," or **"SL."**

16        86.    According to Herbalife's Statements of Average Compensation

17   distributed in 2009-2012 (Exhibit A), approximately 25% of Herbalife's

18   Distributors become Supervisors and above.

19        87.    A distributor can qualify to become a Supervisor in one of three ways:

20        88.    **One-Month Qualification** – by "achieving" 4,000 Volume Points in

21   a month. A minimum of 1,000 of these Volume Points must be "Unencumbered

22   Volume"[4]

23

24      [4] **"Unencumbered Volume"** is defined as "all volume produced by anyone in [a

25   distributor's downline], down to the first qualified Supervisor who achieves less than 2,500 Volume Points in one Volume Month," plus all of the distributor's

26   "Personal Volume," and which is volume that is not used by anyone else for Supervisor qualification purposes.

27   **"Personal Volume"** is defined as "The volume purchased by you as a Fully Qualified Supervisor and all others in your downline organization, excluding any

28   50% orders by Qualifying Supervisors and Qualified Supervisors."

89.   **Two-Month Qualification** – by "achieving" 2,500 Volume Points in each of two consecutive months. A minimum of 1,000 of these Volume Points must be "Unencumbered."

90.   **Accumulated Qualification** – by buying 5,000 Personally Purchased Volume Points within 12 months or 1,000 Downline Volume Points with 4,000 Personally Purchased Volume.

91.   Under the One and Two Month Qualifications, a distributor can qualify as a Supervisor without purchasing or reselling any Herbalife products if 1000 of the downline Volume Points are Unencumbered.

92.   This was the problem identified by the Court in the *Herbalife International of America, Inc. v. Ford et al* order described above: "Because both Unencumbered Volume and Encumbered Volume may consist of volume purchased not by the distributor herself but those in her downline, a distributor could qualify to become a Supervisor without purchasing anything."

93.   A distributor can also qualify for Supervisor under any method making no retail sales.

94.   A distributor who does not become a Supervisor before their downline distributor becomes a Supervisor has one year to become a Supervisor. Otherwise, Herbalife takes away that Supervisor and that Supervisor's downline from the distributor and gives them to the first upline Supervisor.

95.   Herbalife requires that a Qualifying Supervisor be sponsored by the first upline Supervisor. The Sponsoring Supervisor must match the Qualifying Supervisor's Volume Points in the qualifying month with "Total Volume."[5]

---

**"Encumbered Volume"** is all volume produced by any downline distributor qualifying for Supervisor, down to the first qualified Supervisor, who achieves 2,500 Volume Points or more at a 25% to 42% discount in one Volume Month. The basic difference between the two forms of volume is that Unencumbered Volume is volume that no other distributor uses to qualify to become a Supervisor.

[5] **"Total Volume"** is defined as "the combined total of Personal Volume plus Group Volume."

Case 2:18-cv-07480-JAK-MRW   Document 142-3   Filed 09/28/18   Page 22 of 156   Page ID
#:2783
Case 2:13-cv-02488-PA-RZ   Document 1   Filed 04/08/13   Page 21 of 68   Page ID #:24

96.     A Sponsoring Supervisor can sponsor the Qualifying Supervisor without purchasing or reselling any Herbalife products if their downline generates sufficient Total Volume to match the Qualifying Supervisor's Volume Points in that qualifying month.

97.     If the Supervisor sponsors a distributor who becomes a Supervisor that Supervisor is called a first-level Supervisor. If that first-level Supervisor sponsors a Supervisor that Supervisor becomes the original Supervisor's second-level Supervisor. If that second-level Supervisor sponsors a Supervisor that Supervisor becomes the original Supervisor's third-level Supervisor. Supervisors can earn royalties on all three of these downline level Supervisors' volume.

**Benefits for Supervisors**

98.     A Supervisor can purchase Herbalife's product at a 50% discount off the SRP and can earn from 25% - 15% - 8% in commissions from their downline's purchases. The commissions decrease as the Supervisor's downline distributors' discounts increase – 25% - 35% - 42%.

99.     If a Supervisor purchases a product with an SRP of $100, the cost is $50. Herbalife pays the upline $23 of that $50 cost in Royalty Overrides, bonuses, and other incentives – even if the Supervisor does not resell the product for $100.

100.   For a Supervisor's purchase, $0.46 out of every dollar <u>paid</u> for Herbalife product goes upline in Royalty Overrides, bonuses, and other incentives.

101.   A Supervisor also qualifies for "Royalty Overrides," if that Supervisor has first or second or third level Supervisors in their downline.

102.   A Royalty Override is a commission that a Supervisor receives on the Volume Points accrued by Supervisor's downline (the First, Second, and Third Level Supervisors). In its 10-Ks, Herbalife calls Royalty payments "compensation

**"Group Volume"** is defined as "Orders purchased at a temporary 50% discount, by Qualifying Supervisor(s) in a Supervisor's personal organization."

1  to distributors for services rendered including the development, retention and the

2  improved productivity of their sales organizations."

3      103. The percentage (1%-5%) of Royalty Overrides that a Supervisor can

4  earn depends on the number of Total Volume Points the Supervisor accumulates in

5  that month. Supervisors can qualify for Royalty Overrides from their three levels of

6  downline Supervisors. In their Sales and Marketing Plan, Exhibit C, p. 13, Herbalife

7  illustrates Royalty Override as:

**Royalty Override Sliding Scale**

| Your Total Volume Points | Royalty Override Earning % |
|---|---|
| 0–499 | 0% |
| 500–999 | 1% |
| 1,000–1,499 | 2% |
| 1,500–1,999 | 3% |
| 2,000–2,499 | 4% |
| 2,500 plus | 5% |

**Royalty Override Example**

| | | | |
|---|---|---|---|
| YOU | 2,500 Volume Points | = | Your Total Royalty Override = 1,500 Royalty Points |
| First-Level Supervisor | 10,000 Volume Points | = | 5% = 500 Royalty Points |
| Second-Level Supervisor | 10,000 Volume Points | = | 5% = 500 Royalty Points |
| Third-Level Supervisor | 10,000 Volume Points | = | 5% = 500 Royalty Points |

15      104. To qualify for Royalty Overrides, a Supervisor must certify that they

16  comply with Herbalife's "10-Retail Customer Rule" and "70% Rule." Under these

17  rules, a Supervisor "must personally make sales to at least 10 separate retail

18  customers each month," and "at least 70% of the total value of Herbalife products a

19  Distributor purchases each Volume Month must be sold or consumed that month."

20  A copy of the Earnings Certificate form is found on page 48 of Exhibit C.

21      105. Herbalife Supervisors must requalify annually by paying the Annual

22  Processing Fee and by meeting similar volume requirements as the original

23  qualification requirements.

24      106. In Herbalife's 10-Ks, Herbalife reported that for the years 2012, 2011,

25  2010, and 2009, its Sales Leader retention rate was approximately 51.10%, 48.6%,

26  43.3%, and 42.2%, respectively.

27                  **World Team (SL)**

28

107.   Herbalife promotes Supervisors to the World Team if they meet one of the three following requirements. They achieve 10,000 Total Volume Points in one month after becoming a Qualifying or a Fully-Qualified Supervisor. Or if they achieve 2,500 Total Volume Points each month for four consecutive months. Or if they are awarded 500 Royalty Override Points in one month. World Team members get special planning and training sessions targeted to accelerate their progress to TAB Team membership and all the benefits of being a Supervisor.

108.   According to Herbalife's 2012 Statement, World Team members' average annual earnings are $6,224 and the median compensation is $5,659 in payments from Herbalife.

### TAB Team (SL)

109.   Supervisors are eligible to become members of the "Top Achievers Business Team" ("**TAB Team**"), which includes three steps: Global Expansion Team ("**GET**"), Millionaire Team, and President's Team.

110.   TAB team members are eligible for Production Bonuses. The TAB Team Production Bonus is a bonus on the downline Organizational Volume (the volume on which a Supervisor is paid a Royalty Override).

### GET Team (SL)

111.   Herbalife promotes a Supervisor to the GET Team if that Supervisor accrues 1,000 Royalty Override Points each month for three consecutive months.

112.   As a GET Team member, the distributor gets all the benefits of a Supervisor and can earn TAB Team Production Bonuses based on the qualification level, can qualify for vacation and training events and can participate in special advanced trainings and conference calls.

113.   A GET Team member can qualify for a monthly 2% TAB Team bonus payment of the downline Organizational Volume, which Herbalife describes as a partial reward for the team member's "undivided loyalty" to the company.

1    114.   According to Herbalife's 2012 Statement, GET Team members have

2    an average annual earnings of $22,766 and median compensation of $19,417 in

3    payments from Herbalife.

4                            **Millionaire Team (SL)**

5    115.   If a Supervisor achieves 4,000 Royalty Override Points each month

6    for three consecutive months, Herbalife promotes that Supervisor to the Millionaire

7    Team the following month and, after a waiting period of two months, that

8    Millionaire Team member can earn a 2-4% monthly TAB Team bonus off the

9    downline's Organizational Volume. Millionaire Team members also get all the

10   benefits of being a Supervisor.

11   116.   According to Herbalife's 2012 Statement, Millionaire Team members

12   earn an average of $100,195 and median of $97,303 in payments from Herbalife.

13                           **President's Team (SL)**

14   117.   Herbalife promotes a Supervisor who accrues 10,000 Royalty

15   Override Points in three consecutive months to the President's Team where, after a

16   waiting period of three months the President's Team member can earn a 2%-6%

17   Production Bonus.

18   118.   To qualify for the President's Team, a Supervisor must accrue 20,000

19   to 50,000 Royalty Override Points in three months. The TAB Team bonuses range

20   from 2% to 7%, depending on the number of Royalty Override Points the

21   Supervisor accrues.

22   119.   For all TAB Team members, the Production Bonus decreases from the

23   maximum percentage depending on whether there are other TAB Team members in

24   the Tab Team member's downline earning Production Bonuses on the volume.

25   120.   According to Herbalife's 2012 Statement, President's Team members

26   (which include the Chairman's Club and Founder's Circle Members) earn an

27   average of $514,638 and median of $336,901 in payments from Herbalife.

28                           **Chairman's Club (SL)**

COMPLAINT

1    121.   Herbalife promotes a distributor to the Chairman's Club if the

2    distributor has five Fully-Qualified President's Team members in five separate lines

3    of the distributor's downline organization.

4    122.   Chairman's Club Members are eligible for a percentage of Herbalife's

5    global sales. This bonus is the "Mark Hughes Bonus Award."

6    123.   The Mark Hughes Bonus Award is a bonus pool representing a 1% of

7    Herbalife's *worldwide* product sales (calculated using SRP). Herbalife distributes

8    this bonus annually among the Chairman's Club and Founder's Circle Members. A

9    copy of the 2010 Mark Hughes Bonus Award Qualifications and Rules (available

10   by searching google for "'MH Bonus' Herbalife") is attached as **Exhibit J**.

11   124.   The rules to qualify for a Mark Hughes Bonus are incredibly complex.

12   They largely depend on a distributor having President's Team Members within their

13   downline who meet certain production requirements, the Royalty Override Points

14   that Herbalife awards the distributor, and their overall organization production.

15   Notably, there are no rules requiring additional retail sales beyond the "10-Retail

16   Customer Rule" and "70% Rule."

17   125.   Herbalife can also exercise discretion in awarding the MH Bonus.

18   Chairman's Club and Founder's Circle members are encouraged to

19   Demonstrate leadership and Herbalife spirit. ...Support, promotion and
20   participation in Herbalife efforts, including Company meetings and
     other efforts such as conference calls, Herbalife Broadband Network
21   (HBN), audio/visual recordings, promotions, marketing and sales,
     projects, suggestions and working with the Company as it develops
22   strategic plans and leads the effort to enhance the Company's overall
     business... Attendance of the Distributorship at major events.

23   126.   This discretionary element of the MH bonus creates symbiotic

24   relationship between Herbalife and the Beneficiaries and Promoters. It is not

25   enough for a Beneficiary and Promoter to build their downline; instead, the

26   Beneficiary and Promoter must actively work with Herbalife to promote the scheme

27   and "enhance [Herbalife's] overall business."

28

127.   Plaintiff is informed based on information found at http://www.herbalife.com/chairmansclub and believes there are only forty-three Chairman's Club members, worldwide, as of April 4, 2013.

### Founders Circle (SL)

128.   The pinnacle of the Herbalife Pyramid is the Founder's Circle.

129.   Herbalife promotes a distributor to the Founder's Circle if the distributor has ten first-line, Fully-Qualified President's Team members in ten separate lines of that distributor's downline organization.

130.   Founder's Circle members are also eligible for the "Mark Hughes Bonus Award."

131.   Plaintiff is informed based on information found at http://www.herbalife.com/chairmansclub that as of April 4, 2013, there are only eight Founder's Circle members, worldwide.

### THE ILLEGAL SCHEME

132.   Herbalife's compensation structure rewards recruiting of new participants over retail sales and leads to abuses.

133.   These abuses include: (1) Herbalife and Beneficiaries and Promoters making outlandish statements about potential earnings and the business opportunity for potential and actual distributors; (2) distributors focusing on recruiting new distributors rather than on making retail sales of products; (3) distributors purchasing more products than they can feasibly sell to actual retail customers to meet volume requirements (a practice known as "inventory loading"); (4) Herbalife and Beneficiaries and Promoters encouraging other distributors to make "one-time" purchases to jump up the pyramid to higher levels ("pay determines position" and "position determines pay"); and (5) Herbalife and Beneficiaries and Promoters encouraging their downline distributors to recruit other distributors so they can use those distributors' purchases to move higher up the Herbalife Pyramid and get the Royalty Overrides, bonuses, and other incentives.

134.   Herbalife Ltd.'s 2011 and 2012 10-Ks describes this compensation structure as necessary to keep "its most active and productive distributors" – the Beneficiaries and Promoters:

> Once a distributor becomes a sales leader, he or she has the opportunity to qualify by earning specified amounts of royalty overrides for the Global Expansion Team, the Millionaire Team or the President's Team, and thereby receives production bonuses of up to 7%. We believe that the opportunity for distributors to earn royalty overrides and production bonuses contributes significantly to our ability to retain our most active and productive distributors.

Based on their 10-Ks, Herbalife Ltd. books the payment of these Royalty Overrides, bonuses, and other incentives on its own balance sheet as an expense.

135.   In its 2011 10-K, Herbalife Ltd. admits its business depends upon it success in recruiting and retaining distributors:

> Our ability to remain competitive depends, in significant part, on our success in recruiting and retaining distributors through an attractive compensation plan and other incentives. We believe that our production bonus program, international sponsorship program and other compensation and incentive programs provide our distributors with significant earning potential.

In its 2012 10-K, Herbalife changed that to mention its products: "Our ability to remain competitive depends on having relevant products that meet consumer needs, a rewarding compensation plan, and a financially viable company."

136.   With the 2004 and 2005 disclosures by Herbalife regarding its NSL turnover of 90% (who make up 83% of its total distributors) and disclosures that of the remaining 17% who are Supervisors and above, 43%-51% of its Supervisors do not requalify, historically, most Herbalife distributors will fail.

137.   As illustrated best by Exhibit B, Herbalife's 2013 Statement, the Herbalife Pyramid makes money for those few at the top of the pyramid – the Beneficiaries and Promoters – and those are the distributors Herbalife tries to retain to remain competitive in the industry – and disappoints the many at the bottom who cannot make retail profits and who give up on the Herbalife "business opportunity" in droves.

Case 2:18-cv-07480-JAK-MRW   Document 142-3   Filed 09/28/18   Page 29 of 156   Page ID
#:2790
Case 2:13-cv-02488-PA-RZ   Document 1   Filed 04/08/13   Page 28 of 68   Page ID #:31

**Herbalife's Inducement of New Recruits**

138.   Herbalife induces new recruits to join the Herbalife program through material false representations that such recruits can re-sell Herbalife products for retail profit and can move up the pyramid and earn commissions, bonuses, and other incentives because of their recruiting activities.

139.   Besides representations made in the IBP or mini-IBP, Herbalife also promotes the scheme using distributor testimonials. In testimonials Herbalife published on its website, Herbalife tells recruits and distributors:

a.  Natalie and Justin M. say that "'Now we control our destiny.' … 'We researched different business opportunities,'…'But Herbalife offered the chance to work from home, coupled with solid earning potential.'"

b.  Scotty M. says that "'After just two years working the business, I was able to quit my job and become a full-time Distributor.' 'I wanted to be my own boss.' … 'I've been able to upgrade to a bigger home and nicer car.'"

c.  Wendy W. says "'I'm the owner of an International business!' … 'If you have little or no business experience, don't worry; determination can go a long way!'"

These statements taken from Herbalife's website are attached as **Exhibit K**.

140.   In Herbalife's IBP and Mini-IBP, Herbalife includes a magazine called *Live the Good Life! HERBALIFE* (Exhibit F). There, with images of currency, luxury vehicles, boats, and expensive homes, Herbalife tells recruits that it is a "part-time opportunity," "[a] full-time Opportunity,": and "[t]he opportunity to earn more than you ever thought possible and make your dreams come true!" Recruits are also told this is "[a] business opportunity for everyone that's fun, simple and magical!" and that all they need to do is: use the products, wear the button, and talk to people – "Use, Wear, Talk."

Case 2:18-cv-07480-JAK-MRW   Document 142-3   Filed 09/28/18   Page 30 of 156   Page ID
#:2791
Case 2:13-cv-02488-PA-RZ   Document 1   Filed 04/08/13   Page 29 of 68   Page ID #:32

1    141.   In *Live the Good Life! Herbalife,* Herbalife provides the following

2  example of potential ways that new recruits can earn income. For both of these

3  examples in the below representation.

## Earn an income several different ways





**Direct Sales**
* As a Distributor $25 of every $100      25%
* As a Success Builder $42 of every $100   42%
* As a Supervisor $50 of every $100       50%

**Downline organization**
* Commission checks
* Royalty checks
* Bonus checks

## Plus:
* **Recognition**
* **Promotions**
* **Training**

## How to earn even more income

| Example 1 | Example 2 |
|---|---|
| You = Supervisor (2,500 Volume Points) | You = Supervisor (2,500 Volume Points) |
| You recruit & retain 2 supervisors | You recruit & retain 3 supervisors |
| • 2 Supervisors each produce 2,500 Organizational Volume Points<br>• = 5,000 Volume Points   R.O. = $250/month | • 3 Supervisors each produce 2,500 Organizational Volume Points<br>• = 7,500 Volume Points   R.O. = $375/month |
| They each recruit & retain 2 Supervisors | They each recruit & retain 3 Supervisors |
| • 4 Supervisors each produce 2,500 Organizational Volume Points<br>• = 10,000 Volume Points   R.O. = $500/month | • 9 Supervisors each produce 2,500 Organizational Volume Points<br>• = 22,500 Volume Points   R.O. = $1,125/month |
| They each recruit & retain 2 Supervisors | They each recruit & retain 3 Supervisors |
| • 8 Supervisors each produce 2,500 Organizational Volume Points<br>• = 20,000 Volume Points   R.O. = $1,000/month | • 27 Supervisors each produce 2,500 Organizational Volume Points<br>• = 67,500 Volume Points   R.O. = $3,375/month |
| Total of 35,000 Volume Points. Your R.O. = $1,750 Plus Production Bonus of 2% = $700 | Total of 97,500 Volume Points. Your R.O. = $4,875 Plus Production Bonus of 4% = $3,900 |
| **Total of Checks $2,450/mo.** | **Total of Checks $8,775/mo.** |

## Imagine...4 or 5!

*The incomes presented are applicable to the individuals depicted and are not a guarantee of your income, nor are they typical. For the Statement of Average Gross Compensation for U.S. Supervisors, go to www.Herbalife.com or www.MyHerbalife.com.

41

Based on Herbalife's 2013 Statement, a distributor receiving checks of $2,450 a

1   month or $8,775 a month would be at least in the top 0.23% or 0.092% of all U.S.

2   distributors, respectively. Prior to Herbalife's 2013 Statement, a prospective or

3   actual distributor had no way to know how atypical Herbalife's examples were.

4        142.   Herbalife also distributes a magazine through the U.S. Mail called

5   *Herbalife Today*. *Herbalife Today* follows a format where Herbalife Ltd.'s CEO

6   and President, Michael Johnson, has a letter to distributors, as well as product

7   advertisements, as well as a section called "Success Stories," featuring a President's

8   Circle member, along with other success stories of TAB Team and GET Team

9   members.

10        143.   In the *Herbalife Today* magazine, Issue No.156, which Herbalife

11   distributed in the third quarter of 2012, and which Herbalife sent to Plaintiff Bostick

12   and other members of the class, Michael Johnson writes, "[m]illions of people's

13   lives are being improved through our products and our business opportunity."

14   Selected portions of *Herbalife Today*, Issue No. 156 are attached as **Exhibit L**.

15   Bostick reviewed *Herbalife Today* as they were sent to him.

16        144.   For the "Success Story," *Herbalife Today*, Issue No. 156, p.11-12,

17   features a Chairman's Club member, Paulina Riveros. Herbalife tells a tale of

18   Paulina working part-time using "a proven and surprisingly simple approach to

19   breathe life into her organization: using the products, wearing the button, and

20   talking to people." "This is how Paulina began climbing the Marketing Plan and

21   earning amazing income. … Today she lives in a spacious ranch in Florida, and has

22   a lifestyle that she couldn't have imagined in her wildest dreams."

23        145.   *Herbalife Today*, No 156, also features a section called "Where

24   Inspiration Meets Success: At a crossroads in their lives, these Distributors took the

25   high road, and turned their inspiration into success." There, distributors like Deisy

26   T., advises readers:

27          You only have to put in the hard work along with the dedication,
   patience and discipline, attributes you can learn at the events.

28          Herbalife is a real opportunity for everyone who is willing to focus

1   and work for his or her goals. Plant a seed every day and you will harvest lifetime success.

2   146.   *Herbalife Today* is full of "success" stories of distributors like the

3   Beneficiaries and Promoters. They boast of: their "successful international business

4   that I managed to build from scratch"; leaving high-paying jobs to join the

5   Herbalife business; enjoying "a lifestyle that they always dreamed of"; replacing

6   "two engineering salaries with Herbalife income"; and "making more money than

7   he could have ever imagined." Herbalife has published similar testimonials in

8   *Herbalife Today* for the last four years.

9   147.   Herbalife also has its own official YouTube channel,

10   http://www.youtube.com/user/HerbalifeIntl. There, a video entitled "Why

11   Herbalife, Why Now? Building your Business"( uploaded on December 22, 2008

12   and available through the date of filing, <http://www.youtube.com/watch?v=-

13   990eOlwchw>) demonstrates the Herbalife "pitch."

14   148.   Herbalife Ltd.'s Chairman and CEO, Michael Johnson, introduces that

15   video, saying "boy do we have a solution to help you in these tough economic

16   times." Highlighting the economic uncertainty at the time, the video asks "why

17   Herbalife?" To that question, various distributors respond: "it's recession proof."

18   "When everybody else is having troubles, listen – we're flourishing." "When the

19   economy is bad our business is fueled." "I got started in a recession – this is my

20   fourth recession. I'm more excited about today than ever before." And "This

21   opportunity can be your answer."

22   149.   In that video, Distributors tell viewers that with Herbalife "you get to

23   be your own boss," "earn extra money," "work from home," "raise your own

24   children," "make your own hours," "make part-time or full-time money," "take

25   your family on vacations," "give your family all the extras that they deserve,"

26   "change your lifestyle to do whatever you want to do." When asked again, "why

27   Herbalife, " recruits are told "because you can finally earn what you're worth."

28

1      150.   The video ends with the Herbalife's Chairman and CEO exclaiming,

2  "So why are you waiting. Come on – at Herbalife we've got the answer to these

3  tough economic times. Contact the person who sent you this video and start

4  improving your life right now. Become an Herbalife independent distributor today."

5      <strong>Beneficiaries and Promoters' Inducement of New Recruits &amp;</strong>

6      <strong>Rallying the Troops</strong>

7      151.   Herbalife features the Beneficiaries and Promoters on its website

8  www.herbalife.com/chairmansclub (visited April 8, 2013) and at

9  www.video.herbalife.com. There, many of the Beneficiaries and Promoters have

10  videos detailing their expensive lifestyles, lavish homes, luxury cars, and their

11  "rags-to-riches" stories, all purportedly made possible through Herbalife.

12      152.   Herbalife also prominently features the Beneficiaries and Promoters in

13  literature, flyers, and public events.

14      153.   Herbalife sponsors what it calls an "Herbalife Extravaganza." The

15  Herbalife Extravaganza is annual convention that Herbalife promotes in *Herbalife*

16  *Today*, online and through emails. A the Extravaganza, Herbalife distributors come

17  from around the country for sales and marketing advice and tips from Beneficiaries

18  and Promoters.

19      154.   In one video taken from the Herbalife 2010 Extravaganza in Los

20  Angeles, California, Beneficiary and Promoter Geri Cvitanovich, in minutes 1:40-

21  3:00, tells a convention hall filled with distributors that the Herbalife plan "is a

22  confidence plan … to take you from where you are to wherever you want to go,"

23  grooming them to become multimillionaires:

24         all of us are getting groomed to become multi-millionaires. That is an
           awesome opportunity. Now you can take advantage of it. Or you only

25         want to make $60,000, $100,000, couple $100,000. But the fact that
           we are all here getting groomed to become millionaires in today's

26         marketplace to me is an awesome privilege to be a part of. And I just
           want those of you who are new to know that you are in the right place

27         at the right time. The fastest amount of growth in the shortest amount
           of time in our history. And we are doing nothing but going up.

28

32
COMPLAINT

1   That video can be found at http://www.youtube.com/watch?v=PmeLJHHKoDk

2   (visited April 8, 2013).

3          155.   In another video taken at the Herbalife 2011 Extravaganza in Las

4   Vegas found at http://www.youtube.com/watch?v=cVbd8bw4MlQ (visited April 8,

5   2013) Beneficiary and Promoter Susan Peterson tells attendees, at minutes 1:03-

6   1:58 that, if they are not getting rich in Herbalife, "it's wrong" and that they are

7   taking things for granted:

> A lot of us, we built our organizations not when it was easy but when
> it was hard. When it was terrible. When it was tough. And to make a
> fortune in the tough times is really something. But to make it in the
> easy times you would think everyone would do it and to not do [it] is
> just to me wrong. I mean if you are not getting rich today in Herbalife,
> I'm going to be honest, it's wrong. It's really wrong. It means you're
> taking things for granted.

12  Peterson instructs attendees at minutes 3:00-5:42 that to increase their royalty

13  checks, they should focus on recruiting people looking for opportunity:

> If you want to recruit somebody who loves the products and who
> wants to be your discounted customer because they love the products
> … I would say keep doing that and it's wonderful. But you can't
> count that in business-building recruiting. If you want to move the
> check, you need to find other people that want to make money and
> represent the Herbalife products and Herbalife opportunity. People
> that are like you that want to be distributors….find those people that
> are looking for opportunity. That want to change their family's lives
> and their financial situation. [Those are the] people you need to work
> with. [Those are] the people you need to find. And believe me, there
> has never been an easier time to find people like that, okay, because
> our economy is bad in America. But at the same time our opportunity
> has never been stronger. Our brand, our product, our company, our
> direction. And if you aren't going after this, shame on you. Because
> you're going to miss the greatest time-period to literally go here
> [gestures with her hand down] to here [gestures with her hand up]
> with your royalty check. It doesn't happen often. It has happened two
> times in my Herbalife career. This is number three. This is the time to
> work. This is the time to recruit. This is the time to build a new
> organization. This is the time. There has never been a time this easy.
> You've gotta go for this.

25         156.   In a video profile of Beneficiary and Promoter Doran Andre found at

26  http://www.youtube.com/watch?v=2dYK605bAaU (visited April 8, 2013) Andre

27  tells about how, at minutes 1:08-2:00, he went from working for a company at 22

28  building his own Herbalife distributorship:

1   There [were] people in the company that wanted to mentor us. There
2   was a support system, an infrastructure, a business model that all we
    needed to do is execute. And then before you know it, in four months
3   working the same amount of hours, two to three hours a week, [our]
    income hit $1,500 a month...and in 90 days our income hit $10,000 a
4   month. And our very first calendar year our income hit $350,000. And
    our second year... our income hit a million one.

