Mark T. Drooks – State Bar No. 123561
   mdrooks@birdmarella.com
Paul S. Chan – State Bar No. 183406
   pchan@birdmarella.com
Gopi K. Panchapakesan – State Bar No. 279586
   gpanchapakesan@birdmarella.com
Jonathan M. Jackson – State Bar No. 257554
   jjackson@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant Herbalife
International of America, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MICHAEL LAVIGNE, *et al.*,<br><br>          Plaintiffs,<br><br>     vs.<br><br>HERBALIFE LTD., *et al.*,<br><br>          Defendants. | CASE NO. 2:18-cv-07480-JAK (MRWx)<br><br>**DEFENDANT HERBALIFE'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:     February 10, 2020<br>Time:    8:30 A.M.<br>Crtrm.:  10B<br><br>Assigned to Hon. John A. Kronstadt |

3622729.6

I.      INTRODUCTION ............................................................................. 1

II.     RELEVANT BACKGROUND ........................................................ 2

        A.      Procedural History ............................................................. 2

        B.      Plaintiffs Ignore Manifest Problems with Their Proposed Class ............ 3

        C.      Plaintiffs Do Not Identify Any Uniform Misrepresentations
                Made by Herbalife to the Putative Class .................................. 5

                1.      Herbalife's Role Varies by Event. .............................. 5

                        a.      Herbalife Has Little to No Involvement in
                                Distributor-Run Events. ................................ 5

                        b.      The Content Presented at Corporate Events Varies. ...... 6

                2.      Herbalife's Policies Regarding Event Content Have
                        Evolved Over Time. ........................................ 7

                3.      Plaintiffs' Downline Members Were Not Misled
                        Regarding Events. ......................................... 8

                4.      Plaintiffs Admit They Were Never Guaranteed Success. ...... 8

                5.      Plaintiffs' Experiences Regarding Events Differed
                        Substantially. ........................................... 9

                6.      Plaintiffs Relied on Representations Outside of Events. ....... 10

        D.      Plaintiffs' Alleged Losses Had Varied, Plaintiff-Specific Causes. ...... 10

III.    ARGUMENT ................................................................................ 11

        A.      Plaintiffs Rely on the Wrong Legal Standard. ........................ 11

        B.      Plaintiffs Have Not Proposed a Viable Class. ....................... 12

        C.      Plaintiffs Have Not Proven the Existence of a Common
                Question. ................................................................ 14

        D.      Plaintiffs Cannot Meet Rule 23(b)'s Stringent Predominance
                Requirement. ........................................................... 16

                1.      Plaintiffs' RICO Claims Are Not Class Claims. .............. 18

                        a.      Plaintiffs Have Not Established a Fraudulent
                                Scheme That Can be Proven on a Classwide Basis. ........ 18

                        b.      The Causation and Damages Inquiries under RICO
                                Preclude Certification. ................................ 19

                2.      Plaintiffs' Negligent Misrepresentation Claim Cannot Be

3622729.6

i

Proven on a Classwide Basis. .......................................................20

3.   Plaintiffs' UCL Claim Is Not Suitable for Classwide
Adjudication. ...............................................................21

E.   Plaintiffs Have Not Established the Superiority of a Class
Action. ......................................................................................22

F.   Plaintiffs Do Not Meet the Typicality and Adequacy
Requirements. ...........................................................................24

G.   Proposed Class Counsel Is Inadequate under Rule 23(a)(4). ..............25

IV.   CONCLUSION ......................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*All. Mortg. Co. v. Rothwell,*
  10 Cal. 4th 1226 (1995)......................................................................................21

*In re Arris Cable Modem Consumer Litig.,*
  327 F.R.D. 334 (N.D. Cal. 2018) ......................................................................18

*AT&T Mobility LLC v. Concepcion,*
  563 U.S. 333 (2011) ...........................................................................................12

*Bostick v. Herbalife Int'l of America, Inc., et al.,*
  Case No. 2:13-cv-02488-BRO-RZ (C.D. Cal.)..........................................*passim*

*Campion v. Old Republic Home Prot. Co.,*
  272 F.R.D. 517 (S.D. Cal. 2011) .......................................................................21

*Castro Valley Union 76, Inc. v. Vapor Sys. Techs., Inc.,*
  No. C 11-0299 PJH, 2012 WL 5199458 (N.D. Cal. Oct. 22, 2012) ..................21

*Class Plaintiffs v. City of Seattle,*
  955 F.2d 1268 (9th Cir. 1992) ...........................................................................13

*Comcast Corp. v. Behrend,*
  569 U.S. 27 (2013) ...........................................................................16, 18, 20

*Conde v. Sensa,*
  No. 14-CV-51 JLS WVG, 2018 WL 4297056 (S.D. Cal. Sept. 10,
  2018)..............................................................................................................17, 23

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.,*
  277 F.R.D. 586 (S.D. Cal. 2011)...................................................................18, 19

*Crowley Mar. Corp. v. Bos. Old Colony Ins. Co.,*
  158 Cal. App. 4th 1061 (2008)...........................................................................12

*Day v. AT&T Corp.,*
  63 Cal. App. 4th 325 (1998)...............................................................................22

*Diediker v. Peelle Fin. Corp.,*
  60 Cal. App. 4th 288 (1998)...............................................................................17

*Doe v. Trump Corp.*,
   385 F. Supp. 3d 265 (S.D.N.Y. 2019) ................................................................ 20

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ............................................................................. 11

*In re First All. Mortg. Co.*,
   471 F.3d 977 (9th Cir. 2006) ............................................................................. 18

*Healey v. Murphy*,
   No. 01-11099, 2009 WL 6613209 (D. Mass. Jan. 14, 2009) ............................. 25

*Hemi Grp., LLC v. City of New York, N.Y.*,
   559 U.S. 1 (2010) ........................................................................................ 19, 20

*Henson v. Fid. Nat. Fin. Inc.*,
   300 F.R.D. 413 (C.D. Cal. 2014) ....................................................................... 17

*Kaldenbach v. Mut. of Omaha Life Ins. Co.*,
   178 Cal. App. 4th 830 (Cal. Ct. App. 2009) ...................................................... 21

*Kamm v. California City Dev. Co.*,
   509 F.2d 205 (9th Cir. 1975) ............................................................................. 23

*Lim v. Helio, LLC*,
   No. CV119183PSGACRX, 2012 WL 12884439 (C.D. Cal. Apr. 18,
   2012) .................................................................................................................. 12

*Lindblom v. Santander Consumer USA, Inc.*,
   2018 WL 573356 (E.D. Cal. Jan. 26, 2018) ....................................................... 24

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ............................................................................. 12

*Murray v. DirecTV, Inc.*,
   No. ML 09-2093, 2014 WL 12597904 (C.D. Cal. Apr. 23, 2014) ..................... 23

*Olds v. Gen. Acc. Fire & Life Assur. Corp.*,
   67 Cal. App. 2d 812 (1945) ............................................................................... 13

*Pablo v. ServiceMaster Glob. Holdings Inc.*,
   No. C 08-03894 SI, 2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) .................... 12

*Pincay v. Andrews*,
   238 F.3d 1106 (9th Cir. 2001) ..................................................................... 13, 17

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
    442 F.3d 741 (9th Cir. 2006) ............................................................... 14

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ............................................................... 25

*Tan v. Grubhub, Inc.*,
    No. 15-CV-05128-JSC, 2016 WL 4721439 (N.D. Cal. July 19,
    2016) ...................................................................................................... 24

*Victorino v. FCA US LLC*,
    322 F.R.D. 403 (S.D. Cal. 2017) ......................................................... 25

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ......................................................................*passim*

*Willis v. City of Seattle*,
    No. 18-35053, 2019 WL 6442929 (9th Cir. Nov. 29, 2019).............. 15

*Zinser v. Accufix Research Institute, Inc.*,
    253 F.3d 1180 (9th Cir. 2001), *opinion amended on denial of reh'g*,
    273 F.3d 1266 (9th Cir. 2001) ................................................. 16, 22, 24

**Other Authorities**

Fed. R. Civ. P. 9(b) ...................................................................................... 3

Fed. R. Civ. P. 23........................................................................... 1, 11, 25

Fed. R. Civ. P. 23(a) ..............................................................................*passim*

Fed. R. Civ. P. 23(b) ..............................................................................*passim*

Fed. R. Civ. P. 30(b)(6) ............................................................................... 3

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiffs woefully fail to comply with Rule 23.  They impermissibly seek class certification based on unsubstantiated allegations, when it is their burden to "affirmatively demonstrate" that they have "*in fact*" complied with Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original). They ask the Court simply to presume that Herbalife promoted a uniform fraudulent message in thousands of events since 2009.  To the contrary, Herbalife did not control the content of most of these events, there was no standard "script" required to be used at these events, and Plaintiffs have pointed to no misrepresentations in any such "script."  Plaintiffs offer no evidence that *any* event speaker achieved success through illegitimate means.  Instead, Plaintiffs' claims rest upon a hodgepodge of written and oral representations allegedly made by Herbalife or third parties through a variety of channels, including outside of events.  Plaintiffs do not cite a single case in which any court has certified a class under these circumstances.

