1  Mark T. Drooks – State Bar No. 123561
       mdrooks@birdmarella.com
2  Paul S. Chan – State Bar No. 183406
       pchan@birdmarella.com
3  Gopi K. Panchapakesan – State Bar No. 279586
       gpanchapakesan@birdmarella.com
4  Jonathan M. Jackson – State Bar No. 257554
       jjackson@birdmarella.com
5  BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
   DROOKS, LINCENBERG & RHOW, P.C.
6  1875 Century Park East, 23rd Floor
   Los Angeles, California 90067-2561
7  Telephone: (310) 201-2100
   Facsimile: (310) 201-2110
8
   Attorneys for Defendant Herbalife
9  International of America, Inc.

10

11            **UNITED STATES DISTRICT COURT**

12   **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

13

| | |
|---|---|
| 14  MICHAEL LAVIGNE, *et al.*, | CASE NO. 2:18-cv-07480-JAK (MRWx) |
| 15      Plaintiffs, | **EXPERT REPORT OF ROBERT L. KEHR IN SUPPORT OF HERBALIFE'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| 16      vs. | |
| 17  HERBALIFE LTD., *et al.*, | |
| 18      Defendants. | Date:    February 10, 2020 |
| 19 | Time:    8:30 A.M. |
| | Crtrm.:  10B |
| 20 | Assigned to Hon. John A. Kronstadt |

21

22

23

24

25

26

27

28

3623225.1

# EXPERT REPORT OF ROBERT L. KEHR

**1**      I am providing this Expert Report at the request of Bird Marella Boxer Wolpert Nessim Drooks Lincenberg Rhow, P.C., attorneys for the Herbalife defendants in the putative class action brought by Rodgers, *et al.* I have been asked to state my opinions on whether the lawyers representing the putative class are governed by advertising and solicitation standards in their seeking class members and representatives, and if so whether their conduct provides a basis for their disqualification or other court response. Section 2 of the Report and the attached Exhibit "A" together describe my qualifications, and the attached Exhibit "B" identifies the materials I have reviewed in arriving at my opinions. Any assumptions that contributed to my opinions are stated explicitly in Section 4 of this Report. My opinions are mine alone and are based on my independent review of materials. This Declaration is based on the information so far known to me and might be supplemented if additional information later becomes available.

**2**      **My qualifications**. I have been asked to provide this Report because of my long-standing involvement with the professional responsibility of lawyers, which includes chairing the Professional Responsibility and Ethics Committee of the L.A. County Bar Assn., chairing the Standing Committee on Professional Responsibility and Conduct of the State Bar of California, serving as a member of the State Bar Commissions that over a number of years drafted California's new Rules of Professional Conduct (effective as of November 1, 2018), and serving as an Adjunct Professor of Law at Loyola Law School teaching subjects that include the professional responsibilities of lawyers.

**3**      **Introduction regarding choice of law.** Choice of law issues are fairly common in determining the standards applicable to lawyers because lawyers often work in cooperation with lawyers licensed in different jurisdictions, and because lawyers

frequently are engaged in conduct that affects person and events in other jurisdictions. A lawyer who appears of record in litigation universally is required to agree to conform to the Rules of Professional Conduct in effect in that jurisdiction. Because the events underlying this Expert Report related to the filing of a lawsuit in Florida, my analysis begins with Florida's Rules of Professional Conduct, but it is possible that the Ohio or California Rules also might apply because Jason Jones is an Ohio lawyer and presumably was located in Ohio when some of the challenged conduct occurred, and because the putative class action now is pending in California. Unfortunately the Florida choice of law Rule, Fl. Rule 4-8.5, is particularly unhelpful. It states in full: "A lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction although engaged in practice elsewhere." The accompanying Florida Comment says only that conflict of law principles might apply in some situations but says nothing about the substance of those principles. It is my view that, in the absence of any Florida guidance, the choice of law standards are correctly set out in ABA Model Rule 8.5(a) and the identical Ohio and California rules bearing the same number. They state:

> (b) Choice of Law. In any exercise of the disciplinary authority of Ohio, the rules of professional conduct to be applied shall be as follows:
>
>> (1) for conduct in connection with a matter pending before a tribunal, the rules of the jurisdiction in which the tribunal sits, unless the rules of the tribunal provide otherwise;
>>
>> (2) for any other conduct, the rules of the jurisdiction in which the lawyer's conduct occurred, or, if the predominant effect of the conduct is in a different jurisdiction, the rules of that jurisdiction shall be applied to the conduct. A lawyer shall not be subject to discipline if the lawyer's conduct conforms to the rules of a jurisdiction in which the lawyer reasonably believes the predominant effect of the lawyer's conduct will occur

Based on my assumption that all of the questioned lawyer conduct occurred for purposes

of the filing of the original federal court lawsuit in Florida, it is my opinion that the Florida Rules of Professional Conduct govern here. For reasons explained by the Florida Supreme Court,[1] the pertinent Rule, numbered as Rule 7.3 in most jurisdictions is numbered in Florida as Rule 4-7.18. However, it is the substantive equivalent of Model Rule 7.3 (and the identically numbered California and Ohio Rules). Because the Florida Rule is considerably more extensive and detailed than either the Model Rule or those in other jurisdictions, because it is possible to address the questioned lawyer conduct without going into Florida's elaborations and because the case law generally uses the Model Rule numbering, I will use the Model Rule numbering in the balance of this Report.

**4** **My opinions.** My opinions are based on assumptions stemming from deposition testimony provided by Jennifer Ribalta, Patricia Rodgers, and Izaar Valdez; the deposition extracts on which I have relied are attached as Exhibit "C" to this Report. Each one testified that they first were contacted about being a member of the putative class or class representative when each received a soliciting telephone call. Ms. Ribalta testified that this initiating contact was from Jason Jones and that she had no prior relationship with him. Ms. Rodgers testified that her initiating call was from a woman who she did not believe to be a lawyer but an agency, and that she then was contacted by Jason Jones with whom she had no prior relationship. Ms. Valdez testified she was introduced to Jason Jones by her father, Felix Valdez; Mr. Valdez was a member and was a representative of the putative class when the action was filed. On this basis, I assume for purposes of this Expert Report that Mr. Jones either directly or indirectly contacted at least two members and representatives of the putative class through direct person-to-person communication, plus Mr. Valdez unless Mr. Jones' communications with him are

---

[1]available at: https://www.floridasupremecourt.org/content/download/421522/4555521/sc11-1327.pdf#search=SC11-1327

shown to have been proper and Ms. Valdez unless her father is show to have acted independently of Mr. Jones.[2]

