1

2

3                    UNITED STATES DISTRICT COURT

4                    CENTRAL DISTRICT OF CALIFORNIA
                             WESTERN DIVISION

5

6

7   MICHAEL LAVIGNE, ET AL.,        )
                                    )
8              PLAINTIFFS,          )
                                    )
9          V.                       )
                                    )
10                                  )
                                    )
11  HERBALIFE, LTD., ET AL.,        )
                                    )
12                                  )  CV 18-07480-JAK(MRWX)
               DEFENDANTS.          )  JANUARY 29, 2020
13                                  )  LOS ANGELES, CALIFORNIA
    _____)  (1:40 P.M. TO 3:16 P.M.)
14                                     (3:33 P.M. TO 4:09 P.M.)

15

16                            HEARING

17          BEFORE THE HONORABLE MICHAEL R. WILNER
                UNITED STATES MAGISTRATE JUDGE

18

19  APPEARANCES:            SEE NEXT PAGE

20  COURT REPORTER:         RECORDED; COURT SMART

21  COURTROOM DEPUTY:       V. PIPER

22  TRANSCRIBER:            DOROTHY BABYKIN
                            COURTHOUSE SERVICES
23                          1218 VALEBROOK PLACE
                            GLENDORA, CALIFORNIA  91740
24                          (626) 963-0566

25  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
    TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

2

1   APPEARANCES:

2   FOR THE PLAINTIFF MICHAEL LAVIGNE, ET AL.:

3
                MARK MIGDAL & HAYDEN
4               BY:  YANIV ADAR
                     ATTORNEY AT LAW
5               80 SW 8TH STREET
                SUITE 1999
6               MIAMI, FLORIDA  33130

7
    FOR DEFENDANT HERBALIFE, LTD.:
8
9               BIRD MARELLA BOXER WOLPERT NESSIM
                  DROOKS LINCENBERG & RHOW
10              BY:  JONATHAN MICHAEL JACKSON
                     MARK T. DROOKS
11                   ATTORNEYS AT LAW
                1875 CENTURY PARK EAST
12              23RD FLOOR
                LOS ANGELES, CALIFORNIA  90067
13
14  FOR FLORIDA DEFENDANTS:

15
                QUARLES & BRADY LLP
16              BY:  MICHAEL S. CATLETT
                     ATTORNEY AT LAW
17              RENAISSANCE ONE
                TWO NORTH CENTRAL AVENUE
18              PHOENIX, ARIZONA  85004

19

20

21

22

23

24

25

3

1                           I N D E X
     CV 18-07480-JAK(MRW)                      JANUARY 29, 2020
2
     PROCEEDINGS:   PLAINTIFFS' MOTION FOR AN ORDER COMPELLING
3                   DISCOVERY

