Mark T. Drooks – State Bar No. 123561
  mdrooks@birdmarella.com
Paul S. Chan – State Bar No. 183406
  pchan@birdmarella.com
Gopi K. Panchapakesan – State Bar No. 279586
  gpanchapakesan@birdmarella.com
Jon M. Jackson – State Bar No. 257554
  jjackson@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant Herbalife
International of America, Inc.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| MICHAEL LAVIGNE, *et al.*, | CASE NO. 2:18-cv-07480-JAK (MRWx) |
| Plaintiffs, | [Related Case 2:13-cv-02488-BRO-RZ] |
| vs. | **DECLARATION OF GOPI K. PANCHAPAKESAN IN SUPPORT OF HERBALIFE'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT DR. WILLIAM W. KEEP** |
| HERBALIFE LTD., *et al.*, | |
| Defendants. | |
| | *[Filed concurrently with Motion to Exclude Testimony of Plaintiffs' Expert Dr. William W. Keep; and [Proposed] Order]* |
| | Date: June 7, 2021
Time: 8:30 A.M.
Crtrm.: 10B |
| | Assigned to Hon. John A. Kronstadt |

3700903.1

# DECLARATION OF GOPI K. PANCHAPAKESAN

I, Gopi K. Panchapakesan, declare as follows:

1.      I am an active member of the Bar of the State of California and a principal with Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, a professional corporation, attorneys of record for Defendant Herbalife International of America, Inc. in this action.  I make this declaration in support of Herbalife's Motion to Exclude Testimony of Plaintiffs' Expert Dr. William W. Keep.  Except for those matters stated on information and belief, I make this declaration based upon personal knowledge and, if called upon to do so, I could and would so testify.

2.      Attached as **Exhibit A** is a true and correct copy of the Initial Expert of Dr. William W. Keep.

3.      Attached as **Exhibit B** is a true and correct copy of excerpts of the transcript of the February 3, 2021 Deposition of William W. Keep in this matter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I executed this declaration on February 15, 2021, at Los Angeles, California.

 _/s/ Gopi K. Panchapakesan_
Gopi K. Panchapakesan

3700903.1

2

DECLARATION OF GOPI K. PANCHAPAKESAN IN SUPPORT OF HERBALIFE'S
MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT DR. WILLIAM W. KEEP

# EXHIBIT A

## I.      Introduction

1.      My name is William Keep and I have a doctoral degree in Marketing, with minors in Business Ethics and Psychometrics, from Michigan State University. In my career as a marketing professor, I have published research in retailing; business ethics; multi-level marketing, direct selling, and pyramid schemes; long-term business relationships; and marketing history. My research has appeared in the JOURNAL OF MARKETING, the JOURNAL OF PUBLIC POLICY AND MARKETING, the JOURNAL OF BUSINESS ETHICS, the JOURNAL OF HISTORICAL RESEARCH IN MARKETING, INDUSTRIAL MARKETING MANAGEMENT, AND MARKETING THEORY AND PRACTICE, and others. In 2014, I published with Dr. Peter Vander Nat, then a senior economist with the Federal Trade Commission ("FTC"), the first academic paper to trace important historical trends in direct selling, from single-level to multi-level marketing (MLM). I have taught university courses in retailing, channels of distributions, strategic marketing, marketing planning, and business ethics, among others. A copy of my Curriculum Vitae is attached (Appendix A).

2.      I have also served as an expert witness for and/or consultant to federal and state prosecutors and in private cases. These matters are listed in Appendix B. The U.S. Court of Appeals for the Ninth Circuit referenced my work on *Gold Unlimited* in the matter of *FTC v. BurnLounge, Inc.*, 753 F. 3d 878, 883 (9th Cir. 2014).

## II. Purpose and Materials

3.      I have been retained by Plaintiff's lawyers as an expert consultant in the matter of *Lavigne et al, vs. Herbalife LTD., et al.* My specific focus is on the adoption and use over many years of the Circle of Success strategy based in large part on Success Training Seminars (STS) and corporate events promoted by Herbalife as necessary for distributor success. In my opinion, the Circle of Success was a tool used by high-level distributors to sustain low-level distributor engagement. Based on my experience studying the economics and practices of MLMs, distributor retention in the face of continuing losses is critical. It is also my opinion that Herbalife's conduct in using the Circle of Success as a tool to sustain distributor retention is violative of the Direct Selling Association's Code of Ethics, to which Herbalife purports to subscribe.

1      4

4.      The following analysis and conclusions are based on available case materials, industry standards as set forth by the Direct Selling Association (DSA) and statements by the Federal Trade Commission. My formal training as a PhD in Marketing and professional experiences in researching multi-level marketing companies and how they operate provides a relevant perspective in understanding MLM company practices.

5.      The DSA, a trade association for the direct selling industry so named since 1968, has among its members numerous multi-level marketing companies, including Herbalife. An Herbalife representative serves on the DSA Board of Directors and the company is a signatory[1] to the DSA Code of Ethics (Appendix C; hereafter, DSA Ethics). Below I highlight portions of two key sections, one pertains to deceptive and unlawful consumer and recruiting practices, and the other to earnings representations (Figure 1). For emphasis, I underline particular passages. Regarding earnings representations, the DSA Ethics also directs members to examine legal precedent: *"There is ample legal precedent in the form of FTC decisions to afford guidance on the subject of earnings representations. While not controlling, these precedents should be used by the Administrator in making determinations as to the substantiation of a member company's earnings claims."* (p. 8). Therefore, I also provide relevant language from sample FTC cases and the FTC website (Figure 2).

---

[1] https://support.herbalife.com/s/?language=en_US

**FIGURE 1**

**Direct Selling Association
Code of Ethics (partial)**

**A. Code of Conduct**

**1. Deceptive or Unlawful Consumer or Recruiting Practices**

a. No member company or independent salesperson for a member company shall engage in any deceptive, false, unethical or unlawful consumer or recruiting practice. Member companies shall ensure that <u>no statements, promises or testimonials are made that are likely to mislead consumers or prospective independent salespeople.</u>

b. Member companies and their independent salespeople <u>must comply with all requirements of law.</u> While this Code does not restate all legal obligations, compliance with all pertinent laws by member companies and their independent salespeople is a condition of acceptance by and continuing membership in DSA.

d. <u>Information provided by member companies and their independent salespeople to prospective or current independent salespeople concerning the opportunity and related rights and obligations shall be accurate and complete.</u> Member companies and their independent salespeople shall not make any factual representation to prospective independent salespeople that cannot be verified or make any promise that cannot be fulfilled. Member companies and their independent salespeople shall not present any selling opportunity to any prospective independent salesperson in a false, deceptive or misleading manner.

f. Member companies shall provide to their independent salespeople either a written agreement or a downloadable electronic statement to be signed by both the member company and <u>the independent salesperson, or a written statement containing the essential details of the relationship between the independent salesperson and the member company.</u> Member companies shall inform their independent salespeople of their legal obligations, including their responsibility to handle any applicable licenses, registrations and taxes.

h. Independent salespeople <u>shall respect any lack of commercial experience of consumers.</u> Independent salespeople shall not abuse the trust of individual consumers, or exploit a consumer's age, illness, handicap, <u>lack of understanding or unfamiliarity with a language.</u>

3      6

**FIGURE 1 (cont.)**

**Direct Selling Association
Code of Ethics (partial)**

**8. Earnings Representations**
a. The following shall be considered "earnings representations" under this Code:
    1. Any oral, written or visual claim that conveys, expressly or by implication:
        a) A specific level or range of actual or potential sales; or
        b) Gross or net income or profits, including but not limited to representations that either explicitly or implicitly suggest that lifestyle purchases— including homes, vehicles, vacations and the like—are related to income earned.
    2. Any statement, representation or hypothetical scenario from which a prospective independent salesperson could reasonably infer that he/she will earn a minimum level of income;
    3. Any chart, table or mathematical calculation demonstrating possible income, actual or potential sales, or gross or net profits based upon a combination of variables;
    4. Marketing materials or advertising explicitly describing or promising potential income amounts, or material- based lifestyles of independent salespeople;
    5. Any award or announcement of compensation describing the earnings of any current or past salesperson. A company's sales incentive awards, trips or meetings, and/or commissions, overrides, bonuses or other compensation, shall not be considered earnings representations unless they are accompanied by express indication of their value.
b. Member companies must comply with, and obligate their independent salespeople to also comply with, the following standards:
    1. Earnings representations and sales figures must be truthful, accurate, and presented in a manner that is not false, deceptive or misleading.
    2. Current and prospective independent salespeople must be provided with sufficient information to understand that:
        a) Actual earnings can vary significantly depending upon time committed, skill level and other factors;
        b) Not everyone will achieve the represented level of income; and
        c) Such amounts are before expenses, if any.
    3. Current and prospective independent salespeople must be provided with sufficient information to enable a reasonable evaluation of the opportunity to earn income.
    4. If a specific independent salesperson's commission or bonus payments are included in an earnings representation, any distributions made for those payments to others in the sales organization must be disclosed or deducted from the figure(s) used.
    5. Any sales and earnings representations must be documented and substantiated.

FIGURE 2

Sample Language from FTC Cases

- Complaint in FTC v. TrekAlliance Inc (2002)
  - "During these company overviews, Trek representatives typically <u>claim, either expressly or by implication, that prospective recruits are likely to make a substantial profit as Trek sales representatives, and that almost everyone can and will make some money.</u> While prospective recruits are sometimes told that some Trek representatives fail, <u>they are also told that lack of success cannot be blamed on the system, but rather only on the insufficient efforts of those who failed.</u>" (11:21-14)
- Complaint in FTC v. NexGen3000.com (2003)
  - "In numerous instances, <u>Defendants represented, expressly or by implication, that participants in the NexGen program were likely to receive substantial income.</u> (8:31)
  - In truth and in fact, in numerous instances, <u>consumers who participated in the NexGen program were not likely to receive substantial income.</u>" (8:32)
- Complaint in FTC v. Mall. Ventures, Inc. (2004)
  - "In connection with the offering and sale of the right to participate in the 2by2.net program, Defendants have represented, expressly or by implication, that consumers who join the 2by2.net program <u>are likely to realize substantial financial gain.</u>" (10: 6-10)
  - "<u>Defendants have failed to disclose that most consumers who join the 2by2.net program are not likely to realize substantial financial gain.</u>" (11: 4-6)
- Settlement in FTC v. Mall. Ventures, Inc. (2004)
  - Restrained and enjoined Defendants and their successors from "Misrepresenting, expressly or by implication, or assisting others in misrepresenting, expressly or by implication:
    - <u>the potential or likely earnings or income derived from a business venture</u>
    - the benefits any person participating in a business venture actually can receive from such activity;
    - <u>the amount of sales a person actually made or can likely make through a business venture;</u>" (7: 12:21)
- Complaint in FTC v. BurnLounge (2007)
  - "In contrast to the claims of profitability, the compensation plan used by BurnLounge mathematically dictates that at any particular time the majority of Moguls <u>will spend more money to participate in BurnLounge than they have earned through their involvement with the company,</u> and the majority of Moguls will not have made the substantial incomes represented. (8:17-21)

---

FIGURE 2 (cont.)

Sample Language from FTC Website

*Ask yourself these questions:*

- **Can you afford to risk the money and time?** Every business venture has risks. MLMs are no different. <u>Even if the start-up costs seem low, additional expenses can add up quickly. Expenses can include training and travel costs, website fees, promotional materials, costs to host parties, and costs to buy products.</u> If you need to borrow money or use your credit card to finance your expenses, you may face hefty interest charges too. Also, consider the time demands of the business, like going to training, recruiting new distributors, managing paperwork, recording inventory, and shipping products.

*Do your homework:*

- **Understand the costs.** Many MLMs make you buy training or marketing materials, or pay for seminars on building your business. <u>You may need to book travel and pay for hotels and meals. Make sure you know what you must pay for, and how much it will cost over time. If the company says some of these things – like periodic product purchases or training – are optional, find out if you'll become ineligible for bonuses or rewards if you opt out of them.</u>

---

## III. Analysis and Summary of Conclusions

6.      My conclusions are based on an analysis of various documents, depositions and related exhibits as well as my experience in studying the business practices of MLMs and the DSA.  When I refer to "Herbalife" I mean the corporate entity. I refer to top distributors as a group or by name. Any reference to the Circle of Success includes STS and corporate events. My conclusions are as follow:

I.      Retention, not distributor success, is the real and unspoken goal of the Circle of Success and regular attendance at STS and corporate events.

