**PAUL A. LEVIN (State Bar No. 229077)**
**MORTGAGE RECOVERY LAW GROUP LLP**
**550 North Brand Boulevard, Suite 1100**
**Glendale, California 91203**
**TELEPHONE: (818) 630-7900 FASCIMILE: (818) 630-7920**
**EMAIL:      plevin@themrlg.com**

**ETAN MARK (admitted *pro hac*)**
**DONALD J. HAYDEN (admitted *pro hac*)**
**YANIV ADAR (admitted *pro hac*)**
**MARK MIGDAL & HAYDEN**
**80 SW 8ᵗʰ Street, Suite 1999**
**Miami, Florida 33130**
**TELEPHONE: (305) 374-0440**
**EMAIL:      etan@markmigdal.com**
**            don@markmigdal.com**
**            yaniv@markmigdal.com**

**Attorneys for Plaintiffs**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MICHAEL LAVIGNE, *et al.*,<br><br>        Plaintiffs,<br><br>    vs.<br><br>HERBALIFE LTD., *et al.*,<br><br>        Defendants. | CASE NO. 2:18-cv-07480-JAK (MRWx)<br><br>[Related Case 2:13-cv-02488-BRO-RZ]<br><br>**AMENDED DECLARATION OF YANIV ADAR IN SUPPORT OF PLANTIFFS' DAUBERT MOTION TO AND MOTION *IN LIMINE* TO EXCLUDE EXPERT OPINION OF JONATHAN T. TOMLIN**<br><br>Assigned to Hon. John A. Kronstadt, Courtroom 10B |

I, Yaniv Adar, declare:

1.      I am an attorney admitted *Pro Hac Vice* in the State of California and the United States District Court, Central District of California. I am an attorney at Mark Migdal and Hayden ("MMH") and counsel of record for Plaintiffs Patricia Rodgers, Izaar Valdez and Jennifer Ribalta ("Plaintiffs") in the above-captioned matter. My knowledge of the information and events described herein derives from my personal knowledge, a careful review of the file, relevant court records and communications with other Plaintiffs' counsel, and if called as a witness, I could and would completely testify thereto.

2.      Attached as **Exhibit A** is a true and correct copy of the January 11, 2021 Expert Report of Jonathan T. Tomlin ("Tomlin Report").

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 22, 2021, at Miami, Florida.

                                                           */s/ Yaniv Adar*
                                                            Yaniv Adar

AMENDED DECLARATION OF YANIV ADAR IN SUPPORT OF PLAINTIFFS' DAUBERT MOTION TO AND MOTION IN LIMINE TO EXCLUDE EXPERT OPINION OF JONATHAN T. TOMLIN

# EXHIBIT A

1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

11

MICHAEL LAVIGNE, *et al.*,

CASE NO. 2:18-cv-07480-JAK (MRWx)

12

Plaintiffs,

[Related Case 2:13-cv-02488-BRO-RZ]

13

vs.

**EXPERT REPORT OF JONATHAN T. TOMLIN**

14

HERBALIFE LTD., *et al.*,

**January 11, 2021**

15

Defendants.

Assigned to Hon. John A. Kronstadt, Courtroom 10B

16

17

18

19

20

21

22

23

24

25

26

27

28

3693556.1

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION .................................................................................. 1

   A.   Qualifications ............................................................................ 1

   B.   Task Presented and Summary of Conclusions Reached ....................... 2

II.   BACKGROUND .................................................................................. 4

   A.   Herbalife ................................................................................. 4

   B.   Plaintiff Allegations ................................................................... 5

   C.   Herbalife Events ....................................................................... 6

III.   ECONOMIC EVALUATION OF PLAINTIFFS' PROPOSED
DAMAGES METHOD .......................................................................... 8

   A.   Economic Fundamentals of Damages Calculations ............................ 8

   B.   Restitution Damages .................................................................. 9

   C.   Reliance Damages ..................................................................... 16

IV.   CONCLUSION ................................................................................... 18

# I.   __INTRODUCTION__

### A.   Qualifications

1.   I am an economist and Senior Managing Director in the Los Angeles office of Ankura Consulting.  Ankura Consulting is an international consulting services firm with over thirty offices worldwide.

2.   I hold a B.A. in economics from the University of Pennsylvania, an M.A. in economics from the University of California, Los Angeles, and a Ph.D. in economics from UCLA.  My specialization for over twenty-five years as a business economist has been in the application of economics to legal issues. I have assessed economic damages in numerous cases involving the appropriateness of class certification.  I have also specifically assessed economic damages issues in multiple consumer class actions.

3.   I have published over twenty articles on law and economics.  My research has been published in books, peer-reviewed economic journals, and law reviews.  Many of my publications focus on the appropriate calculation of economic damages.  Several focus on the topic of damages and restitution involving consumer class actions.  My research has been accepted in such publications as the *Review of Law and Economics*, the *Journal of Forensic Economics*, the *B.E. Journal of Economic Analysis and Policy*, and the *George Mason Law Review*.  I have served as an economic commentator for the online edition of *Forbes* and for *theStreet.com*.

4.   My past and present professional affiliations include the American Economic Association, the American Finance Association, the American Law and Economics Association, and the National Association of Business Economists.  I have served as an Economics Instructor for the National Association of Certified Valuation Analysts, where I taught principles of economic damages analysis.  In addition, I have testified as an economic expert witness for cases in state and federal courts.

5.   My curriculum vitae is attached as Exhibit 1.  Ankura Consulting

is being compensated for my work on this matter at my standard hourly rate of $625.

### B. Task Presented and Summary of Conclusions Reached

6.　　I have been retained on behalf of Herbalife International of America, Inc. ("Herbalife") to evaluate, from the perspective of an economist, the damages model proposed by the Plaintiffs in this case, which Plaintiffs describe as seeking recovery of the money they spent purchasing tickets to, and attending, events."[1]  In particular, I have been asked to determine whether such a calculation of damages is capable of accurately measuring restitution and compensatory damages on a classwide basis in this case.[2]

7.　　As a result of my analysis in this case, I have the following opinions:

(a)　　With regard to restitution damages, Plaintiffs' proposed calculation would provide a "full refund" to putative class members.[3]  I am informed that, in order to establish that a "full refund" is applicable in this case, the Plaintiffs must demonstrate that they did not receive any value for the tickets they purchased.  Plaintiffs have not provided any economic support for the conclusion that class members did not receive any value from their event ticket purchases.[4]  In

---

[1]　Plaintiffs' Reply in Support of Plaintiffs' Motion for Class Certification filed January 13, 2020 ("Reply in Support of Class Certification") at page 8.