5   Andre goes on to remark, after a tour of his luxury home and images of his red

6   Ferrari, at minutes 4:00-4:15:

7       You know it's really amazing. I step out of the Ferrari or Bentley or
        whatever and people go 'what does that guy do for a living?' and I go
8       I'm an Herbalife independent distributor. And people are absolutely
        amazed at that that's what I do. It's an incredible quality of life.
9

10  Andre also operates what he calls the "Financial Success System." In a video found

11  at http://vimeo.com/20317153 (visited April 8, 2013) promoting his system, he

12  shows his $30,000,000 home, luxury cars and motorcycle and tells his audience:

13  "the big money hasn't even been made in Herbalife.... The biggest money in the

14  shortest period of time is going to be in the next 3-5 years."

15      157.   These types of grand overstatements regarding distributors' potential

16  earnings and opportunities are part of a pattern and practice throughout the

17  Herbalife Pyramid. One Herbalife distributor's website, http://www.cwgteam.com/,

18  (visited April 8, 2013) promises that:

19      how far you take your Herbalife business and the income you require
        or desire is your decision. However, you may be interested in the
20      following statistics:

21      o   Lottery Win: 1 in 13 million chance of becoming a millionaire
        o   Herbalife Distributor: 1 in 26,000 chance of becoming a
22      millionaire
        o   Herbalife Supervisor: 1 in 2,600 chance of becoming a
23      millionaire
        o   Herbalife World Team member: 1 in 800 chance of becoming a
24      millionaire
        o   Herbalife Global Expansion Team member: 1 in 80 chance of
25      becoming a millionaire
        o   Herbalife Millionaire Team member: 1 in 8 chance of becoming
26      a millionaire
        o   Herbalife President's Team member: becoming a millionaire is
27      a certainty

28                  **Herbalife's Deception Regarding Potential Earnings**

Case 2:18-cv-07480-JAK-MRW    Document 142-3    Filed 09/28/18    Page 36 of 156    Page ID
#:2797
Case 2:13-cv-02488-PA-RZ    Document 1    Filed 04/08/13    Page 35 of 68    Page ID #:38

158.    When making statements regarding their wealth and the potential
wealth for new recruits, Herbalife and the Beneficiaries and Promoters routinely
refer the readers or viewers (with an asterisk and a footnote) to the Herbalife
"Statement of Average Gross Compensation of U.S. Supervisors." They disclaim,
"Incomes applicable to the individual (or example) depicted and not average. For
average financial performance data, see the Statement of Average Gross
Compensation of U.S. Supervisors at Herbalife.com and MyHerbalife.com."

159.    At a meeting with Wall Street analysts in 2007, Herbalife's Chairman
and CEO Michael Johnson characterized these Statements of Average Gross
Compensation as "transparent" to distributors:

> We are transparent with our earnings potential among supervisors.
> The staff [*sic.*] on this page which is the average gross compensation
> of U.S. supervisors is a public document, it is available on our website
> and is part of our introductory business pack that all new distributors
> receive. So, every new distributor in this Company knows exactly
> where they stand and what their opportunity is inside the Company.

160.    As Johnson explains, throughout 2009-2013, Herbalife distributed its
"Statements of Average Gross Compensation of U.S. Supervisors" to all of its U.S.
distributors both in Book 4, the Sales and Marketing Plan, as well as on the internet.

161.    At the bottom of each of its disclosures made from 2009-2012
(Exhibit A) Herbalife tells its distributors: "The figures stated above are not a
guarantee nor are they a projection of a typical Distributor's earnings or profits.
Like any other independent business, the achievement or failure of a Distributor
depends upon his or her skill set, commitment and desire to succeed. At Herbalife,
the opportunity to earn more is always available to each and every Distributor."

162.    From at least 2009 through February 2013, however, Herbalife
cherry-picked the data set that they used to create their 2009-2013 Statements. They
only reported the incomes of "Supervisors" and above, and further limited that data
set to "Active Leaders" – those who "generated at least 2,500 points of volume in"
in the year "after becoming Supervisor."

Case 2:18-cv-07480-JAK-MRW   Document 142-3   Filed 09/28/18   Page 37 of 156   Page ID
#:2798
Case 2:13-cv-02488-PA-RZ   Document 1   Filed 04/08/13   Page 36 of 68   Page ID #:39

1       163.  According to their 2011 Statement, "Active Leaders" only make up

2  39.4% of Herbalife's "Leaders." Thus, not only did Herbalife fail to disclose any

3  earnings as to majority of distributors who were NSLs, Herbalife failed to disclose

4  the earnings of 60.6% of SLs in their statements distributed in 2012. Below is the

5  Statement that Herbalife distributed to Bostick in his Sales and Marketing Plan. A

6  full copy is attached as part of Exhibit A:

7

STATEMENT OF AVERAGE GROSS
COMPENSATION OF U.S. SUPERVISORS

Herbalife offers its Distributors an opportunity to achieve a lifetime of better health through its scientifically advanced weight-management and nutrition products. While many of our Distributors join the Herbalife family simply to enjoy our life-changing products, others want to share their results and take advantage of the many income benefits our business opportunity provides. With Herbalife, you can work part time and earn a supplemental income, or focus solely on your Herbalife Distributorship and increase your financial potential. It's completely up to the individual how much he or she wants to achieve! A Distributor earns profits by buying Herbalife products at wholesale and reselling them at retail. If the Distributor wants to increase his or her involvement in the business and enjoy the possibility of higher levels of income, he or she may sponsor others into the business and develop an organization.

Over 25% of Distributors reach the rank of Supervisor and above ("Leader"), qualifying them for additional compensation, which is paid by Herbalife based upon the sales production of those they have sponsored directly and indirectly. The annual gross compensation paid by Herbalife to all Leaders during 2011 averaged $2,900. Over 39% of Supervisors are "Active" (defined as those who generated at least 2,500 points of volume in 2011 after becoming Supervisor). The annual gross compensation paid by Herbalife to Active Leaders during 2011 averaged approximately $7,300.

**ACTIVE LEADERS**

| Earning Level | % of Total Leaders | % of Active Leaders | Average Earnings (USD) |
|---|---|---|---|
| President's Team | 0.2% | 0.6% | $ 515,689 |
| Millionaire Team | 0.7% | 1.7% | $ 100,195 |
| GET | 2.6% | 6.5% | $ 22,766 |
| World Team | 2.9% | 7.3% | $ 6,224 |
| Supervisor | 33.1% | 83.9% | $ 901 |
| Total | 39.4% | 100.0% | $ 7,348 |

The amounts above do not include the income Distributors can earn from their retail or wholesale income, so the actual compensation can be somewhat higher, depending upon each Distributor's personal-selling efforts.

The figures stated above are not a guarantee nor are they a projection of a typical Distributor's earnings or profits. Like any other independent business, the achievement or failure of a Distributor depends upon his or her skill set, commitment and desire to succeed. At Herbalife, the opportunity to earn more is always available to each and every Distributor.

164.   In February 2013, Herbalife released an updated and extended disclosure. A full copy is available at Exhibit B. A portion is below:

| Single-Level Distributors (No Downline) | | | |
|---|---|---|---|
| **Economic Opportunity** | Distributors* | | The economic rewards for single-level Distributors are the wholesale pricing received on products for consumption by the Distributor and his or her family as well as the opportunity to retail product to non-Distributors. Neither of these rewards are payments made by the company and therefore are excluded from this schedule |
| | Number | % | |
| • Wholesale price on product purchases<br>• Retail profit on sales to non-Distributors | 351,065 | 71% | |

| Non-Sales Leaders** With a Downline | | | |
|---|---|---|---|
| **Economic Opportunity** | Distributors | | In addition to the economic rewards of the single-level Distributors above, which are not included in this chart, certain non-sales leaders with a downline may be eligible for payments from Herbalife on downline product purchases made directly with Herbalife.<br><br>2,466 of the 4,449 eligible Distributors earned such payments in 2012. The average total payments to the 2,466 Distributors was $104. |
| | Number | % | |
| • Wholesale price on product purchases<br>• Retail profit on sales to non-Distributors<br>• Wholesale profit on sales to another Distributor | 60,333 | 12% | |

| Sales Leaders** With a Downline | | | | | | |
|---|---|---|---|---|---|---|
| **Economic Opportunity** | Distributors | | | All Sales Leaders with a Downline | | |
| | Number | % | Average Payments from Herbalife | Number of Distributors | % of Total Grouping | Average Gross Payments |
| • Wholesale price on product purchases<br>• Retail profit on sales to non-Distributors<br>• Wholesale profit on sales to another Distributor<br>• Multi-level compensation on downline sales<br>    • Royalties<br>    • Bonuses | 82,464 | 17% | >$250,000 | 194 | 0.2% | $724,030 |
| | | | $100,001-$250,000 | 452 | 0.5% | $148,808 |
| | | | $50,001-$100,000 | 539 | 0.7% | $68,912 |
| | | | $25,001-$50,000 | 1,136 | 1.4% | $35,581 |
| | | | $10,001-$25,000 | 1,940 | 2.4% | $15,538 |
| | | | $5,001-$10,000 | 2,552 | 3.1% | $7,008 |
| | | | $1,001-$5,000 | 11,307 | 13.7% | $2,216 |
| | | | $1-$1,000 | 39,151 | 47.5% | $292 |
| | | | 0 | 25,193 | 30.6% | $0 |
| | | | Total | 82,464 | 100.0% | $4,485 |

This chart does not include amounts earned by Distributors on their sales of Herbalife products to others

* 30,621 of the 351,065 single-level Distributors are sales leaders without a downline
** Sales leaders are Distributors that achieved the level of Supervisor or higher. See details on Herbalife's marketing plan at www.myherbalife.com.

165.   Plaintiff is informed and believes based on Herbalife's 2013 Statement that Herbalife's representation in its 2009-2012 Statements that "[o]ver 25% of Distributors reach the level of Supervisor and above" is false and misleading. The 2013 Statement disclosed that 83% of all of its distributors in 2012 were NSLs, leaving only 17% as Supervisors and above in 2013. Including the 30,621 distributors who became Supervisors through their own Personally Purchased Volume, brings the percentage of Supervisors to 22.89% of all distributors.

166.   Herbalife's 2013 Statement discloses that 71% of all U.S. Distributors – 351,065 distributors – are "Single-Level Distributors" with no downline.

167.   Herbalife's 2013 Statement discloses that there are only 60,333 NSLs with a downline (Senior Consultants and Qualified Producers). Of that number, only 2,466 of those distributors earned "Wholesale Profits." Even then, the average "wholesale profits" of those 2,466 distributors was $104 for a total payment of $256,464 paid to NSLs in 2012 in "Wholesale Profits."

168.   Herbalife's 2013 Statement also discloses that a "majority of those Distributors who earned in excess of $100,000 in 2012 had reached the level of Herbalife's President's Team. During 2012, 47 U.S. Distributors joined the level of President's Team. They averaged 9 years as an Herbalife Distributor before reaching President's Team, with the longest being 20 years and the shortest being less than three years."

169.   Similarly, Herbalife's 2013 Statement discloses that besides the 82,464 SLs, there are 30,621 SLs who "paid for their position."

170.   In its 2012, 2011, 2010, and 2009 10-K disclosures, Herbalife makes at least some disclosure to investors and potential investors that it retains 51.1%, 48.6%, 43.3%, and 42.2% of its Sales Leaders; until the 2013 Statement; Herbalife, however, failed to disclose this same fact to distributors and potential distributors. Finally, in the 2013 Statement Herbalife provided distributors the same information

1   that it thinks is important for investors: "51.0% of all sales leaders as of February

2   1st, 2011, requalified by February 1st, 2012 (including 33% of first time sales

3   leaders)."

4        171.   All of the information not disclosed in 2009-2012 is relevant for:

5   recruits deciding if Herbalife really is the "answer to these tough economic times";

6   recruits deciding to become Herbalife distributors; distributors deciding to purchase

7   Herbalife product; distributors reading glowing profiles on *Herbalife Today*;

8   distributors evaluating their chances of earning "Wholesale profits," distributors

9   deciding whether to purchase product to "pay for position"; distributors deciding

10  whether to recruit other distributors; and distributors evaluating Founder's Circle

11  members telling them they are "groomed to become multi-millionaires" and that if

12  they are not "getting rich today in Herbalife…It's really wrong."

### Herbalife's Recruiting Rewards Price-Out Products

14       172.   Because Herbalife sends such a large percentage of every dollar

15  received by it upline as Wholesale Profits, Royalty Overrides, bonuses, and

16  incentives – $0.46 to $0.64 of every dollar paid it for product – Herbalife sets the

17  SRP at an inflated price well over what Herbalife's products sell at in the open

18  marketplace.

19       173.   While Herbalife's "competitive compensation structure" supposedly

20  pays out up to 73% of product revenues to distributors in "Retail and Wholesale

21  Profits, Royalty and bonus income and incentives," it falls on the Herbalife

22  distributor retailing the product to recoup this 73%.

23       174.   This inflated markup necessary for the "competitive compensation

24  structure" makes Herbalife's products uncompetitive for retail sale at SRP.

### Overcharges on Packaging and Handling

26       175.   On top of this inflated SRP, Herbalife charges a 7% "packaging and

27  handling" fee based on the SRP for products ordered directly from Herbalife. A

28

1  distributor must add that 7% fee to the SRP to recoup their costs and earn the

2  promised retail profits.

3       176.   Besides this 7% surcharge, Herbalife charges its distributors up to

4  anywhere from 2.5% to 4% of the SRP if they have products shipped to them

5  instead of picking them up at an Herbalife distribution center (there only six centers

6  in the U.S.). For a distributor to earn the promised profit on a retail sale, the

7  distributor would need to resell the product at 109.5% to 111% of SRP.

8       177.   Based on Herbalife's 2009-2012 10-Ks, Herbalife's average revenue

9  for North America for "packaging and handling" and shipping is 10.33%, 10.50%,

10  10.59, and 10.7% of its total "Retail Sales" (which it uses the SRP to calculate).

11       178.   In an April 21, 2011 letter to the SEC, Herbalife states "[t]he shipping

12  and handlings costs for 2010, 2009, and 2008 were $58 million, $49 million and

13  $48 million, respectively." Herbalife's 2010 and 2009 10-Ks, however, account for

14  Herbalife's revenues for North America (which includes Canada, Jamaica, and

15  Aruba) from shipping and handling for 2010, 2009, and 2008 as $102.70 million,

16  $87.30 million, and $80.8 million, respectively.

17       179.   Plaintiff is informed and believes based on the discrepancy between

18  these reported numbers that Herbalife overcharged members of the class in 2009

19  and 2010 by millions of dollars for packaging, shipping, and handling. Because

20  Herbalife has not changed its formula to calculate the "Packaging and Handling"

21  and shipping costs since 2009, Plaintiff is informed and believes that Herbalife has

22  similarly overcharged and profited from Bostick and the class from their supposed

23  "Packaging and Handling" and "Shipping" fees during 2011, 2012, and 2013.

24       180.   Plaintiff is further informed and believes that Herbalife uses this

25  surcharge on top of the SRP as a way to avoid having to pay $0.46 to $0.64 of the

26  actual revenue it receives from purchases upline. By using a surcharge, Herbalife

27  can increase its profit margin without dramatically raising the SRP on its products

28

1  (and without having to share those price increases with the Beneficiaries and
2  Promoters).

3      181.  Because of the inflated SRP and the packaging, handling, and
4  shipping fees, the prices distributors pay for Herbalife's products are so high that
5  the profit Herbalife promises on retail sales at the Distributor level is almost
6  impossible.

7      182.  While there is a retail component to the Herbalife Pyramid, the
8  inflated SRP of the products and inflated shipping and handling fees make it
9  unlikely that Herbalife distributors have meaningful opportunities to have retail
10  sales. As Herbalife pays out "Wholesale Profits," royalties, bonuses, and other
11  incentives regardless of whether the downline distributor sells the product at SRP,
12  there is a systematic incentive to recruit other distributors.

13      183.  Herbalife's system of graduated discounts depending on the
14  distributor's position exacerbates this problem. Distributors who purchase Herbalife
15  products at a 25%, 35, or 42% discount must compete on price with other
16  distributors higher up the pyramid who can purchase products at greater discount
17  and sell those same products at or around cost.

18      184.  Based on Bostick's experience in selling Herbalife products and
19  competing in the marketplace, he is informed and believes that Herbalife's
20  distributors routinely discount Herbalife products on EBay, Craigslist, and on
21  various websites from the SRP, and there is little opportunity for retail profits.

22      185.  Because the distributors are Herbalife's actual customers and
23  consumers of its products and those actual customers and consumers are overpaying
24  $0.46 to $0.64 on the dollar for product, those distributors drop out at
25  overwhelming numbers, and Herbalife requires an ever expanding network of so-
26  called distributors.

27              **Herbalife's Sales and Marketing Plan Does Not Have or Follow**
28                                      **Safeguards**

Case 2:18-cv-07480-JAK-MRW   Document 142-3   Filed 09/28/18   Page 43 of 156   Page ID
#:2804
Case 2:13-cv-02488-PA-RZ   Document 1   Filed 04/08/13   Page 42 of 68   Page ID #:45

186.   In *In re Amway Corp., 93 F.T.C. 618 (1979)* ("*Amway*") the FTC ruled that Amway did not violate the FTC Act because it adopted and enforced four rules that would help a direct marketer avoid the characteristics of an FTC Act violation: the initial investment rule, the 70% rule, the buyback rule, and the 10 customer rule.

187.   These rules are designed to deter inventory loading and encourage retail sales. In *Omnitrition*, the Ninth Circuit explained that where "a distribution program appears to meet the *Koscot* definition of a pyramid scheme, there must be evidence that the program's safeguards are enforced and actually serve to deter inventory loading and encourage retail sales." *Omnitrition*, 79 F.3d 776 (1996).

188.   **The Initial Investment Rule**. The FTC decision noted that illegal schemes require a payment or initial disbursement by a new participant for the right to sell products and the right to earn rewards, in return for recruiting other participants into the program and which are unrelated to sale of product to the ultimate user. The FTC found that Amway did not require such an investment because "the Amway system does not involve an 'investment' inventory by a new distributor. A kit of sales literature costing only $15.60 is the only requisite." *In re Amway Corp.*, 93 F.T.C. 618, 716 (1979).

189.   Defendant Herbalife requires each new Herbalife distributor must purchase an International Business Pack (IBP) or mini-IBP at a cost of $95.55 or $57.75, respectively. This requirement, by itself, does not constitute an "investment inventory" under the rule.

190.   Because Herbalife increases its discount off the SRP on a graduated basis for Distributors, Senior Consultants, Success Builders, Qualified Producers, and Supervisors, however, Herbalife requires an initial investment well beyond the price of the IBP if a distributor wants to compete in the marketplace for retail consumers of Herbalife products or move up the Herbalife Pyramid to a place where they can earn commissions, Royalty Overrides, bonuses, and incentives.

1   Following the mantra of "pay for your position" and "position determines the pay,"

2   Herbalife and Beneficiaries and Promoters pressure distributors to make a

3   significant investment to "buy their discount" and get the "highest discount for the

4   least expenditure."

5       191.   In the IBC, Booklet 3, Building Your Business (Exhibit H) Herbalife

6   encourages its distributors on page 18 to invest in product inventory for customer

7   orders:

8         Here are some areas you may want to consider putting money
      towards:

9         • Product Inventory for customer orders
      • Personal product inventory

10        • Advertising for your business
      • Training events/seminars

11        • Business costs, such as office supplies
      • And, most of all, yourself!"

12

13      192.   In explaining why it is important to build an investment inventory,

14  Herbalife tells distributors on page 19 of Exhibit H:

15        •You can't sell what you don't have. Carry enough inventory on hand
      to cover all your local sales

16        …

17        • Many people purchase product on the spot. Carry enough product
      on hand to accommodate spur-of-the-moment sales. You don't want
      to make a paying customer wait

18        …

19        • If you are doing a one-on-one presentation, don't make the
      customer wait for product…"

20      193.   Like here, in *Omnitrition* there was no significant charge to become a

21  distributor and the distributors had no quota of product to buy. *Omnitrition*, 79 F.3d

22  at 780. Similar to Herbalife, however, to receive any "non-retail" benefit from the

23  Omnitrition system or to move up to the next level as a "Bronze Supervisor," the

24  Omnitrition distributors had to purchase and convince three other recruits to

25  purchase a certain amount of product. *Id.* Omnitrition argued that its business plan

26  did not meet the first element of the *Koscot* test because: "it does not charge for the

27  right to sell its products at the distributor level." The Ninth Circuit disagreed,

28

1  finding that while that may be the case for the "distributor" level, considering the

2  "supervisor" level, a reasonable jury could conclude the *Koscot* factors are met:

> A participant must pay a substantial amount of money to Omnitrition in the form of large monthly product orders. In exchange for these purchases, the supervisor receives the right to sell the products and earn compensation based on product orders made by the supervisor's recruits. This compensation is facially "unrelated to the sale of product to ultimate users" because it is paid based on the suggested retail price of the amount ordered from Omnitrition rather than based on actual sales to consumers. On its face, Omnitrition' s program appears to be a pyramid scheme. Omnitrition cannot save itself simply by pointing to the fact that it makes some retail sales.

*Id*. at 782 (emphasis added).

10       194.   **The "70%" Rule**: In the *Amway* decision, the FTC explained the 70%

11  rule as follows: "[t]o ensure that distributors do not attempt to secure the

12  performance bonus solely on the basis of purchases, Amway requires that, to

13  receive a performance bonus, distributors must resell at least 70% of the products

14  they have purchased each month.... Amway enforces the 70% rule." *Amway*, 93

15  F.T.C. 618, 646, ¶73.

16       195.   Herbalife's 70% rule, found at page 71 of Exhibit C is:

> In order to qualify for and receive Royalty Overrides, Production Bonuses, and other bonuses paid by Herbalife, at least 70% of the total value of Herbalife products a Distributor purchases each Volume Month must be sold or consumed that month. For the purpose of fulfilling the certification requirements of this Rule, a Distributor may count any or all of the following:
>
>   • Sales to retail customers;
>   • Sales at wholesale to downline Distributors;
>   • Product used for personal or family consumption; and
>   • *Product consumed at Nutrition Clubs.
>
>   If the Distributor fails to timely certify to Herbalife that they have sold or consumed 70% of the product purchases made that Volume Month, Royalty Overrides, Production Bonuses, and other bonuses will not be paid to the Distributor.
>
>   *If a Distributor utilizes Nutrition Club sampling activity towards compliance, the Distributor shall maintain a log of member visits for at least two years, setting forth the name of the member, dates of visits, and contact information, and shall make those records available for verification purposes if requested by the Company.

Case 2:18-cv-07480-JAK-MRW   Document 142-3   Filed 09/28/18   Page 46 of 156   Page ID
#:2807
Case 2:13-cv-02488-PA-RZ   Document 1   Filed 04/08/13   Page 45 of 68   Page ID #:48

196.   Herbalife's 70% Rule does not require that Herbalife's distributors resell at least 70% of the Herbalife products to resale customers because it allows "[p]roduct used for personal or family consumption" to satisfy the rule. As reiterated by the 9th Circuit in *Webster v. Omnitrition Intern., Inc.*, self-consumption does not count as a retail sale: "If *Koscot* is to have any teeth, such a sale [for self-consumption] cannot satisfy the requirement that sales be to 'ultimate users' of a product." *Omnitrition*, 79 F.3d 776, 783 citing *Koscot*, 86 F.T.C. 1106,1181.

197.   Herbalife does not require a Supervisor to make *any* retail sales as the rule allows "[s]ales at wholesale to downline Distributors." Again, as explained by the 9th Circuit in *Omnitrition* in finding that where Omnitrition also allowed sales to downline distributors to count for the 70% rule it did not comply: "Importantly, the [70%] requirement can be satisfied by *non-retail* sales to a supervisor's own downline [distributors]. This makes it less likely that the rule will effectively tie royalty overrides to sales to ultimate users, as *Koscot* requires." *Omnitrition*, 79 F.3d 776, 783.

198.   The 70% Rule is not applied to NSL distributors (or Supervisors who do not have a First, Second, or Third Level) even though those distributors can qualify for compensation in promotions up the chain, increased discounts on purchases, and commissions on downline purchases.

199.   While Herbalife requires Supervisors and above to certify that they have complied with the 70% rule, Plaintiff is informed and believes based the Court's finding of fact in its August 25, 2009 Memorandum & Order Regarding Cross-Motions for Summary Judgment, *Herbalife International of America, Inc. v. Ford et al.* Case No. 2:07-CV-2529-GAF-FMO (C.D. Cal.), that "Herbalife does not perform audits to determine compliance with the 70% Rule unless there is an ongoing 'ethical investigation' of a Supervisor suspected of violating Herbalife's policies." *See Memorandum & Order* (Docket No. 374), 8:16-19.

1    200. **The Ten Customer Rule**: The "ten customer rule" approved by the

2    FTC in *Amway* provided that "distributors may not receive a performance bonus

3    unless they prove a sale to each of ten different retail customers during each month.

4    . . . The ten customer rule is enforced by Amway and the Direct Distributors. . ."

5    *Amway*, 93 F.T.C. 618, 646, ¶74.

6    201.   Herbalife's Rule is: Rule 18-B The 10 Retail Customers Rule

7    
8    A Distributor must personally make sales to at least ten (10) separate
     retail customers in a given Volume Month to qualify for and receive
9    Royalty Overrides, Production Bonuses, and other bonuses paid by
     Herbalife. For the purpose of fulfilling the certification requirements
10   of this Rule, a Distributor may count any or all of the following each
     Volume Month.
11
     •      A sale to a retail customer;
12   •      A sale to a first-line Distributor with up to 200 Personally
     Purchased Volume Points (and no downline Distributors) may be
13   counted as a sale to one (1) retail customer; and
14   •      *A Nutrition Club member who consumed products during ten
     (10) visits to a Nutrition Club within one Volume Month may be
15   counted by the Nutrition Club operator as a sale to one (1) retail
16   customer.

17
     If the Distributor fails to timely certify to Herbalife that they have sold
18   to at least ten (10) retail customers in a given Volume Month, Royalty
     Overrides, Production Bonuses, and other bonuses will not be paid to
19   the Distributor.

20

21   202.   Herbalife's Ten Customer Rule does not mandate sales to customers

22   not already Herbalife distributors. Herbalife allows "[a] sale to a first line

23   Distributor with up to 200 personally purchased Volume Points (and no downline

24   Distributors) which may be counted as a sale to one (1) retail customer," to count to

25   satisfy the Retail Customer Rule. Herbalife's exception takes the "teeth" out of

26   *Koscot.*

27

28

1    203.   Distributors can also satisfy this Herbalife's rule by giving away free

2    samples of Herbalife products at their Nutrition Clubs. This does not constitute an

3    "actual sale" under *Omnitrition* or *Koscot.*

4    204.   Herbalife does not apply the Ten Customer Rule to NSL distributors

5    and Supervisors (who do not have a First, Second, or Third Level), even though

6    they can obtain performance bonuses in promotions up the chain, increased

7    discounts on purchases, and commissions on downline purchases.

8    205.   Herbalife's 10 Customer Rule and 70% Rule are ineffective in

9    ensuring its distributors focus on retailing the products over recruiting. Because

10   only distributors eligible for Royalty Overrides, bonuses, and other incentives must

11   comply with the rule, to even become a distributor subject to the rules a distributor

12   must recruit heavily and would be in at least the top 10% of all Herbalife

13   distributors.

14   206.   **The Buy Back Rule.** Amway had a buy back rule where participants

15   had to buy back from any person they recruited any saleable, unsold inventory upon

16   the recruit's leaving Amway. *Amway*, 93 F.T.C. 618, 716. As the 9th Circuit

17   explained: "The buy-back rule is only effective if it can reduce or eliminate the

18   possibility of inventory loading by insuring that program participants do not find

19   themselves saddled with thousands of dollars' worth of unsaleable products."

20   *Omnitrition*, 79 F.3d 776, 784.

21   207.   Herbalife has a 30-Day Money Back Guarantee for "retail customers."

22   When a retail customer returns product, they return the product to the distributor

23   who sold them the product. That distributor is required, within 30 days of paying

24   the refund to the customer, to send back the unused portion of the product or the

25   containers. Then Herbalife exchanges the returned product with an identical

26   replacement product for the Distributor, regardless of whether that distributor has

27   another customer who wants to purchase the product or products.

28   208.   Herbalife has no such "Money Back Guarantee," for a distributor.