There is also no viable class for the Court to certify.  Plaintiffs' motion fails to disclose that *each member* of the putative class is subject to either an arbitration agreement, a contractual one-year statute of limitations, or both.  Indeed, the claims of four of the original Plaintiffs were compelled to arbitration over a year ago, yet Plaintiffs have not amended their class definition to exclude class members who are parties to the same arbitration agreements.  As if that were not enough, the majority of the class is subject to the *Bostick* settlement release pursuant to a judgment entered by this Court in June 2015.

Plaintiffs' motion does not even begin to scratch the surface of what is required to satisfy Rule 23(a) and (b)(3) under *Dukes*.  First, Plaintiffs have not demonstrated that the class is numerous, given that the claims of each class member are barred for at least one of the reasons noted above.  Second, the motion does not

articulate even one common question of fact or law.  The commonality requirement demands more than the mere use of buzzwords like "uniform" and "scripted," particularly where there is no evidence that the use of such terms is accurate.

Third, Plaintiffs cannot possibly meet Rule 23(b)(3)'s demanding predominance requirement.  Because adjudication of Plaintiffs' claims would result in endless mini-trials regarding issues of reliance and causation, they are patently inappropriate for class treatment.  Fourth, under well-established law, class treatment is not superior here given Herbalife's 2016 settlement with the FTC, which paid out $200 million to 350,000 Herbalife distributors, each of whom pursued the business opportunity during the proposed class period.

Fifth, Plaintiffs' claims are not typical of the claims of the class, nor are Plaintiffs adequate representatives.[1]  Among other reasons, (a) Valdez's claims are separately time-barred because she concluded in *2009* that events were valueless; (b) the Rodgers and Valdez are *Bostick* settlement class members; and (c) each Plaintiff abandoned the business opportunity for varied and individualized reasons, unrelated to event attendance.  Finally, proposed class counsel are not adequate because they solicited each of the Plaintiffs to participate in this class action in violation of prevailing ethical standards and lack relevant class action experience.

## II.   RELEVANT BACKGROUND

### A.   Procedural History

Plaintiffs originally sued three Herbalife entities and 44 individual "Florida Defendants" in the District Court for the Southern District of Florida on September 18, 2017.  Dkt. 1.  Plaintiffs here were improperly solicited by their

---

[1]   Due to what Plaintiffs' counsel has represented are serious health issues, Mr. Rodgers has been unavailable to be deposed for several months.  There is no indication that he is in a position to vigorously pursue this action.  Plaintiffs tentatively have offered him for a half-day deposition on January 19, 2020.  To the extent Herbalife is able to take his deposition in advance of the hearing, it anticipates filing a short supplemental brief summarizing the pertinent aspects of his testimony.

1   counsel to participate in this putative class action.  *See* Expert Report of Robert L.

2   Kehr ("Kehr Rpt.").  The claims of four of the original plaintiffs were compelled to

3   arbitration.  Dkt. 106.  The claims of the remaining four plaintiffs, Patricia Rodgers,

4   Jeff Rodgers, Jennifer Ribalta, and Izaar Valdez, were transferred to this Court

5   pursuant to valid forum selection clauses.  *Id.*  Plaintiffs' claims were dismissed for

6   failure to meet Rule 9(b)'s heightened pleading standard.  Dkt. 196.  The Amended

7   Complaint pleads claims under RICO, California's Unfair Competition Law

8   ("UCL"), and a claim for negligent misrepresentation.  Dkt. 202.  Herbalife's

9   motion to dismiss the Amended Complaint is pending, and also will be heard on

10  February 10, 2020.  Dkt. 208, 217.[2]

11          **B.        Plaintiffs Ignore Manifest Problems with Their Proposed Class.**

12          There is no viable class, because each member of the putative class is an

13  Herbalife distributor[3] subject to one or more of the following:  (1) an arbitration

14  agreement and class action waiver, (2) a contractual one-year statute of limitations,

15  and/or (3) the class action settlement release in *Bostick v. Herbalife Int'l of America,*

16  *Inc., et al.*, Case No. 2:13-cv-02488-BRO-RZ (C.D. Cal.).  *See* Attachment A.  The

17  motion does not address any of these issues.

18          First, all distributors who joined Herbalife either between March 2006 and

19  April 2009 or after October 2013 are subject to an arbitration clause (the

20  October 2013 version encompasses all "claims arising out of or relating to any

21  aspect of the relationship between Herbalife and Member").  Declaration of

22

23  [2]   Plaintiffs have conducted extensive discovery.  Herbalife and various third
    parties collectively have produced over 150,000 pages of discovery and hundreds of

24  hours of event video footage in response to Plaintiffs' requests.  As of the date of
    this filing, Plaintiffs also have taken the depositions of three Herbalife witnesses (in

25  their individual and Rule 30(b)(6) capacities) and three third-party witnesses.
    Declaration of Gopi K. Panchapakesan ("Panchapakesan Decl.") at ¶ 5.

26  [3]   Only Herbalife distributors may pursue the business opportunity.  Cooper Decl.

27  at ¶ 2.  Further, under Herbalife's rules, spouses are required to pursue the business
    opportunity under a single distributorship, as did the Rodgers.  *Id.* at ¶ 4;

28  Panchapakesan Decl., Exh. A (Rodgers Depo. Tr.) at 36:7-16.

1   Kimberly Cooper ("Cooper Decl.") at ¶¶ 6-11, Exhs. A-C.  Those agreements also

2   contain a class action waiver.  *Id.*  Before transferring the balance of the case against

3   Herbalife to this Court, the district court in Florida found those agreements

4   enforceable and ordered four named plaintiffs to arbitration, effectively eviscerating

5   any class that included members who joined Herbalife before April 2009 or after

6   October 2013.

7        Second, since at least March 2006, Herbalife's distributorship agreements

8   have included a one-year statute of limitations.  Cooper Decl. at ¶ 12, Exh. A at

9   ¶ 12 ("any Claim . . . shall be brought within one (1) year from the date the person

10  or entity asserting the Claim first knew, or through the exercise of reasonable

11  diligence should have known, that the Claim existed.").  It bars the vast majority of

12  the proposed class from bringing suit, and raises individualized factual issues as to

13  when any remaining class members knew or should have known about their claims.

14       Third, the *Bostick* settlement, approved by this Court in June 2015, covers "all

15  persons who are or were Herbalife members or distributors in the United States at

16  any time from April 1, 2009 to December 2, 2014."  Dkt. 142-4, Exh. 5 at ¶ 3.  The

17  effective date of the settlement was September 18, 2015.  *See* Dkt. 142 at 6, n.5.  As

18  in this case, the central allegation in *Bostick* was that the Herbalife business model is

19  fraudulent, including with respect to event-related representations.  Dkt. 142-3,

20  Exh. 2 at ¶¶ 3, 175-76.  The settlement released claims concerning allegations that

21  Herbalife, among other things, "engaged in any acts of unfair competition; false

22  and/or misleading advertising; or operated any type of illegal, pyramid, endless

23  chain, or fraudulent scheme."  Dkt. 142-3, Exh. 5 at ¶ 12.  Most proposed class

24  members, including the Rodgers and Valdez, are *Bostick* settlement class members.