    **4.1**    **Rule 7.3.**  The starting point for any inquiry about a lawyer's solicitation is Rule 7.3.  That Rule, in Florida and elsewhere, generally prohibits solicitation.  Florida Rule 4-7.18(a)(1) is substantively the same as the Model, California, and Ohio Rules 7.3 in using the following definition: "The term 'solicit' includes contact in person, by telephone, by electronic means that include real-time communication face-to-face such as video telephone or video conference ...."  The key to this definition is that advertising rules recognize an essential difference between static advertising, such a billboards, newsletters, radio and television advertising and so on, and person-to-person communications.  Static forms of advertising permit a potential client to make a measured decision about legal representation while person-to-person communications could permit a lawyer or a lawyer's representative to utilize professional skills, experience, and status to intrude on and hurry a potential client's decision-making.  The Florida and comparable Rules elsewhere apply only when there is "no family or prior professional relationship."[3]

    **4.2**    **Rule 7.3 applies to class actions**.  The starting point in analyzing this issue is ABA Formal Op. 07-445 (2007).  It concludes that "if ... plaintiffs' counsel's goal is to seek to represent the putative class member directly as a named party to the action or otherwise, the provisions of Rule 7.3, which governs lawyers' direct contact with prospective clients, applies."  The reason is that absent class members then are not considered to be clients of putative class counsel, and "[t]he fact that an action has been filed as a class action does not affect the policies underlying Rule 7.3 that prohibit the

---

    [2]The prohibition in Florida Rule 4-7.18(a)(1) applies to solicitations by a lawyer and also those by a lawyer's employee or agent.

    [3]The quoted words are taken from Florida Rule 4-7.18(a)(1).  Model Rule 7.3(b)(2) similarly applies only when there is no "family, close personal, or prior business or professional relationship" with the lawyer or law firm (California and Ohio use this same Model Rule phrase in their versions of Rule 7.3).  The language differences are not pertinent here.

types of contact with prospective clients that have serious potential for overreaching and other abuse." This conclusion has been widely accepted. *See, e.g., Farrow v. Ammari of Louisiana, Ltd*, 2017 WL 2812930, at *10 (E.D. La. 2017); *Mendez v. Enecon Northeast Applied Polymer Sys., Inc.,* 2015 WL 4249219, at *3 (E.D.N.Y. 2015); *Spagnuoli v. Louie's Seafood Rest., LLC*, 20 F. Supp. 3d 348, 358 (E.D.N.Y. 2014); *Johnson v. Bankers Life & Cas. Co.*, 2013 WL 5442374, at *2, n.1 (W.D. Wis. 2013); and *Berndt v. California Dep't of Corr.,* 2010 WL 5209384, at *2, n. 6 (N.D. Cal. 2010).[4]

    **4.3**     **Class action consequences of a Rule 7.3 violation.** Just as there is no question that Rule 7.3 applies to the conduct of a lawyer for a putative class, there is no question that courts have a variety of remedies available for use when the putative class lawyer violates Rule 7.3. *See, e.g., Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 498-99 (7th Cir. 2013) (recognizing that a Rule 7.3 violation by putative class counsel can result in the denial of certification); *Edwards v. First Am. Corp.*, 289 F.R.D. 296, 302 (C.D. Cal. 2012) (to the same effect); *Bennett v. Advanced Cable Contractors, Inc.*, 2012 WL 1600443, at *11 (N.D. Ga. 2012) (finding a Rule 7.3 violation as to two Plaintiffs who opted in to the class after prohibited communications and requiring that they file renewed Consent Forms to join the case); *Hamm v. TBC Corp.*, 597 F. Supp. 2d 1338, 1353 (S.D. Fla. 2009) (lawyers' telephone solicitation of opt-in plaintiffs before certification violated Rule 7.3, and court barred the lawyers from representing any future opt-in client not directly associated with the named plaintiffs); *Kaufman v. Am. Family Mut. Ins. Co.*, 2008 WL 1806195, at *5 (D. Colo. 2008) (finding telephonic potential class member solicitation violated Colorado Rule 7.3 and protective order and, after considering that the purposes of discovery sanctions include "deterring

---

[4]*Cf. Kennedy v. United Healthcare of Ohio, Inc*., 206 F.R.D. 191 (S.D. Ohio 2002) has language to the contrary, but it uses "solicit" only in the sense of "seek" and without reference to Rule 7.3 or its policy concerns. I do not disagree that a lawyer may use advertising to seek class members and representatives so long as the advertising complies with Rule 7.1.

future litigation abuse, punishing present litigation abuse, compensating victims of litigation abuse, and streamlining court dockets and facilitating case management" (*Id.* at *7), denying class certification, ordering Plaintiff's counsel to pay the legal fees and costs incurred by Defendant for the depositions of the claimants contacted by Plaintiff's counsel and preparation of the Motion for Sanctions and reply brief (*Id.*) and referring Plaintiff's counsel to the Court's Committee on Conduct (*Id.* at *6), among other things); and *Cavallaro v. U. Mass Mem'l Health Care Inc.*, 2010 WL 3609535, at *6 (D. Mass. 2010) (commenting that a facially-valid opt-in consent might prove to be invalid if it was the product of unethical solicitation).

**5      Conclusion.** It is my opinion that Mr. Jones repeatedly violated Rule 7.3 - Florida Rule 4-7.18 - through in-person solicitations of potential class members and representatives.  These violations can have civil as well as disciplinary consequences that include, among other things, rejection of class status.  The consequences are within the court's discretion based on the evidence provided to it, and as an expert witness I do not comment on the ultimate result in this situation.


December 12, 2019.

_____

Robert L. Kehr

**EXHIBIT "A"**

ROBERT L. KEHR - Cornell University (B.A., 1966); Columbia University (J.D., 1969); Member:  California State Bar Commission for the Revision of the Rules of Professional Conduct (2005-2017); California State Bar Standing Committee on Professional Responsibility and Conduct (Member: 1996-2001, Chair, 1999-2000 and Special Advisor: 2000-01); Professional Responsibility and Ethics Committee of the Los Angeles County Bar Association (Member: 1981-Present and Chair: 1986-87); Evaluation of Professional Standards Committee of the Los Angeles County Bar Association (Member: 1988 - merged into PREC); Member:  American Law Institute; Member:  Association of Professional Responsibility Lawyers; Adjunct Professor - Loyola Law School; Author: "A Trial Lawyer's Guide to Rule 3.3" (to be published by the Litigation Section of the California Lawyers Assoc. in 2020); "The Troubled History of the Business Transactions Rule" - July/August 2019 issue of Los Angeles Lawyer; "The Lawyer as Director" - April 2018 Los Angeles County Bar Updates; "The Lawyer as Escrow Holder" - March 2018 Los Angeles County Bar Updates; "Lawyer Ethics in Real Estate Transactions" - ABA Probate & Property, Vol. 26, No. 2 (Mar/Apr 2012) (with Prof. Roger Bernhardt); "The Lawyer as Scrivener" - Los Angeles Lawyer (2011), Vol. 34, No. 6, p. 20; "Midcourse Corrections: Being Professionally Responsible in Property Transactions" - 34 CEB Real Property Law Reporter 123 (July 2011) (with Prof. Roger Bernhardt); "When a Lawyer-Mediator Prepares the Settlement Agreement" - ABA/BNA Lawyers' Manual on Professional Conduct (2011), Vol. 27, No. 12; "Principles or Rules:  What is the Best Approach to Regulation?" Los Angeles Daily Journal, August 12 and August 13, 2010; "Lawyer Error:  Malpractice, Fiduciary Breach, or Disciplinable Offense?" - 29 W.St.U.L.Rev. 235 (2002); "Update on Conflicts of Interest" - Los Angeles Lawyer (2000), Vol. 23, No. 4 p. 33; "Ruling on the Rules" - Los Angeles Lawyer (1998), Vol. 21 No. 4 p. 37; Peck & Kehr, "Ruling on the Rules" - Vol. 21 No. 4, p. 37 Los Angeles Lawyer (1998); "The Changing Law of Lease Assignments" - Real Estate Review, Vol. 11 No. 2 p. 54, (1981); "Lease Assignments:  The