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1          LOS ANGELES, CALIFORNIA; JANUARY 29, 2020; 1:40 P.M.
 2              THE CLERK:  -- JUDGE PRESIDING.
 3              THE COURT:  GOOD AFTERNOON, YOUR HONOR.
 4              ALL:  GOOD AFTERNOON, YOUR HONOR.
 5              THE CLERK:  CV 18-7480-JAK(MRWX), MICHAEL LAVIGNE
 6   VERSUS HERBALIFE.
 7              COUNSEL, PLEASE STATE YOUR APPEARANCES.
 8              MR. ADAR:  YANIV ADAR ON BEHALF OF THE PLAINTIFFS AND
 9   THE PUTATIVE CLASS.
10              THE COURT:  MR. ADAR, HI.
11              MR. JACKSON:  JONATHAN JACKSON ON BEHALF OF DEFENDANT
12   HERBALIFE.
13              THE COURT:  MR. JACKSON.
14              MR. CATLETT:  MIKE CATLETT ON BEHALF OF THE 44 THIRD
15   PARTIES.  I BELIEVE WE'RE REFERRED TO AS THE FLORIDA
16   DEFENDANTS.
17              THE COURT:  GOT IT.
18              GOOD AFTERNOON, MR. CATLETT.
19              MR. DROOKS:  GOOD AFTERNOON, YOUR HONOR.
20              MARK DROOKS, ALSO ON BEHALF OF HERBALIFE.
21              THE COURT:  AND, MR. DROOKS, GOOD AFTERNOON TO YOU.
22              HAVE A SEAT.  YOU'RE ALL WELCOME HERE.
23              THE MATTER IS ON HERE TODAY FOR -- WELL, LET'S CALL
24   IT A MOTION TO COMPEL.  PERHAPS, IT'S A MOTION FOR A PROTECTIVE
25   ORDER.  THERE'S A RELATED PROCEDURAL DEVICE HERE HAVING TO DO
```

1  WITH THE FLORIDA FOLKS BECAUSE OF WHAT IS UNQUESTIONABLY A MESS

2  WITH THE DISCOVERY IN THIS CASE.

3        I SPENT A FAIR AMOUNT OF TIME LOOKING AT THE DOCKET

4  OF THE MATTER IN FRONT OF JUDGE KRONSTADT.  I'M AWARE THAT SOME

5  OF YOUR DATES HAVE RECENTLY CHANGED BY A STIPULATION AND ORDER.

6  AND THE CLASS CERT TRAIN IS RUMBLING ALONG.  AND THAT'S WHERE

7  WE ARE.

8        I ALSO SPENT SOME QUALITY TIME WITH -- WELL, THIS IS

9  A MATTER WHERE I'VE HAD A FAIR AMOUNT OF INVOLVEMENT -- AN

10  EXCEPTIONALLY LARGE AMOUNT OF TIME DEALING WITH DISCOVERY

11  ISSUES.  GAVE YOU A LENGTHY DECISION ON SOME ISSUES TOWARDS THE

12  TAIL END OF LAST YEAR.

13        THE ISSUES BUBBLED UP AGAIN.  I HAD A LENGTHY

14  DISCUSSION WITH THE PARTIES.  GAVE THEM A NEW SCHEDULE.  AND I

15  RECEIVED TWO SETS OF THREE BRIEFS -- NICE JOB -- IN WHICH ALL

16  THREE OF OUR TRIANGULAR PARTIES LAID OUT THEIR POSITIONS AND

17  THEN TURNED AROUND A FEW DAYS LATER AND GAVE ME THEIR TAKE ON

18  THE OTHER SIDES' POSITIONS.  AND I HAVE SOMETHING OF A HANDLE

19  ON WHAT -- WHAT IS GOING ON HERE.

20        AFTER HAVING TAKEN A LOOK AT THOSE PAPERS AND BEFORE

21  GETTING US GOING HERE, I DID REACH OUT TO THE PARTIES.  I THINK

22  I ISSUED ONE OF MY CHATTY ORDERS BECAUSE THERE WAS AN ISSUE

23  WITH RESPECT TO MATERIALS THAT HAD BEEN REDACTED BY HERBALIFE

24  ON THIS DISCIPLINARY ISSUE.

25        AND THE PLAINTIFFS -- YOU KNOW, NOT WRONGLY -- I'LL

6

1    GIVE YOU THAT SORT OF PASSIVENESS THERE -- AND MAYBE RIGHTLY --

2    WERE CONCERNED ABOUT THAT PROCESS AND MAY NOT HAVE HAD ENTIRELY

3    FULL INFORMATION TO JUDGE THE APPROPRIATENESS OF THAT.

4            SO, I SENT OUT A REQUEST THAT I HAVE THE PARTIES SORT

5    OF LOOK INTO THAT A LITTLE BIT MORE.  THAT'S PROBABLY A GOOD

6    PLACE TO START OUR DISCUSSION JUST SO I'M MORE FULLY INFORMED

7    ABOUT WHAT'S GOING ON.

8            THEN, MY PRACTICE WOULD BE TO SORT OF GIVE YOU --

9    GIVE YOU MY TENTATIVE THOUGHTS.  AND I'M HAPPY TO HEAR FROM ANY

10   OF YOU AT THE LECTERN SO WE CAN PROPERLY RECORD YOU.

11           BUT WITH RESPECT TO MY -- MY PREGAME ORDER FROM A

12   COUPLE OF WEEKS AGO, HAS THERE BEEN ANY ADVANCEMENT OF THE

13   ISSUE OF THE REDACTIONS ON THE DISCIPLINARY RECORDS?

14           AND WHO WOULD LIKE TO TELL ME ABOUT THAT?

15           MR. ADAR:  I'M HAPPY TO, YOUR HONOR.

16           THE COURT:  MR. ADAR.

17           MR. ADAR:  THANK YOU, YOUR HONOR.

18           UNFORTUNATELY, NOT MUCH PROGRESS ON THAT END.

19           I DID CONFER WITH MR. JACKSON.  WE DID RECEIVE IN

20   THEIR -- I'LL CALL IT "REPLY BRIEF DISCUSSION" ABOUT WHY THEY

21   REDACTED CERTAIN ADDITIONAL DOCUMENTS.

22           BUT AS SUGGESTED IN YOUR HONOR'S ORDER, WE ARE NOT

23   SATISFIED WITH THAT RESPONSE, AND WE DO RESPECTFULLY REQUEST

24   THE ISSUE BE ADDRESSED.

25           AND WE WOULD LIKE TO HAVE UNREDACTED COPIES OF A

1  DISCIPLINARY PROCEEDINGS FOR REASONS THAT I'M HAPPY TO DISCUSS

2  NOW OR CAN DISCUSS IN THE DUE COURSE OF THINGS.

3          THE COURT:  OKAY.

4          MR. JACKSON, TALK TO ME ABOUT THAT ONE.

5          MR. JACKSON:  IS IT EASIER IF I GO TO THE LECTERN,

6  YOUR HONOR, OR FROM HERE?

7          WHAT WORKS BEST FOR YOU?

8          MR. ADAR:  MAY I BE EXCUSED, YOUR HONOR?

9          THE COURT:  UH-HMM.

10          MR. ADAR:  OKAY.  GREAT.

11          MR. JACKSON:  SO, FIRST, YOUR HONOR, JUST

12  PROCEDURALLY WE DID DISCUSS YOUR ORDER THAT CAME OUT A COUPLE

13  OF WEEKS AGO.

14          AND I WENT OVER WITH MR. ADAR THE PRIOR

15  COMMUNICATIONS WE HAD HAD.  JUST -- JUST TO BE CLEAR ON THAT

16  FRONT, ONE OF THE QUESTIONS RAISED IN YOUR ORDER IS WHETHER WE

17  HAD DISCUSSED WHAT HAD BEEN REDACTED AND WHY IT HAD BEEN

18  REDACTED BEFORE THE MOTION PRACTICE.  AND WE HAD MY COLLEAGUE

19  GOPI HAD SOME ORAL DISCUSSIONS ON THE TELEPHONE.  I HAD SENT AN

20  EMAIL DESCRIBING THE BASIS FOR THE REDACTIONS.

21          AND THEN AS MR. ADAR --

22          THE COURT:  WHAT IS IT?  WHAT IS THAT BASIS?

23          MR. JACKSON:  SO, OUR UNDERSTANDING OF YOUR PRIOR

24  ORDER WAS WE WERE TO PRODUCE -- HERBALIFE WAS TO PRODUCE

25  DOCUMENTS SUFFICIENT TO SHOW FINDINGS OF MISCONDUCT OR ANY

8

1     DISCIPLINARY ACTIONS TAKEN.  BUT YOU WEREN'T INTERESTED IN

2     FORCING US TO PRODUCE INVESTIGATIONS, INVESTIGATIVE FILES OR

3     JUST UNSUPPORTED ALLEGATIONS OF MISCONDUCT.

4           THE ISSUE AROSE ON OUR END IS THAT WE HAVE THESE

5     ELECTRONIC CASE FILES THAT CONTAIN ALL OF THE INFORMATION

6     REGARDING ANY PARTICULAR INVESTIGATION, INCLUDING

7     UNSUBSTANTIATED ALLEGATIONS AND INCLUDING ANY FINDINGS OF

8     MISCONDUCT TO THE EXTENT THEY WERE MADE.  AND THEY'RE STORED IN

9     THESE VARIOUS DATABASE FIELDS.

10          SO, INITIALLY WHAT WE HAD REQUESTED WAS THAT

11    HERBALIFE PRODUCE ONLY THE DATABASE FIELDS THAT WERE RESPONSIVE

12    TO YOUR ORDER.  AND BASED ON MY REVIEW THERE WERE THREE.  THERE

13    WAS --

14          THE COURT:  I'M SORRY.  YOU REQUESTED OF YOUR CLIENT?

15          MR. JACKSON:  RIGHT.  CORRECT.

16          THE COURT:  OH, I SEE.  OKAY.

17          MR. JACKSON:  AND BASED ON MY REVIEW OF THE DATA --

18    THERE WERE THREE FIELDS THAT WERE RESPONSIVE.  THEY WERE I

19    BELIEVE CALLED "THE FACT SUMMARY FIELD," THE "PROVEN OR

20    UNPROVEN ANALYSIS FIELD" AND "THE CONCLUSION FIELD," WHICH

21    ACTUALLY TRACKED IN OUR VIEW QUITE NICELY WITH WHAT WE'VE BEEN

22    ORDERED TO PRODUCE.  BUT NOT TO PRODUCE ANY OF THE OTHER

23    FIELDS, WHICH, AGAIN, CONTAINED AMONG OTHER THINGS

24    UNSUBSTANTIATED ALLEGATIONS -- NOTES ON THE INVESTIGATION, ET

25    CETERA.

1            LOGISTICALLY SPEAKING THE ISSUE AROSE IN THAT THE

2     SOFTWARE USED WAS UNABLE TO GENERATE THAT REPORT.  AND FOR ANY

3     GIVEN INVESTIGATION COULD ONLY SPIT OUT A PDF THAT CONTAINED

4     ALL OF THE INFORMATION ASSOCIATED WITH ANY GIVEN INVESTIGATIVE

5     FILE.

6            AND, SO, AT THAT POINT WHAT WE DECIDED TO DO WAS

7     PRODUCE ONLY THOSE THREE RELEVANT FIELDS THAT WE'VE IDENTIFIED

8     AND REMOVE OR REDACT ALL OF THE OTHER FIELDS CONSISTENTLY

9     ACROSS ALL OF THE CASE FILES THAT WE PRODUCED.

10            THE COURT:  OKAY.  SO --

11            MR. JACKSON:  AND FROM OUR PERSPECTIVE THAT BALANCED

12     WHAT WE WERE REQUIRED TO PRODUCE, WHAT WE WERE TOLD WE

13     SHOULDN'T PRODUCE.

14            THE COURT:  OKAY.  SO, THE FIELDS THAT HAVE BEEN

15     COVERED UP -- JUST TO TAKE PLAINTIFF'S WORDS FOR A SECOND --

16     ARE?

17            MR. JACKSON:  THEY'RE PRIMARILY THE COMPLAINT FIELD

18     WHICH OFTEN HAS -- YOU KNOW, HOWEVER THE INVESTIGATIVE FILE

19     STARTED, MAYBE A THIRD PARTY COMPLAINT --

20            THE COURT:  GOT IT.

21            MR. JACKSON:  -- OR SOME OTHER COMPLAINT CAME IN.

22     VARIOUS COMMUNICATIONS FIELDS.  SO, THAT WAS BACK AND FORTH

23     COMMUNICATIONS, WHETHER IT'S WITH A DISTRIBUTOR AT ISSUE OR A

24     THIRD-PARTY WITNESS, ET CETERA.

25            AND THEN A VARIETY OF WHAT ARE CALLED "NOTES FIELDS"

1    THAT JUST HAVE ANY NOTES IN TERMS OF THE ONGOING INVESTIGATION.

2            SO, THOSE WERE THE THREE PRIMARY FIELDS --

3            THE COURT:  THESE ARE INVESTIGATIONS BEING CONDUCTED

4    BY WHOM GENERALLY SPEAKING?

5            MR. JACKSON:  BY HERBALIFE.  BY AN INTERNAL

6    DEPARTMENT -- I BELIEVE IT'S THE M.P.C. DEPARTMENT WITHIN

7    HERBALIFE.

8            THE COURT:  WHAT DOES "N.P.C."?

9            MR. JACKSON:  N.P.C. -- I DON'T REMEMBER WHAT THAT

10   ACRONYM STANDS FOR.

11           MARK, ARE YOU GOING TO HELP ME?

12           THE COURT:  BUT YOU MADE A -- BUT YOU MADE A POINT OF

13   USING IT WITH ME.

14           (LAUGHTER.)

15           THE COURT:  LIKE I'M SUPPOSED TO KNOW --

16           MR. JACKSON:  APOLOGIES, YOUR HONOR.  I WAS NOT --

17           THE COURT:  ALL RIGHT.

18           MR. JACKSON:  TRYING TO PRETEND THAT THE --

19           THE COURT:  THAT'S FINE.  THAT'S FINE.

20           MR. JACKSON:  -- THE LETTERS WERE IMPORTANT.

21           THE COURT:  IS IT -- ARE THEY -- ARE -- IS IT -- IS

22   IT LAWYERS?  IS IT PART OF A GENERAL COUNSEL FUNCTION?  IS IT

23   BUSINESS PEOPLE?

24           DO YOU KNOW?

25           MR. JACKSON:  IT IS NOT ENTIRELY COUNSEL.  BUT THEY

1  DO DO SOME OF THEIR WORK IN CONJUNCTION WITH A LEGAL DEPARTMENT

2  NOT -- NOT SURPRISINGLY.

3          THE COURT:  OKAY.

4          SO, THE BASIS FOR WITHHOLDING THESE FIELDS, THE

5  COMPLAINT OR SOURCE OF THE INQUIRY, THE COMMUNICATIONS WITH

6  DISTRIBUTORS AND WITNESSES AND THEN INTERNAL NOTES IS PRIMARILY

7  BECAUSE IT DOESN'T NECESSARILY LEAD TO THE FINDINGS AND

8  CONCLUSIONS, THE RELEVANCE ISSUE.

9          MR. JACKSON:  YEP.

10          THE COURT:  IS IT ALSO BASED ON SOME SORT OF

11  ASSERTION OF PRIVILEGE?

12          MR. JACKSON:  SO, THE PRIMARY REDACTIONS -- THERE

13  WERE TWO REASONS FOR THEM, YOUR HONOR.

14          NUMBER ONE, AGAIN, IT DIDN'T GET TO THE FINDINGS OF

15  MISCONDUCT OR DISCIPLINARY ACTIONS LIKE YOU SAID.

16          AND RELATED TO THAT, NUMBER TWO, THEY ACTUALLY DID

17  CONTAIN IN CERTAIN CASES A NUMBER OF UNSUBSTANTIATED

18  ALLEGATIONS WHICH OUR READING OF THE ORDER WERE -- WERE

19  SPECIFICALLY NOT TO BE PRODUCED.

20          THE COURT:  WELL, IF IT'S --

21          MR. JACKSON:  THAT WAS THE --

22          THE COURT:  -- IF IT'S UNSUBSTANTIATED, THAT'S

23  CORRECT.  OKAY.

24          MR. JACKSON:  SO, TO THE EXTENT THEY WERE

25  SUBSTANTIATED -- JUST TO CLOSE THE LOOP, THAT WOULD BE

12

1  REFLECTED IN THE CONCLUSION FIELD AND THE PROVEN/UNPROVEN

2  ANALYSIS FIELD.

3          SO, TO THE EXTENT ALLEGATIONS WERE, IN FACT,

4  SUBSTANTIATED BY HERBALIFE, THAT INFORMATION APPEARED IN THE

5  FIELDS THAT WE DID PRODUCE.

6          THE COURT:  OKAY.

7          MR. JACKSON:  NOW, TO YOUR -- TO YOUR LAST QUESTION,

8  IN A HANDFUL OF CASES THERE WERE ADDITIONAL REDACTIONS.  AND

9  THESE ARE LISTED OUT IN SOME DETAIL IN MY SUPPLEMENTAL

10  DECLARATION IN SUPPORT OF OUR REPLY.

11          I THINK IN TWO OR THREE CASES THERE WERE REFERENCE TO

12  PRIVILEGED DISCUSSIONS WITH COUNSEL.  AND IN THREE OR FOUR

13  CASES THERE WERE INDIVIDUALS' PHONE NUMBERS AND POSSIBLY AN

14  ADDRESS THAT WERE ALSO REDACTED.

15          AND THAT INFORMATION, AGAIN, WAS IN A SUPPLEMENTAL

16  DECLARATION THAT WAS PROVIDED WITH OUR REPLY BRIEF.

17          THE COURT:  YEAH.  NOW, I'VE GOT TO FIND THAT.  A LOT

18  OF PAPER.

19          OKAY.  SO, THAT'S YOUR -- THAT'S DOCKET 243.

20          MR. ADAR:  YOUR HONOR, IF I MAY, I HAVE THE PAGE AND

21  NUMBER.

22          IT'S 243-1 --

23          THE COURT:  YEAH.

24          MR. ADAR:  -- PAGE 3.

25          THE COURT:  GOT IT.  OKAY.

1           OKAY.  NOW -- OKAY.  I'VE REVIEWED THAT AND I GOT IT.

2    OKAY.

3           OKAY.  OKAY.  SO, WHAT'S THE PROBLEM? -- BESIDES YOU

4    WANT THE GOOD STUFF.

5           MR. ADAR:  WE DO WANT THE GOOD STUFF, YOUR HONOR.

6    AND THANK YOU.

7           I THINK THERE'S TWO PRIMARY ISSUES.  ONE OF THEM IS

8    THAT WE ARE -- WE UNDERSTAND THE COURT'S CLEAR DIRECTION THAT

9    WE'RE NOT ENTITLED TO EVERY SINGLE COMPLAINT.  IF SOMEONE WENT

10   ON FACEBOOK AND SAID THIS PERSON STEALS, AND IT'S

11   UNSUBSTANTIATED, WE WOULDN'T BE ENTITLED TO THAT INFORMATION.

12          OUR POSITION WAS SIMPLE.  IF THERE WAS A

13   SUBSTANTIATED ALLEGATION, AND WE WERE ENTITLED TO THE

14   INFORMATION ASSOCIATED WITH THAT ALLEGATION SO WE CAN

15   UNDERSTAND THE UNDERLYING MERITS BEHIND IT AND TO UNDERSTAND

16   WHAT HERBALIFE KNEW.

17          SOME OF THE DOCUMENTS THAT WERE PRODUCED, THE

18   REDACTED DOCUMENTS SIMPLY SAID, YOU KNOW, SOCIAL MEDIA POSTING

19   OR VAGUELY REFERENCED A TOPIC THAT WE COULDN'T GET MORE

20   INFORMATION ON.

21          SO, WE ASKED OF OPPOSING COUNSEL DURING OUR

22   CONFERENCES PRIOR TO THE BRIEFING AND DURING THE BRIEFING WAS

23   SIMPLY TO PROVIDE US DOCUMENTS ONLY LINKED TO THOSE WHERE

24   HERBALIFE -- AND THAT'S A MASSIVE FILTER BECAUSE THEY HAVE AN

25   INCENTIVE NOT TO FIND WRONGDOING.  WHERE HERBALIFE FOUND

1   WRONGDOING WE WANTED INFORMATION ASSOCIATED WITH THAT AS

2   OPPOSED TO THE MINOR TIDBITS THAT WERE PRODUCED.

3            THAT'S ALL.

4            THE COURT:  IS THAT -- WAS THAT MY RULING?

5            MR. ADAR:  WELL, YOUR PRIOR RULING, YOUR HONOR, SAID

6   THAT WE WERE NOT ENTITLED TO EVERY SHEET OF PAPER ASSOCIATED

7   WITH IT.  AND I APPRECIATE YOUR HONOR'S REFERENCE TO 1983 THAT

8   WE AREN'T GOING TO GET EVERYTHING ASSOCIATED WITH IT.  BUT AT A

9   BARE MINIMUM WE SHOULD BE ENTITLED TO INFORMATION TO HELP US

10  UNDERSTAND WHAT THOSE CONCLUSIONS WERE.

11           BASED ON THE REDACTIONS THAT WERE PRODUCED, WE DIDN'T

12  HAVE AN ADEQUATE UNDERSTANDING OF WHAT HERBALIFE WAS ON NOTICE

13  OF.

14           AND IF THERE ARE PRIVILEGED --

15           THE COURT:  WAS ON NOTICE OF OR FOUND TO BE

16  PROBLEMATIC AND LED TO DISCIPLINE?

17           MR. ADAR:  THE LATTER.  AND I WOULD USE THE ON NOTICE

18  OF AS A SUBSET OF THAT.

19           AS YOUR HONOR'S ORDER POINTED OUT, WE -- THE ONLY

20  REASON WHY WE WOULD BE ENTITLED TO THIS INFORMATION IS TO KNOW

21  WHAT HERBALIFE KNEW.

22           SO, WE AREN'T CAPABLE AS THE PLAINTIFFS OF

23  UNDERSTANDING WHAT HERBALIFE KNEW FOR THOSE SUBSET OF FINDINGS

24  WHERE THEY DID FIND GUILT WITHOUT HAVING MORE OF THE CASE FILE.

25           AND I DON'T WANT TO GO WITH A BACK AND FORTH

15

1    REGARDING OUR CONFERENCES.  WE HAD NO IDEA WHAT THE SUBSTANCE

2    OF THAT WAS UP UNTIL MR. JACKSON'S DECLARATION WAS FILED.

3              DURING OUR PRIOR CONFERENCES WE ASKED

4    MR. PANCHAPAKESAN --

5              THE COURT:  OKAY.  SO, I -- I DON'T HAVE THIS

6    MATERIAL, RIGHT?  I DON'T HAVE THAT -- THE PDF DOWNLOAD, RIGHT?

7              MR. JACKSON:  YOU HAD -- SO, WE SUBMITTED ONE

8    EXEMPLARY CASE FILE THAT WE HAD FURTHER REDACTED BECAUSE THEY

9    WERE PRODUCED AEO JUST TO REMOVE ANYONE'S NAME OR IDENTIFYING

10   INFORMATION.  AND THAT JUST SHOWS AN EXAMPLE OF WHAT'S IN THE

11   FACT SUMMARY, THE CONCLUSION FIELD, AND THE PROVEN/UNPROVEN

12   ANALYSIS FIELD.

13             MR. ADAR:  AND, YOUR HONOR, WE DID TRY TO HAVE A

14   DISCUSSION WITH OPPOSING COUNSEL TO AT LEAST DESCRIBE WITH

15   PARTICULARITY THE CONTENT.  AND I HAD REPEATED DISCUSSIONS WITH

16   MR. PANCHAPAKESAN REGARDING WHAT WAS THE CONTENT THAT WAS

17   REDACTED.  AND WE HAVE SOME INFORMATION REGARDING THE FIELDS,

18   BUT WE STILL DON'T KNOW WHAT THEY'RE NOT PRODUCING.  SO WE HAVE

19   NO WAY OF KNOWING WHETHER IT'S RESPONSIVE TO THE COURT'S ORDER.

20             THE COURT:  THAT'S NOT WHAT'S ATTACHED TO YOUR

21   SUPPLEMENTAL BRIEF --

22             MR. JACKSON:  SO, APOLOGIES, YOUR HONOR.

23             AND ATTACHED TO THE INITIAL DECLARATION --

24             THE COURT:  RIGHT.

25             MR. JACKSON:  -- THERE WAS AN EXAMPLE CASE FILE.  SO,

1    THAT WOULD BE 231-1 --

2              THE COURT:  231.

3              MR. JACKSON:  -- THE VERY LAST COUPLE OF PAGES,

4    EXHIBIT 7 TO MY ORIGINAL DECLARATION.

5              (PAUSE IN PROCEEDINGS.)

6              THE COURT:  SO, YOU'RE FAMILIAR WITH THIS MATERIAL?

7    RIGHT?

8              MR. JACKSON:  YES, YOUR HONOR.

9              THE COURT:  OKAY.

10             THIS IS ON -- DOES IT EVEN IDENTIFY THAT PERSON?

11             MR. JACKSON:  IT DOES NOT IN THE -- IN THE VERSION

12   THAT WAS SUBMITTED TO THE COURT IN A PUBLIC FILING IT DOES NOT

13   --

14             THE COURT:  OKAY.

15             MR. JACKSON:  -- WHAT WAS PROVIDED WITH.

16             THE COURT:  SO, WE'LL CALL THAT PERSON X, BUT YOU

17   KNOW WHO PERSON X IS.

18             MR. ADAR:  YES, YOUR HONOR.

19             THE COURT:  SO, YOU DON'T KNOW WHAT PERSON X DID?

20             MR. ADAR:  IN THAT EXAMPLE WE DO, YOUR HONOR.

21             THE COURT:  OKAY.

22             MR. ADAR:  IN OTHER EXAMPLES WE DO NOT.

23             THE COURT:  HOW MANY?

24             MR. ADAR:  THERE WERE 44 PAGES THAT WERE PRODUCED. I

25   WOULD ESTIMATE 15 TO 20 OF THEM WE WOULD REQUIRE FURTHER

17

1    INFORMATION ON.

2              THE COURT:  NOT HOW MANY PAGES.  HOW MANY PEOPLE.

3    HOW MANY PEOPLE DO -- HOW MANY PEOPLE THAT THEY DESCRIBED, THAT

4    THEY MADE FINDINGS AGAINST, AND YOU DON'T KNOW WHAT THEY'RE

5    TALKING ABOUT?

6              MR. ADAR:  ALL BUT TWO OR THREE.  AND I THINK THAT

7    WOULD BE APPROXIMATELY 15 TO 18 PEOPLE.  I APOLOGIZE.  I DON'T

8    HAVE THE EXACT NUMBERS.

9              THE COURT:  OKAY.

10             AND THEN THE TOTAL QUANTITY OF PAPER WE'RE TALKING

11   ABOUT IS 40-SOME-ODD PAGES?

12             MR. ADAR:  YES, I BELIEVE THAT'S CORRECT.

13             THE COURT:  DO YOU WANT ME TO DO AN IN CAMERA REVIEW

14   OF THAT?

15             MR. ADAR:  YES, YOUR HONOR.

16             THE COURT:  OKAY.

17             ARE YOU WILLING TO PAY 37(A)(5) FEES IF YOU'RE NOT

18   SUBSTANTIALLY JUSTIFIED IN THAT REQUEST?

19             MR. ADAR:  I WILL CONFER WITH MY CLIENTS.  AND IF I

20    --

21             THE COURT:  THAT WOULD NOT BE A CLIENT PAYMENT.

22             MR. ADAR:  NO, THAT WOULD BE -- I UNDERSTAND.  MY

23   CO-COUNSEL.

24             THE COURT:  OH.  OH, OKAY.

25             (LAUGHTER.)

18

1           MR. ADAR:  THE BANK.

2           BUT I WILL -- WE DO FEEL WE ARE ENTITLED TO THAT,

3   YOUR HONOR.  AND --

4           THE COURT:  I'M SORRY.  THE BANK?

5           MR. ADAR:  WELL, THE -- THE --

6           THE COURT:  CHECKBOOK.

7           MR. ADAR:  YES, EXACTLY.  CORRECT.

8           YOUR HONOR, IF I'M --

9           THE COURT:  WE DON'T HAVE TO DECIDE THAT TODAY.

10          MR. ADAR:  IF YOU DON'T MIND, IF I CAN CONFER WITH MY

11  PARTNERS.

12          THE COURT:  I UNDERSTAND.  AND I -- I MEAN, I'M -- I

13  DISLIKE IN CAMERA REVIEW.  IT'S INCREDIBLY BURDENSOME ON ME.

14  I'M DISAPPEARING NEXT WEEK INTO A TRIAL.  I'M THE PERSON WHO

15  KNOWS THE LEAST ABOUT ALL OF THIS.  BUT I'M AWARE OF WHAT'S

16  BEEN GOING ON HERE.  AND I'M AWARE OF THE CONTENTIOUSNESS.  AND

17  IF THERE'S A QUESTION OF TRUST OR USABILITY OR GAMESMANSHIP,

18  I'LL GET INVOLVED.

19          BUT I NEED TO KNOW IT'S THAT SERIOUS.

20          AND, MR. JACKSON, I'M GOING TO LOOK AT YOU, SIR, AND

21  ASK YOU, DO YOU WANT IN CAMERA REVIEW TO DEMONSTRATE THAT YOU

22  HAVE BEEN SUBSTANTIALLY JUSTIFIED IN THE REDACTIONS YOU'VE

23  TAKEN, YOU'VE MADE AND THE POSITION YOU'RE TAKING HERE?

24          MR. JACKSON:  I THINK OUR POSITION IS IN CAMERA

25  REVIEW WOULDN'T BE NECESSARY.  BUT TO THE EXTENT IT IS, WE'RE

19

1  HAPPY TO HAVE IT.

2          THE COURT:  I'M NOT ASKING -- WELL, ALL RIGHT.

3  NECESSARY OR NOT.

4          BUT, I MEAN, IF -- IF I MOVE FORWARD WITH THIS, WOULD

5  YOU WANT TO RECONSIDER YOUR POSITION BEFORE I SPEND TIME ON

6  THIS?  BECAUSE THERE'S 37(A)(5) FEES COMING YOUR WAY AS WELL.

7          MR. JACKSON:  NO.  REALLY.  NO, YOUR HONOR.

8          THE COURT:  ALL RIGHT.

9          MR. JACKSON:  BUT THANK YOU FOR --

10          THE COURT:  YOU MISSED IT.

11          MR. JACKSON:  -- GIVING ME THE OPPORTUNITY.

12          THE COURT:  BECAUSE MR. DROOKS -- MR. DROOKS WAS

13  SERENELY NODDING THE ENTIRE TIME.

14          (LAUGHTER.)

15          MR. ADAR:  YOUR HONOR, IF I MAY JUST MAKE ONE

16  ADDITIONAL POINT.

17          THE COURT:  YES, SIR.

18          MR. ADAR:  ONE THING THAT WE WERE STRUGGLING, AND I

19  TRIED TO RESEARCH THIS POINT, I DID NOT FIND ANY BASIS FOR THEM

20  BEING ABLE TO REDACT DOCUMENTS IF THERE'S NO PRIVILEGE.

21          SO, WHILE IT'S TOUGH FOR ME OR MY PARTNERS OR MY

22  CLIENTS TO BE ABLE TO COMMIT TO UNDERSTANDING WHETHER THERE'S

23  GOOD STUFF IN THERE, WHETHER THERE'S RESPONSIVE STUFF IN THERE,

24  THEY'VE DECIDED UNILATERALLY TO REDACT INFORMATION THAT COULD

25  BE RESPONSIVE.

1        AND WE'RE IN A VACUUM.  WE'RE NOT IN A POSITION TO

2   KNOW.  AND WE'VE TRIED TO HAVE GOOD FAITH DISCUSSIONS REGARDING

3   WHAT THAT CONTENT IS AND WHAT WE WERE GIVEN DESPITE REPEATED

4   REQUESTS WAS SIMPLY WHAT'S IN THE DECLARATION.

5        THE COURT:  HEAR ME NOW.  I GET IT.

6        MR. ADAR:  OKAY.

7        THE COURT:  THAT'S ALMOST ALWAYS THE CASE.  SOMEONE

8   ELSE HAS THE FILES AND DOESN'T TURN THEM OVER.  AND WHETHER

9   IT'S COP FILES OR EDUCATION FILES OR EMPLOYMENT FILES OR

10  MEDICAL FILES OR WHATEVER THESE ARE.  YEAH, I MEAN, DISCOVERY

11  IS, YOU KNOW, TRUSTING THAT, YOU KNOW, THE FOLKS AT BIRD

12  MARELLA ARE NOT PUTTING THEIR LAW LICENSES ON THE LINE AND

13  ENGAGING IN MISCONDUCT.

14       BUT HOW DO YOU KNOW.  YOU DON'T.  AND, YOU KNOW,

15  WHAT'S THE DIFFERENCE BETWEEN WHAT YOU GOT AND WHAT YOU CAN'T

16  SEE.  YOU DON'T KNOW IF WHAT YOU HAVE IS PATENTLY INADEQUATE

17  FOR YOU TO REPRESENT YOUR CLIENTS AND TO CROSS WITNESSES,

18  IMPEACH WITNESSES, ADVANCE YOUR CLAIMS OF, YOU KNOW, RAMPANT

19  MISCONDUCT BY THESE FOLKS, THEN, YOU HAVE TO ASK ME -- WELL,

20  YOU HAVE TO ASK THEM AND PUSH THEM TO GET THIS STUFF.  AND IF

21  YOU DON'T GET IT, YOU'RE ABSOLUTELY ENTITLED TO COME TO ME FOR

22  IT.

23       IF YOU'RE JUST BEING AGGRESSIVE AND YOU'RE WRONG,

24  THAT'S NOT A LEGITIMATE LITIGATION POSITION.  NEITHER IS

25  OVERREDACTING AND CONCEALING RELEVANT MATERIAL.  AND THAT'S --

1    AND I DON'T KNOW EITHER, RIGHT?  I DON'T KNOW WHAT THEY -- WHAT

2    THEY HAVEN'T SHOWN ME AND WHAT -- AND IF WE MOVE FORWARD WITH

3    THIS, I'M GOING TO GET THE REDACTED VERSION AND THE UNREDACTED

4    VERSION.  AND THE UNREDACTED VERSION IS GOING TO, YOU KNOW,

5    LIKELY SHOW ME WHAT WAS REDACTED.  MAYBE I'LL TAKE A BRIEF AS

6    TO WHY, WHICH WOULD BE IN CAMERA AS WELL WHICH I SOMETIMES

7    DO.

8           AND, THEN, YOU'RE IN MY HANDS.

9           NOW, THE BASIS FOR REDACTING MATERIAL THAT IS

10   PERSONAL OR PRIVATE, NOT APPROPRIATE TO BE TURNED OVER, NOT

11   RESPONSIVE TO DISCOVERY CERTAINLY FALLS WELL WITHIN THE

12   PARAMETERS OF MY ORDER.

13          AND IF THEY KEPT THINGS OUT THAT THEY JUST SAID

14   AREN'T PART OF THE REQUESTS AND SHOULDN'T GO OVER,

15   NOTWITHSTANDING THE EXISTENCE OF A PROTECTIVE ORDER, I WILL

16   TELL YOU RIGHT NOW I DON'T HAVE A PROBLEM WITH THAT. I DON'T

17   HAVE A PROBLEM WITH THAT.

18          AND IF THEY JUST BLACKED OUT STUFF THAT'S IRRELEVANT

19   OR DIDN'T FALL WITHIN MY ORDER, THAT'S NOT GOING TO BE A

20   PROBLEM WITH ME.

21          BUT IF THEY TURNED OVER STUFF THAT'S UNUSABLE OR JUST

22   WAY TOO -- WAY TOO FLINT-EYED FOR YOU TO DO ANYTHING WITH IT,

23   THAT'S A PROBLEM.  THAT'S A PROBLEM.  THAT'S --

24          MR. ADAR:  YOUR GUIDANCE IS WELL RECEIVED, YOUR

25   HONOR.

22

1              THE COURT:  GOOD.

2              MR. ADAR:  AND WE WILL LET YOU KNOW.  IS THERE A

3    TIMETABLE WHEN YOU'D LIKE FOR US TO RESPOND BY OR LET THE COURT

4    KNOW BY?

5              THE COURT:  TAKE YOUR TIME.

6              MR. ADAR:  THANK YOU, YOUR HONOR.

7              THE COURT:  BUT I ALSO WANTED TO GIVE BOTH SIDES ONE

8    CLEAR CHANCE AND TO CONVEY THE SERIOUSNESS OF WHAT WE'RE

9    TALKING ABOUT.  IF I'M GOING TO TAKE SEVERAL HOURS TO READ THIS

10   -- BECAUSE I'M NOT GOING TO BE ABLE TO GET THROUGH IT IN A FEW

11   MINUTES -- AND NOT ONLY MY TIME IS MORE VALUABLE THAN YOU GUYS,

12   I PROBABLY BILL OUT FAR LESS THAN YOU DO.  I DEFINITELY BILL

13   OUT FAR LESS THAN YOU DO.

14             BUT IT'S SERIOUS.  AND THE FACT THAT IT'S GOTTEN

15   PUSHED TO THIS LEVEL TRIGGERS 37(A)(5).

16             OKAY.

17             MR. ADAR:  THANK YOU, YOUR HONOR.

18             THE COURT:  ALL RIGHT.  WE'LL COME BACK TO THAT ONE.

19   BUT THANK YOU FOR THE DISCUSSION.

20             ALL RIGHT.

21             MR. ADAR:  MAY I HAVE A SEAT?

22             THE COURT:  YES, PLEASE.

23             MR. ADAR:  THANK YOU.

24             THE COURT:  YOU DON'T HAVE TO ASK.  JUST GO.

25             (PAUSE IN PROCEEDINGS.)

23

1          THE COURT:  JUST TAKING A NOTE BECAUSE WE'RE GOING TO

2     BE HERE AWHILE.

3          BY THE WAY, THANKS FOR GETTING HERE EARLY, EVERYBODY.

4          ALL RIGHT.  SO, NOW PPV SALES DATA.  FIRST I THOUGHT

5     THAT WAS PAY-PER-VIEW.  THEN I REALIZED THAT THAT WAS MY AUTO

6     CORRECT FOR THE PEOPLE VERSUS WHEN I DO STATE HABEAS CASES

7     INVOLVING CRIMINAL CONDUCT.  GOT NOTHING TO DO HERE.

8          WHAT DOES PPV STAND FOR, GUYS?

9          MR. JACKSON:  PERSONALLY PURCHASED VOLUME.

10          THE COURT:  PERSONALLY PURCHASED VOLUME.  THAT'S