II.      At a cost to downline distributors, Herbalife worked to greatly expand STS events that are misrepresented as completely independent and under local control.

III.      As part of the Circle of Success, over many years Herbalife and top distributors communicated to downline distributors the necessity of regular attendance at STS and corporate events in order to achieve success.

IV.     Repetitive storytelling of atypical experiences inspire, ignore, and obscure the typical
distributor experience, thereby providing, disclaimers notwithstanding, a net
impression that the path to success relies upon following the Circle of Success and
monthly attendance at STS and corporate events.

V.      Disinformation shared at STS and corporate events obscures and misrepresents the
actual typical distributor compensation and experiences.

VI.     Herbalife adopted a hear-no-evil, see-no-evil, speak-no-evil approach to information
shared with downline distributors and potential distributors, failing to share available
data relevant to the decision to become or remain an Herbalife distributor and to follow
the Circle of Success regime.

**I. Retention, not distributor success, is the real and unspoken goal of the Circle of Success
and regular attendance at STS and corporate events.**

7.      Within Herbalife the three Rs refers to: "Retail, Recruiting, and Retention." Of the three,
retention necessarily is the first priority. A failure to retain a current distributor means wasted
effort, a lost opportunity for required product purchases in pursuit of success, downline recruitment
and retailing. It also means the need to recruit a replacement. To undervalue the importance of
retention means placing product purchases, royalties, and bonuses at risk. Thus, risk management
makes retention imperative. Herbalife and top distributors describe retention as "crucial," and
"Absolutely" important. A distributor becoming inactive, for many years the ultimate outcome for
the majority of Herbalife distributors, closes off a cash flow to Herbalife and rewards to top
distributors.

8.      Multi-level marketing differs from single-level direst selling in multiple ways, particularly
in terms of rewards for documented sales to non-distributors. To calculate distributor rewards,
Herbalife necessarily tracks purchases made by distributors but only after the FTC settlement
began documenting sales to non-distributors (e.g., retail sales and Preferred Customers). From a
data collection perspective, retailing was a late addition to the three Rs. Given the data now
available and the current emphasis on retailing, distributor retention becomes even more important.

9.      In response to a Notice of Deposition Herbalife stated that "no such internal analysis exist" regarding information on attendees at STS events, a first step in tracking success associated with attendance. Yet, tracking distributor retention and attendance at corporate events are corporate priorities. While the supposed benefits to attendees for following the Circle of Success lacks support, the continued pursuit of success by monthly event attendance benefits Herbalife and upline distributors. Whether event attendees ever make President's Team, as long as they keep attending events and make qualifying purchases, they generate revenue for Herbalife and rewards for upline distributors. As a result, distributor retention, not attendee success is the primary focus of the Circle of Success. Additionally, post-2009 the benefits from increased retention came at no cost to top distributors or Herbalife as attendees self-fund STS events. Attendees working "event to event" delivers benefits to some at a cost to others. (See Response to 30(b)(6) Depo Notice; Bogard Depo. At 295-298; Tartol Depo. At 194, Wick Depo. At 100, Montesino Depo. At 146, Gioiosa Depo. At 306; Waldron Depo. At 129; de la Concepcion Depo. At 287-288)

10.     With retention a top priority and the primary purpose of the Circle of Success, we should see increased Sales Leader retention during the period. According to Herbalife 10K reports, retention of North America Sales Leaders (excluding Mexico) nearly doubled, increasing from 37.5% in 2004 to 73.2% in 2019 (Figure 3; Table 1). During that period, however, the number of Sales Leaders in North America steadily declined as a percent of all Herbalife Sales Leaders from 22.3% in 2004 to 12% in 2019 (Figure 4). Interestingly, as a percentage of Herbalife's total net sales, net sales generated by North America remained quite stable, increasing from 20.7% in 2004 to 21% in 2019 (Figure 4). Further, Herbalife earnings statements from 2008 to 2015 show virtually no change in the percent of all U.S. distributors with earnings (Figure 6). Sales Leaders in North America declined relative to the global number of Sales Leaders, yet they maintained their share of global net sales.







Figure 5
North America Net Sales as
% of Total Herbalife Net Sales



Figure 6
US: Sales Leaders Retention Rate &
Sales Leaders with Earnings as % of All Distributors

10    **13**

11.     A growing negative relationship between North American Sales Leaders as a percent of all Sales Leaders and U.S. Sales Leader retention becomes evident during the ramp up of the Circle of Success. While the decreasing percent of Sales Leaders in North America and increasing U.S. Sales Leader retention persists throughout the period, the negative correlation increases (i.e., becomes stronger) with the unfolding of the Circle of Success strategy. During the full period (2004-2019), the negative correlation between the two is -88%. The increase in STS events began in 2010 with further increases in subsequent years. Giving time for the impact on retention to be fully apparent, the data shows a stronger negative correlation in the later years. From 2004 through 2011 the correlation is -27%, and from 2012 through 2019 -87%.

12.     Correlation alone is not proof of causation. One cannot simply say because one measure went up as another went down that change in the first caused change in the second (or that change in the second caused change in the first). The data, however, provides additional information. That the percent of net sales generated from North America remains steady means fewer Sales Leaders as a percent of the whole generate the same percent of global net sales as a much larger percent generated in years past. Product purchases associated with retention, remaining eligible and qualifying "for everything," will have the impact of building sales per Sales Leaders. More purchases are being made by fewer North American Sales Leaders (as a percent). Yet, the percent of U.S. distributors with earnings remains essentially unchanged.

## Table 1
## Herbalife

|      | Herbalife SL | NA SL | % SL in NA | Herbalife NS | NS in NA | % NS in NA | NA RR |
|------|--------------|-------|------------|--------------|----------|------------|-------|
| 2004 | 191334 | 42703 | 0.223 | 1309.7 | 271.2 | 0.207 | 0.375 |
| 2005 | 201925 | 41262 | 0.204 | 1566.8 | 303.8 | 0.194 | 0.386 |
| 2006 | 243572 | 45778 | 0.188 | 1885.5 | 357.6 | 0.190 | 0.412 |
| 2007 | 298791 | 54314 | 0.182 | 2145.8 | 438.7 | 0.204 | 0.431 |
| 2008 | 334971 | 64383 | 0.192 | 2359.2 | 496.9 | 0.211 | 0.435 |
| 2009 | 324387 | 63726 | 0.196 | 2324.6 | 529 | 0.228 | 0.422 |
| 2010 | 312926 | 64668 | 0.207 | 2734.2 | 614.1 | 0.225 | 0.433 |
| 2011 | 348027 | 72152 | 0.207 | 3454.5 | 698.6 | 0.202 | 0.486 |
| 2012 | 410303 | 79150 | 0.193 | 4072.3 | 841.2 | 0.207 | 0.511 |
| 2013 | 466362 | 86469 | 0.185 | 4825.3 | 908 | 0.188 | 0.547 |
| 2014 | 486088 | 86129 | 0.177 | 4958.6 | 926.8 | 0.187 | 0.551 |

11   **14**

| 2015 | 501894 | 88866 | 0.177 | 4469 | 879.5 | 0.197 | 0.584 |
| 2016 | 461383 | 79305 | 0.172 | 4488.4 | 955.7 | 0.213 | 0.583 |
| 2017 | 482605 | 61362 | 0.127 | 4427.7 | 840.2 | 0.190 | 0.748 |
| 2018 | 486369 | 49379 | 0.102 | 4891.8 | 948.3 | 0.194 | 0.659 |
| 2019 | 550859 | 66264 | 0.120 | 4877.1 | 1025.5 | 0.210 | 0.732 |

|  |  |  | Correlations |  |
| SL = Sales Leaders |  | 2004-2019 | -0.88 |
| NA = North America (excludes Mexico) |  | 2004-2011 | -0.27 |
| NS = Net Sales |  | 2012-2019 | -0.87 |
| RR = Retention Rate |  |  |  |

13. That downline distributors are customers first is clear from the recruitment process. Whether in an HOM or nutrition club, the typical goals are to heighten interest in the product, encourage product sampling and adopting a product-based regimen, and along the way show the benefits of being a customer-distributor. Ms. Peterson describes the dual role and then demurs.

Q. So in your view, the customer is the end user of the product?
A. The customer is the end user.
Q. So do you consider any member of your team who purchases product for personal consumption, are they your customers in that sense?
A. In that sense, they are.
Q. And again, can you look at this same section that we're looking at here on this disclaimer and explain to me what a typical customer can expect?
A. No. Because I told you that I'm not -- they're not -- they are not customers. (Peterson Dep. 175:1-12)

14. The view that the primary goal of sponsors and other upline distributors is to help downline distributors achieve success (e.g., make President Team) ignores the inherent and ongoing financial relationship that benefits upline distributors and Herbalife as long as downline distributors keep trying. Herbalife and top distributors have the experience, years of data, and the knowledge that downline distributors lack. Herbalife and top distributors have a shared financial interest in retaining downline distributors as long as possible so they will: a) maintain purchase behavior, 2) expand purchase behavior (i.e., purchase other Herbalife products -- "buy from your own store"), 3) recruit other customer-distributors, and 4) promote Herbalife products. The post-2009 change dramatically increasing the number of STS events allowed Herbalife and top distributors to use the events and the often-repeated emphasis on monthly event attendance as a mechanism for retaining downline distributors hopeful in the pursuit of success (the main theme

of STS events). Only after fruitlessly expending funds to attend events month-after-month and sustaining purchases did the downline distributors learn what Herbalife's own data shows and has showed for many years—the vast majority will be unsuccessful.

**II. At a cost to downline distributors, Herbalife worked to greatly expand STS events that are misrepresented as completely independent and under local control, a violation of DSA Ethics 1a and 1d.**

15.     The evidence shows a concerted effort by Herbalife in cooperation with top distributors to expand the number of STS events nationally as part of the Circle of Success strategy, an expansion financed by shifting event expenses to distributors attendees in pursuit of success. Top distributors overstate the level of independence and appear hesitant to admit that STS events are discussed at Herbalife committee meetings. The faux independence and appearance of the distancing of STS event from the company creates at least the potential for Herbalife to claim deniability should any complaints arise, such as are present in this case. In misleading event attendees, the Circle of Success violates DSA Ethics 1a, " No member company or independent salesperson for a member company shall engage in any deceptive, false, unethical or unlawful consumer or recruiting practice." and 1d, "Member companies and their independent salespeople shall not present any selling opportunity to any prospective independent salesperson in a false, deceptive or misleading manner."

16.     STS-type events have been "a staple for the company since Mark Hughes's day." The evidence indicates that from their inception until 2009 STS-type events were company-sponsored with Herbalife covering expenses. It is not clear to what extent pre-2010 attendees had event tickets provided in their member kits at no cost and to what extent attendees paid for tickets. It is clear that the number of events each year was small, and that Herbalife covered any expenses not covered by ticket revenue, including the staff time needed to create and support each event. Mr. Waldron estimated that there were only 16 STS events nationally in 2009 (See: (Montesino Depo. At 45; Waldron Depo. At 87-88, 93).

17.     Mr. Waldron initiated or led a discussion at the 2009 Future President Team retreat in support of dramatically increasing the number of STS events, an initiative that distributor attendees enthusiastically supported. It is important to note, however, that Herbalife insisted on a change in the financial structure. While the company saw the expansion as potentially profitable for upline distributors holding STS events, without this change substantial STS event expansion, a key component to the Circle of Success, would not have been achievable by Herbalife with pre-2010 financial and staff support levels. Contrary to DSA Ethics, attendees at STS events were misled as to the changing role of Herbalife and the potential for profit-making.

Q. Well, you said that they banked money for future STSs, correct?
A. They can, yes.
Q. And that's the reason why Herbalife asks the distributors to take over those events, correct?
A. That was one of the reasons, yes.
Q. That was the main reason. I think that was the first reason you gave me, correct?
A. That was a big reason, yes.
Q. So is that because Herbalife expected that those independent distributors would make money from those events and then use that money to put on future STSs?
A. Partially, yes.
Q. So is it fair to say that it's Herbalife's expectation that the independent distributors are profiting from                                    those                                    events?
A. Expectation, yes. (Bogard Dep. 170:19—171:2).