[2]　I offer no opinion on liability issues in this matter.  For purposes of my assessment of the Plaintiffs' proposed damages calculation I have been asked to assume liability.

[3]　I refer to the term "damages" in an economic sense.  I understand that, under applicable UCL law, Plaintiffs are entitled to restitution but not "damages."

[4]　I am referring to the information provided by the Plaintiffs in their Amended Complaint filed November 12, 2019 ("Amended Complaint"), Plaintiffs' Notice of Motion and Motion for Class Certification filed November 25, 2019 ("Motion for Class Certification") and Reply in Support of Class Certification.  If the Plaintiffs provide further information about their proposed damages method, I understand that

2

1  addition to the content of the events themselves, some (and perhaps many, most, or

2  all) events provided valuable products and/or services to attendees including

3  products, meals, and entertainment.

4            (b)     With regard to compensatory damages, Plaintiffs'

5  proposed method assumes that, absent the allegedly wrongful conduct in this case,

6  no putative class members would have chosen to attend an event.[5]  It also assumes

7  that the events and the travel expenses incurred by all putative class members and

8  for all events have no value.  The Plaintiffs provide no support for these strong

9  assumptions.  It is highly likely that these assumptions are inaccurate for some (and

10  perhaps many, most, or all) putative class members.

11            (c)     Determining the value any putative class member received

12  for an event ticket they purchased would require individualized analysis.  As

13  a matter of economics, it cannot merely be presumed that none of the events had any

14  value.

15            (d)     Determining the costs incurred by putative class members

16  for travel to and from events and the value, if any, such putative class members

17  obtained from such travel outside of event attendance also is inherently

18  individualized.

19            8.     In short, the Plaintiffs have not provided any reasonable

20  economic support for a classwide calculation of either restitution or compensatory

21  damages based on "the money they spent purchasing tickets to, and attending,

22  events."[6]

23

24  I may be asked to evaluate that information.

25  [5]   As explained below, I also refer to the compensatory damages sought by the

26  Plaintiffs in this case as "reliance" damages.

27  [6]   Plaintiffs' Reply in Support of Class Certification at page 8.  I also refer to

28  compensatory damages as "reliance damage" below.

3

9.      The list of materials I reviewed in performing my analysis is attached as Exhibit 2.  The basis for my opinions is summarized below.  I may update and/or revise this analysis should further information be provided to me.  I understand that I may be asked to perform an economic evaluation of any expert analysis that Plaintiffs may provide related to their proposed damages calculation.

## II.      BACKGROUND

### A.      Herbalife

10.      Herbalife is a publicly traded company that "provides nutrition solutions for consumers looking to achieve results in the areas of weight management, health and wellness, and sports performance."[7]  Herbalife sells its product through a "direct selling business model" which relies in part on a network of "distributors."[8]  In support of this business, Herbalife and some of its distributors organize and conduct "events" that "provide updates on product education, sales and marketing training, and instruction on available tools."[9]  While some of these events are organized and financed at the corporate level by Herbalife, others are organized and financed by distributors.[10]

---

[7]   Herbalife 2019 Annual Report at page 5.  In addition to distributors, Herbalife has "preferred members" who purchase Herbalife product at discounted prices as customers for their own use but do not pursue the business opportunity of selling products.  Herbalife 2019 Annual Report at page 7; Deposition of Robert Bogard (Herbalife Senior Director of North American Sales & Strategy) Volume 1 dated September 25, 2019 ("Bogard Deposition") at pages 32-33.

[8]   Herbalife 2019 Annual Report at page 7.

[9]   Herbalife 2019 Annual Report at page 8.

[10]   Declaration of Bob Bogard (Herbalife Senior Director of North American Sales & Strategy) filed December 20, 2019 ("Bogard Declaration") at paragraphs 3 and 13.

### B.     Plaintiff Allegations

11.     The Plaintiffs in this case are three former distributors.[11]  The Plaintiffs describe Herbalife events as "Circle of Success events" and allege, *inter alia*, that "events are pitched as the guaranteed pathway to attaining life changing financial success" but that "there is no correlation between financial success and event attendance" and that "if Herbalife told the truth . . . no reasonable person, including Plaintiffs, would have attended Circle of Success events, paid for tickets to Circle of Success events, and paid for incidental expenses (such as hotel and airfare) to attend Circle of Success events."[12]  The Plaintiffs state that they "seek damages and injunctive relief against the corrupt organization of individuals and entities who sell, operate, and compel participation in the Circle of Success."[13]

12.     The Plaintiffs seek to "certify a class defined as: All persons who purchased tickets to and attended at least two Circle of Success events from 2009 until the present, in pursuit of Herbalife's business opportunity."[14]  They state that the "damages model proposed here is simple: Plaintiffs are seeking recovery of the money they spent purchasing tickets to, and attending, events."[15]  I am informed that the Plaintiffs have not provided any expert or other analysis to date supporting the validity of this proposed damages model.  I understand that Plaintiffs may submit such a report contemporaneously with the service of my report.

---

[11]  Amended Complaint at paragraphs 16-19.  I understand that Jeff Rodgers, a fourth Plaintiff listed in the Amended Complaint, is now deceased.

[12]  Amended Complaint at paragraphs 4 and 9.

[13]  Amended Complaint at paragraph 11.

[14]  Motion for Class Certification at page 2.

[15]  Plaintiffs' Reply in Support of Class Certification at page 8.

C.   **Herbalife Events**

13.   Both corporate events and distributor-run events are available to distributors.  Corporate events are financed by Herbalife and often organized by Herbalife.  Distributor-run events are planned and organized by local distributors.[16]

14.   There are multiple types of corporate events that occur over the year.  The content of these events varies across events and has varied over time.[17] According to Bob Bogard, Senior Director of North American Sales & Strategy at Herbalife, Herbalife has sponsored over 500 corporate events since January 2009.[18]

(a)   *Kickoff events* occur at the beginning of the calendar year.[19]  They take place over one or two days and "focus on planning and promotions for the upcoming year."[20]  Herbalife pays for some of the costs of Kickoff events and distributors who organize them collect the revenues.[21]

(b)   *Leadership Development Weekends ("LDWs")* focus on "business opportunity training" and occur in the spring and the fall.[22]  These are organized by Herbalife and multiple such events occur at different locations ("50 to 60" per year).[23]

---

[16]   Declaration of Tommy Gioiosa (Independent Herbalife Distributor who helped plan and organize Success Training Seminars) filed December 20, 2019 ("Gioiosa Declaration") at paragraph 3.