209. The distributor can return products *purchased from Herbalife* within the prior 12 months on the following conditions:

    a. The distributor must resign as an Herbalife Distributor (and forfeit all of their downline).

    b. Herbalife reimburses a distributor the SRP of a product less that distributor's discount to purchase the product, less a 10% restocking fee.[6] A distributor does not receive a reimbursement of the 7% packaging and handling fee of the SRP or the shipping fee.

    c. If the distributor has received Royalty Overrides, that distributor must return all of their records relative to the 70% rule.

An "Inventory Repurchase Request Form" is found at page 50 of Exhibit C.

210. If a distributor purchases products from distributors in their upline (and not directly from Herbalife) this return policy does not apply. As NSLs can purchase product from their sponsor or their first upline Supervisor, unlike Amway's rule mandating that participants had to buy back recruit's product, Herbalife leaves its NSLs at the mercy of their upline to determine whether they will accept the return.

211. As Herbalife took a 10% restocking fee from 2009 through May of 2012, Herbalife has not complied with the *Amway* rule.

212. As Herbalife does not reimburse the distributor for the inflated packaging and shipping fees, Herbalife has not complied with the *Amway* rule.

213. Herbalife knows of, approves, promotes, and facilitates the systematic noncompliance with or breach of, the rules that purportedly protect against the operation of an illegal scheme.

### Herbalife is Bound to Operate as Pyramid Scheme

---

[6] Plaintiff is informed that the 10% restocking fee was discontinued sometime in May of 2012.

Case 2:18-cv-07480-JAK-MRW   Document 142-3   Filed 09/28/18   Page 50 of 156   Page ID
#:2811
Case 2:13-cv-02488-PA-RZ   Document 1   Filed 04/08/13   Page 49 of 68   Page ID #:52

214.   Herbalife cannot fix itself even if it wants. In Herbalife's 2012 10-K, it explains it is contractually bound to continue implementing and operating this pyramid scheme:

> This agreement with our distributors provides that we will not change certain aspects of our marketing plan without the consent of a specified percentage of our distributors. For example, our agreement with our distributors provides that we may increase, but not decrease, the discount percentages available to our distributors for the purchase of products or the applicable royalty override percentages, including roll-ups, and production and other bonus percentages available to our distributors at various qualification levels within our distributor hierarchy.

215.   As Plaintiff Bostick has never made such an agreement with Herbalife, Bostick is informed and believes that the agreement Herbalife refers to is between Herbalife and Beneficiaries and Promoters and others. This agreement solidifies and memorializes that symbiotic relationship between Herbalife and the Beneficiaries and Promoters.

### Class Action Allegations

216.   Plaintiff Bostick brings this action as a class action under Federal Rule of Civil Procedure 23.

217.   **Class Definition:** All persons who were Herbalife distributors from April 2009 until the present.

Excluded from the class are the Defendants, their employees, family members, and any distributor who has been a member of the President's Circle, Founder's Circle, Chairman's Club, Millionaire Team, or the GET Team.

218.   Plaintiff Bostick also seeks relief for himself and all members of the class who agreed to a choice of law of California under California's Unfair and Deceptive Practices Acts, and California's Unfair Competition Act.

219.   Plaintiff Bostick seeks to pursue a private attorney general action for injunctive relief for himself and all members of the class who agreed to a choice of law of California, and he satisfies the standing and class action requirements.

220.   The members of the class number are over 400,000 and joinder of all Class members in a single action is impracticable.

221.   There are questions of law and/or fact common to the class and subclass, including but not limited to:

    a.   Whether Herbalife is operating an unlawful scheme;

    b.   Whether Herbalife and Beneficiaries and Promoters were operating an unlawful scheme;

    c.   Whether distributors paid money to Herbalife for (1) the right to sell a product and (2) the right to receive, in return for recruiting others, rewards which were unrelated to the sale of the product to retail consumers

    d.   Whether distributors had to make an initial investment;

    e.   Whether Herbalife had a 70% Rule and enforced it;

    f.   Whether Herbalife had a Ten-Customer Rule and enforced it;

    g.   Whether Herbalife had a buy-back rule and enforced it;

    h.   Whether Herbalife's Sales and Marketing Plan constitutes an endless chain under California state law.

    i.   Whether Herbalife or the Beneficiaries and Promoters omitted to inform Bostick and the plaintiff class that they were entering into an illegal scheme where an overwhelming number of participants lose money;

    j.   Whether Herbalife's Statements of Average Gross Compensation distributed from 2009 through 2012 were deceptive and misleading;

    k.   Whether Herbalife's business model primarily incentivizes the payment of compensation facially unrelated to the sale of the product to ultimate users because it is paid based on the suggested retail price of the amount ordered from Herbalife rather than on actual sales to consumers;

COMPLAINT

Case 2:18-cv-07480-JAK-MRW   Document 142-3   Filed 09/28/18   Page 52 of 156   Page ID
#:2813
Case 2:13-cv-02488-PA-RZ   Document 1   Filed 04/08/13   Page 51 of 68   Page ID #:54

1     l.  Whether Herbalife overcharged for Packaging and Handling;

2    m. Whether Herbalife or the Beneficiaries and Promoters engaged in acts

3       of mail and/or wire fraud in direct violation of RICO;

4     n.  To what extent the conduct injured Bostick and the class;

5     o.  Whether Herbalife's conduct constitutes an unlawful, unfair and/or

6       deceptive trade practice under California state law;

7     p.  Whether Herbalife's conduct constitutes unfair competition under

8       California state law; and

9     q.   Whether Herbalife's conduct constitutes false advertising under

10       California state law; and

11   222.  These and other questions of law and/or fact are common to the class

12 and predominate over any question affecting only individual class members.

13   223.  Bostick's claims are typical of the claims of the class in that Bostick

14 was a distributor for Defendant Herbalife and lost money because of the illegal

15 scheme.

16   224.  Bostick will fairly and adequately represent the interests of the class.

17 Bostick's claims are typical of those of the class. Bostick's interests are fully

18 aligned with those of the class. And Bostick has retained counsel experienced and

19 skilled in complex class action litigation.

20   225.  Class action treatment is superior to the alternatives for the fair and

21 efficient adjudication of the controversy alleged, because such treatment will allow

22 many similarly-situated persons to pursue their common claims in a single forum

23 simultaneously, efficiently and without unnecessary duplication of evidence, effort,

24 and expense that numerous individual actions would engender.

25   226.  Bostick knows of no difficulty likely to be encountered in the

26 management of this case that would preclude its maintenance as a class action.

27          **FIRST CLAIM FOR RELIEF**

28    **(ENDLESS CHAIN SCHEME; California Penal Code §327**

1       **and Section 1689.2 of the California Civil Code)**

2                       **Against All Defendants**

3          227.   Plaintiff realleges the previous allegations.

4          228.   California Penal Code § 327 renders endless chain schemes illegal.

5   Section 1689.2 of the California Civil Code provides:

6          A participant in an endless chain scheme, as defined in Section 327 of
7          the Penal Code, may rescind the contract upon which the scheme is
           based, and may recover all consideration paid pursuant to the scheme,
8          less any amounts paid or consideration provided to the participant
           pursuant to the scheme.

9          229.   Herbalife is operating an endless chain scheme.

10         230.   Bostick and the class have suffered an injury in fact and have lost

11  money or property because of Herbalife's business acts, omissions, and practices.

12         231.   Bostick and the class are entitled to recover all consideration paid

13  under the scheme, less any amounts paid or consideration provided to the

14  participant under the scheme.

15         232.   As punishment for violation of California Penal Code §327 is

16  punishable by imprisonment for over one year, violation of California Penal Code

17  §327 can provide the basis for a RICO predicate act of racketeering.

18                      **SECOND CLAIM FOR RELIEF**

19                      **(RICO 18 U.S.C. § 1962(a))**

20                      **Against All Defendants**

21         233.   Plaintiff realleges the previous allegations.

22         234.   Herbalife and others willfully and intentionally violated and continue

23  to violate RICO and California law with the goal of obtaining money, directly and

24  indirectly, through a pattern of racketeering activities in violation of the mail and

25  wire fraud statutes,18 U.S.C. §§ 1341 and 1343, 18 U.S.C. 1962(a), and California

26  Penal Code §327.

27         235.   Herbalife International of America, Inc., Herbalife International, Inc.,

28  and Herbalife, Ltd. and the Beneficiaries and Promoters are engaged in activities

Case 2:18-cv-07480-JAK-MRW Document 142-3 Filed 09/28/18 Page 54 of 156 Page ID
#:2815
Case 2:13-cv-02488-PA-RZ Document 1 Filed 04/08/13 Page 53 of 68 Page ID #:56

1    affecting federal interstate and foreign commerce and are entities capable of holding

2    a legal or beneficial interest in property. Herbalife International of America, Inc.,

3    Herbalife International, Inc., and Herbalife, Ltd. and the various Beneficiaries and

4    Promoters are "persons," as that term is defined by 18 U.S.C. §1961(3).

5                                    **The Herbalife Enterprise**

6         236.   Herbalife International of America, Inc., Herbalife International, Inc.,

7    and Herbalife Ltd. and the Beneficiaries and Promoters make up the "Herbalife

8    Enterprise" as an association of entities and individuals associated in fact to operate

9    an illegal pyramid scheme. The Herbalife Enterprise is not a legal entity within the

10   meaning of "enterprise" as defined in 18 U.S.C. § 1961(4). Herbalife and the

11   Beneficiaries and Promoters have been members of the Herbalife Enterprise from at

12   least April 2009 and continuing until the present. Herbalife and the Beneficiaries

13   and Promoters are separate entities from the Herbalife Enterprise and play separate

14   and distinct roles in the operation of the Herbalife Enterprise.

15           a. Herbalife Ltd. is the founder, architect, and beneficiary of the

16               Herbalife Pyramid. Through interstate wire and mails, it coordinates

17               the Herbalife Enterprise, a worldwide scheme. It also pays and awards

18               the Royalty Overrides, bonuses, and other incentives to the

19               Beneficiaries and Promoters and others. This includes the Mark

20               Hughes Bonus, which Herbalife Ltd. exercises discretion in awarding,

21               based on the Beneficiaries and Promoters' participation in promoting

22               the Herbalife Enterprise.

23           b. Herbalife Ltd. employs Herbalife International, Inc. to coordinate the

24               operations of the Herbalife Pyramid in the countries in which

25               Herbalife operates, including determining and coordinating Royalty

26               Points, Royalty Overrides, bonuses, and other incentives. Herbalife

27               International, Inc. also coordinates the global marketing and

28               promotion of the Herbalife Pyramid.

Case 2:18-cv-07480-JAK-MRW   Document 142-3   Filed 09/28/18   Page 55 of 156   Page ID
#:2816
Case 2:13-cv-02488-PA-RZ   Document 1   Filed 04/08/13   Page 54 of 68   Page ID #:57

c.  Herbalife Ltd. employs Herbalife International of America, Inc. as its
operational arm of the Herbalife Enterprise in the U.S. Herbalife Ltd.
employs Herbalife International of America, Inc. to conduct
racketeering activities in the U.S.

d.  Herbalife employs the Beneficiaries and Promoters to induce new
recruits into the Herbalife Pyramid, to induce distributors to purchase
Herbalife product, and to induce distributors to recruit additional
distributors into the Herbalife Pyramid. The Beneficiaries and
Promoters also have an agreement with Herbalife Ltd. mandating that
Herbalife will not reform its fraudulent marketing plan without their
consent.

237.  From at least April 2009 and continuing until the present, within the
Central District of California and elsewhere, Herbalife International of America,
Inc., Herbalife International, Inc., and Herbalife Ltd., in association with each other
and in association with the Beneficiaries and Promoters, did knowingly, willfully
and unlawfully conduct and participate, directly and indirectly, in the conduct of the
affairs of the Herbalife Enterprise through a pattern of racketeering activity.

238.  From at least April 2009 and continuing until the present, Herbalife
International of America, Inc., Herbalife International, Inc., and Herbalife Ltd., with
each other and the Beneficiaries and Promoters, executed a *per se* scheme to
defraud through a pattern of racketeering made up of distinct acts of mail and wire
fraud under 18 U.S.C. §§ 1341 and 1343. The Herbalife Enterprise engaged in and
affected interstate and foreign trade. The Herbalife Enterprise transacts business
through the instrumentalities of interstate commerce such as telephones, facsimile
machines, the internet, email, and the United States mail and interstate commercial
carrier to communicate in furtherance of the activities of the Herbalife Enterprise.
The Herbalife Enterprise advertises, markets, and sells products and services
throughout the United States. The operation of the enterprise continued over several

1  years, including activities in every state, and has affected and damaged, and
2  continues to affect and damage, commercial activity.

3      239.   To further the goals of the Herbalife Enterprise, which were to (1)
4  earn money through fraudulent means, (2) entice individuals to become Herbalife
5  distributors, (3) entice individuals to purchase products from Herbalife; (4) entice
6  individuals to recruit others to become Herbalife distributors and profit off those
7  recruits' purchases of Herbalife products, and (5) reap large profits for themselves
8  based on false representations, Herbalife International of America, Inc., Herbalife
9  International, Inc., and Herbalife Ltd. and the Beneficiaries and Promoters engaged
10  in various forms of illegal activity, including (a) mail fraud, (b) wire fraud, and (c)
11  conspiracy.

12      240.   The pattern of racketeering activity alleged is distinct from the
13  Herbalife Enterprise. Each act of racketeering activity is distinct from the Herbalife
14  Enterprise in that each is a separate offense committed by an entity or individual
15  while the Herbalife Enterprise is an association of entities and individuals. The
16  Herbalife Enterprise has an ongoing structure and/or organization supported by
17  personnel and/or associates with continuing functions or duties.

18      241.   The racketeering acts set out above and below, and others, all had the
19  same pattern and similar purpose of defrauding Bostick and the class for the benefit
20  of the Herbalife Enterprise and its members. Each racketeering act was related, had
21  a similar purpose, involved the same or similar participants and methods of
22  commission and had similar results affecting Bostick and the class. The
23  racketeering acts of mail and wire fraud were also related to each other in that they
24  were part of the Herbalife Enterprise's goal to fraudulently induce Bostick and the
25  class to join the illegal scheme, purchase products, and recruit others to join the
26  scheme.

27      242.   Herbalife's and members of the Beneficiaries and Promoters'
28  wrongful conduct has been and remains part of Herbalife Enterprise's ongoing way

1  of doing business and constitutes a continuing threat to the property of Bostick and

2  the class. Without the repeated acts of mail and wire fraud, the Herbalife

3  Enterprise's fraudulent scheme would not have succeeded.

4      243.  Revenue gained from the pattern of racketeering activity, which

5  constitutes a significant portion of the total income of Herbalife and the

6  Beneficiaries and Promoters, was reinvested in the operations of the Herbalife

7  Enterprise for the following purposes: (a) to expand the operations of the Herbalife

8  Enterprise through additional false and misleading advertising and promotional

9  materials aimed at recruiting new distributors; (b) to facilitate the execution of the

10  illegal scheme; and (c) to convince current distributors to recruit new distributors,

11  and purchase Herbalife products.

12      244.  Bostick and the class were injured by the reinvestment of the

13  racketeering income into the Herbalife Enterprise because they invested billions of

14  dollars of their own money through their purchasing of IBP's, promotional

15  materials, and Herbalife products, all of which were packaged and shipped at

16  inflated charges.

17      245.  In connection with promoting and executing their illegal scheme,

18  members of the Herbalife Enterprise knowingly and recklessly placed and caused to

19  be placed in the United States mail or by interstate commercial carrier, or took or

20  received therefrom, matters or things to be sent to or delivered by the United States

21  mail or by interstate commercial carrier comprising, among other things product,

22  invoices, letters, promotional materials, brochures, products and checks to Bostick

23  and the class and received communications between and among themselves through

24  the United States mail, in all fifty states and the District of Columbia. It was

25  reasonably foreseeable that these mailings or receipts would take place in

26  furtherance of the fraudulent scheme.

27      246.  In connection with promoting and executing their illegal scheme,

28  members of the Herbalife Enterprise engaged in wire fraud, in violation of 18

1   U.S.C. § 1343, by, among other things, knowingly and recklessly transmitting or

2   causing to be transmitted with wire communications, in interstate and foreign trade,

3   materials promoting the illegal Herbalife Pyramid on internet web sites, radio,

4   satellite radio, television, email, facsimile, telephone, and text messages, including

5   promotional materials, registration information, product information, and invoices.

6   Herbalife and Beneficiaries and Promoters maintain websites on the internet where

7   Herbalife distributors can and do buy products and are given inducements to

8   continue working as distributors within the Herbalife Pyramid. Herbalife maintains

9   various websites hosting promotional videos featuring the Beneficiaries and

10  Promoters promoting the unlawful scheme and other marketing materials featuring

11  the Beneficiaries and Promoters promoting the illegal scheme. Herbalife sent and

12  received these interstate wire communications to and from all fifty states and the

13  District of Columbia.

14       247.   Each Defendant has promoted the Herbalife Pyramid and Herbalife

15  Enterprise. Each use of the mail or wire by Defendants and the Beneficiaries and

16  Promoters done in furtherance of the Herbalife Pyramid is an act of racketeering.

17       248.   The pattern of racketeering activity through which the affairs of the

18  Herbalife Enterprise were conducted and in which Herbalife and the Beneficiaries

19  and Promoters participated consisted of the following:

20                       **Racketeering Act Number One**

21       249.   In April 2012, plaintiff Bostick received, through private commercial

22  interstate carrier, the International Business Pack featuring the magazine *Live the*

23  *Good Life! Herbalife*, which promoted the Herbalife Enterprise and contained

24  material false representations regarding the success distributors could achieve

25  through Herbalife by purchasing products and recruiting others to do the same.

26  Herbalife includes *Live the Good Life! Herbalife*, in all International Business

27  Packs and mini-IBP's. Because of his receipt of *Live the Good Life! Herbalife*, and

28  the representations contained therein, Plaintiff Bostick signed up with Herbalife,

1  purchased Herbalife products, and recruited others to do the same. *Live the Good*
2  *Life! Herbalife* was sent by Herbalife International of America, Inc. with the
3  purpose and intent of promoting the Herbalife Enterprise's illegal scheme, all in
4  violation of 18 U.S.C. § 1341.

5  ### Racketeering Act Number Two

6      250.   In April 2012, plaintiff Bostick received, through private commercial
7  interstate carrier, the International Business Pack, which promoted the Herbalife
8  Enterprise and the Herbalife Pyramid through the Sales and Marketing plan, and
9  which contained material false representations regarding the success that
10  distributors could achieve through Herbalife by purchasing products and recruiting
11  others to do the same. The Sales and Marketing Plan contained a "Statement of
12  Average Gross Compensation of U.S. Supervisors," which contained deceptive and
13  misleading information regarding the likelihood of success in becoming a
14  Supervisor as well as the average earnings of distributors and the amount of product
15  revenues that are paid out by Herbalife to distributors in the form of Wholesale
16  Profits, Royalty and bonus incomes and incentives. Because of his receipt of the
17  International Business Pack, and the representations contained therein, Plaintiff
18  Bostick purchased Herbalife products, signed up as an Herbalife distributor, and
19  recruited others to do the same. Herbalife International of America, Inc. sent the
20  International Business Pack with the purpose and intent of promoting the Herbalife
21  Enterprise's illegal scheme, all in violation of 18 U.S.C. § 1341.

22  ### Racketeering Act Number Three

23      251.   On April 13, 2012, April 26, 2012, May 21, 2012, June 18, 19, 22, 27,
24  2012, and July 20, 2012, Plaintiff Bostick ordered, through interstate wire
25  transmissions over the internet on myherbalife.com, an Herbalife hosted website,
26  Herbalife products associated with Volume Points, which were promoted by the
27  Herbalife Enterprise as the means by which distributors such as Bostick could "pay
28  for his position" and get greater retail profits. Herbalife International of America,

1  Inc. hosted these websites. Bostick paid Herbalife International of America, Inc. for

2  these products using an electronic transfer of funds. Herbalife International of

3  America, Inc. shipped Bostick these products through private commercial interstate

4  carrier. Herbalife International Inc., coordinated through interstate wires on at least

5  a monthly basis following the order the collection and accruing of the Volume

6  Points associated with those purchases. Herbalife Ltd., paid 22% of the SRP from

7  Bostick's purchases in Royalty Overrides, bonuses, and other incentives monthly

8  following Bostick's order. Herbalife Ltd., paid 1% of the SRP from Bostick's

9  purchases in Mark Hughes Bonuses annually. Because of the promised "Volume

10  Points," "Retail Profits," and opportunity to advance up the Herbalife Pyramid,

11  Plaintiff Bostick purchased Herbalife Products, paid for those Herbalife Products,

12  and received those products, using instrumentalities of interstate commerce. This

13  violated 18 U.S.C. §§ 1341 and 1343.

14  **Racketeering Act Number Four**

15  252.   On a quarterly basis throughout 2012, and occurring from 2009-the

16  present, plaintiff Bostick, as an Herbalife distributor, received, through the United

17  States mail, *Herbalife Today* featuring the "Royalty Achievers" "President's

18  Team," "Millionaire Team," and "Lifetime Achievers," including members of the

19  Beneficiaries and Promoters, which promoted the Herbalife Enterprise and

20  contained material false representations regarding the success that a distributor

21  could achieve through Herbalife by purchasing products and recruiting others to do

22  the same. Because of his receipt of the *Herbalife Today* and the representations

23  contained therein, Plaintiff Bostick purchased Herbalife products, and recruited

24  others to do the same. Bostick continued to receive Herbalife magazines and

25  catalogs through the United States mail. Herbalife International of America, Inc.

26  sent the Herbalife magazines and catalogs with the purpose and intent of promoting

27  the Herbalife Enterprise's illegal scheme. This violated 18 U.S.C. § 1341.

28  **Racketeering Act Number Four**

1   253. Throughout 2012 as an Herbalife distributor, plaintiff Bostick

2 received, through email, numerous emails from Herbalife that promoted the

3 Herbalife Enterprise and contained material false representations regarding the

4 success that a distributor could achieve through Herbalife by purchasing products

5 and recruiting others to do the same. Because of his receipt of these emails the

6 representations contained therein, Plaintiff Bostick purchased Herbalife products

7 and tried to recruit others to do the same. Herbalife International of America, Inc.

8 sent those emails with the purpose and intent of promoting the Herbalife

9 Enterprise's illegal scheme. This violated 18 U.S.C. § 1343.

10          **Racketeering Act Number Five**

11   254. Throughout April of 2009 and continuing, Herbalife distributed

12 information by interstate wire transmissions over the internet, such as

13 www.herbalife.com, https://www.myherbalife.com/, and

14 http://www.herbalifemail.com/ In April of 2012 and throughout 2012, Bostick

15 reviewed information on Herbalife's websites. The Herbalife websites promoted the

16 fraudulent scheme through videos of Beneficiaries and Promoters containing

17 material false representations regarding the business opportunity available to

18 distributors, and the wealth that a distributor could get by agreeing to become an

19 Herbalife distributor. Because of the representations on Herbalife's websites,

20 Bostick became an Herbalife distributor and maintained his position as an Herbalife

21 distributor and continued to order Herbalife products and recruit others to do the

22 same. This violated 18 U.S.C. § 1343.

23          **Racketeering Act Number Six**

24   255. In late March to early April 2012, plaintiff Bostick received, through

25 the United States mail or through private commercial interstate carrier, the Internet

26 Business Starter Pack, including the DVD featuring Maurice Smith, which

27 promoted the Herbalife Enterprise and contained material false representations

28 regarding the success that a distributor could get through Herbalife by purchasing

1  products and recruiting others to do the same. Because of his receipt and review of
2  the Internet Business Starter Pack, and the representations contained therein,
3  Plaintiff Bostick purchased Herbalife products, and recruited others to do the same.
4  Beneficiaries and Promoters sent Bostick the Internet Business Starter Pack
5  Herbalife with the purpose and intent of promoting the Herbalife Enterprise's illegal
6  scheme. This violated 18 U.S.C. § 1341.

### Racketeering Act Number Seven

8  256.   Throughout 2012, Bostick purchased Herbalife products and was
9  charged a 7% "Packaging and Handling" fee and a shipping fee. Herbalife
10  International of America, Inc. charged Bostick this fee via interstate wire
11  communications and fraudulently represented that such Packaging and Handling
12  fees and shipping fees were owed through the interstate wire communications,
13  when they were not. Because of the representations of Herbalife, Plaintiff Bostick
14  purchased Herbalife products and paid "Packaging and Handling" fees. Herbalife
15  did this with the purpose and intent of profiting off of the Herbalife Enterprise's
16  illegal scheme. This violated 18 U.S.C. § 1343.

### Racketeering Act Number Eight

18  257.   Throughout 2012, Beneficiaries and Promoters Tartol, Stanford,
19  Cvitanovich, Susan Peterson, Andre, and other President's Circle, Founder's Circle
20  and Chairman's Club members distributed information by interstate wire
21  transmissions over the internet promoting Herbalife, such as the videos described in
22  paragraphs 43-47, 77, 147-150, 151, 154, 155, and 156. Just as the Smith's video
23  contained material misrepresentations regarding the potential for success, these
24  videos promoted the fraudulent pyramid scheme and contained material false
25  representations regarding the wealth that a recruit or Herbalife distributor could
26  achieve if that recruit became an Herbalife distributor and if a distributor purchased
27  Herbalife products. This violated 18 U.S.C. §1343.

28

Case 2:18-cv-07480-JAK-MRW   Document 142-3   Filed 09/28/18   Page 63 of 156   Page ID
#:2824
Case 2:13-cv-02488-PA-RZ   Document 1   Filed 04/08/13   Page 62 of 68   Page ID #:65

258.   Herbalife's and the Beneficiaries' and Promoters' representations and omissions were the proximate cause of Bostick and the class joining the fraudulent scheme and purchasing the products.

259.   To the extent proof of reliance is legally required, in engaging in the aforementioned wire and mail fraud, Herbalife and the Beneficiaries and Promoters knew that Bostick and the class would reasonably rely on their representations and omissions which would cause the plaintiffs and the class joining the fraudulent pyramid scheme and purchasing the products.

260.   Defendants and the Beneficiaries and Promoters knew that the misrepresentations and omissions described above in promoting and executing the fraudulent scheme were material because they caused Bostick and the class to join and participate in the illegal scheme.

261.   Had Bostick and the class known that Herbalife and the Beneficiaries and Promoters were promoting an illegal scheme, they would not have joined the Herbalife Pyramid scheme.

262.   Herbalife's and the Beneficiaries' and Promoters' acts of mail and wire fraud were a proximate cause of the injuries that Bostick and the class suffered. Because of Herbalife's and the Beneficiaries' and Promoters' pattern of unlawful conduct, Bostick and the class lost billions of dollars.

263.   Under 18 U.S.C. § 1964, Bostick and the class are entitled to treble their damages, plus interest, costs and attorney's fees.

### THIRD CLAIM FOR RELIEF

### (RICO 18 U.S.C. § 1962(c))

### Against All Defendants

264.   Plaintiff realleges the previous allegations.

265.   Herbalife and the Beneficiaries and Promoters are associated with the Herbalife Enterprise. In violation of 18 U.S.C. § 1962(c), Herbalife and the Beneficiaries and Promoters conducted and/or participated in the conduct of the

1 | affairs of the Herbalife Enterprise, including participation in activities in
2 | furtherance of the Herbalife Defendants' fraudulent scheme, through the pattern of
3 | racketeering activity earlier alleged.

4 |   266. As a direct and proximate result of Herbalife's and the Beneficiaries'
5 | and Promoters' violation of 18 U.S.C. § 1962(c), Bostick and the class were
6 | induced to, and did, become distributors in the Herbalife Pyramid scheme and
7 | purchased billions of dollars of the Herbalife products and recruited others to do the
8 | same. Bostick and the class were injured by Herbalife's and the Beneficiaries' and
9 | Promoters' unlawful conduct. The funds used to buy Herbalife products constitute
10 | property of Bostick and the class within the meaning of 18 U.S.C. § 1964(c).

11 |   267. Under 18 U.S.C. § 1964(c), Bostick and the class are entitled to treble
12 | their damages, plus interest, costs and attorney's fees.

13 | **FOURTH CLAIM FOR RELIEF**
14 | **(RICO 18 U.S.C. § 1962(d))**
15 | **Against All Defendants**

16 |   268. Plaintiff realleges the previous allegations.