25  Dkt. 66-1 at ¶ 12; Cooper Decl. at ¶¶ 17, 19, Exhs. H, J.[4]

26  _____

27  [4]  Mr. Rodgers also is a *Bostick* settlement class member because he pursued the
    business opportunity under his wife's distributorship.  Dkt. 142-4, Exh. 5 at ¶ 12

28  (releasing claims as to the agents and representatives of settlement class members).

3622729.6

4

**C.      Plaintiffs Do Not Identify Any Uniform Misrepresentations Made by Herbalife to the Putative Class.**

As an initial matter, Plaintiffs do not specify (i) who the "Featured Speakers" are,[5] (ii) the purported "illegitimate" means they each used to achieve success, (iii) the precise "advice" they allegedly "peddled" at events, or (iv) Herbalife's participation in the alleged misconduct of the "Featured Speakers."  Dkt. 207 at 2.  Nor do they present evidence of *classwide conduct* on the part of Herbalife.  To the contrary, key aspects of Herbalife events and Plaintiffs' experiences attending events demonstrate that there is no uniform, classwide misrepresentation.

**1.      Herbalife's Role Varies by Event.**

Since January 2009, there have been thousands of events.  The vast majority of these events have been Success Training Seminars"("STS") or Herbalife Opportunity Meetings ("HOM"), which are run by distributors, each of whom is an independent contractor.  Bogard Decl. at ¶¶ 13-19; Cooper Decl. at ¶ 2; Dkt. 202 at ¶¶ 63, 67.  Since 2009, more than 2,000 different distributors have organized and/or spoken at these independent events.  Bogard Decl. at ¶ 18.  In addition, hundreds of different distributors have spoken at corporate events during the class period.  Bogard Decl. at ¶ 5.

**a.      Herbalife Has Little to No Involvement in Distributor-Run Events.**

As to distributor-run events, Herbalife *does not* (1) organize or finance them; (2) collect any revenues from them; (3) promote them (other than identifying them

---

Because Ribalta was a Global Expansion Team ("GET") member, one of the higher levels within Herbalife's marketing plan, she was excluded from the settlement.  Dkt. 142-4, Exh. 5 at ¶ 3; Declaration of Bob Bogard ("Bogard Decl.") at ¶¶ 8, 21.

[5]     Plaintiffs interchangeably refer to the estimated 100 "Featured Speakers" and those who belong to Herbalife's President's Team, one of the highest levels in the Herbalife marketing plan.  Dkt. 207 at 9.  There are, however, 673 President's Team members in the United States.  Bogard Decl. at ¶ 22.

1    on an online calendar); or (4) with limited exceptions, record or attend them.

2    Bogard Decl. at ¶ 13; Declarations of Tommy Gioiosa ("Gioiosa Decl.") and Jorge

3    de la Concepción ("Concepción Decl.") at ¶ 3.  These events often occur without

4    Herbalife's knowledge.  Bogard Decl. at ¶ 14.  Although Herbalife provides basic

5    training materials that may be used at these events, Plaintiffs do not allege these

6    materials are fraudulent or contain any false statements.  Further, the company does

7    not require distributors to use these materials.  Bogard Decl. at ¶¶ 15-16; Gioiosa

8    Decl. at ¶¶ 4-5; Concepción Decl. at ¶¶ 4-5.  Those who use the materials often

9    deviate from them or tailor them for a specific audience; others do not use the

10   materials at all.  *Id*.  Herbalife does not review ahead of time presentations given at

11   distributor-run events.  Bogard Decl. at ¶ 16; Gioiosa Decl. at ¶ 4; Concepción Decl.

12   at ¶ 4.

13               **b.     The Content Presented at Corporate Events Varies.**

14        Herbalife has a role in organizing around 100 corporate events each year.

15   Bogard Decl. at ¶ 3.  These events can last up to three days.  *Id*. at ¶ 4.  Herbalife

16   provides food and/or entertainment at some of these events, and also ensures the

17   presentation of valuable content.  *Id*. at ¶ 6, Exhs. A-F; *see* Attachment B.

18        There are key differences amongst these events.  Kickoff events focus on

19   planning and promotions for the upcoming year, and sometimes address the

20   launching of new products.  Bogard Decl. at ¶ 7.  Since 2015, Herbalife has covered

21   the cost of these events, while the distributors who organize them collect ticket

22   revenues.  *Id*.  There is one Extravaganza each year; Herbalife is more involved in

23   directly organizing this event.  *Id*. at ¶ 8.  The first day of the Extravaganza often has

24   involved a "Future Millionaire Team Experience," which is reserved for distributors

25   who have achieved the GET team level or higher, or about 4% of Herbalife's current

26   distributors (of the Plaintiffs, only Ribalta reached this level).  *Id*.  This special

27   session involves advanced training on business management.  *Id*.  Leadership

28   Development Weekends ("LDWs") focus on business opportunity training.  *Id*. at

3622729.6

**6**

¶ 9.  Only those who reach the level of "Supervisor" (about 45% of Herbalife's current distributors) can attend.  *Id.*  There is one Future President's Team Retreat each year, and it can be attended only by those who qualify for it, which typically include distributors who are Millionaire Team level or higher, or about 1% of Herbalife's current distributors.  The retreat provides advanced training.  *Id.* at ¶ 10.

### 2. Herbalife's Policies Regarding Event Content Have Evolved Over Time.

Since as early as May 2005, Herbalife has required that earnings claims be accompanied by a disclaimer.  Declaration of Sacha Mauricio Domingo Donovan ("Domingo Decl.") at ¶ 5.  In or around 2014, Herbalife published guidance regarding the making of claims that advised against showing lavish lifestyle images.  *Id.*  Since around July 2016, Herbalife has prohibited distributors, including event speakers, from displaying such images.  *Id.*  For more than ten years, Herbalife has had a process (that has evolved over time) for requiring speakers at corporate events to submit their presentations to the company for review ahead of time.  *Id.*  For at least the last five years, Herbalife has offered training regarding the making of claims.  *Id.*  For example, in May 2016, Herbalife required distributors to undergo mandatory online training regarding, among other topics, income claims and business management.  *Id.*  In February 2017, Herbalife made available to distributors additional training regarding these issues.  *Id.*

Further, in July 2016, Herbalife and the FTC stipulated to a consent decree that permanently enjoins Herbalife from misrepresenting (1) that distributors "will or are likely to earn substantial income," (2) that the reason a distributor does not earn a significant income is because of a failure to "devote substantial or sufficient effort," (3) that participation is likely to result in a lavish lifestyle; and (4) "any other fact material" to distributors, including "trainings."  Request for Judicial Notice ("RJN"), Exh. A at 14-16.  Under the settlement, Herbalife contributed and the FTC paid out $200 million to about 350,000 individuals who served as Herbalife

1   distributors between 2009 and 2015.  *Id*. at Exh. A, § VII(A), (G); Exh. B.

2         **3.**      **Plaintiffs' Downline Members Were Not Misled Regarding**

3                  **Events.**

4         Plaintiffs invited their downline members (dozens of putative class members

5   whom they recruited into the business opportunity) to both corporate and local

6   events, including their own events.  In doing so, Plaintiffs testified that they did not

7   threaten or coerce their downline members to attend, nor did they make any

8   guarantees or promises regarding attendance.  Panchapakesan Decl., Exh. A

9   ("Rodgers Depo. Tr.") at 50:18-53:21, 66:16-68:19; Exh. B ("Ribalta Depo Tr.") at

10   31:2-14, 32:15-34:9, 41:2-42:7, 44:24-46:16, 45:11-19, 55:11-56:18; Exh. C

11   ("Valdez Depo. Tr.") at 76:25-77:11.  Plaintiffs are not aware of any of their

12   downline members being subjected to such conduct by anyone else.  Rodgers Depo

13   Tr. at 68:20-69:7; Ribalta Depo Tr. at 47:2-18, 48:11-20.

14         **4.**      **Plaintiffs Admit They Were Never Guaranteed Success.**

15         Plaintiffs were never explicitly guaranteed success.  Rodgers Depo. Tr. at

16   14:4-15:25, 64:15-66:5, 143:9-13 (a guarantee was "implied"); Ribalta Depo. Tr. at

17   53:1-13 (events were "essential to success but not a guarantee;" "Nobody knows if

18   somebody's going to succeed or not."); Valdez Depo. Tr. at 28:8-10, 29:21-23,

19   47:1-7, 90:7-21 (by early 2009, Valdez knew that events did not guarantee success).