Landlord's Consent" - 55 California State Bar Journal 108 (1980); "The Application of Green v. Superior Court to Non-Residential Realty" - 1 Los Angeles Lawyer 30 (1979). Arbitrator: Los Angeles County Bar Attorneys Fee Arbitration Committee, (1980-Present).

Currently practice limited to transactional matters and consultation and expert testimony concerning legal ethics and standard of care issues. Frequent lecturer on lawyer responsibilities.

Robert L. Kehr was a speaker or one of the panelists at the following programs:

1.      "Disclosure Pitfalls for Lawyers:  Partners, Brokers, and Other Fiduciaries in Real Estate Transactions."  This program was given under the auspices of the Real Estate Committee of the Los Angeles County Bar Association on May 18, 1995.

2.      "Breaking Up is Hard to Do:  Ethical Issues in Lateral Transfers and Law Firm Dissolutions." This program was given under the auspices of the Los Angeles County Bar Association Committee on Professional Responsibility and Ethics on June 22, 1995.

3.      "Engagement, Disengagement, and Non-Engagement Letters."  This program was given under the auspices of the Business Law Section of the State Bar of California as part of the annual spring program on June 23, 1995.

4.      "Managing Civil Conflicts of Interest In and Out of Court."  This program was given under the auspices of the Los Angeles County Bar Association on October 21, 1995.

5.      "Conflicts of Interest."  This program was sponsored by the California Continuing Education for the Bar on January 23, 1997.

6.      "The Application of Advertising & Solicitation Rules to the Internet". This program was sponsored by the Law Firm of Jackson & Lewis on March 18, 1997.

7.      "Recognizing and Avoiding Conflicts of Interest."  This program was presented to the Los Angeles Consumer Lawyers Association on July 10, 1997.

8.      "Recent Developments in Legal Ethics."  This program was presented to the California State Bar at its September 13, 1997 annual meeting.

9.      "Ethics Issues in Buying and Selling Businesses."  This program was presented by CLE International as part of a 2-day program on December 4, 1997.

10.      "Conflicts:  Traps and Consequences for Lawyer and Insurers."  This program was presented by the Assoc. of So. Cal. Defense Counsel on February 5, 1998

11.      "Legal Ethics in Land Use Matters".  This program was presented by CLE International on April 30, 1998.

12.      "Recent Developments in Professional Responsibility."  This program was presented to the California State Bar at its October 1-4, 1998 annual meeting.

13.      "What Every Lawyer Needs to Know About Conflicts of Interest."  This program was presented to the California State Bar at its October 1-4, 1998 annual meeting.

14.      "Ethics Issues in Buying and Selling Businesses."  This program was presented by CLE International as part of a 2-day program on February 26, 1999.

15.      "Methods for Identifying and Avoiding Conflicts."  This program was presented to the California State Bar at its October 2, 1999 annual meeting.

16.      "Conflicts of Interest."  This program was presented to the Sonoma County Bar Association on November 30, 1999.

17.      "Ethics Issues in Cutting Edge Fee Arrangements."  This program was presented at the Beverly Hills Bar Association on April 29, 2000.

18.      "The Ethics of Taking Stock for Services."  This program was presented at the Annual Statewide Ethics Symposium on June 17, 2000, at Western States University School of Law.

19.      "Methods for Identifying and Avoiding Conflicts."  This program was presented to the California State Bar at its September 2000 annual meeting.

20.      "Conflicts of Interest: An In-Depth Analysis for Corporate and Private Counsel."  This program was presented by PLI on December 14, 2000 (Los Angeles)

and January 12, 2001 (San Francisco).

21.    "Navigating the Ethical Maze of Elder Law, Estate Planning and Fiduciary Conflicts:  Practical Strategies both to Serve our Clients and Avoid Malpractice" which was presented to  the Beverly Hills Bar Association on May 30, 2001.

22.    "Non-Consensual Ethics Screening for Private Lawyers" which was presented at the Annual Statewide Ethics Symposium on June 16, 2001, at Western States University School of Law.

23.    "A Review of Fees, Fee Agreements, Fee Collections, Unconscionability, and Non-Standard Fee Arrangements" which was presented to the State Bar of California at its September 8, 2001 annual meeting.

24.    "The Going Rate:  Entertainment Economics by the Numbers" [legal ethics aspects] which was presented at the USC/Beverly Hills Bar Association 47th Annual Entertainment Law Institute on September 15, 2001.

25.    "Recognizing and Avoiding Conflicts of Interest" which was presented by CEB on November 7 (San Diego), November 17 (Costa Mesa), and December 8, 2001 (Los Angeles).

26.    "Conflicts of Interest:  An In-Depth Analysis for Corporate and Private Counsel" which was presented by PLI on December 14, 2001 (San Francisco) and January 11, 2002 (Los Angeles).

27.    "Legal Ethics 2002-2003 - Current Developments" which was presented by PLI (Los Angeles) on January 10, 2003.

28.    "The Role and Responsibility of Lawyers" which was presented at Pepperdine Law School, MDR program on January 21, 2003.

29.    "Ethics" which was presented at the 15th Annual Educational Conference of the California Alliance of Paralegal Association program on June 21, 2003.

30.    "Advanced Problems in Conflicts of Interest" which was presented at the Annual Statewide Ethics Symposium on June 28, 2003, at Whittier Law School, Costa Mesa.

31.     "Buying & Selling a Business" which was presented by Sterling Education Services on November 14, 2003 in Pasadena.

32.     "Legal Ethics - Current Developments" which was presented by PLI on January 9, 2004, in Los Angeles.

33.     "The Essentials of Legal Ethics:  The Lawyers' Responsibilities and Conflicts of Interest" which was presented by CLE International in Los Angeles on January 23, 2004.

34.     "The Role and Responsibility of Lawyers" which was presented at Pepperdine Law School, MDR program on February 2, 2004.

35.     "An Attorney's Duties to the Court and Opposing Counsel" which was presented by Consumer Attorneys of Los Angeles Annual Las Vegas Convention on August 29, 2004.