11     ITEMS THAT DISTRIBUTORS BUY FROM HERBALIFE FOR RESALE?

12          MR. JACKSON:  YES.

13          THE COURT:  INVENTORY?

14          MR. JACKSON:  FOR PERSONAL USE.

15          YES.  THAT'S THE PRODUCT THAT'S BOUGHT BY AN

16     INDIVIDUAL DISTRIBUTOR, EITHER FOR RESALE OR PERSONAL USE.

17          THE COURT:  SURE.  OKAY.  ALL RIGHT.

18          OKAY.  SO, THE CONTENTION AS I UNDERSTAND IT FROM MR.

19     ADAR IS THAT I ORDERED PRODUCTION OF --

20          NO, WAIT.  I'VE GOT THIS.  I'VE GOT THIS.

21          (BRIEF PAUSE.)

22          THE COURT:  I DON'T GOT THIS.

23          THE BIZWORKS REPORT, RIGHT.

24          "FOR A PERIOD OF TIME HERBALIFE WILL PRODUCE THE

25               BIZWORKS SPREADSHEET OR INFORMATION IN ANOTHER

24

1           WORKABLE FORMAT SHOWING AGGREGATE INFORMATION

2           ABOUT ANNUAL SOURCES OF INCOME FOR THE FLORIDA

3           DEFENDANTS DURING THE PERIOD OF TIME COVERED BY

4           THE AMENDED COMPLAINT."

5           SO, IT'S WHAT SALES PEOPLE EARNED AND DOWNLINE

6   BUCKETS OF INCOME.

7           I DIDN'T MAKE THAT STUFF UP.  THAT WAS WHAT YOU HAD

8   REQUESTED, MR. ADAR.  AND I WENT YOUR WAY.

9           MR. ADAR:  THANK YOU, YOUR HONOR.

10          THE COURT:  YOU'RE WELCOME, BUT YOU DON'T HAVE TO

11  THANK ME.

12          AND THERE WAS A TIME PERIOD THAT WAS COVERED BY THIS.

13          AND, THEN, THE CONTENTION IN THE MOTION RIGHT NOW IS

14  THAT YOU DIDN'T GET IT ALL, YOU GOT IT FOR A PERIOD OF TIME,

15  AND YOU DID NOT GET THE PPV STUFF, PERSONALLY PURCHASED VOLUME.

16          WHAT'S THIS ABOUT?

17          MR. ADAR:  SO, YOUR HONOR, IN YOUR ORDER YOU REQUIRED

18  THEM TO PRODUCE -- YOU DEFINED AGGREGATE AS THE AMOUNTS OF

19  MONEY EARNED PER YEAR IN THE DIRECT SALES AND DOWNLINE BUCKETS

20  OF INCOME.

21          I -- WE VIEW THOSE AS TWO SEPARATE THINGS.

22          AND AS YOU ARE AWARE WHAT THIS CASE IS ABOUT IS YOU

23  HAVE PEOPLE THAT ARE GOING TO EVENTS AND THEY'RE SPEAKING AND

24  SAYING IF YOU LISTEN TO ME AND DO AS I SAY, YOU WILL SUCCEED IN

25  RETAIL SALES.

1          YOU SAID THAT TO PROVIDE THAT INFORMATION, HERBALIFE

2    HAS TWO OPTIONS.  OPTION ONE IS THEY PRODUCE BIZWORKS REPORTS.

3    OR OPTION TWO IS THEY PRODUCE THE ANALOGOUS OR SOME SORT OF

4    ADDITIONAL DOCUMENT THAT WOULD BE ABLE TO PROVIDE THAT

5    INFORMATION.

6          WHAT THEY'VE GIVEN US INITIALLY -- AND THEY HAVE

7    SUPPLEMENTED IT.  WE WERE ABLE TO RESOLVE THE MARK HUGHES BONUS

8    DISPUTE.  THEY PROVIDED US WITH THAT.  THAT WAS SOMETHING THAT

9    WAS ORIGINALLY RAISED IN OUR EMAIL.  THEY PROVIDED US AGGREGATE

10   DATA THAT FOR THE YEARS PRIOR TO 2017 MADE IT IMPOSSIBLE FOR US

11   TO UNDERSTAND WHAT THEIR DIRECT SALES WERE.

12          THE COURT:  WHEN YOU SAY AGGREGATE DATA --

13          MR. ADAR:  YES.

14          THE COURT:  -- WHAT DO YOU MEAN?

15          MR. ADAR:  WELL, THEY PROVIDE THE TOTAL COMPENSATION

16   THAT THEY RECEIVED FROM HERBALIFE.

17          AND FOR YEARS 2017 ONWARD, THEY PRODUCED THE CELL OR

18   A ROW CALLED "RETAIL PROFIT."  SO, WE WERE ABLE TO UNDERSTAND

19   FOR 2017 ONWARD HOW MUCH MONEY THEY EARNED THROUGH RETAIL

20   PROFIT OR RETAIL SALES.  IT WAS A FRACTION, LESS THAN --

21          THE COURT:  WHEN YOU SAY RETAIL PROFIT -- I DON'T

22   KNOW WHAT THESE TERMS MEAN IN THE CONTEXT OF THIS CASE.

23          MR. ADAR:  RETAIL PROFIT I WOULD BE SPECULATING AS TO

24   WHAT IT MEANS.  IT HASN'T BEEN DEFINED.  BUT MY GUESS IS IT'S

25   THE AMOUNT OF MONEY THEY MADE THROUGH -- HERBALIFE IS -- THEY

26

1   SELL SHAKES AND NUTRITIONAL SUPPLEMENTS.  SO, IT WOULD BE THE

2   AMOUNT OF MONEY THAT THEY MADE THROUGH THEIR DIRECT SALES OF

3   RETAIL -- RETAIL SALES.  WHAT THEY MADE FOLLOWING THE ADVICE

4   THAT THEY GIVE AT THE EVENTS.

5           THE COURT:  WHAT THE DISTRIBUTORS MADE.

6           MR. ADAR:  CORRECT.  DIRECTLY.

7           THE COURT:  SO, THE DISTRIBUTORS BOUGHT OR GOT THE

8   SHAKES AND SOLD THEM.

9           AND HERBALIFE KNOWS THEIR PROFIT?

10          MR. ADAR:  THAT'S WHAT THEY PRODUCED.

11          ALL WE WANTED TO KNOW WAS THE DIRECT SALES AMOUNT.

12   THEY PRODUCED RETAIL PROFITS.

13          THE COURT:  AND DIRECT SALES IS REFERRING TO WHAT?

14          MR. ADAR:  SO, AS OPPOSED TO -- THERE ARE MULTIPLE

15   SOURCES OF INCOME FOR DISTRIBUTORS, TWO OF WHICH RELEVANT HERE.

16   ONE OF THEM IS THEY MAKE MONEY IF THEY WERE TO RECRUIT 10

17   PEOPLE TO SELL UNDER THEM.  THEY GET A COMMISSION OF EACH OF

18   THOSE 10 PEOPLE'S SALES.  AND IF EACH OF THOSE 10 PEOPLE

19   RECRUIT 10 MORE, THEY GET FOR THE ENTIRE DOWNLINE TREE EVERYONE

20   THAT SELLS UNDER THEM IN THEIR TREE.  THAT'S WHERE THEY MAKE

21   THE BULK OF THEIR MONEY BASED ON THE INFORMATION THAT'S BEEN

22   PRODUCED.

23          WE WANT TO KNOW IF THEY MADE $5 MILLION FROM

24   HERBALIFE, WHETHER A HUNDRED DOLLARS IS MADE FROM RETAIL SALES,

25   OR $4.9 MILLION IS MADE FROM RETAIL SALES.

27

1          THE COURT:  SO, THE SALES FROM DOWNSTREAM SALES

2     PEOPLE THAT MONEY GOES INTO HERBALIFE.

3          HERBALIFE OR HERBALIFE, WHICH DO YOU ALL PREFER?

4          MR. JACKSON:  HERBALIFE.

5          THE COURT:  SORRY?

6          MR. JACKSON:  HERBALIFE.

7          MR. ADAR:  HERBALIFE.

8          THE COURT:  HERB.

9          MR. ADAR:  YES.

10          THE COURT:  OKAY.  GOT IT.

11          AND, THEN, HERBALIFE IS RESPONSIBLE FOR DISTRIBUTING

12     OR AT LEAST ACCOUNTING FOR THE MONEY THAT THE MORE SENIOR

13     PEOPLE HAVE EARNED AS A RESULT OF THOSE TRANSACTIONS?

14          MR. ADAR:  YES.  THAT'S IN ESSENCE ACCURATE.

15          WHAT WOULD HAPPEN IS IF THERE'S -- IF PERSON A WERE

16     TO MAKE SALES, THEY WOULD GIVE IT TO HERBALIFE.  BUT THEN IF

17     PERSONS B, C, AND D ARE UNDER THEM, AND THEY MAKE SALES, THE

18     MONEY WOULD GO TO HERBALIFE, AND THEN HERBALIFE WOULD PAY A

19     COMMISSION --

20          THE COURT:  GOT IT.

21          MR. ADAR:  -- TO EVERYONE ON THE TREE.

22          THE COURT:  SO, THE MOTHER SHIP KNOWS ABOUT

23     COMMISSIONS THAT ARE ATTRIBUTABLE TO SENIOR MEMBERS OF THIS

24     DISTRIBUTION CHAIN.

25          MR. ADAR:  YES, YOUR HONOR.

1          THE COURT:  AND THAT'S THE INFORMATION YOU WANT?

2          MR. ADAR:  THAT'S THE INFORMATION WE HAVE.  WE WANT

3    TO KNOW WHETHER THEY MADE ANY MONEY IN THEIR OWN DIRECT SALES,

4    WHETHER THEY ARE HITTING THE PAVEMENT SELLING NUTRITIONAL

5    SUPPLEMENTS AND HAVE ANY KNOWLEDGE OR ANY BASIS WHATSOEVER FOR

6    THEIR CLAIMS TO PEOPLE THAT THEY SAY, LISTEN TO ME, AND I WILL

7    TEACH YOU THE TRICK OF THE TRADE TO BE ABLE TO LEARN HOW TO

8    SELL HERBALIFE SUPPLEMENTS.

9          THE COURT:  OKAY.  SO, A SENIOR DISTRIBUTOR WHO MAY

10   BE ONE OF THE FLORIDA DEFENDANTS IS HERSELF OR HIMSELF OUT

11   SELLING PRODUCTS, GETS TO KEEP A LOT OF MONEY FOR THAT.  AND

12   THEN ALSO HAS OTHER FOLKS DOWNSTREAM SELLING AND THAT, AGAIN,

13   FLORIDA PERSON RECEIVES A PORTION OF THEIR COMMISSIONS.

14         MR. ADAR:  WE DON'T KNOW WHETHER THEY'RE OUT SELLING

15   PRODUCTS.  WE'VE ASKED, AND WE HAVE NO IDEA.

16         THE COURT:  OKAY.

17         BUT THAT -- BUT WHEN YOU SAY YOU WANT DIRECT SALES

18   INFORMATION, THAT'S WHAT YOU WANT?

19         MR. ADAR:  CORRECT.

20         THE COURT:  OKAY.

21         AND YOU THINK THAT'S GOING TO BE MORE -- WELL, YOU

22   DON'T KNOW.  BUT YOU WANT TO KNOW WHAT THE FLORIDA -- THESE ARE

23   THE FLORIDA DEFENDANTS, RIGHT?

24         MR. ADAR:  YES, YOUR HONOR.

25         THE COURT:  OKAY.

1          SO, AN INDIVIDUAL FLORIDA DEFENDANT EARNS HER OR HIS

2   OWN SALES AMOUNTS AND THEN GETS SOME DERIVATIVE AMOUNT FROM THE

3   FOLKS DOWNSTREAM?

4          MR. ADAR:  THE ONLY WAY I WOULD RECHARACTERIZE THAT,

5   YOUR HONOR, IS BASED ON WHAT WE'VE SEEN IS IT'S NOT SOME

6   AMOUNT.  NINETY-NINE PERCENT OF WHAT THEY RECEIVE IS THE

7   DERIVATIVE AMOUNT.

8          THE COURT:  OKAY.

9          MR. ADAR:  AND LESS THAN 1 PERCENT IS THE DIRECT

10  SALES.

11         THE COURT:  OKAY.  SO, WE'RE FIGHTING ABOUT WHAT?

12         MR. ADAR:  WELL, THAT'S FOR THE LIMITED DATA THAT

13  WE'VE SEEN.

14         WHAT WE'D LIKE TO KNOW IS PRIOR TO 2017 MAYBE THEY

15  HAD SUCCESS AT RETAIL SALES.  AND THERE WOULD BE A BASIS FOR

16  JUSTIFYING THAT THEY KNOW WHAT THEY'RE DOING IN HOW TO SELL

17  RETAIL PRODUCTS.

18         THE COURT:  OKAY.  SO, THE PRE-2017 DATA THAT YOU

19  RECEIVED DOES NOT DISTINGUISH BETWEEN DIRECT SALES COMMISSIONS

20  AND PROFITS FROM THE DOWNSTREAM SALES COMMISSIONS AND PROFITS.

21         MR. ADAR:  CORRECT FOR POST- -- AND IN FAIRNESS TO

22  HERBALIFE, THEY DIDN'T TRACK THE RETAIL PROFITS PRIOR TO 2017.

23         SO, WE ARE -- WE WOULD LIKE --

24         THE COURT:  WHEN YOU SAY "RETAIL PROFITS," DO YOU

25  MEAN DIRECT SALES?

1            DO YOU --

2            MR. ADAR:  I -- I -- THAT'S A QUESTION THEY DON'T --

3     THAT WE WERE UNABLE TO ASCERTAIN FROM HERBALIFE.

4            SO, WE DON'T KNOW WHAT RETAIL PROFITS NECESSARILY

5     MEANS.

6            WE DO KNOW THAT THEY DON'T TRACK DIRECT SALES PRIOR

7     TO 2017.  YOUR ORDER REQUIRED THEM TO PRODUCE IT.  AND THEY

8     DON'T TRACK IT.

9            SO, THE ONLY --

10           THE COURT:  MY ORDER REQUIRED THEM TO PRODUCE IT

11    BECAUSE YOU ASKED FOR IT.

12           MR. ADAR:  CORRECT, YOUR HONOR.

13           THE COURT:  OKAY.

14           MR. ADAR:  AND THAT INFORMATION WOULD BE AVAILABLE IF

15    THEY WERE TO PRODUCE THE ENTIRE BIZWORKS REPORT.  BUT BECAUSE

16    THEY DON'T HAVE THAT INFORMATION, WE WOULD BE ABLE TO

17    UNDERSTAND WHAT THE DIRECT SALES WERE BASED ON THE PPV DATA.

18           THE COURT:  THAT ONE WENT REALLY QUICK.  DO IT AGAIN.

19           MR. ADAR:  SURE, YOUR HONOR.

20           SO, IF WE WANT TO UNDERSTAND WHAT THE DIRECT SALES

21    ARE, THEY TRACK RETAIL PROFITS.  THIS IS BASED ON OUR

22    CONFERENCES.  BUT THEY STARTED DOING IT IN 2017 IN RESPONSE TO

23    AN FTC ORDER.

24           SO, PRIOR TO 2017 THEY DIDN'T TRACK RETAIL PROFITS.

25           WE WANT TO UNDERSTAND HOW MUCH MONEY THEY MADE FROM

1    RETAIL SALES.

2              ONE METRIC IS --

3              THE COURT:  YOU'RE USING THREE DIFFERENT TERMS THERE,

4    MR. --

5              MR. ADAR:  YES, YOUR HONOR.

6              THE COURT:  RETAIL SALES, RETAIL PROFITS, DIRECT

7    SALES.

8              MR. ADAR:  RETAIL AND DIRECT SALES I WOULD USE

9    INTERCHANGEABLY.  WE WANT TO UNDERSTAND WHAT RETAIL SALES ARE.

10             THE COURT:  OKAY.

11             MR. ADAR:  HOW MUCH MONEY DID THEY MAKE SELLING

12   HERBALIFE PRODUCTS.

13             THEY DON'T HAVE THAT SPECIFIC INFORMATION PRIOR TO

14   2017, AT LEAST THAT'S WHAT'S BEEN REPRESENTED TO US.  AND WE

15   HAVE NO REASON TO DOUBT THAT.

16             WHAT THEY DO HAVE, HOWEVER, AT THE CLICK OF A BUTTON

17    -- BECAUSE WE HAVEN'T HAD ANY UNDUE BURDEN ANALYSIS OR ANY

18   CLAIM OF UNDUE BURDEN -- IS THEY DO HAVE THROUGH THEIR SOFTWARE

19   THE ABILITY TO PRODUCE PERSONALLY PURCHASED VOLUME WHERE WE

20   WOULD BE ABLE TO UNDERSTAND HOW MUCH VOLUME THEY INDIVIDUALLY

21   PURCHASED.

22             AND WHATEVER THEY INDIVIDUALLY PURCHASED, A SUBSET OR

23   ALL OF THAT, WOULD BE WHAT THEY WOULD RESELL.

24             THE COURT:  OKAY.  SAVE FOR WHAT THEY DRANK OR ATE.

25             MR. ADAR:  CORRECT OR GAVE AWAY.

1           THE COURT:  FAIR ENOUGH.  OKAY.

2           AND FOR POST-2017, YOU'VE TOLD ME THAT'S AN

3    INFINITESIMAL AMOUNT OF MONEY, RIGHT?

4           MR. ADAR:  YES.

5           THE COURT:  OKAY.

6           AND YOU SPECIFICALLY ASKED FOR THE BIZWORKS REPORTS

7    BECAUSE YOU TOLD ME AT A CLICK OF THE BUTTON YOU'D GET THE

8    INFORMATION YOU WANTED.

9           MR. ADAR:  YES, YOUR HONOR.

10           THE COURT:  OKAY.

11           DID YOU GET BIZWORKS REPORTS FOR PRE-2017?

12           MR. ADAR:  NO, YOUR HONOR.  WE HAVEN'T GOTTEN IT FOR

13    ANY YEAR.

14           AND --

15           THE COURT:  OKAY.

16           MR. ADAR:  AND WE ALSO HAVE IN ADDITION TO OUR

17    REQUEST WE ASKED TO INSPECT THEIR SOFTWARE.  WE DID A REQUEST

18    FOR INSPECTION.  AND THAT WAS OBJECTED TO.

19           AND WE CONFERRED WITH THEM.  THEY SAID LET US KNOW

20    WHAT YOU NEED.  AND WE'LL GIVE IT TO YOU RATHER THAN HAVING YOU

21    COME TO OUR HEADQUARTERS AND INSPECTING OUR SERVERS.

22           WE --

23           THE COURT:  SURE ABOUT -- I'M SURE ABOUT THAT.

24           MR. ADAR:  AND WE STILL HAVEN'T GOTTEN WHAT WE NEED.

25           WHAT WE WOULD LIKE IS THE BIZWORKS REPORTS.  AND IF

1    WE CAN'T GET IT, THEN, WE WOULD LIKE AT A MINIMUM THE PPV SALES

2    SO WE CAN UNDERSTAND WHETHER THE PEOPLE THAT ARE SAYING LISTEN

3    TO ME.  I KNOW HOW TO SELL THINGS -- ACTUALLY SOLD ANYTHING.

4             THE COURT:  OKAY.  GETTING THERE.

5             OKAY.  SO, YOU EITHER WANT DIRECT INFORMATION ABOUT

6    -- SORRY.  YOU EITHER WANT INFORMATION ABOUT DIRECT SALES AND

7    THE DOWNLINE STREAM OR THE BIZWORKS REPORTS OR THE PPV REPORTS.

8    AND YOU'RE TELLING ME THAT EITHER OF THOSE TWO ALTERNATIVES,

9    BIZWORKS OR PPV, WOULD GET YOU TO THE INFORMATION THAT YOU

10   WANT.

11            MR. ADAR:  YES, YOUR HONOR.

12            THE COURT:  OKAY.

13            AND WHAT WAS MY ORDER?

14            MR. ADAR:  YOUR ORDER REQUIRED THEM TO PRODUCE THE

15   BIZWORKS REPORTS OR INFORMATION IN ANOTHER WORKABLE FORMAT

16   SHOWING AGGREGATE INFORMATION REGARDING ANNUAL SOURCES OF

17   INCOME FOR THE FLORIDA DEFENDANTS DURING THE PERIOD OF TIME

18   COVERED BY THE AMENDED COMPLAINT.

19            THE COURT:  YES, I DID.  THAT'S PARAGRAPH 19.

20            MR. ADAR:  YES.

21            THE COURT:  OKAY.  GOT IT.

22            OKAY.  I SHOULD HEAR FROM HIM, SHOULDN'T I?

23            MR. ADAR:  YES.

24            THANK YOU, YOUR HONOR.

25            THE COURT:  OKAY.

1            MR. JACKSON.

2            MR. JACKSON:  SO, YOUR HONOR, I THINK ONE WAY THAT I

3    THINK WILL HELP MAKE THIS DISPUTE A LITTLE MORE MANAGEABLE IS

4    TO TAKE A STEP BACK TO THE PRIOR ROUND OF BRIEFING AND WHAT LED

5    UP TO YOUR LAST ORDER.

6            AND IF YOU MAY RECALL, THERE WERE TWO REQUESTS FOR

7    PRODUCTION AT ISSUE RELEVANT TO THIS DISPUTE.

8            ONE WAS A REQUEST FOR ALL OF THE INFORMATION

9    REGARDING THESE FLORIDA DEFENDANTS, THE INDIVIDUAL

10   DISTRIBUTORS' EARNINGS.  ESSENTIALLY WHAT THEY WERE BEING PAID

11   BY HERBALIFE.

12           THE SECOND WAS THE FLIP SIDE OF THAT -- MONEY GOING

13   THE OTHER WAY, INFORMATION REGARDING ANYTHING THAT THOSE

14   DISTRIBUTORS WERE PAYING TO HERBALIFE.  SO, ESSENTIALLY WHAT

15   THEY HAD BEEN PURCHASING FROM HERBALIFE.  AND THAT'S HOW THE

16   DISPUTE STARTED WITH THOSE TWO DIFFERENT REQUESTS SEEKING TWO

17   DIFFERENT TYPES OF INFORMATION.  SO, EARNINGS FROM THE

18   DISTRIBUTORS ON THE ONE HAND AND ALSO PURCHASES BY THE

19   DISTRIBUTOR ON THE OTHER.

20           AND IN THE COURSE OF THE BRIEFING WE THOUGHT THAT

21   PLAINTIFFS HAD ABANDONED THEIR REQUEST FOR THAT PURCHASE

22   INFORMATION AND WERE SEEKING ONLY EARNINGS INFORMATION.

23           AND WHEN YOUR ORDER CAME OUT WE THOUGHT IT WAS VERY

24   CLEAR THAT ALL THAT WAS CONTEMPLATED IN YOUR ORDER WAS EARNINGS

25   INFORMATION FOR THESE DISTRIBUTORS -- NOT ANY PURCHASES THEY

1  MIGHT HAVE MADE WHICH ARE SUBSTANTIALLY LESS RELEVANT WITH

2  RESPECT TO THE ALLEGATIONS THAT THEY'RE MAKING.  SO --

3           THE COURT:  OH, I DON'T THINK MR. ADAR CARES HOW MANY

4  MILKSHAKES THESE FOLKS BOUGHT FROM HERBALIFE.  I THINK HE WANTS

5  TO KNOW ABOUT THE MONEY THAT THESE FOLKS GOT.

6           MR. JACKSON:  AND I THINK THAT'S EXACTLY WHAT WE

7  PRODUCED, YOUR HONOR.

8           THE COURT:  OKAY.

9           MR. JACKSON:  IT MIGHT BE HELPFUL TO LOOK -- AGAIN,

10  WE PRODUCED A REDACTED SPREADSHEET OF WHAT WAS PRODUCED.  THIS

11  IS THE --

12           THE COURT:  THIS IS ATTACHED --

13           MR. JACKSON:  -- A SUPPLEMENTAL DECLARATION TO THE

14  REPLY --

15           THE COURT:  -- TO YOUR SUPPLEMENTAL DECLARATION.

16  YEAH.  ALL RIGHT.

17           MR. JACKSON:  SO, IT WOULD BE 243-1 --

18           THE COURT:  YEP.

19           MR. JACKSON:  -- THE LAST HANDFUL OF PAGES --

20           THE COURT:  YEP.

21           MR. JACKSON:  AND YOU CAN MAYBE LOOK JUST AT THE

22  FIRST PAGE.  YOU CAN AT LEAST SEE THE COLUMN HEADERS TO SHOW

23  WHAT INFORMATION WAS PRODUCED.  SO --

24           THE COURT:  OKAY.  SO, MARK ADDY, YOU HAVE HIM ON

25  YOUR LIST FROM 2009 THROUGH 2019.

1          MR. JACKSON:  RIGHT.  AND JUST READING STRAIGHT

2    ACROSS IN TERMS OF HIS EARNINGS FOR EACH ONE OF THOSE YEARS,

3    THERE'S COMMISSIONS, ROYALTIES, AND PERSONAL BONUSES -- AND

4    APOLOGIES.  THOSE HEADERS ARE SPIT OUT BY MACHINE.  NOT REAL

5    EASY TO READ.

6          THE COURT:  I -- THAT'S -- THAT'S HOW THE BUSINESS

7    RUNS.  I GOT IT.

8          MR. JACKSON:  FOR THE YEARS IN WHICH IT WAS TRACKED

9    BY HERBALIFE -- WHICH MR. ADAR POINTED OUT I BELIEVE WAS 2017,

10   '18 AND '19, THERE'S THIS RETAIL PROFIT FIELD.  THAT DOES

11   CORRESPOND WITH WHAT YOU IN YOUR ORDER CALLED "THE DIRECT SALES

12   BUCKET."

13         THE REST OF THESE COLUMNS ARE ESSENTIALLY THE

14   DOWNLINE BUCKET BROKEN INTO A FEW DIFFERENT PIECES OF INCOME.

15         THE TOTAL EARNINGS -- AND THEN AT THE END YOU'LL SEE

16   WE HAVE THIS MARK HUGHES BONUS THAT WE MET AND CONFERRED ABOUT

17   WITH OPPOSING COUNSEL AND ADDED TO THE SUPPLEMENTAL PRODUCTION.

18         THE COURT:  OKAY.  SO, I'M LOOKING AT A REDACTED

19   VERSION.  SO, I HAVE NO IDEA WHAT THE INFORMATION ACTUALLY

20   SAYS.

21         MR. JACKSON:  EXACTLY.  WE JUST WANTED TO MAKE CLEAR

22   WHAT GENERALLY HAD BEEN INCLUDED WITHOUT SHOWING SPECIFIC

23   DOLLAR FIGURES.

24         THE COURT:  OKAY.

25         MR. JACKSON:  AND WE TRIED TO MAKE THE REDACTIONS

1   ACCURATE SO THAT YOU COULD SEE THAT RETAIL PROFIT WAS ONLY

2   TRACKED FOR THOSE THREE YEARS.  SO, IT WASN'T PROVIDED FOR

3   EVERY YEAR.  THAT'S CORRECT.  THERE'S NO DISPUTE.

4           AND IN OUR VIEW, NUMBER ONE, THIS WAS EXACTLY WHAT

5   WAS CALLED FOR BY THE ORDER AND RESPONSIVE TO THE ORDER.  IT

6   DOESN'T JUST SHOW AGGREGATE INCOME.  IT'S BROKEN OUT TO EVERY

7   ONE OF THE BUCKETS THAT WE'VE BEEN ABLE TO -- YOU KNOW, WE'RE

8   ABLE TO TRACK.

9           THE COURT:  OKAY.  SO, THE COMMISSION BUCKET IN THE

10  FIRST -- IN THE FIRST COLUMN CORRESPONDS TO WHAT?

11          MR. JACKSON:  SO, I'M NOT GOING TO BE ABLE TO GIVE

12  YOU THE EXTREMELY DETAILED ANSWER TO THIS.

13          I CAN TELL YOU --

14          THE COURT:  GOOD.  GOOD.

15          MR. JACKSON:  -- THE --

16          THE COURT:  DON'T WANT THE EXTREMELY DETAILED.  I

17  WANT --

18          MR. JACKSON:  THE FIRST -- THE FIRST THREE,

19  COMMISSIONS, ROYALTIES AND BONUSES.

20          SO, COMMISSIONS RELATE DIRECTLY TO THESE DOWNLINE

21  SALES.  AND THEN THE ROYALTIES AND BONUSES ARE SOME COMBINATION

22  OF METRICS BASED ON THOSE SALES, BONUSES AWARDED BY HERBALIFE,

23  ET CETERA.

24          THE COURT:  OKAY.

25          MR. JACKSON:  BUT I CAN'T TELL YOU THE EXACT

38

1    CALCULATIONS THAT GO IN THERE.

2              THE COURT:  OKAY.

3              MR. JACKSON:  THE MARK HUGHES BONUS, THE MHB AT THE

4    FAR RIGHT, SIMILAR AGAIN.  IT'S A -- IT'S A BONUS BASED ON

5    SALES VOLUME, DOWNLINE SALES VOLUME, ET CETERA.

6              BUT AGAIN THOSE -- THOSE COLUMNS ALL CORRESPOND TO

7    WHAT YOU, YOU KNOW, GENERALLY REFERRED TO IN YOUR ORDER AS THAT

8    DOWNLINE SALES --

9              THE COURT:  OKAY.

10             MR. JACKSON:  -- BUCKET.

11             THE COURT:  OKAY.  SO -- SO, YOU FEEL LIKE YOU'VE

12   ADEQUATELY DISCLOSED THE DOWNLINE COMMISSIONS FOR THE RELEVANT

13   PERIOD.

14             CORRECT?

15             MR. JACKSON:  CORRECT.  AND --

16             THE COURT:  OKAY.

17             MR. JACKSON:  -- I'D LIKE TO JUST ADD.

18             ONE ADDITIONAL POINT IN TERMS OF THE RELEVANCE OF THE

19   INFORMATION THAT WE'RE SEEKING NOW, NUMBER ONE, I DON'T THINK

20   THERE'S ANY DISPUTE THAT FOR ALL OF THE FLORIDA DEFENDANTS WHO

21   ARE THE MOST SUCCESSFUL HERBALIFE DISTRIBUTORS OR SOME OF THE

22   MOST SUCCESSFUL HERBALIFE DISTRIBUTORS AROUND THE COUNTRY, THE

23   VAST MAJORITY OF THEIR INCOME IS NOT COMING FROM THEIR OWN

24   PERSONAL SALES.  IT'S GOING TO BE FROM THEIR TEAMS THAT THEY

25   RECRUITED OVER THE YEARS AND THAT ARE SELLING ON THEIR BEHALF,

1    ET CETERA.

2            FROM OUR POINT OF VIEW, THAT'S -- THAT'S NOT REALLY A

3    DISPUTED FACT.  THAT'S JUST A NATURAL OUTGROWTH OF THE LAWFUL

4    USE OF THE MULTILEVEL MARKETING SYSTEM.  THERE'S NOTHING

5    UNLAWFUL ABOUT RECRUITING PEOPLE AND EARNING COMMISSIONS ON

6    THEIR SALES.

7            AND CERTAINLY WE DON'T DISPUTE THAT FOR THESE HIGHLY

8    SUCCESSFUL DISTRIBUTORS THEIR PERSONAL SALES VOLUME IS GOING TO

9    BE A VERY SMALL PERCENTAGE OF THEIR OVERALL SALES.  I DON'T

10   THINK THAT'S IN DISPUTE.

11           AND, FRANKLY, THAT'S DEMONSTRATED --

12           THE COURT:  I DON'T -- I DON'T --

13           MR. JACKSON:  -- BY THE DATA WE'VE ALREADY PRODUCED,

14   THE 278 -- 2017, 2018, 2019.  IT IS IN FACT A SMALL PERCENTAGE.

15           THE COURT:  OKAY.  SO, WHY ARE YOU UNABLE -- I MEAN,

16   WHETHER YOU PROVE IT, WHETHER -- I MEAN, I UNDERSTAND THE

17   ARGUMENT YOU'RE GOING TO MAKE WITH THE DISTRICT JUDGE ON THOSE

18   ISSUES.  BUT FOR DISCOVERY PURPOSES, YOU KNOW, TERIS WOULD

19   VERIFY.  HE WANTS TO HAVE THE SAME INFORMATION FOR THAT EARLIER

20   PERIOD OF TIME WITH RESPECT TO DOWNLINE SALES AND, YOU KNOW, IT

21   MAY BE AN INSIGNIFICANT NUMBER BUT THE DIRECT SALES OR MAYBE IF

22   SOMEBODY HAS LIKE A BIG STORE OR WHATEVER, I DON'T KNOW.

23           WHAT'S THE IMPEDIMENT TO PRODUCING THAT INFORMATION.

24           WHY WASN'T IT DONE?

25           MR. JACKSON:  HERBALIFE SIMPLY DIDN'T TRACK IT BEFORE

1   2017.  THEY -- THEIR SYSTEMS DIDN'T TRACK THAT INFORMATION.

2   IT'S NOT AVAILABLE.  AND THAT'S BEEN DISCLOSED IN DISCUSSIONS

3   WITH OPPOSING COUNSEL.

4           THE COURT:  SO, WHEN THEY ASKED FOR THIS BIZWORKS

5   REPORT, DOES THAT DOCUMENT CONTAIN THAT INFORMATION?

6           MR. JACKSON:  NO.  THERE WILL BE NO DOCUMENT WE COULD

7   CREATE THAT WOULD CONTAIN THAT INFORMATION.

8           AND I THINK -- I THINK TO BE FAIR TO MR. ADAR'S

9   POSITION, THAT I THINK APPEARS TO BE WHY THEY'RE NOW SEEKING A

10  DIFFERENT TYPE OF INFORMATION.

11          THE COURT:  OKAY.

12          MR. JACKSON:  THERE'S PERSONAL PURCHASE VOLUME.

13          AND, AGAIN, I JUST WANT TO BE CLEAR.  THAT VOLUME,

14  NOT DOLLARS, THE VOLUME MEASURED IN SOME SORT OF POINT SYSTEM

15  OF THE PRODUCTS THAT THEY PURCHASED FROM HERBALIFE.  THIS IS

16  NOT RETAIL SALES OR PROFITS FROM RETAIL SALES, ET CETERA.  IT'S

17  MONEY GOING IN THE OTHER DIRECTION OR PRODUCT GOING IN THE

18  OTHER DIRECTION.  IT'S THE VOLUME OF PRODUCT THAT THESE

19  INDIVIDUAL DISTRIBUTORS --

20          THE COURT:  IT'S THE ORDERS.

21          MR. JACKSON:  RIGHT, RIGHT.  ORDERS FROM HERBALIFE.

22  HEY, GIVE ME A THOUSAND SHAKES.  THAT KIND OF THING.  IT'S NOT

23  --

24          THE COURT:  AND CAN THAT BE DISTINGUISHED BETWEEN --

25  WELL, I MEAN, I GUESS BY DEFINITION THAT'S THAT PERSON'S

1   PERSONAL ORDERS AS OPPOSED TO ORDERS ON BEHALF OF PEOPLE WHO

2   ARE DOWNSTREAM?

3            MR. JACKSON:  YES.

4            THE COURT:  OKAY.

5            SO, WHY NOT TURN THAT OVER?

6            MR. JACKSON:  TWO REASONS, YOUR HONOR.

7            NUMBER ONE, IN OUR VIEW THIS IS ALREADY PREVIOUSLY

8   BRIEFED AND ADDRESSED AND NOT INCLUDED IN YOUR PRIOR ORDER.

9            AND, NUMBER TWO, YOU KNOW, MAYBE NOT SURPRISINGLY

10  IT'S NOT QUITE AS EASY AS THE CLICK OF A BUTTON.  THERE

11  ACTUALLY IS SOME WORK THAT GOES INTO GETTING THIS INFORMATION.

12  AND, SO --

13           THE COURT:  LIKE WHAT?

14           MR. JACKSON:  IT'S -- LIKE, I DON'T KNOW EXACTLY THE

15  STEPS THAT ARE INVOLVED.  I DO KNOW THAT, FOR EXAMPLE, WITH THE

16  MARK HUGHES BONUS INFORMATION, THAT WAS RELATIVELY OBTAINABLE.

17  SO WE PRODUCED A SUPPLEMENTAL PRODUCTION WITH THE MARK HUGHES

18  BONUS INFORMATION.

19           WITH THE PPV VOLUME IT'S A LITTLE BIT MORE INVOLVED.

20  I HONESTLY DON'T KNOW EACH AND EVERY STEP THAT'S INVOLVED IN

21  IT.

22           BUT TO BE CLEAR, THE RELEVANCE OF THAT INFORMATION

23  FROM OUR PERSPECTIVE IS SO TANGENTIAL.  WE'VE GONE BEYOND --

24           THE COURT:  WHY?

25           MR. JACKSON:  -- YOU KNOW, DIRECT SALES --

42

1              THE COURT:  WHY?

2              MR. JACKSON:  -- VERSUS DOWN- --

3              THE COURT:  WHY IS IT TANGENTIAL?

4              MR. JACKSON:  AGAIN, SO, WHAT WE PRODUCED SHOWED

5    EARNINGS OF A DISTRIBUTOR BROKEN OUT INTO THESE DIFFERENT

6    BUCKETS.

7              THE PERSONAL PURCHASE VOLUME HAS -- DOESN'T RELATE

8    DIRECTLY TO ANY OF THESE EARNINGS.  IT'S WHAT IT'S ORDERING

9    FROM HERBALIFE.  THEY MAYBE USED IT FOR PERSONAL USE.  THEY MAY

10   HAVE SOLD IT.  THEY MAY HAVE DISCARDED IT.  THERE'S NO --

11             THE COURT:  SO, THE SALES DATA MAY -- SORRY.  THE

12   INVOICES MAY NOT SHOW PROFIT RELATED TO THOSE PRODUCTS?

13             MR. JACKSON:  IT WON'T.  I MEAN, IT WON'T SHOW ANY OF

14   THAT INFORMATION.  IT'S JUST A VOLUME METRIC THAT I BELIEVE IS

15   MEASURED IN TERMS OF POINTS AS OPPOSED TO NUMBER OF ORDERS.

16             THE COURT:  OKAY.

17             MR. ADAR, WHY DO YOU WANT THAT STUFF?  HOW IS THIS A

18   SUBSTITUTE FOR OTHER DATA?

19             MR. ADAR:  YOUR HONOR, PERSONALLY PURCHASED VOLUME

20   WOULD SHOW THE CEILING OF WHAT THEIR DIRECT SALES COULD BE.

21             THE COURT:  SURE.

22             MR. ADAR:  SO, AS WE DISCUSSED, THE ONLY -- AND WE'VE