18.     Over the next ten years the number of STS events nationally increased between 60- and 100-fold with an associated increase in attendees, all of whom were pressed to attend an STS event each month unless attending an Herbalife corporate event. The Circle of Success outlines a monthly event calendar and a commitment to attend. Prior to the structural change adopted in 2009 (and implemented in 2010), achieving the desired event growth would have increased Herbalife's expenses exponentially. Even if ticket prices covered direct event expenses, the amount of Herbalife staff time devoted to as many as 150 per month would have been many multiples of event efforts prior to 2009. The solution came in the form of STS events structured to be wholly supported by attendees striving to achieve success. Expenses are covered by ticket revenue and "staff" support comes in the form of distributors volunteering for "production" to show their commitment. In instances where ticket revenue exceeds expenses STS coordinators may bank the funds.

19.     The new structure echoes the overall multi-level marketing model that delegates and incentivizes existing distributors to recruit and train new distributors. The "new" STS model puts the financial responsibility for each event on downline attendee distributors, releasing Herbalife and top distributors from any financial burden for what is clearly a distributor retention effort. Though claimed to be independent, company support legitimizes the events and STS coordinators have a self-interest in adhering to Herbalife's criteria and recommended materials (See: Peterson, exhibit 88; Bogard Depo. At 190).

20.     The fiction of the independence of post-2009 STS events continues but the reality is one of limited autonomy for the STS coordinator under close Herbalife monitoring. Herbalife and its top distributors have worked closely together for decades. The MLM reward structure creates a symbiotic relationship between a multi-level marketing company and its top distributors that is quite literally a matter of the life or death for the firm. A failure in either role will untie that which binds the multi-level marketing structure and efforts. This symbiotic relationship is opaque to event attendees. Though DSA Ethics requires an agreement or statement "containing the essential details of the relationship between the independent salesperson and the member company," top distributors occupy essentially supra-distributor positions filled with opportunities to pursue self-interests to the detriment of downline distributors, Circle of Success participants, and event attendees. Through various committees and meetings on matters ranging from events to products to prices to qualification for VIP standing, etc., Herbalife and its top distributors plan, develop policies, create events, and discuss who is responsible for what. Top distributors have been shaping the agenda for Herbalife events for "many years" and discussions continue as to whether Herbalife or a local coordinator will be responsible for a function or task (See Waldron Depo. At 69, 72; Bogard Depo. At 108-109; Stanford exhibit 197).

21.     Despite claims to the contrary, Herbalife maintains controlling influence over and monitors STS events from 2009 forward. Herbalife provides agenda templates, products, slide decks for speakers, and promotion information; monitors attendance levels; developed criteria for recognizing a sponsored STS event; and threatens to withdraw support for non-compliance. Herbalife formed an STS Committee, promoted the notion of a "unified philosophy," and requires the posting of Statement of Average Gross Compensation at all STS events and the completion of

post-event forms. STS events, key to the Circle of Success, focuses on current Herbalife distributors because, "it's an Herbalife event" (See Morrow Depo. At 19; Bogard Depo. At 129-130, 183-184, 186, 188, 208-209, 250, 267, 285; Morrow Depo. At 62-63; Peterson Depo. At 89; Waldron Depo. At 71, 247; Tartol Depo. At 192, 194; De La Concepcion Depo. At 235; Montesino Depo. At 141:8-17).

22.     Just as Herbalife and top distributors share a financial interest in promoting attendance at STS events, STS coordinators have a shared interest in complying with the Herbalife criteria to receive Herbalife support. Language about the independence of STS events appears in distributor depositions but, in fact, STS events not only mimic Herbalife corporate events, they rely on Herbalife's multifaceted, ongoing, and formalized support (Morrow exhibit 49). The company estimates the vast majority of attendees attend Herbalife supported STS events.

Q. Sure. Is it fair to say that the vast majority of distributors that are attending STSs are attending STSs that are supported by Herbalife corporate?
A. It would be an assumption, but I -- I would think so. (Bogard Dep. 191:3-8)

**III. As part of the Circle of Success, over many years Herbalife and top distributors communicated to downline distributors the necessity of regular attendance at STS and corporate events in order to achieve success.**

23.     Taken as a whole, the evidence supports an overwhelming, compelling message to distributors that committing to the Circle of Success and monthly attendance at an STS or corporate event was necessary to building a successful business. Given the lack of supporting data reflecting a correlation between event attendance and success within Herbalife, strong exhortations to attend events sanctioned by Herbalife are contrary to DSA Ethics 1a that, "that no statements, promises or testimonials are made that are likely to mislead consumers or prospective independent salespeople" and that information "concerning the opportunity and related rights and obligations shall be accurate and complete." (See Gioiosa Depo. At 58, 169; Morrow Depo. At 182; Wick Depo. At 70, 251; Waldron Depo. At 112, 282, 288; de la Concepcion Depo. At 77, 89)

16     **19**

24.     Words spoken from the stage at events are consistently clear, strong, misleading, and rely on incomplete information about attendance at future events. Featured speakers repeatedly link, without supporting data, success and support from top distributors to regularly attending STS and corporate events. Attendees are told to plan even their personal calendars around event attendance. According to speakers on the stage, event attendance is tantamount to investing in their future, an investment well worth the future returns. Messaging strongly suggests that failure to attend will be detrimental to future earnings. The FTC warns about potential lost opportunities for failure to pursue even optional training, "If the company says some of these things – like periodic product purchases or training – are optional, find out if you'll become ineligible for bonuses or rewards if you opt out of them."   The 2014 Extravaganza event provides numerous speaker examples (underline emphasis added):

- (2:19) "pack out those STS, every single event"
- (2:27) So, I made a decision. My sponsor does not have to call me up to ask me if I am going to be at a training. There's not an option for me, its non-negotiable." "core," "backbone"
- (2:45) "2009 Dan Waldron put the call out—STSs…that would begin to change the fabric." "The STSs are an environment." "Environment is stronger than will." "What's so great about STSs? It creates structure. Monthly events, month after month, after month. You funnel everything into the success training school. Its become the backbone of; its the fabric of Herbalife right now." [references CYCLE OF SUCCESS slide]
- (3:40) I actually don't think I have ever even gotten to an STS later than when the volunteers arrive. From the day I started. It was just taught to me from the beginning."
- (4:03 min) "And then you go to the STS and you walk out feeling 1,000 times better. Right? That is a core of our company." [references "Take Aways:" STS slide]
- (4:25 min) "The one thing you want to write down is events are not negotiable. That's the mindset."
- (4:47) "I can be counted on to show up as a leader at every event. Not the events where I get recognized. At every event."
- (5:09) "This is our church, a meeting."
- (5:23) "So I have a calendar that has Cycle of Success written down with all the Herbalife dates so I can plan my family around it so I don't miss events."
- (6:20) "Whatever you had to do to be here, you did the right thing for your family."
- (6:30) "Never miss an event and qualify for everything."
- (7:06) "An expensive proposition to come and be with us this weekend" "But this is the place that the big picture gets taught."
- (7:14) [slide "4.) INCREASE ENGAGEMENT AND GROW NUMBERS AT EVENTS"] "And this for me you guys has been engrained in my blood since I started Herbalife. Thank you mentors who have taught me this."
- (7:58) "So we literally you guys, for the first year of our business worked STS to STS just like they talk about at all of the training. So the STSs groomed all of the members on our

17     20

team. And so through those STSs we were able to gain traction, gain momentum…That's because <u>our culture of working STS to STS is groomed into who we are</u>."

- (8:30) "Four steps to success. You heard them all day. Social Media. Document your journey. Fuel your local community. Fuel the HUB. And <u>pack the Herbalife event structure</u>. Who is excited about packing the Herbalife event structure?" [references "Steps to Success" slide]

- (11:55) "So as Mark said structure was so critical and where <u>we started is where we all started with that Success Training Seminar</u>. And I am so grateful to Suzanne and Cody Morrow, Dennis , Mark and I wouldn't be here without you. They took us in. they taught us. They really got us clear on <u>the value of that backbone of North America, which the Success Training Seminars</u>" "<u>The Success Training Seminar is no matter what, we've never missed one, it's been the key to everything that we have done</u>." [references "CYCLE OF SUCCESS" slide] "So, this chain of events, every event builds on each other…<u>Plan your personal life around the events</u>."

- (12:37) "There's an <u>invisible leadership structure</u> that takes place inside of the event." "You need to be intentional with <u>grooming leadership through the events</u>." "It doesn't happen by accident." "<u>You found what you are looking for. Its right here</u>."

- (13:32) "We have a predictable training structure. So, <u>we work event to event</u>. Correct guys?" "We have approximately sixty STSs all over the country. So, there is <u>no excuse for you not getting to your local event</u>. This is so <u>crucial to your development, guys, and the growth of your business</u>."

- (14:10) [references dates for upcoming STSs] "You gotta know the calendar. You gotta know what's going on. It's your business to know what's going on…<u>No, you work things around Herbalife</u>." "Number five, qualify for everything."

25.     The Circle of Success and monthly event attendance are presented as necessary but not sufficient conditions for success, with would-be President's Team members also told to "qualify for everything." Qualifying means reaching specific purchase volume levels, leading to a VIP designation with special seating and exclusive access to top distributors and speakers. Somehow sitting at "a special table and chairs," can also lead to eventual success. Presumably, speakers talking directly with VIP attendees reaffirm the message that monthly STS or Herbalife corporate events attendance and maintaining purchase volumes are critical to building a successful business. Hyping the need to qualify for VIP intentionally conveyed status and reinforced the incomplete, biased information given out from the stage. (See Waldron Depo. At 175; Gioiosa Depo. At 118; de la Concepcion Depo. At 100; Rogers Depo. At 86; Valdez Depo. At 72)

Q. Okay. You've heard, and again, you may have said this yourself, "qualify for everything." What does that mean?
A. Well, if there's a meeting going on and you can qualify to sit up front if you do a little bit more business, I would encourage you to qualify for everything, because you can sit up front, and you get a special table and chairs, so we encourage people to qualify for everything. And if there's a

picture taken that evening, if you do a little bit more business, so, hey, qualify for everything, for the special seating and for the picture taking. So we encourage people that are business builders, that are more career-level income people to qualify for everything. (Waldron Dep. 174:18—175:8)

26.     Speakers on stage at STS and Herbalife corporate events cross-promote future events in support of continued event attendance (Morrow Exhibit 52). For example, a proforma agenda produced and disseminated by Herbalife recommends promoting upcoming STS events from the stage multiple times during a weekend event (TARTOL00013344 exhibit). Similarly, Herbalife periodically ran "City by City Challenge" for the purpose of growing STS events (Morrow exhibit 46). Yet, the company failed to vet earning claims by STS speakers or provide supporting data regarding the value of attending. DSA Ethics 1a prohibits a member company from engaging "in any deceptive, false, unethical or unlawful consumer or recruiting practice." (See Tartol Depo. At 204; Wick Depo. At 217; Bogard Depo. At 203, 219, 248, Montesino Depo. At 138)

27.     A clear and ongoing Circle of Success strategy promoted monthly attendance at STS and corporate events from the stage and linked event attendance with success. Speakers tell attendees that those who achieved success "worked STS to STS" and that to move up the marketing plan event attendance is: "core," "not negotiable,"  "an environment…stronger than will," the "backbone of North America." When it comes to the planning a calendar "you work things around Herbalife." The misrepresentation here is that speakers do not and cannot support the claims and reply on incomplete information, contrary to DSA Ethics. The misrepresentation is compounded by the fact that local event attendee data are not analyzed and/or not used to show the impact of event attendance. Herbalife tracks the relative success of each distributor month-to-month and event coordinators collect registration names. Yet, contrary to its other uses of data, Herbalife fails to use this information to test the relationship described by speakers.