[17]   Bogard Declaration at paragraphs 7 and 11.

[18]   Bogard Declaration at paragraph 3.

[19]   Bogard Deposition at page 98.

[20]   Bogard Declaration at paragraph 7.

[21]   Bogard Declaration at paragraph 7.

[22]   Bogard Declaration at paragraphs 3 and 9; Bogard Deposition at page 101.

[23]   Bogard Declaration at paragraph 3.

   (c) *A Future President's Retreat* occurs once a year and provides "advanced training" for those who have obtained certain royalty thresholds.[24]

   (d) An *Extravaganza* occurs once a year and typically includes speeches by Herbalife employees and distributors.[25]

  15. There are also numerous events that are organized and financed by distributors.[26]

   (a) *Success Training Seminars ("STSs")* are locally organized and "in any given month, there can be anywhere from 150 to 175 STS events in different cities around the United States, each of which is organized by a different distributor."[27] These provide "training and advice" and often feature speakers and presentations.[28]

   (b) *Herbalife Opportunity Meetings ("HOMs")* focus on providing information about the Herbalife business opportunity and are locally organized and run by distributors.[29]

---

[24] Bogard Declaration at paragraph 10; Bogard Deposition at page 104.

[25] Bogard Declaration at paragraph 8; Bogard Deposition at page 103.

[26] Bogard Declaration at paragraph 13.

[27] Bogard Declaration at paragraph 17.

[28] Gioiosa Declaration at paragraph 5.

[29] Deposition of Ibelis Montesino (Herbalife Senior Vice President and Managing Director of North America who manages sales and marketing) dated September 27, 2019 ("Montesino Deposition") at page 132; Bogard Deposition at page 105. Bogard Declaration at paragraph 13. Some Herbalife corporate events include a "HOM." Bogard Deposition at pages 109-110.

## III. ECONOMIC EVALUATION OF PLAINTIFFS' PROPOSED DAMAGES METHOD

### A. Economic Fundamentals of Damages Calculations

16. A proper calculation of economic damages requires a description of what economists call a "but-for" scenario.[30] The but-for world implies a set of economic values—such as quantities or prices—that would have prevailed "but-for" the alleged wrongful conduct at issue. These but-for values become the basis for calculating damages. In other words, the but-for world describes the economic environment that would have prevailed in the absence of the alleged wrongful conduct. Any excess of these "but-for" values above the actual value obtained by a Plaintiff represents damages.

17. A proper economic damages analysis begins with the allegations made by the Plaintiff(s) and an understanding of the proper legal measure of damages. In this case, the Plaintiffs raise two separate claims of economic losses ("damages"): (i) Restitution for their claim under California Unfair Competition Law ("UCL"),[31] and (ii) Compensatory damages under their claims of Racketeering and Negligent Misrepresentation.[32] Below I consider both of the Plaintiffs' claims of economic losses (restitution and compensatory damages), the "but-for" scenario under these claims, and the requirements of a damages model that can determine whether class members were harmed and, if so, the amount of such economic harm

---

[30] Economists typically evaluate the financial position of a Plaintiff "but-for" the allegedly wrongful act or acts of a Defendant in order to calculate damages. *See, e.g.*, Mark Allen, Robert Hall, and Victoria Lazear, "Reference Guide on Estimation of Economic Damages," *Reference Manual on Scientific Evidence*, Federal Judicial Center, Third Edition, 2011 ("Hall, *et al.*, 2011") at page 432.

[31] Amended Complaint at paragraph 239.

[32] Amended Complaint at paragraphs 225, 229, and 243. Plaintiffs seek a damages award equal to treble the alleged compensatory damages amount.

on a classwide basis.  In order to avoid confusion, I will refer to "Restitution Damages" for the UCL claim and "Reliance Damages" for the Racketeering and Negligent Misrepresentation claims.[33]

### B.    Restitution Damages

18.    I am informed that the proper legal measure of restitution in this case is a "price premium," which is "the difference between the market price actually paid by consumers and the true market price that reflects the impact of the [alleged] unlawful, unfair, or fraudulent business practices."[34]  The "true market" price represents the "but-for" economic value described above.

19.    In this case, the Plaintiffs seek "recovery of the money they spent purchasing tickets to, and attending, events."[35]  Thus, with regard to event ticket prices, Plaintiffs seek the actual full price of their tickets for restitution with no deduction for the "true market price that reflects the impact of the [alleged] unlawful, unfair, or fraudulent business practices."  This proposed method amounts to a "full refund" of all event ticket purchases to all putative class members under the extreme assumption that these purchases generated no value for any event.[36]

---

[33]  I use the term "Restitution Damages" in the economic sense and understand that, under the law, Plaintiffs are not entitled to "damages" under a UCL claim.  In assessing restitution below, I use the definition provided to me by counsel.

[34]  *Werdebaugh v. Blue Diamond Growers*, No. 12-2724, 2014 WL 2191901 at *22 (N.D. Cal. May 23, 2014) at page 16; *Wendy Chowning v. Kohl's Department Stores, Inc., et al.*, United States Court of Appeals for the Ninth Circuit, Memorandum filed June 18, 2018; "Reliability of 'Price Premium' Calculations in Class Actions," Jon Tomlin, *Law360*, October 10, 2017 ("Tomlin 2017").

[35]  Plaintiffs' Reply in Support of Class Certification at page 8.

[36]  *See, e.g.*, *Wendy Chowning v. Kohl's Department Stores, Inc., et al.*, United States Court of Appeals for the Ninth Circuit, Memorandum filed June 18, 2018 at paragraph 3.

Moreover, the costs that putative class members paid to attend events, aside from event tickets (such as travel expenses and hotel rooms), were not incurred in exchange for products or services sold by Herbalife and, therefore, I am informed are not recoverable by the Plaintiffs as restitution.[37]  Similarly, I am advised that, because the distributors who sponsored the relevant events are not defendants in this case, ticket revenues that they received from these distributor-run events may not be recovered from Herbalife in this case.