17 |   269. Herbalife and the Beneficiaries and Promoters agreed to work
18 | together in a symbiotic relationship to carry on the illegal scheme. Under that
19 | agreement, Herbalife International of America, Inc., Herbalife International, Inc.,
20 | Herbalife, Ltd, the Beneficiaries and Promoters and others conspired to violate 18
21 | U.S.C. § 1962(a) and (c), in violation of 18 U.S.C. § 1962(d).

22 |   270. As a direct and proximate result of Herbalife's and the Beneficiaries'
23 | and Promoters' violation of 18 U.S.C. § 1962(d), Bostick and the class were injured
24 | by Herbalife's and the Beneficiaries' and Promoters' unlawful conduct. The funds
25 | used to buy Herbalife products constitute property of Bostick and the class under 18
26 | U.S.C. § 1964(c).

27 |   271. Under 18 U.S.C. § 1964(c), Bostick and the class are entitled to treble
28 | their damages, plus interest, costs and attorney's fees.

**FOURTH CLAIM FOR RELIEF**

**(Unfair and Deceptive Practices Claims Under**

**Cal. Bus, & Prof. Code § 17200, *et seq.*)**

**Against All Defendants**

272.   Plaintiff realleges the previous allegations.

273.   Plaintiff brings this cause of action for himself for himself and all other Herbalife distributors in the class who signed a distributor agreement with Herbalife governed by California law.

274.   Herbalife has engaged in constant and continuous illegal, unfair, and fraudulent business acts or practices, and unfair, deceptive, false and misleading advertising within the meaning of the California Business and Professions Code § 17200, *et seq*. The acts or practices alleged constitute a pattern of behavior, pursued as wrongful business practice that has victimized and continues to victimize thousands of consumers.

275.   Under California Business and Professions Code § 17200, an "unlawful" business practice violates California law. Herbalife's business practices are illegal because they involve the creation and promotion of an illegal pyramid scheme or "endless chain" under California law. Herbalife is engaged in an illegal pyramid scheme or "endless chain" as defined under California Penal Code § 327. Herbalife utilizes this illegal pyramid scheme with the intent, directly or indirectly to dispose of property, in Herbalife products, and to convince distributors to recruit others to do the same.

276.   Under California Business and Professions Code § 17200, an "unfair" business practice includes a practice that offends an established public policy, or that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. Herbalife's promotion and operation of an illegal pyramid scheme is unethical, oppressive, and unscrupulous in that Herbalife is duping consumers out of billions of dollars through the illegal pyramid scheme.

277.   Under California Business and Professions Code § 17200, a "fraudulent" business practice is likely to deceive the public. Herbalife's business practice is fraudulent in that they have deceived and continue to deceive the public by misrepresenting their business. Herbalife has made numerous misrepresentations about the income that a recruit or a distributor can realize by becoming a distributor and participating in the scheme and have failed to inform the public they are operating an illegal pyramid scheme. Bostick and the class have relied, and continue to rely on Herbalife's misrepresentations and omissions to their detriment.

278.   Because of these unlawful acts, Herbalife has reaped and continues to reap unfair benefits and illegal profits at the expenses of Bostick and the class members. Defendants should be made to disgorge these ill-gotten gains and return to Plaintiff Bostick and the class the wrongfully taken revenue.

279.   Defendants' unlawful, unfair and fraudulent acts and/or omissions, will not be completely and finally stopped without orders of an injunctive nature. Under California Business and Professions Code section 17203, Bostick seeks a judicial order of an equitable nature against all Defendants, including, but not limited to, an order declaring such practices as complained of to be unlawful, unfair, fraudulent and/or deceptive, and enjoining them from undertaking any further unfair, unlawful, fraudulent and/or deceptive acts or omissions related to operating the illegal pyramid scheme.

## FIFTH CLAIM FOR RELIEF

### False Advertising

### (California Business and Professions Code § 17500, *et seq.*)

### Against All Defendants

280.   Plaintiff realleges the previous allegations.

281.   Plaintiff brings this cause of action for himself and all other Herbalife distributors in the class who signed a Distributor Agreement with Herbalife governed by California law.

282.   Defendants' business acts, false advertisements and materially misleading omissions constitute unfair trade practices and false advertising, in violation of the California Business and Professions Code § 17500, *et seq.*

283.   Defendants engaged in false, unfair and misleading business practices, consisting of false advertising and materially misleading omissions likely to deceive the public and include, but are not limited to:

    a.   Defendants failing to disclose to consumers that they were entering into an illegal pyramid scheme;

    b.   Defendants misrepresenting the money that a distributor would earn;

    c.   Defendants misrepresenting the "Packaging and Handling" fee in connection with the "Shipping" fee. Defendants misrepresented the fee as imposed to recover the costs associated with processing the order, packaging the order, and handling the order. The "Packaging and Handling" and shipping fees are a profit generator for Herbalife, unrelated to the packaging, handling, and shipping of products and designed to maximize Herbalife's overall profit. Herbalife made this misrepresentation to all U.S. distributors.

284.   Defendants' marketing and promotion of the illegal pyramid scheme and the "Packaging and Handling" fee constitutes misleading, unfair, and fraudulent advertising in connection with their false advertising to induce consumers to purchase products and join the illegal pyramid scheme. Defendants knew or should have known, in exercising reasonable care, that the statements they were making were untrue or misleading and deceived members of the public. Defendants knew or should have known, in exercising reasonable care, that distributors, including Bostick, would rely, and relied on Defendants' misrepresentations and omissions.

285.   Because of Defendants' untrue and/or misleading representations, Defendants wrongfully acquired money from Bostick and the class members to which it was not entitled. The Court should order Defendants to disgorge, for the

1  benefit of Bostick and all other Herbalife distributors in the class who signed a

2  Distributor Agreement with Herbalife governed by California law their profits and

3  compensation and/or make restitution to Bostick and the class.

4      286.   Under California Business and Professions Code section 17535,

5  Plaintiff Bostick and the class seek a judicial order directing Defendants to cease

6  and desist with all false advertising related to the Defendants' illegal pyramid

7  scheme, and "Packaging and Handling" fee, and such other injunctive relief as the

8  Court finds just and appropriate.

9                    **PRAYER FOR RELIEF**

10     The named Plaintiff Bostick and the Plaintiff class request the following

11  relief:

12     a.    Certification of the class;

13     b.    A jury trial and judgment against Defendants;

14     c.    Damages for the financial losses incurred by Bostick and by the class

15  because of the Herbalife Defendants' conduct and for injury to their business and

16  property, all because of the Herbalife Defendants' violations of § 1964(a), (c) and

17  (d) and that such sum be trebled under 18 U.S.C. § 1964(c);

18     d.    Restitution and disgorgement of monies, under the California

19  Business Code;

20     e.    Temporary and permanent injunctive relief enjoining Herbalife and

21  the Beneficiaries and Promoters working in concert with Defendant Herbalife from

22  further unfair, unlawful, fraudulent and/or deceptive acts, including, but not limited

23  to, false advertising;

24     f.    The cost of suit including reasonable attorneys' fees under 18 U.S.C.

25  § 1964(c) and under California Code of Civil Procedure § 1021.5 and otherwise by

26  law.

27     g.    For general, compensatory and exemplary damages in an amount yet

28  to be ascertained; and

1      h.     For such other damages, relief and pre- and post-judgment interest as

2 the Court may deem just and proper.

3    DATED: April 8, 2013            FABIAN & CLENDENIN, P.C.

4

5                                      Philip D. Dracht

6                                     Thomas G. Foley, Jr.

7                                     Robert A. Curtis
FOLEY BEZEK BEHLE & CURTIS, LLP

8                                     *Attorneys for Plaintiff*

9 **DEMAND FOR JURY TRIAL**

10      Bostick demands a jury trial as provided by Rule 38(a) of the Federal Rules

11 of Civil Procedure.

12

13 DATED: April 8, 2013

14                                     FABIAN & CLENDENIN, P.C.

15

16                                     Philip D. Dracht

17                                     Thomas G. Foley, Jr.
Robert A. Curtis

18                                     FOLEY BEZEK BEHLE & CURTIS, LLP

19                                     *Attorneys for Plaintiff*

20

21

22

23

24

25

26

27

28

# Exhibit 2

Philip D. Dracht, SBN 219044
Scott M. Petersen (admitted *Pro Hac Vice*)
Jason W. Hardin (admitted *Pro Hac Vice*)
**FABIAN & CLENDENIN**
215 South State Street, Suite 1200
Salt Lake City, UT 84151-0210
Telephone: (801) 531-8900
pdracht@fabianlaw.com
spetersen@fabianlaw.com
jhardin@fabianlaw.com

Thomas G. Foley, Jr., SBN 65812
Robert A. Curtis, SBN 203870
Justin P. Karczag, SBN 223764
**FOLEY BEZEK BEHLE & CURTIS, LLP**
15 West Carrillo Street
Santa Barbara, California 93101
Telephone: (805) 962-9495
tfoley@foleybezek.com
rcurtis@foleybezek.com
jkarczag@foleyzek.com

*Attorneys for Plaintiffs Dana Bostick, Anita Vasko,*
*Judi Trotter, Beverly Molnar, and Chester Cote*

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DANA BOSTICK, a California Resident, ANITA VASKO, a Pennsylvania resident, JUDI TROTTER, a Washington resident, BEVERLY MOLNAR, a Pennsylvania Resident, CHESTER COTE, a Vermont resident, on behalf of themselves and all others similarly situated, and on behalf of the general public, | Case No.: 2:13-cv-02488-BRO-RZ<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |
| PLAINTIFFS, |  |
| vs. |  |
| HERBALIFE INTERNATIONAL OF AMERICA, INC., a Nevada Corporation, HERBALIFE INTERNATIONAL, INC., a Nevada Corporation, HERBALIFE, LTD a Cayman Island Corporation, |  |
| DEFENDANTS. |  |

## INTRODUCTION TO THE CASE

1. Herbalife told Plaintiffs Dana Bostick, Anita Vasko, Judi Trotter, Beverly Molnar, and Chester Cote that if they "put in the time, effort, and commitment," they could make money from retail sales and, by recruiting others to become Herbalife distributors, they could make money off them.

2. Plaintiffs all purchased International Business Packs and became distributors. They ordered Herbalife products – enough products that they jumped up the chain and qualified for additional discounts and commissions from potential recruits' purchases.

3. However, they did not make money as promised. Like the hundreds of thousands of Herbalife distributors before and after, they failed. They failed even though they were committed and put in the time and effort. They failed because they were doomed from the start by an Herbalife marketing plan that systematically rewards recruiting distributors over retail sales of product. A marketing plan in which Herbalife pays a significant portion of every dollar that Plaintiffs and other distributors pay for Herbalife product to others in the form of recruiting rewards, regardless of the distributors' actual retail sales. A marketing plan that pays millions to those few at the top in recruiting rewards at the expense of the many at the bottom.

4. Accordingly, Plaintiffs, for themselves, all others similarly situated, and the general public, allege:

## TYPE OF ACTION

5. Plaintiffs sue for themselves and for all persons who were Herbalife distributors from April 2009 until the present under California's Endless Chain Scheme Law (California's Penal Code § 327 and California Civil Code § 1689.2), California's Unfair Competition Law (Business and Professions Code Section 17200 *et seq.*), and False Advertising Law (Business and Professions Code § 17500), against Herbalife International, Inc., Herbalife International of America,

Inc., and Herbalife, Ltd for the operation and promotion of an inherently fraudulent endless chain scheme.

**PARTIES**

6.      Plaintiff Dana Bostick is and at all relevant times was an individual who resides in Los Angeles County, California. Bostick entered into an Agreement of Distribution with Herbalife and became an Herbalife distributor in April of 2012.

7.      Plaintiff Anita Vasko is and at all relevant times was an individual who resides in Chester County, Pennsylvania. Vasko entered into an Agreement of Distribution with Herbalife and became an Herbalife distributor in December of 2012.

8.      Plaintiff Judi Trotter is and at all relevant times was an individual who resides in King County, Washington. Trotter entered into an Agreement of Distribution with Herbalife and became an Herbalife distributor in January of 2012.

9.      Beverly Molnar is and at all relevant times was an individual residing in Allegheny County, Pennsylvania. Molnar entered into an Agreement of Distribution with Herbalife and became an Herbalife distributor in June 2011. Molnar is still registered as an Herbalife distributor although she is not active.

10.      Plaintiff Chester G. Cote is an individual who resides in Bellows Falls, Vermont. When he became an Herbalife distributor he was a resident of Connecticut. When his Herbalife distributorship expired, he was a resident of Missouri. He became a distributor in 2009.

11.      Defendant Herbalife International of America, Inc. is and at all material times was a Nevada corporation headquartered in Los Angeles. Defendant Herbalife International of America, Inc. is a wholly-owned subsidiary of Herbalife International, Inc. and an indirectly wholly-owned subsidiary of Herbalife, Ltd, and is employed by those entities to conduct their U.S. operations.

12.     Defendant Herbalife International, Inc. is and at all material times was a Nevada corporation headquartered in Los Angeles. Herbalife International, Inc. is an indirect wholly-owned subsidiary of Herbalife Ltd. Herbalife International, Inc. was the former parent company of "Herbalife" but it and its subsidiaries were acquired on July 31, 2002 by an entity that became Herbalife Ltd.

13.     Herbalife Ltd. is "one of the largest network marketing companies in the world." Herbalife Ltd. is and at all material times was a corporation organized under the laws of the Cayman Islands with its corporate headquarters in Los Angeles. Herbalife Ltd. is a publicly held corporation traded on the NYSE as "HLF."

## JURISDICTION AND VENUE

14.     Defendants Herbalife International, Inc., Herbalife International of America, Inc., and Herbalife Ltd. are subject to the jurisdiction of this Court. They have been engaged in continuous and systematic business in California. Defendants have designated agents for service of process in this State or have their principal place of business here and have committed tortious acts in this State. Plaintiff Bostick is a resident of California.

15.     As Plaintiffs bring a putative class action where the amount in controversy exceeds $5 million, and in which members of the class of plaintiffs are citizens of a state different than from any Defendant, the Court has jurisdiction over these claims under 28 U.S.C. § 1332(d).

16.     At all material times, Herbalife Ltd. owned, controlled, and had common and/or overlapping management with Herbalife International Inc.; Herbalife International, Inc., owned, controlled, and had common and/or overlapping management with Herbalife International of America, Inc.; and Herbalife Ltd. indirectly owned, directly controlled, and had common and/or overlapping management with Herbalife International of America, Inc. Herbalife

Ltd., Herbalife International, Inc., and Herbalife International of America, Inc. are the principals, agents, affiliates, partners, co-conspirators or alter-egos of each other, and each acted within the course, scope and authority of such relationships so that Herbalife Ltd., Herbalife International, Inc., and Herbalife International, Inc., are alter egos of one another and are jointly and severally liable for the acts alleged herein. In Herbalife's dealings with Plaintiffs and the Class, Herbalife generally does not distinguish between the three corporate entities but instead refers to itself singularly as "Herbalife." This Complaint, therefore, also refers to Herbalife Ltd., Herbalife International, Inc., and Herbalife International of America, Inc. collectively as "Herbalife."

17.　Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because a substantial number of the acts and transactions that established the claims of the Plaintiff and the class occurred within this District. Defendants conducted business and solicited business relating to the illegal scheme in this district. Defendants transacted their affairs, resided within California and this judicial district, and Defendants' wrongful acts occurred in this District and have directly impacted the general public of this district.

18.　Plaintiffs and the class have also executed an "Agreement of Distributorship" with Herbalife, which requires claims to be "resolved exclusively in a judicial proceeding in either the Superior Court or the United States Court, both located in Los Angeles, California."

## FACTS

## SUMMARY OF FACTS

19.　From 2009-2013, Herbalife made disclosures of "Statements of Average Gross Compensation of U.S. Supervisors" that were deceptive and misleading as to the likelihood that a distributor could reach the level of Supervisor and earn money from the scheme. Herbalife included these disclosures in the Sales and Marketing Plan received by Plaintiffs and the class. Herbalife also posted these

disclosures online. None of these disclosures provided any information that would allow a potential or actual distributor to meaningfully evaluate their likelihood of success in the scheme. Copies of the disclosures made from 2009-February 2013 are attached as **Exhibit A** and are referred to as the **"2008-2011 Statements"**

20.     As recently disclosed by Herbalife in February 2013 in their Statement of Average Gross Compensation Paid by Herbalife to United States Distributors in 2012 (attached as **Exhibit B**, and referred to as the **"2012 Statement"**) the majority of Herbalife's U.S. distributors earn nothing from Herbalife. In 2012, Herbalife's real business opportunity was:

a.  Herbalife paid nothing to over 87.9% of all distributors;

b.  Herbalife paid $1 to $1,000 to 8.43% of all distributors;

c.  Herbalife paid $1,001 to $5,000 to 2.2% of all distributors;

d.  Herbalife paid $5,001 to $10,000 to 0.5% of all distributors;

e.  Herbalife paid $10,000 to $25,000 to 0.393% of all distributors;

f.  Herbalife paid $25,001-$50,000 to 0.230% of all distributors;

g.  Herbalife paid $50,000-$100,000 to 0.109% of all distributors;

h.  Herbalife paid $100,001-$250,000 to 0.092% of all distributors; and

i.  Herbalife paid more than $250,000 to 0.039% of all distributors.

21.     These real numbers are in direct contrast to the deceptive earning claims referenced in Herbalife's promotional materials, including videos on Herbalife's website, YouTube, and Herbalife distributors' websites, often featuring prominent distributors and promoters of the Herbalife scheme, and Herbalife's prior Statements of Average Gross Compensations distributed to Plaintiffs and the class.

22.     An undisclosed fact is that there is little to no opportunity for an Herbalife distributor to earn a "retail profit" on the sales of Herbalife products because Herbalife sets the "Suggested Retail Price" (**"SRP"**) at a price so high that few if any Herbalife distributors can earn retail profits.

23. Herbalife sets the SRP so high because for every dollar a distributor paid Herbalife for Herbalife product (not including packaging, handling, shipping, and tax) Herbalife paid out $0.46 to $0.64 to its top distributors as recruiting bonuses. Herbalife made these payments upline whether or not the distributor sells the product at retail and whether or not the distributor sells the product at SRP.

24. Besides setting the SRP at an inflated price, Herbalife charges its distributors a 7% fee for "Packaging and Handling" and a 2.5% to 4% fee for shipping, based solely on the inflated SRP and not on Herbalife's actual or estimated costs for packaging, handling, and shipping. This makes it even harder for a distributor to make retail profits as it drives their retail price even higher.

25. An undisclosed fact (from at least April 2009 to February 2013) is that a large majority of all distributors (approximately 71%) make few if any retail sales and are forced to self-consume the Herbalife products.

26. An undisclosed material fact is that the vast majority of participants in Herbalife's endless chain scheme drop out within one year of becoming Herbalife distributors and have usually lost most, if not all, of their investment and thousands of dollars expended to build their supposed "business opportunity."

27. To avoid being an endless chains scheme, a multi-level marketing plan must have effective provisions to ensure that its distributors sell most products to consumers not a part of the marketing system. Herbalife does or did not employ or enforce such provisions.

### THE HERBALIFE SALES AND MARKETING PLAN

28. As a direct-sales company, Herbalife operates a multi-level distribution system – the Herbalife Sales and Marketing Plan – relying on individual distributors to market, promote, and sell its products.

29. A copy of the Herbalife "Sales and Marketing Plan and Business Rules" (**"Sales and Marketing Plan"**) purchased by Bostick as part of his

FIRST AMENDED COMPLAINT

International Business Pack is attached as **Exhibit C.** The Sales and Marketing Plan is an incredibly complex set of rules and regulations.

30.     Anyone can become an Herbalife distributor if they purchase an Herbalife International Business Pack (**"IBP"**) or a mini-IBP at a cost of $95.95 or $57.75 respectively, apply to become a distributor, and are sponsored by an existing Herbalife distributor.

31.     Herbalife recruits prospective participants by offering them the opportunity to participate in a "tested proven business plan" "designed to maximize rewards for effort and provide substantial and ongoing income."

32.     Herbalife recruits prospective participants by promising them "Immediate Retail Profit," "Daily Wholesale Profit," "Monthly Override Income," "Monthly Production Bonuses," "Annual Bonuses" for Top Achievers, and "Special Vacations and Training Events" that will "teach you how to meet your goals, increase your earning power and build an international business without leaving the comfort of your own home!"

33.     Herbalife's distributors promise recruits and other distributors that they can "be your own boss – take charge of your life," achieve "financial freedom," earn "extra income," "retirement/pension," and "leave a legacy."

34.     Herbalife recruits prospective participants by boasting that the Herbalife Sales and Marketing Plan is "[t]he best Marketing Plan in the industry" and that it pays out up to 73% of product revenues to distributors in "Retail and Wholesale Profits, Royalty and bonus income and incentives." Herbalife stresses:

> Each Distributor's success is dependent on two primary factors: The time, effort and commitment a Distributor puts into their Herbalife business and the product sales made by a Distributor and their downline organization. These two factors raise the importance of a Distributor's responsibility to train, support and motivate their downline organization.

35.     Herbalife divides the "73% of product revenue" by apportioning 23% of the SRP to "Royalty, bonus income, and incentives" and 50% to "Retail and Wholesale Profits." Herbalife's 73% payout claim depends on a distributor reselling the product at 100% of the SRP.

36.     By basing these "Retail and Wholesale Profits, Royalty and bonus income and incentives" off the SRP, Herbalife masked that for every dollar the purchasing distributor spent on Herbalife product, Herbalife paid from $0.46 to $0.64 upline in the form of recruiting rewards.

37.     Because so much money is paid upline in recruiting bonuses so that Herbalife can retain its "most active and productive distributors," Herbalife's SRP is an inflated price that bears no relation to the actual market price distributors can get for Herbalife's products in sales to retail customers.

## BOSTICK IS RECRUITED TO HERBALIFE

### "Position Determines the Pay," "You Determine Your Position"

38.     Dana Bostick responded to an internet advertisement for a "trial offer." It offered an "Internet Business Starter Pack" where Bostick paid $9.95 in Shipping and Handling and would be charged an additional $39.95 if he did not return the package within fourteen days. Interested in earning monthly and residual income, Bostick signed up for the pack. The Internet Business Starter Pack was mailed to Bostick sometime between late-March and early-April 2012.

39.     Bostick reviewed the pack, which is attached as **Exhibit D**, and the DVD video enclosed in that pack, which revealed the "business" as Herbalife.

40.     Bostick watched the DVD. A spokeswoman explained that within Herbalife, "the position determines the pay - meaning, the higher you start the more money you can make."

41.     On the video, Maurice Smith reiterates that "position determines the pay" and that "you determine your position." Smith tells viewers that an average Herbalife distributor earns "between $100 and $300 per month – part-time." And

9

Success Builders "have the opportunity to earn between $400-$600 part-time." Smith encourages recruits to become a "Supervisor," a level in the Herbalife endless chain that requires a significant purchase of product but where distributors, if they have a downline, can start to earn recruiting rewards:

> Supervisor is the highest level you can choose to position yourself at today. And, this is very important to know, Supervisor is the gateway to the rest of the levels of the marketing plan. You cannot get to the higher income levels without first becoming a Supervisor.

42. The graphics on the video display that Supervisors can earn between $500-$1500 a month. Smith explains that a World Team member can earn $1,500-$3000 a month, GET Team member can earn $3,500-$7,000 a month, Millionaire Team can earn between $7,500-$15,000 a month, and President's Team members typically earn between $25,000-$100,000+ a month. Images of Smith's presentation and representations of potential distributor's earnings are attached as **Exhibit E**.

43. Smith explains why it is so important to become a Supervisor: "It's the highest paying position that you can start at today. You've set yourself up for retail profits of 50% so you've doubled your money for the same work you've been doing." A Supervisor is at the "gateway to the rest of the marketing plan," because Supervisors can begin to get royalties, production bonuses, spontaneous bonuses, 1% annual bonus pool, and paid vacations.

44. Bostick viewed this video, Herbalife's website, and various other Herbalife related websites. Upon viewing these materials, Bostick believed that retailing Herbalife products and recruiting distributors would be a way for him to build a business where he could earn both monthly income and residual income.

45. Bostick ordered and paid for an IBP. It was sent to him by Federal Express. The IBP contained the magazine, Live the Good Life! Herbalife (relevant portions of which are attached as **Exhibit F**) and four distributor workbooks:

"Your Business Basics" (relevant portions of which are attached as **Exhibit G** to the Complaint); "Using and Retailing Your Products"; "Building Your Business" (relevant portions of which are attached as **Exhibit H** to the Complaint); and the "Sales & Marketing Plan and Business Rules" (**Exhibit C**). Bostick reviewed the IBP and the materials in the IBP.

46.     On April 6, 2012, Bostick went online and signed an Agreement of Distribution. That agreement is attached as **Exhibit I.**

47.     Bostick worked hard to build his business. He bought and used products himself so he would know what he was selling. He set up three websites. Two were set up to sell Herbalife products to the public and one was to recruit downline distributors. He paid for "coaching" sessions where the coaches "taught" him how to recruit downline distributors to build a downline. In spite of his hard work, the only recruit he made was a long-time friend.

48.     On April 6, and 26, 2012, May 21, 2012, June 18, 19, 22, and 27, 2012, and July 20, 2012, Plaintiff Bostick ordered products from Herbalife. Besides the purchase price for product, Herbalife added a 7% "Packaging and Handling" fee and a shipping fee of anywhere from 2.5% to 4%, solely based on the SRP of the product and not on the actual or estimated costs.

49.     On June 22, 2012, he attempted to "pay for his position" by coordinating with his friend. They were supposed to both purchase enough product to become a Supervisor, the "gateway to the rest of the marketing plan." On June 22, 2012, he made a single order that cost him $2,133.72. Bostick's downline did not make the purchase and Bostick did not advance to Supervisor.

50.     When he tried to resell the product he purchased to qualify as a Supervisor, Bostick learned that there was little opportunity for him to earn monthly income or residual income with Herbalife. The SRP alone was an uncompetitive price in the market, and, when Bostick would add the shipping, handling, and packaging fees to recoup his costs, the retail price was so high that

there were virtually no retail purchasers willing to pay the full retail price. And other distributors were selling Herbalife products online on Craigslist and EBay at or below their cost, making retail profits in the amounts promised by Herbalife even more difficult to achieve.

51.     As to the over $3,000 (SRP) worth of Herbalife products that Bostick purchased that he has not self-consumed or given away, Plaintiff Bostick has tried to sell it on Craigslist at or around his purchase cost.

## ANITA VASKO IS RECRUITED TO HERBALIFE

### The Nutrition Club

52.     Anita Vasko was looking to reenter the workforce after being a homemaker for some years. With two children in their early teens and with a health-coach certificate, she went to a "nutrition club" operated by another Herbalife distributor in a nearby town.

53.     She told the owner of the Herbalife nutrition club she was looking for a job. He explained the multi-level-marketing concept to her and she thought it sounded interesting. Late December 2012, Vasko purchased an IBP and signed the distributor agreement.

54.     She reviewed the IBP and she thought it sounded and looked like a good opportunity.   Based on the representations in the IBP, including the Statement of Average Gross Compensation, she thought that she could earn retail profits by reselling Herbalife products and that she could recruit other distributors and earn profits off of their purchases and sales.  She wanted a part-time and eventual full-time job and Herbalife sounded like it would provide her with that opportunity.

55.     She kept "training" at the nutrition club for around four months and became familiar with the products and how to prepare the shakes by consuming them herself.

FIRST AMENDED COMPLAINT

56.    In late January/early-February of 2013, Vasko decided to open her own nutrition club. She sub-leased a prime commercial location in Westchester, Pennsylvania. The rent was $725 a month plus common area maintenance charges plus utilities for seven months. She then entered into a three year lease and from August 2013 until January 2014 she shared the rent, which cost a total of $1500 a month with another Herbalife distributor to operate the club. When she opened the Nutrition club in the winter of 2013, Vasko became a Supervisor, purchasing enough products to qualify under the one-month qualification.

57.    The rules for operating the nutrition club made it hard for her to get business. She could only have people come into her club by "invitation," so she would have to go on the street to invite people into the club. Few people responded to her invitation. Under the rules, there could be no sign indicating she was affiliated with Herbalife. She had to place curtains on the windows of the storefront as well. The logo they initially selected was rejected by Herbalife as being "too similar" to Herbalife's logo.