20   Plaintiffs understood that successful pursuit of the business opportunity would

21   require significant work and investment of time outside of events.  Rodgers Depo.

22   Tr. at 21:2-10; 30:2-8; Ribalta Depo. Tr. at 103:19-104:10, 145:9-148:7; Valdez

23   Depo. Tr. at 38:25-39:21.

24         Plaintiffs each represented in their agreements with Herbalife that they would

25   review the Statement of Average Gross Compensation ("SAGC"), which discloses

26   that only about 1% of distributors make President's Team.  Cooper Decl., Exh. E.

27   Neither Ms. Rodgers nor Valdez recalls reviewing the SAGC.  Rodgers Depo. Tr. at

28   149:14-150:3; Valdez Depo. Tr. at 42:6-43:3.  Ms. Rodgers testified that if she had

1  seen it, she likely would not have joined Herbalife.  Rodgers Depo Tr. at 155:2-12,

2  159:9-15.  Ribalta saw the SAGC and understood that in order to make President's

3  Team, she would need to be around the top 1% of all distributors.  Ribalta Depo. Tr.

4  at 143:11-144:7, 145:15-146:1.  Plaintiffs also represented in their agreements that

5  they are "not relying upon any representations as to the financial results [they] might

6  achieve."  Cooper Decl., Exh. H at 2, ¶ 3(b); Exh. I at 2, ¶ 3(b); Exh. J at 7, ¶ 4.

### 5. Plaintiffs' Experiences Regarding Events Differed Substantially.

9  Ms. Rodgers found that the trainings helped with the management of her

10  Herbalife business.  Rodgers Depo. Tr. at 73:3-74:15, 75:14-17, 80:2-81:22.  At no

11  point when she was attending events did she find them repetitive.  *Id*.  She attended

12  events where she received training regarding money management and was advised

13  not to prematurely quit her job, as reflected in notes she took at events.  *Id*. at

14  109:24-110:9, 131:21-25, 132:8-11, 134:20-24, 140:12-141:2.  She also found that

15  events were a valuable networking opportunity and inspiring.  *Id.* at 79:17-81:15.

16  Ribalta claims that she did not learn anything at events, but nevertheless

17  found them inspiring.  Ribalta Depo. Tr. at 239:7-240:1.  She testified that if she had

18  heard at events the very things that are reflected in Ms. Rodgers' event notes (and

19  that in fact were presented at events, *see* Attachment B), she "absolutely" would

20  have considered them to be useful.  *Id*. at 70:22-71:1.

21  As to Valdez, by early 2009, just half a year after she joined Herbalife, she

22  concluded that (1) events were not providing her value, (2) the content presented

23  was repetitive, (3) certain statements made by event speakers were false, and

24  (4) there was no guarantee of success.  Valdez Depo Tr. at 70:11-71:11, 72:13-16,

25  73:25-74:8, 74:20-25, 79:10-80:3, 82:6-83:10, 84:21-85:5, 90:7-21, 132:18-21.  She

26  quit Herbalife in 2009, but joined again in 2013, despite having arrived at the above

27  conclusions four years earlier.  *Id*. at 93:13-24, 95:10-14, 124:15-19, 134:5-14,

28  136:17-137:16, 138:23-139:3.

### 6.     Plaintiffs Relied on Representations Outside of Events.

Ribalta relied on representations allegedly made by third-party Tommy Gioiosa that she "can make a lot of money with Herbalife," including representations made "a whole year before [she] came to an event."  Ribalta Depo. Tr. at 57:3-58:13.  Ms. Rodgers understood that distributors are prohibited from making financial guarantees; despite this, she relied on a private conversation she and her husband had with an upline member, who allegedly told them that he would "make [them] rich."  Rodgers Depo Tr. at 92:3-12, 129:3-24.  Valdez allegedly was told by an upline member, whom she was with "all the time," that she had the potential to become a millionaire.  Valdez Depo. Tr. at 27:16-28:10.  There is no evidence that Herbalife participated in any of these private discussions or encouraged Plaintiffs' upline members to make these representations.

### D.     Plaintiffs' Alleged Losses Had Varied, Plaintiff-Specific Causes.

Unlike most proposed class members, each Plaintiff operated a commercial nutrition club as part of their pursuit of the Herbalife business opportunity.[6] Rodgers Depo Tr. at 22:9-13; Ribalta Depo Tr. at 15:2-5; Valdez Depo Tr. at 48:22-49:2, 104:14-16.  Ribalta did not achieve success, in part, due to her inability to manage her finances and her desire to convert her nutrition club into a yoga studio. Ribalta Depo. Tr. at 54:14-22, 107:14-23, 108:14-20, 114:17-25, 119:1-7, 121:7-12, 234:15-18.  Indeed, Ribalta did not do her taxes for three years because she was "afraid to look at the numbers," and did not realize until after the fact that she "couldn't afford to keep doing Herbalife."  *Id.* at 116:18-117:3.  The Rodgers found it challenging to cover the overhead on their club, and did not assess their financial

---

[6]   A nutrition club is one of multiple daily methods of operation or "DMOs" that distributors can pursue.  Distributors can sell product, conduct trainings, and run fitness classes out of these physical storefront clubs.  Domingo Decl. at ¶ 2.  In and of itself, the fact that each named Plaintiff operated a commercial nutrition club (*i.e.*, not out of their own homes) makes their experiences atypical—only about 13% of U.S.-based Herbalife distributors currently are involved in the operation of a commercial nutrition club.  *Id.* at ¶ 4.

1  situation at any time while they were pursuing the business opportunity.  Rodgers

2  Depo Tr. at 58:10-15, 59:7-60:1, 87:7-89:18, 182:17-183:1, 184:1-4, 206:16-207:2,

3  217:21-24.  They also moved to a new city to build their business based solely on

4  the recommendation of one of their upline members, even though they had virtually

5  no network there.  *Id.* at 211:7-23.  Despite Herbalife's rules discouraging

6  distributors from incurring debt (and statements made at events to this effect, *see*

7  Attachment B), Valdez was in debt soon after beginning her pursuit of the business

8  opportunity.  Valdez Depo. Tr. at 52:4-54:21; Cooper Decl., Exh. D at 3.

9  **III.**   **ARGUMENT**

10      **A.**   **Plaintiffs Rely on the Wrong Legal Standard.**

11       Plaintiffs' motion relies extensively on allegations in their complaint.  But

12  Rule 23 "does not set forth a mere pleading standard."  *Dukes*, 564 U.S. at 350; *see*

13  Dkt. 207 at 2 (relying on pre-*Dukes* case law).  Under *Dukes*, "[a] party seeking

14  class certification must affirmatively demonstrate his compliance with the Rule—

15  that is, he must be prepared to prove that there are *in fact* sufficiently numerous

16  parties, common questions of law or fact, etc."  *Id*. (emphasis in original); *Ellis v.*

17  *Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) ("[A] district court *must*

18  consider the merits if they overlap with the Rule 23(a) requirements.") (emphasis in

19  original).  Certification is proper only if "the trial court is satisfied, after a rigorous

20  analysis, that the prerequisites of Rule 23(a) have been satisfied."  *Id*.[7]

21       Plaintiffs "bear the burden of demonstrating that they have met each of the

22  four requirements of . . . [Rule] 23(a) and at least one of the requirements of

23  Rule 23(b)."  *Costco*,  657 F.3d at 979–80.  Here, Plaintiffs seek to certify a class

24  under Rule 23(b)(3), which requires them to "demonstrate the superiority of

25  maintaining a class action and show 'that the questions of law or fact common to

26  

27  [7]   Unless otherwise noted, internal citations and quotation marks have been
omitted.

28  

11

1  class members predominate over any questions affecting only individual members.'"

2  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012); Dkt. 207 at 3.[8]

3       **B.**     **Plaintiffs Have Not Proposed a Viable Class.**

4       Plaintiffs have not satisfied their burden of "affirmatively demonstrat[ing]"

5  that Rule 23(a)'s numerosity requirement has "in fact" been satisfied. *See Dukes*,

6  564 U.S. at 350. First, most class members entered into arbitration agreements and

7  class action waivers that the District Court for the Southern District of Florida

8  already ruled bars them from participating in the proposed class action. Cooper

9  Decl. at ¶¶ 6-11; Dkt. 106; *see Pablo v. ServiceMaster Glob. Holdings Inc.*, No. C

10  08-03894 SI, 2011 WL 3476473, at *2 (N.D. Cal. Aug. 9, 2011) ("The arbitration

11  agreements raise concerns about whether plaintiffs will be able to satisfy Rule

12  23(a)'s numerosity requirement."); *AT&T Mobility LLC v. Concepcion*, 563 U.S.