36.     "Legal Ethics - Current Developments" which was  presented by PLI on January 14, 2005, in Los Angeles.

37.     "The Ethics of Referral Fees" which was presented by the Southern California Council of Elder Law Attorneys on February 9, 2005.

38.     "The Role and Responsibility of Lawyers" which was presented at Pepperdine Law School, MDR program on March 2, 2005.

39.     "Relationship Agreements" which was presented by The Seminar Group on March 4, 2005, in Los Angeles.

40.     "Ethics and Conflict of Interest" which was presented at The Family Law Study Group on May 10, 2005, in Los Angeles.

41.     "Legal Ethics for Real Estate Attorneys" which was presented by the Los Angeles County Bar Association and the American Bar Association on December 7, 2005, in Los Angeles.

42.     "The Work of the Commission for the Revision of the Rules of Professional Conduct" which was presented at the Annual Statewide Ethics Symposium on May 6, 2006, at Santa Clara Law School.

43.     "Legal Ethics in ADR" which was presented at the ADR conference at Pepperdine Law School on May 20, 2006.

44.     "Legal Ethics Issues of the California Environmental Quality Act" which was presented by CLE International on August 14, 2006, in Los Angeles.

45.     "Legal Ethics" which was presented by CEB on November 18, 2006, in Anaheim and December 9, 2006, in Los Angeles.

46.     "Ethical Issues for Business Lawyers" which was presented by the California Bankers Association's Bank Counsel Seminar on March 30, 2007, in Dana Point, California.

47.     "Ethics Update: The Latest Recent Developments and Proposed New Rules from the California Rules Revision Commission" which was presented by CEB on November 16 and December 8, 2007 in Anaheim and Los Angeles.

48.     "Potpourri of Ethics: Conflicts and Updates on Important Developments" which was presented by the Beverly Hills Bar on November 30, 2007, in Beverly Hills.

49.     "Residential Landlord-Tenant Law" (legal ethics aspects) which was presented by Sterling Education Services on March 27, 2008, in Santa Monica.

50.     "Nuts and Bolts of Ethics" which was presented by The California Political Attorneys Association on September 6, 2008, in Universal City.

51.     "What Every Lawyer Needs to Know About the Upcoming Changes to the Rules of Professional Conduct" which was jointly sponsored by the Rules Revision Commission and the Inns of Court and was presented at the State Bar Convention on September 25, 2008, in Monterey, California.

52.     "Ethics Update: The Latest Recent Developments and Proposed New Rules from the California Rules Revision Commission" which was presented by CEB on December 5, 2008, in Los Angeles.

53.     "Re-Forming the California Rules of Professional Conduct" which was presented at the State Bar 13th Annual Ethics Symposium on May 2, 2009, in San Diego.

54.     "Ethics Update 2010:  Recent Developments and Proposed New Rules

from the California Rules Revision Commission" which was presented by CEB on January 15, 2010 in Orange County and on January 29, 2010, in Los Angeles.

55.    "Criminal Defense and the New Rules of Professional Conduct" which was presented by the Los Angeles County Bar Association on January 16, 2010, in Los Angeles.

56.    "The ABCs of Conflicts of Interest" which was presented in Temecula, California on January 30, 2010.

57.    "Landlord-Tenant Law Update" which was presented by Sterling Education Services in Pasadena on June 17, 2010.

58.    "Attorney Fee Agreements & Fee Disputes:  Basics and Recent Developments" which was presented by CEB in Los Angeles on August 20, 2010.

59.    "The Proposed New California Rules of Professional Conduct" which was presented by BNA on November 11, 2010 as a webinar.

60.    "Ethics Update 2011:  Recent Developments and Proposed New Rules from the California Rules Revision Commission" which was presented by CEB on January 21, 2011 in Orange County and on January 28, 2011, in Los Angeles.

61.    "Foreshadowing:  California's New Proposed Rules of Professional Conduct" which was presented by California Society for Healthcare Attorneys on April 10, 1011 in Los Angeles.

62.    "The Proposed New California Rules of Professional Conduct" which was presented by BNA on October 19, 2011 as a webinar.

63.    "A Selected Introduction to Contingency Fees, Non-Refundable Fees, and Lawyer-Client Business Transactions" which was presented on November 30, 2011 as an in-house seminar at King, Holmes, Paterno & Berliner, LLP in Los Angeles.

64.    "Advance Consents to Conflicts of Interest" which was presented on December 3, 2011 by the Los Angeles County Bar Association in Los Angeles.

65.    "Ethics Update 2012:  Recent Developments and Proposed New Rules from the California Rules Revision Commission" which was presented by CEB on

-13-

January 20, 2012 in Orange County and on January 27, 2012, in Los Angeles.

66.     "Transactional Conflicts of Interest" which was presented to USC Law School LLM students on February 6, 2012.

67.     "Navigating Common Ethical Dilemmas," which was presented on May 17, 2012 by the Los Angeles Paralegal Association at Abraham Lincoln University School of Law in Los Angeles.

68.     "The No-Contact Rule:  Up Close and Personal," which was presented on May 19, 2012 at the State Bar's Statewide Ethics Symposium to be held at Hastings School of Law.

69.     "Attorney-Client Privilege" which was presented on June 13, 2012 by the Kern County Bar Association at the Petroleum Club in Bakersfield, California.

70.     "Ethics for Criminal Defense Lawyers" which was presented on August 30, 2012 as a firm-wide teleconference for the Kavinoky Law Firm.

71.     "Ethics Update 2013:  Recent Developments and Proposed New Rules from the California Rules Revision Commission" which was presented by CEB on January 18, 2013 in Los Angeles and on January 25, 2013 in Orange County.

72.     "Ethical Rules for Healthcare Lawyers:  What You Don't Know Can Harm You (And Your Clients)" which was presented by the California Society of Health Attorneys on April 13, 2013 in Newport Beach, California.

73.     "Legal Ethics, Recent Developments & Emerging Rules" presented by the Association of Business Trial Lawyers on May 7, 2013 in Los Angeles.

74.     "Avoiding Conflicts in Representing a Closely-Held Business" presented by CEB as a webinar on September 24, 2013.

75.     "Selected Issues in Attorneys Fees" presented on December 7, 2013 by the Los Angeles County Bar Association in Los Angeles.

76.     "OCBA Ethics Update 2013" presented by the Orange County Bar Association on December 14, 2013 in Newport Beach.

77.     "Legal Ethics in Probate and Trust Matters" presented on May 14, 2014 by

-14-

1   the Kern County Bar Association in Bakersfield, California.

2       78.    "An Introduction to Conflicts of Interest" videotaped on June 19, 2014 for
3   AttorneyCredits.com.

4       79.    "Legal Fees, Fee Agreements, and Fee Collectibility" presented by
5   Concord Law School on June 21, 2014 in Pasadena.

6       80.    "Recent Developments in California Legal Ethics" videotaped for  CEB on
7   July 19, 2014.

8       81.    "Ethical Issues in Law Office Marketing" presented by the Beverly Hills
9   Bar Association on November 5, 2014.