23   CONFERRED WITH THEM AT LENGTH ABOUT THIS.

24             AND REGARDING THEIR UNDUE BURDEN ANALYSIS, I JUST

25   WANT TO CLARIFY, WE'VE DONE OUR BEST TO NARROW THE ISSUES

1   BEFORE THE COURT.  THE ONLY OBJECTION THEY HAVE FOR PPV IS

2   RELEVANCE.  AND I'LL ADDRESS THAT RIGHT NOW.

3           WE WANT TO UNDERSTAND HOW MUCH MONEY THEY MADE IN

4   DIRECT SALES.  WE DIDN'T KNOW PRIOR TO THEIR PRODUCTION THEY

5   DIDN'T TRACK DIRECT SALES PRIOR TO 2017.  THAT'S WHY WE DIDN'T

6   BRIEF THE ISSUE.

7           THE COURT:  ALL RIGHT.

8           MR. ADAR:  SO, THE SECOND BEST THING TO US IS TO

9   UNDERSTAND WHAT WAS THEIR PERSONALLY PURCHASED VOLUME.  THAT

10  WOULD CREATE A CEILING OF WHAT THEIR DIRECT SALES POSSIBLY

11  COULD BE.  IT'S NOT PERFECT.  IDEALLY WE WOULD KNOW THE DIRECT

12  SALES.  BUT TO THEIR CREDIT WHEN WE CONFERRED, THEY SAID FOR

13  THEM TO BE ABLE TO DETERMINE DIRECT SALES THEY'D HAVE TO GO

14  THROUGH TENS OF THOUSANDS -- THIS IS IN THEIR BRIEF --

15  DOCUMENTS AND INVOICES TO BE ABLE TO UNDERSTAND WHICH IS

16  ATTRIBUTABLE TO DIRECT SALES.

17          WE'RE NOT ASKING THEM TO DO THAT.  WHAT WE ASKED THEM

18  FOR WAS TO GIVE US A METRIC THAT WE UNDERSTAND THEY TRACK WHICH

19  IS PERSONALLY PURCHASED VOLUME.  I ASKED THEM, IS THAT A BURDEN

20  TO PRODUCE AND, IF SO, CAN YOU DESCRIBE THE BURDEN TO ME.  WE

21  WERE MET WITH CRICKETS.

22          SO, THE ONLY QUESTION BEFORE YOUR HONOR IS IT

23  RELEVANT AND IS IT PERFECT.  NO.  BUT WE DIDN'T KNOW THEY

24  DIDN'T TRACK DIRECT SALES.  THIS WOULD PROVIDE US THE MAXIMUM

25  AMOUNT OF THEIR DIRECT SALES.  WE KNOW IT WOULD BE A SUBSET OF

44

1   THAT.

2           THE COURT:  WELL, IT COULDN'T BE BIGGER.

3           AND WHAT ARE YOU HOPING TO FIND?

4           MR. ADAR:  WE'RE HOPING TO FIND THAT WHEN THESE

5   INDIVIDUALS AT NO POINT FROM 2009 TO NOW -- WE WANT TO CONFIRM

6   THIS -- HAD ANY MEANINGFUL AMOUNT OF SALES.

7           THE PERCENTAGE OF SALES IS DIRECT SALES TO THEIR

8   CREDIT, TO HERBALIFE'S CREDIT, ISN'T THAT CRITICAL BECAUSE THEY

9   MADE A LOT OF MONEY WITH THE DOWNLINES.

10          THE COURT:  YEAH.

11          MR. ADAR:  HOWEVER, IF THEY MADE NO MONEY IN RETAIL

12  SALES OR HUNDREDS OF DOLLARS OF RETAIL SALES, AND THEY'RE GOING

13  AND TELLING PEOPLE COME TO OUR EVENTS, I WILL TEACH YOU HOW TO

14  SUCCEED IN THE HERBALIFE BUSINESS MODEL, YET, THEY, THEMSELVES,

15  ARE FAILURES WHEN IT COMES TO THE DIRECT SALES AND ARE ONLY

16  SUCCESSFUL BECAUSE THEY WERE ABLE TO RECRUIT OTHERS IN THEIR

17  DOWNLINE SYSTEM, THAT'S RELEVANT.

18          THE COURT:  WELL, ONLY FAILURES OR MAY NOT EVEN BE

19  TRYING BECAUSE THE OTHER SIDE IS SO LUCRATIVE.  BUT I GET YOUR

20  POINT.

21          MR. ADAR:  AND IF THEY'RE NOT TRYING, THEY SHOULDN'T

22  BE PRESENTED AS EXPERTS IN THE FIELD.

23          THE COURT:  WELL, THOSE WHO CAN, DO; THOSE WHO CAN'T,

24  TEACH.

25          (LAUGHTER.)

1              MR. ADAR:  AND IF THEY WANT TO COMMIT TO THAT IN A

2     POSITION, SURE, THAT WOULD BE OKAY.  BUT THEY -- THEY HAVE NOT.

3              THE COURT:  SO, YOU HAVE A DECENT PICTURE FOR A

4     LIMITED PERIOD OF TIME, RIGHT?  2017 THROUGH THE PRESENT?

5              MR. ADAR:  YES, YOUR HONOR.

6              THE COURT:  OKAY.

7              MR. ADAR:  AND IT'S POSSIBLE AT TRIAL THEY CAN SAY,

8     WELL, IN 2017 THEY ONLY HAD $1,600 IN RETAIL SALES OF THEIR 8

9     MILLION.  BUT IN 2016 THROUGH THEIR DILIGENCE AND INVOICES --

10    THAT WE DON'T HAVE BECAUSE THEY'RE CLAIMING UNDUE BURDEN --

11    THEY ACTUALLY SOLD 9 MILLION DOLLARS' WORTH OF RETAIL SALES BUT

12    THEN GAVE THAT UP BECAUSE IT WAS MORE LUCRATIVE TO RECRUIT AND

13    DO THE COMMISSION REPORTS.

14             WE JUST DON'T KNOW.  AND WE'RE NOT ABLE TO ADEQUATELY

15    PREPARE OUR CLAIMS WITHOUT HAVING THAT BASIC INFORMATION.  THE

16    PPV IS A COMPROMISE, YOUR HONOR.  WE ARE NOT ASKING THEM TO GO

17    AND CREATE A METRIC THEY DON'T HAVE.  WE'RE LOOKING FOR THE

18    SIMPLEST WAY TO GET IT.  AND THEY HAVEN'T PRESENTED ANY

19    EVIDENCE OR RELATED TO US ANY EVIDENCE OF UNDUE BURDEN.

20             THE COURT:  MR. JACKSON.

21             MR. JACKSON:  JUST A COUPLE OF QUICK POINTS, YOUR

22    HONOR.

23             NUMBER ONE, YOU KNOW, I THINK WHAT'S BEING ASKED FOR

24    NOW IS THIS PPV DATA GOING BACK FROM 2009 I GUESS THROUGH

25    2016.  BECAUSE IN 2017 IS WHEN THIS OTHER INFORMATION PICKED

1  UP.  A LOT OF THESE DISTRIBUTORS WORKED FOR HERBALIFE SINCE THE

2  1990S.  I DON'T KNOW THAT THE 2009 TO 2016 INFORMATION WOULD BE

3  PARTICULARLY RELEVANT WITH RESPECT TO WHETHER OR NOT THEY

4  DEVELOPED THEIR EXPERTISE OVER TIME.

5         AND, NUMBER TWO, JUST GENERALLY ON THE UNDUE BURDEN

6  FRONT.  OUR VIEW IS THAT THE UNDUE BURDEN HAD BEEN LITIGATED IN

7  THE LAST ROUND OF BRIEFING, WHERE THERE HAD BEEN DECLARATIONS

8  AND OTHER THINGS PUT FORWARD ABOUT HOW DIFFICULT IT IS TO GET

9  PURCHASING INFORMATION.

10         MR. ADAR IS CERTAINLY RIGHT.  WE'RE NOT TRYING TO

11  RELITIGATE THAT.  AGAIN, WE THOUGHT THIS HAD BEEN DECIDED IN

12  THE PRIOR ORDER.  AND IT WAS JUST THE EARNINGS, NOT THE

13  PURCHASES FROM THE DISTRIBUTORS, THAT WERE RELEVANT.

14         THE COURT:  YEAH, BUT YOU HAVEN'T BEEN ABLE TO COMPLY

15  WITH THAT.

16         MR. JACKSON:  UNDERSTOOD, YOUR HONOR.  WE ONLY HAVE

17  THE DATA IN 2017, 2018 AND 2019.  AND IT --

18         THE COURT:  RIGHT.

19         MR. JACKSON:  -- SHOWS WHAT IT SHOWS, WHICH I THINK

20  MR. ADAR ACCURATELY CHARACTERIZED.

21         THE COURT:  YEAH.  AND, SO, I WAS MISINFORMED ABOUT

22  YOUR ABILITY TO COMPLY, WHICH IS A PROBLEM FROM YOUR

23  PERSPECTIVE.

24         AND THEN THE PROBLEM FROM MR. ADAR'S PERSPECTIVE IS

25  THIS MAY BE REALLY MEANINGLESS.  AND THAT RAISES A REAL CONCERN

1    UNDER 26(B)(1).  BECAUSE I DON'T WANT THE COMPANY TO INCUR A

2    LOT OF EXPENSE -- WHICH MAY OR MAY NOT BE TRUE BECAUSE I DON'T

3    HAVE THAT IN FRONT OF ME.  AND YOU COULDN'T, YOU KNOW, IN

4    FAIRNESS TELL ME TODAY WHAT THE BURDEN IS TO DO THIS.

5           BUT THE PAY-OFF HERE SEEMS REALLY PRETTY MINIMAL.

6    AND I'M KIND OF -- I'M KIND OF BAFFLED THAT YOU HAVEN'T BEEN

7    ABLE TO -- AND I CAN'T IMAGINE WHY YOU WOULDN'T STIPULATE TO

8    SOMETHING LIKE THIS.  YOU KNOW, IF YOU CAN CONFIDENTLY SAY OR,

9    AT LEAST, WON'T CONTEST THAT PERSONAL SALES REPRESENT, YOU

10   KNOW, LESS THEN X PERCENT OR NO MORE THAN Y PERCENT OF A

11   PERSON'S INCOME, THAT WOULD BE A HUGE WIN FOR YOU.  YOU

12   WOULDN'T HAVE TO WADE THROUGH THIS DATA, AND IT WOULD BE AN

13   UNCONTESTED FACT.

14          AND I ALREADY SEE THEM KIND OF SHRUGGING AND NODDING.

15          YOU DON'T WANT THE DETAILS, MR. ADAR.  YOU WANT THE

16   WIN.

17          MR. ADAR:  MAY I RESPOND, YOUR HONOR?

18          THE COURT:  LET'S LET THEM FINISH THEIR HUDDLE.

19          MR. ADAR:  THANK YOU.

20          THE COURT:  BECAUSE I DON'T WANT THEM MISSING YOUR

21   PEARLS OF WISDOM.

22          MR. JACKSON:  NO, I APOLOGIZE.  I DIDN'T MEAN TO

23   WAIT.

24          THE COURT:  THAT'S ALL RIGHT.

25          MR. JACKSON:  IF -- WE WERE JUST -- I WAS JUST

48

1    DISCUSSING THE LOGISTICS OF WHETHER AND TO WHAT EXTENT WE WOULD

2    BE WILLING TO ENTER INTO A STIPULATION.

3            SO, I THINK THE SHORT ANSWER IS WE'D WANT TO MAKE

4    SURE WHATEVER WE STIPULATED TO WAS ACCURATE.  SO THAT WOULD

5    TAKE SOME DIGGING ON OUR END PROBABLY TO SOME DEGREE.  BUT I

6    DON'T THINK WE'D BE UNWILLING TO ENTER THE STIPULATION.

7            THE COURT:  WELL, I'M NOT LOOKING TO BIND YOU FOLKS,

8    YOU KNOW, FOR ALL PURPOSES DOWN THE ROAD.  BUT I MEAN YOU COULD

9    EASILY DRAFT SOMETHING FOR PURPOSES OF THIS CASE OR FOR

10   PURPOSES OF CLASS CERT OR WHATEVER.  YOU WON'T OPPOSE, OR

11   YOU'LL ACKNOWLEDGE -- WITHOUT RESEARCHING --

12           MR. JACKSON:  YEAH.

13           THE COURT:  YOU'RE LAWYERS.  YOU KNOW HOW NOT TO

14   COMMIT.

15           (LAUGHTER.)

16           THE COURT:  I THANK YOU FOR SMILING FOR THAT ONE.

17           MR. JACKSON:  I THINK YOU LOOKED AT ME WHEN YOU SAID

18   WE COULD AGREE TO SOMETHING WITHOUT RESEARCH.

19           THE COURT:  YEAH, YEAH.

20           THAT ALLOWS THEM TO ADVANCE THIS WITHOUT SPENDING

21   MORE TIME AND BRAIN TIME ON THIS.

22           MR. ADAR, I REALIZE THIS IS -- I'M SPRINGING

23   SOMETHING ON YOU, BUT WE'RE NEGOTIATING HERE.  BECAUSE, YOU

24   KNOW, IF YOU GET REAMS AND REAMS OF PAPER ON THIS AND YOU'RE

25   JUST FUMBLING THROUGH JUST TO FIND OUT HOW MANY POPTARTS THEY

1    SOLD, THAT'S A WASTE OF YOUR TIME.

2            MR. ADAR:  AND, YOUR HONOR, WE'RE NOT ASKING THEM TO

3    GIVE US REAMS AND REAMS OF PAPER.  WHAT WE'VE ASKED THEM -- AND

4    THEY CAN'T ANSWER TO THE COURT'S SIMPLE QUESTION IS, IS IT

5    BURDENSOME TO PROVIDE PPV DATA.

6            IT'S OUR UNDERSTANDING -- WE HAVEN'T GOTTEN ANY

7    NEGATIVE EVIDENCE OR COMMENTS TO THE CONTRARY THAT THIS DATA IS

8    TRACKED.  SO, THEY DIDN'T TRACK DIRECT SALES FROM 2017 ONWARD.

9    PPV IS TRACKED IT'S OUR UNDERSTANDING FROM 2009 ONWARD.

10           AND THE PERCENTAGE OF DATA IS CERTAINLY RELEVANT.

11   THE PERCENTAGE OF THE INCOME EARNED ATTRIBUTABLE TO DIRECT

12   SALES IS RELEVANT.  BUT IT'S ALSO RELEVANT THE SHEER SIZE OF

13   THAT NUMBER.  IF THEY MADE --

14           THE COURT:  BUT YOU COULD --

15           MR. ADAR:  -- A HUNDRED MILLION DOLLARS --

16           THE COURT:  YOU CAN DO THAT MATH.  THAT'S EASY.

17           MR. ADAR:  WELL, BUT WE CAN'T UNLESS WE KNOW WHAT THE

18   UNDERLYING RAW DATA IS UNLESS WE KNOW WHAT THE CEILING IS OF

19   HOW MUCH THEY POSSIBLY COULD HAVE SOLVED.

20           BASED ON THE DATA WE'VE SEEN -- AND I'M DOING MY BEST

21   NOT TO STEER CLEAR FROM -- TO HONOR THE PROTECTIVE ORDER.  I'M

22   GOING TO SPEAK IN GENERALITIES NOT IN SPECIFICS -- IT'S A

23   MINUSCULE NUMBER SEPARATE AND APART FROM THE FRACTION OF THE

24   PERCENTAGE IT IS.  SO, IF THESE PEOPLE ARE SAYING FOLLOW MY

25   LEAD, YOU WILL LEARN HOW TO MAKE SALES, AND YOU WILL MAKE

1    HUNDREDS OF THOUSANDS OF DOLLARS AND BE ABLE TO BUY BOATS AND

2    BE ABLE TO LIVE LIKE KINGS AND PRESIDENTS, BUT THEY ONLY

3    THEMSELVES SOLD 400 DOLLARS' WORTH OF SALES OVER THE COURSE OF

4    A YEAR OR $1,400, THAT WOULD BE INCONSISTENT WITH THE

5    REPRESENTATIONS THEY'RE MAKING AT THESE EVENTS.

6            THE COURT:  YEAH, BUT YOU KNOW -- BUT YOU KNOW THE

7    PERCENTAGES.  YOU KNOW THE RATIO FROM 2017 FORWARD?

8            CORRECT?

9            MR. ADAR:  WELL, WE KNOW -- FOR CERTAIN INDIVIDUALS

10   WE KNOW HOW MUCH -- YES, WE DO KNOW THAT FOR '17 ONWARD.

11           THE COURT:  YEAH.

12           MR. ADAR:  BECAUSE WE KNOW HOW MUCH THEY SOLD.  I

13   THINK IT'S EQUALLY AS IMPORTANT TO KNOW THEIR TOTAL NUMBER OF

14   DIRECT SALES.

15           THE COURT:  NOW, THIS IS MATH.  IF YOU KNOW THE DOWN

16   -- THE SIZE OF THE DOWNSTREAM SALES -- AND YOU DO.

17           MR. ADAR:  YES.

18           THE COURT:  FOR ALL PERIODS OF TIME?

19           MR. ADAR:  CORRECT.

20           THE COURT:  OKAY.

21           AND YOU KNOW THE DIRECT SALES FOR '17,'18 AND '19.

22           MR. ADAR:  YES.

23           THE COURT:  THERE'S A RATIO THERE.

24           MR. ADAR:  YES.

25           THE COURT:  YOU'VE TOLD ME SEVERAL TIMES VERY

51

1  CANDIDLY IT'S A REALLY SMALL RATIO.

2          MR. ADAR:  YES, YOUR HONOR.

3          THE COURT:  IF THEY COMMIT TO SAY -- AND THAT SMALL

4  RATIO IS A GOOD FACT FOR YOU.

5          MR. ADAR:  YES, YOUR HONOR.  EXCELLENT.

6          THE COURT:  IT'S -- I GOT IT.  I GOT IT.

7          MR. ADAR:  YES.

8          THE COURT:  YOU ALL CAN RESERVE WHATEVER YOU THINK

9  ABOUT THAT, BUT IF THEY COMMIT AND SAY IT'S THE SAME RATIO --

10  OR WE'LL SAY -- WE'LL ACKNOWLEDGE IT'S THE SAME RATIO GOING

11  BACK INTO TIME.

12          MR. ADAR:  THAT WOULD BE SATISFACTORY, YOUR HONOR.

13  YES.  WE WOULD NOT NEED THE DATA IF THEY WERE TO COMMIT TO

14  THAT.

15          THE COURT:  MATH IS A GOOD THING.

16          MR. ADAR:  IT IS, YOUR HONOR.

17          THE COURT:  AND MATH SAVES YOUR CLIENTS.

18          I'M NOT GOING TO COMMIT YOU TO THIS RIGHT NOW IF YOU

19  WANT SOME TIME TO THINK ABOUT THAT.  I'M JUST TRYING TO ADVANCE

20  THE BALL HERE.

21          MR. DROOKS, YOU CAN -- YOU CAN TALK IF YOU'D LIKE.

22  I'D BE HAPPY TO HEAR FROM YOU, SIR.

23          MR. DROOKS:  I DIDN'T WANT TO DOUBLE-TEAM, YOUR

24  HONOR.

25          THE COURT:  OKAY.  ALL RIGHT.  I'LL STAND UP FOR

52

1   MYSELF IF NEED BE.  IF YOU'D RATHER GO THROUGH HIM, HE'S DOING

2   A GOOD JOB.

3            HE IS, RIGHT?

4            MR. ADAR:  YES.  EXCELLENT, YOUR HONOR.

5            MR. DROOKS:  I MEAN, YOUR HONOR, WE'LL LOOK INTO IT.

6   AND IF WE CAN REPRESENT -- IF WE CAN DETERMINE IT, WHICH I

7   SUSPECT WE CAN IN SOME GENERAL WAY, AND WE CAN STIPULATE THAT

8   THE RATIO IS NOT MATERIALLY DIFFERENT BETWEEN 2009 AND 2016,

9   WE'LL PERHAPS IDENTIFY THOSE FOR WHOM WE BELIEVE IT MIGHT BE

10  MATERIALLY DIFFERENT AND NOT THE OTHERS.

11           THE COURT:  WHICH WOULD BE -- YOU KNOW, ANY

12  SPECIFICITY WOULD AGAIN BE TO YOUR ADVANTAGE --

13           MR. DROOKS:  RIGHT.

14           THE COURT:  AND WOULD HELP YOU FOLKS.

15           MR. ADAR:  YES, YOUR HONOR.

16           MR. DROOKS:  WE'LL LOOK INTO THAT AND SEE IF WE CAN

17  DO IT.

18           THE COURT:  I MEAN, THE ALTERNATIVE IS IF THE

19  GOALPOSTS HAVE CHANGED FOR WHATEVER REASON, AND IF WHEN YOU

20  CAME TO COURT WE DIDN'T KNOW THE FACTS AND PARAMETERS OF

21  CERTAIN REPORTS, I MEAN, I GET IT.  YOU KNOW, YOU ALL ARE ON

22  THE CLOCK WITH YOUR DISCOVERY CUTOFF WITH JUDGE KRONSTADT,

23  WHICH IS WEIGHING ON ME AS I'M SURE IT'S WEIGHING ON YOU.

24           BUT, YOU KNOW, I MIGHT NEED TO HEAR MORE ABOUT THAT.

25  I MAY NEED TO TAKE SOME TESTIMONY FROM SOMEBODY.  I MIGHT, YOU

1    KNOW, WANT TO SEE SOME OF THESE REPORTS.  I MIGHT ORDER A

2    SAMPLING.

3              BUT, YOU KNOW, NONE OF THAT IS GOING TO BE GREAT FOR

4    YOU.  AND IT MAY NOT END UP BEING WORKABLE OR USABLE FOR YOU

5    DOWN THE ROAD.  AND, SO, I'M TRYING -- I'M TRYING TO MOVE THIS

6    CASE FORWARD, WHICH IS MY OBLIGATION TO JUDGE KRONSTADT AND TO

7    YOU ALL.

8              MR. DROOKS:  AND WE THANK YOU FOR THAT, YOUR HONOR.

9              THE COURT:  WELL, I WASN'T FISHING FOR THAT, BUT

10   THANKS.  BUT I'M TRYING TO GET THIS GOING.

11             ALL RIGHT.  WE'LL TBD.

12             OKAY.  WHAT ELSE?

13             SO, WE'VE GOT A COUPLE OF REQUESTS FOR MATERIALS FROM

14   MR. CATLETT'S CLIENTS.

15             I HAVEN'T FORGOTTEN ABOUT YOU, SIR.

16             THEIR BUSINESS RECORDS AND EMAILS.  AND THEN GETTING

17   ALL THESE PEOPLE TO SIT DOWN FOR DEPOSITIONS.  AND I HEARD A

18   LOT OF DIFFERENT STORIES ON THAT FROM SOME PRETTY TALENTED

19   LAWYERS, WHICH IS REALLY KIND OF PROBLEMATIC.

20             REALLY HARD FOR ME TO FIGURE OUT WHAT'S GOING ON HERE

21   AND REALLY HARD FOR ME TO AVOID CONCLUDING THAT THERE'S BEEN

22   SOME OVERREACH BY PLAINTIFFS IN TERMS OF ASKING FOR EVERY

23   BUSINESS RECORD AND LOOKING TO TAKE, YOU KNOW, SO MANY

24   DEPOSITIONS.

25             IT'S ALSO GOT A WHIFF OF SOME BIG FIRMING AGAINST YOU

54

1   IN THAT, YOU KNOW, SOME DEPOSITIONS CAME ON CALENDAR, WENT OFF

2   CALENDAR.  IT'S REALLY HARD FOR ME AND REALLY FRUSTRATING TO

3   READ LAWYER EMAILS AND FIGURE OUT WHO SAID WHAT, WHEN, ABOUT

4   WHAT.  AND IT REALLY DOESN'T LEAD TO GOOD POSITIVE RESULTS.

5          BUT I'M NOT SURE I UNDERSTAND THE NEED FOR A LOT OF

6   THIS DISCOVERY.

7          AND I MEAN, WE CAN -- WE CAN BE SPECIFIC.

8          WHAT, PARENTHESES, ON EARTH, CLOSE PARENTHESES, DO

9   YOU NEED:

10         "ALL BUSINESS ENTITY FORMATION DOCUMENTS, ALL

11          BUSINESS LEDGERS, ALL MERCHANT ACCOUNT INFORMATION,

12          AND ALL TAX RETURNS FOR COMPANIES INVOLVED WITH THE

13          FLORIDA DEFENDANTS."

14         MR. ADAR:  SO, YOUR HONOR, I THINK IT'S IMPORTANT TO

15  NOTE THEY WERE SEEKING ONLY BUSINESS RECORDS.  AND WHEN I READ

16  THE BRIEFS I WAS A BIT CONFUSED WHEN I SAW THE FLORIDA

17  DEFENDANT'S BRIEF BECAUSE THEY FOCUSED A LOT ON PERSONAL

18  FINANCIAL RECORDS.

19         AND I WANT TO BE CLEAR THAT WE ARE NOT SEEKING

20  PERSONAL FINANCIAL RECORDS.  WE HAVE TESTIMONY THAT SUPPORTS

21  THE PROPOSITION THAT SPECIAL PURPOSE ENTITIES WERE CREATED TO

22  FURTHER THEIR ENTERPRISE AT ISSUE IN THIS CASE.

23         WHAT HAPPENS IS THESE INDIVIDUAL DEFENDANTS WHAT THEY

24  WOULD DO -- OR THE FLORIDA DEFENDANTS' FEATURED SPEAKERS, THEY

25  WOULD CREATE ENTITLES, THE SOLE PURPOSE OF WHICH TO OUR

1  UNDERSTANDING IS TO TRACK TICKET SALES, TO BE ABLE TO DEAL WITH

2  THE VENUE, TO BE ABLE TO DEAL WITH THE EVENT PROGRAM THAT IS AT

3  ISSUE IN OUR COMPLAINT.

4         WE HAVE -- INITIALLY WE DID ASK FOR PERSONAL

5  FINANCIAL RECORDS.  AFTER CONFERRING WITH COUNSEL FOR THE

6  FLORIDA DEFENDANTS AND HERBALIFE, WE ARE NO LONGER SEEKING THAT

7  BECAUSE WE RECOGNIZE THERE THE BURDEN AND WE RECOGNIZE THE FACT

8  THAT THEY -- WE WERE ABLE TO GET THE INFORMATION A DIFFERENT

9  WAY.

10        SO, HERE WE'VE NARROWED THE REQUEST SUBSTANTIALLY AND

11  ARE ONLY ASKING FOR BUSINESS RECORDS, BASICALLY FINANCIAL

12  RECORDS AND FORMATION DOCUMENTS UNDERSTANDING WHO THE MEMBERS

13  ARE, CORPORATE GOVERNING DOCUMENTS, IDENTITY OF OWNERSHIP FOR

14  THESE ENTITIES THAT WERE CREATED TO FURTHER THE ENTERPRISE.

15        THE COURT:  BUSINESS LEDGERS, MERCHANT ACCOUNT

16  INFORMATION, AND TAX RETURNS.

17        MR. ADAR:  YES, YOUR HONOR.

18        THE COURT:  OKAY.  I MEAN, A SECRETARY OF STATE

19  FILING IS REALLY NOT WORTH FIGHTING ABOUT, AND IT'S PROBABLY

20  ACCESSIBLE WITH THE PUSH OF A BUTTON ON WESTLAW.

21        MR. ADAR:  THAT'S CORRECT, YOUR HONOR.

22        THE COURT:  OKAY.  I'M NOT SURE WHY YOU HAD TO COME

23  TO FEDERAL COURT TO GET THOSE AND WHY THAT'S WORTH YOUR WHILE.

24        BUSINESS LEDGERS, MERCHANT -- WHAT IS MERCHANT

25  ACCOUNT INFORMATION?  WHAT DOES IT MEAN?

1          MR. ADAR:  SO, WHEN YOU GO TO AN EVENT, IF THERE'S A

2     POINT -- I FORGOT THE EXACT TERMINOLOGY, BUT IF THERE'S A

3     MACHINE TO TRACK CREDIT CARDS, IF SOMEONE WERE TO PAY BY CREDIT

4     CARD TO BE ABLE TO PAY FOR THEIR TICKETS, WE WANT TO BE ABLE TO

5     HAVE THE MERCHANT PROCESSOR ACCOUNT INFORMATION TO UNDERSTAND

6     --

7          THE COURT:  CREDIT CARD RECORDS?

8          MR. ADAR:  WELL, WE WERE -- WE WOULD GET TO A VIABLE

9     WAY TO PRODUCE IT.  WE CAN REDACT THAT INFORMATION.  AND WE CAN

10    WORK ON WHAT NARROW SCOPE WE'D BE ENTITLED TO.  BUT THEY'RE

11    SAYING THAT WE'RE NOT ENTITLED TO ANYTHING.  THAT'S THE

12    PROBLEM.

13         WE DO THINK THAT WE'D BE ENTITLED TO THE TOTAL AMOUNT

14    OF SALES FOR EACH PARTICULAR EVENT.  WE'D LIKE TO UNDERSTAND

15    HOW MUCH WAS DONE BY CREDIT CARD, HOW MUCH WAS DONE BY, YOU

16    KNOW, CASH, HOW MUCH WAS DONE BY -- THROUGH OTHER MEDIUMS.  WE

17    JUST WANT TO BE ABLE TO UNDERSTAND HOW MUCH MONEY WAS GENERATED

18    AT THESE EVENTS.  AND WE WANT TO UNDERSTAND THE DETAILS OF

19    THESE EVENTS.  THAT'S THE CORE OF OUR AMENDED COMPLAINT AND THE

20    CORE OF THIS CASE.

21         THE COURT:  I THOUGHT THE CORE OF YOUR CASE WAS THAT

22    PEOPLE WERE DUPED INTO JOINING HERBALIFE WITH GRANDIOSE

23    PROMISES OF PERSONAL PROFITS.

24         MR. ADAR:  AT EVENTS.  THAT'S THE -- THAT'S -- AND

25    THAT'S THE TWO WORDS THAT I WOULD ADD TO THAT.

1           THE COURT:  YES.  IF YOU SHOW UP AT THESE EVENTS, YOU

2    WILL BE REMARKABLY SUCCESSFUL.

3           MR. ADAR:  YES, YOUR HONOR.

4           AND OUR DAMAGES -- PART OF OUR DAMAGES MODEL IS THAT

5    WE -- PEOPLE HAD TO SPEND MONEY TO GO TO THESE EVENTS.

6           AND WE'RE SEEKING RELIEF ON BEHALF OF A PUTATIVE

7    CLASS.  WE WANT TO UNDERSTAND THE NATURE AND SALES OF THESE

8    EVENTS.  WE'VE ASKED FOR THIS INFORMATION BUT HAVE NOT BEEN

9    ABLE TO OBTAIN IT THROUGH OTHER MEANS.

10           AND BUSINESS RECORDS, YOU KNOW, AT LEAST IN FLORIDA

11    WHERE A LOT -- SOME OF THESE DEFENDANTS --

12           THE COURT:  I'M SORRY.  THIS IS NOT THE CORE OF YOUR

13    CASE.  THIS IS YOUR DAMAGES CASE.

14           MR. ADAR:  IT ALSO GOES TOWARDS THE CORE OF OUR CASE

15    TO UNDERSTAND DETAILS ASSOCIATED WITH THE EVENTS AND HOW IT WAS

16    PUT ON.

17           THE COURT:  WHAT DO YOU CARE HOW IT WAS PUT ON?  DO

18    YOU WANT -- DO YOU WANT INFORMATION ABOUT THE COLOR OF LIGHT

19    BULBS?

20           MR. ADAR:  NO, YOUR HONOR, WE DON'T.

21           THE COURT:  OKAY.

22           MR. ADAR:  BUT --

23           THE COURT:  IF IT HAD -- IT OCCURRED AT AN EVENT.  I

24    MEAN, I'M NOT BEING SARCASTIC BUT I -- HOW DOES HAVING A

25    CORPORATE -- THE FLORIDA DEFENDANTS OPERATE THROUGH, YOU KNOW,

58

1    SMALL CORPORATIONS, RIGHT?

2              MR. ADAR:  YES, YOUR HONOR.

3              THE COURT:  OKAY.

4              AND THOSE CORPORATIONS FILE TAX RETURNS.

5              MR. ADAR:  YES, YOUR HONOR.

6              THE COURT:  AND WHAT INFORMATION ARE YOU GOING TO GET

7    FROM A FEDERAL INCOME TAX RETURN THAT'S RELEVANT TO YOUR CLAIM

8    THAT THESE INDIVIDUALS CONSPIRED WITH HERBALIFE TO DEFRAUD YOUR

9    CLIENTS?

10             MR. ADAR:  WE WILL BE ABLE TO UNDERSTAND HOW MANY

11   PEOPLE ATTEND THESE EVENTS, WHETHER FOR --

12             THE COURT:  FROM A TAX RETURN?

13             MR. ADAR:  YES.  BECAUSE WE UNDERSTAND WHAT TICKET

14   SALES WERE, LIKE THE -- WE HAVE INFORMATION THAT THE AVERAGE

15   TICKET SALE WAS 75 OR $115.

16             WE'RE ABLE TO UNDERSTAND HOW MANY EVENTS WERE PUT ON

17   SO WE COULD, AS YOUR HONOR POINTED OUT, THROUGH MATH UNDERSTAND

18   HOW MANY PEOPLE ATTENDED THESE EVENTS BY LOOKING AT THE

19   FINANCIAL RECORDS.

20             THE COURT:  AND THE PROPORTIONAL WAY OF GETTING THE

21   INFORMATION ABOUT TICKET SALES IS BY SUBPOENAING THEIR FEDERAL

22   INCOME TAX RETURNS?

23             MR. ADAR:  FOR THE BUSINESS RECORDS.

24             IF IT IS AN UNDUE BURDEN, AND THERE'S ANY DIFFICULTY

25   IN PRODUCING THOSE, WE'RE HAPPY TO HAVE THAT DISCUSSION.  BUT

1  THEY DIDN'T PROVIDE ANY ALTERNATIVES OR OTHER WAYS THAT WE WERE

2  ABLE TO GET THAT INFORMATION.

3           THE COURT:  COME ON.  THAT'S -- THAT'S YOUR CLAIM?

4           MR. ADAR:  WELL --

5           THE COURT:  YOU WANT TO FIND OUT TICKET SALES.  SO,

6  YOU ASK FOR THEIR TAX RETURNS?

7           MR. ADAR:  FOR BUSINESS RECORDS.  AND WE ALSO WOULD

8  LIKE TO KNOW WHETHER THERE'S --

9           THE COURT:  WHAT'S THE POINT?  WHY DO YOU KEEP SAYING

10  BUSINESS RECORDS?  SO WHAT?

11           MR. ADAR:  WELL, WE'D LIKE TO UNDERSTAND WHAT PURPOSE

12  THESE -- LET ME TAKE A STEP BACK, YOUR HONOR, BECAUSE YOUR

13  POINT IS A FAIR ONE.

14           WE ALSO BELIEVE THERE COULD BE NEFARIOUS ACTIVITY

15  THAT OCCURRED WITH THESE ENTITIES.  WE DON'T KNOW WHETHER

16  THERE'S -- WE HAVE ACCUSED IN OUR COMPLAINT THAT THERE COULD BE

17  ISSUES OF MONEY LAUNDERING.  THERE COULD BE ISSUES WHERE MONEY

18  WENT ELSEWHERE.  WE DON'T KNOW WHETHER THESE ENTITIES -- LIKE

19  WHERE THE MONEY WENT.

20           WE KNOW, FOR EXAMPLE, THAT FOR SOME EVENTS HERBALIFE

21  FUNDED THE EVENT.  THEY ADVANCED MONEY TO PAY FOR --

22           THE COURT:  SO YOU HAVE A CAUSE OF ACTION FOR MONEY

23  LAUNDERING?

24           MR. ADAR:  I BELIEVE THAT IN OUR PLEADINGS WE DO --

25  ONE OF THE WAYS THAT WE ARE -- WE -- LET ME TAKE A STEP BACK,

1    YOUR HONOR.

2              THE AMENDED COMPLAINT SAYS THAT THESE PEOPLE MADE

3    MONEY IN A WAY THAT WASN'T THROUGH PRACTICING WHAT THEY PREACH.

4              WE WANT TO UNDERSTAND WHETHER THERE WERE

5    ANY OTHER NEFARIOUS ACTIVITIES THAT HAPPENS AT THESE EVENTS.

6    AND WE WANT TO UNDERSTAND HOW THE MONEY FLOWED.  WE WANT TO

7    UNDERSTAND TO BE ABLE TO TRACK THE DOLLARS.  AND WE'RE NOT

8    ASKING FOR IT FROM A PERSONAL FINANCIAL STANDPOINT.   WE'RE

9    ASKING --

10             THE COURT:  SO, IF AN INDIVIDUAL --

11             MR. ADAR:  -- FOR BUSINESSES ONLY.

12             THE COURT:  IF ONE OF THE FLORIDA DEFENDANTS TOOK

13   MONEY IN FROM TICKET SALES --

14             MR. ADAR:  YES.

15             THE COURT:  -- AND USED THAT MONEY TO BUY HEROIN,

16   WOULD YOU -- WOULD IT BE RELEVANT TO YOUR CASE TO ISSUE A

17   SUBPOENA FOR ALL RECORDS RELATED TO HEROIN TRANSACTIONS DERIVED

18   FROM MONEY RECEIVED FROM YOUR CLIENTS?

19             MR. ADAR:  NO, YOUR HONOR -- WELL, I MEAN -- I HAVE

20   TO THINK ABOUT THAT ONE.  I THINK THAT THAT WOULD BE SOMETHING

21   THAT WE WOULD NOT NECESSARILY --

22             THE COURT:  WELL, YOU'RE TALKING ABOUT MISUSE OF

23   FUNDS AFTER IT'S BEEN -- AFTER YOUR CLIENTS HAVE BEEN

24   DEFRAUDED, RIGHT?  AFTER -- AFTER THEY'VE BECOME CULPABLE?

25             MR. ADAR:  NO, YOUR HONOR.  IT WOULD BE BEFORE AS

1   WELL.  SO, WHEN THESE PEOPLE ARE -- THE FEATURED PRESENTERS ARE

2   GOING TO THESE EVENTS, AND THEY'RE SPEAKING.  AND THEY'RE

3   SAYING WE MADE OUR MONEY BECAUSE WE FOLLOW THE PLAN.  AND THEY

4   ARE MAKING THEIR MONEY ELSEWHERE.

5         SO, THESE ENTITIES COULD HAVE PURPOSES OTHER THAN

6   TICKET SALES.  THEY COULD GET INCOME -- IF THEY'RE CREATED --

7   IF THEY WERE TO TESTIFY UNDER OATH AND THEY SAY I CREATED THIS,

8   AS THEY HAVE, I CREATED THIS BUSINESS ENTITY TO TRACK TICKET

9   SALES.  AND THERE'S ONLY A HUNDRED THOUSAND DOLLARS' WORTH OF

10  TICKET SALES, YOU KNOW, THIS PARTICULAR ENTITY --

11        THE COURT:  SO, IF ONE OF YOUR FLORIDA DEFENDANTS

12  RECEIVES A LARGE INHERITANCE FROM GRANDMA --

13        MR. ADAR:  YES.  THAT WOULD NOT BE IN THEIR BUSINESS

14  RECORDS.  THAT WOULD BE IN THEIR PERSONAL RECORDS.  IT

15  SHOULDN'T FLOW THROUGH --

16        THE COURT:  MAYBE GRANDMA LEFT IT TO THE COMPANY.