**IV. Repetitive storytelling of atypical experiences inspire, ignore, and obscure the typical distributor experience, thereby providing, disclaimers notwithstanding, a net impression that the path to success relies upon following the Circle of Success and monthly attendance at STS and corporate events.**

28.     Stories are told to inspire. One top distributor described purchasing a house for his brother and another proudly reported that he "retired" his mother. Yet, the path to success remains unclear and untold. Contrary to DSA Ethics, the result is to mislead attendees for the purpose of retaining attendees' month-to-month. Speakers such as Ms. Wick describe the importance of nutrition clubs despite the fact that (confidential) data on top distributors shows earnings from retail sales of all types, including nutrition clubs, represented an average of less than one percent of total earnings. Ms. Wick's earnings from retail sales never exceeded more than one and one-half percent of total earnings from 2009 to 2019. No information is shared regarding the reasons for failed nutrition clubs, nor is that information tracked by Herbalife despite the fact that the number of new nutrition clubs is tracked. The company does not demonstrate an interest in having or conveying complete information. Because Herbalife and top distributors know or can know that retail sales, including those through nutrition clubs, contribute very little distributor total earnings, statements to the contrary intentionally mislead event attendees. Sharing stories of success without context and intentionally under-utilizing available data provides an incomplete, misleading view of the typical distributor experience, messaging that violates DSA Ethics 1a "No member company or independent salesperson for a member company shall engage in any deceptive, false, unethical or unlawful consumer or recruiting practice"; 1d, "Information provided by member companies and their independent salespeople to prospective or current independent salespeople concerning the opportunity and related rights and obligations shall be accurate and complete,"; and 1h, "Independent salespeople shall respect any lack of commercial experience of consumers. Independent salespeople shall not abuse the trust of individual consumers, or exploit a consumer's age, illness, handicap, lack of understanding or unfamiliarity with a language."

29.     In the absence of supporting data, events speakers promoting the Circle of Success and attendance at STS and corporate events fail the most rudimentary logic. There are many activities common among top Herbalife distributors: each likely showers or bathes regularly, generally obey

traffic laws when driving, and communicate regularly with their upline distributors. Yet none of these activities intentionally seek to increase retention of downline distributors as does event attendance portrayed to be core to success. In order for monthly event attendance to be logically different from other actions common to top distributors, it needs to be shown that attendance makes a positive contribution toward success and that not attending makes a negative one. Thus far, no evidence supports the relationship between adhering to the Circle of Success, including monthly event attendance, and success. A fact not completely missed by some top distributors or Herbalife. (Plaintiffs' Reply In Support of Plaintiffs' Motion for Class Certification, Jones Declaration, Composite Exhibit 2; Wick Depo. At 251; Tartol Depo. At 125; Bogard Depo. At 271; Waldron Depo. At 299).

30.   STS and corporate events are designed to inspire and energize attendees. Asking distributors to attend events monthly has been equated to asking them to go to church (paragraph 24). The analogy holds given the repetitive messages and effort to shape future behavior. But a fundamental question remains: What benefits come from regularly attending STS and corporate events that justify the expenses distributors incur? Beyond inspiration, the answer most often given is information. Thus, downline distributors are told that attending events month-after-month provides inspiration and information important enough to justify ongoing out-of-pocket expenses. Top distributors disagree on the relative balance between inspiration versus information, but not the idea that both are to play a role. (See Morrow Depo. At 209; Tartol Depo. At 119; Wick Depo. At 95; de la Concepcion Depo. At 181-182)

31.   That the events are intended to inspire appears beyond doubt. However, the information shared at the expense of attendees lacks quality, accuracy, and truthfulness relative to the typical distributor experience. The FTC was well aware that expenses may well become excessive relative to the income generated: "Even if the start-up costs seem low, additional expenses can add up quickly. Expenses can include training and travel costs, website fees, promotional materials, costs to host parties, and costs to buy products." In the BurnLounge case the FTC noted, "...at any particular time the majority of Moguls will spend more money to participate in BurnLounge than they have earned through their involvement with the company."

**V. Disinformation shared at STS and corporate events obscures and misrepresents the actual typical distributor compensation and experiences.**

32.     Misinformation, present at every event that follows Herbalife guidelines, plays a role more important than the repetition valued by Mr. Waldron. Misinformation comes in two forms: omission and commission. The latter comes directly from Herbalife.

33.     The "big picture" hyped by Mr. Johnson is a picture distorted in many ways, beginning with the omission of basic business and economic principles. Multi-level marketing is a form of all-against-all competition. Each Founder and Chairman's Club member has a financial interest in protecting their positions and downlines. Most established their downlines a decade or more ago. Herbalife likely has years of data on the geographic areas where successful recruitment has been heavy or light, areas where distributors have succeeded or failed and by what percentage, and even current retention and inactivity rates. Many business types (e.g., franchises, corporate retail chains, etc.) use similar types of information to assess opportunities and make improvements. Rather than help distributors focus their efforts and invest time and energy as productively as possible, however, event speakers and presentations present the "big picture" as if none of this information matters and that helpful data does not exist.

34.     Beyond data on new distributor success or lack thereof, Herbalife has data on the typical distributor experience at each level—GET, Millionaire, and President's Team. Available only to a privileged few top distributors, confidential data shared with Herbalife's Event and Promotions Committee shows that in 2017 Top Achievers Business (TAB) Team members, the highest earners in Herbalife, qualified for Royalty Overloads (RO) at low rates: 15% President's Team (PT), 21% Global Expansion Team (GT), and 25% Millionaire Team (MT). The 2017 RO qualifying rates were below both 2016 and 2015. In 2017 fewer than 80% of PT and MT members, and only 57% of GT members had 2,500+ in Total Volume (Stanford Exhibit 185). Again, the percentages are

22   **25**

lower than in 2016 and 2015. Sharing this information exclusively with a few top distributors creates an asymmetric information situation that hides from all distributors the challenges of maintaining volumes sufficient to generate RO while advantaging top distributors with information to allow them to focus on retention. With information in hand, top distributors can develop strategies that target specific groups to keep trying. Downline distributors in these groups will be encouraged to purchase volume and earn eligibility in the absence of a more complete success/failure context. That some distributors have more complete information than others illustrates Herbalife's comfort with violating DSA Ethics.

35.    Messaging about success, particularly achieving PT, conflates achieving, expected earnings, and sustaining PT-level success. First, there are many PT levels that require increasing purchase volumes. Second, Herbalife stopped reporting earnings by level (PT, MT, etc.) after 2011. Even when reporting earnings by level Herbalife did not reveal the number or percent of those who achieved PT or what level of PT that constituted the earnings reported. The low rate of PT distributors (and those at other levels) qualifying for RO shows that a large percentage of distributors at each level fail to earn compensation from a primary earnings source. Thus, statements about what it means to become a PT level distributor are misleading, incomplete, and disconnected from the reality experienced by the typical distributors who achieves PT status.

36.    Data also show that over an eight-month period in 2017 the percent of monthly orders placed on the end-of-month (EOM) day averaged 18.3%. The EOM day is the last day of a month during which a product order can be placed to count for volume in that month. In a business where orders can be placed 24/7, a single business day represents one-thirtieth (i.e., 3.3%) of all possible days to make a purchase (Stanford Exhibit 185). The 2017 data showed between one-fifth and one-sixth of orders placed at EOM. Herbalife and top distributors use the data to develop strategies for maintaining or increasing targeted distributors' purchase behavior.

Q. And what kind of data can you mine?
Q. You can answer it again.
A. It's just very vast. You can mind any point that we harvest from the field. Any point is minable.
Q. So you can mine the names of the customers who bought it?

A. Yes.
Q. The products they bought?
A. Yes.
Q. The amounts they spent?
A. Yes. (Domingo Dep. 70:20—71:9)

Q. So BI keeps track of how much distributors are paid?
A. BI mines the database that keeps track. (Domingo Dep. 123:20-12)

Q. Can you just explain to me how they're using this term, "stretcher"?
A. Let me look.
A. I think they're simply referring to people who may not have worked -- you know, to get their
people to do 2500 or more, would work with them harder to become an active supervisor. So
stretch.
Q. So the objective is to get people to stretch?
A. The objective is to get people to work harder. (Tartol Dep. 186:16—187:5)

37.    Misinformation by commission comes in the form of Herbalife's Statement of Average
Gross Compensation (SAGC), a document required to be shared and/or posted at all STS and
corporate events. In its various forms the SAGC: 1) makes opaque the typical earnings of new
distributors and non-new distributors at different levels of the marketing plan, 2) falsely implies a
probability of achieving a particular level of earnings, 3) prohibits comparisons over time, and 4)
appears to be downplayed or ignored by top distributors. The latter of the four might be explained
by the disconnect between the success stories told from the stage and the reality experienced by
typical distributors. Each of these concerns are inconsistent with DSA Ethics and FTC guidance.

38.    By presenting average earnings the SAGC obscures the underlying skewed distribution of
distributor earnings, information needed to understand a typical distributor's experience in each
category. For example, 2,084 distributors earned between $10,000 - $25,000 in 2015 with average
earnings of $15,445. What then did the typical distributor in this group earn? Here are two of many
possible answers: 1) each distributor in the group earned $15,445 or 2) 688 earned $25,000, 79
earned $20,000 and 1,313 earned $10,000. The latter example means the typical distributor, 63%
of the entire group, earned only 65% of the reported average amount earned, and only 40% of the
amount earned by top earners in the group. Distributors attending an STS or corporate event cannot
use the SAGC to determine the typical distributor's experience. The Federal Trade Commission
(FTC) has made clear the standard for evaluating income representations: "If participants generally

do not achieve such results, these representations likely would be false or misleading to current or
prospective participants." Herbalife collects all the earnings data needed to make the information
meaningful yet fails to do so.

39.     At the direction of the DSA, Herbalife and other member firms are invited to examine legal
precedent. Three cases brought prior to 2009 show FTC concern for messaging by MLM
companies and their distributors about "likely" earnings (Figure 2). Thus, the FTC demonstrated
an ongoing concern for typical or representative distributor experience. Average earnings based
on a known skewed earnings distribution do not show "likely" earnings and therefore fail to meet
that standard.

40.     The second piece of information of possible interest to distributors would be the historic
probability of achieving a given earnings level. Here too the SAGC obscures rather than informs.
According to the 2015 SAGC, 187 distributors earned $250,000 or more in 2015 (.3%) and another
450 distributors earned between $100,001 and $250,000 (.7%). The two comprise 1.0% of all
distributors with a downline. Does that then mean that in 2015 any distributor has a 1% chance of
earning more than $100,000? No, it does not. For that conclusion to be true each distributor would
face the same probabilities of success and they clearly do not. In fact, distributors who have
achieved high ranks in the marketing plan persist year after year. If half of those earning more than
$250,000 each year persist from the year before due to their established downlines, then the
probability of a distributor not in that top group earning that amount is reduced to .15%. If 90% of
all distributors earning more than $250,000 per year persist year after year then the probability
goes from .3% to .03%. Despite having data that could inform distributors, Herbalife persists in
producing SAGC that obscure information important to distributors and insists that the obscured
information be posted at each event.

41.     Changing the SAGC over time prevents comparisons. For years 2008 thru 2011 each
SAGC provided average earnings according to rank in the marketing plan (2011 also provided
mean earnings). From 2012 thru 2015 the SAGCs categorized grouped earnings according to
earnings amounts (e.g., $5,001 to $10,000, $10,001 to $25,000, etc.). A separate SAGC in 2015
grouped earnings in broad categories with minimum earnings (e.g., 50% made more than $245;

10% made more than $4,350, etc.). In 2016 the SAGC followed this pattern of minimum earnings in broad categories (i.e., 50%, 10%, 1%). Beginning in 2017 the SAGC format followed the approach from the preceding year but separated new from current distributors (e.g., 10% of new distributors earned more than $740; 10% of other distributors earned more than $3,450). On top of the fatal flaws that characterize all SAGC, changes in the SAGC format over time makes comparisons virtually impossible. Contrary to DSA Ethics and FTC guidance, the various formats are incomplete and misleading.

42.     Herbalife also does not explain even apparent changes in the data. For example, the 2015 SAGC identified 780 distributors in the top 1%, by 2017 and 2018 the number dropped to 300 and 420, respectively. What happened? The separation of new distributors into a separate column will not account for the difference as the average earnings of their top 1% certainly would not have placed them in the top 1% when all distributors are considered. A decline in the number of top 1% distributors would seem an important piece of information. While Herbalife wants distributors to persist year after year, celebrates the growth in and attendance at STS events (more on this later), and requires that SAGC information be posted at each event, in fact, the company repeatedly fails to use available date to provide distributors and prospective distributors meaningful information on typical distributor earnings.