20.     Plaintiffs' proposed full refund calculation can only be an appropriate calculation of restitution if none of the events for which the Plaintiffs seek restitution had any economic value for any putative class member.  If, instead, the event ticket purchased by a putative class member had a value at least equal to the ticket price they paid, then this putative class member sustained no economic harm (and no restitution loss).  If the event ticket purchased by a putative class member had any economic value (even if less than the price paid by that putative class member) then Plaintiffs' "full refund" method would overcompensate that class member and not properly measure restitution.

21.     The Plaintiffs have not provided any economic support for the assumption that no putative class member received any economic value for any of the events they attended.  Even assuming that Plaintiffs' allegations are true, it is highly likely that some of the events at issue had economic value (and it may be the case that many or most had economic value).

22.     The Plaintiffs have not clearly articulated the "but-for" scenario for their proposed damages method.  For example, is it that Herbalife and/or its distributors should have provided particular information regarding its events to attendees before the events (and, if so, what information)?  Is it instead, that Herbalife and/or its distributors should never have made particular statements at the

---

[37]  I have no legal opinions on this or any other legal issue in this case.

events and/or presented particular materials at the events (and, if so, what statements and events)?  Different assumptions regarding the "but-for" scenario can lead to different determinations as to whether a putative class member sustained any economic injury and, if so, the amount.  Moreover, different determinations of what, if any, conduct was wrongful by the finder of fact could lead to different determinations of whether particular class members were injured and, if so, the amount.

23.     Plaintiffs allege, *inter alia*, that "Herbalife has a duty to disclose that increased event attendance does not lead to increased success at Herbalife, and/or that Herbalife is unaware of any correlation between a distributor's event attendance and financial success."[38]  For purposes of assessing Plaintiffs' proposed damages calculation, I will assume that the Plaintiffs are alleging a "but-for" scenario in which Herbalife should have made some disclosure to event participants either that: (a) "event attendance does not lead to increased success at Herbalife," or (b) "Herbalife is unaware of any correlation between a distributor's event attendance and financial success."

24.     Assessing whether or not an individual putative class member sustained economic injury in this case (and the amount of any restitution), requires determining the prices that would have prevailed for each Herbalife event in the counterfactual "but-for" scenario in which Herbalife disclosed to event participants either that event attendance "does not lead to financial success" or that Herbalife is "unaware" of any correlation between event attendance and financial success.  It cannot be presumed that the price of all events in this scenario would be zero (*i.e.*, that they had no value—the basis of the Plaintiffs' proposed calculation).

25.     Market prices are determined by demand, costs, and competitive

---

[38]  Amended Complaint at paragraph 222.

conditions, as well as by pricing strategies.[39]  In this case, determining the price of an event that would have existed in the "but-for" scenario requires examining each of these factors for each event at issue.  With regard to demand, the impact on the prices of events, if any, of a disclosure by Herbalife regarding event attendance and financial success would depend upon how this impacted what economists call the "willingness to pay" of potential event attendees for each event.  With regard to costs, it would require examining Herbalife and distributor costs for each event.  Finally, with regard to competitive conditions/pricing strategy, it would require examining how Herbalife's pricing strategy (and that of distributors) would have been impacted, if at all, by such disclosures for each event.  Herbalife did not price its events based on profit maximization for these events.  Rather, it subsidized the costs of its corporate events (*i.e.*, priced them below costs) and incurred costs for distributor events but let distributors keep the revenues.[40]

26.     Thus, determining whether or not an event has no economic value in this case is a complex economic question.  It cannot simply be assumed.  Plaintiffs' full refund restitution damages calculation presumes that the "but-for" price of all events (thousands of them) would have been zero but provides no basis for such an assumption.  Not only is such an assumption unsupported by the required economic analysis in the Plaintiffs' Amended Complaint, Motion for Class Certification, and Reply in Support of Class Certification, it is highly unlikely to be true.  In other words, it is highly likely that some (and perhaps many, most, or even all) events would have had a positive economic value even if Herbalife had made a disclosure regarding financial success.

---

[39]  Tomlin 2017.  *See also*, "Valuation of Patented Product Features," Greg Allenby, Jeff Brazell, John Howell, and Peter Rossi, *Journal of Law and Economics*, vol. 57, August 2014, at page 630.

[40]  Bogard Deposition at page 120, 131; Bogard Declaration at paragraph 7

27.     On the demand side, there are several reasons why individual attendees could have been willing to pay for a ticket to a specific event following a disclosure by Herbalife that there was either no correlation between event attendance and financial success at Herbalife or that Herbalife did not know whether or not there was such a correlation:[41]

(i)     Events often provided goods with positive economic value—such as meals, entertainment, and Herbalife products.[42]

(ii)     Some of the events included what economists call "non-firm-specific" training, meaning training that may have value outside of Herbalife such as training on regulations and money management.[43]

(iii)     There was a social and networking aspect of the events (including parties) which some event participants found fun.[44]

(iv)     If the disclosure by Herbalife was that it was unaware of any correlation between attendance and financial success, it still may have been economically rational for some attendees to be willing to pay for an event ticket based on the possibility of it leading to increased financial success at Herbalife (even if that success was uncertain).

28.     At least one of the named Plaintiffs in this case, Patricia

---

[41]   In economic terminology they could have had a positive "willingness to pay."

[42]   Montesino Deposition at pages 41 and 159; Bogard Declaration at paragraph 6.

[43]   Bogard Deposition at pages 127-128; Montesino Deposition at pages, 47, 139-140; Deposition of Thomas Gioiosa (Independent Herbalife Distributor who helped plan and organize Success Training Seminars) dated October 10, 2019 at pages 107-110, 248; Deposition of Patricia Rodgers dated September 21, 2019 ("Rodgers Deposition") at pages 79-80; Bogard Declaration at paragraph 6.

[44]   Rodgers Deposition at pages 79-80; Deposition of Jennifer Ribalta dated August 29, 2019, at page 59.

Rodgers, testified that she found value in attending events for several years.[45]  In addition, many putative class members continued to attend numerous events (and, therefore, pay for tickets) over an extended time period (presumably after they had an opportunity to view the event content and see if it had any impact on their own business).  In addition, Herbalife charged similar prices for events after the initial Complaint in this case (it did not reduce prices to zero).  Thus, attendees continued to choose to pay similar prices for events even after Plaintiffs' allegations that there was no correlation between financial success and events was public information.[46] These are also factors supporting the conclusion that some (and perhaps, many, most, or all) events had a positive economic value.