58.    Vasko worked six days a week and sometimes seven, often from eight a.m. to late in the evening. In November of 2013 she had a meeting with her upline distributor and her husband regarding the lack of sales and the lack of interest in the club. Her upline suggested she continue to hand out invites on the street.  Later her upline stopped calling her back when she sought additional help.

59.    When Vasco was actively working on her Herbalife distributorship, she had never seen a copy of the Statement of Average Gross Compensation for 2012, Exhibit B. Vasco Last year Vasko calculated a loss of approximately $12,000 in 2013 on her Herbalife nutrition club, not including the hundreds to thousands of hours spent working at the club. Vasko is also stuck with unopened Herbalife product that cost her over $2,000 to purchase and that she cannot return to Herbalife because it is past the one-year return policy.

## JUDI TROTTER IS RECRUITED TO HERBALIFE

### Retirement Gone Wrong

60.     In January of 2012 Judi Trotter saw an advertisement about how to make money at home. She had just retired but her husband was still working. She was bored and looking to earn some extra money so she got in contact with the company, Online Business Systems.

61.     The person recruiting her gave her a high pressure sales pitch, telling her that if she did not have the money to join she should call her bank to get a credit card limit raised. On the first call with her upline, Trotter signed up and paid for enough products to immediately qualify as a Supervisor.

62.     The product and the IBP were delivered to her. When Trotter reviewed the IBP, including the statement of average gross compensation it contained, she believed the IBP when it said Herbalife provided a full-time or part-time opportunity. After reviewing the IBP, including the representations of income, testimonials, and the Statement of Average Gross Compensation, she thought "I could do this."  Based on the representations of the IBP, Trotter thought she would be able to make retail profits and recruit other Herbalife distributors and earn money off of their purchases and sales.

63.     She bought leads of prospective recruits from Online Business System. She signed up other recruits. She sent the product that she purchased to the people that she signed up from her leads – they all got a selection of products provided by Trotter and paid for it as part of their sign up, which cost (including the IBP) the leads around $200. All but one of them cancelled.

64.     Trotter reached the level of "World Team" without ever filling out a 10 Customer Form or a 70% Rule Form.  She earned "mailbox money," or a Royalty Override check, and she never filled a 10 Customer Form or a 70% Form. Trotter reached the level of World Team without making 10 retail sales.

65.     Trotter felt uncomfortable following the Online Business System scripts as she felt they were too high pressure. The leads that she purchased were usually very poor quality leads – the leads would be very ignorant about starting a business. By March 2012 she decided she could not in good conscious recruit any more people and that she needed to try to resell product in order to work off the debt she had incurred.

66.     Sometime in May 2012 she went to a conference sponsored by Herbalife. There were Herbalife ethics people there, and she told them about her concerns with recruiting and her difficulty in retailing. When they asked how she became a Supervisor, she told them that she was following the Online Business System way. The Herbalife representatives told her that they did not condone what Online Business Systems was doing.

67.     After that conference, Trotter went back and read her IBP to see if Online Business Systems was legitimate. She found language allowing business and methods tools, which she took to mean that Online Business System was not prohibited under the Herbalife rules. She tried for another couple of months to sell the product that she had not personally consumed or provided to her "leads," and found that it was very difficult to sell. When she ultimately tried to sell her product on Craigslist she found that people were heavily discounting the product. At this point she had lost $8842.11 in pursuing her Herbalife distributorship for product, leads, booklets to send to leads, websites, and other tools.

68.     Trotter resigned from her distributorship in the fall of 2012 and returned the product she had leftover to Herbalife. Trotter did not realize that she had a cause of action against Herbalife until she learned of this action.

## BEVERLY MOLNAR IS RECRUITED TO HERBALIFE

### The Lead Game

69.     In June 2011, Beverly Molnar ordered the $9.95 Online Business System brochure and DVD. She was looking to make some money on the side.

She called the upline and from that call she jumped into the program, buying the IBP and enough volume points to become a Supervisor.

70. Molnar reviewed the IBP when it was sent to her. She read the statement of average gross compensation, income projections, and testimonials and thought that she could make money as a Supervisor, both by selling products for retail profit and by recruiting distributors underneath her.

71. The first six months she tried hard to sell product to earn back her initial investment. But she had to give purchasers significant discounts off the suggested retail price in order to sell the product. After that first large purchase, Molnar stopped trying to resell product and just consumed it.

72. She also purchased leads from Online Business System. Molnar was required to purchase packages to send to the leads, which cost a fee for each lead. Molnar had little success with the leads. Online Business System would handle all the shipping of the lead packages and DVD's, but when the leads would return product and the lead package, Molnar was required to pay for their return. The leads that Molnar purchased were often of low quality, with phone numbers and emails that were frequently wrong. If Molnar did not contact the lead within two weeks she lost the lead. Molnar estimates she spent over $11,000 on leads and on other bundled services, such as websites, training, and coaching.

73. Molnar stopped buying leads over a year ago and is trying to pay-down her credit card debt incurred in chasing the Herbalife opportunity. Molnar did not realize that she had a cause of action against Herbalife until she learned of this action.

### CHESTER COTE IS RECRUITED TO HERBALIFE
#### "Closet Qualified"

74. In 2009 Chester Cote was laid off. He saw an online opportunity and he called about it. A man from Minnesota returned Cote's call and convinced Chester to join Herbalife as a distributor.

75.    Cote bought an IBP and reviewed it. He liked what he saw and read. Based on his review of the IBP and the representations contained in it, including the Statement of Average Gross Compensation, Cote thought that Herbalife would be a good way to earn money by selling products and earning retail profits and by recruiting other distributors and earning based on those distributors purchases and sales.

76.    Cote bought enough Herbalife product in a single purchase to become a Supervisor.

77.    Cote had trouble recruiting his friends and family into Herbalife.

78.    Cote went to two training programs – one in Minneapolis, Minnesota and one in Phoenix, Arizona. There, Herbalife representatives gave them pep talks about how much money they could earn being Herbalife distributors.

79.    Cote wanted to earn the kind of money these people described, so he tried to recruit online. He also sent out fliers, which he purchased from senior members in his upline.

80.    Cote tried to sell products online, but he found it was difficult because the prices were depressed by other distributors who were selling their products at a significant discount off SRP. Cote still has canisters of Herbalife product that he would like to return but the return period has ended.  Cote did not realize he had a cause of action against Herbalife until he learned of this action – he thought his failure as an Herbalife distributor was due to his own shortcomings as an Herbalife distributor.

81.     All of these Plaintiffs' experience is the same as most Herbalife distributors. As Herbalife's 2012 Statement shows, most Herbalife distributors earn nothing from Herbalife and only 33% of Newly Qualified Supervisors requalify.

82.    Plaintiffs' failure and the other distributors' failure are not for lack of time, effort, or commitment to Herbalife. These failures are due to a marketing

plan that, by its design, systematically rewards recruiting over retailing and systematically rewards those distributors at the top at the expense of the many distributors at the bottom.

## MECHANICS OF THE SALES AND MARKETING PROGRAM

83.     Within the Herbalife endless chain, there are 11 levels of Herbalife distributors. The bottom four categories are Distributors,[1] Senior Consultants, Success Builders, and Qualified Producers. Herbalife calls the bottom four categories "Non-Sales Leaders" (**"NSL"**). The top seven categories are Supervisors, World Team, Global Expansion Team, Millionaire's Team, President's Team, Chairman's Club, and Founders Circle. Herbalife calls these distributors "Sales Leaders" (**"SL"**).[2] Bostick was an NSL and Vasko, Trotter, Molnar, and Cote were all SLs.

84.     Herbalife assigns a new distributor to an existing "line of sponsorship" to which the recruiting distributor already belongs. A line of sponsorship includes a hierarchy of distributors starting with the newly-recruited distributor and proceeding by seniority up to a distributor heading the line of sponsorship. These distributors at the heads of the lines of sponsorship are Beneficiaries and Promoters.

85.     Junior (or "downline") distributors purchase products from more senior (or "upline") distributors within their line of sponsorship or from Herbalife directly. Herbalife pays bonuses upline to distributors based on purchases from Herbalife by downline distributors. Any distributor at any level may sponsor new distributors.

---

[1] The use of a lower-case "distributor" refers to all Herbalife distributors, regardless of level. The use of a capitalized "Distributor" refers to the first-level Herbalife distributor.

[2] Members of the Millionaire's Team, President's Team, Chairman's Club and Founders Circle are the primary beneficiaries and promoters of the Herbalife endless chain (**"Beneficiaries and Promoters"**).

86.     Herbalife protects its distributors' downlines. A distributor who wants to change their sponsor must obtain a written, notarized release from their Sponsor and upline distributors. Herbalife can still deny the request. The distributor changing sponsors can only keep their downline if their upline agrees.

87.     To move up the Herbalife endless chain and qualify for higher levels of compensation, Herbalife requires a distributor to "achieve" (either through their own purchases of Herbalife products or through their downline's purchases) specific "Volume" during specified time-periods.

88.     Herbalife calculates a distributor's Volume by using **"Volume Points."** Volume Points are point values that Herbalife assigns to each of their products. In the U.S., Herbalife uses a Volume Point to dollar ratio to assign Value Points to specific products. It displays a product's Value Points on the price sheet.

89.     In 2012 the dollar to Volume Point ratio ranged from approximately $1:0.57VP to approximately $1:0.905VP.

90.     If a distributor orders products the distributor collects "Personally Purchased Volume" points [3] The Volume Points that a distributor accumulates either through Personally Purchased Volume or through the Volume Points purchased by the distributor's downline become the distributor's sales production. Herbalife uses Volume Points to qualify distributors for higher levels, sales commissions, royalties, bonuses, and other incentives and benefits. Herbalife calculates Volume Points monthly.

---

[3] **"Personally Purchased Volume"** is defined as "The volume purchased directly from Herbalife using your [the distributor's] Herbalife Identification Number." All defined terms from the Sales and Marketing Plan are found on Exhibit C, pp. 21-22.

## NON-SALES LEADERS: DISTRIBUTORS, SENIOR CONSULTANTS, SUCCESS BUILDERS, & QUALIFIED PRODUCERS

### Distributors (NSL)

91.     Herbalife calls its first-level distributors "Distributors."

92.     A Distributor buys Herbalife products at a 25% discount off the SRP whether for personal use or resale. In its promotional materials, Herbalife characterizes the 25% discount as an opportunity for the Distributors to earn 25% in retail profits from reselling the Herbalife products.

93.     Prior to the filing of the Complaint in this case, if a Distributor purchased a product with an SRP of $100, the cost was $75. Herbalife paid the Distributor's upline $48 of the $75 cost – $25 upline in "Wholesale Profits" and $23 in Royalty Overrides, bonuses, and other incentives – even if the Distributor could not resell the product for the $100 SRP. For a Distributor's purchase, $0.64 out of every dollar paid for Herbalife product went upline ($0.33 in Wholesale Profits and $0.31 in royalties, bonuses, and incentives).

### Senior Consultants (NSL)

94.     Herbalife promotes a Distributor to "Senior Consultant" if they buy 500 or more Personally Purchased Volume Points, or, if their recruited distributors provide 500 Volume Points in "Downline Volume."[4]

95.     Senior Consultants buy Herbalife product at a 35% discount off SRP and are eligible for a 10% commission off their downline Distributor's purchases, so long as that distributor remains a Distributor. Herbalife calls this commission "Wholesale Profit."

96.     A Distributor can also qualify for Senior Consultant if the distributor gets 2,000 Volume Points in a month, either through Personally Purchased

---

[4] **"Downline Volume"** is defined as "As a non-Supervisor, Downline volume is based on volume which is placed by your downline Distributors directly from Herbalife or order between 25% to 42% discount.

Volume or through Downline Volume. That Senior Consultant gets a 42% discount off of SRP, both on the qualifying purchase and on purchases in the qualifying month. The next month their discount is 35% off of SRP.

97.     A Distributor can become a Senior Consultant without purchasing or reselling Herbalife product if the Distributor recruits downline distributors and those distributors purchase the required 500 or 2,000 Volume Points in a month.

98.     Prior to filing the Complaint in this action, if a Senior Consultant with a 35% discount purchased a product with an SRP of $100, the cost was $65. Herbalife paid the upline $38 of the $65 cost – $15 in "Wholesale Profits" and $23 in Royalty Overrides, bonuses, and other incentives – even if the Senior Consultant does not resell the product. For a Senior Consultant's purchase with a 35% discount, $0.58 out of every dollar paid for Herbalife product went upline ($0.23 in Wholesale Profits and $0.35 in royalties, bonuses, and incentives).

## Success Builder (NSL)

99.     A Distributor or Senior Consultant becomes a "Success Builder" if the distributor places a single order of 1,000 Personally Purchased Volume Points. Success Builders get a 42% discount on that order and on other purchases in the same month they qualify. A Success Builder becomes a Senior Consultant with a 35% discount the next month.

100.     Herbalife and the Beneficiaries and Promoters encourage Distributors to become Success Builders to get "higher retail profits" because of the discount. In the video called "Senior Consultant & Success Builder," which is hosted at http://www.youtube.com/watch?v=8b2pyw3A6FA and on the official Herbalife website www.video.herbalife.com, Beneficiaries and Promoters John Tartol and Leslie Stanford encourage distributors to become Success Builders. Tartol explains in minutes 5:20-6:18 how a distributor can "qualify right away" for a 35% discount "with just one order" and "enjoy a substantial 42% discount

FIRST AMENDED COMPLAINT

immediately." He tells distributors that "this will get you the highest discount for the least expenditure."

## Qualified Producer (NSL)

101.   A Distributor, Senior Consultant, or Success Builder becomes a "Qualified Producer" if the distributor purchases 2,500 Personally Purchased Volume Points within one to three months, or the distributor can combine up to 1,000 Downline Volume (Volume placed by downline distributors) Points and 1,500 Personally Purchased Volume Points in a single month.

102.   A Qualified Producer gets a 42% discount off SRP for a full year and qualifies for up to 7% to 17% of commissions on the Qualified Producer's downline distributors' (below the level of Qualified Producer, Success Builder, or Senior Consultant with a 42% discount) purchases.

103.   Prior to the filing of this action, if a Qualified Producer (or Senior Consultant or Success Builder) with a 42% discount purchased a product with an SRP of $100, the cost was $58. Herbalife paid the upline $31 of the $58 cost – $8 upline in "Wholesale Profits" and $23 in Royalty Overrides, bonuses, and other incentives – even if the Qualified Producer does not resell the product. For distributors with a 42% discount, $0.53 out of every dollar paid for Herbalife product went upline (~$0.13 in Wholesale Profits and ~$0.40 in royalties, bonuses, and incentives).

104.   According to Herbalife's recently revised 2012 Statement, Distributors, Senior Consultants, Success Builders, and Qualified Producers (all NSLs) and Supervisors without a downline made up 83% of their total distributors in 2012.

105.   Unless an NSL is participating in the Herbalife Advantage Promotion (an automatic monthly product shipment program) and has orders for 12 consecutive months, the NSL must pay an Annual Processing Fee of $15.00 on their "anniversary date" to remain an Herbalife distributor. Supervisors also must

pay an Annual Processing Fee of $79.99. Herbalife has described this fee as necessary because "The fee keeps you on our system by letting us know that you are still enjoying working your Herbalife business. If it is not paid then your Distributorship is subject to deletion."

106.   In Herbalife's 2004 and 2005 10-Ks to investors, Herbalife disclosed that for the reporting year, "more than 90% of our distributors that are not supervisors turned over." Herbalife stopped disclosing the turnover rate of Non-Sales Leaders in their 10-Ks and never disclosed turnover rates of its NSL's to Plaintiffs and members of the class. Based on the 2004 and 2005 disclosures and Plaintiff's own experience with distributors in his own upline and downline, Plaintiff is informed and believes that the non-Supervisor turnover rate for 2009-2013 is approximately 90%.

### SALES LEADERS: SUPERVISORS, WORLD TEAM, TAB TEAM, PRESIDENT'S TEAM, FOUNDER'S CIRCLE, CHAIRMAN'S CLUB
### Supervisor (SL)

107.   Becoming a "Supervisor" means a distributor moves from being a "Non-Sales Leader" to a "Sales Leader," or **"SL."**

108.   According to Herbalife's Statements of Average Compensation distributed in 2009-2013 (**Exhibit A**), approximately 25% of Herbalife's Distributors become Supervisors and above.

109.   A distributor can qualify to become a Supervisor in one of three ways:

110. **One-Month Qualification** – by "achieving" 4,000 Volume Points in a month. A minimum of 1,000 of these Volume Points must be "Unencumbered Volume"[5]

111. **Two-Month Qualification** – by "achieving" 2,500 Volume Points in each of two consecutive months. A minimum of 1,000 of these Volume Points must be "Unencumbered."

112. **Accumulated Qualification** – by buying 5,000 Personally Purchased Volume Points within 12 months or 1,000 Downline Volume Points with 4,000 Personally Purchased Volume.

113. Under the One and Two Month Qualifications, a distributor can qualify as a Supervisor without purchasing or reselling any Herbalife products if 1000 of the downline Volume Points are Unencumbered.

114. A distributor can also qualify for Supervisor under any method making no retail sales.

115. A distributor who does not become a Supervisor before their downline distributor becomes a Supervisor has one year to become a Supervisor.

---

[5] **"Unencumbered Volume"** is defined as "all volume produced by anyone in [a distributor's downline], down to the first qualified Supervisor who achieves less than 2,500 Volume Points in one Volume Month," plus all of the distributor's "Personal Volume," and which is volume that is not used by anyone else for Supervisor qualification purposes.

**"Personal Volume"** is defined as "The volume purchased by you as a Fully Qualified Supervisor and all others in your downline organization, excluding any 50% orders by Qualifying Supervisors and Qualified Supervisors."

**"Encumbered Volume"** is all volume produced by any downline distributor qualifying for Supervisor, down to the first qualified Supervisor, who achieves 2,500 Volume Points or more at a 25% to 42% discount in one Volume Month. The basic difference between the two forms of volume is that Unencumbered Volume is volume that no other distributor uses to qualify to become a Supervisor.

FIRST AMENDED COMPLAINT

Otherwise, Herbalife takes away that Supervisor and that Supervisor's downline from the distributor and gives them to the first upline Supervisor.

116. Herbalife requires that a Qualifying Supervisor be sponsored by the first upline Supervisor. The Sponsoring Supervisor must match the Qualifying Supervisor's Volume Points in the qualifying month with "Total Volume."[6]

117. A Sponsoring Supervisor can sponsor the Qualifying Supervisor without purchasing or reselling any Herbalife products if their downline generates sufficient Total Volume to match the Qualifying Supervisor's Volume Points in that qualifying month.

118. If the Supervisor sponsors a distributor who becomes a Supervisor that Supervisor is called a first-level Supervisor. If that first-level Supervisor sponsors a Supervisor that Supervisor becomes the original Supervisor's second-level Supervisor. If that second-level Supervisor sponsors a Supervisor that Supervisor becomes the original Supervisor's third-level Supervisor. Supervisors can earn royalties on all three of these downline level Supervisors' volume.

## Benefits for Supervisors

119. A Supervisor can purchase Herbalife's product at a 50% discount off the SRP and can earn from 25% - 15% - 8% in commissions from their downline's purchases. The commissions decrease as the Supervisor's downline distributors' discounts increase – 25% - 35% - 42%.

120. Prior to the filing of this action, if a Supervisor purchases a product with an SRP of $100, the cost was $50. Herbalife paid the upline $23 of that $50

---

[6] **"Total Volume"** is defined as "the combined total of Personal Volume plus Group Volume."

**"Group Volume"** is defined as "Orders purchased at a temporary 50% discount, by Qualifying Supervisor(s) in a Supervisor's personal organization."

FIRST AMENDED COMPLAINT

1  cost in Royalty Overrides, bonuses, and other incentives – even if the Supervisor

2  does not resell the product.

3      121.   For a Supervisor's purchase, $0.46 out of every dollar <u>paid</u> for

4  Herbalife product went upline in Royalty Overrides, bonuses, and other incentives.

5      122.   A Supervisor also qualifies for "Royalty Overrides," if that

6  Supervisor has first, or second, or third level Supervisors in their downline.

7      123.   A Royalty Override is a commission that a Supervisor receives on the

8  Volume Points accrued by that Supervisor's downline (the First, Second, and

9  Third Level Supervisors). In its 10-Ks, Herbalife calls Royalty payments

10  "compensation to distributors for services rendered including the development,

11  retention and the improved productivity of their sales organizations."

12      124.   The percentage (1%-5%) of Royalty Overrides that a Supervisor can

13  earn depends on the number of Total Volume Points the Supervisor accumulates

14  in that month. Supervisors can qualify for Royalty Overrides from their three

15  levels of downline Supervisors. In their Sales and Marketing Plan, Exhibit C, p.

16  13, Herbalife illustrates Royalty Override:



25      125.   To qualify for Royalty Overrides, a Supervisor must certify that they

26  comply with Herbalife's "10-Retail Customer Rule" and "70% Rule." Under these

27  rules, a Supervisor "must personally make sales to at least 10 separate retail

28  customers each month," and "at least 70% of the total value of Herbalife products

FIRST AMENDED COMPLAINT

a Distributor purchases each Volume Month must be sold or consumed that month." A copy of the Earnings Certificate form is found on page 48 of Exhibit C.

126.   Herbalife Supervisors must requalify annually by paying the Annual Processing Fee and by meeting similar volume requirements as the original qualification requirements.

127.   In Herbalife's 10-Ks, Herbalife reported that for the years 2012, 2011, 2010, and 2009, its Sales Leader retention rate was approximately 51.10%, 48.6%, 43.3%, and 42.2%, respectively.

### World Team (SL)

128.   Herbalife promotes Supervisors to the World Team if they meet one of the three following requirements. They achieve 10,000 Total Volume Points in one month after becoming a Qualifying or a Fully-Qualified Supervisor. Or if they achieve 2,500 Total Volume Points each month for four consecutive months. Or if they are awarded 500 Royalty Override Points in one month. World Team members get special planning and training sessions targeted to accelerate their progress to TAB Team membership and all the benefits of being a Supervisor.

129.   According to Herbalife's 2012 Statement, World Team members' average annual earnings are $6,224 and the median compensation is $5,659 in payments from Herbalife.

### TAB Team (SL)

130.   Supervisors are eligible to become members of the "Top Achievers Business Team" (**"TAB Team"**), which includes three steps: Global Expansion Team (**"GET"**), Millionaire Team, and President's Team.

131.   TAB team members are eligible for Production Bonuses. The TAB Team Production Bonus is a bonus on the downline Organizational Volume (the volume on which a Supervisor is paid a Royalty Override).

**FIRST AMENDED COMPLAINT**

## GET Team (SL)

132.   Herbalife promotes a Supervisor to the GET Team if that Supervisor accrues 1,000 Royalty Override Points each month for three consecutive months.

133.   As a GET Team member, the distributor gets all the benefits of a Supervisor and can earn TAB Team Production Bonuses based on the qualification level, can qualify for vacation and training events and can participate in special advanced trainings and conference calls.

134.   A GET Team member can qualify for a monthly 2% TAB Team bonus payment of the downline Organizational Volume, which Herbalife describes as a partial reward for the team member's "undivided loyalty" to the company.

135.   According to Herbalife's 2012 Statement, GET Team members have an average annual earnings of $22,766 and median compensation of $19,417 in payments from Herbalife.

## Millionaire Team (SL)

136.   If a Supervisor achieves 4,000 Royalty Override Points each month for three consecutive months, Herbalife promotes that Supervisor to the Millionaire Team the following month and, after a waiting period of two months, that Millionaire Team member can earn a 2-4% monthly TAB Team bonus off the downline's Organizational Volume. Millionaire Team members also get all the benefits of being a Supervisor.

137.   According to Herbalife's 2012 Statement, Millionaire Team members earn an average of $100,195 and median of $97,303 in payments from Herbalife.

## President's Team (SL)

138.   Herbalife promotes a Supervisor who accrues 10,000 Royalty Override Points in three consecutive months to the President's Team where, after a waiting period of three months the President's Team member can earn a 2%-6% Production Bonus.

139.   To qualify for the President's Team, a Supervisor must accrue 20,000 to 50,000 Royalty Override Points in three months. The TAB Team bonuses range from 2% to 7%, depending on the number of Royalty Override Points the Supervisor accrues.

140.   For all TAB Team members, the Production Bonus decreases from the maximum percentage depending on whether there are other TAB Team members in the Tab Team member's downline earning Production Bonuses on the volume.

141.   According to Herbalife's 2012 Statement, President's Team members (which include the Chairman's Club and Founder's Circle Members) earn an average of $514,638 and median of $336,901 in payments from Herbalife.

## Chairman's Club (SL)

142.   Herbalife promotes a distributor to the Chairman's Club if the distributor has five Fully-Qualified President's Team members in five separate lines of the distributor's downline organization.

143.   Chairman's Club Members are eligible for a percentage of Herbalife's global sales. This bonus is the "Mark Hughes Bonus Award."

144.   The Mark Hughes Bonus Award is a bonus pool representing a 1% of Herbalife's *worldwide* product sales (calculated using SRP). Herbalife distributes this bonus annually among the Chairman's Club and Founder's Circle Members. A copy of the 2010 Mark Hughes Bonus Award Qualifications and Rules is attached as **Exhibit J**.

145.   The rules to qualify for a Mark Hughes Bonus are incredibly complex. They largely depend on a distributor having President's Team Members within their downline who meet certain production requirements, the Royalty Override Points that Herbalife awards the distributor, and their overall organization production. Notably, there are no rules requiring additional retail sales beyond the "10-Retail Customer Rule" and "70% Rule."

146. Herbalife can also exercise discretion in awarding the MH Bonus. Chairman's Club and Founder's Circle members are encouraged to

Demonstrate leadership and Herbalife spirit. ...Support, promotion and participation in Herbalife efforts, including Company meetings and other efforts such as conference calls, Herbalife Broadband Network (HBN), audio/visual recordings, promotions, marketing and sales, projects, suggestions and working with the Company as it develops strategic plans and leads the effort to enhance the Company's overall business… Attendance of the Distributorship at major events.

147. Plaintiffs are informed based on information found at http://www.herbalife.com/chairmansclub <visited April 4, 2013> and believe there were only forty-three Chairman's Club members, worldwide, as of April 4, 2013.

### Founders Circle (SL)

148. The pinnacle of the Herbalife endless chain is the Founder's Circle.

149. Herbalife promotes a distributor to the Founder's Circle if the distributor has ten first-line, Fully-Qualified President's Team members in ten separate lines of that distributor's downline organization.

150. Founder's Circle members are also eligible for the "Mark Hughes Bonus Award."

151. Plaintiffs are informed based on information found at http://www.herbalife.com/chairmansclub that as of April 4, 2013, there are only eight Founder's Circle members, worldwide.

### THE ILLEGAL SCHEME

152. Herbalife's compensation structure rewards recruiting of new participants over retail sales and leads to abuses.

153. These abuses include: (1) Herbalife and Beneficiaries and Promoters making outlandish statements about potential earnings and the business

30

opportunity for potential and actual distributors; (2) distributors focusing on recruiting new distributors rather than on making retail sales of products; (3) distributors purchasing more products than they can feasibly sell to actual retail customers to meet volume requirements (a practice known as "inventory loading"); (4) Herbalife and Beneficiaries and Promoters encouraging other distributors to make "one-time" purchases to jump up the chain to higher levels ("pay determines position" and "position determines pay"); and (5) Herbalife and Beneficiaries and Promoters encouraging their downline distributors to recruit other distributors so they can use those distributors' purchases to move higher up the chain and get the Royalty Overrides, bonuses, and other incentives.

154.   Herbalife Ltd.'s 2011 and 2012 10-Ks describes this compensation structure as necessary to keep "its most active and productive distributors" – the Beneficiaries and Promoters:

> Once a distributor becomes a sales leader, he or she has the opportunity to qualify by earning specified amounts of royalty overrides for the Global Expansion Team, the Millionaire Team or the President's Team, and thereby receives production bonuses of up to 7%. We believe that the opportunity for distributors to earn royalty overrides and production bonuses contributes significantly to our ability to retain our most active and productive distributors.

155.   In its 2011 10-K, Herbalife Ltd. admits its business depends upon it success in recruiting and retaining distributors:

> Our ability to remain competitive depends, in significant part, on our success in recruiting and retaining distributors through an attractive compensation plan and other incentives. We believe that our production bonus program, international sponsorship program and other compensation and incentive programs provide our distributors with significant earning potential.