13  333, 344 (2011) (holding that class action waivers are valid). Those arbitration

14  agreements plainly encompass Plaintiffs' claims*, see supra* Section II.B, and in fact,

15  their former co-Plaintiffs' claims were dismissed for this very reason. *See* Dkt. 106

16  at 1; Dkt. 62 at 6 n.9 (noting that the agreement former Plaintiff Felix Valdez

17  executed in 2008 contained an arbitration provision); Dkt. 62-2 at ¶ 7; *see Lim v.*

18  *Helio, LLC*, No. CV119183PSGACRX, 2012 WL 12884439, at *4 (C.D. Cal.

19  Apr. 18, 2012) (finding plaintiffs had made a "deficient showing" with regard to the

20  numerosity requirement given the existence of arbitration agreements applicable to

21  the putative class).[9]

22

23  [8]  Although Plaintiffs seek injunctive relief under their UCL claim, they have not sought certification under Rule 23(b)(2).

24
25  [9]  Because Herbalife's rules preclude spouses from having separate distributorships, a class member who is the spouse of a distributor who signed an arbitration agreement also would be subject to it. Cooper Decl. at ¶ 4; *see Crowley*

26  *Mar. Corp. v. Bos. Old Colony Ins. Co.*, 158 Cal. App. 4th 1061, 1069–70 (2008)

27  (a non-signatory can be compelled to arbitrate where she is a "third party beneficiary" of the agreement or has a "preexisting relationship" with one of the

28  signatories, including a spousal relationship). The Florida court found that both of

Second, the claims of those putative class members who did not enter into arbitration agreements (*i.e.*, those who joined Herbalife between April 2009 and October 2013) are time-barred under the contractual one-year statute of limitations.[10]   Cooper Decl. at ¶ 12; *see Olds v. Gen. Acc. Fire & Life Assur. Corp.*, 67 Cal. App. 2d 812, 817 (1945), *disapproved of on other grounds by Barrera v. State Farm Mut. Auto. Ins. Co.*, 71 Cal. 2d 659 (1969) ("[P]rovisions in a contract shortening the normal statute of limitations are valid between the parties, if reasonable, and . . . one year is not, as between the contracting parties, an unfair period of limitation."). Plaintiffs, who themselves are subject to the one-year limitations period, fail to address this gaping hole in their class, as well. Cooper Decl., Exh. H at 3, ¶ 11; Exh. I at 3, ¶ 11; Exh. J at 9, ¶ 17.[11]

Third, the vast majority of class members who were distributors between April 2009 and December 2014 are subject to the *Bostick* release, because their claims are based on the "identical factual predicate" as the claims asserted in *Bostick*—namely, the viability of the Herbalife business opportunity. Dkt. 142-3, Exh. 2 at ¶¶ 1-3; *see Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287 (9th Cir. 1992). Plaintiffs here are suing Herbalife because they believe the business opportunity is fraudulent and cannot be pursued profitably—the exact same theory

---

the Lavignes, who were married, were subject to the arbitration clause, even though only one of them signed it. Dkt. 106.

[10]   Plaintiffs' RICO claims, which are premised on alleged misrepresentations made by Herbalife regarding the business opportunity, plainly arise out of the relationship between Herbalife and its distributors. In any event, even if RICO's four-year limitations period applied here, the claims of anyone who attended events *before* September 18, 2013, four years before the complaint was filed, would be time-barred. *See Pincay v. Andrews*, 238 F.3d 1106, 1109 (9th Cir. 2001) ("We have continuously followed the 'injury discovery' statute of limitations rule for civil RICO claims."). Further, virtually every class member who joined Herbalife after that point is subject to an arbitration clause.

[11]   The hypothetical exception would be a class member who joined Herbalife in October 2013 and waited three years to attend an event; there is no proof that such a person exists.

of fraud as in *Bostick*.  Rodgers Depo. Tr. at 100:18-101:17, 102:5-9; Ribalta Depo. Tr. at 58:19-25, 247:10-248:23, 249:8-12; Dkt. 192 at 4 (asserting that the success of top distributors "is achieved through breaking Herbalife's rules rather than through rigorous adherence to the Herbalife business model"); Dkt. 207 at 6 ("Herbalife is a corrupt organization of corporate executives who, together with a hodgepodge of 'independent' distributors, fleece tens of thousands of victims out of their hard-earned money by selling a dream they know is unattainable").

Similarly, Plaintiffs allege events are a marketing tool used to keep distributors involved in the business opportunity; the *Bostick* plaintiffs alleged the same thing.  *See, e.g.*, Dkt. 142-3, Exh. 2 at ¶¶ 32, 78, 159(a)-(b), 166, 175, 176, 178, 302(f); Dkt. 152 at Exh. A (comparing allegations between the two complaints).  Plaintiffs' purported emphasis on events is not enough to preclude the applicability of the *Bostick* settlement release.  *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 749 (9th Cir. 2006) ("While Plaintiffs seek to hold Defendants liable by positing a different theory of anti-competitive conduct, the price-fixing predicate . . . and the underlying injury are identical.").  At the pleading stage, Plaintiffs tried to distinguish *Bostick* by arguing that it primarily concerned the use of "lead generation" systems (Dkt. 151 at 16-17); but now, Plaintiffs allege the exact same thing: that their losses were caused by the failure of event speakers to disclose their use of "lead generation" systems.  Dkt. 202 at ¶¶ 28-29, 44-45.

## C.  Plaintiffs Have Not Proven the Existence of a Common Question.

Plaintiffs fundamentally misunderstand Rule 23(a)'s commonality requirement.  The motion *does not even identify* the purported questions of law or fact common to the class, instead making unsupported, broad-brush *conclusions* that "each event presented the same misinformation regarding how success could be achieved," and "each event contained the same intentional omissions."  Dkt. 207 at 13.  There is no "common contention" such that the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in

1    one stroke." *Dukes*, 564 U.S. at 350.

2        First, Plaintiffs offer no evidence that *any*—much less all (or even most)—of

3    the thousands of event speakers over the past ten years attained success through

4    illegitimate means *and* later misrepresented the basis for their success at an

5    Herbalife event.  Only a handful of the 44 Florida Defendants have been the subject

6    of disciplinary actions by Herbalife that even arguably relate to the so-called

7    "banned" practices alleged by Plaintiffs.  Domingo Decl. at ¶¶ 6-8.  Many of those

8    actions were instituted as a result of Herbalife's proactive efforts to identify and

9    remove potentially misleading information (*e.g.*, social media posts lacking income

10   disclaimers), and only *one* of them involved claims made by a speaker at an

11   Herbalife event.  *Id.*  In each instance, they faced appropriate discipline from

12   Herbalife.  *Id.*

13       Second, there is no evidence of a corporate policy or practice to promote false

14   event content.  Rather, Herbalife requires event speakers to substantiate their income

15   claims, and proactively takes steps to eliminate potentially misleading content.  *Id.*

16   at ¶¶ 5-7.  Herbalife's policy precludes the very misconduct Plaintiffs claim

17   Herbalife promoted.  *Willis v. City of Seattle*, No. 18-35053, 2019 WL 6442929, at

18   *2 (9th Cir. Nov. 29, 2019) ("Appellants notably do not point to a specific practice

19   that applies uniformly to all proposed class members.  Despite the broad allegations

20   in their complaint, there is no evidence that every Appellant has experienced the

21   same challenged practice or suffered the same injury.").

22       Third, Herbalife does not require distributors to present a uniform, scripted

23   message at either corporate or distributor-run events.[12]  Bogard Decl. at ¶¶ 15-16;

24   Gioiosa Decl. at ¶¶ 4-5; Concepción Decl. at ¶¶ 4-5.  Nor could it, since distributors

25

26   ───────────────
     [12]  Plaintiffs' reliance on a presentation stating there is a "standardized message that
     everything works, all [Daily Methods of Operation] work" cuts the other way.
27   Dkt. 207 at 15.  This suggests that the standardized message, if there is one, is that
     the Herbalife business opportunity may successfully be pursued in a number of
28   different ways, not that event attendance alone is the key to success.