10      82.    "Conflicts of Interest" presented by the Los Angeles County Bar Assoc.
11  Prof. Responsibility and Ethics Comm. on December 6, 2014 in Los Angeles.

12      83.    "OCBA Ethics Update 2014" presented by the Orange County Bar
13  Association on December10, 2014 in Irvine.

14      84.    "Conflicts of Interest and Disqualification Arising from Prior Client
15  Representations: What Are the Rules?" presented by COPLI as a webinar on January 13,
16  2015.

17      85.    "Selected Issues in Legal Ethics for Health Lawyer" presented by the Los
18  Angeles County Bar Section on Health Law on January 15, 2015.

19      86.    "Probate Symposium" presented by the San Bernardino County Bar
20  Association on May 27, 2015.

21      87.    "Selected Issues in Legal Ethics" presented by the California Association
22  of Realtors on August 6, 2015.

23      88.    "The Past Year in Review: Recent Developments in the Law of
24  Lawyering" presented by the State Bar's Committee on Professional Liability Insurance
25  at the State Bar Annual Meeting in Anaheim on October 10, 2015.

26      89.    "Recent Developments in California Legal Ethics" videotaped for  CEB on
27  December 1, 2015.

28      90.    "OCBA Ethics Update 2015" presented to the Orange County Bar

-15-

Association on December 5, 2015.

91.    "Ethical Keys: Client Identity, Conflicts, and More" presented to the Group Legal Services meeting of the California Teachers' Association in Costa Mesa on February 6, 2016.

92.    "Doing Business with Your Client: The Problems, Pitfalls and Issues in Lawyer-Client Transactions" presented to the Southern California Business Litigation Inn of Court on March 3, 2016.

93.    "Common Mistakes Made in Drafting Contingency Fee Agreements and How to Avoid Them" presented by COPLI as a webinar on April 19, 2016.

94.    "The Formation, Scope, and Termination of a Lawyer-Client Relationship" presented by COPLI on September 29, 2016 at the State Bar annual meeting.

95.    "OCBA Ethics Update 2016" presented to the Orange County Bar Association on December 3, 2016.

96.    "What you don't know, but should, about the New California Rules of Professional Conduct" presented at the Annual Statewide Ethics Symposium on April 21, 2017 at Loyola Law School, Los Angeles.

97.    "OCBA Ethics Update 2017" presented to the Orange County Bar Association on September 28, 2017.

98.    "Conflicts Analysis in the Representation of Governmental Entities and Agencies" presented in-house to Meyers Nave on May 22, 2018.

99.    "Brave New World:  What Business Lawyers Need to Know about the Sea Change to new Rules of Professional Conduct" presented to the Beverly Hills Bar Association on July 12, 2018.

100.    "The New Rules of Professional Conduct" presented to the Los Angeles County Bar Association on August 21, 2018.

101.    "California's New Rules of Professional Conduct: BE PREPARED!" presented to the Orange County Bar Association on October 17, 2018.

102.  "An Introduction to California's New Rules of Professional Conduct"

-16-

presented in-house to Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg, APC on October 24, 2018 in Los Angeles.

103.  "An Introduction to California's New Rules of Professional Conduct" presented in-house to Klein DeNatale Goldner on October 27, 2018 at Bakersfield.

104.  "An Introduction to California's New Rules of Professional Conduct" presented in-house to Pachulski Stang Ziehl & Jones on November 19, 2018 in Los Angeles.

105.  "OCBA Ethics Update 2018" presented to the Orange County Bar Association on November 29, 2018.

106.  "An Introduction to California's New Rules of Professional Conduct" presented in-house to Shartsis Friese, LLP on January 14, 2019 in San Francisco.

107.  "The New Rules of Professional Conduct" presented at the Mexican-American Bar Association on January 26, 2019 at Loyola Law School, Los Angeles.

108.  "An Introduction to California's New Rules of Professional Conduct' presented to the Century City Bar Assoc. on January 31, 2019.

109.  "Tips & Training: Navigating Attorney-Client Fee Disputes" presented via the internet CLE Program and hosted by the National Association of Legal Fee Analysis on March 14, 2019.

110.  "An Introduction to California's New Rules of Professional Conduct" presented to the American College of Trust and Estate Counsel on March 23, 2019 in La Quinta, California.

111.  "New Rules for Trust & Estate Lawyers" presented to the South Bay Bar (Trusts and Estates sections) and South Bay Estate Planning Council on July 11, 2019 in Torrance, California.

112.  "The Role of Non-Attorneys in Access to Justice:  A Discussion with the State Bar of California" on August 27, 2019 at the Los Angeles County Bar Association.

113.  "Minor's Counsel Training: Professional Responsibilities: *Knowing the difference between what you have a right to do and what is right to do.*"  - presented as

the Los Angeles County Bar Assoc. November 19, 2019

114.  "Ethics in IP Enforcement" presented by the Los Angeles Chapter of the Copyright Society of the USA in Century City on November 21, 2019.

115.  "OCBA Ethics Update 2019" presented to the Orange County Bar Association on December 4, 2019.

116.  "Legal Ethics for Trust & Estate Lawyers" to be presented to the  UCLA/ CEB Estate Planning Institute on April 25th, 2020 at the Marina del Rey Marriott.

**EXHIBIT "B"**

**MATERIALS REVIEWED**

Rodgers, *et al.* v. Herbalife, Ltd. *et al.* Class Action Complaint (S.D. Fl.)

Attached selections from depositions of Jennifer Ribalta, Patricia Rogers, and Izaar
      Valdez

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT "C"**

**DEPOSITION EXTRACTS**

```
 1              UNITED STATES DISTRICT COURT

 2     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   MICHAEL LAVIGNE, et al.,

 5               Plaintiffs,

 6   vs.                      CASE NO.:

 7   HERBALIFE LTD., et al.,  2:18-CV-07480-JAK (MRWX)

 8               Defendants.

 9   _____/

10

11

12      VIDEOTAPED DEPOSITION OF PATRICIA RODGERS

13            Saturday, September 21, 2019

14               9:09 a.m. - 3:27 p.m.

15                  Kluger Kaplan

16       201 S. Biscayne Boulevard, 27th Floor

17                  Miami, Florida

18

19

20

21   Reported By:

22   Gina Rodriguez, RPR, CRR, CCP

23   JOB No. 3487023

24

25   PAGES 1 - 251

                                        Page 1
```

```
 1        Q.   Okay.  How did you come to be a plaintiff
 2   in this action?
 3             MS. JONES:  I -- I'll just object with the
 4        caveat that no conversations with any of your
 5        attorneys, don't discuss any of those, but
 6        generally outside of conversations.
 7             Does that make sense?
 8             THE WITNESS:  Hmmm.
 9             MS. JONES:  Okay.  So you can answer.
10   BY MR. PANCHAPAKESAN:
11        Q.   How did you become a plaintiff in this
12   case?  And, again, I don't want to know about
13   conversations --
14        A.   Someone called me on the phone.
15        Q.   Who called you?
16        A.   A lady.
17        Q.   Do you remember her name?
18        A.   No.
19        Q.   Is she an attorney?
20        A.   No.
21        Q.   Was she a distributor?
22        A.   No.  She was a lady wanting to know if I
23   would be interested in speaking to someone about it.
24        Q.   Okay.  Do you know if that lady worked at a
25   law firm?
```