17        MR. ADAR:  THAT WOULD BE SUSPICIOUS, YOUR HONOR.

18        THE COURT:  WHAT IF THE ENTITY IS A TRUST?

19        MY POINT IS YOU WANT TO DELVE INTO ALL OF THE

20  FINANCES OF ALL OF THESE PEOPLE TO EXAMINE WHETHER THERE ARE

21  STATEMENTS ABOUT "I GOT RICH THROUGH HERBALIFE" ARE TRUE OR

22  NOT.

23        MR. ADAR:  NO, YOUR HONOR.  WE HAVE SUBSTANTIALLY

24  NARROWED THAT.  WE ARE NOT ASKING FOR ALL THEIR PERSONAL

25  FINANCIAL RECORDS.  AND I THINK WHAT THE FLORIDA DEFENDANTS

62

1    HAVE PRESENTED IN THEIR BRIEFS IS MAKING IT SEEM LIKE WE'RE

2    SEEKING PERSONAL FINANCIAL RECORDS.  WE ARE NOT.

3              THE COURT:  NO, NO, I UNDERSTAND.  IT'S BUSINESS

4    RECORDS?

5              MR. ADAR:  YES, YOUR HONOR.

6              THE COURT:  OKAY.

7              BUT THESE ARE FOR INDIVIDUALS, RIGHT?  I MEAN,

8    THEY'RE LIMITING THEIR LIABILITY.  THAT'S WHY PEOPLE DO STUFF

9    IN BUSINESSES -- BUSINESS FORMS.

10             MR. ADAR:  YOUR HONOR, THAT'S WHY WE WANT CORPORATE

11   COVERING DOCUMENTS.  IN SOME OF THE DEPOSITIONS WE'VE LEARNED

12   THAT, NO, IT'S NOT JUST WHOLLY OWNED BY AN INDIVIDUAL.  THERE

13   COULD BE OTHERS INVOLVED AS WELL.  WE DON'T KNOW WHETHER

14   HERBALIFE HAS A STAKE IN THESE ENTITIES.

15             BUT WE KNOW THAT THESE ENTITIES WERE CREATED IN

16   FURTHERANCE OF THE EVENT SYSTEM.  AND WE'D LIKE TO HAVE

17   INFORMATION ABOUT IT TO HELP UNDERSTAND OUR CASE.  WE ARE NOT

18   SEEKING TO UNDERSTAND WHERE THEY GOT INHERITANCES FROM THEIR

19   GRANDMOTHER.  WE DON'T WANT PERSONAL FINANCIAL RECORDS.  WE'RE

20   NOT SEEKING THAT IN THE SCOPE OF THIS REQUEST.  WE'RE SEEKING

21   DOCUMENTS STRICTLY RELATED TO SPECIAL PURPOSE ENTITIES THAT

22   WERE CREATED REGARDING THE EVENT SYSTEM.

23             THE COURT:  I UNDERSTAND WHAT YOU'RE ASKING FOR.

24             MR. ADAR:  YES, YOUR HONOR.

25             THE COURT:  MY QUESTION IS WHY AND WHAT THIS

1    INFORMATION IS GOING TO SHOW YOU THAT IS RELEVANT TO A CLAIM OR

2    DEFENSE IN THIS ACTION.

3           AND I GOT TO TELL YOU I DON'T HAVE ANY CLUE HOW A LOT

4    OF THESE RELATE, OR IF THEY MARGINALLY RELATE, WHY THIS FEDERAL

5    COURT SHOULD ORDER THE PRODUCTION OF A LOT OF THESE RECORDS.

6           I'M ALSO CONSIDERING WHETHER TO EXERCISE MY AUTHORITY

7    UNDER THE FEDERAL RULES TO CHANGE THE SEQUENCE OF THESE THINGS.

8           IF YOU NEED TO GET ANSWERS TO SPECIFIC QUESTIONS, IF

9    WHAT YOU'RE REALLY LOOKING FOR IS HOW MANY TICKETS DID WE SELL

10   AND HOW MUCH MONEY DID WE BRING IN FROM THESE EVENTS, WHICH

11   ASSUME THAT HAS SOME RELEVANCE, THEN, ASK THE QUESTION, AND

12   WE'LL SEE WHERE WE GO.

13          AND IF YOU'VE TRIED THAT AND HAVEN'T GOTTEN THERE,

14   THAT'S NOT BEEN MADE CLEAR TO ME AT ALL.  BUT ASKING FOR EVERY

15   PIECE OF PAPER IN THE HOUSE, BUSINESS RECORD --

16          MR. ADAR:  RIGHT.

17          THE COURT:  -- IS INCREDIBLY, INCREDIBLY -- WELL,

18   LET'S USE A BETTER WORD -- "PROBLEMATIC."

19          MR. ADAR:  I UNDERSTAND, YOUR HONOR.

20          I BELIEVE -- AND WHEN WE HAD THE DISCUSSION, WE DON'T

21   UNDERSTAND WHAT THE NATURE OF THE DOCUMENTS ARE.  IT COULD BE

22   THERE'S ONLY 14 RESPONSIVE DOCUMENTS TO THE REQUEST FOR EACH

23   INDIVIDUAL DEFENDANT.  IT COULD BE -- THERE COULD JUST BE A

24   LEDGER THAT SHOWS TICKET SALES, AND THERE COULD BE BUSINESS

25   RECORDS.  WE DON'T KNOW.

1          SO, I THINK PROPORTIONALITY REQUIRES, YOUR HONOR, TO

2     BALANCE A NUMBER OF FACTORS TO DETERMINE RELEVANCE IS ONLY ONE

3     OF THEM.  AND I RESPECT THAT.

4          THE COURT:  NO.  RELEVANCE IS NOT ONE OF THE

5     PROPORTIONALITY FACTORS.

6          MR. ADAR:  WELL, IT'S NOT ONE OF THE PROPORTIONALITY

7     FACTORS, BUT SOMETHING NEEDS TO BE RELEVANT IN ORDER -- IF IT'S

8     COMPLETELY IRRELEVANT, THEN, WE WOULDN'T BE ENTITLED TO IT.

9          THE COURT:  THAT'S CORRECT.

10         MR. ADAR:  SO, WE BELIEVE THAT THERE COULD BE

11    RELEVANCE --

12         THE COURT:  PROPORTIONALITY PRESUMES RELEVANCE.

13         MR. ADAR:  YES, YOUR HONOR.  FAR MORE ARTICULATELY

14    STATED THAN I SAID A MOMENT AGO.

15         THE COURT:  KIND OF WHAT I DO FOR A LIVING.

16         MR. ADAR:  SO --

17         THE COURT:  I DON'T UNDERSTAND THE RELEVANCE OF A LOT

18    OF WHAT YOU'RE ASKING.  AND IF THERE IS RELEVANCE, IT SEEMS

19    PRETTY MARGINAL.  AND THAT DOES GO TO THE PROPORTIONALITY

20    FACTORS UNDER RULE 26(B)(1).

21         MR. ADAR:  OKAY.

22         YOUR HONOR, WE DON'T KNOW WHAT WE DON'T KNOW.  AND

23    THESE SPECIAL -- OUR POSITION WAS THESE SPECIAL PURPOSE

24    ENTITIES WERE CREATED IN FURTHERANCE OF THE ENTERPRISE.  WE DID

25    CAST A WIDE NET.  BUT I APPRECIATE THE DIRECTION THE COURT IS

1   GOING IN.  IF YOUR HONOR DOES NOT BELIEVE THAT THEY -- THAT THE

2   REQUESTS ARE PROPORTIONAL, THEN, I ACCEPT THAT POSITION.

3           THE COURT:  I DON'T UNDERSTAND WHAT YOU'RE ASKING

4   FOR.

5           AND YOU'VE SPENT 10 MINUTES -- AND YOU'VE VERY

6   EARNEST.  AND I LIKE TALKING TO YOU.  YOU'RE VERY SMART.

7           MR. ADAR:  THANK YOU, YOUR HONOR.

8           THE COURT:  YOU'RE WELCOME.  I DON'T GET IT.

9           MR. ADAR:  THESE -- THEY WERE -- THEY WERE ENTITIES

10  THAT WERE CREATED IN FURTHERANCE OF THE ENTERPRISE.

11          THESE ENTITIES AS WE UNDERSTAND FROM OUR -- FROM

12  TESTIMONY TAKEN WERE CREATED SIMPLY BECAUSE THEY WANT TO BE

13  ABLE TO FACILITATE THE EVENTS THAT ARE PUT ON -- THE STS

14  EVENTS, THE HERBALIFE EVENTS, THE EVENTS THAT THESE FEATURE

15  PRESENTERS ARE PUTTING ON.

16          SO, WE WANT TO UNDERSTAND BECAUSE --

17          THE COURT:  WHY?

18          MR. ADAR:  BECAUSE WE THINK THAT THIS -- THE EVENT

19  SYSTEM, OUR WHOLE ALLEGATION IN THE COMPLAINT IS THAT THE WHOLE

20  THING IS A SHAM.  IT'S A FRAUD.

21          AND WE WANT TO LEARN MORE INFORMATION ABOUT IT SO WE

22  CAN --

23          THE COURT:  I DON'T UNDERSTAND THE WHOLE THING IS A

24  SHAM.

25          PEOPLE LIED AT THE EVENTS IS YOUR ALLEGATION.

66

1          MR. ADAR:  YES, YOUR HONOR.  BUT IT WAS ALSO --

2     THAT'S ONE OF THE ALLEGATIONS.

3          OUR POSITION IS ALSO THAT THIS WHOLE EVENT SYSTEM WAS

4     CREATED NOT TO HELP PEOPLE.  IT WAS CREATED TO FURTHER THE

5     POCKETS OF HERBALIFE AND THE FUTURE PRESENTERS.  THERE'S NO

6     GOOD PURPOSE FOR THEM.  THERE'S NO VALID PURPOSE FOR THEM.

7     IT'S JUST -- THE WHOLE THING IS A FRAUD.  THE WHOLE EVENT

8     SYSTEM IS A FRAUD.

9          SO, PART OF THAT FRAUD IS THE FACT THAT AT THE EVENTS

10    FRAUDULENT STATEMENTS ARE MADE, BUT WE DON'T KNOW WHAT WE DON'T

11    KNOW.

12          AND WE WANT TO BE ABLE TO OBTAIN INFORMATION ABOUT

13    THESE SPECIAL PURPOSE ENTITIES THAT WERE CREATED JUST ABOUT

14    THESE -- TO --

15          THE COURT:  RIGHT.

16          MR. ADAR:  RIGHT.

17          THE COURT:  BUT WHAT INFORMATION IN THOSE MATERIALS

18    COULD BE RELEVANT TO YOUR CLAIM ABOUT FRAUD?

19          MR. ADAR:  OTHER THAN TICKET SALES, IT WOULD BE

20    HELPFUL TO KNOW WHO THE OWNERS ARE.

21          THE COURT:  WHY?

22          MR. ADAR:  BECAUSE IF HERBALIFE HAS AN OWNERSHIP

23    STAKE IN THESE EVENTS THAT WOULD BE RELEVANT.  IF THERE ARE

24    OTHER FEATURED PRESENTERS OR UPLINES OR DOWNLINES THAT HAVE

25    OWNERSHIP STAKES, THAT COULD BE RELEVANT AND WOULD BE RELEVANT

1   TO UNDERSTANDING HOW THIS ENTERPRISE WORKS.

2           BUT I'M DOING MY BEST TO READ THE BODY LANGUAGE OF

3   THE COURT.  AND I UNDERSTAND THAT IF --

4           THE COURT:  WELL, IT SOUNDS AWFULLY SPECULATIVE.  IF

5   YOU DON'T KNOW WHAT THESE RECORDS HAVE, AND YOU DON'T KNOW HOW

6   THEY RELATE TO YOUR CLAIMS OR DEFENSE IN THIS ACTION -- WHEREAS

7   WHEN WE HAD A DISCUSSION ABOUT EARNINGS --

8           MR. ADAR:  YES.

9           THE COURT:  -- YOU WERE PRETTY COMPETENT ON THAT,

10  MAN.

11          YOU COULD TELL ME THAT, YOU KNOW, PEOPLE SAID X, BUT

12  THE DOCUMENTS SHOW THAT THEY EARNED Y.  OKAY.

13          MR. ADAR:  RIGHT.

14          THE COURT:  I GOT THAT.  AND I WENT YOUR WAY ON THAT.

15  OKAY.

16          THESE PEOPLE SAID THEY'RE SQUEAKY CLEAN.  AND, IN

17  FACT, THEY'VE BEEN DISCIPLINED BY THE COMPANY.  THAT'S A

18  MISSTATEMENT.

19          I AGREED.  AND I SAID YOU'RE ENTITLED TO SOME RECORDS

20  ON THAT.  AND IF YOU DIDN'T GET THE RIGHT ONES, I'LL GO TO BAT.

21  AND I'LL READ THEM.

22          MR. ADAR:  THANK YOU, YOUR HONOR.

23          THE COURT:  OKAY.  HERE YOU WANT MATERIALS -- FORGET

24  ABOUT PERSONAL AND PRIVILEGE AND PRIVACY AND WHATEVER -- YOU

25  WANT STUFF THAT YOU DON'T EVEN KNOW WHAT IT'S GOING TO SHOW.

1   YOU'RE JUST HOPING THAT SOMEHOW YOU GET SOME GOOD STUFF OUT OF

2   IT.  THAT'S A FISHING EXPEDITION.  AND THAT'S REALLY

3   PROBLEMATIC.

4           MR. ADAR:  OKAY.  UNDERSTOOD, YOUR HONOR.

5           THE COURT:  OKAY.  GOOD.

6           AND I DON'T THINK MR. CATLETT WANTS TO TALK ABOUT

7   THAT ONE.

8           DO YOU, SIR?

9           (LAUGHTER.)

10          MR. CATLETT:  YOU'RE CORRECT, YOUR HONOR.

11          THE COURT:  THAT'S GOOD LAWYERING.

12          ALL RIGHT.

13          MR. ADAR:  YOUR HONOR --

14          THE COURT:  LET --

15          MR. ADAR:  -- BEFORE WE GO ON TO THE -- THE NEXT

16  TOPIC.

17          THE COURT:  YES, SIR.

18          MR. ADAR:  I MAY BE ABLE TO PROVIDE A BIT OF CLARITY

19  REGARDING NUMBER OF DEPOSITIONS.

20          THE COURT:  DO IT.

21          MR. ADAR:  SO, WHEN WE ORIGINALLY SENT OUR SUBPOENAS

22  OUT, WE ASKED FOR 12 DEPOSITIONS BEYOND THE 10-DEPOSITION RULE.

23          AND THE MATH WAS --

24          THE COURT:  THAT WOULD BE 22.  YES --

25          MR. ADAR:  YES, YOUR HONOR.

1           THE COURT:  -- WE GOT ISSUES ABOUT, LIKE, WHETHER THE

2    30(B)(6) IS COUNTED MORE THAN ONCE.

3           MR. ADAR:  YES, YOUR HONOR.

4           SO, WE HAVE ENGAGED IN SEVERAL GOOD FAITH MEET AND

5    CONFERS BETWEEN THEN.  AND THE WAY THAT I LOOK AT THE NUMBERS

6    IS WE ORIGINALLY WANTED -- THERE WAS ONE -- ASSUMING THERE'S

7    ONE HERBALIFE CORPORATE REP.  WE'VE ALREADY TAKEN FIVE

8    ADDITIONAL NONPARTIES.  SO, THAT WOULD BE SIX.  AND AN OFFER

9    THAT WAS MADE BY HERBALIFE THAT IS IN THEIR PAPERS -- BECAUSE

10   THEY WANT TO PRESENT TO THE COURT AS IF THEY'RE REASONABLE --

11   IS THAT THEY ARE OFFERING --

12          THE COURT:  OKAY.  WE DON'T NEED THAT.

13          MR. ADAR:  NO, NO, NO.  AND I -- THAT WASN'T MEANT TO

14   BE THAT WAY, YOUR HONOR.  I APOLOGIZE.  BECAUSE WE WANT TO BE

15   REASONABLE AS WELL.

16          THE COURT:  AND YOU'RE DOING FINE.  THEY'RE DOING

17   FINE.

18          MR. ADAR:  YES.

19          THE COURT:  I ENJOY THE TIME SPENT WITH YOU.  VERY

20   BRIGHT PEOPLE.  DON'T TAKE ANY OF THIS THE WRONG WAY.

21          MR. ADAR:  YES, OF COURSE.

22          THE COURT:  PLAY NICE.  KEEP --

23          MR. ADAR:  UNDERSTOOD, YOUR HONOR.

24          THE COURT:  KEEP GOING.  KEEP GOING.  WHAT DO YOU

25   GOT?

1          MR. ADAR:  SO, WHAT THEY OFFERED IN THERE IS THEY

2    SAID WE WILL OFFER AN ADDITIONAL TWO OR THREE DEPOSITIONS

3    BEYOND THE TEN.

4          THE COURT:  YES.

5          MR. ADAR:  SO, BY MY MATH, THAT WOULD BE FOUR

6    DEPOSITIONS BECAUSE WE HAVE FOUR MORE TO GET US TO TEN, PLUS

7    TWO.

8          I CALLED MR. PANCHAPAKESAN AND I SAID, YOU KNOW WHAT,

9    BEFORE I FLY OUT TO CALIFORNIA.  I DON'T WANT TO BOOK TICKETS.

10   THAT'S THE BIGGEST ISSUE.  THE PPV, EVERYTHING ELSE I'LL BE

11   ABLE TO WORK OUT.  WE WILL ACCEPT YOUR OFFER.

12         BUT HERE'S THE PROBLEM, YOUR HONOR.  IT'S NOT SIMPLY

13   THE NUMBER OF DEPOSITIONS THAT'S THE ISSUE.  IT'S THE EXECUTION

14   ON AN AGREEMENT.  BECAUSE I'M HEEDING THE COURT'S ORDER ON THE

15   TELEPHONE CALL.  YOU DO NOT WANT US TO SPEND AN HOUR OF YOUR

16   TIME GOING BACK AND FORTH ABOUT WHAT HAPPENED BETWEEN JANUARY

17   2019 AND TODAY.  BUT I CAN TELL YOU THAT THERE HAS BEEN AT A

18   MINIMUM AN INABILITY TO EXECUTE AN AGREEMENT WHERE THEY WILL

19   PRODUCE DOCUMENTS BY DATE CERTAIN.  AND AFTER THAT DATE CERTAIN

20   WE WILL BE ABLE TO DEPOSE THEM.

21         INSTEAD, AND YOU'VE SEEN IN OUR BRIEFS, THEY PRODUCED

22   DOCUMENTS OFTEN AFTER THE DEPOSITION IS COMPLETE, THE NIGHT

23   BEFORE.  THESE ARE TENS OF THOUSANDS OF PAGES OF DOCUMENTS.

24         SO, ON THE FIRST ISSUE REGARDING THE NUMBER OF

25   DEPOSITIONS, WE CAN GET TO THAT IN A MINUTE, AND I'LL EXPLAIN

1   TO YOU WHY WE FEEL WE'RE ENTITLED TO MORE.

2          BUT I THINK THE BIGGEST ISSUE IS THAT WE JUST NEED A

3   COURT ORDER -- AND WE'VE ASKED THEM FOR THIS AND ASKED THEM TO

4   AGREE TO THIS -- WHERE THEY HAVE TO AGREE TO PRODUCE DOCUMENTS

5   BY A DATE CERTAIN 14 DAYS BEFORE A DEPOSITION.  AND THEN WE

6   TAKE THE DEPOSITION.  AND THAT'S IT.

7          AND WE'VE TRIED TO COME TO THAT AGREEMENT IN THE

8   PAST.  THOSE DEADLINES HAVE BEEN AGREED TO, NOT TANGIBLY, AND

9   HAVEN'T BEEN MET.

10          THE COURT:  LET'S -- LET'S HEAR SOMETHING ON THAT.

11          MR. ADAR:  OKAY.

12          THE COURT:  MR. -- OH, HERE WE GO.

13          MR. ADAR:  THERE YOU GO.

14          THE COURT:  MR. CATLETT.

15          MR. CATLETT:  THANK YOU.  THANK YOU, JUDGE.

16          WE -- LIKE MR. ADAR SAID, WE'VE TRIED TO WORK WITH

17   HIM.  WE'VE TRIED TO BE REASONABLE.  I THINK EVERYONE HAS DONE

18   THAT.

19          THE ISSUE WITH A DATE CERTAIN IS THAT UNTIL WE GET A

20   PARTICULAR INDIVIDUAL IDENTIFIED WITH A DATE AND A TIME LOCKED

21   DOWN, AND WE GO TO THAT INDIVIDUAL WITH OUR EDISCOVERY VENDOR,

22   AND WE HAVE THE CONVERSATION WITH THEM ABOUT HERE'S WHAT WE

23   NEED.  WE NEED ALL YOUR PASSWORDS, WE NEED TO DOWNLOAD YOUR

24   SOCIAL MEDIA ACCOUNTS.  AND THEN WE ACTUALLY GO OUT AND WE DO

25   THAT.  WE DON'T KNOW WHAT VOLUME OF DOCUMENTS WE'RE TALKING

1  ABOUT.

2          WITH CERTAIN OF THE INDIVIDUALS IT'S BEEN

3  SIGNIFICANTLY MORE THAN OTHERS.  I DON'T WANT TO AGREE TO A

4  DEADLINE THAT I THEN VIOLATE BECAUSE WE'LL BE RIGHT BACK IN

5  FRONT OF YOUR HONOR.  AND I'LL BE -- YOU KNOW, I'LL -- WE'LL

6  HAVE ISSUES OF WHETHER WE'RE COMPLYING WITH OUR OBLIGATIONS OR

7  NOT.

8          IT'S A VERY FLUID PROCESS DEALING WITH THESE FOLKS

9  AND THEIR ESI.  WE'VE ATTEMPTED -- ONCE WE KNOW WHO'S GOING TO

10  BE DEPOSED, AND WE HAVE THE DATE AND TIME, WE'VE ATTEMPTED TO

11  MOVE AS QUICKLY AS POSSIBLE.  WE GET FOLKS ON THE PHONE

12  IMMEDIATELY.  AS WE ALLUDED TO IN OUR PAPERS, WE HAVE A

13  WAREHOUSE IN THE OUTSKIRTS OF PHOENIX WITH 10 LICENSE FOLKS WHO

14  ONCE THE INFORMATION IS PROCESSED AND HOSTED ACTUALLY GO

15  THROUGH IT AND REDACT ANYTHING THAT IS PERSONAL AND IRRELEVANT

16  AND MAKE SURE THAT WE HAVE A RELEVANT SET OF DOCUMENTS THAT

17  WE'RE ACTUALLY PRODUCING TO PLAINTIFFS.

18          ON ONE OCCASION THAT PROCESS WENT OVER AND WENT

19  BEYOND THE DATE OF THE DEPOSITION.  WE PRODUCED A SMALL SET I

20  BELIEVE ON THE MONDAY FOLLOWING A THURSDAY OR FRIDAY

21  DEPOSITION.  AND ALL THE OTHERS WE'VE MANAGED TO GET THE

22  DOCUMENTS OUT TO THEM.

23          PRIOR TO THE DEPOSITION I UNDERSTAND THAT IN CERTAIN

24  CIRCUMSTANCES, THAT IT'S BEEN, YOU KNOW, THOUSANDS OF PAGES,

25  AND THEY WOULD LIKE IT SOONER.  ALL I CAN SAY IS WE'RE DOING

73

1    OUR BEST TO MAKE SURE THAT THAT HAPPENS.

2              THE COURT:  OKAY.  I MEAN, IT'S VERY HARD FOR ME TO,

3    YOU KNOW, FIGURE OUT WHETHER YOU ARE ACTUALLY DOING YOUR BEST,

4    WHAT YOUR BEST MEANS --

5              MR. CATLETT:  SURE.

6              THE COURT:  -- WHETHER YOU'RE HAVING DIFFICULTY

7    DEALING WITH THE OTHER SIDE.  AND WHEN I HEAR ABOUT FLUIDITY I

8    MEAN MY FIRST COUPLE OF PASSES THROUGH THE EMAILS AND THE --

9    THE BRIEFS, YOU KNOW, MAY HAVE SHOWN FLUIDITY OVER THERE ABOUT

10   WHAT YOU WANTED TO DO, WHEN YOU WANTED TO DO IT, WHAT THE

11   DEMAND THEY ASK.

12             I MEAN, THIS IS A MESS, GUYS.  THIS IS A MESS.  AND

13   I'M NOT HERE TO PLAY GOTCHA WITH ANY OF YOU.  OKAY.  IF WE'RE

14   GOING TO GET SIX PEOPLE IN A ROOM OR WHATEVER THE NUMBER IS

15   THESE DAYS, FIGURE IT OUT.  FIGURE IT OUT AS PROFESSIONALS.

16   YOU KNOW, YOU'VE ASKED FOR A LOT OF STUFF.  IT TAKES A LOT OF

17   WORK TO GET IT.  YOU'VE GOT A COMMITMENT TO GET IT TO THEM.

18   AND DATES FOCUS THE MIND.

19             I MEAN, THERE ARE WAYS TO DO THIS THAT DON'T INVOLVE

20   JUST THROWING AWAY SIX MONTHS OF CALENDAR WHICH IS ESSENTIALLY

21   WHAT IT FEELS LIKE HAS HAPPENED HERE.  BECAUSE ASPECTS OF THIS

22   PROCESS STARTED EASILY LAST SUMMER, RIGHT?

23             MR. ADAR:  JANUARY -- FEBRUARY OF 2019, YOUR HONOR.

24             THE COURT:  YEAH, FEBRUARY.  ALL RIGHT.  SO COMING UP

25   ON A YEAR.

1        AND, YOU KNOW, I UNDERSTAND THE BENEFITS OF, YOU

2   KNOW, RUN THE CLOCK OUT.  AND I SEE THAT A LOT.  AND I ALSO

3   UNDERSTAND THAT, YOU KNOW, THE REMEDY TO THAT IS COME INTO

4   COURT AND, YOU KNOW, GETTING ME TO DO SOME STUFF.  AND I'M --

5   I'M WELL ABLE TO WHACK ALL OF YOU AROUND ON SOME OF THESE

6   ISSUES AND MAKE IT FINANCIAL OR MAKE IT TIMINGWISE.  YOU KNOW,

7   I CAN MAKE IT AS DIFFICULT AS ANY OF YOU NEED.  OR I CAN GIVE

8   YOU A HAND IN GETTING THE DISCOVERY YOU WANT IN AN EFFICIENT

9   AND COST-EFFECTIVE MANNER FOR YOUR CLIENTS SO WE CAN GET THIS

10  GOING.

11       AND I'M JUST NOT SURE HOW THIS HAPPENS.  BECAUSE BY

12  THE TIME I GET UP TO SPEED ON SOME OF THESE ISSUES, BECAUSE I

13  CAN'T GET IT ON A PHONE CALL WHERE EVERYBODY IS SHOUTING AT

14  EACH OTHER -- YOU'RE NOT THAT SHOUTY, BUT, YOU KNOW, THERE WAS

15  SOME OF IT.  YOU KNOW, THIS IS A PROBLEM.

16       SO, I CAN SIT HERE AND MEDIATE THIS AND DO YOUR MEET

17  AND CONFER.  I CAN GIVE -- I CAN GIVE YOU A FEW MINUTES TO

18  MAYBE PULL OUT A CALENDAR, FIGURE OUT A PROTOCOL.

19       I CAN ENDORSE IT, MR. ADAR, AND MONITOR IT.  AND, YOU

20  KNOW, MAYBE THAT MOTIVATES SOME FOLKS ON BOTH SIDES.  BUT, YOU

21  KNOW, THERE'S GOING TO BE SOME COMPROMISES WITH THIS AND SOME

22  COMPROMISES PERHAPS IN WHAT THE DOCUMENTS ARE THAT ARE BEING

23  REQUESTED FOR SITTING DOWN FOR WHAT FEEL LIKE KIND OF

24  REPETITIVE DEPOSITIONS.  BECAUSE I THINK SOME OF THE THINGS YOU

25  WANT TO COVER MAY GO WELL BEYOND ASPECTS THAT ARE BOLLOXING

1   THIS THING UP, WHICH IS, YOU KNOW, GETTING THE EMAILS, GETTING

2   SOCIAL MEDIA, SCREENING IT, YOU KNOW, THINGS THAT OBVIOUSLY,

3   OBVIOUSLY TAKE A LOT OF LAWYER TIME AND MONEY WHEN YOU'RE

4   ASKING FOR THESE THINGS.

5            MR. CATLETT:  SO --

6            THE COURT:  AND, SO -- AND, YOU KNOW, COST-SHIFT

7   ISSUES MAY BE COMING UP HERE, TOO.  I MEAN, THERE'S A LOT TO

8   THINK ABOUT HERE.

9            GO AHEAD.

10           MR. CATLETT:  WITH RESPECT TO THE ISSUE OF THE NUMBER

11  OF DEPOSITIONS, OUR POSITION ON BEHALF OF OUR CLIENTS HAS

12  LARGELY BEEN THAT'S AN ISSUE BETWEEN HERBALIFE AND THE

13  PLAINTIFFS.

14           THE COURT:  YEP.

15           MR. CATLETT:  SO, ONCE THEY IDENTIFY WHO ELSE IS

16  GOING TO BE DEPOSED --

17           THE COURT:  YEP.

18           MR. CATLETT:  -- THEY LET US KNOW.  WE'LL WORK WITH

19  OUR FOLKS AND GET DATES AND TIMES.  AND, THEN, WE'LL BE OFF TO

20  THE RACES ON THE ESI PROCESS.

21           I THINK WE'VE COMMUNICATED THAT POSITION TO BOTH

22  SIDES IN THE CASE.  IF WE HAVEN'T, THEN, YOU KNOW, I APOLOGIZE

23  FOR THAT.  BUT I THINK THAT'S REALLY THE STEP NUMBER ONE.

24           THE COURT:  AND --

25           MR. CATLETT:  AND I THINK THAT'S A DIFFERENT ISSUE

1  THAN THE 25-DOCUMENT SUBPOENAS THAT THEY WANT IN ADDITION TO

2  WHATEVER REMAINING DEPOSITIONS WE AGREE UPON IN TERMS OF NUMBER

3  AND WHO THOSE FOLKS ARE.

4            THE COURT:  YEAH.  I MEAN, YOU KNOW, QUERY WHETHER

5  THEY WANT TO TAKE THE TESTIMONY OR WHETHER THEY WANT THE PAPER

6  OR BOTH.

7            WHAT'S THE STATUS OF THE FLORIDA CASE BY THE WAY?  IS

8  THAT --

9            MR. CATLETT:  WE ARE STILL STAYED.  WE ARE ON APPEAL

10 WITH THE ELEVENTH CIRCUIT.  WE JUST RECEIVED NOTIFICATION LAST

11 WEEK THAT THE ELEVENTH CIRCUIT HAS DECIDED TO HOLD ORAL

12 ARGUMENT.  AND THAT -- THAT IS TENTATIVELY SCHEDULED FOR THE

13 WEEK OF APRIL 20TH.

14            THE COURT:  AND THIS IS BASED ON YOUR MOTION FOR

15 ARBITRATION?

16            MR. CATLETT:  OUR MOTION TO COMPEL ARBITRATION AND IN

17 THE ALTERNATIVE TO TRANSFER VENUE.

18            THE COURT:  AND THE DISTRICT COURT IN FLORIDA GRANTED

19 THE ARBITRATION COMPONENT?

20            MR. CATLETT:  WITH RESPECT TO OUR CLIENTS --

21            THE COURT:  YEAH.

22            MR. CATLETT:  -- THE DISTRICT COURT IN FLORIDA DENIED

23 BOTH MOTIONS.

24            THE COURT:  OH, I BEG YOUR PARDON.

25            MR. CATLETT:  SAID YOU'RE STAYING HERE WITH ME.

77

1              THE COURT:  OKAY.  SO --

2              MR. CATLETT:  SO, THAT'S WHY WE -- WE HAVE APPEALED.

3              THE COURT:  GOT IT.

4              MR. CATLETT:  THE 44 DISTRIBUTORS HAVE APPEALED TO

5    THE ELEVENTH CIRCUIT IN AN ATTEMPT TO TRY TO GET THAT -- THAT

6    RULING THAT WE ARE TO BE SPLINTERED OFF AND TO STAY IN FLORIDA

7    TO GET THAT OVERTURNED.

8              AND THAT WILL BE HEARD ON APRIL 20TH.  AND WHO KNOWS

9    HOW LONG THE ELEVENTH CIRCUIT WILL TAKE TO DECIDE.

10             THE COURT:  NOT ME.

11             (LAUGHTER.)

12             THE COURT:  SO, I'M SORRY.  YOU'RE APPEALING THE?

13             MR. CATLETT:  THE DENIAL OF OUR MOTION TO COMPEL

14   ARBITRATION.

15             THE COURT:  RIGHT.

16             MR. CATLETT:  AND THE DENIAL OF OUR MOTION TO

17   TRANSFER VENUE.

18             THE COURT:  SO, YOU WANT TO BE HERE WITH HERBALIFE IN

19   LOS ANGELES?

20             MR. CATLETT:  THAT WAS OUR ALTERNATIVE REQUEST, YES.

21             THE COURT:  OR -- OR YOU WANTED TO BE IN ARBITRATION.

22   THE DISTRICT JUDGE GAVE YOU NEITHER.  THAT'S UP --

23             MR. CATLETT:  CORRECT.

24             THE COURT:  OKAY.  SO, IF THE CIRCUIT AFFIRMS ALL

25   ASPECTS OF THE DISTRICT COURT DECISION, YOU GET TO KEEP GOING

78

1    IN TO --

2              MIAMI?  FORT LAUDERDALE?

3              MR. CATLETT:  MIAMI.

4              MR. ADAR:  MIAMI, YOUR HONOR.

5              MR. CATLETT:  SOUTHERN DISTRICT.  CORRECT.

6              THE COURT:  SO -- SO, THE CASE AGAINST YOUR CLIENTS

7    WILL RESUME THERE?

8              MR. CATLETT:  CORRECT.

9              THE COURT:  GOT IT.  OKAY.

10             OKAY.  WELL, GOOD LUCK WITH THAT.  OKAY.

11             SO -- ALL RIGHT.

12             MR. ADAR, I DON'T KNOW WHETHER I'M HEARING THIS FOR

13   THE TIME, WHETHER IT'S A NICE SPEECH FOR THE JUDGE --

14             WHAT YOUR REACTION IS HERE?

15             WHAT ARE YOU THINKING?

16             MR. ADAR:  I THINK THAT SOUNDS GREAT.  AND I THINK

17   WHAT YOU SAID WE WOULD LOVE TO ACCEPT YOUR OFFER OF A JUDICIAL

18   ENDORSEMENT.

19             IF WE'RE ABLE TO COME UP WITH A DEAL -- NOT A DEAL --

20   THAT'S THE WRONG WORD -- WHEN WE COME UP WITH A COMPROMISE.

21   AND I THINK WE --

22             THE COURT:  WHY IS THAT NOT A -- WHY IS THAT NOT A

23   DEAL?

24             MR. ADAR:  IT IS A DEAL, BUT I DON'T LIKE THE

25   CONNOTATION OF THAT.

1            THE -- THE OTHER SIDE -- THE TRIANGLE, I GUESS.

2            WE'VE HAD NUMEROUS CONFERENCES.  AND WE JUST WANT TO

3    COMMIT TO A SCHEDULE.  WE ARE PREPARED -- AND I'VE TOLD THEM

4    THIS -- TO COMMIT TO SIX INDIVIDUALS.  I CAN NAME THEM RIGHT

5    NOW.

6            IN THE INTEREST OF WHERE THIS CASE IS AND HOW WE'RE

7    ALMOST IN FEBRUARY, WE STILL STAND BY THE FACT THAT 12

8    ADDITIONAL DEPOSITIONS IS PROPORTIONAL IN THIS CASE.  BUT WE

9    ARE NOW ONLY SEEKING IN THE INTEREST OF COMPROMISE AND MOVING

10   FORWARD TO ACCEPT THEIR OFFER OF SIX ADDITIONAL DEPOSITIONS

11   WHICH IS MOOTING THE ISSUE OF WHETHER OR NOT THE 30(B)(6) REP

12   COUNTS AS THREE.

13           AND -- YES.

14           THE COURT:  OKAY.  I GOT IT.

15           LET'S SAY ABSTRACTLY -- BECAUSE I DO WANT TO GIVE YOU

16   ALL A CHANCE TO GO INTO THE HALL OR TAKE MY ATTORNEY ROOM OR

17   FIGURE OUT A PLACE TO TALK AND IF IT CAN GET DONE TODAY --

18           BUT SORT OF REALISTICALLY WHAT DO YOU THINK THE

19   TIMELINE IS FOR SIX ADDITIONAL DEPOSITIONS OF IDENTIFIED

20   PEOPLE?

21           MR. ADAR:  IN ORDER FOR THOSE DEPOSITIONS TO BE

22   FRUITFUL, WE WANT TO HAVE THE DOCUMENTS TWO WEEKS IN ADVANCE.

23   SO, WE HAVE -- THERE'S TWO INDIVIDUALS THAT ARE IDENTIFIED IN

24   THE FLORIDA DEFENDANT'S BRIEF, FOR EXAMPLE, LESLIE STANFORD AND

25   SUSAN PETERSON.  WE DON'T KNOW WHERE THEY STAND ON THE

1   DISCOVERY PRODUCTION.  WE DON'T KNOW WHEN THEY'RE GOING TO BE

2   ABLE TO PRODUCE IT.

3           SO, WE'RE PREPARED TO TAKE THE DEPOSITIONS RATHER

4   QUICKLY, BUT WE WANT TO BE ABLE TO HAVE AT LEAST TWO WEEKS TO

5   BE ABLE TO REVIEW THE DOCUMENTS THEY ULTIMATELY PRODUCE.

6           SO, I CAN'T ANSWER HOW LONG IT WOULD TAKE THEM.  THEY

7   HAVE THE NAMES.  WE ARE NOW GIVING A TRUNCATED VERSION BUT --

8           THE COURT:  I GOT IT.

9           MR. CATLETT, LET'S PUT ASIDE FOR THE MOMENT THE

10  AMOUNT OF LEAD TIME.  LET'S SAY HE GAVE YOU THE NAME OF SIX

11  PEOPLE TODAY.

12          CAN YOU GIVE ME ANY KIND OF SCALE OR SCOPE AS TO WHAT

13  IT WOULD TAKE TO GET RELEVANT MATERIALS REVIEWED -- COMPILED,

14  REVIEWED, PRODUCED IN HIS HANDS?

15          MR. CATLETT:  FIRST SIX FOLKS, I MEAN, WITH THE

16  CURRENT SET OF SEARCH TERMS THAT WE'RE USING -- AND THIS WAS IN

17  -- YOU KNOW, THIS WAS MENTIONED IN THE BRIEF -- WE'VE BEEN

18  LOOKING AT BETWEEN 400 AND 500 HOURS OF REVIEW TIME TOTAL.

19          WITH TEN FOLKS, THAT'S -- YOU KNOW, THEY'RE SPENDING

20  A WEEK, A WEEK AND A HALF FULL TIME JUST TO REVIEW ONE PERSON'S

21  DOCUMENTS.

22          THE COURT:  WHAT ARE WE TALKING ABOUT?  WHAT

23  MATERIALS ARE BEING REVIEWED?

24          MR. CATLETT:  SO, WE ARE OBTAINING ALL EMAILS FROM