Q. So what do you understand that to mean?
A. Well, I'm looking at that. It's just showing the total numbers -- the top 1 percent, about 780, earned over $82,000 in earnings. And it also shows that the average 1 percent took between 3 to 35 years in the business, averaging 13 years, to get to that point.
Q. Are you in that top 1 percent?
A. Yes, I am.
Q. Would you understand this to mean that a person has a 1 percent chance of making it to the top?
A. No.
Q. If a new person was starting right now and they were looking at this disclaimer, what is -- what do you think this indicates what a new person's chances are of making it to the top?
A Well, looking at this, it just shows the amount of people that actually made it to that -- to the top in that length of time. It's just giving facts. (Morrow Dep. 72:19—73:16)

43.     As Mr. Morrow noted, the SAGC does not represent the probability of making it to the top 1% or 10%. However, his description of the SAGC as "facts" that shows, "the amount of people that actually made it to that – to the top in that length of time" actually misrepresents the data.

Static data represents a point in time, not a "length of time." In other words, the SAGC does not show the amount of people who made it "to the top" that year. Rather, it shows the number of people in top categories that year. Some top earners persist year after year. They did not make it "to the top" that year but, rather, kept from falling out of the top. If the percentages and numbers provided do not represent the probability of success, then what do they represent? More importantly, how might the data be understood or misunderstood? Might even an experienced Herbalife distributor look at the SAGC and come to the wrong conclusion? Mr. Tartol—an Herbalife distributor since 1981, Chairman's Club member, and fifteen-year member of the Herbalife Board of Directors—did, twice. Mr. Tartol believes the SAGC provides a good "overview" for distributors, yet, twice claimed incorrectly that a distributor had a 1% chance of earning $14,270 or more per month. His faulty conclusion ignored: 1) his familiarity with distributors in top earning positions, 2) that the SAGC in question showed new distributors in the top 1% earning only a fraction of that earned by established distributors in the top 1%, and 3) that according to the SAGC it took five years minimum to reach President's Team.

Q. And do you believe that the SAGC, in its current form, gives the audience a good idea of the typical results that can be expected from pursuing the Herbalife business opportunity?
A. Yeah.  I think it gives 'em a good overview. (Tartol Dep. 247:1-8)
Q. So if you're talking to a popular new distributor, you're going over the SAGC with them --
  what're -- what is a new person's chances of making it  into this top one percent group?
A. From reading it, I'd say one percent. (Tartol Dep. 252:5-11)
Q. Yes. And I'd asked -- I asked you before if you're showing a new distributor this slide, what percentage chance do they have of making it to the $14,270-a-month level?
A. Again, if I was reading, I'd say the top one percent.  It's one percent. (Tartol Dep. 264:2-9)

44.     That long-time top distributors fail to understand the meaning of frequently distributed earnings data, while others ignore the relevance, demonstrates a lack of concern for distributor understanding. Yet, DSA Ethics 1h requires that, "Independent salespeople shall not abuse the trust of individual consumers, or exploit a consumer's age, illness, handicap, lack of understanding or unfamiliarity with a language." Despite statements by Herbalife representatives, even top distributors clearly lack a shared understanding of the meaning of the SAGC, a document so important that it is to be posted at all events.

27     30

**VI. Herbalife adopted a hear-no-evil, see-no-evil, speak-no-evil approach to information shared with downline distributors and potential distributors, failing to share available data relevant to the decision to become or remain an Herbalife distributor and to follow the Circle of Success regime.**

44.     Herbalife collects a considerable amount of data, including data on corporate event attendance. However, when it comes STS events attendee information (i.e., names and distributor number) are either not collected or if collected not analyzed. This lack of analysis for STS event attendance happens concurrent with corporate messaging and speakers on the stage promoting the importance of attendance. Choosing not to analyze STS event attendee data provides Herbalife with deniability regarding the benefits of following the Circle of Success.

Q. Do you believe that there is a correlation between product sales and events?
A Yes.
Q. And what is that correlation?
A. They receive training and education about the product, and I feel that they're better equipped to do what they do in the field based on attending events.
Q. So you think people are more capable of selling product as a result of events, and therefore it is your supposition that there is an increase in product sales as a result of events?
A. I think so, yes.
Q. But you've never seen any data to support that?
A. I don't know.
Q. As you sit here today, are you aware of any data that supports that?
A. I don't know. (Bogard Dep. 122:6-24)

45.     Corporate deniability is also possible in terms of earnings claims made by STS event speakers. For corporate events Herbalife requires that speakers substantiate with the company earning claims they intend to make. Speakers at STS events are not so obligated even though DSA Ethics 8b1 clearly states, "Earnings representations and sales figures must be truthful, accurate, and presented in a manner that is not false, deceptive or misleading." Herbalife monitoring of STS events is spotting, non-systematic, and without any apparent intent. Attendees at STS events may or may not know if Herbalife substantiates or monitor earnings claims made by speakers. It is clear, however, that while Herbalife may expect STS event speakers to adhere to company policies, no effort is made to ensure this happens except for at corporate events.

Q. But this is talking about substantiation for earnings claims. Does an independent distributor that makes an earnings claim at an STS have an obligation to substantiate that to corporate?
A. They have an obligation to follow our policies and rules, yes. Do we ask them to substantiate? Corporate events, yes. STSs, no. (Bogard Dep. 281:4-10)

Q. In other words, if a distributor makes a misrepresentation at an STS, he or she will be subject to the rules of conduct; correct?
A. Yes.
Q. And what does Herbalife do to monitor misrepresentations made at STSs?
A. I'm not in that department, but we have ambassadors which report into MPC. So they would be the ones who would receive that.
Q. And ambassadors are people that attend STSs?
A. They -- ambassadors are employees who live within the different cities, and so they would attend STSs, yes.
Q. And how often do ambassadors attend
A. I don't know.
Q. How many ambassadors are there?
A. I don't know.
Q. It's fair to assume that ambassadors are not attending every STS; correct?
A. Correct
Q. There's not thousands of ambassadors; correct?
A. Correct.
Q. And do you know whether these ambassadors are known to the independent distributors that are putting on the STS?
A.Yes.
Q. They are known. (Montesino Dep. 173:19—174:23)

46.     In the words of one speaker recruiting is "what we do" but the "how" will often be explained simply as "hard work" and "luck." The all-against-all competition inherent in the multi-level marketing structure and the legacy positions of top earners with large downlines means that each distributor faces an unknown level of competition. The same is not necessarily true for their upline distributors. Top distributors can have long histories in certain regions, family members in their downlines (a fact ironically celebrated on stage), and access to data unavailable to downline distributors. This asymmetric information structure favors top distributors with Herbalife's support and at the expense, literally and figuratively, of struggling downline distributors and the new recruits that will replace them. When asked why downline distributors do not achieve success the common response appears to be: blame the distributor. Here too, the FTC has expressed concerns, "While prospective recruits are sometimes told that some Trek representatives fail, they are also told that lack of success cannot be blamed on the system, but rather only on the insufficient efforts

of those who failed." (Waldron Depo. At 35; Peterson Depo. At 176; Gioiosa Depo. At 202; Tartol
Depo. At 151)


By: s/   *William W. Keep*

References:

https://www.ftc.gov/sites/default/files/documents/cases/2002/12/021216comp0123096.pdf

https://www.truthinadvertising.org/wp-content/uploads/2015/09/FTC-v-NexGen3000-complaint.pdf

https://www.ftc.gov/sites/default/files/documents/cases/2005/05/050512cmp2by2net.pdf

https://www.ftc.gov/sites/default/files/documents/cases/2005/05/050512stip2by2net.pdf

https://www.ftc.gov/sites/default/files/documents/cases/2007/06/061207complaint.pdf

https://www.consumer.ftc.gov/articles/0065-multi-level-marketing-businesses-and-pyramid-schemes

Appendix A

# William W Keep                                      Curriculum Vitae

Home Address:                                    Work Address:
196 High Meadow Lane                             The College of New Jersey
Mystic, CT 06355-1652                            School of Business
203-915-3165                                     PO Box 7718
                                                 Ewing, NJ 08628-0718
                                                 609-771-3064
                                                 Email: keep@tcnj.edu

## Education
PhD 1991          Eli Broad College of Business, Michigan State University
                      Major: Marketing     Minors: Philosophy, Psychometrics

BA 1981           James Madison College, Michigan State University
                      Dual Major: Social Science and Economics

Electronics Technician        United State Coast Guard (Active Service 1970-1974)

## Appointments
2009 – Present            Professor of Marketing
2018 – 2020               Interim Provost / Vice President for Academic Affairs
2009 – 2018               Dean, School of Business, The College of New Jersey
2007 (January – June)     Dean, Sprott School of Business, Carleton University
2002 – 2005               Associate Vice-President for Academic Affairs, Quinnipiac University
2001 – 2009               Professor of Marketing, Quinnipiac University
1999 – 2002               Director of Assessment, School of Business, Quinnipiac University
1998 – 2001               Associate Professor of Marketing, Quinnipiac University
1991 – 1998               Assistant Professor of Marketing, University of Kentucky

## Faculty Record
### Research                                      ### Consulting
• Competitive Channel Strategies                  • Analysis of Marketing Channels (Expert Witness)
• Long-Term Business Relationships                • Marketing from the Inside Out
• Marketing: Ethical & Legal Issues               • Marketing Equity and Integrity
• Marketing History                               • Assessment of Strategy Implementation

### Teaching
• Marketing Management – MBA                      • Marketing Strategies: Case Analysis
• Marketing Planning – MBA                        • Business Ethics
• Top Management Leadership & Ethics – MBA        • Marketing Principles
• Marketing Communications – MBA                  • Services Marketing
• Channels of Distribution                        • Business-to-Business Marketing
• Retailing                                       • Database Marketing

## Peer-Reviewed Journal Publications
William W Keep and Peter J Vander Nat (2014), "Multilevel Marketing and Pyramid Schemes in the United States: An Historical Analysis," *Journal of Historical Research in Marketing*, 6 (2), 188-210

William W Keep                          2                          April 2020

Tarique Hossain, William W Keep, and Susan Peters (2012), "Does Corruption Impede and Bilateral Tax Treaties Help Foreign Direct Investment?" *International Journal of Business Insights and Transformation*, 4 (3), 40-47

David Burns, Chris Manolis, and William W Keep (2010), ''Fear of Crime on Shopping Intentions: An Examination,'' *International Journal of Retail & Distribution Management*, 38 (1), 45-56

William W Keep and Gary P Schneider (2010), "Deception and defection from ethical norms in market relationships: a general analytic framework," *Business Ethics: A European Review*, 19 (1), 64-80

**Book Chapters, Books, Cases and Abstracts**
William W Keep (2019), "S.C. Hollander: Retailing and Marketing Scholar," In History of Marketing Thought in the United States, part 2: 157-185. Marketing History Society of Japan, ed.