29.     In addition to the demand side, Herbalife incurred costs for its events and in supporting some distributor-led events as well.[47]  Distributors presumably also incurred costs in holding events.[48]  Other things equal, these costs would also tend to lead to positive prices for some events in the "but-for" scenario.

30.     Finally, the large number of different types of events, in different locations, and in different time periods makes it unlikely that none of the events at issue had any value.  According to Bob Bogard, Senior Director of North American Sales & Strategy at Herbalife, there have been approximately 540 corporate events

---

[45]  Rodgers Deposition at pages 81-82.

[46]  Herbalife's Responses to Plaintiff Jennifer Ribalta's Second Set of Interrogatories dated September 13, 2019, Exhibit 1 (showing ticket prices). Plaintiffs' allegations involving Herbalife and distributor events has been publicly available information since at least August of 2018.  *See*, Curt Anderson, "Herbalife Distributors Claim in $1B Suit Events Were a Sham," *Associated Press*, August 21, 2018.  Data on Herbalife events shows numerous attendees who attended events both before and after this date.  *See* HLF_034754.

[47]  Bogard Deposition at page 120, 131; Bogard Declaration at paragraphs 6 and 7.

[48]  Montesino Deposition at page 151.

and 2,200 distributor-run events since January 2009 (the beginning of the proposed class period).[49]  In order for Plaintiffs' full refund calculation to be a proper measure of restitution it would have to be the case that none of these events would have had any economic value in the "but-for" scenario.

31.    Determining restitution in this case would involve an individualized analysis based on specific events.  In other words, an individualized analysis would be required to determine whether or not a full refund was an appropriate measure of damages; whether a partial refund was more appropriate; or whether an individual putative class member received a value for the events they attended equal to or greater than their ticket price (and, therefore, suffered no economic injury under a restitution measure).  This conclusion holds even if one accepts Plaintiffs' argument that Herbalife's messaging regarding the correlation between event success and financial success was consistent across different events.[50] This is because, even if the messaging by Herbalife was the same or similar across events, the events themselves differed in terms of location, when they were held, their duration, what speakers were at the event, the topics at the event, their price, whether they were corporate events or distributor-led events, who was allowed to attend, whether Herbalife products were provided, whether entertainment was provided, and whether a meal or meals were provided (and what those meals were).[51]  In terms of economics, this means that the demand and costs likely differed

---

[49]  Bogard Declaration at paragraphs 3 and 17.

[50]  Amended Complaint at paragraph 199.

[51]  Herbalife's Responses to Plaintiff Jennifer Ribalta's Second Set of Interrogatories dated September 13, 2019, Exhibit 1 (ticket prices); Bogard Declaration at paragraphs 4-11, 13, and 17-19; Gioiosa Declaration at paragraph 5; Declaration of Jorge de la Concepcion (Independent Herbalife Distributor who helped plan and organize Success Training Seminars) filed December 20, 2019, at paragraph 5; Montesino Deposition at p. 148.

between events and the expected price, therefore, differed as well.

## C. Reliance Damages

32.     In addition to seeking restitution under their Unfair Competition Law claim, Plaintiffs' seek compensatory damages under their counts for Racketeering and Negligent Misrepresentation.[52]  Once again, the Plaintiffs' have not clearly articulated what they perceive to be the counterfactual "but-for" scenario underlying their proposed damages calculation based on a full ticket refund and, in the case of compensatory damages, other expenses related to attending events. However, they have stated that "Plaintiffs relied on the representations made by Herbalife at Circle of Success events and were harmed when they expended substantial money, time, and effort attending those events."[53]  Thus, for purposes of assessing the Plaintiffs' proposed compensatory damages calculation, I assume that they are proposing a "but-for" scenario in which Herbalife either did not make specific claims related to events or provided additional information on these events related to the relationship between events and financial success.[54]  In this but-for scenario, the Plaintiffs' presumably are assuming that putative class members would not have attended any events.

33.     The compensatory damages scenario I presume the Plaintiffs are proposing is sometimes labeled "Reliance" damages.  Reliance damages can be defined as being based on a scenario in which the plaintiff is "restored to the same position as if the relationship with the defendants' misrepresentation (and resulting harm) had not existed in the first place."[55]  Plaintiffs' proposed damages theory

---

[52]  Amended Complaint at paragraphs 225, 229, and 243.

[53]  Amended Complaint at paragraph 243.

[54]  If the Plaintiffs' later specify a damages framework and that framework differs from my assumption, I understand that I may be asked to evaluate that framework.

[55]  Hall, *et al.*, 2011 at page 433.

would be appropriate for an individual class member under this measure only if in the absence of Herbalife's alleged misrepresentations about events they would not have attended that event *and* they did not obtain any economic benefit from attending that event.  If a putative class member would have purchased a ticket and attended an event "but-for" the alleged wrongful conduct in this case (and incurred the same attendance expenses), then the alleged wrongful conduct did not cause them economic injury under this reliance measure.  If a putative class member received any economic value from event attendance, then Plaintiffs' proposed calculation overstates damages by not offsetting ticket expenditures and travel expenses by this economic value.

34.     The Plaintiffs' have not provided any economic support to date for the assumption that none of the putative class members would have attended events in the absence of Herbalife's allegedly wrongful conduct in this case.  They also have not provided any support for the proposition that no putative class members received any economic value from their attendance.  It is highly likely that both of these assumptions are inaccurate.  As explained above, there are multiple factors that could have led to a positive "willingness to pay" for some class members regardless of any allegedly wrongful conduct.  These include receiving products, meals, non-firm specific training, and social opportunities.  Moreover, there were thousands of different events within the proposed class period and, for the Plaintiffs' reliance damages model to be valid, it would have to be the case that none of these events would have led to attendance and none provided any economic value to the individuals who attended them.

35.     Like a restitution measure of economic harm, determining whether an individual sustained any economic harm under a compensatory damages standard and the extent of that harm also would require an individualized analysis under the Plaintiffs' theory.  Determining whether or not an individual likely would have attended a particular event would depend on the particulars of that event.

17

1  Determining whether an individual received any economic value from attending an

2  event (which might be conferred through, *e.g.*, products or meals that were

3  received), and how much value he or she received, also would require an

4  individualized inquiry into specific events.  Finally, determining whether the travel

5  expenses incurred by an individual putative class member conferred any economic

6  value would require individually examining the expenditures of that individual and

7  determining whether the individual received any economic value apart from

8  attending an event (*e.g.*, as part of a vacation or visiting friends or family).