31

In its 2012 10-K, Herbalife changed that to mention its products: "Our ability to remain competitive depends on having relevant products that meet consumer needs, a rewarding compensation plan, and a financially viable company."

156.   With the 2004 and 2005 disclosures by Herbalife regarding its NSL turnover of 90% (who make up 83% of its total distributors) and disclosures that of the remaining 17% who are Supervisors and above, 43%-51% of its Supervisors do not requalify, historically, most Herbalife distributors will fail.

157.   As illustrated best by Exhibit B, Herbalife's 2012 Statement the Herbalife endless chain scheme makes money for those few at the top– the Beneficiaries and Promoters – and those are the distributors Herbalife tries to retain to remain competitive in the industry – and disappoints the many at the bottom who cannot make retail profits and who give up on the Herbalife "business opportunity" in droves.

### Herbalife's Inducement of New Recruits

158.   Herbalife induces new recruits to join the Herbalife program through material false representations that such recruits can re-sell Herbalife products for retail profit and can move up the endless chain and earn commissions, bonuses, and other incentives because of their recruiting activities.

159.   Besides representations made in the IBP or mini-IBP, Herbalife also promotes the scheme using distributor testimonials. In testimonials Herbalife published on its website, Herbalife tells recruits and distributors:

a. Natalie and Justin M. say that "'Now we control our destiny.' … 'We researched different business opportunities,'…'But Herbalife offered the chance to work from home, coupled with solid earning potential.'"

b. Scotty M. says that "'After just two years working the business, I was able to quit my job and become a full-time Distributor.' 'I wanted to be my own boss.' … 'I've been able to upgrade to a bigger home and

nicer car.'"

    c. Wendy W. says "'I'm the owner of an International business!' … 'If you have little or no business experience, don't worry; determination can go a long way!'"

These statements taken from Herbalife's website are attached as **Exhibit K**.

160. In Herbalife's IBP and Mini-IBP, Herbalife includes a magazine called *Live the Good Life! HERBALIFE* (**Exhibit F** (excerpts)). There, with images of currency, luxury vehicles, boats, and expensive homes, Herbalife tells recruits that it is a "part-time opportunity," "[a] full-time Opportunity," and "[t]he opportunity to earn more than you ever thought possible and make your dreams come true!" Recruits are also told this is "[a] business opportunity for everyone that's fun, simple and magical!" and that all they need to do is: use the products, wear the button, and talk to people – "Use, Wear, Talk."

161. In *Live the Good Life! Herbalife*, Herbalife provides the following example of potential ways that new recruits can earn income.

# Earn an income several different ways





**Direct Sales**
- As a Distributor $25 of every $100    **25%**
- As a Success Builder $42 of every $100    **42%**
- As a Supervisor $50 of every $100    **50%**

**Downline organization**
- Commission checks
- Royalty checks
- Bonus checks

## Plus:
- **Recognition**
- **Promotions**
- **Training**

# How to earn even more income

| Example 1 |
|---|
| **You = Supervisor (2,500 Volume Points)** |
| You recruit & retain 2 supervisors |
| • 2 Supervisors each produce 2,500 Organizational Volume Points |
| • = 5,000 Volume Points   R.O. = $250/month |
| They each recruit & retain 2 Supervisors |
| • 4 Supervisors each produce 2,500 Organizational Volume Points |
| • = 10,000 Volume Points   R.O. = $500/month |
| They each recruit & retain 2 Supervisors |
| • 8 Supervisors each produce 2,500 Organizational Volume Points |
| • = 20,000 Volume Points   R.O. = $1,000/month |
| Total of 35,000 Volume Points, Your R.O. = $1,750 Plus Production Bonus of 2% = $700 |
| **Total of Checks $2,450/mo.** |

| Example 2 |
|---|
| **You = Supervisor (2,500 Volume Points)** |
| You recruit & retain 3 supervisors |
| • 3 Supervisors each produce 2,500 Organizational Volume Points |
| • = 7,500 Volume Points   R.O. = $375/month |
| They each recruit & retain 3 Supervisors |
| • 9 Supervisors each produce 2,500 Organizational Volume Points |
| • = 22,500 Volume Points   R.O. = $1,125/month |
| They each recruit & retain 3 Supervisors |
| • 27 Supervisors each produce 2,500 Organizational Volume Points |
| • = 67,500 Volume Points   R.O. = $3,375/month |
| Total of 97,500 Volume Points, Your R.O. = $4,875 Plus Production Bonus of 4% = $3,900 |
| **Total of Checks $8,775/mo.** |

## Imagine…4 or 5!

*The incomes presented are applicable to the individuals depicted and are not a guarantee of your income, nor are they typical. For the Statement of Average-Gross Compensation for U.S. Supervisors, go to www.Herbalife.com or www.MyHerbalife.com.

41

FIRST AMENDED COMPLAINT

162.   Based on Herbalife's 2012 Statement, a distributor receiving checks of $2,450 a month or $8,775 a month would be at least in the top 0.23% or 0.092% of all U.S. distributors, respectively. Prior to Herbalife's 2012 Statement, a prospective or actual distributor had no way to know how atypical Herbalife's examples were.

163.   Herbalife also distributes a magazine called *Herbalife Today*. *Herbalife Today* follows a format where Herbalife's CEO and President, Michael Johnson, has a letter to distributors, as well as product advertisements, as well as a section called "Success Stories," featuring a President's Circle member, along with other success stories of TAB Team and GET Team members.

164.   In the *Herbalife Today* magazine, Issue No.156, which Herbalife distributed in 2012 to Plaintiffs and other members of the class, Michael Johnson writes, "[m]illions of people's lives are being improved through our products and our business opportunity." Selected portions of *Herbalife Today*, Issue No. 156 are attached as **Exhibit L**. Plaintiffs reviewed *Herbalife Today*.

165.   For the "Success Story," *Herbalife Today*, Issue No. 156, p.11-12, features a Chairman's Club member, Paulina Riveros. Herbalife tells a tale of Paulina working part-time using "a proven and surprisingly simple approach to breathe life into her organization: using the products, wearing the button, and talking to people." "This is how Paulina began climbing the Marketing Plan and earning amazing income. … Today she lives in a spacious ranch in Florida, and has a lifestyle that she couldn't have imagined in her wildest dreams."

166.   *Herbalife Today*, No 156, also features a section called "Where Inspiration Meets Success: At a crossroads in their lives, these Distributors took the high road, and turned their inspiration into success." There, distributors like Deisy T., advises readers:

> You only have to put in the hard work along with the dedication, patience and discipline, attributes you can learn at the events. Herbalife is a real

opportunity for everyone who is willing to focus and work for his or her goals. Plant a seed every day and you will harvest lifetime success.

167. *Herbalife Today* is full of "success" stories of distributors. They boast of: their "successful international business that I managed to build from scratch"; leaving high-paying jobs to join the Herbalife business; enjoying "a lifestyle that they always dreamed of"; replacing "two engineering salaries with Herbalife income"; and "making more money than he could have ever imagined." Herbalife has published similar testimonials in *Herbalife Today* for the last four years.

168. Herbalife also has its own official YouTube channel, http://www.youtube.com/user/HerbalifeIntl. There, a video entitled "Why Herbalife, Why Now? Building your Business" (uploaded on December 22, 2008 and available through April 9, 2013, <http://www.youtube.com/watch?v=-990eOlwchw>) demonstrates the Herbalife "pitch."

169. Herbalife's Chairman and CEO, Michael Johnson, introduces that video, saying "boy do we have a solution to help you in these tough economic times." Highlighting the economic uncertainty at the time, the video asks "why Herbalife?" To that question, various distributors respond: "it's recession proof." "When everybody else is having troubles, listen – we're flourishing." "When the economy is bad our business is fueled." "I got started in a recession -- this is my fourth recession. I'm more excited about today than ever before." And "This opportunity can be your answer."

170. In that video, Distributors tell viewers that with Herbalife "you get to be your own boss," "earn extra money," "work from home," "raise your own children," "make your own hours," "make part-time or full-time money," "take your family on vacations," "give your family all the extras that they deserve," "change your lifestyle to do whatever you want to do." When asked again, "why Herbalife, "recruits are told "because you can finally earn what you're worth."

36

171.  The video ends with the Herbalife's Chairman and CEO exclaiming, "So why are you waiting. Come on -- at Herbalife we've got the answer to these tough economic times. Contact the person who sent you this video and start improving your life right now. Become an Herbalife independent distributor today."

172.  Herbalife features the Beneficiaries and Promoters on its website www.herbalife.com/chairmansclub (visited April 8, 2013) and at www.video.herbalife.com. There, many of the Beneficiaries and Promoters have videos detailing their expensive lifestyles, lavish homes, luxury cars, and their "rags-to-riches" stories, all purportedly made possible through Herbalife.

173.  Herbalife also prominently features the Beneficiaries and Promoters in literature, flyers, and public events.

174.  Herbalife sponsors what it calls an "Herbalife Extravaganza." The Herbalife Extravaganza is annual convention that Herbalife promotes in *Herbalife Today*, online and through emails. At the Extravaganza, Herbalife distributors come from around the country for sales and marketing advice and tips from Beneficiaries and Promoters.

175.  In one video taken from the Herbalife 2010 Extravaganza in Los Angeles, California, Beneficiary and Promoter Geri Cvitanovich, in minutes 1:40-3:00, tells a convention hall filled with distributors that the Herbalife plan "is a confidence plan … to take you from where you are to wherever you want to go," grooming them to become multimillionaires:

> all of us are getting groomed to become multi-millionaires. That is an
> awesome opportunity. Now you can take advantage of it. Or you only
> want to make $60,000, $100,000, couple $100,000. But the fact that
> we are all here getting groomed to become millionaires in today's
> marketplace to me is an awesome privilege to be a part of. And I just
> want those of you who are new to know that you are in the right place

37

at the right time. The fastest amount of growth in the shortest amount
of time in our history. And we are doing nothing but going up.

That video can be found at http://www.youtube.com/watch?v=PmeLJHHKoDk
(visited April 8, 2013).

176.   In another video taken at the Herbalife 2011 Extravaganza in Las
Vegas found at http://www.youtube.com/watch?v=cVbd8bw4MlQ (visited April 8,
2013) Beneficiary and Promoter Susan Peterson tells attendees, at minutes 1:03-
1:58 that, if they are not getting rich in Herbalife, "it's wrong" and that they are
taking things for granted:

> A lot of us, we built our organizations not when it was easy but when
> it was hard. When it was terrible. When it was tough. And to make a
> fortune in the tough times is really something. But to make it in the
> easy times you would think everyone would do it and to not do [it] is
> just to me wrong. I mean if you are not getting rich today in Herbalife,
> I'm going to be honest, it's wrong. It's really wrong. It means you're
> taking things for granted.

Peterson instructs attendees at minutes 3:00-5:42 that to increase their royalty
checks, they should focus on recruiting people looking for opportunity:

> If you want to recruit somebody who loves the products and who
> wants to be your discounted customer because they love the products
> … I would say keep doing that and it's wonderful. But you can't
> count that in business-building recruiting. If you want to move the
> check, you need to find other people that want to make money and
> represent the Herbalife products and Herbalife opportunity. People
> that are like you that want to be distributors….find those people that
> are looking for opportunity. That want to change their family's lives
> and their financial situation. [Those are the] people you need to work
> with. [Those are] the people you need to find. And believe me, there

38

has never been an easier time to find people like that, okay, because our economy is bad in America. But at the same time our opportunity has never been stronger. Our brand, our product, our company, our direction. And if you aren't going after this, shame on you. Because you're going to miss the greatest time-period to literally go here [gestures with her hand down] to here [gestures with her hand up] with your royalty check. It doesn't happen often. It has happened two times in my Herbalife career. This is number three. This is the time to work. This is the time to recruit. This is the time to build a new organization. This is the time. There has never been a time this easy. You've gotta go for this.

177.   In a video profile of Beneficiary and Promoter Doran Andre found at http://www.youtube.com/watch?v=2dYK605bAaU (visited April 8, 2013) Andre tells about how, at minutes 1:08-2:00, he went from working for a company at 22 building his own Herbalife distributorship:

There [were] people in the company that wanted to mentor us. There was a support system, an infrastructure, a business model that all we needed to do is execute. And then before you know it, in four months working the same amount of hours, two to three hours a week, [our] income hit $1,500 a month…and in 90 days our income hit $10,000 a month. And our very first calendar year our income hit $350,000. And our second year… our income hit a million one.

Andre goes on to remark, after a tour of his luxury home and images of his red Ferrari, at minutes 4:00-4:15:

You know it's really amazing. I step out of the Ferrari or Bentley or whatever and people go 'what does that guy do for a living?' and I go I'm an Herbalife independent distributor. And people are

absolutely amazed at that that's what I do. It's an incredible quality of life.

Andre also operates what he calls the "Financial Success System." In a video found at http://vimeo.com/20317153 (visited April 8, 2013) promoting his system, he shows his $30,000,000 home, luxury cars and motorcycle and tells his audience: "the big money hasn't even been made in Herbalife…. The biggest money in the shortest period of time is going to be in the next 3-5 years."

178.    These types of grand overstatements regarding distributors' potential earnings and opportunities are part of a pattern and practice throughout the Herbalife endless chain. One Herbalife distributor's website, http://www.cwgteam.com/, (visited April 8, 2013) promises that:

how far you take your Herbalife business and the income you require or desire is your decision. However, you may be interested in the following statistics:

o       Lottery Win: 1 in 13 million chance of becoming a millionaire

o       Herbalife Distributor: 1 in 26,000 chance of becoming a millionaire

o       Herbalife Supervisor: 1 in 2,600 chance of becoming a millionaire

o       Herbalife World Team member: 1 in 800 chance of becoming a millionaire

o       Herbalife Global Expansion Team member: 1 in 80 chance of becoming a millionaire

o       Herbalife Millionaire Team member: 1 in 8 chance of becoming a millionaire

o       Herbalife President's Team member: becoming a millionaire is a certainty

FIRST AMENDED COMPLAINT

**Herbalife's Deception Regarding Potential Earnings**

179.    When making statements regarding their wealth and the potential wealth for new recruits, Herbalife and the Beneficiaries and Promoters routinely refer the readers or viewers (with an asterisk and a footnote) to the Herbalife "Statement of Average Gross Compensation of U.S. Supervisors." They disclaim, "Incomes applicable to the individual (or example) depicted and not average. For average financial performance data, see the Statement of Average Gross Compensation of U.S. Supervisors at Herbalife.com and MyHerbalife.com."

180.    At a meeting with Wall Street analysts in 2007, Herbalife's Chairman and CEO Michael Johnson characterized these Statements of Average Gross Compensation as "transparent" to distributors:

> We are transparent with our earnings potential among supervisors. The staff [*sic.*] on this page which is the average gross compensation of U.S. supervisors is a public document, it is available on our website and is part of our introductory business pack that all new distributors receive. So, every new distributor in this Company knows exactly where they stand and what their opportunity is inside the Company.

181.    As Johnson explains, throughout 2009-to the present, Herbalife distributed its "Statements of Average Gross Compensation of U.S. Supervisors," to all of its U.S. distributors both in Book 4, the Sales and Marketing Plan, as well as on the internet.

182.    At the bottom of each of its disclosures made from 2009-February 2013 (Exhibit A) Herbalife tells its distributors: "The figures stated above are not a guarantee nor are they a projection of a typical Distributor's earnings or profits. Like any other independent business, the achievement or failure of a Distributor depends upon his or her skill set, commitment and desire to succeed. At Herbalife, the opportunity to earn more is always available to each and every Distributor."

183.   From at least 2009 through February 2013, however, Herbalife cherry-picked the data set that they used to create their 2008-2011 Statements. They only reported the incomes of "Supervisors" and above, and further limited that data set to "Active Leaders" – those who "generated at least 2,500 points of volume in" in the year "after becoming Supervisor."

184.   According to their 2011 Statement, "Active Leaders" only make up 39.4% of Herbalife's "Leaders." Thus, not only did Herbalife fail to disclose any earnings as to majority of distributors who were NSLs, Herbalife failed to disclose the earnings of 60.6% of SLs in their statements distributed in 2012. See Exhibit A. A portion is below:

## STATEMENT OF AVERAGE GROSS COMPENSATION OF U.S. SUPERVISORS

Herbalife offers its Distributors an opportunity to achieve a lifetime of better health through its scientifically advanced weight-management and nutrition products. While many of our Distributors join the Herbalife family simply to enjoy our life-changing products, others want to share their results and take advantage of the many income benefits our business opportunity provides. With Herbalife, you can work part time and earn a supplemental income, or focus solely on your Herbalife Distributorship and increase your financial potential. It's completely up to the individual how much he or she wants to achieve! A Distributor earns profits by buying Herbalife products at wholesale and reselling them at retail. If the Distributor wants to increase his or her involvement in the business and enjoy the possibility of higher levels of income, he or she may sponsor others into the business and develop an organization.

Over 25% of Distributors reach the rank of Supervisor and above ("Leader"), qualifying them for additional compensation, which is paid by Herbalife based upon the sales production of those they have sponsored directly and indirectly. The annual gross compensation paid by Herbalife to all Leaders during 2011 averaged $2,900. Over 39% of Supervisors are "Active" (defined as those who generated at least 2,500 points of volume in 2011 after becoming Supervisor). The annual gross compensation paid by Herbalife to Active Leaders during 2011 averaged approximately $7,300.

| ACTIVE LEADERS | | | |
|---|---|---|---|
| Earning Level | % of Total Leaders | % of Active Leaders | Average Earnings (USD) |
| President's Team | 0.2% | 0.6% | $ 515,689 |
| Millionaire Team | 0.7% | 1.7% | $ 100,195 |
| GET | 2.6% | 6.5% | $ 22,766 |
| World Team | 2.9% | 7.3% | $ 6,224 |
| Supervisor | 33.1% | 83.9% | $ 901 |
| Total | 39.4% | 100.0% | $ 7,348 |

The amounts above do not include the income Distributors can earn from their retail or wholesale income, so the actual compensation can be somewhat higher, depending upon each Distributor's personal-selling efforts.

The figures stated above are not a guarantee nor are they a projection of a typical Distributor's earnings or profits. Like any other independent business, the achievement or failure of a Distributor depends upon his or her skill set, commitment and desire to succeed. At Herbalife, the opportunity to earn more is always available to each and every Distributor.

FIRST AMENDED COMPLAINT

185.   In February 2013, Herbalife released an updated and extended disclosure. A full copy is available at Exhibit B. A portion is below:

| **Single-Level Distributors (No Downline)** | | | |
|---|---|---|---|
| **Economic Opportunity** | **Distributors*** | | The economic rewards for single-level Distributors are the wholesale pricing received on products for consumption by the Distributor and his or her family as well as the opportunity to retail product to non-Distributors. Neither of these rewards are payments made by the company and therefore are excluded from this schedule |
| | Number | % | |
| • Wholesale price on product purchases <br> • Retail profit on sales to non-Distributors | 351,065 | 71% | |

| **Non-Sales Leaders** With a Downline** | | | |
|---|---|---|---|
| **Economic Opportunity** | **Distributors** | | In addition to the economic rewards of the single-level Distributors above, which are not included in this chart, certain non-sales leaders with a downline may be eligible for payments from Herbalife on downline product purchases made directly with Herbalife. |
| | Number | % | |
| • Wholesale price on product purchases <br> • Retail profit on sales to non-Distributors <br> • Wholesale profit on sales to another Distributor | 60,333 | 12% | 2,466 of the 4,449 eligible Distributors earned such payments in 2012. The average total payments to the 2,466 Distributors was $104. |

| **Sales Leaders** With a Downline** | | | | | | |
|---|---|---|---|---|---|---|
| **Economic Opportunity** | **Distributors** | | Average Payments from Herbalife | All Sales Leaders with a Downline | | |
| | Number | % | | Number of Distributors | % of Total Grouping | Average Gross Payments |
| • Wholesale price on product purchases <br> • Retail profit on sales to non-Distributors <br> • Wholesale profit on sales to another Distributor <br> • Multi-level compensation on downline sales <br>  • Royalties <br>  • Bonuses | 82,464 | 17% | >$250,000 | 194 | 0.2% | $724,030 |
| | | | $100,001-$250,000 | 452 | 0.5% | $148,808 |
| | | | $50,001-$100,000 | 539 | 0.7% | $68,912 |
| | | | $25,001-$50,000 | 1,136 | 1.4% | $35,581 |
| | | | $10,001-$25,000 | 1,940 | 2.4% | $15,538 |
| | | | $5,001-$10,000 | 2,552 | 3.1% | $7,008 |
| | | | $1,001-$5,000 | 11,307 | 13.7% | $2,216 |
| | | | $1-$1,000 | 39,151 | 47.5% | $292 |
| | | | 0 | 25,193 | 30.6% | $0 |
| | | | Total | 82,464 | 100.0% | $4,485 |

This chart does not include amounts earned by Distributors on their sales of Herbalife products to others

* 30,621 of the 351,065 single-level Distributors are sales leaders without a downline
** Sales leaders are Distributors that achieved the level of Supervisor or higher. See details on Herbalife's marketing plan at www.myherbalife.com.

FIRST AMENDED COMPLAINT

186.   Plaintiff is informed and believes based on Herbalife's 2012 Statement that Herbalife's representation in its 2008-2011 Statements that "[o]ver 25% of Distributors reach the level of Supervisor and above" is false and misleading. The 2012 Statement disclosed that 83% of all of its distributors in 2012 were NSLs, leaving only 17% as Supervisors and above in 2013. Including the 30,621 distributors who became Supervisors through their own Personally Purchased Volume, brings the percentage of Supervisors to 22.89% of all distributors.

187.   Herbalife's 2012 Statement discloses that 71% of all U.S. Distributors – 351,065 distributors – are "Single-Level Distributors" with no downline.

188.   Herbalife's 2012 Statement discloses that there are only 60,333 NSLs with a downline (Senior Consultants and Qualified Producers). Of that number, only 2,466 of those distributors earned "Wholesale Profits." Even then, the average "wholesale profits" of those 2,466 distributors was $104 for a total payment of $256,464 paid to NSLs in 2012 in "Wholesale Profits."

189.   Herbalife's 2012 Statement also discloses that a "majority of those Distributors who earned in excess of $100,000 in 2012 had reached the level of Herbalife's President's Team. During 2012, 47 U.S. Distributors joined the level of President's Team. They averaged 9 years as an Herbalife Distributor before reaching President's Team, with the longest being 20 years and the shortest being less than three years."

190.   Similarly, Herbalife's 2012 Statement discloses that besides the 82,464 SLs, there are 30,621 SLs who "paid for their position."

191.   In its 2012, 2011, 2010, and 2009 10-K disclosures, Herbalife makes at least some disclosure to investors and potential investors that it retains 51.1%, 48.6%, 43.3%, and 42.2% of its Sales Leaders; until the 2012 Statement; Herbalife, however, failed to disclose this same fact to distributors and potential

distributors. Finally, in the 2012 Statement Herbalife provided distributors the same information that it thinks is important for investors: "51.0% of all sales leaders as of February 1st, 2011, requalified by February 1st, 2012 (including 33% of first time sales leaders)."

192. All of the information not disclosed in the 2008-2011 Statements are relevant for: recruits deciding if Herbalife really is the "answer to these tough economic times"; recruits deciding to become Herbalife distributors; distributors deciding to purchase Herbalife product; distributors reading glowing profiles on *Herbalife Today*; distributors evaluating their chances of earning "Wholesale profits," distributors deciding whether to purchase product to "pay for position"; distributors deciding whether to recruit other distributors; and distributors evaluating Founder's Circle members telling them they are "groomed to become multi-millionaires" and that if they are not "getting rich today in Herbalife…It's really wrong."

### Herbalife's Recruiting Rewards Price-Out Products

193. Because Herbalife sends such a large percentage of every dollar received by it upline as Wholesale Profits, Royalty Overrides, bonuses, and incentives – $0.46 to $0.64 of every dollar paid it for product – Herbalife sets the SRP at an inflated price well over what Herbalife's products sell at in the open marketplace.

194. While Herbalife's "competitive compensation structure" supposedly pays out up to 73% of product revenues to distributors in "Retail and Wholesale Profits, Royalty and bonus income and incentives," it falls on the Herbalife distributor retailing the product to recoup this 73%.

195. This inflated markup necessary for the "competitive compensation structure" makes Herbalife's products uncompetitive for retail sale at SRP.

## Overcharges on Packaging and Handling

196.   On top of this inflated SRP, Herbalife charged a 7% "packaging and handling" fee based on the SRP for products ordered directly from Herbalife. A distributor must add that 7% fee to the SRP to recoup their costs and earn the promised retail profits.

197.   Besides this 7% surcharge, Herbalife charged its distributors from 2.5% to 4% of the SRP if they had products shipped to them instead of picking the products up at an Herbalife distribution center (there are only six centers in the U.S.). For a distributor to earn the promised profit on a retail sale, the distributor would need to resell the product at 109.5% to 111% of SRP.

198.   Based on Herbalife's 2008-2011 10-Ks, Herbalife's average revenue for North America for "packaging and handling" and shipping is 10.33%, 10.50%, 10.59, and 10.7% of its total "Retail Sales" (which it uses the SRP to calculate).

199.   In an April 21, 2011 letter to the SEC, Herbalife states "[t]he shipping and handlings costs for 2010, 2009, and 2008 were $58 million, $49 million and $48 million, respectively." Herbalife's 2010 and 2009 10-Ks, however, account for Herbalife's revenues for North America (which includes Canada, Jamaica, and Aruba) from shipping and handling for 2010, 2009, and 2008 as $102.70 million, $87.30 million, and $80.8 million, respectively.

200.   Plaintiff is informed and believes based on the discrepancy between these reported numbers that Herbalife overcharged members of the class in 2009 and 2010 by millions of dollars for packaging, shipping, and handling. Because Herbalife has not changed its formula to calculate the "Packaging and Handling" and shipping costs since 2009, Plaintiff is informed and believes that Herbalife has similarly overcharged and profited from Plaintiffs and the class from their supposed "Packaging and Handling" and "Shipping" fees during 2011, 2012, and 2013.

201.   Plaintiff is further informed and believes that Herbalife uses this surcharge on top of the SRP as a way to avoid having to pay $0.46 to $0.64 of the actual revenue it receives from purchases upline. By using a surcharge, Herbalife can increase its profit margin without dramatically raising the SRP on its products (and without having to share those price increases with the Beneficiaries and Promoters).

202.   Because of the inflated SRP and the packaging, handling, and shipping fees, the prices distributors pay for Herbalife's products are so high that the profit Herbalife promises on retail sales at the Distributor level is almost impossible.

203.   While there is a retail component to the Herbalife endless chain, the inflated SRP of the products and inflated shipping and handling fees make it unlikely that Herbalife distributors have meaningful opportunities to have retail sales. As Herbalife pays out "Wholesale Profits," royalties, bonuses, and other incentives regardless of whether the downline distributor sells the product at SRP there is a systematic incentive to recruit other distributors.

204.   Herbalife's system of graduated discounts depending on position exacerbates this problem. Distributors who purchase Herbalife products at a 25%, 35%, or 42% discount must compete on price with other distributors higher up the endless chain who can purchase products at greater discount and sell those same products at or around cost.

205.   Based on Plaintiffs' experience in selling Herbalife products and competing in the marketplace, they are informed and believe that Herbalife's distributors routinely discount Herbalife products on EBay, Craigslist, and on various websites from the SRP, and there is little opportunity for retail profits.

206.   Because the distributors are Herbalife's actual customers and consumers of its products and those actual customers and consumers are overpaying $0.46 to $0.64 on the dollar for product, those distributors drop out at

47

overwhelming numbers, and Herbalife requires an ever expanding network of so-called distributors.

### Herbalife's Sales and Marketing Plan Does Not Have or Follow Safeguards

207.   In *In re Amway Corp., 93 F.T.C. 618 (1979)* ("*Amway*") the FTC recognized four rules that may help a direct marketer avoid the characteristics of an FTC Act violation: the initial investment rule, the 70% rule, the buyback rule, and the 10 customer rule.