1   are independent contractors.  Cooper Decl. at ¶ 2; *Dukes*, 564 U.S. at 355 (finding

2   that a policy of "allowing discretion" in connection with certain employment

3   practices is "just the opposite of a uniform employment practice that would provide

4   the commonality needed for a class action").  There is no evidence that event

5   presentations uniformly "contain statements . . . which draw a direct correlation

6   between events and financial compensation," let alone that Herbalife has a practice

7   of encouraging such statements.  Dkt. 207 at 8 (citing a single event presentation,

8   which states, "work event to event," and the testimony of a lone distributor that he

9   encourages event participants to "plug in").

10        Although Herbalife pays for certain distributors to speak at corporate events

11   and assists in the creation of event agendas and training materials, Plaintiffs do not

12   allege that any of this conduct is fraudulent.  In other words, the resolution of these

13   issues does not establish that class members "have suffered the same injury," nor are

14   these issues "central to the validity of each" of Plaintiffs' claims such that they can

15   be adjudicated in "one stroke."  *Dukes*, 564 U.S. at 349.

16       **D.**    **Plaintiffs Cannot Meet Rule 23(b)'s Stringent Predominance**

17             **Requirement.**

18        Plaintiffs' assertion that their claims will turn on "common proof" is not

19   enough to meet Rule 23(b)'s "demanding" predominance requirement.  Dkt. 207 at

20   18-22; *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (requiring courts to "take

21   a close look at whether common questions predominate over individual ones").

22   Under Rule 23(b)(3), "[i]f the main issues in a case require the separate adjudication

23   of each class member's individual claim or defense," then class treatment "would be

24   inappropriate."  *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1190 (9th

25   Cir. 2001), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001).

26        Here, there are several critical, dispositive factual and legal issues that would

27   have to be resolved on a class member-by-class member basis.  For example:

28         •   Did a given class member enter into a valid arbitration agreement with

Herbalife?  *See Conde v. Sensa*, No. 14-CV-51 JLS WVG, 2018 WL 4297056, at *11 (S.D. Cal. Sept. 10, 2018) (denying certification where "the Court will be forced to determine which of the class members may be subject to the arbitration provision," and "may have to analyze the legality of the arbitration clause").

- Did the events that a given class member attended each feature speakers who (a) previously engaged in illegitimate methods to achieve success, and (b) later failed to disclose their use of such methods?

- Was a given class member guaranteed success?  *See supra* Section II.C.4 (neither Plaintiffs nor their downline members received such guarantees). Was the guarantee only "implied," as in the case of Ms. Rodgers?  *Supra* Section II.C.4; *see Diediker v. Peelle Fin. Corp.*, 60 Cal. App. 4th 288, 297-98 (1998) ("An 'implied' assertion or representation is not enough" to establish fraud).

- To what extent did each class member rely on representations made by third parties?  *See supra* Section II.C.6; *see also, e.g.*, Dkt. 208 at ¶¶ 126, 129, 154 (alleging third-party distributor misconduct over social media, including in private messages).

- If class members intend to seek equitable relief from the contractual one-year statute of limitations, doctrines like the discovery rule "are by their very nature fact-intensive and highly individualized."  *Henson v. Fid. Nat. Fin. Inc.*, 300 F.R.D. 413, 421 (C.D. Cal. 2014); *see supra* Section II.C.5 (Ms. Rodgers found events valuable the entire time she attended them, but Valdez immediately found them useless in 2009).[13]

Further, Plaintiffs do not—as they must—propose a damages model, instead asserting only that, "records of ticket purchases, expenses, and event attendance will

---

[13]  To the extent RICO's four-year statute applies, when was a given class member on notice that she had suffered an injury?  *See Pincay*, 238 F.3d at 1109.

1  be used to calculate damages for each class member in the same way."  Dkt. 207 at

2  24; *see In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 367 (N.D. Cal.

3  2018) ("[T]he plaintiff bears the burden of providing a damages model showing that

4  'damages are susceptible of measurement across the entire class for purposes of

5  Rule 23(b)(3).'  The damages model 'must measure only those damages attributable

6  to' the plaintiff's theory of liability.") (quoting *Comcast*, 569 U.S. at 35).  Are

7  Plaintiffs seeking only the money they spent on tickets?  What about travel

8  expenses?  Or products purchased to "qualify" for certain event perks?  The motion

9  does not say.

10       A "close look" at each of Plaintiffs' claims confirms that Plaintiffs do not

11  come close to meeting the predominance requirement.  *Comcast*, 569 U.S. at 34.

12            **1.    Plaintiffs' RICO Claims Are Not Class Claims.**

13                 **a.    Plaintiffs Have Not Established a Fraudulent Scheme**

14                 **That Can be Proven on a Classwide Basis.**

15       Unlike the cases on which Plaintiffs rely, here, there is no "script that was

16  required to be memorized" by event speakers, nor is there any claim that Herbalife

17  required "strict adherence to a specific method of hiding information [from] and

18  misleading" event-goers.  *In re First All. Mortg. Co.*, 471 F.3d 977, 991 (9th Cir.

19  2006).  *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 277

20  F.R.D. 586 (S.D. Cal. 2011) is instructive.  There, the court declined to certify

21  a civil RICO class for several reasons.  First, the plaintiffs, Countrywide borrowers,

22  failed to establish a duty to disclose "because there is no fiduciary relationship

23  between the parties."  *Id.* at 600 ("Determining whether a duty of disclosure arose

24  based upon what was said between parties is necessarily fact intensive.

25  Countrywide is entitled to explore what was said by whom, and when.").  So too

26  here.

27       Second, the alleged nationwide scheme was not "sufficiently supported by

28  evidence of standardized or uniform fraudulent conduct," because many of the class

members obtained their loans through independent brokers who were not required to follow a script; even as to Countrywide's loan officers, the script that they used did not contain any misrepresentations. *Id*. at 601. Here, there is no "script," let alone one that is tortious or that speakers are required to use (or did actually use) at events. *See supra* Sections II.C.1.a-b.

Third, because some of Countrywide's independent brokers and loan officers "did disclose loan risks," the Court concluded that "significant individual issues exist regarding the nature and scope of representations made to borrowers." *Id*. at 602. Likewise, here, whether a given class member (1) reviewed the SAGC (neither Rodgers nor Valdez did), (2) understood that Herbalife makes no guarantee as to financial success, (3) heard the cautionary advice presented at events (Ribalta did not), or (4) was exposed to income claims without an accompanying disclaimer are all issues subject to individualized proof. *See supra* Section II.C.

### b.       The Causation and Damages Inquiries under RICO Preclude Certification.

A civil RICO plaintiff "is required to show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well." *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010). Proximate causation cannot be proven on a classwide basis here. First, proximate causation cannot be found "where, as here, there is more than one logical explanation for" a given class member's decision to attend an event. *Countrywide*, 277 F.R.D. at 604. Plaintiffs (and their downline members) attended events for reasons other than representations made by Herbalife, including representations made by their upline members, and because they found events to be inspiring, enjoyable, and a valuable networking opportunity. *See supra* Sections II.C.3-5.

Second, because the class is defined as those who attended events "in pursuit of Herbalife's business opportunity" (Dkt. 207), implicit in Plaintiffs' RICO claims is that they did not make enough money to recoup their event-related expenses. The

Court must therefore analyze the proximate causation issue with reference to a given class member's "net loss[es]" rather than her "expenditures." *Doe v. Trump Corp.*, 385 F. Supp. 3d 265 (S.D.N.Y. 2019).[14]  Any number of factors could have caused a given class member—including Plaintiffs—to suffer a loss, including her sales skills, the extensiveness of her network, her ability to recruit others to pursue the business opportunity, the local market for Herbalife product, or the mismanagement of their finances. *Trump Corp.*, 385 F. Supp. 3d at 280; *see supra* Section II.D.