Page 239

1        A.    I don't remember.   She said she worked for
2   someone, like a agency that looked for people kind of
3   thing.
4        Q.    So you were contacted by someone --
5        A.    She was ad agency or something.
6        Q.    You think you were contacted by someone who
7   works for -- for an ad agency, you said?
8        A.    I don't remember.   It was a lady.
9        Q.    Okay.   But you -- you weren't contacted by
10  an attorney?
11       A.    No.
12       Q.    And the person you were contacted by, do
13  you know if she worked for an attorney?
14       A.    I don't think so.
15       Q.    Okay.   You think she worked for some
16  agency?
17       A.    Yeah.
18       Q.    Do you know the name of the agency?
19       A.    No.
20       Q.    Do you know anything about the agency?
21       A.    No.
22       Q.    Is it some agency that -- that looks for
23  potential plaintiffs --
24             MS. JONES:   Object- --
25

Page  240

1          Q.    It was after that?

2          A.    It was after that.

3          Q.    Okay.  Then what happened next after that

4    call?  Were you -- were you contacted by an attorney?

5                MR. ADAR:  If -- if the answer to your

6          question -- you can go ahead, I'm sorry.

7                MS. JONES:  You can answer.  Just no -- no

8          conversations.

9          A.    Yes.

10   BY MR. PANCHAPAKESAN:

11         Q.    When was that?  How long after that first

12   call was that?

13         A.    After I gave her the okay.

14         Q.    And -- and who contacted you that second

15   time?

16                MS. JONES:  You can give him the name of

17          the person.

18          A.    I don't remember his name.

19   BY MR. PANCHAPAKESAN:

20          Q.    Is it Jason Jones?

21          A.    Jason.

22          Q.    All right.  And that was shortly after the

23   first call with -- with this person from an agency?

24          A.    Yes, a lady.

25          Q.    Okay.  Are you -- are you being compensated

                                        Page 242

```
 1          A.    No.

 2          Q.    Is there anywhere else you have records --

 3     existing records in connection with Herbalife?

 4          A.    (Shaking head.)

 5          Q.    Is that a "no"?

 6          A.    No.

 7          Q.    Okay.

 8                MR. PANCHAPAKESAN:  Why don't we take a

 9          quick break.  I think I'm very close.

10                THE WITNESS:  Okay.

11                THE VIDEOGRAPHER:  Off the record.  The

12          time is 3:14.

13        (Recess was held from 3:14 p.m. until 3:22 p.m.)

14                THE VIDEOGRAPHER:  Back on the record.  The

15          time is 3:22.

16                MR. PANCHAPAKESAN:  Just -- just a few more

17          questions, Ms. Rodgers.

18     BY MR. PANCHAPAKESAN:

19          Q.    You don't -- you didn't have a prior

20     relationship with Mr. Jones, right?  He just

21     contacted you?

22          A.    No.

23                MS. JONES:  I just want to object.  That

24          was misstating the -- I don't think she ever

25          said he contacted her.
```

                                        Page 245

```
 1    BY MR. PANCHAPAKESAN:
 2         Q.   You didn't have a prior relationship before
 3    you spoke with Mr. Jones, right?
 4         A.   No.
 5         Q.   Now, earlier -- and -- and he contacted you
 6    directly, Mr. Jones?
 7              MS. JONES:   You can answer if you know.
 8    That's --
 9         A.   Yes.
10    BY MR. PANCHAPAKESAN:
11         Q.   Earlier when we were talking about your
12    nutrition club, you had said there were some health
13    issues you faced.
14              I don't want to get into the specifics,
15    but can you tell me generally what that involved.
16              MS. JONES:  Objection, form.
17         A.   I just had some health issues.
18              MS. JONES:  Is there a way you can ask the
19         question without the specifics of her health
20         issues?
21              MR. PANCHAPAKESAN:  You know, forget about
22         it.  I think we can . . .
23    BY MR. PANCHAPAKESAN:
24         Q.   But you felt those issues were serious
25    enough that it may have taken some time away from the
```

Page 246

```
 1              CERTIFICATE OF REPORTER

 2

 3   STATE OF FLORIDA

 4   COUNTY OF MIAMI-DADE

 5

 6              I, GINA RODRIGUEZ, Registered

 7       Professional Reporter, Certified Realtime

 8       Reporter, do hereby certify that I was authorized

 9       to and did stenographically report the foregoing

10       videotaped deposition of PATRICIA RODGERS; pages

11       1 through 249; that a review of the transcript

12       was requested; and that the transcript is a true

13       record of my stenographic notes.

14              I FURTHER CERTIFY that I am not a

15       relative, employee, attorney, or counsel of any

16       of the parties, nor am I a relative or employee

17       of any of the parties' attorneys or counsel

18       connected with the action, nor am I financially

19       interested in the action.

20              Dated this 8th day of October, 2019.

21

22

23

24

25              GINA RODRIGUEZ, RPR, CRR

                                          Page 251
```

JENNIFER NOEL RIBALTA                    August 29, 2019

1                  UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4   MICHAEL LAVIGNE, ET AL.,           )
                                       )
5                PLAINTIFFS,           )
                                       )
6        VS.                           ) CASE NO. 2:18-cv-07480
                                       )            JAK (MRWx)
7   HERBALIFE LTD., ET AL.,            )
                                       )
8                DEFENDANTS.           )
    _____)