25  OUR CLIENTS.  WE ARE OBTAINING ALL SOCIAL MEDIA ACCOUNTS, BOTH

1    PUBLIC FACING AND ANYTHING PRIVATE.  SO, CERTAIN SOCIAL MEDIA

2    APPS HAVE A DIRECT MESSAGE FEATURE.  WE'RE MAKING SURE THAT WE

3    GRAB ANY OF -- THAT IS NOT PUBLIC FACING.  WE'RE MAKING SURE

4    THAT WE GRAB ANY OF THOSE DIRECT MESSAGES BETWEEN OUR FOLKS AND

5    ANYONE ELSE.  THIS IS JUST THE INITIAL GRAB.  THIS IS NOT --

6    AFTER WE TAKE THE GRAB, THEN WE APPLY THE SEARCH TERMS TO TRY

7    TO NARROW THE REVIEW SET.  BUT THE REVIEW SET IS ALL EMAILS,

8    ALL SOCIAL MEDIA, PUBLIC AND PRIVATE, ANYTHING WE'RE IMAGING,

9    HARD DRIVES.  WE ARE IMAGING IPHONES OR WHATEVER OTHER BRAND OF

10   CELL PHONE THEY MAY HAVE.

11        WE'RE ASKING FOR ANY HARD COPY DOCUMENTS THEY MIGHT

12   HAVE THAT RELATE TO THE ISSUES IN THE CASE.

13        AND IF I -- IF I'M ANTICIPATING WHERE YOUR HONOR

14   MIGHT BE GOING, IT MIGHT BE HELPFUL FOR US IN ORDER TO GET

15   THROUGH SOME OF THIS STUFF  QUICKER IF WE NARROWED THE SOURCES

16   OF INFORMATION THAT WE ARE HAVING TO OBTAIN TO SAY EMAIL AND

17   PRIVATE SOCIAL MEDIA OR SOMETHING LIKE THAT.

18        THE COURT:  WELL, I MEAN, I ALSO RECALL -- I BELIEVE

19   IT WAS IN YOUR PAPERS -- THAT WHEN THE DEPOSITIONS OCCURRED,

20   NOT A LOT OF THOSE PIECES OF PAPER WERE LAID ON THE TABLE IN

21   FRONT OF PEOPLE.

22        MR. CATLETT:  CORRECT, JUDGE.

23        THE COURT:  OKAY.

24        NOW, THERE'S NOT A REQUIREMENT THAT THAT HAPPEN.

25        MR. CATLETT:  NO.

1            THE COURT:  RIGHT.  I MEAN, I COULD LOOK AT RECORDS

2    AND NOT SHOW THEM TO YOU AND JUST ASK QUESTIONS BASED OFF OF

3    THAT.  OKAY.

4            MR. ADAR:  WE WOULD DISAGREE WITH THAT

5    CHARACTERIZATION, YOUR HONOR.

6            THE COURT:  WHICH CHARACTERIZATION?

7            MR. ADAR:  THAT THE DOCUMENTS WEREN'T USED.  THEIR

8    CHARACTERIZATION IS THAT WE DIDN'T USE ANY OF THE DOCUMENTS.

9    WE USED MANY OF THE DOCUMENTS IN OUR AMENDED COMPLAINT.  AND WE

10   DO USE THEM AT THE DEPOSITIONS.

11           UNFORTUNATELY, BECAUSE THEY'RE PRODUCED SOMETIMES 30

12   HOURS OR 10 HOURS IN ADVANCE OF THE DEPOSITION, WE'RE NOT ABLE

13   TO REVIEW ALL OF THEM IN ADVANCE.  SO, WE CAN ONLY USE THE

14   DEPOSITION -- THE DOCUMENTS THAT HAVE BEEN REVIEWED AT THAT

15   TIME.

16           BUT THE DOCUMENTS HAVE BEEN INCREDIBLY HELPFUL,

17   RELEVANT, AND HAVE BEEN UTILIZED IN THIS CASE.

18           THE COURT:  WELL, YEAH.  I MEAN, I READ -- I READ --

19   I READ THAT THEY ARE USED.  I MEAN, DOZENS OF PAGES WERE MARKED

20   AS EXHIBITS.  IT DOESN'T REALLY TELL ME MUCH.  I MEAN, IT'S A

21   DOZEN-PAGE DOCUMENT.  THAT'S REALLY NOT MUCH.

22           I MEAN -- I MEAN, THE INDIVIDUALS I DON'T THINK ARE

23   SEEKING RELIEF FROM THE DEPOSITION DOCUMENT SUBPOENAS.

24           CORRECT, MR. CATLETT?

25           MR. CATLETT:  WELL, WE ARE AND WE AREN'T, I GUESS.

1          TO THE EXTENT THAT -- THAT HERBALIFE AND THE

2   PLAINTIFFS MAKE AN AGREEMENT ON SOME SET PORTION OF DEFENDANTS,

3   WE HAVE INDICATED THAT WE WOULD CONTINUE -- OR DEPONENTS.  I'M

4   SORRY -- WE HAVE INDICATED WE WOULD CONTINUE TO USE THE SAME

5   PROTOCOL.

6          THE COURT:  RIGHT.  BUT IT WOULD GO FASTER FROM MR.

7   ADAR'S PERSPECTIVE IF, SAY, YOU DIDN'T HAVE TO SEARCH A PHONE.

8          MR. CATLETT:  CORRECT.

9          THE COURT:  OR YOU DIDN'T HAVE TO IMAGE A DRIVE.  AND

10  IF THERE WAS MAYBE A LIMIT TO JUST WHAT YOU PUT ON FACEBOOK.

11         MR. CATLETT:  CORRECT.  OR WE -- AND/OR WE

12  SIGNIFICANTLY NARROWED THE SEARCH TERMS THAT WERE THEN HAVING

13  TO BUMP UP AGAINST THAT DATA.

14         THE COURT:  HOW MANY TERMS ARE THERE?

15         MR. CATLETT:  PROBABLY ABOUT 50.  AND SOME OF THEM

16  ARE LIKE QUALIFY, RETREAT, TICKET, ZOOM, LDW.  THERE'S A LOT OF

17  ACRONYMS HERE.  I'M NOT EVEN SURE WHAT THEY -- WHAT EXACTLY

18  THEY MEAN.  EXTRAVAGANZA.

19         THE COURT:  YEAH.  I MEAN, MR. ADAR IS A DILIGENT

20  PLAINTIFF AND DOESN'T KNOW WHAT'S OUT THERE.  SO, HE ASKED FOR

21  STUFF TO BE DILIGENT.

22         MR. CATLETT:  SURE.

23         THE COURT:  AND THAT TAKES TIME.  AND THAT TAKES

24  MONEY.  AND THAT'S NOT UNREASONABLE.

25         AND IF THAT'S BEEN PART OF THE PROCESS FOR THIS --

84

1   PART OF THE REASON FOR THIS BEING A SLOW PROCESS, I GET IT.

2            AND I'M TRYING TO EXPEDITE THIS BECAUSE I FIGURE, MR.

3   ADAR, YOU WANT THESE DEPOS DONE.  YOU WANT THESE DEPOS DONE IN

4   AN INTELLIGENT WAY SO YOU DON'T MISS STUFF BECAUSE --

5            MR. CATLETT:  CORRECT, YOUR HONOR.

6            THE COURT:  BECAUSE THAT DOESN'T HELP YOU.

7            MR. CATLETT:  IT DOES NOT.

8            THE COURT:  BUT, YOU KNOW, I THINK WHAT YOU REALLY

9   WANT MORE THAN ANYTHING IS TO GET THESE FOLKS IN THE ROOM AND

10  ASK THEM THE QUESTIONS YOU -- YOU ALREADY HAVE IN MIND.

11           MR. ADAR:  YOUR HONOR, THE DOCUMENTS THAT ARE

12  PRODUCED LEAD TO QUESTIONS THAT ARE HIGHLY RELEVANT AT THESE

13  DEPOSITIONS.  AND THEY DO GUIDE THE QUESTIONS THAT ARE ASKED.

14           I DON'T WANT TO DOWNPLAY THE IMPORTANCE OF THOSE

15  DOCUMENTS IN ADVANCE OF THE DEPOSITIONS.

16           THE COURT:  YEAH.  THEN YOU'RE GOING TO WAIT.

17           MR. ADAR:  AND IF THAT'S WHAT NEEDS TO HAPPEN, YOUR

18  HONOR, THEN WAITING IS ACCEPTABLE.  BUT WE UNDERSTAND THESE

19  THINGS TAKE TIME.

20           I THINK IN ORDER TO EXPEDITE THINGS, THAT WITHOUT

21  DWELLING ON THE PAST, IF THAT SEARCH PROCESS BEGIN NOW, THEN,

22  THINGS CAN MOVE FASTER RATHER THAN -- AND IF THERE COULD BE A

23  SENSE OF URGENCY TO GET THIS DONE THAT WOULD -- IF IT WOULD

24  TAKE WEEKS AS OPPOSED TO MONTHS IS WHERE WE WOULD BE LOOKING TO

25  GO.

1           THE COURT:  WELL, I MEAN, MY OBLIGATION -- AND JUDGE

2    KRONSTADT -- YOU ALL ARE KIND OF LUCKY BECAUSE I THINK JUDGE

3    KRONSTADT DOES NOT -- HE'S ONE OF OUR RARE DISTRICT JUDGES IF

4    MEMORY SERVES -- DOES NOT PRECLUDE POST-CUTOFF DISCOVERY

5    RELATED TO DISPUTES BROUGHT TO THE MAGISTRATE JUDGE.

6           AND IN ADDITION I THINK I HAVE THE AUTHORITY UNDER

7    RULE 29 TO ALLOW THE DEPOSITION AND RELATED DISCOVERY TO OCCUR

8    AFTER A CUTOFF AS LONG AS IT'S NOT LIKELY TO INTERFERE WITH

9    OTHER THINGS GOING ON IN THE CASE.

10          AND, SO, IF IT'S NOT GOING TO INTERFERE WITH AND BE A

11   BASIS FOR RAISING THE ISSUES IN, SAY, THE CLASS CERT STUFF, OR

12   IF THIS DEPOSITION IS GOING TO AFFECT TIMING FOR EXPERT

13   DISCOVERY -- WHICH I THINK JUST GOT RECENTLY CHANGED -- I THINK

14    -- I THINK I'LL BE OKAY.  AND I THINK HE'LL BE OKAY WITH ME

15   GIVING YOU ALL A NEW SCHEDULE BASED ON WHATEVER YOU CAN

16   NEGOTIATE.

17          BUT, YOU KNOW, THAT PUTS US ON A DIFFERENT TRACK.

18          SO, YOU ALL WITH ME SO FAR ON THIS?

19          MR. ADAR:  YES, YOUR HONOR.

20          THE COURT:  MR. DROOKS.  BOY, I MUST HAVE HIT A

21   NERVE.

22          (LAUGHTER.)

23          MR. DROOKS:  WELL, YOUR HONOR, WE HAVE CONSISTENTLY

24   TOLD THE PLAINTIFFS A FEW THINGS.

25          FIRST OF ALL, WE HAVE FOUR LAWYERS ON THE CASE.  ANY

1    TIME WE CAN GET ANY ONE OF THEM TO WHEREVER IN THE COUNTRY

2    THESE THIRD-PARTY DEPOSITIONS ARE TAKING PLACE, WE'LL BE THERE.

3            WE'VE TOLD THEM THAT WE CAN LIVE --

4            THE COURT:  DOES HERBALIFE QUESTION THESE WITNESSES?

5    OR ARE YOU JUST MONITORING THE --

6            MR. DROOKS:  WE HAVEN'T ASKED ANY QUESTIONS YET AS

7    FAR AS I CAN RECALL.

8            THE COURT:  ALL RIGHT.  SO, SOMEBODY COULD JUST PUT

9    AN IPHONE ON THE TABLE WITH FACETIME.  AND OFF YOU GO.

10           MR. DROOKS:  I JUST NEED SOMEONE WHO'S FAMILIAR WITH

11   THE CASE.

12           THE COURT:  GOT IT.

13           MR. DROOKS:  AND I GET HIM THERE.  AND THAT'S IT.  WE

14   HAVEN'T STOOD IN THE WAY OF SCHEDULING.

15           THE COURT:  OKAY.

16           MR. DROOKS:  SECOND, WE'VE TOLD THEM FROM THE

17   BEGINNING THAT WE COULD ACCEPT THEIR CALCULATION AS TO NUMBER

18   OF DEPOSITIONS ALREADY TAKEN AND GO TO ABOUT 12 IF THEY COULD

19   TELL US WHO THEY WERE AND PROMISE US THAT THAT WAS IT.

20           THE COURT:  IT'S GOING TO HAPPEN IN ABOUT 40 SECONDS.

21           MR. DROOKS:  RIGHT.

22           OUR -- AND WE HAVE TOLD THEM CLEARLY THAT WE WOULD

23   NOT OBJECT TO DEPOSITIONS OCCURRING AFTER THE DISCOVERY CUTOFF

24   SO LONG AS WE HAD AN AGREED -- WE HAD AGREED ON WHO THOSE

25   DEPONENTS WERE, THAT THAT WAS THE LIMIT.  AND THAT, YOU KNOW,

1   WITNESSES HAVE ISSUES.  AND WE WOULD NOT OBJECT TO HAVING THEM

2   OCCUR AFTER THE DISCOVERY CUTOFF.

3            THE COURT:  GOOD.

4            MR. DROOKS:  MY ONLY CONCERN THERE --

5            THE COURT:  I KNEW YOU WERE BUILDING TO SOMETHING.

6            MR. DROOKS:  NO.  MY ONLY CONCERN IS THAT WE HAVE A

7   SUMMARY JUDGMENT DEADLINE IN MARCH.

8            WE DON'T BELIEVE THAT ANY OF THESE DEPOSITIONS ARE

9   GOING TO IMPLICATE SUMMARY JUDGMENT.  WE JUST DON'T WANT TO BE

10  HIT WITH A 56 -- IS IT (E) OR (F) MOTION SAYING THAT THEY NEED

11  TO COMPLETE THEIR DISCOVERY IN ORDER TO OPPOSE OUR SUMMARY

12  JUDGMENT MOTION.

13           THE COURT:  OKAY.

14           MR. DROOKS:  WE'D LIKE TO GET THAT HEARD ON A TIMELY

15  BASIS.

16           THE COURT:  OKAY.  WELL, THEN, LET'S GET PEOPLE GOING

17  ON -- LEGITIMATE -- LEGITIMATE POINT OBVIOUSLY.  AND I'M -- I

18  MEAN, I GET IT.

19           SO, I'M TRYING TO FIGURE OUT THE WAY FORWARD HERE.

20  I MEAN, I -- I HAVE YOU ALL HERE.  YOU FLEW ACROSS THE COUNTRY.

21           YOU'RE FROM FLORIDA AS WELL?

22           MR. CATLETT:  PHOENIX.

23           THE COURT:  THAT'S NOT FAR --

24           MR. CATLETT:  NOT THAT FAR.

25           THE COURT:  I'VE HEARD OF THAT ONE.

1            MR. ADAR.

2            MR. ADAR:  YES, YOUR HONOR.

3            WE WOULD PROPOSE THEY KNOW THAT LESLIE STANFORD AND

4    SUSAN PETERSON ARE GOING TO GET DEPOSED IN FEBRUARY.  THAT'S

5    BEEN IN THE BRIEFS.  IT'S NOT DISPUTED.  WE DON'T HAVE DATES

6    YET.

7            AND WHAT WE'D LIKE TODAY AT A MINIMUM IS SOME SORT OF

8    CONCRETE DATE WHERE THEY CAN BE PRODUCED.  THE DOCUMENTS WILL

9    BE PRODUCED.  AND THEN TWO WEEKS LATER WE'LL DEPOSE THEM.  AND

10   WE'LL GIVE THEM THE FOUR OTHER NAMES.  AND --

11           THE COURT:  WHAT'S BEEN --

12           FOR -- WHAT'S BEEN THE SCOPE OF MATERIALS YOU'VE

13   RECEIVED FOR OTHER WITNESSES? -- EITHER BEFORE OR AFTER.

14           MR. ADAR:  SO, WE'VE RECEIVED LOTS OF DOCUMENTS.

15   WE'VE RECEIVED COMMUNICATIONS WITH HERBALIFE REGARDING CONTENT

16   THAT IS DISCUSSED AT THESE EVENTS.  AND HERBALIFE --

17           THE COURT:  SORRY.  HOW MANY PAGES HAVE YOU GOTTEN?

18   THIS IS THE ONE TIME I CARE ABOUT NUMBERS.

19           MR. ADAR:  BETWEEN 10 AND 40,000 PER NONPARTY.  MAYBE

20   THERE'S ONE WHERE IT HAS 65,000 AS WELL.  SO, TENS OF THOUSANDS

21   OF PAGES PER NONPARTY.

22           (PAUSE IN PROCEEDINGS.)

23           THE COURT:  SO, YOU'VE REQUESTED -- YOU'VE MADE

24   REQUESTS IN CONNECTION WITH THESE PEOPLE.  AND YOU GET 60 --

25   THAT'S LIKE CASES AND CASES OF MATERIAL.

1            MR. ADAR:  YES, YOUR HONOR.  WE'VE BEEN BUSY.

2            WE'VE  -- IT'S -- REVIEWING THE DOCUMENTS HAVE BEEN

3    TIME CONSUMING BUT HELPFUL AND RELEVANT.

4            WE DON'T WANT IRRELEVANT DOCUMENTS.  WE DON'T LIKE

5    REVIEWING DOCUMENTS THAT ARE NOT RELEVANT TO OUR CASE.  BUT

6    THESE DOCUMENTS HAVE BEEN PARTICULARLY RELEVANT.

7            THE COURT:  THE 40,000 PAGES ARE RELEVANT TO YOUR

8    CASE?

9            MR. ADAR:  I CAN'T SAY THAT EVERY SINGLE ONE WAS BUT

10   --

11           THE COURT:  I KNOW YOU CAN'T.

12           MR. ADAR:  BUT THERE HAVE BEEN  -- IF WE COULD ASK

13   THEM TO GIVE US THE IMPORTANT DOCUMENTS THAT ARE RELEVANT THAT

14   WERE HELPFUL TO OUR CASE, WE'D PREFER TO FOCUS ON THOSE.  BUT

15   WE'VE --

16           THE COURT:  WHAT'S HELPFUL TO YOUR CASE?

17           IS IT THE EMAILS?  IS IT THE SOCIAL MEDIA?

18           IS IT THE TEXT ON THE PHONE?  IS IT FINANCIAL

19   RECORDS?

20           WHAT'S THE GOOD STUFF?

21           MR. ADAR:  AVOIDING FINANCIAL RECORDS AT THE MOMENT.

22   WHEN YOU LOOK AT THE OTHER ONES, YES, IT IS THE GOOD STUFF.

23   WHEN YOU LOOK AT THE EMAILS, WHEN YOU LOOK AT THE

24   COMMUNICATIONS TO HERBALIFE.  HERBALIFE IN CERTAIN INSTANCES

25   PROVIDED COMMENTS ON THE CONTENT FOR THESE EVENTS THAT THEY

1   CLAIM THEY HAVE NOTHING TO DO WITH.  THAT IS EXTREMELY RELEVANT

2   AND HELPFUL.

3          A LOT OF TIMES THESE INDIVIDUALS WILL BE

4   COMMUNICATING -- FOR EXAMPLE, SAYING IN THEIR NOTES YOU SHOULD

5   TAKE OUT STUDENT LOAN DEBT TO BE ABLE TO FUND HERBALIFE

6   PURCHASES.  YOU SHOULD TAKE ON CREDIT CARD DEBT TO FUND

7   HERBALIFE PURCHASES.

8          IN THE -- AND ONE PARTICULAR WITNESS THAT WAS JUST

9   DEPOSED, THAT PARTICULAR PERSON SAID YOU SHOULD TAKE ON CREDIT

10  CARD DEBT AND THEN DECLARED -- AND WE LEARNED IN DISCOVERY THAT

11  THEY DECLARED OR AT LEAST THERE WERE DOCUMENTS SUPPORTING THE

12  NOTION THAT THEY DECLARED BANKRUPTCY BECAUSE OF THE CREDIT CARD

13  DEBT THAT THEY INCURRED IN CONNECTION WITH HERBALIFE.

14         THESE ARE THINGS THAT WE WOULDN'T HAVE KNOWN UNLESS

15  WE GOT IT THROUGH DISCOVERY.

16         AND TO OUR CREDIT AND TO THE PARTY'S CREDIT, WE HAVE

17  SPENT THE BETTER PART -- BETWEEN JANUARY 2019 AND JANUARY 2020,

18  WE HAVEN'T BEEN SITTING DOING NOTHING.  WE'VE BEEN CONFERRING

19  WITH MR. CATLETT AND HERBALIFE, AND WE DID REQUEST A MUCH

20  LARGER VOLUME OF DOCUMENTS AND A LARGER SCOPE.

21         AND THEY HAVE AGREED, AND WE'VE CONFIRMED THIS ON THE

22  PHONE, AND CONFIRMED THIS IN WRITING, THAT THE CURRENT UNIVERSE

23  OF DOCUMENTS THAT WE ARE SEEKING IS PROPORTIONAL, AND THEY ARE

24  NOT OBJECTING ON THE BASIS OF UNDUE BURDEN.  AND THAT'S BEEN --

25  THAT WAS THE GRAND COMPROMISE REFERENCED IN OUR -- IN OUR

1  BRIEF.  AND IT WAS DONE THROUGH --

2          THE COURT:  BY THE WAY, NICE JOB SETTING THE AGENDA

3  BY THE WAY.  THAT TERM GOT ME.

4          MR. ADAR:  THANK YOU, YOUR HONOR.

5          DOZENS OF --

6          THE COURT:  OKAY.  WELL, I'M TRYING -- I'M TRYING TO

7  FIGURE OUT -- I'M TRYING TO FIGURE OUT THE LEGITIMACY OF YOUR

8  TWO-WEEK BUFFER BECAUSE THAT'S A TIME COMMITMENT AND THAT

9  AFFECTS SCHEDULING.  AND WHAT MR. CATLETT SAID ABOUT SORT OF

10  DOMINOES TUMBLING, YOU KNOW, WEIGHS -- WEIGHS ON ME AS WELL.

11  AND I'M TRYING TO FIGURE OUT WHAT FLEXIBILITY I NEED TO HAVE SO

12  THAT THINGS DON'T CRATER SO THAT YOU CAN GET IN A ROOM AND TALK

13  TO THESE PEOPLE AND TALK INTELLIGENTLY TO THEM WHICH IS THE

14  GOAL ALL THE WAY AROUND.

15          SO, WHAT DO YOU WANT TO DO?

16          YOU WANT TO GET A FIRM DATE FROM THE TWO PEOPLE

17  YOU'VE IDENTIFIED?

18          MR. ADAR:  THE TWO PEOPLE THAT EVERYONE KNOWS ARE

19  BEING DEPOSED IN FEBRUARY.

20          THE COURT:  YEAH.  AND I'M CALLING IT FIRM.  MAYBE

21  "FIRMISH" IS THE WORD.  BECAUSE I GOT TO FIGURE OUT WHAT'S

22  GOING TO HAPPEN.  I MEAN, SOMEONE IS GOING TO HAVE TO SHOW

23  CAUSE TO MOVE THESE DATES.  BUT IT MAY MAKE SENSE TO MOVE THESE

24  DATES BECAUSE I CAN'T PREDICT WHAT'S GOING TO HAPPEN.  I WILL

25  NEED TO BE CONVINCED THAT PEOPLE ARE BEING REASONABLY DILIGENT

92

1    WITH THIS STUFF.  IT'S JUST LIKE EVERYTHING ELSE I'M INVOLVED

2    IN -- TRYING TO FIGURE IT OUT.

3              BUT YOU WANT TO GET DATES, FIRM OR FIRMISH.

4              MR. ADAR:  AND, YOUR HONOR, WE'VE HAD -- WE'VE BEEN

5    VERY CORDIAL AND PROFESSIONAL THROUGHOUT THE CASE.

6              THE COURT:  GOOD.

7              MR. ADAR:  IF MIKE PICKS UP THE PHONE AND CALLS ME ON

8    A FRIDAY AND SAYS I NEED TILL MONDAY, HE'S GOING TO GET IT.

9    THAT'S NOT BEEN AN ISSUE.

10             THE PROBLEM IS, IF HE PICKS UP THE PHONE ON A FRIDAY,

11   AND SAYS YOU'RE NOT GETTING IT TILL 2026, THAT'S THE EXTREME

12   SITUATION THAT WOULD BE A PROBLEM.

13             THE COURT:  HE DID NOT TELL YOU THAT.

14             MR. ADAR:  NO, HE DID NOT.

15             I'M TRYING TO -- WITHOUT PIGEONHOLING HIM --

16             THE COURT:  THAT'S FINE.

17             MR. ADAR:  -- I'M TRYING TO THINK OF AN EXTREME

18   EXAMPLE, YES.

19             THE COURT:  THAT'S FINE.

20             MR. ADAR:  YES.

21             THE COURT:  JUST DON'T WANT YOU TO HAVE A --

22             MR. ADAR:  NO, NO.

23             THE COURT:  OKAY.

24             ALL RIGHT.  WELL, THEN -- OKAY.  I THINK -- I THINK

25   WE CAN GET YOU THERE.  YOU'RE GOING TO SAY FOUR OTHER NAMES,

1  RIGHT?

2          MR. ADAR:  I'M PREPARED TO DO SO RIGHT NOW, YOUR

3  HONOR.

4          THE COURT:  OKAY.

5          AND, THEN, YOU NEED TO SIT DOWN.  AND HE'S GOT TO PUT

6  SOME STUFF IN PROGRESS FOR THAT.  AND THEN YOU NEED TO PULL OUT

7  CALENDARS AND FIGURE OUT WHETHER IT'S LATE FEBRUARY, WHETHER

8  IT'S SOMETIME INTO MARCH.  NOT TOO CLOSE TO MR. DROOKS'

9  DEADLINE IS HIS ISSUE.  BUT, YOU KNOW, WE'LL SEE WHERE WE GO.

10          THAT'S YOUR GOAL TODAY?

11          MR. ADAR:  YES, YOUR HONOR.

12          THE COURT:  GOT IT.  I GOT IT.

13          MR. ADAR:  THE BIGGEST GOAL, YES.

14          THE COURT:  ALWAYS A CAVEAT.  OKAY.

15          MR. ADAR:  AND WHY I FLEW OUT HERE.  BECAUSE IT IS

16  -- I WANT TO MAKE SURE THE COURT UNDERSTANDS THAT THESE

17  DOCUMENTS THAT WE'VE RECEIVED, I DIDN'T WANT TO PHONE THIS IN.

18  THEY'VE BEEN CRITICAL TO OUR CASE.  THEY ARE IMPORTANT.

19          THE COURT:  GOOD.

20          MR. ADAR:  THESE DEPOSITIONS ARE IMPORTANT.  AND IT

21  MEANS A LOT TO OUR CASE AND TO THE PLAINTIFFS.

22          THE COURT:  RIGHT.  MR. CATLETT CAME FROM PHOENIX.

23          MR. ADAR:  YES.

24          THE COURT:  MR. CATLETT, IF WE GET DATES -- IF WE GET

25  NAMES, YOU CAN START YOUR PROCESS, AND WE CAN START FIGURING

94

 1    OUT WHAT IT TAKES TO GET THINGS RUMBLING ON YOUR SIDE AND THEN

 2    PEOPLE INTO A ROOM.

 3            MR. CATLETT:  IF WE HAVE AN AGREEMENT BETWEEN

 4    PLAINTIFFS AND THE DEFENDANT, AND I GET NAMES, I CAN START THAT

 5    PROCESS.  I CAN'T SAY ON THE RECORD THAT I'M GOING TO BE ABLE

 6    TO GET PETERSON AND STANFORD IN FEBRUARY.  WE'VE STARTED THAT

 7    PROCESS WITH THEM.  WE INDICATED ABOUT A MONTH AGO TO THE

 8    PLAINTIFFS THAT WE THOUGHT WE COULD GET MS. PETERSON THE LAST

 9    WEEK OF FEBRUARY.  APPARENTLY THAT HAS CHANGED.  BUT I -- I

10    UNDERSTAND THE URGENCY --

11            THE COURT:  OKAY.

12            MR. CATLETT:  -- ON BOTH SIDES.  AND I'M GOING -- IF I

13    GET THOSE SIX NAMES, I'M GOING TO START GETTING DATES.  AND I'M

14    GOING TO START GETTING MY ESI TEAM COLLECTING FROM ALL SIX OF

15    THEM.

16            THE COURT:  ALL RIGHT.  OKAY.

17            MR. ADAR:  PERFECT.

18            THE COURT:  I HOPE -- OH, HE SAID PERFECT.  I'VE GOT

19    IT.  OKAY.  -- PERF-E-C-T.  GOT IT.

20            ALL RIGHT.  LET'S DO THAT.  LET'S DO THAT.  AND

21    WHATEVER YOU CAN FIGURE OUT, IDENTIFYING, MOVING THINGS FORWARD

22    -- AND THE COMPANY IS ON BOARD.

23            THAT'S WHAT YOU SAID, MR. DROOKS?

24            MR. DROOKS:  YES, YOUR HONOR.

25            I MEAN, WE HAVE THE WHOLE ISSUE OF THE 15 OR 25

95

1  DOCUMENT SUBPOENAS, WHICH I THINK WILL COMPLICATE MR. CATLETT'S

2  --

3          THE COURT:  OH, WE'LL GET THERE.

4          MR. DROOKS:  -- EFFORTS AT SOME POINT.

5          THE COURT:  SOMETIMES -- AND SOMETIMES YOU TAKE THE

6  BIG ISSUE FIRST AND THEN YOU -- SOMETIMES YOU SNOWBALL FROM THE

7  LITTLE ONE.  IT'S DAVE RAMSEY.

8          MR. DROOKS:  AND, YOUR HONOR, AT SOME POINT I WOULD

9  ASK THE COURT TO ADDRESS COST SHIFTING ON THIRD-PARTY

10 DISCOVERY.

11         THE COURT:  ALL RIGHT.  HERE WE GO.

12         LET'S DO THIS.  I NEED TO GIVE STAFF AND ME A BREAK.

13 AND WE'VE BEEN GOING FOR -- WHAT TIME DID WE START?  BEFORE

14 2:00.  YEAH.

15         ALL RIGHT.  WE'RE GOING TO TAKE A 10-MINUTE BREAK.

16         MR. CATLETT:  THANK YOU, YOUR HONOR.

17         THE COURT:   SURE.

18         YOU GUYS CAN KEEP CHATTING.  AND IF YOU WANT TO START

19 WORKING SOMETHING OUT.

20         IN TERMS OF A MECHANISM FOR THIS, IF WE COME TO AN

21 AGREEMENT TODAY, IF YOU WANT TO TALK TO CLIENTS AND PARTIES AND

22 SUBMIT SOMETHING LATER ON, WE CAN ALSO FIGURE OUT WHETHER IT

23 MAKES SENSE TO HAVE A CALL NEXT WEEK.  I'M IN TRIAL, BUT I'LL

24 MAKE TIME FOR THIS.  WE'LL FIGURE OUT THE RESOLUTION.  WE'LL

25 TAKE UP THE OTHER ISSUES.  WE'RE NOT DONE.

1          MR. DROOKS:  YOUR HONOR, CAN I SUGGEST 15 MINUTES?

2          THE COURT:  YES.

3          MR. DROOKS:  -- GIVE US A LITTLE MORE TIME TO --

4          THE COURT:  YES.

5          MR. DROOKS:  -- DISCUSS IT OUTSIDE.

6          THE COURT:  YOU'RE FINE.

7          MR. DROOKS:  THANK YOU.

8          THE COURT:  YOU BET.

9          (RECESS, 3:16 P.M. TO 3:33 P.M.)

10         THE COURT:  OKAY.  CONTINUING WITH OUR SUDDENLY

11   PRODUCTIVE DISCUSSION.

12         MR. ADAR, WHAT'S UP?

13         MR. ADAR:  SO -- I CAN BE CORRECTED IF I'M WRONG.

14   BUT I BELIEVE WE HAVE A COMPROMISE REGARDING THE DEPOSITIONS

15   THAT ARE GOING TO GO FORWARD.

16         THE PROBLEM IS IS THAT -- TO MR. CATLETT'S CREDIT, HE

17   DOESN'T KNOW WHAT THE UNIVERSE OF RESPONSIVE DOCUMENTS IS RIGHT

18   NOW FOR THESE SIX INDIVIDUALS, INCLUDING THE TWO THAT WERE

19   IDENTIFIED.  SO, HE CAN'T COMMIT TO DATES UNTIL HE HAS AN

20   OPPORTUNITY TO DO THAT.

21         THE COURT:  YEP.

22         MR. ADAR:  BUT HE WILL DO SO IN HASTE.

23         AND --

24         THE COURT:  IN HASTE?

25         MR. ADAR:  IN HASTE.

1              THE COURT:  GOT IT.

2              MR. ADAR:  AND WE WILL -- IT PROBABLY WILL MAKE SENSE

3    ON THAT ISSUE TO REQUIRE US TO CONFER BY WEEK END.

4              AND I APPRECIATE YOUR HONOR'S OFFER TO SCHEDULE A

5    CALL NEXT WEEK WHERE WE CAN PERHAPS GET PEN TO PAPER IF

6    NECESSARY.  BUT HOPEFULLY THE PARTIES CAN GET TOGETHER AND DO

7    AN ORDER.

8              WHERE WE HAVE AN ISSUE ARE -- SO, WE ORIGINALLY

9    REQUESTED 12 ADDITIONAL DEPOS.  NOW, WE'RE ONLY REQUESTING SIX.

10   SO, THERE ARE SIX ADDITIONAL DOCUMENTS REQUESTS THAT WE HAVE IN

11   ADDITION TO THE 25.  THAT CREATES 31 ADDITIONAL DOCUMENT

12   REQUESTS THAT ARE THERE.  AND --

13             THE COURT:  SO, YOU'RE ASKING FOR RECORDS TO BE

14   PRODUCED BY FLORIDA DEFENDANTS WHO ARE NOT GOING TO BE

15   TESTIFYING IN THIS CASE AS DEPOSITION WITNESSES.

16             MR. ADAR:  YES, YOUR HONOR.

17             AND WE ARE ABLE AND WILLING AND ARE TRYING TO WORK

18   WITH MR. CATLETT TO BE ABLE TO IDENTIFY NARROWER CATEGORIES OF

19   DOCUMENTS TO MAKE THE BURDEN EVEN LESS THAN IT ALREADY IS NOW

20   FOR THOSE 31, RECOGNIZING THAT IT COULD BE EQUALLY AS --

21             THE COURT:  NARROWER IN TERMS OF SEARCH TERMS?

22   NARROWER IN TERMS OF PLACES TO BE SEARCHED AND MATERIALS TO BE

23   SEIZED?

24             MR. ADAR:  IN EVERY WHICH WAY WE'RE WILLING TO HAVE

25   THAT DISCUSSION.

1              THE PROBLEM IS IS THAT EVEN IF -- AND I'M NOT WILLING

2   TO COMMIT TO JUST THIS ONE CATEGORY -- BUT IF WE ONLY WANTED TO

3   KNOW THEIR COMMUNICATIONS WITH HERBALIFE REGARDING EVENTS AND

4   ANY COMMENTS THAT HERBALIFE HAD, THE PROBLEM THAT I'M HEARING

5   FROM MR. CATLETT IS THE ONLY WAY THEY CAN SEARCH FOR ANY

6   RESPONSIVE DOCUMENTS IS BY INITIALLY INCURRING $15,000 OR

7   APPROXIMATELY TO BE ABLE TO GET EVERYTHING UPLOADED.  AND HE'S

8   ASKING THAT THAT COST BE BORNE BY US.

9              BUT IF WE'RE ABLE TO REDUCE --

10             THE COURT:  DO YOU HAVE REASON TO DOUBT THAT?

11             MR. ADAR:  YES, YOUR HONOR.

12             I THINK THAT IT CAN'T BE THAT EVERY SINGLE REQUEST

13  FOR DOCUMENTS TO ANY PARTY AND ANY CASE IN THE COUNTRY REQUIRES

14  AN INITIAL COST OF $15,000.  THERE HAS TO BE A LESS BURDENSOME

15  WAY TO BE ABLE TO SEARCH FOR NARROWER DOCUMENTS.

16             SO, WE WOULD BE WILLING -- I ASKED WHETHER HE'S ABLE

17  TO ALLOCATE PERHAPS THE IPHONE COSTS -- 80 PERCENT OF THE

18  COSTS.  AND THE EMAILS ARE ONLY 3 PERCENT OF THE COST.  I DON'T

19  KNOW.

20             AND I ASKED HIM IF HE'S ABLE TO ALLOCATE THE $15,000

21  TO PARTICULAR SOURCES, BUT HE WASN'T ABLE -- UNABLE TO DO SO AT

22  THIS TIME.

23             THE POSITION OF THE FLORIDA DEFENDANTS HAS BEEN --

24  AND I DON'T KNOW IF IT'S CHANGED -- THAT ANY ADDITIONAL

25  REQUEST, EVEN ONE, FOR ANY OF THESE ADDITIONAL DEFENDANTS WOULD

1   BE BURDENSOME.

2           AND THE REASON WHY IS BECAUSE THE CUMULATIVE EFFECT

3   IS BURDENSOME.

4           YOUR HONOR HAS READ OUR PAPERS.  I'M NOT GOING TO

5   BELABOR THE POINT OTHER THAN WE HAVE NO EVIDENCE RIGHT NOW THAT

6   FOR ANY ONE OF THOSE 31 INDIVIDUALS THERE WOULD BE ANY BURDEN

7   WHATSOEVER BECAUSE THEY HAVEN'T STARTED THAT PROCESS.

8           IT'S ENTIRELY POSSIBLE FOR, FOR EXAMPLE, GABRIEL

9   SANDOVAL, THAT IF THEY WERE TO TRY TO REQUEST DOCUMENTS, THERE

10  COULD BE 14 REQUESTS DOCUMENTS RESPONSIVE.  SHE MIGHT NOT USE

11  FACEBOOK.  SHE MIGHT NOT USE ANY OF THESE MEDIUMS.  AND IT

12  COULD BE NO BURDEN WHATSOEVER.  BUT WE CAN'T HAVE A DISCUSSION

13  REGARDING COST-SHIFTING.  AND WE CAN'T HAVE A DISCUSSION

14  REGARDING WHAT THAT BURDEN IS UNLESS WE UNDERSTAND WHAT THE

15  UNIVERSE OF DOCUMENTS IS.

16          AND WE ARE PREPARED AND WILLING TO SUBSTANTIALLY

17  NARROW THOSE OTHER THAN THE SIX THAT WE'VE REQUESTED.  BUT

18  THERE'S NO STARTING POINT BECAUSE WE'RE GOING TO HAVE TO AT

19  THEIR REQUEST PAY AN ENTRY FEE OF $15,000 PER PARTY JUST TO

20  START THAT DISCUSSION.  AND WE THINK THAT'S NOT FAIR.

21          THE COURT:  ALL RIGHT, KIDS.  IF I HAVE TO DO THIS,

22  I'LL DO THIS.

23          MR. CATLETT, STAND AT THE MICROPHONE NEXT TO MR.

24  ADAR.  AND TELL ME WHERE THE 15,000-DOLLAR FIGURE COMES FROM.

25          (PAUSE IN PROCEEDINGS.)