**Memberships**
American Marketing Association

# Media Mentions, Expert Witness, Consulting & Training
**Media Mentions**
Numerous radio, television, newspaper, and popular press interviews on contemporary marketing topics: *Bloomberg TV, Business Talk Radio* (James Campbell show), *Fox Television (national and regional), Businessweek, The New York Times, The Wall Street Journal, CNBC, Financial Times, Washington Post, among others*

Published dozens of opinion pieces in outlets including: *The Chronicle of Higher Education, CNBC online, Seeking Alpha, The Hill, Trenton Times, New Haven Register, The Providence Journal,* and *The Hartford Currant,* among others

**Expert Witness Consultant – Multilevel Marketing and Pyramid Schemes**
Federal Trade Commission v. Dluca, Gatto, Pinkston, and Chandler, d/b/a Bitcoin Funding Team and My7Network (2018)
https://www.ftc.gov/enforcement/cases-proceedings/172-3107/federal-trade-commission-v-thomas-dluca-et-al-bitcoin-funding

NXIVM Corporation et al v Ross Institute et al (2017)
https://www.gpo.gov/fdsys/granule/USCOURTS-njd-2_06-cv-01051/USCOURTS-njd-2_06-cv-01051-5/content-detail.html

Freedman v Nu Skin Enterprises Inc. et al, (2016)
http://wwwlaw360com/articles/764650/nu-skin-pays-47m-to-end-investor-row-over-china-ops

William W Keep                           3                                April 2020

Calvin L Raup and Angela J Raup, v. Wells Fargo Bank, NA; et al, (2013)
https://www.law360.com/cases/51001d3b3e15cd7656000001

Schneider v Wells Fargo Bank, NA et al (2013) – Deposed
https://scholar.google.com/scholar_case?case=7434377468653142558&hl=en&as_sdt=6&as_vis=1&oi=scholarr\

Yvonne Day, et al v Fortune Hi-Tech Marketing, et al (2011)
http://wwwca6uscourtsgov/opinionspdf/13a0827n-06pdf

Proctor & Gamble v Amway Corporation (1998-2008)
http://caselaw.findlaw.com/us-5th-circuit/1453950.html
http://caselaw.findlaw.com/us-10th-circuit/1213852.html
http://caselaw.findlaw.com/us-5th-circuit/1296426.html

US Securities & Exchange Commission v International Heritage, Inc., Stanley H Van Etten, Claude W Savage, Larry G Smith and International Heritage, Incorporated (2002)
https://www.sec.gov/litigation/litreleases/lr15672.txt

United States Federal Trade Commission v Alpine Industries (2000)
http://wwwftcgov/opa/2000/04/alpineindustries2shtm

SEC v Le Club Privie (2000)
(http://wwwsecgov/divisions/enforce/claims/leprivehtm)

State of Florida v International Metals & Trade Company (IMTC) (2000)

Commonwealth of Kentucky v Travelmax (1996)

US Department of Justice v Gold Unlimited (1996)
http://caselaw.findlaw.com/us-6th-circuit/1390933.html


**Marketing Consultant & Training**: Radio Frequency System (a division of Alcatel); Gaylord Hospital; Anthem Blue Cross and Blue Shield, Northeast Region; Transcentive Corporation; SuperAmerica (a division of Ashland Oil); and multiple small businesses

## Appendix B

A.   *United States v. Richard Maike*, (2017 to present)

B.   *FTC v. DLuca, Gatto, Pinkston, and Chandler (also d/b/a Bitcoin Funding Team and My7Network* (2019)

C.   *NXIVM Corporation, et al. v. Sutton, et al.* (2017)

D.   *Freedman v. Nu Skin Enter. Inc.* (2016)

E.   *Raup v. Wells Fargo Bank, N.A.* (2013)

F.   *Schneider v. Wells Fargo Bank, N.A.* (2013)

G.   *Day v. Fortune Hi-Tech Mktg.* (2011)

H.   *Proctor & Gamble v. Amway Corp.* (1998-2008)

I.   *SEC v. Intern. Heritage, Inc.* (2002)

J.   *FTC v. Alpine Indus.* (2000)

K.   *SEC v. Le Club Privie* (2000)

L.   *State of Florida v. Intern. Metals & Trade Co.* (2000)

M.   *Commonwealth of Kentucky v. Travelmax* (1996)

N.   *United States v. Gold Unlimited* (1996)

# EXHIBIT B

```
 1            UNITED STATES DISTRICT COURT

 2     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   MICHAEL LAVIGNE, ET AL.,   )
                                )
 5         PLAINTIFFS,          ) CASE NO.
                                ) 2:18-cv-07480-JAK (MRWx)
 6   vs.                        )
                                )
 7   HERBALIFE LTD., ET AL.,    )
                                )
 8        DEFENDANTS.           )
 9   _____)

10

11

12     VIDEO-RECORDED DEPOSITION VIA VIDEOCONFERENCE OF

13              WILLIAM W. KEEP, Ph.D.

14            THURSDAY, FEBRUARY 4, 2021

15

16

17

18

19

20

21

22   JOB NO. 4446851

23   REPORTED STENOGRAPHICALLY BY:

24   MARY K. MEDLEY, CSR NO. 9557

25   PAGES 1-188
```

                                                    Page 1

```
 1      VIDEO-RECORDED DEPOSITION VIA VIDEOCONFERENCE OF
 2      WILLIAM W. KEEP, Ph.D., TAKEN ON BEHALF OF THE
 3      DEFENDANT, AT 7:01 A.M. TAIPEI STANDARD TIME,
 4      THURSDAY, FEBRUARY 4, 2021, BEFORE MARY K. MEDLEY,
 5      CSR NO. 9557.
 6
 7      APPEARANCES OF COUNSEL:
 8      (ALL PARTIES PRESENT VIA
 9      VIDEOCONFERENCE/TELEPHONICALLY)
10
11      FOR PLAINTIFFS JENNIFER RIBALTA, JEFF RODGERS,
        PATRICIA RODGERS, AND IZAAR VALDEZ:
12
             JASON JONES, ATTORNEY AT LAW
13           BY:  JASON M. JONES, ESQ.
             1147 HUNTER AVENUE
14           COLUMBUS, OHIO 43201
             (312) 237-0275
15           JASON@JONESATLAW.COM
16
17      FOR DEFENDANT HERBALIFE INTERNATIONAL OF AMERICA,
        INC.:
18
             BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS,
19           LINCENBERG & RHOW, P.C.
             BY:  MARK T. DROOKS, ESQ.
20           1875 CENTURY PARK EAST, TWENTY-THIRD FLOOR
             LOS ANGELES, CALIFORNIA 90067-2561
21           (310) 201-2100
             MDROOKS@BIRDMARELLA.COM
22
23
24
25
```

Page  2

```
 1     APPEARANCES OF COUNSEL (CONTINUED):

 2

 3     FOR INDIVIDUAL DEFENDANTS:

 4          LTL ATTORNEYS, LLP
            BY:  JOE H. TUFFAHA, ESQ.

 5          300 SOUTH GRAND AVENUE, FOURTEENTH FLOOR
            LOS ANGELES, CALIFORNIA 90071

 6          (213) 612-8900
            JOE.TUFFAHA@LTLATTORNEYS.COM

 7

 8     ALSO PRESENT: ROBERT PETERSON

 9                   PATTI SABEL, ESQ.

10                   JULIE TING, ESQ.

11                   DONALD STAMPER, VIDEOGRAPHER

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              Do you understand that?                    15:05:48

 2        A.  Yes, I understand.

 3        Q.  And that's agreeable with you?

 4        A.  Agreeable to me.

 5        Q.  Thank you.                                   15:05:56

 6              Are you being compensated for your work in

 7    this case?

 8        A.  I am.

 9        Q.  At what hourly rate?

10        A.  $150 per hour and $300 per hour during the  15:06:05

11    deposition.

12        Q.  And what is the total amount of your

13    compensation to date --

14        A.  I --

15        Q.  -- whether paid or not?                      15:06:16

16        A.  Sorry?

17        Q.  Whether paid or not, what is the total

18    amount?

19        THE REPORTER:  Sorry, I didn't hear you.

20        MR. DROOKS:                                      15:06:30

21        Q.  I didn't --

22        A.  Just a little over $20,000.

23        Q.  And how much of that has been paid?

24        A.  About 15-.

25        Q.  Now, in your report, you say that -- on      15:06:47
```

Page 8

1    page 2, you say that your training and experience            15:06:53

2    render you qualified to provide opinions here

3    because they, quote, provide "a relevant perspective

4    in understanding multilevel marketing company

5    practices."                                                    15:07:06

6         A.   Yep.

7         Q.   And is that the basis on which you are

8    claiming expertise sufficient to qualify you as an

9    expert witness in the case?

10        A.   Yes.                                                  15:07:24

11        Q.   Now, do many multilevel marketing companies

12   and other direct sales companies put on events for

13   their distributors?

14        A.   I don't know.

15        Q.   So your studies of multilevel and direct        15:07:42

16   sales companies over these many years have not

17   revealed whether or not it's a common practice among

18   multilevel marketing and other direct sale

19   companies; is that correct?

20        A.   So I have seen examples of it, but there        15:07:59

21   are many hundreds of multilevel marketing companies.

22   So I've seen examples of them.

23        Q.   So you're aware that other MLMs and direct

24   sales companies will put on events for their

25   distributors.                                                   15:08:13

                                                         Page 9

```
 1          Q.  And as far as you know, there's nothing      15:10:01

 2    inherently fraudulent about any multilevel marketing

 3    organization putting on such events; is that --

 4          A.  Correct.

 5          Q.  And there's nothing inherently fraudulent     15:10:10

 6    about certain distributors putting on events for

 7    other distributors; is that correct?

 8          A.  Correct.

 9          (Interruption in proceedings.)

10          THE VIDEOGRAPHER:  This marks the beginning of    15:20:56

11    media two.  It's 7:20 a.m.  We are on the record.

12          MR. DROOKS:

13          Q.  Is it your opinion that it's wrong to make

14    misrepresentations at events?

15          A.  Yes.                                          15:21:18

16          Q.  And is it your opinion that it's wrong to

17    make misrepresentations to induce people to attend

18    events?

19          A.  Yes.

20          Q.  Now, in your report, your -- and -- Strike    15:21:30

21    that.

22              Just so we can make sure we're

23    understanding each other, if I reference "your

24    report," I'll be referencing your initial report.

25              And if I want to talk about or refer you to   15:21:42
```

                                                    Page 11

```
 1    message given to them.                            15:49:58

 2         Q.  But I didn't ask you about the intent of

 3    the message.  I'm asking intent of the attendees --

 4         A.  Right.  I just have to make sure my answer

 5    is understood in the context.                     15:50:09

 6         Q.  So it is not your opinion -- Well, strike

 7    that.

 8             Is it your opinion that the majority of

 9    people attending Herbalife corporate events attend

10    because they believe it will assist them in becoming  15:50:26

11    more successful?

12         MR. JONES:  Objection.  Lacks foundation.

13         THE WITNESS:  I don't know what questions they

14    have in their mind about attending and its

15    relationship to success.                          15:50:44

16             I believe the possibility of success is a

17    motivating factor for most people who attend, and I

18    don't know how convinced they are of that

19    possibility.

20         MR. DROOKS:                                  15:51:00

21         Q.  So retention is not an ethically

22    inappropriate goal of an MLM, is it?

23         A.  I think it is.

24         Q.  Why?

25         A.  Because I think that -- at least the data I  15:51:33
```

Page 32

1    have seen on every MLM I have looked at, there's a          15:51:36

2    very high failure rate.

3           And so the company is in a position to

4    encourage people to keep trying at something that

5    they know large percentages will fail at.  And in          15:51:49

6    trying, the company benefits financially so they

7    have this self-interest in promoting retention.

8           And, in fact, the longer people keep

9    trying, the more they keep purchasing products to

10   qualify, the more money Herbalife and its top              15:52:08

11   distributors make.

12          And these efforts are all with full

13   knowledge that most of those distributors will not

14   have a net positive financial end result.

15       Q.  The fact that most distributors do not have     15:52:24

16   a net positive financial result is widely available

17   to distributors; isn't that correct?

18       A.  It is, but I --

19       Q.  Thank you.

20       A.  Yes, it is.                                       15:52:37

21       Q.  And so do you have any reason to believe

22   that those people who are attending Herbalife events

23   are not aware of the probability of success and --

24       A.  Yes.

25       Q.  -- eventual (unintelligible)?                     15:52:57

Page 33

```
 1      "facilitate" means that they have increased success   15:54:14

 2      of distributors.

 3           Q.  Make it more possible, that's right.

 4           A.  More apparently possible or more possible

 5      as told to them?                                      15:54:29

 6           Q.  No, to make them more successful.  Not to

 7      create the appearance of success.  That wasn't my

 8      question.

 9           If you make distributors more successful,

10      are they more likely to stay with the business       15:54:45

11      opportunity longer?

12           A.  That's verifiable, yes.

13           Q.  And if you make distributors more

14      successful, does that make Herbalife more

15      successful?                                           15:55:00

16           A.  I don't know.

17           Q.  So making distributors more successful is

18      entirely consistent with the goal of retention; is

19      that right?

20           MR. JONES:  Objection.  Calls for speculation,   15:55:15

21      lacks foundation.

22           THE WITNESS:  Making small number of people

23      more successful may, in effect, increase retention,

24      but it doesn't make success a goal that has -- or

25      expressly to build the goal of retention.            15:55:41
```

Page 35

```
 1          MR. DROOKS:  So move to strike everything    15:55:44

 2    beginning with "but" in Dr. Keep's answer as

 3    nonresponsive.

 4          Q.  I just want to hone in on this.

 5               Making distributors more successful is not    15:55:55

 6    inconsistent with the goal of retention; isn't that

 7    correct?

 8          A.  As a standalone statement, I agree with it.

 9          Q.  Now, some ways to improve the likelihood of

10    success would be to educate distributors concerning    15:56:19

11    new product; is that right?

12          A.  I think you already asked me that and I

13    agreed.

14          Q.  Some ways to improve the likelihood of

15    success would be to assist distributors in building    15:56:32

16    downline; right?

17          A.  Yes.

18          Q.  And it would be important to distributor

19    success to educate them concerning ethical issues;

20    isn't that correct?                                    15:56:50

21          A.  Concerning?  Sorry?

22          Q.  Ethical issues.

23          A.  Yes.

24          Q.  Are there legitimate goals and purposes for

25    events such as the ones Herbalife puts on?             15:57:06
```