9  **IV.   CONCLUSION**

10         36.     Based on my analysis of this case, I have the following opinions:

11         (a)     With regard to restitution damages, Plaintiffs' proposed

12  damages calculation would provide a "full refund" to putative class members.[56]

13  I am informed that, in order to establish that a "full refund" is applicable in this case,

14  the Plaintiffs must demonstrate that they did not receive any value for the tickets

15  they purchased.  Plaintiffs have not provided any economic support for the

16  conclusion that class members did not receive any value from their event ticket

17  purchases.[57]  Some (and perhaps many, most, or all) events provided valuable

18  products and/or services to attendees in addition to the content of the events

19  themselves, including products, meals, and entertainment.

20         (b)     With regard to compensatory damages (also called

21  "reliance damages"), Plaintiffs' proposed method assumes that, absent the allegedly

22

23  ───────────────

[56]  As indicated above, I refer to the term "damages" in an economic sense.

24  I understand that, under applicable UCL law, Plaintiffs are entitled to restitution but

    not "damages."

25

26  [57]  I am referring to the information provided by the Plaintiffs in their Amended

    Complaint, Motion for Class Certification, and Reply in Support of Class

27  Certification.  If the Plaintiffs provide further information about their proposed

28  damages method, I understand that I may be asked to evaluate that information.

wrongful conduct in this case, no putative class members would have chosen to attend an event.  It also assumes that the events, and the travel expenses incurred by all putative class members and for all events, have no value.  The Plaintiffs provide no support for these strong assumptions.  It is highly likely that these assumptions are inaccurate for some (and perhaps many, most, or all) putative class members.

(c)     Determining the value any putative class member received for an event ticket they purchased would require individualized analysis.  As a matter of economics, it cannot merely be presumed that none of the events had any value.

(d)     Determining the costs incurred by putative class members for travel to and from events and the value, if any, such putative class members obtained from such travel outside of event attendance is also inherently individualized.

37.     I may update and/or revise this analysis should further information be provided to me.  I understand that, if the Plaintiffs provide any expert analysis related to their proposed damages calculation, I may be asked to perform an economic evaluation of that analysis.

DATED:  January 11, 2021


_____
Jonathan T. Tomlin, Ph.D.

# EXHIBIT 1

EXHIBIT 1

**ankura**
COLLABORATION DRIVES RESULTS

## JONATHAN T. TOMLIN, Ph.D.
Senior Managing Director

## Economist; Expert Witness

515 S. Flower Street, Suite #3500
Los Angeles, CA  90071

+1.213.670.3200 Main
+1.213.670.3221 Direct

jon.tomlin@ankura.com

Jon Tomlin, Senior Managing Director, has performed economic and statistical analysis of complex damages issues for over twenty-five years. Jon has evaluated economic damages in cases involving alleged false advertising, mass torts, class certification, antitrust, breach of contract, fraud, and intellectual property.  He has also published numerous articles on the application of economic principles to legal issues and has testified as an expert witness for cases in state and federal court.

**EDUCATION**

Ph.D., Economics, University of California, Los Angeles, 1994

M.A., Economics, University of California, Los Angeles, 1991

B.A., Economics, University of Pennsylvania, College of Arts and Sciences, Philadelphia, PA, 1989

**HONORS AND AWARDS**
UCLA President's Fellowship, 1989-1993

**AFFILIATIONS**
American Economic Association

National Association of Business Economists

Licensing Executives Society

American Finance Association

National Association of Certified Valuation Analysts, Economics Instructor

B.E. Journal of Economic Analysis & Policy, Referee

Journal of Forensic Economics, Referee

Fields of Concentration

- Industrial Organization

- Antitrust Economics

- Intellectual Property

- Corporate Finance

Experience includes:

- Ankura Consulting
  *2018-present*

- Navigant Consulting
  *2010-2018*

- LECG, LLC
  *Principal, 2003-2010*
  *Senior Managing Economist, 1998-2002*

- Capital Economics
  *Economist, 1998*
  Provided economic analysis for projects involving law and economics.

**23**

**JONATHAN TOMLIN,** Ph.D**.**

- Economic Analysis Corporation
  *Senior Economist, 1996-1997*
  Provided economic and statistical analysis for projects involving questions in the areas of industrial organization, antitrust, intellectual property, and corporate finance.

- Micronomics, Inc.
  *Economist, 1994-1996*
  Provided economic and statistical analysis for litigation consulting and regulatory issues.

- University of California, Los Angeles, Department of Economics
  *Teaching Assistant, 1993-1994*
  Taught Intermediate Microeconomics to undergraduates.

  *Research Assistant, 1992-1993*
  Provided research support for economics faculty.

- Econalysis, Inc.
  *Research Assistant, 1992-1994*
  Provided research support for litigation.

- Brinton Economics
  *Research Assistant, Summer 1987*
  Collected and analyzed data in support of damages calculations for litigation.

**Books**

- "Hicks-Marshall Conditions and Defining Antitrust Markets for Intermediate Goods," with Georgi Giozov, James Langenfeld, and David Weiskopf, Research in Law and Economics, Chapter 3, Volume 27 (2015).

- "Manufacturing Input Markets," with James Langenfeld, William Nye, and Louis Silvia, Market Definition in Antitrust: Theory and Case Studies, American Bar Association, 2012, Chapter II.

**Peer-Reviewed Research**

- "The Impact of Smoking Bans on the Hospitality Industry: New Evidence from Stock Market Returns," The B.E. Journal of Economic Analysis & Policy: Vol. 9: Iss. 1 (Contributions), Article 13 (2009).

- "Expert Testimony, Daubert, and the Determination of Damages," with David Cooper, Review of Law & Economics: Vol. 4: Iss.1, Article 11 (2008).



**24**

**JONATHAN TOMLIN,** Ph.D**.**

- "Junk Forecasts in the Courtroom?: Assessing the 'S' Curve Approach to Calculating Damages," with C. Paul Wazzan, Journal of Forensic Economics, Volume XIX, Number 3, Fall 2006.

- "Distinguishing the Legal from the Illegal in Antitrust Damages Calculations: Lessons from Netscape v. Microsoft," Journal of Forensic Economics, 17 (2), 2004.

- "How Mergers Affect Competitors," Ph.D. dissertation, University of California, Los Angeles, 1994.

**Law Reviews**

- "The Accuracy and Manipulability of Lost Profits Damages Calculations: Should the Trier of Fact be 'Reasonably Certain'?," with David Merrell, Transactions: The Tennessee Journal of Business Law, Volume 7, Number 2, 2006.