208.    Under the FTC Act, these rules are designed to deter inventory loading and encourage retail sales. In *Omnitrition*, the Ninth Circuit explained that where "a distribution program appears to meet the *Koscot* definition of a pyramid scheme, there must be evidence that the program's safeguards are enforced and actually serve to deter inventory loading and encourage retail sales." *Omnitrition*, 79 F.3d 776 (1996).

209.   Because Plaintiffs bring their claims under Section 327 of the California Penal Code and not Section 5 of the FTC Act, these rules do not provide a defense to alleged violations of Section 327. *See Omnitrition*, 79 F.3d 776, 787. And even if the *Amway* rules were relevant, Herbalife does not follow or adequately enforce them.

210.   **The Initial Investment Rule**. The FTC decision noted that illegal schemes require a payment or initial disbursement by a new participant for the right to sell products and the right to earn rewards, in return for recruiting other participants into the program and which are unrelated to sale of product to the ultimate user.

211.   Herbalife requires each new Herbalife distributor to purchase an IBP or mini-IBP at a cost of $95.55 or $57.75, respectively.

212.   Because Herbalife increases its discount off the SRP on a graduated basis for Distributors, Senior Consultants, Success Builders, Qualified Producers,

and Supervisors, however, Herbalife requires an initial investment well beyond the price of the IBP if a distributor wants to compete in the marketplace for retail consumers of Herbalife products or move up the Herbalife endless chain to a place where they can earn commissions, Royalty Overrides, bonuses, and incentives.

213.   Following the mantra of "pay for your position" and "position determines the pay," Herbalife and Beneficiaries and Promoters pressure distributors to make a significant investment to "buy their discount" and get the "highest discount for the least expenditure."

214.   In the IBC, Booklet 3, Building Your Business (Exhibit H) Herbalife encourages its distributors on page 18 to invest in product inventory for customer orders:

> Here are some areas you may want to consider putting money towards:
> ● Product Inventory for customer orders
> ● Personal product inventory
> ● Advertising for your business
> ● Training events/seminars
> ● Business costs, such as office supplies
> ● And, most of all, yourself!"

215.   In explaining why it is important to build an investment inventory, Herbalife tells distributors on page 19 of Exhibit H:

> ●You can't sell what you don't have. Carry enough inventory on hand to cover all your local sales …
> ● Many people purchase product on the spot. Carry enough product on hand to accommodate spur-of-the-moment sales. You don't want to make a paying customer wait …
> ● If you are doing a one-on-one presentation, don't make the customer wait for product…"

216. **The "70%" Rule**: The 70% rule is as follows: "[t]o ensure that distributors do not attempt to secure the performance bonus solely on the basis of purchases, Amway requires that, to receive a performance bonus, distributors must resell at least 70% of the products they have purchased each month.... Amway enforces the 70% rule." *Amway*, 93 F.T.C. 618, 646, ¶73.

217. Herbalife's 70% rule, found at page 71 of Exhibit C is:

In order to qualify for and receive Royalty Overrides, Production Bonuses, and other bonuses paid by Herbalife, at least 70% of the total value of Herbalife products a Distributor purchases each Volume Month must be sold or consumed that month. For the purpose of fulfilling the certification requirements of this Rule, a Distributor may count any or all of the following:

- Sales to retail customers;
- Sales at wholesale to downline Distributors;
- Product used for personal or family consumption; and
- *Product consumed at Nutrition Clubs.

If the Distributor fails to timely certify to Herbalife that they have sold or consumed 70% of the product purchases made that Volume Month, Royalty Overrides, Production Bonuses, and other bonuses will not be paid to the Distributor.

*If a Distributor utilizes Nutrition Club sampling activity towards compliance, the Distributor shall maintain a log of member visits for at least two years, setting forth the name of the member, dates of visits, and contact information, and shall make those records available for verification purposes if requested by the Company.

218. Herbalife's 70% Rule does not require that Herbalife's distributors resell at least 70% of the Herbalife products to resale customers because it allows "[p]roduct used for personal or family consumption" to satisfy the rule. Self-

consumption does not count as a retail sale for purposes of the 70% Rule. *See Omnitrition*, 79 F.3d 776, 783 citing *Koscot*, 86 F.T.C. 1106,1181.

219.   Herbalife does not require a Supervisor to make *any* retail sales as the rule allows "[s]ales at wholesale to downline Distributors." Thus, it does not meet the 70% Rule.

220.   Moreover, the 70% Rule is not applied to NSL distributors (or Supervisors who do not have a First, Second, or Third Level) even though those distributors can qualify for compensation in promotions up the chain, increased discounts on purchases, and commissions on downline purchases.

221.   While Herbalife requires Supervisors and above to "certify" that they have complied with the 70% rule, Plaintiff is informed and believes based the Court's finding of fact in its August 25, 2009 Memorandum & Order Regarding Cross-Motions for Summary Judgment, *Herbalife International of America, Inc. v. Ford et al. Case* No. 2:07-CV-2529-GAF-FMO (C.D. Cal.), that "Herbalife does not perform audits to determine compliance with the 70% Rule unless there is an ongoing 'ethical investigation' of a Supervisor suspected of violating Herbalife's policies." *See Memorandum & Order* (Docket No. 374), 8:16-19. Moreover, even if Herbalife were to perform audits, it does not promote any meaningful change by its distributors who it finds violates its 70% Rule.

222.   **The Ten Customer Rule**: The "ten customer rule" provides that "distributors may not receive a performance bonus unless they prove a sale to each of ten different retail customers during each month. . . ." *Amway*, 93 F.T.C. 618, 646, ¶74.

223.   Herbalife's Rule is: Rule 18-B The 10 Retail Customers Rule
A Distributor must personally make sales to at least ten (10) separate
retail customers in a given Volume Month to qualify for and receive
Royalty Overrides, Production Bonuses, and other bonuses paid by
Herbalife. For the purpose of fulfilling the certification requirements

51

of this Rule, a Distributor may count any or all of the following each Volume Month.

• A sale to a retail customer;

• A sale to a first-line Distributor with up to 200 Personally Purchased Volume Points (and no downline Distributors) may be counted as a sale to one (1) retail customer; and

• *A Nutrition Club member who consumed products during ten (10) visits to a Nutrition Club within one Volume Month may be counted by the Nutrition Club operator as a sale to one (1) retail customer.

If the Distributor fails to timely certify to Herbalife that they have sold to at least ten (10) retail customers in a given Volume Month, Royalty Overrides, Production Bonuses, and other bonuses will not be paid to the Distributor.

224.  Herbalife's Ten Customer Rule does not mandate sales to customers not already Herbalife distributors. Herbalife allows "[a] sale to a first line Distributor with up to 200 personally purchased Volume Points (and no downline Distributors) which may be counted as a sale to one (1) retail customer," to count to satisfy the Retail Customer Rule.

225.  Distributors can also satisfy this Herbalife's rule by giving away free samples of Herbalife products at their Nutrition Clubs. This does not constitute an "actual sale" under *Omnitrition* or *Koscot.*

226.  Herbalife does not apply the Ten Customer Rule to NSL distributors and Supervisors (who do not have a First, Second, or Third Level), even though they can obtain performance bonuses in promotions up the chain, increased discounts on purchases, and commissions on downline purchases.

227.  Herbalife's 10 Customer Rule and 70% Rule are ineffective in ensuring its distributors focus on retailing the products over recruiting. Because

1  only distributors eligible for Royalty Overrides, bonuses, and other incentives
2  must comply with the rule, to even become a distributor subject to the rules a
3  distributor must recruit heavily and would be in at least the top 10% of all
4  Herbalife distributors.

5      228.  **The Buy Back Rule.** The buy back rule requires participants to buy
6  back from any person they recruited any saleable, unsold inventory upon the
7  recruit's leaving Amway. *Amway*, 93 F.T.C. 618, 716. The purpose of the rule is to
8  "reduce or eliminate the possibility of inventory loading by insuring that program
9  participants do not find themselves saddled with thousands of dollars' worth of
10  unsaleable products." *Omnitrition*, 79 F.3d 776, 784.

11      229.  Herbalife has a 30-Day Money Back Guarantee for "retail
12  customers." When a retail customer returns product, they return the product to the
13  distributor who sold them the product. That distributor is required, within 30 days
14  of paying the refund to the customer, to send back the unused portion of the
15  product or the containers. Then Herbalife exchanges the returned product with an
16  identical replacement product for the Distributor, regardless of whether that
17  distributor has another customer who wants to purchase the product or products.

18      230.  Herbalife has no such "Money Back Guarantee," for a distributor.

19      231.  The distributor can return products *purchased from Herbalife* within
20  the prior 12 months on the following conditions:

21          a.  The distributor must resign as an Herbalife Distributor (and forfeit all
22              of their downline).

23          b.  Herbalife reimburses a distributor the SRP of a product less that
24              distributor's discount to purchase the product, less a 10% restocking

25

26

27

28

FIRST AMENDED COMPLAINT

fee.[7] A distributor does not receive a reimbursement of the 7% packaging and handling fee of the SRP or the shipping fee.

   c. If the distributor has received Royalty Overrides, that distributor must return all of their records relative to the 70% rule.

An "Inventory Repurchase Request Form" is found at page 50 of Exhibit C.

232. If a distributor purchases products from distributors in their upline (and not directly from Herbalife) this return policy does not apply. As NSLs can purchase product from their sponsor or their first upline Supervisor, unlike Amway's rule mandating that participants had to buy back recruit's product, Herbalife leaves its NSLs at the mercy of their upline to determine whether they will accept the return.

233. As Herbalife took a 10% restocking fee from 2009 through August of 2012, Herbalife has not complied with the "buy back rule."

234. As Herbalife does not reimburse the distributor for the inflated packaging and shipping fees, Herbalife has not complied with the "buy back rule."

235. Herbalife knows of, approves, promotes, and facilitates the systematic noncompliance with or breach of, the rules that purportedly protect against the operation of an illegal scheme.

**Herbalife is Bound to Operate as an Endless Chain Scheme**

236. Herbalife cannot fix itself even if it wants to. In Herbalife's 2012 10-K, it explains it is contractually bound to continue implementing and operating this endless chain scheme:

   This agreement with our distributors provides that we will not change certain aspects of our marketing plan without the consent of a specified percentage of our distributors. For example, our agreement with our

---

[7] Plaintiffs are informed and believe that the 10% restocking fee was discontinued sometime in August of 2012.

distributors provides that we may increase, but not decrease, the discount percentages available to our distributors for the purchase of products or the applicable royalty override percentages, including roll-ups, and production and other bonus percentages available to our distributors at various qualification levels within our distributor hierarchy.

237.   As Plaintiffs have not made such an agreement with Herbalife, Plaintiffs are informed and believe that the agreement Herbalife refers to is between Herbalife and Beneficiaries and Promoters and others.

### Tolling Applies To Plaintiffs' Claims

238.   As explained herein, Herbalife, through its actions and omissions, intended to, and did, conceal from Plaintiffs and other distributors in the class during the relevant period material facts and information relating to Herbalife's endless chain scheme and its deceptive earnings claims. Plaintiffs did not discover, nor had they reason to discover, the information necessary for the causes of action set forth in this Complaint until at least February 7, 2013, when Herbalife disclosed its most recent Statement of Average Gross Compensation, and/or when the original complaint was filed.

239.   Herbalife's acts and omissions constitute a "continuing violation" such that any limitations period for Plaintiffs' claims did not begin to accrue until the date of the last wrong or injury that is the subject of this action.

### Class Action Allegations

240.   Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23.

241.   Plaintiffs seek to represent a nationwide class defined as follows: "All persons who were Herbalife distributors in the United States from April 2009 until the present."

242.   Excluded from the class are the Defendants, their employees, family members, and any distributor who has been a member of the President's Circle, Founder's Circle, Chairman's Club, Millionaire Team, or the GET Team.

243.   Subject to confirmation, clarification and/or modification based on discovery to be conducted in this action, Plaintiffs seek to represent a **subclass** of individuals who signed up to Herbalife under a pre-February 2013 Statement of Average Gross Compensation (**"Pre-February 2013 Statement of Average Gross Compensation Subclass"**) "All persons who were Herbalife distributors in the United States from April 2009 to February 6, 2013 and who received a pre-February 2013 Statement of Average Gross Compensation in their IBP or mini-IBP."

244.   Subject to confirmation, clarification and/or modification based on discovery to be conducted in this action, Plaintiffs seek to represent a subclass of individuals who paid "Packaging and Handling" and/or Shipping charges (the **"Packaging & Handling and FedEx Freight Subclass"**) defined as follows**:** "All persons who were Herbalife distributors in the United States from April 2009 to April 14, 2013 and who paid 'Packaging and Handling' and Shipping charges before April 14, 2013."

245.   Plaintiffs seek relief for themselves and all members of the class who agreed to a choice of law of California under California's Unfair and Deceptive Practices Acts, and California's Fraudulent Advertising Act.

246.   Plaintiffs seek to pursue a private attorney general action for injunctive relief for themselves and all members of the class who agreed to a choice of law of California, and they satisfy the standing and class action requirements.

247.   While the exact number of members in the Class and Subclasses are unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the class and subclasses is ascertainable based upon the

records maintained by Defendant. It is estimated that the members of the Class are greater than 400,000 and each subclass easily number in the hundreds of thousands. Therefore, the Class and Subclasses are so numerous that individual joinder of all Class and Subclass members is impracticable under Fed. R. Civ. P. 23(a)(1).

248.    There are questions of law and/or fact common to the class and subclasses, including but not limited to:

    a.    Whether Herbalife is operating an endless chain;

    b.    Whether distributors paid money to Herbalife for (1) the right to sell a product and (2) the right to receive, in return for recruiting others, rewards which were unrelated to the sale of the product to retail consumers;

    c.    Whether *Amway's* four rules apply to Section 327 claims;

    d.    If the *Amway* rules do apply, are Herbalife's *Amway* rules effective;

    e.    If the *Amway* rules do apply, and Herbalife's *Amway* rules are effective, did Herbalife enforce those rules;

    f.    Whether Herbalife or the Beneficiaries and Promoters omitted to inform Bostick and the plaintiff class that they were entering into an illegal scheme where an overwhelming number of participants lose money;

    g.    Whether Herbalife's Statements of Average Gross Compensation distributed from 2009 through 2012 were deceptive and misleading;

    h.    Whether Herbalife overcharged for Packaging and Handling;

    i.    Whether Herbalife overcharged for shipping;

    j.    Whether Herbalife's conduct constitutes an unlawful, unfair and/or deceptive trade practice under California state law

    k.    Whether Herbalife's conduct constitutes unfair competition under California state law; and

l.   Whether Herbalife's conduct constitutes false advertising under California state law and

249.   These and other questions of law and/or fact are common to the class and subclasses and predominate over any question affecting only individual class members.

250.   Plaintiffs' claims are typical of the claims of the class and subclasses in that Plaintiffs were distributors for Defendant Herbalife and lost money because of the illegal scheme, each paid Packaging and Handling" and FedEx freight fees that were based on the SRP of a product and each received a pre-February 2013 Statement of Average Gross Compensation.

251.   Plaintiffs will fairly and adequately represent the interests of the class and subclasses. Plaintiffs' claims are typical of those of the class and subclasses. Plaintiffs' interests are fully aligned with those of the class and subclasses. And Plaintiffs have retained counsel experienced and skilled in complex class action litigation.

252.   Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged, because such treatment will allow many similarly-situated persons to pursue their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

253.   Plaintiffs know of no difficulty likely to be encountered in the management that would preclude its maintenance as a class action.

### FIRST CLAIM FOR RELIEF

### (ENDLESS CHAIN SCHEME; California Penal Code §327

### and Section 1689.2 of the California Civil Code)

### Against All Defendants

### (On Behalf of the Class)

254.   Plaintiffs reallege all allegations.

255.   Section 1689.2 of the California Civil Code provides:

A participant in an endless chain scheme, as defined in Section 327 of the Penal Code, may rescind the contract upon which the scheme is based, and may recover all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme.

256.   Herbalife is operating an endless chain scheme.

257.   Plaintiffs and the class have suffered an injury in fact and have lost money or property because of Herbalife's operation of an endless chain, business acts, omissions, and practices.

258.   Plaintiffs and the class are entitled to:

   a.   rescind the contract upon which the scheme is based and recover all consideration paid under the scheme, less any amounts paid or consideration provided to the participant under the scheme;

   b.   restitution, compensatory and consequential damages (where not inconsistent with their request for rescission or restitution); and

   c.   attorneys' fees, costs, pre- and post-judgment interest.

**SECOND CLAIM FOR RELIEF**

**(Unfair and Deceptive Practices Claims Under**

**Cal. Bus, & Prof. Code § 17200, *et seq.*)**

**(On Behalf of the Class, the Pre-February 2013 Statement of Average Gross**

**Compensation Subclass, and the**

**Packaging & Handling and FedEx Freight Subclass)**

**Against All Defendants**

259.   Plaintiffs reallege all allegations.

260.   All claims brought under this Second Cause of action that refer or relate to the unlawful, fraudulent or unfair "endless chain" of Defendants are brought on behalf of Plaintiffs and the Class.

FIRST AMENDED COMPLAINT

261.   All claims brought under this Second Cause of Action that refer or relate to the unlawful, fraudulent or unfair pre-February 2013 Statements of Average Gross Compensation and the touted Herbalife "business opportunity" are brought on behalf of Plaintiffs and the Pre-February 2013 Statement of Average Gross Compensation Subclass.

262.   All claims brought under this Second Cause of Action that refer or relate to the unlawful, fraudulent or unfair "Packaging and Handling" or FedEx freight fees before April 14, 2013 are brought on behalf of Plaintiffs and the Packaging & Handling and "Freight Prepaid" to FedEx Shipping Subclass.

263.   Herbalife has engaged in constant and continuous unlawful, fraudulent and unfair business acts or practices, and unfair, deceptive, false and misleading advertising within the meaning of the California Business and Professions Code § 17200, *et seq*. The acts or practices alleged constitute a pattern of behavior, pursued as a wrongful business practice that has victimized and continues to victimize thousands of consumers.

**The Herbalife Sales and Marketing Plan Is Unlawful**

264.   Under California Business and Professions Code § 17200, an "unlawful" business practice is one that violates California law.

265.   Herbalife's business practices are unlawful under § 17200 because they constitute an illegal "endless chain" as defined under, and prohibited by, California Penal Code § 327.

266.   Herbalife utilizes its illegal "endless chain" with the intent, directly or indirectly, to dispose of property in Herbalife products and to convince distributors to recruit others to do the same.

267.   Herbalife's business practices are unlawful §17200 because they violate §17500 et seq., as alleged in the Third Cause of Action.

**The Herbalife Sales and Marketing Plan Is Fraudulent**

FIRST AMENDED COMPLAINT

268.   Under California Business and Professions Code § 17200, a "fraudulent" business practice is one that is likely to deceive the public.

269.   Herbalife's business practices are fraudulent in four separately actionable ways: (1) Herbalife's illegal and deceptive "endless chain;" (2) the touted, yet non-existent, Herbalife "business opportunity" for everyone, including but not limited to Herbalife's massive advertising campaign and the misleading Statements of Average Gross Compensation; (3) the "Packaging and Handling" fees that actually were secret profit generators untied to, and undetermined by, Defendants' actual packaging and handling related costs; and (4) alleged FedEx freight fees that, in fact, were not a direct pass through of freight charges paid by Herbalife to FedEx but were secretly and substantially marked-up by Herbalife to generate more profits.

The Fraudulent "Endless Chain"

270.   First, as detailed herein, Defendants promoted participation in the Herbalife endless chain, which has a compensation program based on payments to participants for the purchase of product by participants, not the retail sale of products or services.

271.   Herbalife has made numerous misleading representations about the business opportunity of Herbalife and the income that a recruit or a distributor can realize by becoming a distributor and participating in the scheme.

272.   Herbalife knew, or should have known, that the representations about the business opportunity of Herbalife were misleading in nature.

273.   As a direct result of Herbalife's fraudulent representations and omissions regarding the Herbalife endless chain described herein, Herbalife wrongly acquired money from Plaintiffs and the members of the classes.

The Fraudulent "Business Opportunity" and Statements of Average Compensation

274.   Second, Herbalife touted, in numerous different ways as part of a massive advertising campaign, a "business opportunity," which Herbalife also

repeatedly and in many ways represented, among other things, as being "for everyone" and allowing "full time" or "part time" opportunities.

275. The massive advertising campaign included among other things, the IBP or mini-IBP, the magazine *Herbalife Today*, emails, websites, presentations by Herbalife and the Beneficiaries and Promoters, training, word of mouth among distributors, and events.

276. As part of this campaign and a further inducement to potential distributors, prior to February 2013, Herbalife made and disseminated Statements of Average Gross Compensation that further misled the public, among other things: (1) by using cryptic and technical terms known to Herbalife but not to the general public or to those exploring the claimed "business opportunity," (2) by highlighting the "winners," i.e., those that received compensation from Herbalife, and the average gross compensation paid by Herbalife to those winners, (3) by failing to disclose the actual number of "winners" as compared to the number of distributors who received no compensation from Herbalife (i.e., the "losers"); and (4) by downplaying and omitting the risks and costs involved in starting an Herbalife distributorship and succeeding in such a distributorship.

277. In reality, the touted "business opportunity" was only for a select few. As disclosed for the first time in the 2013 Statement, 436,591 distributors (or approximately 87.9% of all distributors) received no payments from Herbalife in 2012, and another 39,151 (or approximately 8.4% of all distributors) received an average of only $292 from Herbalife during the entire year. And these numbers did not include expenses incurred by distributors in the operation or promotion of their businesses, meaning there were likely more net losers who made no profit at all.

278. Herbalife knew, or should have known, that the selective information presented to distributors in the 2008-2011 Statements of Average Gross Compensation and its massive adverting campaign during that time frame touting

its purported "business opportunity" was likely to mislead the public and did in fact mislead the public into believing there was a legitimate "business opportunity" in which distributors, or a large portion of them, could make money in either a full or part time capacity. In fact, however, there was no such "business opportunity," except for a very select few.

279.   As a direct result of Herbalife's fraudulent representations and omissions regarding the 2008-2011 Statements of Average Gross Compensation and the massive adverting campaign during that time frame and thereafter touting Herbalife's purported "business opportunity" described herein, Herbalife wrongly acquired money from Plaintiffs and the members of the classes.

The Fraudulent "Packaging and Handling" Fees

280.   Prior to April 14, 2013, Plaintiffs and the class purchased Herbalife products and were charged a 7% "Packaging and Handling" fee based on the SRP of the products purchased.

281.   Although Herbalife represented to its distributors that the "Packaging and Handling" fees were designed to recover "a great deal of administrative time and labor [related to] . . . processing, handling and marketing," on information and belief, Herbalife set the fees at 7% of product SRP without first doing any analysis of such costs in relation to product SRPs or revenues from product sales. In other words, Herbalife set the amount of these "Packaging and Handling" fees based on what it believed distributors would pay without objection and not in relation to any study or analysis of its administrative time and labor related to processing, handling and marketing, as represented.

282.   Plaintiff is informed and believes that Herbalife's actual "packaging and handling" costs are far lower than the revenues that Herbalife received from its "Packaging and Handling" fees and thus that these fees were secret profit generators as opposed to specific fees tied to, or at least set in relation to, specific costs, as represented.

283.   Herbalife knew, or should have known, that the misrepresentations and omissions about the "Packaging and Handling" fees were likely to mislead the public and its distributors.

284.   As a direct result of Herbalife's fraudulent representations and omissions regarding the purported "Packaging and Handling" fees described herein, Herbalife wrongly acquired money from Plaintiffs and the members of the classes.

The Fraudulent FedEx Freight Fees

285.   Fourth, from April 2009 up to at least April 14, 2013, Plaintiffs purchased Herbalife products and were charged a supposedly FedEx freight fee that was based on the SRP of a product.

286.   Herbalife told its distributors, among other things, that "[o]rders shipped via Fed Ex, Herbalife's most popular freight service, are shipped freight prepaid," that "[a]ll other freight service are shipped freight collect," and that "[w]hen you request FedEx as the method of shipment on an order, your delivery and freight will be calculated as indicated in the ground chart."

287.   "Freight prepaid" is a commonly known and used shipping term that means the seller of goods pays the shipper's freight charges.

288.   Also, Herbalife's various product order forms during this time frame described product shipping as occurring through "FedEx Ground"," "FedEx – 2 Day" and "FedEx – 1 Day" and set forth various percentage fees based on which method was chosen.

289.   Herbalife's disclosures, in its IBPs and on its various product forms, represented to the public and Herbalife's distributors that the FedEx freight charges were a direct pass through of the actual freight costs that Herbalife paid to FedEx to deliver goods to distributors.

FIRST AMENDED COMPLAINT

290.   Nowhere did Herbalife state or imply that it would be marking-up or otherwise inflating the freight costs it paid to FedEx to ship products to distributors.

291.   Instead, all of Herbalife's disclosures implied a direct pass through of third party FedEx charges when a distributor chose Herbalife's "freight prepaid" to FedEx method and related charges.

292.   Because of the representations and omissions of Herbalife, Plaintiffs purchased Herbalife products, chose Herbalife's FedEx method of delivery and were misled into not even exploring their "freight collect" options.

293.   On information and belief, there were alternative "freight collect" shipping options that would have cost less than Herbalife's FedEx freight fees.

294.   Furthermore, Plaintiffs are informed and believe that Herbalife's claimed FedEx freight fees were not actually the "freight prepaid" by Herbalife to FedEx and were not even calculated according to the formulas disclosed to distributors on the product order forms.

295.   Instead, Plaintiffs are informed and believe that Herbalife had different agreements with FedEx for lower freight costs and that the actual FedEx freight costs incurred by Herbalife were substantially less than the revenues Herbalife received from the FedEx freight fees charged to its distributors.

296.   As a result, Plaintiffs and the class were misled into paying, and did in fact pay, bogus and inflated FedEx freight fees that were a secret profit generator for Herbalife.

297.   Herbalife knew, or should have known, that its FedEx freight disclosures were untrue and misleading in that they misrepresented the freight fees as directly passing through the actual "freight prepaid" costs of Herbalife to  a third party, FedEx, while Plaintiffs and the class were unknowingly being charged, and paying, separate and undisclosed charges to Defendants.

FIRST AMENDED COMPLAINT

298.   As a direct result of Herbalife's fraudulent representations and omissions regarding the "FedEx freight fees described herein, Herbalife wrongly acquired money from Plaintiffs and the members of the classes.

Standing, Reliance and Materiality

299.   The named Plaintiffs have standing to bring these Section 17200 claims under the fraudulent prong and can demonstrate actual reliance on the alleged fraudulent conduct.

300.   For instance, Plaintiffs received the IBP or mini-IBP, which promoted the Herbalife Scheme and claimed "business opportunity" and contained material false representations regarding the success distributors could achieve through Herbalife by purchasing products and recruiting others to do the same. Because of their receipt of the IBP or mini-IBP, and the representations contained therein, Plaintiffs did not return the IBP for a refund, signed up with Herbalife, purchased Herbalife products, did not immediately return those products, and attempted to and recruited others to do the same.

301.   The IBP or mini-IBP was sent by Herbalife with the purpose and intent of promoting Herbalife's illegal and deceptive scheme and claimed "business opportunity." Plaintiffs received the IBP or mini-IBP, which promoted the Herbalife "business opportunity." Book 4 of the IBP and mini-IBP the Sales and Marketing Plan contained a "Statement of Average Gross Compensation of U.S. Supervisors," referenced above, which contained deceptive and misleading information regarding the likelihood of success in becoming a Supervisor as well as the average earnings of distributors and the amount of product revenues that are paid out by Herbalife to distributors in the form of Wholesale Profits, Royalty and bonus incomes and incentives. Because of their receipt of the IBP or mini-IBP, and the representations contained in the "Statement of Average Gross Compensation of U.S. Supervisors," Plaintiffs reasonably believed they could succeed in the "business opportunity," did not return the IBP or mini-IBP for a

refund, purchased Herbalife products and did not immediately return them, signed up as Herbalife distributors, and attempted to and recruited others to do the same.