For the same reasons, damages under RICO are not susceptible to class treatment, since each class member would need to segregate any losses proximately caused by Herbalife's alleged conduct from other causes. *See Hemi*, 559 U.S. at 13 (2010) ("[T]he compensable injury flowing from a [RICO] violation . . . necessarily is the harm caused by [the] predicate acts."); *Trump Corp.*, 385 F. Supp. 3d 280 (providing an illustration of how two class members who invested the same amount in the business opportunity could have suffered different net losses under RICO). Plaintiffs have not met their burden of proposing a model that deals with these manifest issues. *See Comcast*, 569 U.S. at 35 ("If the [damages] model does not even attempt to" measure only those damages "attributable" to the theory of liability, "it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).").

## 2. Plaintiffs' Negligent Misrepresentation Claim Cannot Be Proven on a Classwide Basis.

Plaintiffs give their negligent misrepresentation claim short-shrift, asserting only that it "will turn on the issue of whether or not Herbalife had any reasonable grounds to believe that its repeated statements regarding the Circle of Success were true." Dkt. 207 at 22-23.  It is not clear what "statements" Plaintiffs are referring to, nor is there evidence that any such statements were made uniformly across the

---

[14]  *See* Dkt. 208 at 14-17 for a more in-depth treatment of this issue.

proposed class.  Further, as noted above, class treatment of this claim would result in numerous mini-trials centered on issues of reliance and causation.  *See supra* Section III.D; *see also* Dkt. 202 at ¶¶ 102, 103, 105, 107, 109 (Plaintiffs do not allege that that they relied on Herbalife's benign representations); *Castro Valley Union 76, Inc. v. Vapor Sys. Techs., Inc.*, No. C 11-0299 PJH, 2012 WL 5199458, at *11 (N.D. Cal. Oct. 22, 2012) ("[C]ommon issues do not predominate with regard to the negligent misrepresentation claim, as it will require an individualized inquiry into, for example, what verbal or written representations were made to the members of the class, when those representations were made, and whether the class members relied on them.").

Further, under California law, a tort victim generally can recover only her "out-of-pocket" loss, *i.e.*, "the difference in actual value at the time of the transaction between what the plaintiff gave and what he received."  *All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1240 (1995).  Plaintiffs' "damages model" does not account for the fact that some of the Plaintiffs found events valuable, and that some corporate event attendees received food and/or entertainment.  *Supra* Sections II.C.1, 5.

### 3.   Plaintiffs' UCL Claim Is Not Suitable for Classwide Adjudication.

Plaintiffs' UCL claim is premised on the same alleged predicate acts and misrepresentations that form the basis for their RICO and negligent misrepresentation claims, respectively, and therefore cannot be adjudicated on a classwide basis for the same reasons discussed above.  *See* Dkt. 202 at ¶¶ 237-239; *Campion v. Old Republic Home Prot. Co.*, 272 F.R.D. 517, 536 (S.D. Cal. 2011) ("Where a class of consumers may have seen all, some, or none of the advertisements that form the basis of a plaintiff's suit, an inference of common reliance or liability is not permitted" in connection with a UCL claim); *Kaldenbach v. Mut. of Omaha Life Ins. Co.*, 178 Cal. App. 4th 830, 849–50 (Cal. Ct. App. 2009)

1  (affirming denial of certification of UCL claim where insurance company's agents

2  "were not required to attend training or utilize any given sales materials," "[a]gents

3  were not required to adhere to a scripted sales presentation," and therefore "the

4  viability of a UCL claim would turn on inquiry into the practices employed by any

5  given independent agent.").

6       Further, Plaintiffs do not propose a restitutionary damages model.  Any such

7  model would need to account for, *inter alia*, the value class members received from

8  events and their reliance on third-party representations in attending such events.  *See*

9  *Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 339 (1998) (the UCL "operates only to

10  return to a person those *measurable amounts* which are *wrongfully taken* by means

11  of an unfair business practice") (emphasis in original).

12      **E.**     **Plaintiffs Have Not Established the Superiority of a Class Action.**

13       Rule 23(b)(3) identifies four factors that courts must consider in evaluating

14  whether class adjudication is superior to other available methods:  (1) "the class

15  members' interests in individually controlling the prosecution or defense of separate

16  actions;" (2) "the extent and nature of any litigation concerning the controversy

17  already begun by or against class members;" (3) "the desirability or undesirability of

18  concentrating the litigation of the claims in the particular forum;" and (4) "the likely

19  difficulties in managing a class action."  At least three of these factors militate

20  against class certification here.

21       First, Plaintiffs have not established that members of the putative class have

22  an interest in adjudicating their potential claims on a classwide basis.  Three of the

23  named plaintiffs seek damages in excess of $10,000.  Dkt. 202 at ¶¶ 174, 193; *see*

24  *Zinser*, 253 F.3d at 1180 ("[T]he *minimum* amount alleged to be in controversy for

25  each putative class member does not argue persuasively for class certification.")

26  (emphasis in original).  Further, two of the original plaintiffs whose claims were

27  compelled to arbitration (but nevertheless are included in the class definition here)

28  already are pursuing arbitrations against Herbalife.  Panchapakesan Decl. at ¶ 6.

Second, Herbalife's 2016 settlement with the FTC precludes a finding of superiority. *Kamm v. California City Dev. Co.*, 509 F.2d 205, 212 (9th Cir. 1975) is instructive. There, the Ninth Circuit affirmed the dismissal of a class action because the California Attorney General had settled an action with some of the defendants, securing restitution for a portion of the class and injunctive relief. *Id.* at 207-208, 210-12. Despite the fact that not all of the class members benefited from the settlement, the Court found that the superiority requirement had not been met because, (1) "significant relief" had been achieved through the settlement; (2) resolution of the class action would duplicate some of the work conducted in the prior case and would "prove costly" to the defendants; (3) plaintiffs were not precluded by the settlement from bringing their own separate claims; and (4) the court that approved the settlement retained jurisdiction. *Id.* at 211-12; *see also Conde v. Sensa*, No. 14-CV-51 JLS WVG, 2018 WL 4297056, at *16 (S.D. Cal. Sept. 10, 2018) (finding lack of superiority where prior FTC settlement concerned similar false advertising allegations).

Each of the factors identified in *Kamm* applies here. First, the FTC reports that is has paid 350,000 distributors (each of whom was a distributor during the class period) an average of about $500 each. RJN, Exh. B. The settlement also enjoins Herbalife from engaging in the same conduct Plaintiffs allege here. *Id.*, Exh. A at 14-16. Second, class adjudication would duplicate the FTC's efforts. The FTC action broadly addressed representations made by Herbalife about its business opportunity, including event-related conduct. *See* Dkt. 1 at ¶¶ 18-25, 62. Indeed, Plaintiffs admit that the very "banned" methods at the heart of their complaint are "banned" because of Herbalife's settlement with the FTC. *Id.* at ¶ 33, 36. Third, the settlement does not preclude Plaintiffs from bringing individual claims. Fourth, the Court retains jurisdiction over the settlement. *Id.*, Exh. A at 29.

Plaintiffs' allegations admittedly are subsumed by the FTC action, which accordingly bars a finding of superiority. *Kamm*, 509 F.2d at 212; *Murray v.*

*DirecTV, Inc.*, No. ML 09-2093, 2014 WL 12597904, at *3 (C.D. Cal. Apr. 23, 2014) ("The primary difference . . . is that the AG Judgment covers a broader swath of alleged violations and seeks remedies that a class action could not.  To the extent the AG Judgment does not go as far as the class action, Plaintiff hasn't demonstrated that these differences are great enough to render a class action superior.").

Lastly, classwide adjudication of Plaintiffs' claims would be unmanageable because, as noted above in Section III.D.2, it would result in numerous mini-trials on key legal and factual issues.  *Zinser*, 253 F.3d at 1192 ("If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'").

### F.    Plaintiffs Do Not Meet the Typicality and Adequacy Requirements.

Plaintiffs fail to meet the remaining requirements of Rule 23(a) for several reasons.  First, none of them signed arbitration agreements, but the majority of proposed class members did.  *See Tan v. Grubhub, Inc.*, No. 15-CV-05128-JSC, 2016 WL 4721439, at *3 (N.D. Cal. July 19, 2016) ("[C]ourts have . . . found typicality and adequacy of representation to be lacking where the lead plaintiff was not subject to the same arbitration provisions as unnamed plaintiffs.").