9

10

11

12

13

14

15        VIDEOTAPED DEPOSITION OF JENNIFER NOEL RIBALTA

16           THURSDAY, AUGUST 29, 2019, 9:07 A.M.

17                 LOS ANGELES, CALIFORNIA

18

19

20      Reported by Laury Wasoff, CSR No. 10995, RPR

21                 CLS Job No. 107888

22

23

24           CENTEXTLEGAL.COM - 855.CENTEXT

25

JENNIFER NOEL RIBALTA                              August 29, 2019

| | | |
|---|---|---|
| 11:03:40 | 1 | photography business. |
| 11:03:48 | 2 | Q.   Now, you had been freelancing up until |
| 11:03:51 | 3 | then.   Is that right? |
| 11:03:53 | 4 | A.   Assisting and freelancing a little bit, |
| 11:03:56 | 5 | yeah. |
| 11:03:58 | 6 | Q.   About how much of your time was spent |
| 11:04:06 | 7 | working at the photo lab? |
| 11:04:09 | 8 | A.   How many hours a day? |
| 11:04:11 | 9 | Q.   Was it a full-time job? |
| 11:04:12 | 10 | A.   Oh, yeah.   Uh-huh. |
| 11:04:18 | 11 | Q.   And then when did you do your freelance |
| 11:04:20 | 12 | photography work? |
| 11:04:22 | 13 | A.   I would do that on the side.   But mostly I |
| 11:04:24 | 14 | did that in the time that I was living back in |
| 11:04:29 | 15 | Dunedin during that six, eight months when I wasn't |
| 11:04:34 | 16 | working at the lab.   But I did take little jobs |
| 11:04:37 | 17 | while I worked at the lab too. |
| 11:04:39 | 18 | Q.   And forgive me because I didn't put it in |
| 11:04:41 | 19 | my notes, but that would have been around 2005? |
| 11:04:46 | 20 | A.   Yes. |
| 11:04:50 | 21 | Q.   When and how were you -- strike that. |
| 11:04:57 | 22 | When did you first become interested in |
| 11:04:59 | 23 | being a class representative in this case? |
| 11:05:02 | 24 | A.   I don't remember an exact date, but it was |
| 11:05:06 | 25 | two years ago.   Probably two and a half years ago. |

JENNIFER NOEL RIBALTA                          August 29, 2019

| | | |
|---|---|---|
| 11:05:10 | 1 | So that was what?  2017 maybe. |
| 11:05:22 | 2 | Q.   How did you become aware of the |
| 11:05:24 | 3 | possibility? |
| 11:05:24 | 4 | A.   From a phone call that I got from my |
| 11:05:26 | 5 | lawyer. |
| 11:05:27 | 6 | Q.   And who was your lawyer? |
| 11:05:28 | 7 | A.   Jason Jones. |
| 11:05:30 | 8 | Q.   And you had had -- had you had any previous |
| 11:05:35 | 9 | contact with Mr. Jones? |
| 11:05:36 | 10 | A.   Never. |
| 11:05:36 | 11 | Q.   So this was what might be called a cold |
| 11:05:39 | 12 | call? |
| 11:05:39 | 13 | A.   Yes. |
| 11:05:52 | 14 | MR. DROOKS:  Etan, are you going to assert |
| 11:05:54 | 15 | privilege as to anything that was discussed, I |
| 11:05:56 | 16 | assume? |
| 11:05:57 | 17 | MR. MARK:  Yes. |
| 11:05:57 | 18 | MR. DROOKS:  Okay.  So I don't need to ask |
| 11:06:00 | 19 | questions to elicit the privilege? |
| 11:06:02 | 20 | MR. MARK:  No. |
| 11:06:08 | 21 | MR. DROOKS:  Can we go off the record for a |
| 11:06:09 | 22 | moment? |
| 11:06:10 | 23 | MR. MARK:  Sure. |
| 11:06:11 | 24 | THE VIDEOGRAPHER:  We are now off the record. |
| 11:06:12 | 25 | The time is 11:06 A.M. |

JENNIFER NOEL RIBALTA                    August 29, 2019

| | | |
|---|---|---|
| 11:06:13 | 1 | (Off the record.) |
| 11:06:52 | 2 | THE VIDEOGRAPHER:  We are now back on the |
| 11:06:53 | 3 | record.  The time is 11:06 A.M. |
| 11:06:56 | 4 | Q.   BY MR. DROOKS:  About how much time passed |
| 11:06:57 | 5 | between the time you first spoke to Mr. Jones and |
| 11:07:01 | 6 | the time you agreed to serve as class |
| 11:07:04 | 7 | representative? |
| 11:07:08 | 8 | A.   I don't know exactly, but it wasn't right |
| 11:07:10 | 9 | away.  It was at least a couple weeks.  Maybe even a |
| 11:07:13 | 10 | month or two. |
| 11:07:14 | 11 | Q.   Why did you decide to serve as a class |
| 11:07:16 | 12 | representative in this lawsuit? |
| 11:07:19 | 13 | A.   Because I feel like there's a lot of people |
| 11:07:21 | 14 | that had the same situation happen to me, losing |
| 11:07:28 | 15 | money, and feel like Herbalife needs to be held |
| 11:07:32 | 16 | accountable for, like, the misdirection, I guess.  I |
| 11:07:42 | 17 | feel like these people need a voice.  And it would |
| 11:07:46 | 18 | be nice to get some of the money back that I lost. |
| 11:07:49 | 19 | Q.   Now, when you say the money that you lost, |
| 11:07:52 | 20 | what are you referring to? |
| 11:07:55 | 21 | A.   All the loss in money that I had from |
| 11:07:58 | 22 | putting into the business. |
| 11:07:59 | 23 | Q.   The money that you spent pursuing the |
| 11:08:01 | 24 | business opportunity? |
| 11:08:02 | 25 | A.   Correct. |

```
 1    STATE OF CALIFORNIA     )
                              )
 2    COUNTY OF LOS ANGELES   )

 3

 4        I, Laury Wasoff, Certified Shorthand Reporter

 5    No. 10995, Do Hereby Certify:

 6        That prior to being examined, the witness named in the

 7    foregoing deposition was by me duly sworn to testify to

 8    the truth, the whole truth, and nothing but the truth;

 9        That said deposition was taken down by me in shorthand

10    at the time and place therein named and thereafter

11    transcribed under my direction, and the same is a true,

12    correct, and complete transcript of my shorthand notes so

13    taken.

14        That if the foregoing pertains to the original

15    transcript of a deposition in a federal case, before

16    completion of the proceedings, review of the transcript

17    {x} was  { } was not requested.

18        I further certify that I am not in any way interested

19    in the outcome of this action.

20        In witness whereof, I have hereunto subscribed my name

21    this 13th day of September, 2019.

22

23

24    _____
      LAURY WASOFF, CSR NO. 10995, RPR
25
```

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3


4     MICHAEL LAVIGNE, et al,              )
                                           )
5                    Plaintiffs,           )    **CERTIFIED COPY**
                                           )
6            vs.                           )  Case No. 2:18-cv
                                           )  07480-JAK(MRWx)
7     HERBALIFE LTD., et al,               )
                                           )
8                                          )
                     Defendants.           )
9     _____)