```
 1              (COUNSEL CONFERRING.)

 2              MR. CATLETT:  YOUR HONOR, I -- I ACTUALLY DON'T

 3    RECALL SAYING $15,000.  BUT WE CANNOT DETERMINE WHAT THE

 4    UNIVERSE OF POTENTIALLY RELEVANT DOCUMENTS IS WITHOUT ENGAGING

 5    OUR ESI --

 6              THE COURT:  WELL, I MEAN, I'M LOOKING AT -- I'M

 7    LOOKING AT YOUR PAPERS.

 8              MR. CATLETT:  SURE.

 9              THE COURT:  I READ THIS.  YOU KNOW, TOMMY GIOIOSA --

10              MR. CATLETT:  RIGHT.

11              THE COURT:  HE WAS A BASEBALL PLAYER, RIGHT?

12              MR. CATLETT:  HE WAS ACTUALLY.  YES.

13              THE COURT:  YEAH.  YEAH.  YEAH.

14              MR. DE LA CONCEPCION, MR. ADDY,  AND YOU HAVE COSTS

15    ATTRIBUTABLE TO TERIS -- WHO I TAKE IS YOUR I.T. VENDOR --

16              MR. CATLETT:  CORRECT.

17              THE COURT:  -- OR FORENSIC.  YEAH.

18              AND THEN YOUR FIRM SPENDING TIME REVIEWING THESE

19    MATERIALS, RIGHT?

20              MR. CATLETT:  WITH RESPECT TO MR. GIOIOSA AND

21    MR. DE LA CONCEPCION.  WITH RESPECT TO THE -- THE OTHER THREE

22     --

23              THE COURT:  THERE'S PARALLEL -- PARALLEL LAWYERS.

24              MR. CATLETT:  -- WITNESSES WE WISED UP.  AND WE

25    DECIDED THAT IT WOULD BE BEST IF WE OUTSOURCED THE REVIEW TO
```

1    FOLKS --

2            THE COURT:  LEGAL FEES.  LEGAL FEES.

3            MR. CATLETT:  RIGHT.

4            THE COURT:  GOT IT.  OKAY.  ALL RIGHT.

5            SO, YOU KNOW, COLLECTION COSTS ARE BASED ON THE WORK

6    THAT THE VENDOR HAS TO DO.

7            MR. CATLETT:  CORRECT.

8            THE COURT:  AND IT MAY DEPEND ON WHAT THE PERSON HAS.

9    AND IT MAY DEPEND ON HOW YOU INTERPRET WHAT THE DEMAND IS.

10   IF THE REQUEST IS FOR EMAILS, WE KNOW WHAT EMAILS ARE.  AND WE

11   KNOW REASONABLY WHAT IT TAKES.

12           IF THE REQUEST IS FOR SOCIAL MEDIA, IF IT'S FOR EVERY

13   PIECE OF PAPER IN A DRAWER IN A HOUSE, THAT'S SOMETHING ELSE.

14           MR. CATLETT:  CORRECT.

15           THE COURT:  WHAT IS THE STATE OF YOUR DISCUSSIONS

16   REGARDING ITEMS TO BE SEIZED AND THEN THINGS TO BE SEARCHED?

17           MR. CATLETT:  WITH -- WITH RESPECT TO THE 25 DOCUMENT

18   SUBPOENAS -- I KNOW WE'RE NOW I GUESS DEALING WITH 31 BECAUSE

19   WE'VE AGREED THAT WE'RE GOING TO LIMIT THE DEPOS TO SIX MORE

20   FOLKS.

21           THE COURT:  LET'S -- LET'S SAY THE NONTESTIFYING

22   WITNESSES.

23           MR. CATLETT:  OKAY.

24           THE NUMBER THAT -- WALKING IN TODAY, I THOUGHT IT WAS

25   25.

1           THE FIRST TIME I LEARNED THAT WE WERE EVEN GOING TO

2   BE DEALING -- POTENTIALLY DEALING WITH THOSE WAS ON DECEMBER

3   19TH.  WE WERE SERVED BY EMAIL.

4           AND THEN DECEMBER 20TH MR. ADAR EMAILED YOUR HONOR TO

5   TEE UP THE DISPUTE THAT WE'RE -- THAT WE'RE HERE FOR TODAY.

6           SO, WE HAVE HAD VERY LITTLE DISCUSSION WITH

7   PLAINTIFFS ABOUT THOSE 25 DOCUMENT SUBPOENAS.

8           I'M ASSUMING THEY WANT THE SAME UNIVERSE OF

9   DOCUMENTS.

10          THE COURT:  LET'S FIND OUT.

11          MR. ADAR, WHAT DO YOU WANT?

12          MR. ADAR:  ONCE WE UNDERSTAND WHAT THE BURDEN IS WE

13  ARE WILLING TO SUBSTANTIALLY NARROW IT FOR THOSE.

14          THE COURT:  NO.  WHAT DO YOU WANT?  WHAT HAVE YOU

15  ASKED FOR?

16          MR. ADAR:  WE'VE ASKED FOR THE SAME UNIVERSE OF

17  DOCUMENTS, YOUR HONOR.

18          THE COURT:  OKAY.  SO, YOU'VE ASKED FOR -- HELP ME

19  OUT HERE.

20          EMAILS?

21          MR. ADAR:  EMAILS, TEXT MESSAGES, SOCIAL MEDIA, AND

22  OTHER DOCUMENTS IN THEIR POSSESSION, CUSTODY, OR CONTROL

23  REGARDING THESE EVENTS --

24          THE COURT:  EVERYTHING ELSE.

25          MR. ADAR:  -- THAT HAVE BEEN SPECIFICALLY -- WELL,

1    WE'VE NARROWED IT.  AND WE'VE MADE TREMENDOUS PROGRESS TO BE

2    ABLE TO DO THAT.  AND WE'VE USED SEARCH TERMS TO BE ABLE TO

3    NARROW IT FURTHER.

4              THE COURT:  I UNDERSTAND.  THE SEARCH TERMS ARE ONCE

5    THEY GET THEIR ARMS AROUND STUFF.

6              MR. ADAR:  YES, YOUR HONOR.

7              THE COURT:  MY QUESTION IS WHAT HAVE YOU ASKED THEM

8    TO GET THEIR ARMS AROUND? -- EMAIL, SOCIAL MEDIA, TEXTS, AND

9    OTHER PIECES OF PAPER.

10             CORRECT?

11             MR. ADAR:  YES, YOUR HONOR.

12             THE COURT:  OKAY.  AND YOU DON'T SEE THAT AS BEING

13   POTENTIALLY BURDENSOME RIGHT OFF THE BAT?

14             MR. ADAR:  NO, YOUR HONOR.

15             THE COURT:  OKAY.

16             MR. ADAR:  I'VE RESPONDED TO REQUESTS WHERE IT ONLY

17   REQUIRED MINIMAL COSTS, IF ANYTHING, TO COPY TO BE ABLE TO

18   OBTAIN IT.

19             FOR EXAMPLE, IF SOMEONE USES GMAIL, THERE'S A

20   MECHANISM TO BE ABLE TO GET THOSE DOCUMENTS.  IF THERE'S ONLY

21   300 EMAILS, THEN, THAT'S NOT A COST ASSOCIATED WITH IT.  WE

22   JUST DON'T KNOW.

23             AND AS WE DISCUSSED OUTSIDE --

24             THE COURT:  SO HE -- OKAY.

25             MR. ADAR:  YES, YOUR HONOR.

1            THE COURT:  SO, HE WAS ASSUMING THE REQUESTS FOR THE

2    NONTESTIFYING WITNESSES ARE ASKING FOR THE SAME THINGS.

3            AND YOUR ASSUMPTION IS CORRECT, MR. CATLETT.

4            OKAY.  WHAT DO YOU HAVE TO DO NEXT?

5            MR. CATLETT:  WE WOULD HAVE TO CONTACT EACH OF THE 25

6    OR 31 THIRD-PARTY WITNESSES.

7            THE COURT:  YEP.

8            MR. CATLETT:  WE WOULD HAVE TO EXPLAIN TO THEM THE

9    PROCESS.  TYPICALLY WE HAVE TWO CONFERENCE CALLS.  WE EXPLAIN

10   THE PROCESS.  AND, THEN, WE GET TERIS ON THE LINE.  AND WE WALK

11   THROUGH A VERY DETAILED ESI CHECK-LIST THAT GOES THROUGH EVERY

12   POTENTIAL SOURCE -- BECAUSE THERE'S BEEN NO NARROWING --

13           THE COURT:  RIGHT.

14           MR. CATLETT:  WE GO THROUGH EVERY POTENTIAL SOURCE

15   WHERE OUR FOLKS MAY HAVE SOMETHING THAT IS RESPONSIVE TO THE

16   CATEGORIES IN THE SUBPOENA.

17           THE COURT:  OKAY.

18           THAT SOUNDS RIGHT, MR. ADAR, DOESN'T IT?  YOU'VE

19   ASKED FOR ALL THESE THINGS.  HE GOES TO HIS CLIENT AND SAYS,

20   WHAT HAVE YOU GOT.  AND WE HAVE TO SIT DOWN WITH THE VENDOR TO

21   FIGURE OUT WHAT IT'S GOING TO TAKE TO GET THESE THINGS WITHIN

22   -- WITHIN OUR HANDS, RIGHT?

23           MR. ADAR:  YES, YOUR HONOR.  BUT THERE SHOULDN'T BE A

24   FEE ASSOCIATED WITH BEING ABLE TO UNDERSTAND WHAT THE UNIVERSE

25   OF DOCUMENTS ARE.  ONCE WE UNDERSTAND WHAT THE UNIVERSE OF

1    DOCUMENTS ARE BASED ON THEIR INITIAL DISCUSSION WITH THE

2    CLIENTS, AND WE REALIZED THAT THERE COULD BE A TREMENDOUS

3    BURDEN FOR EACH OF THESE INDIVIDUALS, WE ARE WILLING TO WORK

4    WITH THEM AS WE HAVE FOR EVERY OTHER ONE --

5              THE COURT:  SO, YOU DON'T WANT MR. --

6              MR. ADAR:  -- TO REDUCE THE BURDEN.

7              THE COURT:  SO, YOU DON'T WANT MR. CATLETT TO TALK TO

8    THE VENDOR YET.  YOU WANT HIM TO TALK TO HIS CLIENT AND HAVE

9    THE CLIENT SAY, WELL, I'VE GOT, YOU KNOW, FOUR DIFFERENT EMAIL

10   ADDRESSES AND I -- YEAH, I HAVE FACEBOOK.  YEAH, I HAVE TEXTS

11   ON MY PHONE.

12             AND YOU WANT WHAT TO HAPPEN AFTER THAT IF THE VENDOR

13   IS NOT INVOLVED?

14             MR. ADAR:  WE CAN HAVE A DISCUSSION REGARDING HOW

15   MANY -- HOW MANY EMAILS THERE ARE.  THERE ARE FIVE EMAILS OR

16   THERE'S THOUSANDS OF EMAILS.

17             THE COURT:  YOU WANT -- YOU WANT THE WITNESSES TO

18   MAKE THAT DETERMINATION?  YOU WANT THE WITNESSES TO GO INTO THE

19   DATA AND FIND OUT HOW MANY THINGS THEY HAVE AT GMAIL?

20             MR. ADAR:  LET ME -- LET ME TAKE A STEP BACK.

21             WE WOULD LIKE TO KNOW WHAT THE UNIVERSE OF SOURCES

22   ARE BECAUSE WE DON'T KNOW.  IT COULD BE, AS YOU SAID, FOUR

23   EMAIL ACCOUNTS, THREE EMAIL ACCOUNTS OR WHATNOT.

24             I'M GOING TO -- I'M GOING TO TAKE A STEP BACK, YOUR

25   HONOR.  WE ARE NOT RIGHT NOW SITTING HERE TODAY ASKING THEM TO

1  PRODUCE THE SAME UNIVERSE OF DOCUMENTS FOR THOSE 25

2  NONTESTIFYING EXPERTS.  WE ARE WILLING TO HAVE A DISCUSSION

3  WITH THEM REGARDING HOW THAT CAN BE NARROWED TO REDUCE THE

4  BURDEN.

5          WE HAVE PROPOUNDED THOSE REQUESTS.  WE HAVE BEEN MET

6  WITH AN UNDUE BURDEN OBJECTION.

7          THE COURT:  YEAH, BUT THIS --

8          MR. ADAR:  -- AND WE ARE WILLING TO WORK TO NARROW IT

9  EVEN FURTHER.

10          THE COURT:  HOW?

11          MR. ADAR:  BY HAVING A DISCUSSION WITH THEM REGARDING

12  HOW IT CAN BE NARROWED.

13          THE COURT:  HOW WOULD --

14          MR. ADAR:  YES.

15          THE COURT:  YOU'RE NOT MAKING ANY SENSE.

16          MR. ADAR:  SO --

17          THE COURT:  HOW DOES -- HOW DOES -- MR. CATLETT IS A

18  LAWYER.  HE SITS IN AN OFFICE.

19          MR. ADAR:  YES.

20          THE COURT:  HE HAS NO IDEA WHETHER HIS CLIENT HAS

21  FIVE EMAILS OR 5 MILLION, RIGHT?

22          MR. ADAR:  THAT'S CORRECT.

23          THE COURT:  OKAY.

24          THERE'S ONLY TWO WAYS YOU FIND THAT OUT IS IF HIS

25  INDIVIDUAL CLIENT GOES ON TO GMAIL AND STARTS MUCKING AROUND

1    WITH YOUR DATA TO COUNT THEM UP OR HE HAS A QUALIFIED

2    PROFESSIONAL DO THAT.

3            YOU WANT TO KNOW WHAT THE BURDEN IS.  SO DOES HE.

4    BUT THERE'S ONLY -- IS THERE ANOTHER WAY TO FIGURE THAT OUT?

5            MR. ADAR:  NO, YOUR HONOR.

6            THE COURT:  SO, EVEN LAUNCHING THE SUBPOENAS, IT'S

7    FUNDAMENTAL THAT YOU'RE CAUSING THEM TO INCUR COSTS AND A LOT

8    OF TIME JUST TO DO THESE BASICS BEFORE YOU CAN EVEN FIGURE OUT

9    WHAT DO YOU REALLY WANT OR WHAT ARE YOU FACING.

10           MR. ADAR:  WE ARE PREPARED TO FURTHER NARROW THE

11   REQUEST BEFORE THEY HAVE TO DO THAT.

12           BUT BASED ON MY CONVERSATIONS WITH MR. CATLETT, IF WE

13   WERE TO TAKE THE UNIVERSE OF DOCUMENTS THAT WE'RE REQUESTING,

14   AND WE WOULD NARROW IT TO -- AND WE'RE NOT WILLING TO DO THIS

15   JUST YET -- ONE CATEGORY OF DOCUMENTS SAYING, FOR EXAMPLE, ALL

16   COMMUNICATIONS WITH HERBALIFE REGARDING COMMENTS ON EVENT

17   PRESENTATIONS, THAT IN AND OF ITSELF, IT'S NOT REASONABLE THAT

18   IT WOULD BE A 15,000-DOLLAR EXPENSE ASSOCIATED WITH THAT.

19           THE COURT:  WELL, WHAT WOULD BE REASONABLE?

20           MR. ADAR:  HAVING A CONVERSATION WITH THE CLIENT,

21   WHERE DID YOU  -- HOW DID YOU COMMUNICATE WITH HERBALIFE.

22           THE COURT:  EMAIL.

23           MR. ADAR:  OKAY.  SO, THEN, THEY CAN -- ON GMAIL YOU

24   CAN SEARCH FOR DOCUMENTS WITHOUT HAVING TO HAVE A VENDOR DO IT.

25           AND YOU CAN LOOK -- SO, I COMMUNICATED WITH ONE

1  PERSON INDIVIDUAL.  I COMMUNICATED EXCLUSIVELY WITH PERSON X AT

2  HERBALIFE REGARDING CONTENT.

3            THE COURT:  YOU WANT MR. CATLETT TO OUTSOURCE HIS

4  RESPONSIBILITY UNDER RULE 11 AND RULE 37 TO HIS CLIENT WHO HAS

5  BEEN SUED BY YOU -- YOUR SIDE AND ACCUSED OF FRAUD.

6            YOU WANT TO HAVE THE CLIENT SEARCH FOR THIS STUFF?

7  AND YOU HAVE ANY REASONABLE HOPE THAT YOU'RE GOING TO GET A

8  DECENT RESPONSE?

9            MR. ADAR:  WELL, I WOULD HOPE THAT IF SOMEONE --

10           THE COURT:  YOU WANT TOMMY GIOIOSA SEARCHING HIS OWN

11  EMAILS FOR YOU?

12           MR. ADAR:  NO, YOUR HONOR.

13           THE COURT:  WELL, WHAT DO YOU WANT?

14           MR. ADAR:  WHAT WE WANT IS TO HAVE A DISCUSSION WITH

15  THEM REGARDING WHAT THE UNDUE BURDEN WOULD BE.

16           I APPRECIATE -- I UNDERSTAND THAT, YOUR HONOR.  BUT

17  WHAT I WOULD LIKE THEN TO DO -- WE ISSUE THE SUBPOENAS.  WE

18  DIDN'T UNDERSTAND IN FAIRNESS TO US WHAT THE COST ASSOCIATED

19  WITH THESE SUBPOENAS WOULD BE.

20           THE COURT:  LOOK, THEY MAY BE DOING THIS IN A

21  CADILLAC VERSION OR WHATEVER THE 21ST CENTURY IN --

22           WHAT DO YOU DRIVE, MR. DROOKS? -- THE TESLA VERSION

23  --

24           MR. DROOKS:  HYUNDAI, YOUR HONOR.

25           THE COURT:  SORRY?

1              MR. DROOKS:  A HYUNDAI, YOUR HONOR.

2              THE COURT:  AS IF.  AS IF.

3              YEAH.  THEY MAY BE DOING LAMBORGHINI STUFF.  I GET

4     IT.  AND TO BE TOLD IT'S $15,000, I HAVE NO WAY OF KNOWING --

5     I'M NOT IN -- I'M NOT IN THE MARKET FOR THIS STUFF RIGHT NOW.

6              AND IF YOU'RE GETTING STICKER SHOCK FROM THAT, AND IF

7     HE'S BIG-TIMING YOU, I GOT IT.  BUT THERE IS ABSOLUTELY A

8     SIGNIFICANT COST THAT'S PUT IN MOTION JUST BY YOU PUSHING

9     "SEND" ON YOUR -- ON YOUR SUBPOENAS.

10             AND WHAT IT TAKES FOR THAT NUMBER TO COME DOWN OR BE

11    MORE REALISTIC OR FOR YOU TO MAKE A JUDGMENT CALL WILL BE A

12    DIALOGUE.  BUT WHAT YOU'RE -- WHAT YOU'RE JUST SORT OF THROWING

13    OUT THERE IS NOT -- IS NOT PRODUCTIVE AND IS NOT GOING TO GET

14    THEM THERE BECAUSE HE -- HE --

15             MR. CATLETT, ARE YOU COMFORTABLE WITH YOUR OWN

16    CLIENTS DOING THEIR OWN DOCUMENT SEARCH?

17             MR. CATLETT:  NOT TO DISPARAGE MY CLIENTS ON THE

18    RECORD, YOUR HONOR, BUT NO.

19             IF I SEND THEM THIS SUBPOENA WITH THE DEFINITIONS AND

20    THE INSTRUCTIONS AND THE CATEGORIES AND ASK THEM TO JUST GO

21    THROUGH THEIR STUFF AND TELL ME WHAT THEY HAVE --

22             THE COURT:  IF THEY HAVE A HOME OFFICE, AND THEY HAVE

23    TO SEARCH FOR HARD-COPY DOCUMENTS, WOULD YOU SEND A PARALEGAL?

24    OR WOULD YOU HAVE THEM BOX UP THEIR OWN STUFF?

25             MR. CATLETT:  I WOULD PROBABLY SEND A PARALEGAL.  OR

1    I WOULD FIND -- I WOULD FIND SOMEONE LOCAL THAT I TRUSTED TO GO

2    PULL THE STUFF, MAIL IT TO ME -- ACTUALLY COPY -- OR COPY IT.

3               AND THEN I -- OR -- OR AN ASSOCIATE OR A PARALEGAL IN

4    MY OFFICE WOULD GO THROUGH IT.

5               THE COURT:  YEAH.  THERE ARE UNDOUBTEDLY STAGGERING

6    COSTS HERE.

7               WHETHER IT'S 15 GRAND PER PERSON -- I'M NOT CONVINCED

8    EITHER.  I'M NOT.  BUT IF IT'S 14 OR 13 OR 12 OR 9 OR 4, IT'S

9    ABSOLUTELY THERE.  AND IT'S BAKED IN WITH WHAT YOU'VE STARTED.

10              SO, HOW DO WE FIX THIS?

11              MR. ADAR:  WE FIX IT TWO WAYS, YOUR HONOR.

12              FIRST -- AND I HAD A CONVERSATION WITH MR. CATLETT

13   AND -- AND I MIGHT MISPRONOUNCE HIS LAST NAME --

14              SALANGA, IS THAT CORRECT?

15              MR. CATLETT:  CORRECT.

16              MR. ADAR:  OKAY.

17              AND MR. SALANGA.  AND ONCE WE LEARNED AND ONCE WE SAW

18   THE BRIEFS, AND WE SAW THAT THEY HAVE THIS MASSIVE DATA COST,

19   WE SAID, LOOK, LET'S WORK TOGETHER TO REDUCE THE BURDEN ON THE

20   NON-PARTIES.

21              AND I DO WANT TO PUT AN ASTERISK REGARDING THE FACT

22   THAT THEY'RE NON-PARTIES BECAUSE AS YOU READ IN OUR BRIEFS,

23   THEY'RE NOT DISINTERESTED NON-PARTIES.  AND THERE'S CASE LAW IN

24   CALIFORNIA THAT SAYS THAT IF YOU DO HAVE AN INTEREST IN THE

25   OUTCOME OF LITIGATION, THEN, THE UNDUE BURDEN ANALYSIS IS A

1    LITTLE BIT DIFFERENT.

2              REGARDLESS --

3              THE COURT:  I'LL TAKE IT UP UNDER RULE 26(C) WITH

4    COST-SHIFTING.

5              MR. ADAR:  REGARDLESS, YOUR HONOR, WE WANT TO DO OUR

6    BEST TO REDUCE COSTS FOR EVERYONE IN THIS CASE.  WE DON'T WANT

7    TO BE ABLE TO HAVE HUNDREDS OF THOUSANDS OF DOLLARS INCURRED

8    FOR THE SAKE OF HAVING IT INCURRED.  WE'RE NOT LOOKING TO MAKE

9    PUNITIVE DISCOVERY REQUESTS, BUT WE DO WANT RELEVANT DOCUMENTS.

10             SO, WE TRIED TO HAVE A DISCUSSION WITH MR. SALANGA

11   AND MR. CATLETT AND I THINK MR. QUIGLEY FROM QUARLES & BRADY

12   AND SAID HOW CAN WE MOVE FORWARD TO BE ABLE TO REDUCE THE

13   BURDEN.

14             AND THEIR POSITION WAS ANY DOCUMENT REQUEST OR ANY

15   DISCOVERY BEYOND THOSE THAT HAVE ALREADY BEEN PROPOUNDED OR

16   AGREED UPON IS BURDENSOME.  ANY.  AND THAT WAS WHERE WE WERE.

17             SO, WE WEREN'T ABLE TO HAVE A DIALOGUE REGARDING HOW

18   TO REDUCE THE BURDEN.

19             WE CAN DO IT UNILATERALLY.  AND WE CAN DO THAT IF

20   YOUR HONOR WOULD LIKE TO BE ABLE TO MAKE IT LESS BURDENSOME.

21   BUT TYPICALLY THE WAY THE DISCOVERY WORKS IS YOU PROPOUND

22   DISCOVERY REQUESTS.  I HAD NO IDEA THEY ARE INCURRING $15,000 A

23   POP IN INITIAL COSTS TO TERIS.  THAT WAS SOMETHING THAT WE

24   DIDN'T KNOW.

25             NOW THAT WE KNOW THAT, WE CAN TRY TO FIND A WAY TO

1  REDUCE THE BURDEN BY BEING ABLE TO REDUCE THE REQUESTS AND FIND

2  OTHER WAYS TO BE ABLE TO GET THE DOCUMENTS THAT WE NEED.

3          AND THAT TYPICALLY HAPPENS THROUGH A DIALOGUE.  BUT

4  WE HAVE BEEN MET WITH A STONE WALL SAYING NO MORE.

5          THE COURT:  AM I GOING TO KICK YOU ALL BACK IN THE

6  HALLWAY AND COME BACK IN ANOTHER 20 MINUTES?  I MEAN, HAVE IT

7  NOW.  WHAT'S -- WHAT'S THE ISSUE?

8          THIS IS BROKEN.  HOW DO I FIX IT.

9          MR. CATLETT:  YOUR HONOR, WE -- WE HAVE ALREADY

10  AGREED TO -- OR THE PARTIES HAVE AGREED TO SIX ADDITIONAL

11  DEPOS.  WE'RE GOING TO INCUR THE COST OF DOING THE DOCUMENT

12  PROCESS WITH RESPECT TO THOSE SIX WITNESSES AND GO THROUGH THE

13  SAME UNIVERSE OF DOCUMENTS WE HAVE WITH THE PRIOR FIVE.

14          WE KNOW FROM THAT PRIOR EXPERIENCE THAT EACH IS

15  RUNNING ABOUT $50,000 BETWEEN ESI VENDOR COST AND DOCUMENT --

16  LAWYER DOCUMENT REVIEW COSTS.  THAT'S SET OUT ON PAGE 8 OF OUR

17  -- I THINK OUR INITIAL BRIEF.

18          THE COURT:  I HAVE IT.

19          MR. CATLETT:  SO, WE'RE LOOKING AT $300,000 WITH

20  THOSE SIX WITNESSES, ASSUMING -- AND YOU MAY -- MR. ADAR MAY

21  NOT LIKE THIS ASSUMPTION -- ASSUMING THAT THE SAME UNIVERSE OF

22  DOCUMENTS OR THE SAME REQUESTS ARE GOING TO RESULT IN SIMILAR

23  VOLUME OF STUFF WE HAVE TO GO THROUGH WITH RESPECT TO THOSE SIX

24  WITNESSES.

25          IT'S OUR POSITION THAT WE SHOULDN'T HAVE TO DO ANY

1  MORE THAN THAT.  BUT, YOU KNOW, WE'RE WILLING TO GO THROUGH

2  ADDITIONAL STUFF.  BUT WE -- WE DO THINK THAT COST-SHIFTING IS

3  APPROPRIATE UNDER 26(C).  I AM NOT GOING TO BIG TIME.  THE

4  PLAINTIFFS -- IF THAT OCCURS -- AND TRY TO PASS THROUGH THE

5  LAMBORGHINI TO THEM THROUGH 2016 --

6          THE COURT:  OKAY.  DON'T -- STOP -- STOP PANDERING TO

7  ME BY USING MY OWN WORDS BACK --

8          (LAUGHTER.)

9          THE COURT:  -- BECAUSE THAT -- THAT JUST FALLS.

10          MR. CATLETT:  IT'S NOT THE WAY I OPERATE.

11          THE COURT:  I KNOW IT'S NOT.

12          MR. CATLETT:  WE WILL -- WE WILL CONTINUE  --

13          THE COURT:  YOU SPEAK YOUR --

14          MR. CATLETT:  -- TO DO WHAT WE HAVE BEEN DOING IN THE

15  SAME FASHION WE HAVE BEEN DOING IT.

16          AND WE WILL TRY TO GET THROUGH THINGS AS QUICK AS

17  POSSIBLE.  BUT I THINK THAT'S THE BEST WAY FOR THE COURT TO

18  INSURE THAT THE PLAINTIFFS ARE REALLY ASKING FOR AND REALLY

19  NARROWING THINGS DOWN TO WHAT THEY ACTUALLY WANT AND NEED.

20          (PAUSE IN PROCEEDINGS.)

21          THE COURT:  DID YOU ATTACH BILLS TO YOUR DECLARATION?

22          MR. CATLETT:  I DO -- I DO NOT -- I DON'T THINK WE

23  ATTACHED INVOICES.

24          THE COURT:  YOU WILL AT SOME POINT.

25          MR. CATLETT:  CORRECT.

1           THE COURT:  FOR THE VENDORS AND FOR THE FIRMS IF --

2    IF THE REQUEST IS FOR THAT.  BUT IT'S CERTAINLY IN YOUR

3    DECLARATION.

4           SO, WHAT DO WE DO, GUYS?

5           YOU'VE ASKED.  HE'S GOT.  YOU WANT MORE INFORMATION

6    ABOUT WHAT HE'S GOT SO YOU CAN FIGURE OUT WHAT HE'S GOING TO

7    CHARGE YOU.  YOU NEED TO GET INFORMATION ABOUT WHAT YOU'VE GOT

8    SO YOU CAN FIGURE OUT WHAT IT COSTS.

9           MR. ADAR:  WELL, YOUR HONOR, THERE IS A THRESHOLD

10   QUESTION THAT IF YOUR HONOR HAS ALREADY DECIDED IT, I

11   UNDERSTAND THAT.  BUT COST-SHIFTING IS ONLY APPROPRIATE IF

12   THERE'S AN UNDUE BURDEN.  THE WAY THE ANALYSIS AS I UNDERSTAND

13   THE RULE WORKS -- AND YOU WOULD KNOW THIS FAR BETTER THAN I --

14   IS THEY HAVE TO SAY WHAT THEIR BURDEN IS.  THIS IS UNDER RULE

15   26.

16          AND THEN ONCE THE BURDEN IS ARTICULATED, IF IT'S AN

17   UNDUE BURDEN, WE THEN HAVE THE OPTION OF HAVING THE COST SHIFT.

18   OR THE COURT WILL SAY YOU CAN GET WHAT YOU'RE ASKING FOR, BUT

19   THEM I'M GOING TO SHIFT THE COST TO YOU.

20          IT'S NOT THE CASE WHERE EVERY SINGLE NONPARTY

21   SUBPOENA HAS EVERY COST SHIFTED NO MATTER WHAT IN ANY INSTANCE.

22   THERE NEEDS TO BE SOME SORT OF A FINDING.

23          AND BASED ON THAT DOCUMENT THE CASES AND ARGUMENTS WE

24   MADE IN OUR BRIEF IT'S OUR POSITION THAT THESE ARE INTERESTED

25   NON-PARTIES BASED ON THE BALFOUR DECISION AND OTHERS THAT WE

1   CITED.  THIS IS A REASONABLE COST FOR THEM TO INCUR.

2            I DO THINK IT'S WORTH POINTING OUT --

3            THE COURT:  WHAT MAKES -- WHAT MAKES IT A REASONABLE

4   COST, SIR?

5            MR. ADAR:  WELL, IF THEY WERE A PARTY -- YOUR HONOR,

6   THERE IS A DIFFERENCE IF THEY WERE A PARTY --

7            THE COURT:  RIGHT.

8            MR. ADAR:  -- AND IF THEY WERE A NONPARTY.

9            THE COURT:  RIGHT.

10            MR. ADAR:  AND I DO THINK IT'S NOT IRRELEVANT THAT

11   HERBALIFE IS PAYING ALL OF THIS THROUGH A JOINT DEFENSE

12   AGREEMENT.  THEY ARE THE ONES THAT ARE ADVANCING ALL OF THESE

13   COSTS AND PAYING FOR IT.  AND THAT'S WHY THEY'VE CHIMED IN IN

14   THEIR BRIEFS REGARDING WHAT THE NON-PARTIES SHOULD PAY.

15            BUT I CAN TELL YOU IN THE BALFOUR DECISION THERE WAS

16   A SITUATION WHERE THERE WAS A NONPARTY.  AND THERE WERE $25,000

17   IN COSTS.  AND THE COURT SAID THAT THAT WAS NOT AN UNDUE

18   BURDEN.  AND IT WASN'T APPROPRIATE TO SHIFT IN THAT INSTANCE.

19            AND I THINK THAT --

20            THE COURT:  YEAH.  BUT THAT'S NOT WHAT I ASKED YOU

21   BECAUSE THAT'S NOT WHAT YOU SAID.  YOU USED OTHER WORDS.  YOU

22   SAID IT'S A REASONABLE COST.

23            WHAT MAKES THIS A REASONABLE COST?

24            MR. ADAR:  THAT WAS A MISSPEAKING ON MY END, YOUR

25   HONOR, AND AN IMPROPER UTILIZATION OF THE STANDARD.

1          THE QUESTION IS WHETHER IT'S AN UNDUE BURDEN.

2          WHETHER IT'S REASONABLE OR NOT, IT'S MY OPINION THAT

3  IT IS REASONABLE BECAUSE THESE INDIVIDUALS, THEY ARE NAMED

4  PARTIES IN THE FLORIDA LITIGATION.  BUT THEY'RE ALSO MORE

5  IMPORTANTLY COCONSPIRATORS IN THIS CASE.  THEY ARE DIRECT

6  BENEFACTORS OF THE ENTERPRISE AT ISSUE.

7          THE COURT:  SO, THAT TAKES IT OUT OF RULE 45.  THAT

8  BRINGS IT INTO RULE 26.

9          MR. ADAR:  YES, YOUR HONOR.

10          THE COURT:  OKAY.

11          MR. ADAR:  SO, IF -- WHAT WE'RE ASKING FOR WAS

12  DIRECTLY RELEVANT AND PROPORTIONAL- -- THE QUESTION IS

13  PROPORTIONALITY AT THE END OF THE DAY.

14          THE COURT:  OKAY.

15          MR. ADAR:  AND IF IT IS PROPORTIONAL, THEN, COST

16  SHIFTING IS NOT ALWAYS APPROPRIATE.  IT'S ONLY APPROPRIATE IN A