Page 36

```
 1          MR. JONES:  Objection.                        15:57:12

 2          THE WITNESS:  Not comfortable -- I mean, I

 3     don't know what the meaning of "legitimate" is in

 4     this context.

 5              You mean legal?                            15:57:20

 6          MR. DROOKS:

 7          Q.  Well, your -- your report purports to

 8     determine that Herbalife has violated certain

 9     ethical norms in the industry; is that right?

10          A.  Yes.                                       15:57:35

11          Q.  Okay.  Are there any goals for Herbalife

12     events that, in your mind, do not violate ethical

13     norms?

14          A.  Given my position that a goal -- overriding

15     goal is -- the overriding unspoken goal is          15:58:03

16     retention, then my answer's no.

17          Q.  Now, retention and distributor success are

18     not mutually exclusive goals; is that correct?

19          A.  They are not mutually exclusive.

20          Q.  And I believe you agreed that distributor   15:58:26

21     success would tend to improve retention; is that

22     correct?

23          A.  I did, yes.

24          Q.  So Herbalife's goals could have included

25     both improving the likelihood of distributor success 15:58:39
```

Page 37

```
 1        Q.  Anything else?                            16:03:10

 2        A.  No.

 3        Q.  Is it your professional opinion that

 4   corporate events provide no value whatsoever to

 5   those who attend?                                   16:03:23

 6        A.  No.

 7        Q.  Is it your professional opinion that STS

 8   events provide no value whatsoever to those who

 9   attend?

10        A.  No.                                        16:03:35

11        Q.  Now, do you have any reason to believe that

12   individual distributors can't make the determination

13   as to whether the benefits they receive justify the

14   cost of the event --

15        A.  Yes.                                       16:03:58

16        Q.  -- with respect to --

17        A.  Yes.

18        Q.  What is that reason?

19        A.  Because I don't think that individual

20   distributors can assess the probability of success   16:04:06

21   which they're pursuing, nor do I think that the

22   quality statements that are made from speakers at

23   events, I don't think that it's easy for

24   distributors to assess the relative value

25   whatsoever.                                          16:04:38
```

                                                Page 41

```
 1    versus sophisticated at any given event --        16:15:27

 2         A.  I -- I know that any people have a variable

 3    capacity when it comes to communication and that's

 4    what this paragraph is to address.

 5         Q.  Now --                                    16:15:42

 6         MR. JONES:  Can we take a break, Mark, when

 7    it's convenient for you.

 8         MR. DROOKS:  Yeah, sure.  This is fine.

 9         THE VIDEOGRAPHER:  Marks the end of media two.

10    It is 8:16 a.m.  We are off the record.            16:16:11

11         (Interruption in proceedings.)

12         THE VIDEOGRAPHER:  This marks the beginning of

13    media three.  It is 8:24 a.m.  We are on the record.

14         MR. DROOKS:

15         Q.  Now, before we went off the record, I think  16:24:29

16    we had established that it's your opinion that

17    events provide some value to distributors but --

18    that's point one; and point two is you don't believe

19    many distributors are capable of assessing whether

20    the benefits they receive at events justify the   16:24:57

21    cost; is that correct?

22         A.  Correct.

23         Q.  Are you able to quantify the value that's

24    received at events for distributors?

25         A.  I am not, in part because of the value is  16:25:13
```

Page 50

```
1      said.                                           16:27:03

2          MR. DROOKS:

3          Q.  If Herbalife's goal is retention and they

4      offer something of value to their distributors,

5      which their distributors apparently want and go to  16:27:12

6      events to receive, in your opinion, that's unethical

7      if Herbalife does not affirmatively tell the

8      distributors that their goal is to retain them?

9          A.  And what -- And the implications of

10     retention given the environment of failure.       16:27:32

11         Q.  So what you believe is unethical on

12     Herbalife's part is that they have failed to

13     adequately disclose the likelihood of success or the

14     lack thereof to distributors who attend events; is

15     that correct?                                     16:27:48

16         A.  No, that's not correct.

17         Q.  Why is that not correct?

18         A.  Because the -- you missed pieces of things

19     to me of what we had just said.  That's why it's not

20     correct.                                          16:28:10

21         Q.  What pieces did we miss?

22         A.  It is my report, it says that retention is

23     the unspoken goal and despite whatever small benefit

24     the distributor might get from attending an event,

25     they are unaware of the real goal, which is to    16:28:34
```

Page 52

1   retain them to keep trying in an environment where a   16:28:42

2   large percentage will achieve no financial success.

3   That's, in my view, not just unethical but

4   potentially illegal.

5        Q.  And so your view is that unless Herbalife   16:28:57

6   discloses or tells distributors that their real goal

7   is to use the events to retain their commitment to

8   the Herbalife business venture, it's unethical to

9   put on the event?

10       A.  That's not what I said.   16:29:34

11       Q.  What's wrong with that?

12       MR. JONES:  Object to form.

13       MR. DROOKS:

14       Q.  It seems to me that what you're saying is

15   that Herbalife is not allowed to put on events   16:29:46

16   unless Herbalife goes ahead and explains to the

17   people who attend the events why Herbalife is

18   putting them on.

19           Isn't that the (unintelligible) of what

20   you're saying?   16:30:02

21       MR. JONES:  Objection.

22       THE WITNESS:  The -- Why Herbalife is putting

23   them on is what I found incomplete in your last

24   question.

25       MR. DROOKS:   16:30:15

Page 53

```
 1    time again at my cost and at her benefit.  That, to    16:40:55

 2    me, would be a more similar analogy.

 3         Q.  Your second opinion in your report is that

 4    "STS events," quote, "are misrepresented as

 5    completely independent and under local control."     16:41:43

 6         A.  Yes.

 7         Q.  Who made that representation?

 8         A.  Oh, multiple distributors in their

 9    depositions or all others, they claim that they're

10    independent.  I provide -- I provide references to   16:42:02

11    every paragraph where I attribute to the deposition.

12         Q.  Right.

13             And so this is what I want to understand:

14    Are you saying that these misrepresentations are

15    made by witnesses in this case for purposes of the   16:42:16

16    fact-finder in this case?

17         A.  I guess I'm not really familiar with the

18    term "for purposes of the fact-finder."

19             I believe that they were asked in

20    depositions whether or not they considered these     16:42:34

21    events to be independent and they said yes.

22         Q.  Right.

23             So what I want to -- what I want to gather

24    is -- Well, let me ask the question this way:  To

25    whom did these distributors who were deposed make    16:42:49
```

Page 61

1    these representations?                                16:42:52

2         A.   Well, they made them in the deposition.   I

3    have -- It is my belief that that would be not the

4    only place they would make them, given the tone of

5    the depositions, in terms of coordinators of STS       16:43:13

6    events and the description of the development of the

7    events.   In other words, I believe that the

8    communication about the independence of the event

9    extends beyond the deposition.

10        Q.   So let me see if I understand this.          16:43:34

11             People were deposed in this case; is that

12   right?

13        A.   Yes.

14        Q.   Some of them were distributors; is that

15   correct?                                               16:43:46

16        A.   Yes.

17        Q.   And those distributor witnesses were in

18   some way -- they in some way gave testimony that

19   they had been involved in putting on events in one

20   portion of the country or region or area or another;  16:43:59

21   is that correct?

22        A.   Yes.

23        Q.   And when asked a question at the deposition

24   as to who controlled some aspect of the STS event

25   process, they testified that it was individual local  16:44:14

                                           Page 62

```
 1    distributors; is that correct?                    16:44:17

 2        A.  Yes, and that they could do what they

 3    wanted.

 4        Q.  And did any of them testify that they had

 5    told that to anybody, to any distributors to induce  16:44:29

 6    them to come to events?

 7        A.  Did they induce -- Yeah, I -- I think that

 8    the whole message is this is our event, this is the

 9    Houston event, this is for us, this is ours, we do

10    it our way, it's ours.                            16:44:50

11        Q.  I've got to move to strike that as

12    nonresponsive because the question was, did any of

13    those witnesses that you were citing actually

14    testify that they had told other distributors who --

15    in order to induce those distributors to come to   16:45:07

16    events that the events were not controlled by

17    Herbalife?

18        A.  I believe they did.  I would have to go

19    back and find the documentation, but I believe -- I

20    believe that they did.                            16:45:22

21        Q.  So is it your opinion that certain

22    Herbalife distributors made representations to other

23    Herbalife distributors that the events were locally

24    controlled --

25        A.  Yes.                                      16:45:48
```

                                                Page 63

1       Q.   -- in order to induce those people to                16:45:48

2   attend the event?

3       A.   Yes.

4       Q.   Why would, in your mind -- Well, strike

5   that.                                                          16:45:56

6            How frequently did that happen?

7       A.   I don't --

8   MR. JONES:   Objection.

9   THE WITNESS:   No.   I don't have enough data.

10  MR. DROOKS:                                                    16:46:06

11      Q.   And the only way you know that is by

12  reading the deposition transcripts; is that right?

13      A.   Correct.

14      Q.   You never saw any documents --

15  contemporaneous documents from the time period that   16:46:12

16  made that representation; is that correct?

17      A.   Well, the documents refer to, you know, the

18  naming of these events, which are localized names as

19  opposed to, for example, the national extravaganza.

20  And events were, I believe, purposely named locally   16:46:30

21  to convey the local connection and the sort of this

22  is ours, we do it our way here kind of message.

23           And I believe that the labeling of that as

24  a communication of the labeling of that is part of

25  this communication process.                           16:46:48

Page 64

```
 1          Q.  So, in other words, you're saying that when   16:46:50

 2     an event was labeled, for example, the San Diego

 3     STS, that was done in order to induce people to

 4     believe that it was controlled by local

 5     distributors --                                        16:47:11

 6          A.  Yes.

 7          Q.  -- as opposed to inducing people to believe

 8     that it was for distributors in the STS -- in the

 9     San Diego metropolitan area?

10          A.  I believe it had more than one purpose, but   16:47:20

11     I -- I believe it could achieve both.

12          Q.  And let me go back to this.

13          The sole basis for your understanding of

14     this is -- is reading the testimony of various

15     third-party witnesses in this case --                  16:47:37

16          A.  There are multiple distributors who make

17     similar statements.

18          Q.  And you don't have any greater ability to

19     reach this inference than your average juror, do

20     you?                                                   16:47:47

21          MR. JONES:  Object to the form.

22          THE WITNESS:  I don't.  I -- I don't agree with

23     that statement.  I think I do.

24          MR. DROOKS:

25          Q.  You are -- You're better able to determine    16:47:57
```

                                                     Page 65

1    whether or not events were locally controlled?          16:47:59

2         A.   No, the -- I -- I didn't take that as your

3    question, and I apologize if I misunderstood.   I --

4         Q.   Let's begin with that.   Let's begin with

5    that.                                                      16:48:15

6              What is it that qualifies you more than any

7    juror to determine whether events were, in fact,

8    under local control?

9         A.   Because I spend a lot of time and have been

10   trained to spend a lot of time thinking about the         16:48:27

11   purpose of communications, part of the marketing

12   discipline.

13             I think the average juror may have spent --

14   would have spent -- I should probably say may --

15   would have spent less time thinking about the             16:48:37

16   purpose of communications and the multiple goals

17   that a single communication can have.

18        Q.   So -- Anything else?

19        A.   No.

20        Q.   Okay.   So it's just that as a professor of    16:48:55

21   marketing, you understand communication better than

22   jurors; is that right?

23        A.   In the context of business and

24   marketing-related communication.