- "Federalism and the Indirect Purchaser Mess," with Dale J. Giali, George Mason Law Review, Volume 11, Number 1, Fall 2002.

**Magazines, Newsletters, and On-Line Publications**

- "College Refund Class Actions Face Damages Hurdles," with Hassan Faghani, Law360, July 27, 2020.

- "Durational Disconnect Between Cartel Pleas and Class Certs.," Law360, August 9, 2019.

- "Product Labeling Class Actions – Identifying the 'Con' in Conjoint Surveys," with Robert Zeithammer, Bloomberg Law, November 1, 2018.

- "One Size Doesn't Fit All in Product Labeling Class Actions," Law360, June 15, 2018.

- "Two 'Pass-Through' Hurdles for Indirect Purchaser Plaintiffs," Law360, February 14, 2018.

- "Reliability of 'Price Premium' Calculations in Class Actions," Law360, October 10, 2017.

- "Early Lessons from the DOJ Auto Parts Investigation," with Chris Ring, Law360, July 14, 2017.

- "Class Certification and Economic 'Argle Bargle'," Law360, December 16, 2015.

- "Why Didn't Raids Stop Price-Fixing in the Auto Industry?," Law360, July 21, 2015.

- "Calculating 'Pass-Through' Rates in Price-Fixing Cases – What's in the Economist's Toolbox?," The Meeting Place, Newsletter of the ABA Section of Antitrust Law Joint Conduct Committee, Winter 2014.

- "The Demise of the 25% Rule," with Mohan Rao, Intellectual Asset Management, Issue 47, May/June 2011.



**JONATHAN TOMLIN,** Ph.D.

- "Comcast-NBC and the Regulatory Road to Nowhere," TheStreet.com, May 5, 2010.

- "Civil Conspiracy Claims and the Economics of Collusion," with Daniel Ingberman and Christopher Loos, American Bar Association Mass Torts Litigation Committee Newsletter, Summer 2009.

- "The Economic Impact of Smoking Bans," Forbes.com, June 4, 2009

- "Examining Expert Witness Testimony and Judicial Gatekeeping: Insights from Game Theory," with David Cooper, Mealey's Daubert Report, Volume 13, Issue #1, January 2009.

- "Mars v. Coin Acceptors and the 'Hypothetical Negotiation' Approach to Reasonable Royalty Calculations," IP Remedies, American Bar Association, Intellectual Property Litigation Committee, July 2008.

- "Unprofessional Economic Testimony: Why It is a Problem and How Technical Advisors Can Help," with David Cooper, American Bar Association Section of Antitrust Law Economics Committee Newsletter, Volume 7, Number 2, Fall 2007.

- "Recognizing Damages Manipulation: Tips for Putting Barbed Wire on the Daubert Gate," The Committee on Commercial & Business Litigation Newsletter, American Bar Association, Vol. 8, No. 3, Spring 2007.

- "Infringed Tech: Antitrust Responses in Such Suits Ride on Market Power," Legal Times, April 2000.

- "Big Price Fixing Cases: Will Indirect Purchasers Be Able to Recover Damages?," Perspectives, January 2000.

- "Current Methods of Evaluating Vertical Mergers and the Obsolescence of the 1984 Merger Guidelines," Private Antitrust Litigation News, American Bar Association, Spring 1999.


**Presentations**

- "Classwide Damage Models in Misleading and False Advertising Consumer Class Actions," Strafford Publications webinar, May 2020.

- "Antitrust Economics: Fundamental Concepts Practitioners Need to Know," California Lawyers Association webinar, January 28, 2020.

- "Viewpoints on UCL Trends and Developments," California Lawyers Association Annual Meeting, October 2019.

- "Classwide Damage Models in Misleading and False Advertising Consumer Class Actions," Strafford Publications webinar, May 2019

- "Damages Models in Food Labeling Class Actions," ABA Section of Litigation, Consumer Litigation Committee, February 2019.



**JONATHAN TOMLIN,** Ph.D**.**

- "The Georgia-Pacific Factors:  Are They Useful?," Utah IP Summit, February 2016.

- "Econometrics or Just a Con?: Uses and Abuses of Data and Statistics in Competition Cases," Los Angeles County Bar Antitrust Section, May 2015.

- "Clayworth v. Pfizer, Inc. Rejected the Pass-on Defense, or Did It?," Los Angeles County Bar Antitrust Section, March 2011.

- "The Comcast/NBC Merger: Frightening Media Consolidation or Good for Consumers?," Los Angeles County Bar Association Antitrust Section, May 2010.

- "Setting the Bounds of Section 2 Liability: Understanding linkLine and its Potential Implications," Los Angeles County Bar Association Antitrust Section, November 2008.

- "Economics at the Intersection of Antitrust and Intellectual Property," Los Angeles County Bar Association Antitrust Section, September 2002.

- "How Federal and State Laws Can Fail to Work Together: The Economics of Indirect Purchaser Laws," George Mason Law Review Antitrust Symposium, May 2002.

**Expert Reports and Testimony**

- Will Kaupelis and Frank Ortega, individually and behalf of all others similarly situated v. Harbor Freight Tools, USA, Inc.  Central District of California.  Expert Declaration, Deposition Testimony. 2020.

- Vivian Deveroux, on behalf of herself and others similarly situated v. Apple, Inc.  Superior Court of the State of California, County of Santa Clara.  Deposition Testimony.  2019.

- Megan Schmitt et al. v. Younique, LLC.  United States District Court. Central District of California. Expert Report.  2018.

- Claudine Macaspac, on behalf of herself, all others similarly situated, and the general public v. Henkel Corporation.  United States District Court, Southern District of California.  Expert Report. 2018.

- Paramount Petroleum Corporation v. International Surfacing Systems, VSS International, Inc., and Manhole Adjusting, Inc., Superior Court for the State of California, County of Sacramento. Deposition Testimony.  2016.

- California Crane School, Inc. et al. v. National Commission for the Certification of Crane Operators, et al., Superior Court for the State of California, County of Tuolumne.  Expert Declaration, Deposition Testimony.  2015.

- Apumac, LLC; Apple in Bulk, Inc. v. Flint Hills International, LLC, et al., United States District Court, Central District of California.  Expert Report.  2015.

- Waterfield Technologies, Inc. v. BofI Federal Bank.  United States District Court, Southern District of California.  Expert Declaration. 2015.