302.  There were other representations made to distributors as part of the massive advertising campaign regarding the claimed "business opportunity," on which Plaintiffs or some of them, reasonably believed the representations they could succeed in the "business opportunity," did not return the IBP or mini-IBP for a refund, purchased Herbalife products and did not immediately return them, signed up as Herbalife distributors, and attempted to and recruited others to do the same. These other representations include, but are not limited to the following:

a. The *Herbalife Today* magazine featuring the "Royalty Achievers" "President's Team," "Millionaire Team," and "Lifetime Achievers," including members of the Beneficiaries and Promoters, which promoted Herbalife and contained material false representations regarding the "business opportunity" and the success that a distributor could achieve through Herbalife by purchasing products and recruiting others to do the same.

b. Emails from Herbalife that promoted Herbalife and contained material false representations regarding the success that a distributor could achieve through Herbalife by purchasing products and recruiting others to do the same.

c. Websites, such as www.herbalife.com, https://www.myherbalife.com/, and http://www.herbalifemail.com/, which promoted the fraudulent scheme through videos of Beneficiaries and Promoters containing material false representations regarding the "business opportunity" available to distributors and the wealth that a distributor could get by agreeing to become an Herbalife distributor.

d. Presentations by Herbalife distributors, such as the one Bostick received in the Internet Business Starter Pack, which contained material false representations regarding the "business opportunity" and the success that a distributor could get through Herbalife by purchasing products and recruiting others to do the same.

e. Presentations by Herbalife, including the presentations described in this complaint, which contained material false representations regarding the "business opportunity" and the success that a distributor could get through Herbalife by purchasing products and recruiting others to do the same.

f. Training and events, such as the Extravaganza as described in this complaint, where Herbalife distributors made material false representations regarding the "business opportunity" and the success that a distributor could get through Herbalife by purchasing products and recruiting others to do the same.

303. Plaintiffs and the class also purchased Herbalife products and were charged 7% "Packaging and Handling" fees that appeared to be designed to recoup "packaging and handling" costs and also were described elsewhere as covering administrative time and labor related to processing, handling and marketing. Plaintiffs and the class relied upon these representations and paid the "Packaging and Handling" fees without objection, believing the fees were recovering actual costs when in fact they were secretly generating additional profits for Herbalife.

304. Plaintiffs and the class also purchased Herbalife products and were charged FedEx freight fees that implied a direct pass through of shipping costs paid to a third party, FedEx, when in fact they were not direct pass through charges and were instead secret, undisclosed profit generators. The class relied upon these representations and paid the FedEx freight fees without objection, believing they

were simply paying the actual shipping costs charged by FedEx, when they were not.

305. To the extent proof of reliance is required of Plaintiffs, Herbalife and the Beneficiaries and Promoters knew that Plaintiffs and the class would reasonably rely on their representations and omissions, which would cause the Plaintiffs and the class joining the fraudulent endless chain scheme and purchasing the products, and Plaintiffs did in fact reasonably rely upon such representations and omissions.

306. Indeed, had Plaintiffs and the class known that Herbalife and its Beneficiaries and Promoters were promoting an endless chain, they would not have become Herbalife distributors in the first place and, if learned after becoming a distributor, they would not have purchased Herbalife products thereafter.

307. Had Plaintiffs and the class known that Herbalife was promoting a "business opportunity" that did not exist except for a select few, they would not have become Herbalife distributors in the first place and, if learned after becoming a distributor, they would not have purchased Herbalife products thereafter.

308. And had Plaintiffs and the class known that the "Packaging and Handling" fees were not calculated or set in relation to actual packaging and handling costs and instead were secret profit generators, they would not have become Herbalife distributors in the first place, would not have purchased Herbalife products, or would have contacted Herbalife to object and attempt to avoid paying the fees.

309. Regarding the FedEx freight fees, had Plaintiffs and the class known that Herbalife was not directly passing through such fees to the shipper, Fed Ex, they could have and would have explored freight collect options that could have saved them money on shipping, or they could have picked up the products in person, or they could have objected and tried to negotiate the actual shipping fees with Herbalife.

310.   Finally, the fraudulent acts, representations and omissions described herein were material not only to Plaintiffs and the class (as described in this complaint), but also to reasonable persons. For instance, regarding the alleged "business opportunity" and representations in, and omissions from, the 2008 to 2011 Statements of Average Gross Compensation, and on information and belief, a large percentage of individuals who signed up as Herbalife distributors during this time frame expected that they could and would receive annual compensation at the approximate level of the "average earnings compensation," in total, disclosed in the Statements of Average Gross Compensation. Unfortunately, no such large percentage actually could or did earn such an amount.

### The Herbalife Sales and Marketing Plan Is Unfair

311.   Under California Business and Professions Code § 17200, a business practice is "unfair" if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury which outweighs its benefits.

312.   For the reasons set forth herein and above, Herbalife's promotion and operation of an unlawful and fraudulent endless chain, and its fraudulent representations and omissions regarding its purported "business opportunity," "Packaging and Handling" fees, and FedEx freight fees are also unethical, oppressive, and unscrupulous in that Herbalife is and has been duping Plaintiffs and the class out of billions, or at least hundreds of millions, of dollars.

313.   Herbalife's actions have few, if any, benefits. Thus, the injury caused to Plaintiffs and the class easily and dramatically outweighs the benefits, if any.

314.   Defendants should be made to disgorge all ill-gotten gains and return to Plaintiffs and the class all wrongfully taken amounts.

315.   Finally, Defendants' unlawful, fraudulent and unfair acts and omissions will not be completely and finally stopped without orders of an injunctive nature. Under California Business and Professions Code section 17203,

Plaintiffs and the class seek a judicial order of an equitable nature against all Defendants, including, but not limited to, an order declaring such practices as complained of to be unlawful, fraudulent and unfair, and enjoining them from further undertaking any of the unlawful, fraudulent and unfair acts or omissions described herein.

**THIRD CLAIM FOR RELIEF**

**False Advertising**

**(California Business and Professions Code § 17500, *et seq*.)**

**(On Behalf of the Class, the Pre-February 2013 Statement of Average Gross Compensation Subclass, and the Packaging & Handling and FedEx Freight Subclass)**

**Against All Defendants**

316.   Plaintiffs reallege all allegations.

317.   All claims brought under this Third Claim for Relief that refer or relate to the false, untrue, fraudulent or misleading endless chain of Defendants are brought on behalf of Plaintiffs and the Class.

318.   All claims brought under this Third Cause of Action that refer or relate to the false, untrue, fraudulent or misleading pre-February 2013 Statements of Average Gross Compensation and the touted Herbalife "business opportunity" are brought on behalf of Plaintiffs and the Pre-February 2013 Statement of Average Gross Compensation Subclass.

319.   All claims brought under this Third Claim for Relief that refer or relate to the false, untrue, fraudulent or misleading "Packaging and Handling" or FedEx freight fees before April 14, 2013 are brought on behalf of Plaintiffs and the Packaging & Handling and FedEx Freight Subclass.

320.   Defendants' business acts, false advertisements and materially misleading omissions constitute false advertising, in violation of the California Business and Professions Code § 17500, *et seq.*

71

**FIRST AMENDED COMPLAINT**

321.    Defendants engaged in false, unfair and misleading business practices, consisting of false advertising and materially misleading omissions regarding the purported "business opportunity," likely to deceive the public and include, but are not limited to, the items set forth above. Herbalife knew, or should have known, that the representations about the business opportunity of Herbalife were misleading in nature.

322.    Defendants' marketing and promotion of the "Packaging and Handling" that appeared to be designed to recoup "packaging and handling" costs, but, in fact, were secret profit generators for Herbalife, as set forth above. Defendants knew or should have known, in exercising reasonable care, that the statements they were making were untrue or misleading and deceived members of the public. Defendants knew or should have known, in exercising reasonable care, that distributors, including Plaintiffs, would rely, and relied on Defendants' misrepresentations and omissions.

323.    Defendants' marketing and promotion of the FedEx freight fees that implied a direct pass through of shipping costs paid to a third party, FedEx, when in fact they were not direct pass through charges and were instead secret, undisclosed profit generators, constitutes false advertising likely to deceive the public and include, but are not limited to, the items set forth above. Defendants knew or should have known, in exercising reasonable care, that the statements they were making were untrue or misleading and deceived members of the public. Defendants knew or should have known, in exercising reasonable care, that distributors, including Plaintiffs, would rely, and relied on Defendants' misrepresentations and omissions.

324.    Because of Defendants' untrue and/or misleading representations, Defendants wrongfully acquired money from Plaintiffs and the class members to which it was not entitled. The Court should order Defendants to disgorge, for the benefit of Plaintiffs and all other Herbalife distributors in the class who signed a

Distributor Agreement with Herbalife governed by California law their profits and compensation and/or make restitution to Plaintiffs and the class.

325. Under California Business and Professions Code Section 17535, Plaintiffs and the class seek a judicial order directing Defendants to cease and desist all false advertising related to the Defendants' illegal endless chain scheme, and "Packaging and Handling" fee, and such other injunctive relief as the Court finds just and appropriate.

326. Because of Defendants' untrue and/or misleading representations, Defendants wrongfully acquired money from Plaintiffs and the class members to which it was not entitled. The Court should order Defendants to disgorge, for the benefit of Plaintiffs and all other Herbalife distributors in the class who signed a Distributor Agreement with Herbalife governed by California law their profits and compensation and/or make restitution to Plaintiffs and the class.

327. Under California Business and Professions Code Section 17535, Plaintiffs and the class seek a judicial order directing Defendants to cease and desist from all false advertising related to the Defendants' illegal e scheme, and "Packaging and Handling" fee, and such other injunctive relief as the Court finds just and appropriate.

## PRAYER FOR RELIEF

The named Plaintiffs and the Plaintiff class and subclasses request the following relief:

a.      Certification of the class and subclasses;

b.      A jury trial and judgment against Defendants;

c.      Rescission of the agreements upon which the scheme is based, and recovery of all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme;

FIRST AMENDED COMPLAINT

d. Damages for the financial losses incurred by Plaintiffs and by the class and subclasses because of the Herbalife Defendants' conduct and for injury to their business and property;

e. Restitution and disgorgement of monies;

f. Temporary and permanent injunctive relief enjoining Herbalife from paying its Distributors recruiting rewards that are unrelated to retail sales to ultimate users and from further unfair, unlawful, fraudulent and/or deceptive acts;

g. The cost of suit including reasonable attorneys' fees under California Code of Civil Procedure § 1021.5, Civil Code §1689.2, and otherwise by law.

h. For damages in an amount yet to be ascertained as allowed by law; and

i. For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.

DATED: June 9, 2014            FABIAN & CLENDENIN, P.C.
                                        FOLEY BEZEK BEHLE & CURTIS, LLP

                                        */s/ Philip D. Dracht*
                                        Philip D. Dracht
                                        Scott M. Petersen (Admitted *Pro Hac*)
                                        Jason W. Hardin (Admitted *Pro Hac*)

                                        Thomas G. Foley, Jr.
                                        Robert A. Curtis
                                        Justin P. Karczag
                                          FOLEY BEZEK BEHLE & CURTIS, LLP

                                        *Attorneys for Plaintiffs*

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

DATED: June 9, 2014               FABIAN & CLENDENIN, P.C.
                                  FOLEY BEZEK BEHLE & CURTIS, LLP


                                  */s/ Philip D. Dracht*
                                  Philip D. Dracht
                                  Scott M. Petersen (Admitted *Pro Hac*)
                                  Jason W. Hardin (Admitted *Pro Hac*)

                                  Thomas G. Foley, Jr.
                                  Robert A. Curtis
                                  Justin P. Karczag
                                  FOLEY BEZEK BEHLE & CURTIS, LLP

                                  *Attorneys for Plaintiffs*

4840-8247-4779, v. 1

# Exhibit 3

1    Counsel is listed on the following page

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

11   DANA BOSTICK, *et al.*,              CASE NO. 2:13-cv-02488-BRO-RZ

12            Plaintiffs,                 **STIPULATION OF SETTLEMENT**

13        vs.
                                          Assigned to Hon. Beverly Reid
14   HERBALIFE INTERNATIONAL OF           O'Connell
     AMERICA, INC., *et al.*,
15
              Defendants.
16

17

18

19

20

21

22

23

24

25

26

27

28

1

Jonathan D. Schiller (*pro hac vice*)
    jschiller@bsfllp.com
Joseph F. Kroetsch (*pro hac vice*)
    jkroetsch@bsfllp.com
(Other Attorneys Listed Below)
Boies, Schiller & Flexner LLP
575 Lexington Avenue
New York, NY  10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350

A. Howard Matz, SBN 55892
    ahm@birdmarella.com
Mitchell A. Kamin, SBN 202788
    mak@birdmarella.com
Mark T. Drooks, SBN 123561
    mtd@birdmarella.com
Gopi K. Panchapakesan, SBN 279586
    gkp@birdmarella.com
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California  90067-2561
Telephone:  (310) 201-2100
Facsimile:  (310) 201-2110

*Attorneys for Defendants Herbalife
International of America, Inc.; Herbalife
International, Inc.; and Herbalife Ltd.*

Scott M. Petersen (*pro hac vice*)
    spetersen@fabianlaw.com
Jason W. Hardin (*pro hac vice*)
    jhardin@fabianlaw.com
Philip D. Dracht, SBN 219044
    pdracht@fabianlaw.com
Fabian & Clendenin
215 South State Street, Suite 1200
Salt Lake City, UT  84151-0210
Telephone: (801) 531-8900

Thomas G. Foley, Jr., SBN 65812
    tfoley@foleybezek.com
Justin P, Karczag, SBN 223764
    jkarczag@foleybezek.com
Foley Bezek Behle & Curtis, LLP
15 West Carrillo Street
Santa Barbara, CA  93101
Telephone: (805) 962-9495

*Attorneys for Plaintiffs Dana Bostick,
Anita Vasko, Judi Trotter, Beverly
Molnar, and Chester Cote*

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

STIPULATION OF SETTLEMENT

1    This Stipulation of Settlement and attached exhibits (the "Settlement

2    Agreement") dated as of October 31, 2014, is made by and among the following

3    Settling Parties: on the one hand, Plaintiffs Dana Bostick, Anita Vasko, Judi Trotter,

4    Beverly Molnar, and Chester Cote on behalf of themselves, and on behalf of each of

5    the Settlement Class Members (as defined herein), by and through Plaintiffs'

6    Counsel; and on the other, Defendants Herbalife International of America, Inc.,

7    Herbalife International, Inc., and Herbalife Ltd. (collectively, "Herbalife"), by and

8    through their counsel.  This Settlement Agreement is intended by the Settling Parties

9    to resolve, discharge and settle the Released Claims (as defined herein), upon and

10    subject to the terms and conditions of this Settlement Agreement.

11  **1.**    **DEFINITIONS**

12    In addition to the foregoing defined terms, the following terms shall have the

13  meanings as set forth below:

14    1.1    "Action" means the action filed in the United States District Court for

15  the Central District of California entitled *Dana Bostick, et al. v. Herbalife*

16  *International of America, Inc., et al.*, Case No. 2:13-cv-02488-BRO-RZ, including

17  all pleadings on file in that action.

18    1.2    "Authorized Claimant" means a Class Member who submits a timely

19  and valid Claim Form to the Claims Administrator or is otherwise authorized to

20  receive benefits under this Settlement Agreement.

21    1.3    "Claims Administrator" means KCC LLC, who shall be subject to and

22  comply with this Settlement Agreement and the terms of the Claims Protocol

23  attached hereto as Exhibit 3.

24    1.4    "Plaintiffs' Counsel" means the law firms Fabian & Clendenin, P.C.

25  and Foley Bezek Behle & Curtis, LLP.

26    1.5    "Class Period" means the period beginning April 1, 2009, through and

27  including the date the Preliminary Approval Order is entered.

28    1.6    "Court" means the United States District Court for the Central District

1  of California.

2      1.7     "Effective Date" means the first date after which all of the following

3  events and conditions have been met or have occurred:

4          1.7.1     The Settlement Agreement is executed and delivered by/to

5  all Parties and approved by the Court;

6          1.7.2     Entry of the Final Judgment and Order Approving Settlement

7  ("Final Judgment");

8          1.7.3     The Final Judgment becomes "Final." "Final" means the

9  occurrence of any of the following: (a) final affirmance on an appeal of the Final

10  Judgment, the expiration of the time for a petition for review of the Final Judgment

11  and, if the petition is granted, final affirmance of the Final Judgment following

12  review pursuant to that grant; (b) final dismissal of any appeal from the Final

13  Judgment or the final dismissal of any proceeding to review the Final Judgment; or

14  (c) if no appeal is filed, the expiration of the time for the filing or noticing of any

15  appeal from the Court's Final Judgment.  If the Final Judgment is set aside,

16  materially modified, vacated or reversed by the Court or by an appellate court, and

17  is not fully reinstated on further appeal, then the Final Judgment does not become

18  "Final" and the Effective Date cannot occur.

19          1.7.4     Plaintiffs and Herbalife shall have the option to elect to

20  waive the failure, in whole or in part, of any of the conditions set forth in

21  Subsections 1.7.1-1.7.3. If Plaintiffs or Herbalife elects to waive the failure, in

22  whole or in part, of such condition, Plaintiffs or Herbalife shall file a written notice

23  of waiver with the Court within ten (10) days after they become aware of the failure

24  of such condition.  If Plaintiffs or Herbalife waive the failure, in whole or in part, of

25  any condition in Subsections 1.7.1-1.7.3, then the Effective Date will occur without

26  satisfaction of that condition.

27      1.8     "Escrow Agent" means KCC LLC.

28      1.9     "Notice" means the notice provided for in Section 7 and substantially

2

STIPULATION OF SETTLEMENT

1 in the form attached hereto as Exhibit 1.

2      1.10    "Person" means an Herbalife member or distributor in his or her

3 individual capacity; any corporation, limited liability company, partnership, limited

4 partnership, association, joint stock company, estate, legal representative, trust,

5 unincorporated association, or any business or legal entity through which he or she

6 has conducted or conducts an Herbalife distributorship; and their spouses, heirs,

7 predecessors, successors, representatives, alter egos, or assigns.

8      1.11    "Preliminary Approval Order" means the order to be entered by the

9 Court, preliminarily approving the Settlement Agreement, certifying the Settlement

10 Class for settlement purposes only, approving the Notice of Proposed Settlement,

11 approving the Summary Notice, and setting the Settlement Hearing, as provided for

12 in Section 7.

13      1.12    "Settlement Agreement" means this Stipulation of Settlement,

14 including all attached exhibits.

15      1.13    "Settlement Class" means all persons who are or were Herbalife

16 members or distributors in the United States at any time during the Class Period.

17         1.13.1    Excluded from the Settlement Class are the Defendants, their

18 employees, family members, and any member who has been a member of

19 Herbalife's President's Team, Founder's Circle, Chairman's Club, Millionaire

20 Team, or GET Team.

21         1.13.2    Also excluded from the Rule 23(b)(3) class are all Herbalife

22 members or distributors who have agreed to be subject to the arbitration provisions

23 of the Arbitration Agreement for Disputes Between Members and Herbalife

24 contained in the Member Application Agreement revised during or after September

25 2013.

26      1.14    "Settlement Class Member" means a Person who fits within the

27 definition of the Settlement Class and who has not validly and timely requested

28 exclusion from the Settlement Class, as provided in Section 10.

1.15   "Settlement Hearing" means the hearing to determine whether this Settlement Agreement should be finally approved by the Court, as provided for in Section 7.

1.16   "Settling Parties" means Herbalife and each of the Plaintiffs on behalf of themselves and each of the Settlement Class Members.

1.17   "Summary Notice" means the written notice provided for in Section 7 and substantially in the form attached hereto as Exhibit 2.

1.18   The word "or" means and/or.

1.19   The plural includes the singular and vice-versa.

## 2.   LITIGATION BACKGROUND

2.1   <u>Original Complaint</u>. On April 8, 2013, Plaintiff Dana Bostick, on behalf of himself and a putative class of "others similarly situated," filed this Action in the United States District Court for the Central District California, naming as defendants Herbalife International of America, Inc.; Herbalife International, Inc.; and Herbalife Ltd., alleging the following claims for relief: (1) violations of California's endless chain scheme law under California Penal Code Section 327 and California Civil Code Section 1689.2; (2) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §§ 1962(a), (c), and (d)); (3) unfair and deceptive business practices under California Business and Professions Code Section 17200, *et seq.*; and (4) false advertising under California Business and Professions Code Section 17500, *et seq*. The complaint sought, among other things, damages for the financial losses incurred by Bostick and the class; general, compensatory, and exemplary damages; restitution and disgorgement; temporary and permanent injunctive relief; costs; reasonable attorneys' fees; pre- and post-judgment interest; and other damages the Court may deem just and proper.

2.2   <u>Motion to Dismiss</u>. On May 30, 2013, Defendants moved to dismiss the complaint. (Dkt. No. 22.). On October 11, 2013, the Court denied Defendants' motion to dismiss. (Dkt. No. 40).

STIPULATION OF SETTLEMENT

1     2.3    <u>First Amended Complaint</u>.  On July 2, 2014, the Court granted the

2 parties' Stipulation to File First Amended Complaint.  (Dkt. No. 76).  The First

3 Amended Complaint, filed on July 7, 2014, added Anita Vasko, Judi Trotter,

4 Beverly Molnar, and Chester Cote as plaintiffs.  (Dkt. No. 78).  The First Amended

5 Complaint also removed Plaintiffs' RICO causes of action.  On August 15, 2014, the

6 parties sought a 63 day extension of certain case management deadlines and

7 Defendants' time to respond to Plaintiffs' First Amended Complaint.  (Dkt. No. 82).

8 The Court granted this stipulation on August 20, 2014.  (Dkt. No. 83).

9 **3.     BENEFITS OF THE SETTLEMENT**

10     3.1    <u>Diligence of Plaintiffs' Counsel</u>.  Plaintiffs are represented by

11 experienced counsel who have conducted discovery, both formal and informal, as

12 well as investigation prior to and throughout the prosecution of the Action.  The

13 discovery and investigation have included (i) review of over 148,000 pages of

14 internal Herbalife documents; (ii) depositions of Herbalife pursuant to Federal Rule

15 of Civil Procedure 30(b)(6); (iii) analysis of several gigabytes of confidential

16 Herbalife database productions; (iv) review of documents provided by former

17 Herbalife members or distributors and other persons with relevant information; (v)

18 review of written discovery responses provided by Herbalife through the discovery

19 process; (vi) review of Herbalife's public materials and other publicly available

20 documents; (vii) interviews with former Herbalife members or distributors; (viii)

21 consultation with experts; (ix) research of the applicable law with respect to the

22 claims asserted in the complaints and the potential defenses thereto.   Joint

23 Declaration of Thomas J. Foley, Jr. and Scott M. Petersen, dated October 31, 2014,

24 filed concurrently herewith, details such diligence.

25     3.2    <u>Benefits to Settlement Class</u>.  Plaintiffs' Counsel have analyzed the

26 benefits to be obtained under the terms of the proposed Settlement and have

27 considered the costs, risks, and delays associated with the continued prosecution of

28 the Action and likely appeals, as well as the merits of the defenses asserted by

1   Herbalife.  Plaintiffs' Counsel believe that, in consideration of all of the

2   circumstances and after prolonged, serious, and contentious arms-length

3   negotiations in mediation with Herbalife, the proposed Settlement is fair,

4   reasonable, adequate and in the best interests of the Settlement Class.  In making

5   these statements and submitting a declaration filed concurrently herewith, Plaintiffs'

6   Counsel are not making any admission of fact or law in regard to liability, fault

7   allocation, or damages with respect to the Action.

8        3.3   <u>Benefits to Herbalife</u>. Herbalife has concluded that it is in its best

9   interests that the Action be settled on the terms embodied in the Settlement

10   Agreement.  Herbalife reached that conclusion after: (1) analyzing the factual and

11   legal issues in the Action and considering the uncertainty of litigation; (2)

12   determining that further conduct of the Action through trial and any possible appeals

13   would be protracted and expensive; and (3) considering the benefits of permitting

14   Herbalife to conduct its business unhampered by the distractions of continued

15   litigation.

16   **NOW, THEREFORE, IT IS HEREBY AGREED** by and between the

17   parties, through their respective counsel, that the Action and the Released Claims be

18   finally and fully settled, compromised and released, and the Action shall be

19   dismissed on the merits with prejudice, on the terms set forth herein, as between

20   Plaintiffs and the Settlement Class Members on the one hand, and Herbalife on the

21   other.

22   **4.**     **MONETARY RELIEF AND PRODUCT RETURN**

23        4.1   <u>Monetary Fund</u>.  Herbalife shall establish a non-reversionary

24   "Settlement Fund" in the amount of $15,000,000.00.  This amount shall be

25   deposited into an escrow account within ten (10) business days after the Court

26   issues the Preliminary Approval Order.  The Settlement Fund shall be applied: (a)

27   first, to pay the costs of notice and settlement administration, (b) second, to pay

28   Plaintiffs' Counsel's attorneys' fees and expenses and any plaintiff service awards

1   in the amount awarded by the Court, (c) third, after exhausting the Product Return

2   Fund, no more than $2,500,000 of the Settlement Fund may be applied to pay

3   Settlement Class Members who submit a valid claim for a product return, and (d)

4   fourth to pay Settlement Class Members who submit a valid claim for a cash award

5   (this final amount is the "Net Settlement Fund").  The Court shall oversee the

6   distribution of any amounts remaining in the Net Settlement Fund pursuant to the *cy*

7   *pres* doctrine to Consumer Federation of America, or such organization(s) as the

8   parties may jointly propose and the Court approves.  To the extent interest is earned

9   on amounts held in escrow, it shall accrue and be payable to Herbalife, less

10   applicable taxes.  The Escrow Agent, on behalf of the Settlement Class, shall be

11   responsible for all administrative, accounting, and tax compliance activities in

12   connection with this escrow account and shall comply with the provisions of the

13   escrow agreement and the Claims Protocol attached as Exhibit 3.

14       4.2   Product Return Fund.  In addition to the Settlement Fund described in

15   Subsection 5.1, Herbalife shall commit resources to funding a reversionary "Product

16   Return Fund" in the amount of $2,500,000.00.  The Product Return Fund shall be

17   applied to pay Settlement Class Members who submit a valid claim for a product

18   return. The costs of return shipping for product returns shall be borne by the Product

19   Return Fund.  The sum of the Product Return Fund plus the portion of the

20   Settlement Fund available for product returns as set forth in Section 5.1(c) above

21   shall be the "Net Product Return Fund."  The product return fund shall be

22   administered by Herbalife; to the extent the Product Return Fund is not fully

23   expended as set forth in Section 5.3 below, the remainder shall be returned to

24   Herbalife.

25       4.3   Product Return Claimants.  Settlement Class Members may submit

26   claims to return unused and unopened products (excluding International Business

27   Packs ["IBPs"] and mini-IBPs) that were purchased more than one year prior to the

28   deadline for submitting claims forms.  In exchange, Settlement Class Members shall

1   receive a Return Payment from the Net Product Return Fund.  Settlement Class

2   Members submitting claims to return products are "Product Return Claimants."

3          4.3.1      In their claim forms, Product Return Claimants shall identify

4   the (1) SKU of the product(s) to be returned, (2) estimated purchase date of the

5   product(s) to be returned, and (3) actual amount paid for each returned product (the

6   "Product Return Amount").  If the Product Return Claimant is unable to provide the

7   actual amount paid, the Product Return Claimant shall so certify and shall provide

8   an estimated payment.  Assuming all other information is properly provided to the

9   Claims Administrator, the Claims Administrator shall calculate the Return Payment

10  as the lesser of the Product Return Claimant's estimated payment or 50% of

11  Herbalife's Suggested Retail Price for the product(s) on the purchase date.

12         4.3.2      Following the deadline for submitting claim forms, the

13  Settlement Administrator's website shall provide Product Return Claimants with

14  notice of the amount of the proposed payment (the "Return Payment").  If the total

15  Return Payment exceeds the Net Product Return Fund, the Return Payment for each

16  Product Return Claimant shall be subject to pro rata diminution.  Beginning within

17  ten (10) business days following the Settlement Administrator's online posting of

18  notice of the Return Payment and continuing for sixty (60) days thereafter, Product

19  Return Claimants shall be permitted to return the products identified in their claim

20  forms in exchange for a Return Payment.

21         4.3.3      Herbalife shall use its current product return process to

22  retrieve or collect the product for which Product Return Claimants properly submit

23  claims, with no additional cost to the Product Return Claimants.  Should any

24  product be returned by means of shipping (whether through Herbalife's product

25  return process or otherwise), any shipping costs shall be paid by the Net Product

26  Return Fund.

27         4.4      Business Opportunity Claimants.  Settlement Class Members may

28  submit claims for a cash award, as described below.  Settlement Class Members