Second, the Rodgers and Valdez are subject to the *Bostick* release and would be preoccupied with defending against it.  *See supra* Section B.  Third, each of the named Plaintiffs would be subject to unique causation defenses because their alleged losses were caused by individualized reasons, and they admit to having relied on the representations of third parties.  *See supra* Sections II.C.6, II.D.  Fourth, notwithstanding the one-year statute of limitations applicable to all class members, Valdez' claims are time-barred because she concluded that events were valueless by 2009, *eight years* before the complaint was filed.  *Supra* Section II.C.4; *see Lindblom v. Santander Consumer USA, Inc.*, 2018 WL 573356, at *5 (E.D. Cal. Jan. 26, 2018) ("[C]ourts in this Circuit routinely preclude potentially time-barred plaintiffs from serving as class representatives when they seek to represent members

1    with timely claims.").

2          Fifth, Ribalta's experience as a GET member, one of the highest levels of

3    Herbalife's marketing plan, is not typical of the class; she qualified for special

4    events others could not attend.  *See Supra* Section II.C.1.b.  Sixth, each of the

5    named Plaintiffs may be subject to cross-claims by their downline members for their

6    own promotion of events, thereby raising "conflicts of interest" between them and

7    other class members.  *See supra* Section II.C.3; Ribalta Depo. Tr. at 231:6-13

8    (Ribalta admitted she was part of the "problem"); *Staton v. Boeing Co.*, 327 F.3d

9    938, 957 (9th Cir. 2003).  Seventh, given Mr. Rodgers' serious health condition, he

10   is not in a position to "prosecute the action vigorously on behalf of the class[.]"

11   *Staton*, 327 F.3d at 957; Rodgers Depo. Tr. at 247:17-248:5, 248:17-249:5.  He is

12   the only named Plaintiff who purports to represent the spouses of distributors.

13         **G.     Proposed Class Counsel Is Inadequate under Rule 23(a)(4).**

14         Plaintiffs cannot satisfy this requirement because their counsel improperly

15   solicited them to participate in this putative class action.  *See* Kehr Rpt.; *Victorino v.*

16   *FCA US LLC*, 322 F.R.D. 403, 408-09 (S.D. Cal. 2017) ("Counsels' unethical

17   conduct, both before and during the litigation in question, is relevant to determining

18   whether counsel is adequate under Rule 23.").  Counsel have also failed to identify

19   the necessary *personal* expertise and experience to serve as adequate class counsel.

20   *See* Dkt. 207-9; *Healey v. Murphy*, No. 01-11099, 2009 WL 6613209, at *10 (D.

21   Mass. Jan. 14, 2009) (holding Rule 23(a)(4) was not satisfied because "counsel

22   well-versed in class action litigation is needed").

23   **IV.    <u>CONCLUSION</u>**

24         For the foregoing reasons, Herbalife respectfully urges the Court to deny

25   Plaintiffs' Motion for Class Certification.

26

27

28

1 DATED:  December 20, 2019   Respectfully submitted,

2

3               Mark T. Drooks
                 Paul S. Chan

4               Gopi K. Panchapakesan
                 Jonathan M. Jackson

5               Bird, Marella, Boxer, Wolpert, Nessim,
                 Drooks, Lincenberg & Rhow, P.C.

6

7

8              By:   */s/ Mark T. Drooks*
                    Mark T. Drooks

9               Attorneys for Defendant Herbalife
                International of America, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**Attachment A**

# There Is No Viable Class

## *Lavigne, et al. v. Herbalife Ltd., et al.*

**Attachment B**
**Excerpts from Herbalife Event Videos**

| Event | Speaker | Statements |
|-------|---------|------------|
| 2011 Extravaganza (Las Vegas) | Frank Lamberti (then VP of Finance at Herbalife) | • "When we receive inquiries from agencies around the world, when the practices in the field are different than the rules, it really weakens us and puts us in a vulnerable position.  When we have distributors who are new and excited, making exaggerated product claims or exaggerated business claims, saying they can make a million dollars, you know, first year working part time, not only does it not sound credible, but it can get us in a lot of trouble. So, we have to make sure that the practices in the field are consistent with the rules so that we are in the most defensible position when those inquiries come."  Declaration of Bob Bogard ("Bogard Decl."), Exh. A at 4:24-5:12. |
| 2013 Extravaganza (Las Vegas) | Mary Holloway | • "Anything that we talk about, any statements, any statistics, direct quotations . . . other information that we use to promote the products and the business, it's always got to be correct and we have to be able to substantiate it. We just can't throw it out there, okay.  You can't have heard something maybe at an STS from somebody and decide that, oh, this is something I can just go share with everybody.  Not necessarily, okay.  We have to talk about things that we can substantiate."  Bogard Decl., Exh. B at 26:22-27:7. |
| 2014 Leadership Development Weekend (Daytona) | Michael Johnson (CEO, Herbalife) | • "Today you're also going to meet members who have chosen to work the Herbalife business opportunity.  Incomes can vary from person to person.  Some choose to work our business part-time, while others embrace the Herbalife opportunity on a full-time basis.  As in any business, your success depends on your consistent effort, your hard work, and of course, your skills. For more information, a statement of average gross compensation has been posted in this room |

**Attachment B**
**Excerpts from Herbalife Event Videos**

| Event | Speaker | Statements |
|-------|---------|------------|
| | | for you to review.  It shows how much is paid by Herbalife to our members and our distributors.  The statement can also be found in the Business Opportunities section of StartHerbalife.com." Bogard Decl., Exh. C at 3:2-17. |
| 2014 Extravaganza (Chicago) | Leslie Stanford | • "[Y]ou want to have a daily method of operation, a plan for getting retail customers, a plan for sponsoring new members, and then a plan for how you're going to train those people."  Bogard Decl., Exh. D at 8:25-9:7.<br><br>• "So ask yourself who are you accountable to?  Find somebody that you want to commit to sharing those gauges, give them permission to hold you accountable for what you say you want to do." *Id*. at 10:25-11:3.<br><br>• "[Y]ou really need to put together a budget where you have all the things that you're going to spend money on listed on the money out category so that you know in advance if your money in is going to cover that." *Id*. at 26:17-28:18 (discussing budgeting tools and categories of expenses, including taxes).<br><br>• "Don't live beyond your means.  Debt is a bad thing.  I mean, some debt you can use wisely, like a mortgage, a low-cost mortgage.  Right now it's great. But don't go into debt to buy things that you don't need.  If you have credit card debt it's very expensive, that debt.  Pay it off first, get rid of credit card debt." *Id*. at 31:24-32:5. |
| 2014 Extravaganza (Chicago) | Carol Rosenau | • During a training session regarding the making of income claims, Rosenau stated that such claims "must always be factually true and stated in a manner that is not misleading, must be supported."  Bogard Decl., Exh. E at 14:14-20 |

**Attachment B**
**Excerpts from Herbalife Event Videos**

| Event | Speaker | Statements |
|---|---|---|
| | | (also noting that income claims should always be accompanied by a disclaimer).<br><br>• "But we . . . don't want to say things to people . . . that would be misleading, or stuff like, you know, 'oh, it's just--it's all a number's game,' or you know, tell them that they don't have to work hard, or anything like that. Because building a group of customers and training your downline requires hard work and you always want to emphasize that when you talk about the opportunity." *Id.* at 16:20-17:5. |
| 2017 Future President's Team Retreat (San Antonio) | Jill Addy | • "[O]bviously all of our incomes have to be accurate.  You guys are honest, good people for us trying to do accurate testimonials . . . . [I]f your income exceeds $100,000, . . .  the way we'd like for you to explain that or share that number is by saying you have a high or substantial income." Bogard Decl., Exh. F at 38:18-39:5.<br><br>• Noting that when presenting testimonials at an Herbalife Opportunity Meeting, distributors must tell the audience:  "[W]e want you to have reasonable expectations about running a business and what you can expect to earn as you start your Herbalife business.  Most people join because they love the products and want to sell them to make extra income.  Some distributors sponsor others and typically make $300 per year from sales by people they sponsor.  Distributors also earn from retail sales, and it varies greatly depending on how many customers they have. Others can join and build a larger organization, and you'll hear from some of them today." *Id.* at 44:8-20. |