10

11

12

13

14             VIDEOTAPED DEPOSITION OF IZAAR VALDEZ

15                    Los Angeles, California

16                      August 29, 2019

17

18

19

20

21

22    Reported By:
      NANCY KRAMER, CSR 8756
23

24

25

IZAAR VALDEZ                                    August 29, 2019

| | | |
|---|---|---|
| 01:18:44 | 1 | BY MR. CHAN: |
| 01:18:44 | 2 | Q   Sure.  Do you understand who the lawyers are |
| 01:18:47 | 3 | representing you in this case? |
| 01:18:49 | 4 | A   Oh, yes, I do, sir.  Yes. |
| 01:18:50 | 5 | Q   When did you first make contact with them or |
| 01:18:52 | 6 | have contact with them? |
| 01:18:54 | 7 | A   I made contact with them through my father.  My |
| 01:18:57 | 8 | father talked to me about them. |
| 01:19:01 | 9 | Q   What did your father say? |
| 01:19:02 | 10 | A   That he spoke to them and they were attorneys |
| 01:19:07 | 11 | willing to help us. |
| 01:19:10 | 12 | Q   Did he tell you how he got in touch with the |
| 01:19:13 | 13 | lawyers? |
| 01:19:14 | 14 | MS. JONES:  Objection.  Form. |
| 01:19:15 | 15 | THE WITNESS:  Yes. |
| 01:19:16 | 16 | BY MR. CHAN: |
| 01:19:16 | 17 | Q   What did he say? |
| 01:19:17 | 18 | A   A friend.  A friend of him that actually went |
| 01:19:20 | 19 | through the same situation, but I don't know the person. |
| 01:19:23 | 20 | Q   You don't know the friend's name? |
| 01:19:24 | 21 | A   No. |
| 01:19:25 | 22 | Q   Do you remember when -- when was this? |
| 01:19:27 | 23 | A   I was living in New Jersey when he talked to me |
| 01:19:29 | 24 | about it, two years ago. |
| 01:19:30 | 25 | Q   You've got to just let me just finish the |

IZAAR VALDEZ                                    August 29, 2019

| | | |
|---|---|---|
| 01:19:33 | 1 | question so she can get the answer. |
| 01:19:36 | 2 | So it was two years ago that you first had this |
| 01:19:39 | 3 | conversation with your father about the class lawyers? |
| 01:19:40 | 4 | A   Yes, sir. |
| 01:19:41 | 5 | Q   Do you remember when? |
| 01:19:43 | 6 | A   No, I can't remember when exactly. |
| 01:19:45 | 7 | Q   And do you remember what he said about how he |
| 01:19:48 | 8 | got in touch with the class lawyers? |
| 01:19:51 | 9 | A   He was doing a job, a construction job at this |
| 01:19:55 | 10 | person's house and that's how they came up with the |
| 01:19:58 | 11 | conversation.  That's how I know that it was a friend |
| 01:20:01 | 12 | because he was telling me, "Oh, I was doing a job and |
| 01:20:04 | 13 | this person told me that we could get help" and that's |
| 01:20:07 | 14 | how he told me. |
| 01:20:10 | 15 | Q   Did he tell anything else about what the |
| 01:20:14 | 16 | lawyers were proposing to do or could do? |
| 01:20:17 | 17 | MS. JONES:  Objection.  Form. |
| 01:20:18 | 18 | THE WITNESS:  No.  He said I just needed to |
| 01:20:23 | 19 | talk to them. |
| 01:20:23 | 20 | BY MR. CHAN: |
| 01:20:24 | 21 | Q   When did you first talk with your lawyers in |
| 01:20:25 | 22 | this case? |
| 01:20:27 | 23 | A   It was about a month later after my dad spoke |
| 01:20:30 | 24 | to me about it. |
| 01:20:33 | 25 | Q   And you were still in New Jersey at the time? |

IZAAR VALDEZ                                    August 29, 2019

```
01:20:36   1          A    Yes, sir.
01:20:37   2          Q    Did you talk to anyone else about joining in
01:20:41   3     this lawsuit, other than your lawyers?
01:20:44   4          A    No.
01:20:44   5          Q    Did you talk to your father about it?
01:20:47   6          A    He's -- he's -- yeah, he knows.  He's
01:20:50   7     willing -- like, he's in the case.
01:20:52   8          Q    Did you have any discussions with your father
01:20:55   9     before you agreed to have the lawyers represent you in
01:20:59  10     the case?
01:20:59  11          A    No.
01:21:01  12          Q    Did you have any discussions with your father
01:21:03  13     about whether you should engage or hire the lawyers to
01:21:09  14     represent you?
01:21:11  15          A    No, because we knew.  We knew how much, you
01:21:15  16     know, we went through and how much we lost and we needed
01:21:18  17     help.  So we were working as a team with Herbalife.  So
01:21:23  18     we knew all the struggle, so we were just agreeing to
01:21:27  19     look for help.
01:21:28  20          Q    What did your father tell you about whether the
01:21:32  21     lawyers would charge you money or how you'd pay for
01:21:35  22     lawyers?
01:21:35  23               MS. JONES:  Objection.  Form.
01:21:37  24               THE WITNESS:  We didn't talk about that.
          25      ///
```

IZAAR VALDEZ                                    August 29, 2019

| | | |
|---|---|---|
| 01:21:38 | 1 | BY MR. CHAN: |
| 01:21:40 | 2 | Q   Did you have any discussions about that at any |
| 01:21:42 | 3 | point? |
| 01:21:42 | 4 | A   No.  Because a month later I spoke to Jason and |
| 01:21:48 | 5 | he never mentioned to me I had to pay anything. |
| 01:21:52 | 6 | Q   So you never had any discussions with your |
| 01:21:54 | 7 | father about paying for the lawyers before you actually |
| 01:21:56 | 8 | agreed to hire the lawyers? |
| 01:21:59 | 9 | A   No, sir. |
| 01:22:00 | 10 | Q   Why did you decide to serve as a class |
| 01:22:03 | 11 | representative in this lawsuit? |
| 01:22:05 | 12 | A   Honestly, being my second time trying to do the |
| 01:22:10 | 13 | Herbalife business and not being successful about it, I |
| 01:22:14 | 14 | think that I could be part of something positive towards |
| 01:22:19 | 15 | so many hundreds of people that actually is going |
| 01:22:22 | 16 | through the same thing.  And I know that maybe me |
| 01:22:26 | 17 | standing up to look up for a solution, that can help |
| 01:22:28 | 18 | others.  That's how I thought about it. |
| 01:22:31 | 19 | Q   Are you receiving any compensation to serve as |
| 01:22:34 | 20 | a class representative? |
| 01:22:34 | 21 | A   No. |
| 01:22:35 | 22 | Q   Have you been promised any compensation -- |
| 01:22:40 | 23 | A   No, sir. |
| 01:22:40 | 24 | Q   -- to serve as a class rep? |
| 01:22:40 | 25 | A   No. |

1                    REPORTER'S CERTIFICATION

2

3      I, Cheryl M. Haab, Certified Shorthand Reporter in and

4  for the State of California, do hereby certify:

5

6      That the foregoing witness was duly sworn; that the

7  deposition was then taken before me at the time and place

8  herein set forth; that the testimony and proceedings were

9  reported stenographically by me and later transcribed into

10 typewriting under my direction; that the foregoing is a

11 true record of the testimony and proceedings taken at that

12 time.

13         Further, that if the foregoing pertains to the

14 original transcript of a deposition in a federal case,

15 before completion of the proceedings, review of the

16 transcript [ X ] was [  ] was not requested.

17

18     IN WITNESS WHEREOF, I have subscribed my name on this

19 date: September 17, 2019.

20

21

22

23

24  _____

25     Cheryl M. Haab, CSR No. 13600, RPR, CCRR, CLR