17  CERTAIN SUBSET OF INSTANCES.

18          AND WE DON'T THINK THAT THAT SUBSET OF INSTANCES IS

19  APPLICABLE HERE.

20          THE COURT:  WELL, WHY DON'T I GET SOME SPECIFIC

21  BRIEFING ON THAT.  AND IF YOU NEED TO SEE SOME MORE ABOUT COST

22  SHARING AND SHIFTING.

23          BUT YOU'RE ASKING THESE INDIVIDUALS -- BE THEY THIRD

24  PARTIES NOMINALLY OR PARTY DEFENDANTS IN AN ACTION THAT'S GOING

25  FORWARD SOMEWHERE, WHETHER IT'S AN ARBITRATION OR IN THIS

1  DISTRICT OR IN MIAMI OR WHATEVER.

2          MR. ADAR:  YES, YOUR HONOR.

3          THE COURT:  GOT IT.

4          AND YOU'RE TELLING ME THAT THESE FOLKS ARE BEING

5  INDEMNIFIED BY A PUBLICLY TRADED COMPANY.

6          GOT IT.

7          I'M ALSO SEEING EYE-POPPING NUMBERS FROM A LEGITIMATE

8  LAWYER WHO'S ATTESTED TO WHAT THIS IS COMING OUT TO SIMPLY FROM

9  THE PUSH OF A BUTTON FROM THESE WITNESSES.

10          AND I HAVE NOT MADE UP MY MIND ABOUT ANYTHING, MR.

11  ADAR.  BUT I'M REALLY SKEPTICAL ABOUT ISSUES UNDER RULE

12  26(B)(1) ABOUT PROPORTIONALITY AND THE SIGNIFICANCE OF THESE

13  MATERIALS AND HOW THEY RELATE TO THIS ACTION.

14          AND THE BREADTH OF WHAT YOU HAVE ASKED FOR -- I

15  UNDERSTAND YOU'RE WILLING TO NEGOTIATE IT DOWN, BUT YOU'RE

16  STARTING FROM A POSITION THAT SAYS SEARCH FOR EVERYTHING FOR

17  EVERYTHING HAVING TO DO WITH THESE TOPICS, YOUR DEALINGS WITH

18  HERBALIFE.

19          I MEAN, THAT'S -- IT'S GOING TO BE ON EVERY -- EVERY

20  PIECE OF PAPER, EVERY EMAIL THAT -- THAT -- BETWEEN THESE

21  PEOPLE AND THE COMPANY.  THAT'S A LOT OF WORK.  AND IT'S

22  FACIALLY A LOT OF WORK.

23          AND TO TELL ME THAT THERE'S NOT A BURDEN HERE AND TO

24  COME IN AND TELL ME THAT IT'S AUTOMATICALLY NOT AN UNDUE

25  BURDEN, I MEAN YOU CAN TRY THAT.  BUT THERE'S AN OBVIOUS BURDEN

1    HERE.  AND I MAY NEED TO FIGURE OUT HOW TO DEAL WITH IT.

2           MR. ADAR:  YES, YOUR HONOR.

3           AND ONE POINT THAT I WANT TO HIGHLIGHT HERE IS THAT

4    THE UNDUE BURDEN ANALYSIS, THERE HAS BEEN A YEAR OF DISCUSSIONS

5    WITH MR. CATLETT AND QUARLES & BRADY.  AND WE HAVE IN GOOD

6    FAITH GONE AND SAID THAT WE'RE NOT ASKING FOR EVERY DOCUMENT

7    UNDER THE SUN.  WE ASKED FOR A BROADER SET OF DOCUMENTS.  AND

8    WE'VE SUBSTANTIALLY NARROWED IT.

9           AND BASED ON GOOD-FAITH CONFERENCES WITH THE FLORIDA

10   DEFENDANT'S COUNSEL WE HAVE REACHED A COMPROMISE REGARDING A

11   SET OF DOCUMENTS THAT WOULD NOT BE UNDULY BURDENSOME OR AT

12   LEAST THAT WOULD NOT BE SUBJECT TO THE UNDULY BURDENSOME

13   OBJECTION.

14          AND WHAT WE ASKED THE COURT TO DO IS NOT TO LOOK AT

15   THE CUMULATIVE BURDEN ON QUARLES & BRADY AND HERBALIFE AND

16   EVERYONE ELSE BUT TO LOOK AT THE BURDEN ON EACH INDIVIDUAL

17   DEFENDANT.  AND IF THAT BURDEN -- THIS IS THE FIRST TIME TODAY

18   THAT I HEARD WHAT THE EXPENSE WOULD BE ASSOCIATED WITH IT.

19          I APPRECIATE THE DISCUSSION THAT WE HAD ABOUT HOW

20   ELSE ARE THEY GOING TO DO IT.

21          BUT, YOUR HONOR, I'VE ONLY BEEN PRACTICING A LITTLE

22   OVER 10 YEARS, AND IN MY EXPERIENCE IN FEDERAL COURT IT DOESN'T

23   COST 15 TO 25 THOUSAND DOLLARS EVERY SINGLE TIME YOU REQUEST A

24   SINGLE DOCUMENT.

25          AND IF THAT'S WHAT WE'RE HEARING -- IF THAT'S WHAT

1  IT'S GOING TO COST HERE, I DON'T KNOW HOW TO RESPOND RIGHT NOW.

2  BUT WHAT I'D LIKE TO DO IS --

3          THE COURT:  I WOULD LOVE TO HEAR TESTIMONY FROM THE

4  VENDOR.  I LOVE TALKING TO TECH PEOPLE.  LET'S HAVE A HEARING

5  ON THIS.

6          LET'S DO THE DISCOVERY.  AND WE'LL -- I'LL CONDUCT AN

7  EVIDENTIARY HEARING ABOUT WHAT IT TAKES TO GO OUT AND GET ALL

8  THESE -- ALL OF THIS INFORMATION FROM INDIVIDUALS.

9          RIGHT?  I MEAN, YOU'RE NOT -- YOU'RE NOT GOING TO

10 HERBALIFE AND GETTING STUFF OFF OF THEIR SERVER THAT THEIR I.T.

11 PERSON JUST FLICKS A SWITCH ON.

12          RIGHT?

13          MR. ADAR:  CORRECT.

14          THE COURT:  YOU'RE GOING TO 30-SOME-ODD INDIVIDUAL

15 DEFENDANTS.  OKAY.

16          AND ALTHOUGH YOU'RE ASKING FOR LITTLE THINGS -- AND,

17 YOU KNOW, YOU WANT TO JUST PULL OUT THE FILE CABINET AND PULL

18 OUT THE ONE PIECE OF PAPER THAT YOU WANT.  BUT IT MAY REQUIRE

19 PULLING OUT A LOT OF FILE CABINETS.

20          SO, YOU CAN TELL ME YOU'RE REDUCING YOUR DEMANDS, BUT

21 YOU MAY NOT BE REDUCING THE WORK.

22          AND I DON'T KNOW ENOUGH ABOUT IT.  AND I THINK WE'RE

23 GOING TO BE SPENDING A LOT OF QUALITY TIME IF THIS BECOMES AN

24 ISSUE ON THESE ISSUES.  AND I'LL LOOK VERY, VERY SKEPTICALLY AT

25 A BILL BECAUSE I'M NOT GOING TO MAKE A DECISION IN THE ABSENCE

1   OF DATA TO FIGURE THIS OUT.

2           AND THEN TO FIGURE OUT WHAT THE BURDEN IS AND WHETHER

3   THE BURDEN IS -- BUT I THINK YOU UNDERMINED YOURSELF.

4           IF YOU WANT ME TO TALK ABOUT THE BURDEN FOR EACH OF

5   THESE INDIVIDUAL PEOPLE, MAYBE I NEED TO KNOW NET WORTH

6   INFORMATION FOR THOSE FOLKS.

7           BUT WHEN YOU SIMULTANEOUSLY TELL ME THAT IT'S ALL

8   GOING TO PUT ON HERBALIFE'S BILL, WELL, THEN, I THINK IT DOES

9   MAKE SENSE TO AGGREGATE THEM, DOESN'T IT? -- BECAUSE THEY'RE

10  ALL GOING TO BE GOING INTO MR. DROOKS AND OVER TO -- OVER TO

11  THE MOTHERSHIP OVER THERE.

12          MR. ADAR:  WELL, YOUR HONOR, WE'VE BEEN GIVEN NEW

13  INFORMATION BY MR. CATLETT TODAY REGARDING WHAT THESE COSTS

14  ARE.  I DIDN'T HAVE IT BEFORE THE HEARING.

15          WHAT I SUGGEST IS IT SOUNDS LIKE EITHER WAY WE'RE

16  GOING TO BE SPEAKING NEXT WEEK.  WHAT I'D LIKE TO DO IS SPEAK

17  WITH MY PARTNERS, HAVE AN OPPORTUNITY TO FURTHER CONFER WITH

18  MR. CATLETT TO SEE IF THERE'S A FURTHER COMPROMISE THAT CAN BE

19  REACHED.

20          AND IF NOT, AT A MINIMUM, I -- I'M UNCOMFORTABLE

21  COMMITTING TO HAVING THEM PRODUCE DOCUMENTS.  AND THEN WE LATER

22  FIND OUT WHETHER WE'RE POTENTIALLY ON THE HOOK FOR A QUARTER OF

23  MILLION DOLLARS IN FEES WITHOUT KNOWING WHAT IT WOULD BE.

24          SO --

25          THE COURT:  YEAH.  YOU'RE IN A TOUGH POSITION.

121

1            MR. ADAR:  WE -- WE ARE.

2            AND -- AND IN PRIOR EXPERIENCES IN OTHER CASES,

3    TYPICALLY WE'RE TOLD IF YOU WANT THESE DOCUMENTS WE ESTIMATE IT

4    WILL COST $30,000.  AND IF YOU'D LIKE IT, WE'D LIKE TO SHIFT

5    THAT TO YOU.  AT LEAST WE KNOW WHAT THE UNIVERSE OF COST IS.

6            HERE IT'S UNKNOWN.  BUT I APPRECIATE THE POSITION

7    THAT THEY'RE TAKING.

8            THE COURT:  MR. CATLETT, WHAT IS -- WHAT IS THE

9    EFFORT INVOLVED WITH YOUR VENDORS TO GIVE AN INITIAL ESTIMATE

10   WHEN THEY'VE GOT THAT SUBPOENA?

11           MR. CATLETT:  I BELIEVE IT LARGELY TURNS ON THE

12   AMOUNT OF DATA THAT IS IN THE HANDS OF EACH INDIVIDUAL PERSON.

13           AND WE -- AS YOU CAN SEE ON PAGE 8 THERE'S BEEN SOME

14   WIDE VARIATION.  MR. DE LA CONCEPCION HAD A THOUSAND DOCUMENTS.

15           MR. GIOIOSA HAD 170,000 DOCUMENTS.

16           AND THE REASON I THINK -- THE REASON THERE'S A

17   VARIATION IS BECAUSE THOSE DOCUMENTS WHEN THEY'RE ELECTRONIC

18   ARE IN ALL DIFFERENT KINDS OF FILE FORMATS.  YOUR CELL PHONE

19   ALONE I THINK HAS 25 DIFFERENT FILE FORMATS OF STUFF JUST

20   SITTING ON IT.

21           SO, THE VENDOR EVEN ONCE IT GRABS IT IT'S NOT REALLY

22   USEFUL UNTIL IT CONVERTS THAT DATA INTO A FORM THAT IT CAN THEN

23   PUT INTO THE DATABASE TO SEE, OKAY, HOW MUCH DO WE HAVE HERE.

24   AND WHAT IS IT -- WHAT IS IT -- WHAT DOES IT ALL LOOK LIKE.

25           THAT'S ALL PART OF THE $15,000 OR THE INITIAL UPFRONT

1  EXPENSE THAT WE INCUR WITH THE VENDOR.

2          THE COURT:  WELL --

3          MR. CATLETT:  I ACTUALLY THINK THE -- THE LATER COST

4  -- WHEN THERE'S SOME HOSTING COSTS THEN BECAUSE IT'S THEN

5  SITTING ON THEIR SERVERS.  AND THERE'S SOME COSTS TO BUMP THE

6  SEARCH TERMS AND GET IT IN.  BUT I THINK --

7          THE COURT:  I'LL TAKE YOU GUYS TO COSTCO.  I'LL BUY

8  YOU A 2 TERABYTE DRIVE.  AND THAT'S GOING TO BE 90 BUCKS.

9          (LAUGHTER.)

10         THE COURT:  I MEAN, THERE'S -- THERE'S WAYS TO DO

11 THIS.

12         AND MR. ADAR IS SKEPTICAL OF SOME OF THESE COSTS AND

13 THE NECESSITY TO INCUR SOME OF THESE COSTS EARLY ON.

14         I'VE GOT TO SAY I AM TOO.  I AM SKEPTICAL.  BUT I

15 DON'T QUESTION FOR A SECOND THAT SOME COSTS AND SOME ESTIMATES

16 REQUIRE SOME LEG WORK.  BUT, YOU KNOW, YOU'VE GOT CART AND

17 HORSE ISSUES ON BOTH SIDES.  OKAY.

18         IT'S MR. ADAR'S PROBLEM BECAUSE HE'S PUTTING THIS IN

19 MOTION WITH SOME REALLY WIDE DEMANDING -- DOCUMENT DEMANDS

20 WHICH THEN TRIGGER A LOT OF WORK.  AND THIS IS HOW THIS IS

21 MOVING FORWARD.

22         I GOT IT.  LET'S JUST SAY I'M SKEPTICAL OF BOTH OF

23 YOU.

24         SO, FIGURE IT OUT.  OKAY.  IF YOU WANT TO -- IF YOU

25 WANT SOME TIME TO WORK ON THIS AND TO FIGURE OUT A NEW PROTOCOL

1   OR A BETTER WAY OF MOVING FORWARD WITH THIS OR TO CHANGE THE

2   AREAS YOU WANT DOCUMENTS TO BE SEARCHED IN AND THINGS LIKE

3   THAT, OR YOU CAN COME UP WITH A BETTER WAY TO GET YOUR VENDORS

4   TO GIVE YOU SOME ESTIMATES -- AND, YOU KNOW, MAYBE NOW YOU'VE

5   GOT, YOU KNOW, SOME INSTITUTIONAL KNOWLEDGE WITH DEALING WITH

6   SOME OF THESE FOLKS -- I RECOGNIZE IT'S BESPOKE FOR EACH OF

7   THEM, DEPENDING ON WHERE THEIR STUFF IS AND HOW IT GOES OUT.

8   BUT I THINK -- I THINK YOU'RE NOT DONE TALKING.

9           AND I TAKE YOUR POINT, MR. ADAR.  YOU MAY NOT HAVE

10  STARTED TALKING.  START NOW.

11          MR. ADAR:  UNDERSTOOD, YOUR HONOR.

12          THE COURT:  NOW, YOU'RE JUST LOOKING -- NOW YOU'RE

13  JUST STARING AT ME.

14          MR. ADAR:  NO.  WE -- WE WILL DO THAT.

15          THE COURT:  OKAY.  THEN I'LL MAYBE DEFER ON THAT.

16          WHAT ELSE WE GOT?

17          (PAUSE IN PROCEEDINGS.)

18          MR. ADAR:  I THINK WHAT'S LEFT, YOUR HONOR, IS THE

19  PARTIES TO CONFER.

20          THE COURT:  ALL RIGHT.

21          MR. ADAR:  AND THANK YOU FOR YOUR TIME TODAY.

22          I DO WANT TO SAY THAT I APPRECIATE THAT WE JUMPED

23  AHEAD OF THE LINE.  YOU MADE TIME FOR US TODAY.

24          THANK YOU VERY MUCH, YOUR HONOR, ON BEHALF OF THE

25  PLAINTIFFS.

1          THE COURT:  YOU'RE FINE.  AND I DO ENJOY WORKING WITH

2     YOU ALL.  THAT'S PARTLY SOMETIMES WHY I MAKE THE EFFORT.

3          MR. JACKSON, YOU WERE TAKING REALLY GOOD NOTES,

4     RIGHT?

5          MR. JACKSON:  NO PROMISES, YOUR HONOR.  BUT I BELIEVE

6     SO.

7          THE COURT:  ALL RIGHT.  WHAT AM I DOING HERE TODAY?

8          YOU GUYS ARE GOING TO TALK AND FIGURE OUT WHETHER

9     IN-CAMERA REVIEW OF THE PRIVILEGED MATERIALS OR A SUPPLEMENTAL

10    PRODUCTION OF THE PRIVILEGED MATERIALS IS THE WAY TO GO.

11         RIGHT?

12         MR. JACKSON:  YES, YOUR HONOR.

13         THE COURT:  OKAY.  I'M GOING TO WRITE THAT ONE DOWN.

14         OKAY.  WHAT ELSE -- WHAT WAS -- WHAT CAME AFTER THAT?

15         MR. JACKSON:  PPV, YOUR HONOR.

16         THE COURT:  AND --

17         MR. JACKSON:  AND WITH PPV WE WERE GOING TO CONSIDER

18    SOME SORT OF GENERAL PROPOSED STIPULATION AS YOU'VE DISCUSSED

19    AND CIRCLE BACK AND TALK WITH PLAINTIFF'S COUNSEL.

20         THE COURT:  OKAY.  A FACTUAL -- A FACTUAL STIPULATION

21    FOR LIMITED PURPOSES.  I GOT MY FINGERS CROSSED ON THAT ONE.

22         WHAT ELSE?

23         MR. JACKSON:  AND THEN I BELIEVE ON THE DEPOSITIONS

24     -- I DON'T KNOW IF YOU'VE FOR THE RECORD IDENTIFIED WHO THE

25    SIX DEPONENTS ARE.

1          THE COURT:  I DON'T CARE.  I DON'T -- I DON'T NEED

2     THEM.

3          YOU GUYS KNOW THEM?

4          MR. JACKSON:  YES, YOUR HONOR.

5          THE COURT:  YEAH.  THAT'S FINE.  THAT'S FINE.

6          MR. ADAR:  AND I TAKE IT YOUR HONOR SUSTAINED THEIR

7     OBJECTIONS ON THE BUSINESS RECORDS, CORRECT?

8          (PAUSE IN PROCEEDINGS.)

9          THE COURT:  THE INDIVIDUAL DEFENDANTS' BUSINESS --

10         MR. ADAR:  YES, YOUR HONOR.

11         THE COURT:  THAT'S WHAT -- I MEAN, AS PHRASED, I'M --

12    I'M NOT CLEAR I UNDERSTAND.  AND I DON'T SEE HOW IT GETS HERE.

13         IF YOU'VE GOT SPECIFIC THINGS THAT RELATE TO SPECIFIC

14    ISSUES I'M HAPPY TO CONSIDER IT.  AND YOU MAY NOT GET AN

15    OBJECTION.  BUT THE WAY IT'S PHRASED, IT'S QUITE PROBLEMATIC.

16         MR. ADAR:  UNDERSTOOD, YOUR HONOR.

17         THE COURT:  I MEAN, I'LL WRITE SOMETHING ON THAT IF

18    YOU -- IF YOU WANT TO WITHDRAW IT, YOU CAN WITHDRAW IT.  I

19    WON'T TAKE IT UP.  BUT I'LL GIVE YOU A RULING IF YOU NEED IT.

20         MR. ADAR:  IT SOUNDS LIKE PERHAPS WHAT WE SHOULD DO

21    IS WE SHOULD CONFER WITH THEM TO SEE IF THERE'S A SUBSET OF

22    DOCUMENTS THAT THEY'D BE WILLING TO PRODUCE.  AND IF NOT, THEN,

23    THAT SUBSET CAN BE PRESENTED TO YOUR HONOR THROUGH -- I WANT TO

24    BE VERY CAUTIOUS.

25         CAN WE COMMUNICATE WITH THE COURT IF IT'S VIA EMAIL

126

1    REGARDING RESOLUTIONS THAT WE'VE REACHED ON --

2              THE COURT:  YES.

3              MR. ADAR:  -- THESE ISSUES?

4              THE COURT: YES.  YES.

5              MR. ADAR:  OKAY.

6              THE COURT:  YES.

7              MR. ADAR:  THANK YOU, YOUR HONOR.

8              THE COURT:  YES.  NO.  I'LL -- I'LL ALWAYS ENTERTAIN

9    THAT.

10             (LAUGHTER.)

11             THE COURT:  THAT'S JUST -- YEAH.  OKAY.

12             AND THEN -- ALL RIGHT.  SO, YOU'LL CONFER ON THE

13   BUSINESS RECORD ISSUE.  AND I HOPE I WRACKED YOU ALL AROUND ON

14   THAT ONE.

15             MR. ADAR:  REGARDING THE DEPOSITIONS, YOUR HONOR --

16             THE COURT:  YES.

17             MR. ADAR:  -- WE'VE AGREED THAT WE ARE GOING TO -- WE

18   ARE NOT ASKING FOR 12 ADDITIONAL DEPOSITIONS.

19             IT SOUNDS LIKE THE PARTIES HAVE AGREED THAT WE ARE

20   GOING TO BE ABLE TO MOVE FORWARD WITH THE SIX SPECIFIC

21   INDIVIDUALS IDENTIFIED.  AND THE DOCUMENTS WILL BE PRODUCED.

22   BUT MR. CATLETT WILL HAVE TO LET US KNOW WHAT THE UNIVERSE OF

23   DOCUMENTS IS.  "WE" CAN GIVE US --

24             THE COURT:  YOU HAVE COST AND TIME ISSUES THERE.

25             RIGHT?

1          MR. ADAR:  I DON'T KNOW THAT WE HAVE COST ISSUES FOR

2     THOSE SIX REQUESTS.

3          THE COURT:  THEY ARE -- OH, OKAY.  FAIR ENOUGH.

4     OKAY.

5          MR. ADAR:  THAT IS WITH THE 31, THE -- THE COMPROMISE

6     THAT WE'VE REACHED.

7          THE COURT:  I'M WITH YOU -- I'M WITH YOU.  YEAH.

8     YEAH.

9          MR. ADAR:  AND I ACTUALLY WANT TO BE CLEAR ABOUT

10    THAT, YOUR HONOR.

11          WE ARE NOT DEALING -- THE COST-SHIFTING -- THE

12    COST-SHIFTING SYSTEM WE HAD WAS ON THE 31 NONTESTIFYING

13    DOCUMENTS.  IT'S NOT DEALING, YOUR HONOR, WITH THE SIX.

14          THE COURT:  NONTESTIFYING WITNESSES.

15          MR. ADAR:  WITNESSES.

16          THE COURT:  YEAH.

17          MR. ADAR:  NOT DEALING WITH THE SIX TESTIFYING

18    WITNESSES.  THERE'S NO COST ISSUE.

19          THE COURT:  I MIS- -- I MISSPOKE.

20          MR. ADAR:  ALL RIGHT.

21          THE COURT:  BUT YOU DEFINITELY HAVE AN ISSUE WITH

22    RESPECT TO --

23          MR. ADAR:  THE 31 NON- --

24          THE COURT:  NO.

25          MR. ADAR:  OH.

1            THE COURT:  WITH RESPECT TO THE TIMING OF PRODUCTION

2   OF MATERIALS THROUGH THE SIX PEOPLE YOU WANT TO SIT DOWN WITH.

3            MR. ADAR:  YES, YOUR HONOR.

4            AND REGARDING MR. DROOKS' POINT, SO LONG AS WE'RE

5   ABLE TO GET THE DOCUMENTS --

6            DO YOU KNOW WHEN THE SUMMARY JUDGMENT DEADLINE IS

7   OFFHAND?

8            UNIDENTIFIED SPEAKER:  EARLY MARCH.

9            UNIDENTIFIED SPEAKER:  I THINK IT'S -- I THINK IT'S

10  MARCH 9TH.

11           MR. ADAR:  AS LONG AS THE DEPOSITIONS IF THEY COULD

12  BE COMPLETED CLOSE TO THAT DATE, ALL SIX OF THEM -- WE'LL HAVE

13  TO SEE -- WE LIKELY WILL NOT HAVE AN ISSUE REGARDING AS LONG AS

14  WE CAN MUTUALLY AGREE WE MIGHT BE MOVING FOR SUMMARY JUDGMENT

15  AS WELL -- THAT THE RESPONSE --

16           THE COURT:  WELL, IT'S AN ISSUE -- IT'S AN ISSUE AS

17  TO WHETHER YOU USE THEM IN YOUR MOTION.  AND SORT OF A SECOND

18  ISSUE AS TO WHETHER THEY USE IT --

19           OH, SORRY.  IT'S YOUR MOTION, RIGHT?

20           MR. DROOKS:  WELL, I'M CONCERNED ABOUT MY MOTION,

21  YOUR HONOR.

22           I JUST WANT TO --

23           THE COURT:  BECAUSE YOUR -- BECAUSE YOUR MOTION --

24  BECAUSE YOUR MOTION -- BECAUSE YOU DON'T KNOW WHAT HE'S GOING

25  TO PUT INTO AN OPPOSITION BECAUSE YOU DON'T KNOW THE STATE OF

1   THE EVIDENCE.

2           MR. DROOKS:  I JUST DON'T WANT TO GET AN OPPOSITION

3   THAT SAYS JUDGE KRONSTADT CAN'T DECIDE OUR MOTION BECAUSE HE'S

4   STILL WAITING ON DISCOVERY.

5           THE COURT:  WELL, WHEN YOU MEET AND CONFER ON YOUR

6   SUMMARY JUDGMENT MOTION, GENTLEMEN, I THINK YOU'RE GOING TO

7   TAKE THAT ISSUE UP.  AND WE'LL TALK ABOUT WHAT YOU'LL BE

8   PRESENTING AND WHAT YOU'LL BE SAYING IN OPPOSITION.

9           SO, I DON'T -- I DON'T KNOW THAT I CAN PREDICT YOUR

10  RULE 7 CONFERENCE AT THIS STAGE.  BUT YOU'VE PUT A PIN IN

11  THERE.  I'VE GOT IT.  YOU FLAGGED THE ISSUE.

12          MR. ADAR:  UNDERSTOOD.

13          THE COURT:  FLAG -- FLAG IS WAVING UP AND ABOVE.

14  OKAY.

15          OKAY.

16          SO, YOU'RE GOING TO DISCUSS TIMING FOR THOSE

17  DEPOSITIONS.  AND THEN YOU'LL CONTINUE TO CHAT ON COST AND

18  TIMING ON DOCUMENTS FOR THE NONTESTIFYING WITNESSES.

19          CORRECT?

20          MR. ADAR:  YES, YOUR HONOR.

21          THE COURT:  OKAY.

22          MR. ADAR:  AND WOULD YOUR HONOR LIKE TO SCHEDULE A

23  CALL NOW, OR?

24          THE COURT:  I'M CERTAINLY GOING TO SCHEDULE AN EMAIL.

25          I'M GOING TO DISAPPEAR INTO TRIAL NEXT WEEK BECAUSE

1   THE PARTIES JUST SENT ME THEIR DEPOSITION DESIGNATIONS BECAUSE

2   THEY SCREWED THAT UP THE FIRST TIME.

3           AND I'D ALSO LIKE TO GIVE YOU TIME TO MEANINGFULLY

4   HAVE THESE DISCUSSIONS.

5           ARE YOU IN THE AIR TOMORROW OR ARE YOU OUT HERE FOR

6   --

7           MR. ADAR:  I'M IN THE AIR IN THREE HOURS.

8           THE COURT:  YEAH.  OKAY.

9           (LAUGHTER.)

10          THE COURT:  ALL RIGHT.  SO, YOU'RE NOT EVEN GOING TO

11  TALK TO THESE GUYS UNTIL MAYBE TOMORROW.

12          WHY DON'T YOU DO THIS.  WHY DON'T YOU GET ME A JOINT

13  EMAIL JUST SORT OF GIVING ME THE STATE OF PLAY BY SAY MIDDAY

14  MONDAY.

15          IS THAT FEASIBLE?

16          MR. ADAR:  I THINK THE BALL IS IN YOUR COURT, MR.

17  CATLETT.

18          DO YOU THINK YOU'LL BE ABLE TO OBTAIN INFORMATION BY

19  FRIDAY MORNING?

20          MR. CATLETT:  I GUESS I'M NOT EVEN EXACTLY SURE WHAT

21  INFORMATION I'M OBTAINING AT THIS POINT, BUT --

22          MR. ADAR:  FOR --

23          MR. CATLETT: I MEAN, I THINK WE CAN -- WE CAN UPDATE

24  THE COURT ON WHERE WE'RE AT WITH RESPECT TO ANY DISCUSSIONS

25  WE'VE HAD BETWEEN NOW AND MIDDAY NEXT MONDAY.

1              THE COURT:  YEAH.  I MEAN, THERE'S SOME OTHER THINGS

2     THAT I THINK ARE DRIVING THE TRAIN HERE.  BUT --

3              MR. CATLETT:  RIGHT.

4              THE COURT:  -- YOU KNOW, YOU'RE GOING TO GET STARTED

5     ON COMPILING MATERIALS FOR YOUR SIX WITNESSES.

6              MR. CATLETT:  RIGHT.

7              THE COURT:  SO, WE NEED TO KNOW THAT'S MOVING

8     FORWARD.

9              MR. ADAR:  THAT'S WHAT I MEANT.

10             THE COURT:  YEAH.

11             MR. ADAR:  ONLY FOR THOSE SIX NOT THE 31 --

12             MR. CATLETT:  OH, OKAY.

13             YEAH.  YEAH.  WITH RESPECT TO THE SIX, I -- I CAN

14    PROVIDE AN UPDATE BY MIDDAY MONDAY.

15             THE COURT:  GOOD.

16             THERE'S THE OTHER ANCILLARY -- OR THE OTHER ISSUES

17    THAT WE JUST WENT THROUGH.

18             MR. ADAR:  THAT WILL TAKE MORE --

19             THE COURT:  THAT YOU'RE GOING TO TALK WITH YOUR SIDE.

20    YOU'RE GOING TO HUDDLE UP.

21             GET ME AN EMAIL BY MIDDAY ON MONDAY.  AND GIVE ME A

22    PROPOSAL.

23             DO YOU WANT TO TALK TO ME LATER IN THE WEEK?  DO YOU

24    WANT SOME MORE TIME TO KEEP GOING ON YOUR OWN?

25             MR. ADAR:  OKAY.

132

1              THE COURT:  BECAUSE I DON'T WANT TO BE INEFFICIENT.

2              I'LL BE BUSY THROUGH THE CALIFORNIA TRIAL DAY WHICH

3    IS PROBABLY GOING TO BE 8:30 TO ABOUT 2:30 MOST DAYS.  I DO

4    HAVE SOME OTHER STUFF SCHEDULED IN THE WEEK.  SO, IF WE DO IT,

5    IT WILL UNDOUBTEDLY BE LATE IN THE DAY HERE.  IF IT'S NEXT

6    WEEK.

7              I DON'T THINK THE TRIAL IS GOING TO GO MUCH PAST

8    THURSDAY, BUT THEY'RE KIND OF TALKATIVE LAWYERS.

9              BY THE WAY, A JURY IN OUR DISTRICT JUST CAME BACK

10   WITH A BILLION-DOLLAR VERDICT.

11             MR. ADAR:  WOW.

12             THE COURT:  WAS THE FIRM INVOLVED?

13             MR. CATLETT:  NO.  I THINK PRISEC AT QUINN --

14             THE COURT:  YEAH.

15             MR. CATLETT:  -- REPRESENTING CALTECH.

16             THE COURT:  CALTECH.  YEAH.  THIS IS CALTECH AND

17   APPLE.  YEAH.

18             MR. CATLETT:  AND I THINK WILNER AS THE DEFENDANTS.

19             (PAUSE IN PROCEEDINGS.)

20             THE COURT:  OKAY.  FORMER JUDGE LUM OF THIS COURT IS

21   THE DEPUTY G.C. OVER AT CALTECH.  SHE'S HAD A GOOD DAY.

22             OKAY.

23             SO, GOOD.  I'LL LET YOU GUYS GO.

24             AND YOU'VE GOT A PLANE.

25             ANYTHING ELSE TO TAKE UP RIGHT NOW?

133

1          MR. ADAR:  THANK YOU, YOUR HONOR.

2          THE COURT:  OKAY.

3          MR. ADAR:  NONE FROM US.

4          THE COURT:  OKAY.

5          MR. CATLETT:  THANK YOU, YOUR HONOR.

6          THE COURT:  THANK YOU, ALL.

7          I'M GOING TO DO A VERY SHORT ORDER JUST TO PUT ON THE

8   DOCKET SO JUDGE KRONSTADT KNOWS THAT WE'VE ADVANCED THE

9   DISCUSSION.  IT WILL NOT BE REACHING THE MERITS OF THE MOTION

10  BECAUSE I THINK WE'VE SORT OF NEGOTIATED SOME ISSUES HERE

11  TODAY.

12          BUT THIS WAS --

13          MR. ADAR:  YES, YOUR HONOR.

14          THE COURT:  THIS WAS HELPFUL.  AND I HOPE IT WAS

15  HELPFUL FOR YOU ALL AS WELL.

16          MR. ADAR:  VERY MUCH SO.

17          THANK YOU.

18          THE COURT:  VERY GOOD.

19          MR. CATLETT:  THANK YOU.

20          (PROCEEDINGS ADJOURNED AT 4:09 P.M.)

21

22

23

24

25

134

1

2                         C E R T I F I C A T E

3

4            I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
     FROM THE ELECTRONIC SOUND RECORDING OF THE PROCEEDINGS IN THE
5     ABOVE-ENTITLED MATTER.

6

7     /S/ DOROTHY BABYKIN                        4/22/20

8     _____           _____
     FEDERALLY CERTIFIED TRANSCRIBER             DATED
     DOROTHY BABYKIN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25