25             I just want to make sure -- I want to be        16:49:08

                                                        Page 66

1      Q.   And you -- In your opinion, certain          17:21:23
2    individual distributors would be more likely to
3    attend events if they understood them to be
4    controlled, whatever that means, by local
5    distributors; is that right?                        17:21:45
6      A.   Yes.
7      Q.   And what percentage?
8    MR. JONES:   Objection.   Calls for speculation.
9      THE WITNESS:   I don't -- I can't put a
10   percent -- percentage on it, I just think it's --   17:22:00
11   it's seen as a positive, in general, that it's a
12   local event.
13     MR. DROOKS:
14     Q.   What is your basis for that?
15     A.   I think we already covered that, and I       17:22:11
16   think that -- that, you know, recruiting and
17   networking takes place locally.
18          I think that one of the problems here is I
19   think that people have multiple reasons for doing
20   something, for engaging in a behavior.   So when you 17:22:24
21   pick one reason and you ask me to put a probability
22   on that reason, we're kind of denying the fact that
23   there are multiple reasons and that the decision to
24   attend is based on these multiple reasons.
25     Q.   And by that you mean it's -- it's really     17:22:41

Page 90

1   impossible to determine the extent to which somebody      17:22:43

2   believing that the event was under local control

3   would have induced them to attend; is that right?

4        A.  No, no, I think it's impossible for me to

5   give a percentage of people who attended the event      17:22:55

6   because it's under local control.

7        Q.  Well, how many people who attended the

8   event -- What percentage of people who attended the

9   event would have attended anyway?

10       MR. JONES:  Objection.  Calls for speculation.      17:23:12

11       THE WITNESS:  Again, people use -- have

12   multiple reasons, so I can't say if you take one of

13   the reasons away how that would affect

14   decision-making.

15       MR. DROOKS:                                          17:23:25

16       Q.  In fact, if the -- if all of the events

17   were known to be under Herbalife control, do you

18   think nobody would attend them?

19       A.  I don't -- I -- That is not what I think.

20       Q.  So I mean, in the -- in the hypothetical      17:23:42

21   world in which Herbalife had a big sign out and made

22   clear everywhere Herbalife controls these STS

23   events, these are corporate events, you don't think

24   the events would be empty, do you?

25       A.  I do not think they'd be empty.            17:24:01

Page 91

1    Q.   Do you think people would pay less to go to        17:24:04

2    them?

3         A.   I don't know what people would pay.

4         Q.   So other than some generalized sense that

5    Herbalife distributors prefer to go to events that      17:24:19

6    they think are locally controlled, you really have

7    no other information as to the extent to which the

8    belief that they were under local control influenced

9    the conduct of any Herbalife distributors; is

10   that --                                                 17:24:37

11        A.   I don't have that data, that's correct.

12        Q.   Now, you excerpt and highlight two

13   portions -- edited portions of the DSA code of

14   ethics, is that right, in your report?

15        A.   I do.                                         17:24:56

16        Q.   One of them is deceptive and unlawful

17   consumer or recruiting practices; is that right?

18        A.   Yes.

19        Q.   And the other is under Earnings

20   Representations.                                        17:25:09

21            See that?

22        A.   Yep.

23        Q.   Are those the only portions of the DSA

24   code -- DS- -- DSA code of ethics that you believe

25   Herbalife violated?                                     17:25:18

Page 92

```
1    talking about their success that connects to these     18:31:27

2    statements.

3         MR. DROOKS:

4         Q.  And so you believe that because people talk

5    about their success and may also say that they          18:31:36

6    attended events, that's tantamount to telling people

7    that they can't succeed without attending events?

8         A.  That mis- -- misrepresents what I said.

9         Q.  I didn't understand it.

10        A.  (Unintelligible.)                               18:31:58

11        Q.  Well, let's see if we can -- You would

12   agree, would you not, that nobody told Herbalife

13   distributors that attendance at events would

14   guarantee success?

15        A.  I agree with that statement.                    18:32:37

16        Q.  I take it it's your testimony, your

17   opinion, that Herbalife strongly encouraged people

18   to attend events.

19        A.  I would use even stronger language, but

20   yes.                                                     18:34:18

21        Q.  But there's nothing wrong with urging

22   people to attend events; is that right?

23        A.  Depends on the end purpose.

24        Q.  So this all comes back to the notion that,

25   in your opinion, urging people to attend events for      18:34:31
```

Page 127

1    the purpose of retaining them as distributors is          18:34:36

2    wrongful; is that correct?

3         A.   Under the guise of success, agree with that

4    statement.

5         Q.   So in paragraph 22, you mentioned that          18:34:52

6    Herbalife crossed -- I'm sorry, 26, you mention that

7    Herbalife cross-promoted events.

8              See that?

9         A.   Yes.

10        Q.   And, again, but for the notion that you         18:35:25

11   believe that promoting events for the purpose of

12   encouraging retention is wrongful, there's nothing

13   wrong with cross-promoting events; is that right?

14        MR. JONES:   Objection.   Vague --

15        THE WITNESS:   Wrongful under the guise of           18:35:44

16   pursuing success and I agree with your statement.

17        THE REPORTER:   Could you repeat your objection,

18   Mr. Jones.

19        MR. JONES:   It was vague as to "wrong."

20        THE REPORTER:   Thank you.                           18:35:56

21        MR. DROOKS:

22        Q.   Section V of your report is devoted to

23   repetitive storytelling.   I'm sorry, that's

24   section IV; right?

25        A.   Right.                                          18:36:14

                                                    Page 128

1    industry where I cite both academic references.  And    18:43:51

2    I had looked at other documentation of MLM

3    operation.

4         Q.  In the course of your academic career,

5    which MLMs have you become familiar with?          18:44:03

6         A.  None other than mostly looking at industry

7    data.  In terms of individual companies, it might

8    have been because of a study that was relevant to

9    that one company and one, perhaps, part of that

10   company, but it -- I'm a little -- I'm struggling    18:44:28

11   here in terms of studied the company because that

12   can mean a lot of things.

13        Q.  You've testified here many times that the

14   percentage of the Herbalife distributors that

15   succeed meaning, in your estimation, is extremely    18:44:55

16   low; is that right?

17        A.  It's not my estimation.  It's a fact

18   published by Herbalife.

19        Q.  And my question is, have you studied the

20   success rates at other MLMs?                         18:45:13

21        A.  Some.  Advocare is one.

22        Q.  Which one?

23        A.  Advocare is one.

24             I looked at Jeunesse's income statements.

25   I think the old Nu Skin's.  I'd have to go back and   18:45:30

                                              Page 134

1    double-check.                                          18:45:35

2          I've written about them in articles

3    published in Seeking Alpha.  I'd have to double

4    check how many.  Probably less than six because

5    there's no legal requirement that I'm aware of that   18:45:44

6    an MLM publicly state the earnings of distributors.

7          Q.  Say that again.  There's no legal

8    requirement that MLMs publish information about the

9    success rate of their distributors?

10         A.  I believe that's correct.                    18:46:16

11         Q.  Now, among those that you studied,

12   Nanocare, Jeunesse, Nu Skin, perhaps some others,

13   did you conclude that any of them had what you

14   considered to be a -- an acceptable level of success

15   among distributors?                                    18:46:47

16         MR. JONES:  Objection.  Vague as to

17   "acceptable."

18         THE WITNESS:  Yeah, I -- I described earnings

19   and how they're being shared.  I -- I let other

20   people decide whether or not it's acceptable.          18:47:08

21         MR. DROOKS:

22         Q.  Well, isn't the fact that with respect to

23   each and every one of those entities, you were

24   highly critical of the success rate of the -- of the

25   distributors?                                          18:47:21

                                              Page 135

1     A.   Absolutely, yes.                          18:47:22

2     Q.   And isn't it the case that as to every MLM

3  you've ever published about or written about, you've

4  been highly critical of the success rate of

5  distributors?                                      18:47:33

6     A.   Yes.

7     Q.   Isn't it the case that with respect to

8  every MLM you've ever studied, you've been highly

9  critical of the distribution of income?

10    A.   Yes.                                       18:47:47

11    MR. JONES:   Objection.   Vague as to "studied."

12    MR. DROOKS:

13    Q.   In all of those cases that you list in

14 Appendix B to your report, have you ever testified

15 on behalf of an MLM?                               18:48:03

16    A.   No.

17    Q.   Would you -- Would it be fair to

18 characterize yourself as a vocal critic of MLM?

19    A.   Yes.

20    Q.   And so can you -- You leveled certain      18:48:26

21 criticisms of the Herbalife event structure.

22         Is there any MLM you're aware of that you

23 would not have the same complaints about?

24    A.   I think there is.

25    Q.   Which one?                                 18:49:04

                                          Page 136

```
 1     a particular MLM was a legitimate business          18:50:48

 2     opportunity --

 3          A.   No.

 4          Q.   -- for distributors?

 5          A.   No.                                         18:50:55

 6          Q.   And you've testified how many times, 10,

 7     12?

 8          A.   Less than that.

 9          Q.   And in each case you've testified that the

10     MLM in question was not a legitimate business        18:51:07

11     opportunity?

12          A.   I just want to be careful with the word

13     "testified."  I've generated more reports than

14     actually given testimony because in some cases,

15     cases are settled and there's no testimony or        18:51:15

16     deposition.  There are cases, of course, where there

17     are.

18          Q.   Thank you for that clarification.

19               In each of the cases listed in Appendix B

20     in which you served as an expert witness, you        18:51:32

21     testified that the MLM was not a legitimate business

22     opportunity; is that right?

23          A.   In the NXIVM case, I did not in my report

24     say it was not a legitimate business opportunity.

25     That was a situation that had a different kind of     18:51:55
```

Page 138

1   problem.                                                      18:51:58

2      Q.  So in each of the cases in which you

3   provided an expert report in which it was an issue,

4   you concluded that the MLM was not a legitimate

5   business opportunity; is that correct?              18:52:13

6      A.  I don't believe I used the word "legitimate

7   business opportunity," and I don't believe that

8   the -- I was asked to make that conclusion.

9      Q.  What did you conclude?

10     A.  Well, I might conclude that the             18:52:30

11  characteristics are there that are similar to firms

12  that have been found to be pyramid schemes.

13     Q.  And is it your view that Herbalife is a

14  pyramid scheme?

15     A.  I don't have a view on that.                18:52:42

16     Q.  And your discussion of the SAGC is in

17  section V of your report; is that correct?

18     A.  Just a second.

19     Q.  Section V is -- begins at page 22.

20     A.  Yes.                                         18:53:52

21     Q.  Now, have you reviewed Herbalife's

22  guidelines for corporate events?

23     A.  No, I don't believe I have.

24     Q.  So looking at paragraph 32, it says

25  "Misinformation, present at every event that follows  18:54:28

                                                    Page 139

```
 1        efforts and expenses that attendees incurred not        19:29:41

 2        just at events, but in between events.

 3             MR. DROOKS:

 4             Q.  Now, earlier in the deposition, you

 5        admitted that people who attended the events did         19:29:49

 6        receive some benefits; is that right?

 7             A.  Yes.

 8             MR. JONES:  Objection.  That mischaracterizes

 9        testimony.

10             Just give me a chance, Doctor.                      19:29:57

11             THE WITNESS:  Sorry.

12             MR. DROOKS:

13             Q.  Now, you also criticized Mr. Tomlin because

14        you say that he does not include expenses related to

15        this pursuit presumably of success in any               19:30:15

16        recommended calculation of damages.

17             A.  Yes.

18             Q.  Now, you're talking about expenses in the

19        pursuit of the business opportunity; is that right?

20             A.  It could be.  It could be just expenses         19:30:32

21        associated with maintaining purchases to remain

22        eligible, and I am drawing that line because in

23        pursuit of the opportunity, there may be expenses

24        related to the recruitment and retailing aspect of

25        pursuit of success, and I wanted to make sure that I     19:30:55
```

                                                        Page 161

```
 1    STATE OF CALIFORNIA    )

                             ) ss.

 2    COUNTY OF LOS ANGELES  )

 3

 4        I, MARY K. MEDLEY, CSR NO. 9557, in and for the

 5    State of California, do hereby certify:

 6         That prior to being examined, the witness named

 7    in the foregoing deposition was by me duly sworn to

 8    testify the truth, the whole truth, and nothing but

 9    the truth;

10        That said deposition was taken down by me in

11    shorthand at the time therein named and thereafter

12    reduced to typewriting under my direction, and the

13    same is a true, correct, and complete transcript of

14    said proceedings;

15        That if the foregoing pertains to the original

16    transcript of a deposition in a Federal Case, before

17    completion of the proceedings, review of the

18    transcript {X} was {  }  was not required.

19        I further certify that I am not interested in

20    the event of the action.

21    Witness my hand this 9th day of February, 2021.

22

23                                   CSR No. 9557

24        Certified Shorthand Reporter

25            State of California


                                          Page 188
```