**JONATHAN TOMLIN,** Ph.D.

- Puppies 'N Love, d/b/a of CPI, Inc.; Frank Mineo; and Vicki Mineo v. City of Phoenix, United States District Court, District of Arizona.  Expert Report, Deposition Testimony. 2014.

- Cynthia E. Spann, Individually and on Behalf of Others Similarly Situated v. J.C. Penney Corporation, Inc., United States District Court, Central District of California.  Expert Declaration, Deposition Testimony. 2013.

- Eastman Kodak Company v. Altek Corporation, United States District Court, Southern District of New York.  Expert Declaration. 2013.

- Maria Torres, Gabriel Rojas, and Ian Kerner, individually and on behalf of all others similarly situated v. J.C. Penney Corporation, Inc., United States District Court, Northern District of California.  Expert Declaration. 2013.

- Source Health Analytics, Inc. et al. v. SDI Health, LLC, et al., Court of Common Pleas, Philadelphia County.  Expert Report. 2012.

- Promega Corporation et al. v. Life Technologies Corporation, Applied Biosystems, LLC, and Invitrogen IP Holdings, Inc., United States District Court, Western District of Wisconsin.  Expert Report, Deposition Testimony. 2011.

- Ammari Electronics, Mehdi Ammari, Framer's Workshop, on behalf of themselves and all other similarly situated v. Pacific Bell Directory, et al., Superior Court, State of California. Expert Report, Deposition Testimony. 2008.

- Guild, Inc. v. J.C. Penney Corporation, Inc., United States District Court, Central District of California, Southern Division.  Expert Report, Deposition Testimony, Trial Testimony. 2004.

- Asphalt Busters, Inc. v. Chemical Lime Company, United States District Court, District of Arizona. Expert Report. 2003.

- National Guardian Life Insurance Company v. Crestar Securities Corp., United States District Court, Western District of Wisconsin.  Expert Report. 1998.

- Summit Family Restaurants Inc., HTB Restaurants Inc., and CKE Restaurants Inc. v. HomeTown Buffet Inc., and Buffets Inc., U.S. District Court, District of Utah, Central Division.  Expert Report, Trial Testimony. 1996.



# EXHIBIT 2

**EXHIBIT 2**

**MATERIALS CONSIDERED**

**A.**   **Case Filings**

1.   Amended Complaint filed November 12, 2019

2.   Plaintiffs' Notice of Motion and Motion for Class Certification and Exhibits filed November 25, 2019

3.   Plaintiffs' Reply in Support of Plaintiffs' Motion for Class Certification and Exhibits filed January 13, 2020

4.   Herbalife's Evidentiary Objections in Support of Opposition to Plaintiffs' Motion for Class Certification filed December 20, 2019

5.   Defendant Herbalife's Opposition to Plaintiffs' Motion for Class Certification and Attachments filed December 20, 2019

6.   Herbalife's Request for Judicial Notice in Support of Opposition to Plaintiffs' Motion for Class Certification and Exhibits filed December 20, 2019

**B.**   **Interrogatory Responses**

7.   Herbalife's Responses to Plaintiff Jennifer Ribalta's First Set of Interrogatories dated July 17, 2019

8.   Herbalife's Responses to Plaintiff Jennifer Ribalta's Second Set of Interrogatories and Exhibit dated September 13, 2019

9.   Herbalife's Responses to Plaintiffs' Amended Third Set of Interrogatories to Defendant dated December 23, 2019

10.   Plaintiff Izaar Valdez' Responses to Herbalife's Interrogatories, Set One dated August 20, 2019

11.   Plaintiff Jeff Rodgers' Responses to Herbalife's Interrogatories, Set One dated August 20, 2019

12.   Plaintiff Jennifer Ribalta's Responses to Herbalife's Interrogatories, Set One and Attachment dated August 20, 2019

13.   Plaintiff Patricia Rodgers' Responses to Herbalife's Interrogatories, Set One dated August 20, 2019

### C.     Declarations and Expert Reports

14.     Declaration of Jason Jones and Exhibits filed January 13, 2020

15.     Declaration of Tommy Gioiosa in Support of Herbalife's Opposition to Plaintiffs' Motion for Class Certification filed December 20, 2019

16.     Declaration of Gopi K. Panchapakesan in Support of Herbalife's Opposition to Plaintiffs' Motion for Class Certification and Exhibits filed December 20, 2019

17.     Declaration of Jorge de la Concepcion in Support of Herbalife's Opposition to Plaintiffs' Motion for Class Certification filed December 20, 2019

18.     Declaration of Kimberly Cooper in Support of Herbalife's Opposition to Plaintiffs' Motion for Class Certification and Exhibits filed December 20, 2019

19.     Declaration of Sacha Mauricio Domingo Donovan in Support of Herbalife's Opposition to Plaintiffs' Motion for Class Certification filed December 20, 2019

20.     Declaration of Bob Bogard in Support of Herbalife's Opposition to Plaintiffs' Motion for Class Certification and Exhibits, filed December 20, 2019

21.     Declaration of Jennifer Ribalta filed January 13, 2020

22.     Declaration of Etan Mark and Exhibits filed November 25, 2019

23.     Expert Report of Robert L. Kehr in Support of Herbalife's Opposition to Plaintiffs' Motion for Class Certification and Exhibits filed December 20, 2019

### D.     Produced Materials

24.     HLF_034754

### E.     Public Materials

25.     Allen, Mark, Robert Hall, and Victoria Lazear, Reference Guide on Estimation of Economic Damages," *Reference Manual on Scientific Evidence*, Federal Judicial Center, 3rd Ed., 2011.

26.     Allenby, Greg, Jeff Brazell, John Howell, and Peter Rossi, "Valuation of Patented Product Features," *Journal of Law and Economics*, vol. 57, August 2014

27. Anderson, Curt, "Herbalife Distributors Claim in $1B Suit Events Were a Sham," *Associated Press*, August 21, 2018

28. Herbalife 2019 Annual Report

29. Tomlin, Jon, "Reliability of 'Price Premium' Calculations in Class Actions," *Law360*, October 10, 2017

30. *Wendy Chowning v. Kohl's Department Stores, Inc., et al.*, United States Court of Appeals for the Ninth Circuit, Memorandum filed June 18, 2018

31. *Werdebaugh v. Blue Diamond Growers*, No. 12-2724, 2014 WL 2191901 at *22 (N.D. Cal. May 23, 2014)

32. www.Herbalife.com